# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**CLIMATE UNITED FUND**
7550 Wisconsin Avenue 8th Floor
Bethesda, Maryland 20814

          Plaintiff,

  v.

**CITIBANK, N.A.,**
5800 South Corporate Place
Sioux Falls, South Dakota 57108,

   **and**

**UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY**
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460,

   **and**

**LEE ZELDIN, in his official capacity as
ADMINISTRATOR, UNITED STATES
ENVIRONMENTAL PROTECTION
AGENCY**
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

         Defendants.

**ECF CASE**

No. ___

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.     This case seeks to vindicate the right of Plaintiff Climate United Fund ("Climate United") to access grant funds to which it is legally entitled.

2.     On October 12, 2023, Climate United applied for grant funding from EPA through the National Clean Investment Fund ("NCIF"), a program under the Greenhouse Gas Reduction

Fund ("GGRF"). The grant is intended to support Climate United's efforts to offer financing for critical clean energy projects that accelerate local economic development, save money for American families and small businesses, spur demand for domestic manufacturing, create jobs, and reduce air pollution. After being announced as a grantee in April 2024, Climate United has funded projects across the United States that support domestic clean energy development, build healthy and affordable housing, accelerate American-made electric vehicle manufacturing, and save hard-working Americans money on their bills.

3.      The grant requires Climate United's grant funds to be held at Citibank, N.A. ("Citibank"), under a Financial Agent Agreement ("FAA") between Citibank and the U.S. Treasury Department, and an Account Control Agreement ("ACA") between Citibank, Climate United, and EPA that sets forth the specific details for EPA to exercise "control" as a secured party. EPA contemplated this arrangement from the program's inception—and described it in the original Notice of Funding Opportunity ("NOFO") in July 2023 as critical both to allow recipients to leverage private capital and to "ensure that EPA's interests are protected." EPA designed, structured, and negotiated the FAA and the ACA to provide transparency and accountability. The ACA includes provisions that allow EPA to take exclusive control of the funds at Citibank under certain specified conditions. Unless EPA takes exclusive control of the funds, Citibank must disburse funds to Climate United at Climate United's request.

4.      EPA has never attempted to exercise its right to take exclusive control of the funds through legal means—nor could it, because the preconditions for exercising that right have not occurred.

5.      Nonetheless, EPA's Administrator has made several public statements expressing hostility to the GGRF program. For instance, he stated on national television, without basis, that

"the entire scheme, in my opinion, is criminal." He has also publicly stated that EPA is "not going to rest" until it has "recovered" those funds. On March 4, 2025, he publicly stated that the "money is now FROZEN." EPA has also undertaken behind-the-scenes efforts to cause Citibank to withhold Climate United's funds. These efforts resulted in the public resignation of the Chief of the Criminal Division of the D.C. U.S. Attorney's Office, after more than 24 years in that office, following her refusal to carry out an illegal directive to send a letter to Citibank demanding that it freeze GGRF funds.

6.    These efforts have apparently worked, as Citibank is now refusing to honor Climate United's disbursement requests, despite Citibank's unambiguous contractual obligation to do so. On February 18, 2025, Climate United requested a disbursement of funds in the normal course, as it had done multiple times before. But Citibank did not follow Climate United's instructions, and Climate United has since been unable to access the grant funds to which it is entitled.

7.    Citibank has never articulated any legal justification for its refusal to honor the ACA. None exists. Instead, Citibank says it is waiting for direction from EPA before disbursing any grant funds. But the ACA does not allow Citibank to withhold Climate United's grant funds unless EPA has given notice that it intends to exercise exclusive control over the accounts. EPA has not done so and cannot possibly do so because there is no legal justification for such an action.

8.    EPA has no legal basis for causing Citibank to deny Climate United's disbursement requests. Under the Administrative Procedure Act ("APA"), EPA's de facto suspension or termination of Climate United's grant is arbitrary, capricious, and not in accordance with law. Indeed, EPA has offered no reasoned explanation for its action, which violates multiple statutes and regulations.

9.      To the extent EPA pins the blame on Citibank, Citibank likewise has no legal basis for its actions. By failing to disburse Climate United's grant funds, Citibank is in breach of the ACA and has wrongfully withheld the grant funds that Climate United has an immediate legal right to possess.

10.     Defendants' unlawful actions are causing Climate United to suffer real and immediate harm. Climate United does not have other committed sources of funding to replace the grant funds. Without those grant funds, Climate United will shortly run out of cash to pay operating expenses—it will no longer be able to pay its employees, pay rent, pay critical service providers and contractors, or meet its commitments under the loans and awards it has already approved. In fact, as a result of Defendants' actions, Climate United has already been compelled to defer compensation for certain staff to preserve its available cash, while also confronting increasingly unfavorable terms from essential vendors and prospective deal partners. Failure to honor commitments will erode trust in Climate United as an institution, damage its reputation, and cause profound harm to the local organizations that rely on Climate United funds to develop critical energy projects that reduce energy costs and create jobs.

11.     Climate United's access to its grant funding should be restored. The Court should direct Citibank to adhere to its contractual obligations, and bar EPA from interfering with Citibank's disbursements.

## JURISDICTION AND VENUE

12.     This is an action for declaratory and injunctive relief and replevin based on Citibank's breach of contract and conversion and EPA's violation of the Administrative Procedure Act and the Due Process Clause.

13.    The Court has jurisdiction over Climate United's claims against Defendants EPA and Zeldin under 28 U.S.C. § 1331 and 5 U.S.C. § 702.

14.    The Court has jurisdiction over Climate United's claims against Citibank under 28 U.S.C. § 1367, because those claims are so related to Climate United's claims against EPA that they are part of the same case or controversy.[1]

15.    Venue is proper in this district because EPA is located in this district and a substantial part of the acts or omissions giving rise to the claim occurred in this district. 28 U.S.C. § 1391(e).

## PARTIES

16.    Climate United, a Delaware corporation with its principal place of business in Maryland, is a nonprofit financial institution whose mission is to leverage public and private financing to remove financial barriers to deploying clean energy. Climate United's work aims to unleash American clean energy and build a stronger, more efficient, and more resilient economy that lowers energy costs, creates jobs, improves public health, and benefits every American, while making the United States more competitive, secure, and energy independent.

17.    The Climate United coalition brings together three established nonprofits—Calvert Impact, Community Preservation Corporation, and Center for Community Self-Help ("Self-Help")—that have a combined 120 years of experience managing more than $30 billion in private and institutional capital that has unlocked economic opportunity for communities in all 50 states and territories.

---

[1] Even if EPA was not named as a defendant, the Court would have jurisdiction over Climate United's claims against Citibank under 28 U.S.C. § 1332 because the parties are of diverse citizenship and the amount in controversy exceeds $75,000.

18.     Climate United helps fill market gaps where private capital is missing, bringing the economic benefits of clean energy, electric mobility, and building efficiency projects to overlooked markets. From Arkansas to Alaska, these projects will deliver direct benefits to hard-working Americans and communities in the form of lower energy bills, quality jobs, cleaner air and water, and more secure and reliable energy. Climate United focuses its loans and investments in rural, low-income, and Tribal communities across the country, building demand for clean energy and providing markets for domestic manufacturing. Climate United's investments also mobilize private capital, stretching public dollars to go further: for every dollar invested in a program or project, Climate United estimates up to four dollars of private capital flow into communities.

19.     Defendant Citibank, N.A. ("Citibank") is a national banking association organized and existing under the laws of the United States of America, with headquarters in South Dakota. Citibank is the wholly owned subsidiary of Citigroup, Inc., headquartered in New York.

20.     Defendant EPA is the agency of the federal government of the United States responsible for administering the GGRF and its constituent NCIF program. EPA is an agency within the meaning of the APA.

21.     Defendant Lee Zeldin is the EPA Administrator and the agency's highest ranking official. Climate United sues Administrator Zeldin in his official capacity.

## BACKGROUND

### A.     Congress Establishes the NCIF Program.

22.     In 2022, Congress passed and President Biden signed into law the Inflation Reduction Act. Pub. L. No. 117-169, 136 Stat. 1818. The Act amended the Clean Air Act to authorize the GGRF, which appropriated $27 billion to invest in clean energy in communities across the county. *See* 42 U.S.C. § 7434; *About the Greenhouse Gas Reduction Fund*, EPA,

https://www.epa.gov/greenhouse-gas-reduction-fund/about-greenhouse-gas-reduction-fund    (last updated Feb. 13, 2025).

23.    The statute created this new program to leverage public funds with private capital and catalyze investment into places and projects that support local economic development, much like other government programs such as Small Business Administration loan guarantees, New Market Tax Credits, and Opportunity Zones.

24.    The GGRF essentially establishes "[g]reen banks," which are "financial institutions aimed at overcoming market barriers and scaling up investment in low-carbon technologies and climate-resilient infrastructure." Cong. Rsch. Serv. IN12090, *EPA's Greenhouse Gas Reduction Fund* (updated Feb. 14, 2023), https://crsreports.congress.gov/product/pdf/IN/IN12090.  Green banks are generally used "to deliver projects that are not sufficiently met by other financial markets." *Green Banks*, EPA, https://www.epa.gov/statelocalenergy/green-banks (last updated Jan. 24, 2025).

25.    Specifically, Section 134(a)(2) of the Inflation Reduction Act appropriated to the EPA Administrator $11.97 billion "to make grants, on a competitive basis …, to eligible recipients for the purposes of providing financial assistance and technical assistance in accordance with subsection (b)." 42 U.S.C. § 7434(a)(2).

26.    Section 134(a)(3) of the Act appropriated to the EPA Administrator $8 billion to "make grants, on a competitive basis …, to eligible recipients for the purposes of providing financial assistance and technical assistance in low-income and disadvantaged communities in accordance with subsection (b)." *Id.* § 7434(a)(3).

27.    In turn, subsection (b) provides that an eligible recipient shall use the grant in accordance with the following: (1) facilitating "financial assistance to qualified projects at the

national, regional, State, and local levels"; (2) prioritizing "investment in qualified projects that would otherwise lack access to financing"; (3) "retain[ing], manag[ing], recycl[ing], and monetiz[ing] all repayments and other revenue received from fees, interest, repaid loans, and all other types of financial assistance provided using grant funds under this section to ensure continued operability"; and (4) providing "funding and technical assistance to establish new or support existing public, quasi-public, not-for-profit, or nonprofit entities that provide financial assistance to qualified projects." *Id.* § 7434(b).

28. Eligible recipients are defined to include nonprofit organizations that are "designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services," that do not "take deposits other than deposits from repayments and other revenue received from financial assistance provided using grant funds under this section," that are "funded by public or charitable contributions," and that "invest[ ] in or finance[ ] projects alone or in conjunction with other investors." *Id.* § 7434(c)(1).

29. Qualified projects are defined to include any "project, activity, or technology" that either "reduces or avoids greenhouse gas emissions and other forms of air pollution in partnership with, and by leveraging investment from, the private sector," or "assists communities in the efforts of those communities to reduce or avoid greenhouse gas emissions and other forms of air pollution." *Id.* § 7434(c)(3).

30. In 2023, EPA launched three grant competitions, including the approximately $14 billion National Clean Investment Fund competition geared at "financ[ing] clean technology deployment nationally." NOFO at 3. The NCIF program was "funded with $11.97 billion from Section 134(a)(2) and $2.00 billion from Section 134(a)(3)." *Frequent Questions About the Fund*,

EPA, https://www.epa.gov/greenhouse-gas-reduction-fund/frequent-questions-about-fund (last updated Oct. 17, 2024).

31.     The purpose of the NCIF competition was to "provide grants to 2-3 national nonprofit financing entities to create national clean financing institutions capable of partnering with the private sector to provide accessible, affordable financing for tens of thousands of clean technology projects nationwide." NOFO at 4.

32.     Sections 134(a)(1) and 134(a)(2) provided that the EPA Administrator could award grants "on a competitive basis" until September 30, 2024. 42 U.S.C. § 7434(a)(1), (2).

**B.      Climate United Is Awarded NCIF Grant Funding.**

33.     Following passage of the Inflation Reduction Act, Calvert Impact, Community Preservation Corporation, and Self-Help joined together to form a coalition to apply for the GGRF competition. The three coalition members have been in operation for 30 years, 50 years, and 40 years respectively. Together, they have more than 120 years' experience managing more than $30 billion in private and institutional capital. While each of the coalition partners would have been eligible recipients, each formed bespoke subsidiaries to act as the grant recipients and subrecipients to allow them to adopt custom policies, procedures, and governance specifically crafted to more efficiently deploy grant funds while mitigating deployment risk. The subsidiaries benefit from the organizational infrastructure and experience of their parent organizations while allowing them to leverage grant funds with private capital more effectively as stand-alone entities.

34.     In July 2023, EPA issued a Notice of Funding Opportunity for the NCIF. The NOFO "included a robust set of application requirements and corresponding evaluation criteria

that were used to assess materials submitted to meet those application requirements.[2] "Application requirements covered a diverse set of topics and included not just a detailed project narrative but also a robust set of application attachments," such as "organizational and governing documents; resumes of board members and senior management; legal and compliance risk management policies and procedures; financial statements; workplans for the first year of program implementations, and budget narratives."[3]

35.     EPA established a rigorous process to review and select applications. That process included an evaluation of each applicant's program plan, organizational capacity, previous experience managing third-party capital, and experience managing financial, credit, compliance, and other risks. The review was conducted by expert panels with broad and deep qualifications who would then present rankings and recommendations to a Selection Official authorized to make the final selection for awards. NOFO at 54.

36.     Climate United entered the NCIF grant competition with a $13.97 billion proposal to accelerate clean energy adoption across the U.S. economy, including by offering affordable financing for clean technology programs. As part of the application process, Climate United was required to submit a detailed budget to EPA. Additionally, prior to receiving the Notice of Award, Climate United was required to attach a negotiated, thoroughly reviewed, and approved budget to its grant agreement.

---

[2] Greenhouse Gas Reduction Fund, Review and Selection Process, EPA (last updated Aug. 16, 2024), https://www.epa.gov/greenhouse-gas-reduction-fund/review-and-selection-process.
[3] *Id.*

37.     Following the agency's lengthy and rigorous review process, Climate United was awarded $6.97 billion. The award was publicly announced by the White House in April 2024, in a press release touting Climate United's credentials and vision.[4]

38.     Consistent with the purpose of the Inflation Reduction Act under which the NCIF funds were appropriated, Climate United developed and EPA approved a workplan that was finalized with the award and posted publicly for full transparency. As enumerated in the workplan, the Climate United coalition plans to commit at least $580 million toward qualified projects in the first year of funding (*i.e.*, before July 2025), and to draw the full $6.97 billion over the first five years of the program. To date, the Climate United coalition has committed $392 million to qualified projects. Approximately 45% of Climate United investments (the portion of the funds provided through financial assistance), or approximately $2.8 billion of the Initial Award, will focus on investing in energy-efficient buildings and homes. Approximately 20% of Climate United investments, or approximately $1.2 billion of the NCIF Award, will focus on electric transportation and charging infrastructure. Another approximately 25% of Climate United investments, or approximately $1.5 billion of the NCIF Award, will focus on producing affordable, clean electricity and heat through renewable energy generation and battery storage, including through solar, hydroelectric, and geothermal power. The remaining 10% of investments will focus on other sectors that cut costs, reduce pollution, and provide direct benefits to American families, including in agriculture. Further, consistent with the terms of the grant award, Climate United will deploy

---

[4] Biden-Harris Administration Announces $20 Billion in Grants to Mobilize Private Capital and Deliver Clean Energy and Climate Solutions to Communities Across America, EPA (last updated Aug. 16, 2024), https://www.epa.gov/newsreleases/biden-harris-administration-announces-20-billion-grants-mobilize-private-capital-and.

60% of its investments in low- and moderate- income communities, 20% of its investments in rural

communities and 10% of its investments in Tribal communities.

**C.    The Terms and Conditions of the Grant, Including Suspending or Terminating the Grant.**

39.    The award was memorialized in a final grant agreement, known formally as a

Notice of Award ("NOA"), dated August 8, 2024 [hereinafter "August NOA"]. The August NOA

appended Terms and Conditions governing the grant. The Terms and Conditions in the August

NOA included several requirements regarding the use of GGRF funding, including labor and

workforce requirements, *id*. at 34, "Buy America" requirements, *id*. at 28, consumer protection

requirements, *id*. at 36, and training requirements, *id*. at 33-34.

40.    The Terms and Conditions in the August NOA required Climate United to adhere

to a rigorous set of reporting requirements. These include requirements to produce quarterly, semi-

annual, annual, and final reports to EPA with "detailed narratives describing program performance

… supported with qualitative discussions and quantitative metrics," *id*. at 16, submit quarterly

transaction-level and project-level data reports, *id*. at 17-18, and provide ongoing disclosures to

EPA, *id*. at 18-19.

41.    The Terms and Conditions in the August NOA provided that Climate United "must

obtain prior written approval from the EPA Project Officer (who will in turn notify the EPA Award

Official) for any transfers that will not be disbursed for an Allowable Activity within 15 business

days." *Id*. at 61.

42.    In addition, the Terms and Conditions required Climate United (as well as other

GGRF recipients) to complete standard EPA grants training within 90 days of receipt of the grant,

including the "*EPA Grants Management Training for Applicants and Recipients*" and "*How to

Develop a Budget*." *Id*. at 8. Climate United complied with this requirement, even though Climate

United had already submitted a detailed budget to EPA in connection with the grant competition selection process, and had already attached a negotiated, reviewed, and approved budget to its grant agreement before receiving the Notice of Award.

43.    The August NOA was amended on December 20, 2024 [hereinafter "December NOA"]. The December NOA was substantially similar to the August NOA. The changes primarily reflected the insights gained from six months of feedback from going to market with the program, in particular clarifying the applicability of "Build America, Buy America" requirements and the applicability of Davis Bacon and Related Acts to projects. The December NOA did not alter the overall grant award or the underlying reporting and transparency requirements. However, the December NOA updated certain Terms and Conditions governing the grant. December NOA at 1. As relevant here, the December NOA updated the terms and conditions to account for Citigroup being selected by the Treasury Department to serve as its financial agent; clarified the definitions of "Waste, Fraud, and Abuse" and "Materially Impaired"; clarified which versions of the applicable regulations govern termination of the grant; and specified certain procedures involved in issuing notices about the grant funds to financial institutions. December NOA at 12, 41, 56.

44.    Among other things, the Terms and Conditions in the December NOA described the three specific requirements with which EPA must comply to suspend or terminate Climate United's award. December NOA at 41. The Terms and Conditions do not allow for EPA to unilaterally suspend the grant or remove Climate United's ability to access funding.

a.    *First*, EPA may terminate the Agreement if Climate United engages in "substantial" noncompliance such that "effective performance" is "Materially Impaired." *Id.* Effective performance is "Materially Impaired" if (1) EPA issues a "written determination and finding … that the Recipient has failed to achieve sufficient

progress in accordance with the Sufficient Progress clause" and, (2) if EPA determines in its sole discretion that a "corrective action plan" would remedy the issue, EPA must issue a "separate written determination and finding" that the Recipient "has not materially addressed its failure." *Id.* at 8–9.

b. *Second*, EPA may terminate the Agreement if Climate United engages in "material misrepresentation of eligibility status." *Id.* at 41.

c. *Third*, EPA may terminate the Agreement for "Waste, Fraud, or Abuse," *id.*, which is defined with reference to the EPA General Terms and Conditions and 2 C.F.R. § 200.113, *id.* at 12. Those sources require "credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act (31 U.S.C. §§ 3729-3733)." *See* EPA, *General Terms and Conditions* (effective Oct. 1, 2024), https://www.epa.gov/system/files/documents/2024-10/fy_2025_epa_general_terms_and_conditions_effective_october_1_2024_or_later.pdf; 2 C.F.R. § 200.113.

45.     In addition, EPA is obligated by regulation to take certain procedural steps to terminate the grant agreement. Among other things, EPA must comply with 2 C.F.R. § 200.341, which requires EPA to provide written notice of termination to the recipient that includes "the reasons for termination, the effective date, and the portion of the Federal award to be terminated, if applicable." 2 C.F.R. § 200.341; December NOA at 41 (incorporating this regulatory requirement into the Terms and Conditions).

46.     The December NOA was further amended on January 16, 2025 [hereinafter "January NOA"] to tweak the allocation of grant funds within specified budget categories, to align with updates to the Code of Federal Regulations, and to update the workplan. *Compare* December NOA at 3 and January NOA at 3. The January NOA did not change the operative Terms and Conditions attached to the December NOA (including any terms related to termination) nor alter the overall grant award. January NOA at 1, 4–5. The Terms and Conditions in the December NOA are thus the operative Terms and Conditions that remain binding on Climate United and EPA.

### D.     The Account Control Agreement Between Climate United, EPA, and Citibank.

47.     The grant agreement required Climate United to enter into an Account Control Agreement. Under the ACA, Citibank administers the funds provided under the NCIF. To do so, Citibank is "designated and authorized to act as a financial agent of the United States" pursuant to the authority of the Treasury Department, and EPA is serving as the "Secured Party." ACA at 1. After a thorough selection process run by the Treasury Department, Climate United entered into the ACA with EPA and Citibank on November 1, 2024. Climate United, EPA, and Citibank executed an amendment on January 13, 2025, to clarify the parties' intent regarding the treatment of certain obligations that were "properly incurred," if EPA issued a Notice of Exclusive Control [hereinafter "Amended ACA"].

48.     The Financial Agent concept is an established mechanism for disbursing government funding that was first authorized in the 1860s and has been used for decades.[5] As relevant here, the use of a financial agent was referenced in the EPA's Notice of Funding

---

[5] Revenue Collections And Payments: Treasury Has Used Financial Agents in Evolving Ways but Could Improve Transparency, GAO-17-176 (Jan. 2017), https://www.gao.gov/assets/gao-17-176.pdf ("Treasury has a long history of using financial agents to support its core functions of disbursing payments and collecting revenue.").

Opportunity released in July 2023, and the ACA was described in the Terms and Conditions of the August NOA. August NOA at 58; NOFO at 56. Climate United had no role in EPA's decision to include the financial agent concept in the Notice of Funding Opportunity in July 2023. Climate United also had no role in the selection of the financial agent, which was coordinated by EPA and the Treasury Department as part of a competitive process.

49.     The financial agent arrangement provides EPA with full transparency into how grant funds are being spent. EPA has full, real time view access into all accounts of Climate United and its subrecipients. The alternative mechanism used to disburse funds under EPA grants is the Automated Standard Application for Payments ("ASAP") system, which Climate United used to access funds between August 2024 (when the initial NOA was finalized) and November 2024, while the ACA was being finalized. But ASAP is far less transparent by comparison. ASAP provides only a running total of grant funds disbursed to a grant recipient—it does not allow for visibility into the activities of subrecipients. Therefore, the financial agent arrangement increases EPA's oversight of funds by requiring Climate United and its subrecipients to disclose expenditures by budget category in real time. The financial agent arrangement also provides EPA with full visibility into any program income generated by Climate United or any subrecipient, which is typically opaque to EPA under the ASAP system.

50.     The ACA specifies that Citibank's duties with respect to the funding are exclusively "administrative or ministerial (and shall not be construed as fiduciary in nature)." ACA at 3. The ACA further specifies that Citibank "shall not be responsible for any of the agreements referred to or described herein (including, without limitation, the Grant Agreement …), or for determining or compelling compliance therewith, and shall not otherwise be bound thereby." *Id*.

51.    Citibank is required to disburse funds to Climate United upon Climate United's request. ACA § 2 provides that Citibank "shall comply with all instructions, notifications, and entitlement orders the Bank receives directing the disposition of funds and financial assets in the Accounts including, without limitation, directions to distribute proceeds of any such transfer or redemption of interest or dividends on financial assets in the Accounts."

52.    Citibank is not required to disburse funds to Climate United *if* EPA exercises its "right of control" under the ACA. ACA § 2; *see also* Amended ACA § 1 (amending ACA § 2 to clarify that "after the delivery of a Notice of Exclusive Control, Bank shall continue to disburse funds and financial assets associated with financial obligations 'properly incurred' by the Pledgor prior to the issuance of, but not in anticipation of, a delivery of a Notice of Exclusive Control … except for any specific funds or financial assets, identified by Secured Party in the applicable Notice of Exclusive Control as not being 'properly incurred' by the Pledgor in accordance with 2 C.F.R. § 200.343.").

53.    To exercise its right of control, EPA must notify Citibank of its intention to exercise exclusive control over the accounts, in a form substantially similar to a sample Notice of Exclusive Control contained in the ACA. *Id*.; Amended ACA at 10 (Exhibit A: Sample NOEC); *see also* ACA at 3 (stating that Climate United and EPA "have agreed that the terms and conditions entitled 'Deposit Account at Financial Agent' in the Grant Agreement indicate the conditions under which the [EPA] may exercise its right of control").

54.    The operative form Notice of Exclusive Control states: "As required by the Grant Agreement, the Secured Party [*i.e.*, EPA] has issued a written determination and finding that Pledgor [*i.e.*, Climate United] has failed to comply with the terms and conditions of the Grant Agreement, and that noncompliance is substantial such that effective performance of the Grant

Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse (as defined in the Grant Agreement) or material misrepresentation of eligibility status, and that the Secured Party has initiated action under 2 CFR 200.339 to wholly or partly suspend or terminate the Grant Agreement, as authorized in the terms of the Grant Agreement." Amended ACA at 10.

55.    The form NOEC thus incorporates the standard for termination of the award specified under the Terms and Conditions. *Compare id.*, with December NOA at 41 (discussing termination under "programmatic conditions") and January NOA at 5 ("All Programmatic Conditions Remain the Same").

### E.    Climate United Uses Grant Funds Provided By Citibank In The Normal Course.

56.    Climate United's funds were fully obligated by EPA on August 8, 2024. While the NOA contemplated the financial agent arrangement, Climate United initially accessed funds through the Treasury's ASAP system as Treasury worked to set up the financial agent arrangement. The remainder of Climate United's undrawn funding was disbursed to accounts held at Citibank, after those accounts were established, and subject to the ACA.

57.    Thereafter, Climate United drew money from its Citibank accounts approximately once every two weeks to pay operating expenses, as permitted by the governing Terms and Conditions, which requires prior approval for drawing of transfers that will not be disbursed in the following fourteen business days. *See* December NOA at 57–58.

58.    Climate United has used grant funds for salaries and benefits for 37 employees on its payroll. These staff members collectively operate all aspects of Climate United's operations, including establishing financing programs, underwriting potential financial transactions, ensuring compliance with the terms and conditions of the NCIF Award, soliciting and selecting partners, conducting community engagement, and structuring and servicing a portfolio of loans.

59.    Climate United has used grant funds to launch three financing programs to date. The first is a $31.8 million pre-construction loan to support solar power projects across rural communities in Arkansas, which was announced in October 2024. Through this project, Climate United is financing pre-construction costs for 18 solar projects comprising the largest commercial and industrial solar deployment in Arkansas history, which is projected to save more than $120 million in energy costs over the project's life and create hundreds of jobs.

60.    The second is a program to offer affordable leasing options for battery electric heavy-duty trucks to small fleets and independent operators. Climate United issued a request for proposals in October 2024 from qualified U.S. auto manufacturers to deliver up to 500 electric drayage trucks, which Climate United intends to begin leasing at the ports of Long Beach and Los Angeles. When completed, these orders will represent some of the largest-ever purchases of domestically manufactured battery electric trucks in U.S. history. Climate United intends to expand this program nationally. This program will not only reduce the cost per mile of operating drayage trucks for small businesses, but it will also reduce air pollution in port communities and create demand for U.S. manufacturing in factories across the country.

61.    The third is $63 million in committed pre-construction financing for projects to design and develop solar power plants in partnership with Tribal governments and communities. These projects bring access to affordable energy to rural communities and Indigenous people in addition to quality jobs and local economic development. Initial projects will be located in Eastern Oregon and Idaho.

62.    In addition, Climate United has used grant funds to design, develop and launch the Climate United NEXT program. This is a pre-development grant program intended to provide up to $30 million in technical assistance and planning support for community-led projects that

increase energy independence and resiliency, reduce pollution, and save money for families, small businesses, and communities. The first round of grants focused on projects serving Tribal communities. Climate United publicly committed to announcing pre-development grants through the NEXT program across the United States by the end of February 2025. After reviewing 104 applications for the program in the first round of submissions, Climate United approved 22 awards across 18 states, and anticipates issuing $6.35 million in initial subawards.

> ### F.     EPA Takes Actions to Suspend or Terminate Climate United's Grant, And to Cause Citibank to Not Disburse Climate United's Funds.

63.     On January 30, 2025, Administrator Zeldin was sworn in as the EPA Administrator.

64.     On February 12, 2025, Administrator Zeldin made a public statement announcing EPA's goal of taking possession of grant funds disbursed pursuant to the Inflation Reduction Act, referring to Climate United by name.[6] Without mentioning any specific basis for adverse action under the terms of Climate United's award—or that of any other recipient—Administrator Zeldin stated that "the financial agent agreement with the Bank needs to be instantly terminated," and stated that "the Bank must immediately return" the grant funds.[7] To ensure EPA "reassume[s] responsibility for all of these funds," Administrator Zeldin then stated that he would "refer[] this matter to the Inspector General's Office and will work with the Justice Department," and that EPA is "not going to rest" until it has "recover[ed]" the grant funds.[8]

---

[6]     Lee Zeldin (@EPALeeZeldin), X, at 1:40 (Feb. 12, 2025, 7:52 PM), https://x.com/epaleezeldin/status/1889840040622321778.

[7] *Id*. at 2:15.

[8]     Rapid Response 47 (@RapidResponse47), X (Feb. 25, 2025, 10:16 AM), https://x.com/RapidResponse47/status/1894406216052289869.

65.     According to public news reporting, EPA thereafter took multiple actions designed to suspend or terminate Climate United's grant, and cause Citibank to withhold grant funds from Climate United. Those actions include, but are not limited to:

a.  The Office of the Deputy Attorney General ("ODAG") at the Department of Justice communicated with the United States Attorney's Office in Washington, D.C. ("USAO-DC"), seeking to open a grand jury investigation into Climate United's contract awarded by EPA.[9] Denise Cheung, the Chief of the Criminal Division at USAO-DC, advised that there was not an adequate factual basis to open that grand jury investigation.[10] At some point thereafter, the Federal Bureau of Investigation's Washington Field Office issued a "Freeze Letter" to Citibank containing a recommendation that Citibank freeze Climate United's assets.[11]

b.  The ODAG instructed that a second letter be sent to Citibank directing that Citibank implement an asset freeze and refrain from releasing funds pursuant to a criminal investigation.[12] In response, senior officials at the DC-USAO again asserted there was not sufficient evidence to justify issuing that letter.[13] Consistent with her oath

---

[9] *Read the Resignation Letter by Denise Cheung, a Veteran D.C. Federal Prosecutor*, Wash. Post (Feb. 18, 2025), https://www.washingtonpost.com/dc-md-va/2025/02/18/read-resignation-letter-denise-cheung/; *see also* Kyle Cheney, et al., *Senior Prosecutor in Washington Quits, Citing Pressure to Probe Biden-era Climate Funds*, Politico (Feb. 18, 2025), https://www.politico.com/news/2025/02/18/denise-cheung-us-attorneys-office-washington-020363.

[10] *Resignation Letter*, *supra* note 9 (noting assessment that no "predicate for opening such a grand jury investigation existed" on the face of the existing documents provided by ODAG).

[11] *Id.*

[12] *Id.*

[13] *Id.*

of office, the Chief of the Criminal Division, Denise Cheung, refused to send the letter and was forced to resign.[14]

    c.   Apparently without signoff from other prosecutors at the DC-USAO, Interim U.S. Attorney Ed Martin submitted a seizure warrant application with a magistrate judge, which was rejected.[15] After that, ODAG reportedly sought a different U.S. attorney's office to carry out the warrant request in order to launch a grand jury investigation and obtain a court-ordered bank freeze, but prosecutors in that office likewise refused to do so.[16]

    d.   On February 19, 2025, Administrator Zeldin stated on X that he had "just read" a "grant agreement" related to the GGRF, characterizing it as "wild."[17]

    e.   On February 22, 2025, and at other times thereafter, Administrator Zeldin has stated that he has cancelled several grant agreements, apparently unilaterally, regarding climate and the environment.[18]

---

[14] *Id*.

[15] Spencer Hsu, Maxine Joselow & Nicolas Rivero, *FBI Takes Up EPA Probe Amid Pushback from Judge, Prosecutors*, Wash. Post (Feb. 27, 2025), https://www.washingtonpost.com/dc-md-va/2025/02/27/trump-fbi-epa-grant-investigation/.

[16] *Id*.

[17] Lee Zeldin (@EPALeeZeldin), X (Feb. 19, 2025, 4:01 PM), https://x.com/epaleezeldin/status/1892318587961930086.

[18] Lee Zeldin (@EPALeeZeldin), X (Feb. 22, 2025, 2:10 PM), https://x.com/epaleezeldin/status/1893377875220332772 (proclaiming EPA has "cancelled" various "DEI and environmental justice grants and contracts"); *see also* Lee Zeldin (@EPALeeZeldin), X (Feb. 28, 2025, 5:40 PM), https://x.com/epaleezeldin/status/1895604975860125829.

f. On February 23, 2025, Administrator Zeldin discussed the GGRF program on national television and stated, without basis, that "the entire scheme, in my opinion, is criminal."[19]

g. On March 2, 2025, EPA Deputy Administrator W.C. McIntosh sent a letter to EPA's Office of the Inspector General asking for an OIG investigation into GGRF funding.[20]

h. On March 4, 2025, Administrator Zeldin stated: "The money is now FROZEN and DOJ/FBI is investigating."[21] Notwithstanding the Administrator's statements, EPA on other occasions has stated that Citibank is acting voluntarily.[22]

66. EPA has not issued the Notice of Exclusive Control—which is the legal tool described in the ACA for restricting Climate United's access to these funds.

67. Citibank has failed to comply with Climate United's normal-course requests for disbursements, as required by the ACA, and has failed to provide Climate United with any legal basis for its failure to act other than vague references to awaiting EPA's guidance.

a. On February 18, 2025, Climate United placed a request to Citibank to draw funds from Climate United's account. In the normal course, Citibank would have sold

---

[19] Sunday Morning Futures (@SundayMorningFutures), X (Feb. 23, 2025, 11:21 AM), https://x.com/SundayFutures/status/1893697750937505807; *see also* Zack Colman, *Recipient Isn't Giving in as Trump's EPA Tries to Revoke Climate Grants*, Politico (Feb. 24, 2025), https://www.politico.com/news/2025/02/24/climate-grant-recipient-spending-trumps-epa-tries-claw-back-00205814 (collecting quotes).
[20] EPA Formally Refers Financial Mismanagement of $20B "Gold Bars" to Inspector General, EPA (last updated Mar. 3, 2025), https://www.epa.gov/newsreleases/epa-formally-refers-financial-mismanagement-20b-gold-bars-inspector-general.
[21] Lee Zeldin (@EPALeeZeldin), X (Mar. 4, 2025, 6:02 PM), https://x.com/epaleezeldin/status/1897060177784004921.
[22] EPA Formally Refers Financial Mismanagement of $20B "Gold Bars" to Inspector General, EPA (last updated Mar. 3, 2025), https://www.epa.gov/newsreleases/epa-formally-refers-financial-mismanagement-20b-gold-bars-inspector-general.

shares in Climate United's money market account, and then distributed the resulting funds to Climate United later that same day. But Climate United's account with Citibank does not reflect that the typical money market transaction or disbursement occurred, and Climate United did not receive any funds from its account.

b.  On February 19, 2025, at 9:43 am EST, Climate United submitted an email message to Citibank noting that its funding requests remain pending and have not been disbursed. That letter requested that Citibank provide the legal bases for those actions, advise whether those actions were taken pursuant to a directive by a government agency, and provide a reasonable opportunity to respond to any instruction or request that impacts Climate United's accounts before that instruction or request may be acted upon by Citibank. Citibank did not respond.

c.  On February 21, 2025, Climate United placed a request to Citibank to draw funds from Climate United's account. But Climate United's account with Citibank does not reflect that the typical money market transaction or disbursement occurred, and Climate United did not receive any funds from its account.

d.  On February 25, 2025, at 6:06 pm EST, counsel for Climate United submitted another email message to Citibank requesting release of the funds within 24 hours or, in the alternative, to provide the legal bases for its actions. Citibank again failed to respond.

e.  On February 26, 2025, counsel left voicemail messages for Citibank. Citibank again failed to respond.

f.  On March 1, 2025, counsel submitted a letter in hard copy and by email to the Chief Executive and Chief Legal Officers of Citibank. The letter explained that Citibank

24

is illegally withholding Climate United's funds in breach of the ACA; has ignored Climate United's repeated requests for information by phone, voicemail, and email; and has failed to provide any colorable legal basis for Citibank's actions. The letter demanded a response by no later than close of business on Tuesday, March 4, 2025. Citibank failed to respond.

g. On March 3, 2025, Climate United contacted Citibank by email requesting information about the status of Climate United's funds and the process for disbursing those funds. For the first time, Citibank responded, stating: "We have received your correspondence and have forwarded it to the United States Environmental Protection Agency and other federal officials for an appropriate response. … Once we have further information available regarding the program we can provide at that time." In response to a follow-up email from Climate United requesting clarification, Citibank stated: "We are awaiting further guidance."

h. On March 4, 2025, Climate United submitted a letter to EPA by email, notifying EPA that Climate United has been unable to access its funding and to request information regarding the nature of and legal justification for EPA's actions. The letter requested that EPA immediately reverse its actions and reinstate Climate United's access to its NCIF funding. In the alternative, the letter requested that EPA rescind or stay any suspension of termination of Climate United's grant pending judicial review. EPA did not respond.

i. On March 4, 2025, in "a statement emailed to *Newsweek*…, a spokesperson for Citibank said Citi has been working with federal officials to 'address government officials' concerns' regarding the GGRF. 'Our role as financial agent does not

involve any discretion over which organizations receive grant funds,' the bank said

in its statement. 'Citi will of course comply with any binding instructions from the

federal government.'"[23]

68.    EPA has failed to provide Climate United with a reasoned explanation for its

actions or a meaningful opportunity to object or to be heard.

a.   On February 20, 2025, Climate United sent an email message to officials at EPA

notifying EPA that it was being denied access to its funds and to request additional

information and guidance by 10 am on February 21, 2025. The EPA team replied

on February 21, providing no additional information but offering to discuss the

following week. The following week, however, EPA rescheduled the meeting three

times. After being informed that Climate United's outside counsel would be present

at the meeting, an EPA official cancelled the meeting without rescheduling.

b.   Climate United subsequently called the EPA official on February 27. The official's

administrative assistant responded that the official was in possession of Climate

United's e-mails and would reach out. As of the date of this filing, Climate United

is still awaiting a response.

c.   As of the date of this filing, Climate United is also still waiting for a response from

EPA to Climate United's letter to EPA dated March 4, 2025, which is described

above.

---

[23] Jeff Young, *Green Group Wants EPA to Explain Why $20 Billion Accounts Are Frozen*, Newsweek (Mar. 4, 2025), https://www.newsweek.com/climate-united-fund-epa-letter-frozen-bank-accounts-2039608.

**G.      Citibank and EPA's Actions Have Harmed Climate United.**

69.     The NCIF award is currently the basis of funding for all of Climate United's operations and for all financing projects that Climate United either has launched or is planning to launch. Even temporary inability to access its funding immediately threatens Climate United's operations, its ongoing and future projects, and its long-term reputation.

70.     Climate United does not have other committed sources of funding to replace the NCIF award. Nor is private investment a viable replacement. In fact, Climate United was specifically awarded NCIF funding to "prioritize investment in qualified projects that would otherwise lack access to financing." 42 U.S.C. § 7434(b)(1)(B).

71.     Climate United has already been forced to defer compensation for certain employees to preserve cash. Without another source of funding, Climate United will shortly run out of funds to pay operating expenses. At that point, it will no longer be able to pay its employees and will face the risk of cutting hours and/or furloughing staff, beyond the compensation it has already deferred. Climate United also imminently risks not being able to pay rent for select offices or to pay critical third-party contractors who perform necessary services such as auditing financial statements, maintaining IT security and infrastructure, and providing legal services. In addition, as Climate United has explained to EPA, continuing uncertainty around Climate United's funding has caused Climate United to confront increasingly unfavorable terms from essential third-party contractors as well as prospective deal partners.

72.     Further, without a source of funding, Climate United would not be able to meet its commitments under the loans and awards it has already approved. This could render Climate United in breach of its existing agreements, would erode trust in Climate United as an institution and damage its reputation, and would cause profound harm to the local organizations who rely on

these funds to develop critical energy projects that reduce costs and create jobs. As examples, Climate United will be unable to support the worthwhile projects described above—including the solar projects in Arkansas, the project to develop and lease electric heavy-duty drayage trucks in the ports of Long Beach and Los Angeles, the projects to design and develop solar power plants in partnership with Tribal governments and communities in Eastern Oregon and Idaho, and the 22 Tribal projects across 18 states as part of the NEXT program.

## CLAIMS FOR RELIEF

## COUNT ONE: BREACH OF CONTRACT
### (Defendant Citibank)

73.    Climate United repeats and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

74.    Citibank has a duty under the ACA to disburse Climate United's grant funds to Climate United, as Climate United requests. Under the ACA, Citibank "shall comply with all instructions, notifications, and entitlement orders the Bank receives directing the disposition of funds and financial assets in the Accounts." ACA at 2.

75.    Prior to February 18, 2025, when Climate United requested that Citibank disburse grant funds held in Climate United's accounts, Citibank complied with those requests as required by the ACA.

76.    On February 18, 2025 and February 21, 2025, when Climate United requested that Citibank disburse grant funds held in Climate United's accounts, as required by the ACA, Citibank failed to disburse such funds.

77.    Thereafter, on subsequent occasions when Climate United requested that Citibank disburse grant funds held in Climate United's account, as required by the ACA, Citibank has failed to disburse such funds.

78.    Citibank has not offered any legal or factual basis for failing to disburse grant funds from Climate United's accounts, as required by the ACA.

79.    Under the ACA, Citibank's duties with respect to Climate United's grant funding are exclusively "administrative or ministerial (and shall not be construed as fiduciary in nature)," and Citibank "shall not be responsible" for determining whether Climate United's requests for the disbursement of grant funds comply with any applicable contracts or laws. ACA at 3.

80.    EPA (as Secured Party under the ACA), has not notified Citibank of any intention to exercise exclusive control over Climate United's accounts or provided Citibank with a Notice of Exclusive Control. Indeed, there is no factual basis to support such a notice.

81.    EPA has not "issued a written determination and finding that [Climate United] has failed to comply with the terms and conditions of the Grant Agreement, and that noncompliance is substantial such that effective performance of the Grant Agreement is materially impaired or there is adequate evidence of waste, fraud, material misrepresentation of eligibility status, or abuse." ACA Exhibit A. Indeed, there is no factual basis to support such a written determination or finding.

82.    EPA has not "initiated action under 2 CFR 200.339 to wholly or partly suspend or terminate the Grant Agreement, as authorized in the terms of the Grant Agreement." Indeed, there is no factual basis to support such an action.

83.    By failing to disburse grant funds held in Climate United's accounts, Citibank has breached the ACA.

84.    Citibank's failure to disburse funds, as required under the ACA, has caused damage to Climate United. Such damage has resulted solely from Citibank's own gross negligence or willful misconduct.

85.     Pursuant to 28 U.S.C. § 2201, Climate United is entitled to a declaration that Citibank's failure to disburse funds from Climate United's accounts is a breach of the ACA.

86.     Climate United is entitled to an injunction against Citibank's wrongful refusal to honor Climate United's disbursement requests.

## COUNT TWO: REPLEVIN
### (Defendant Citibank)

87.     Climate United repeats and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

88.     Climate United has an immediate legal right to possess the grant funds that Climate United lawfully requested that Citibank disburse from Climate United's accounts, pursuant to the ACA, on February 18, February 21, and thereafter.

89.     Citibank has wrongfully detained the grant funds by unlawfully failing to disburse the grant funds that Climate United lawfully requested on February 18, February 21, and thereafter.

90.     Citibank's intentional actions have caused damage to Climate United.

## COUNT THREE: CONVERSION
### (Defendant Citibank)

91.     Climate United repeats and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

92.     Climate United has a legal right to possess and control the grant funds held in its accounts at Citibank, pursuant to the ACA.

93.     Citibank has wrongfully and intentionally exercised dominion or control over the grant funds in Climate United's accounts, including by failing to disburse grant funds to Climate United from Climate United's accounts in response to Climate United's valid and proper requests.

94.    Citibank has intentionally permanently or substantially interfered with Climate United's property rights, including by failing to disburse grant funds to Climate United from Climate United's accounts in response to Climate United's valid and proper requests.

95.    Citibank has acted without Climate United's consent and has no legal basis or valid justification for its actions.

96.    Citibank's intentional actions have caused damage to Climate United.

97.    Climate United is entitled to an injunction against Citibank's wrongful retention of Citibank's funds.

98.    Pursuant to 28 U.S.C. § 2201, Climate United is entitled to a declaration that Citibank's failure to disburse funds from Climate United's accounts constitutes a conversion of Climate United's funds.

## COUNT FOUR: VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)
### (Defendants EPA, Administrator Zeldin)

99.    Climate United repeats and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

100.    The APA authorizes this Court to hold unlawful and set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

101.    By causing Citibank to withhold Climate United's grant funds, EPA has effectuated a suspension or termination of Climate United's grant.

102.    Defendants' suspension or termination of Climate United's grant constitutes final agency action under the APA.

103.    Defendants' suspension or termination of the grant is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law because, among other things:

a.  EPA has not provided an adequate or reasoned basis for its suspension or termination of the grant. Nor could it, as there is no factual basis for the suspension or termination of the grant.

b.  EPA's suspension or termination of the grant violates the statute establishing the grant fund, 42 U.S.C. § 7434.

c.  EPA's suspension or termination of the grant violates federal appropriations law, which legally requires EPA to spend the funds appropriated for distribution under the Greenhouse Gas Reduction Fund, 42 U.S.C. § 7434, because EPA has not satisfied the stringent requirements for rescinding an appropriation under 2 U.S.C. § 683.

d.  EPA's suspension or termination of the grant violates EPA regulations and Uniform Grant Guidance regulations codified at 2 C.F.R. § 200 *et seq.*, which do not allow EPA to suspend funding or to terminate Climate United's grant under these circumstances.

e.  EPA's suspension or termination of the grant has not complied with EPA's regulatory obligation to take certain procedural steps to terminate the grant agreement, such as providing written notice of termination that includes "the reasons for termination, the effective date, and the portion of the Federal award to be terminated, if applicable." 2 C.F.R. § 200.341.

f.  EPA's suspension or termination of the grant has resulted in improperly withholding payment for allowable costs without establishing that Climate United

has either "failed to comply with the terms and conditions of the Federal award" or is "delinquent in a debt to the United States." 2 C.F.R. § 200.305(b)(6). Indeed, there is no factual basis for EPA to make such a showing.

g. EPA's suspension or termination of the grant has resulted in improperly withholding payment without first making a "determin[ation] that noncompliance cannot be remedied by imposing specific conditions." 2 C.F.R. § 200.339.

104.    As a result of Defendants' conduct, Climate United has suffered and will continue to suffer irreparable injury.

105.    Climate United is entitled to an injunction against EPA's wrongful action.

106.    Pursuant to 28 U.S.C. § 2201, Climate United is entitled to a declaration that Defendants' suspension and termination of the grant is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

### COUNT FIVE: VIOLATION OF THE DUE PROCESS CLAUSE
### (Defendants EPA, Administrator Zeldin)

107.    Climate United repeats and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

108.    Under the Fifth Amendment to the United States Constitution, the government may not deprive a person or entity of a protected property interest without due process of law.

109.    Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr, lnc.*, 575 U.S. 320, 326–27 (2015).

110.    Climate United has a protected property interest in the grant funds it was awarded under the NCIF and which were disbursed into its accounts at Citibank.

111.    Defendants suspended or terminated Climate United's grant without providing notice or an opportunity to be heard.

112.    Climate United is entitled to an injunction against EPA's wrongful action.

113.    Pursuant to 28 U.S.C. § 2201, Climate United is entitled to a declaration that Defendants' suspension and termination of the grant violated due process of law.

**PRAYER FOR RELIEF**

WHEREFORE, Climate United respectfully asks this Court:

1.    Declare that Citibank's failure to disburse grant funds from Climate United's accounts is a breach of the ACA;

2.    Order Citibank to comply with its contractual obligations under the ACA, including by disbursing grant funds to which Climate United is entitled at Climate United's request in accordance with the ACA, both with respect to requests Climate United has already submitted and future requests;

3.    Declare that EPA and Administrator Zeldin's suspension or termination of the grant violates the Administrative Procedure Act;

4.    Declare that EPA and Administrator Zeldin's actions violate the Due Process Clause;

5.    Enjoin EPA, Administrator Zeldin, and others in active concert or participation therewith, from impeding Citibank from complying with its contractual obligations, or otherwise causing Citibank to deny, obstruct, delay, or otherwise prevent Climate United from accessing its funds as permitted under the terms of the ACA and the grant award;

6. Enjoin EPA and Administrator Zeldin from unlawfully suspending or terminating Climate United's grant award except as permitted in accordance with the ACA, the grant award, and applicable law;

7. Grant such other and further relief as may be just and proper.


Dated: March 8, 2025                    Respectfully submitted:

                                        /s/  Adam G. Unikowsky

Gabriel K. Gillett (*pro hac vice* forthcoming)    Adam G. Unikowsky (989053)
JENNER & BLOCK LLP                      Kathryn L. Wynbrandt* (1602446)
353 N. Clark Street                     David B. Robbins (493976)
Chicago, IL 60654                       Tanner J. Lockhead* (90011928)
Tel.: (312) 222-9350                    JENNER & BLOCK LLP
                                        1099 New York Avenue
                                        Suite 900
                                        Washington, D.C. 20001
                                        Tel.: (202) 639-6000
                                        Fax: (202) 639-6066
                                        aunikowsky@jenner.com

                                        * Application to Court pending.

                                        Allison N. Douglis (*pro hac vice* forthcoming)
                                        JENNER & BLOCK LLP
                                        1155 Avenue of the Americas
                                        New York, N.Y. 10023
                                        Tel.: (212) 891-1600
                                        Fax: (212) 891-1699
                                        adouglis@jenner.com

                                        *Attorneys for Plaintiff Climate United Fund*