# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CLIMATE UNITED FUND**<br>7550 Wisconsin Avenue 8th Floor<br>Bethesda, Maryland 20814<br><br>               Plaintiff,<br><br>   v.<br><br>**CITIBANK, N.A.,**<br>5800 South Corporate Place<br>Sioux Falls, South Dakota 57108,<br><br>   **and**<br><br>**UNITED STATES ENVIRONMENTAL<br>PROTECTION AGENCY**<br>1200 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20460,<br><br>   **and**<br><br>**LEE ZELDIN, in his official capacity as<br>ADMINISTRATOR, UNITED STATES<br>ENVIRONMENTAL PROTECTION<br>AGENCY**<br>1200 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20460<br><br>               Defendants. | **ECF CASE**<br><br>No. 1:25-cv-00698 |

## MEMORANDUM OF LAW IN SUPPORT OF CLIMATE UNITED FUND'S MOTION FOR TEMPORARY RESTRAINING ORDER

Gabriel K. Gillett (*pro hac vice* forthcoming)
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
Tel.: (312) 222-9350

Adam G. Unikowsky (989053)
JENNER & BLOCK LLP
1099 New York Avenue, Suite 900
Washington, DC 20001
Tel.: (202) 639-6000
Fax: (202) 639-6066
aunikowsky@jenner.com

Kathryn L. Wynbrandt* (1602446)
David B. Robbins (493976)
Tanner J. Lockhead* (90011928)
JENNER & BLOCK LLP
1099 New York Avenue, Suite 900
Washington, DC 20001
Tel.: (202) 639-6000

*Application for admission pending.

Allison N. Douglis (*pro hac vice*
forthcoming)
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036
Tel.: (212) 891-1600
Fax: (212) 891-1699
adouglis@jenner.com

*Attorneys for Plaintiff Climate United Fund*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. iii

INTRODUCTION ........................................................................................................... 1

STATEMENT OF FACTS ................................................................................................ 4

      A.      The NCIF Was Established to Allocate Inflation Reduction Act Funding to Create National Clean Financing Institutions. ........................................ 4

      B.      EPA Selected Climate United as the Largest Recipient of GGRF Funding. ............................................................................................ 7

      C.      Climate United and EPA Entered Into a Grant Agreement Governing the Award, Including Terms and Conditions Regarding Suspension and Termination. ................................................................................... 9

      D.      The Account Control Agreement Between Climate United, EPA, and Citibank. .......................................................................................... 11

      E.      Climate United Has and Will Invest Its Awarded Funds to Further the Goals of the Inflation Reduction Act. ....................................................... 14

      F.      Following Statements and Actions by Administration Officials, Citibank Refused to Disburse Funds. ....................................................................... 16

              1.      EPA, DOJ, and OIG Actions ....................................................... 16

              2.      Citibank's Failure to Disburse Funds ........................................... 18

      G.      Climate United Has Brought This Action to Vindicate Its Rights ........................ 20

LEGAL STANDARD ...................................................................................................... 21

ARGUMENT ................................................................................................................. 21

I.      The Court Should Issue a Temporary Restraining Order Barring Citibank from Failing to Disburse Climate United's Grant Funds Pursuant to the Contract. ................... 21

      A.      Climate United Is Likely to Succeed on the Merits of Its Claims Against Citibank. ............................................................................................ 21

      B.      Climate United Will Suffer Irreparable Harm Absent Injunctive Relief Against Citibank. ................................................................................ 23

      C.      The Balance of Equities Favors Climate United Over Citibank. ........................... 27

      D.      Enjoining Citibank Is Firmly in the Public Interest. ..................................... 27

II.     The Court Should Issue a Temporary Restraining Order Barring EPA from
        Impeding Citibank from Receiving Grant Funds Without Lawful Justification. ..............28

        A.     Climate United Is Likely to Succeed on The Merits of Its APA and Due
               Process Claims. ........................................................................................28

        B.     Climate United Will Suffer Irreparable Harm Absent Injunctive Relief
               Against EPA ...............................................................................................32

        C.     The Balance of Equities Favors Climate United Over EPA .................................32

        D.     An Injunction Is Firmly in the Public Interest. ......................................................34

CONCLUSION ............................................................................................................................35

# TABLE OF AUTHORITIES[*]

CASES

*AIDS Vaccine Advocacy Coalition v. United States Department of State*, No. 25-cv-400, --- F. Supp. 3d ---, 2025 WL 485324 (D.D.C. Feb. 13, 2025) ............................ 27, 34

*Art-Metal-USA, Inc. v. Solomon*, 473 F. Supp. 1 (D.D.C. 1978) .................................... 33

*Atlas Air, Inc. v. International Brotherhood of Teamsters*, 280 F. Supp. 3d 59 (D.D.C. 2017) ........................................................................................................ 26

*Bayer HealthCare, LLC v. United States Food & Drug Administration*, 942 F. Supp. 2d 17 (D.D.C. 2013) ...................................................................................... 21

*Chef Time 1520 LLC v. Small Business Administration*, 646 F. Supp. 3d 101 (D.D.C. 2022) ........................................................................................................ 21

*Coastal Counties Workforce, Inc. v. LePage*, 284 F. Supp. 3d 32 (D. Me. 2018) ........................ 27

*Deem v. Baron*, No. 15-cv-00755, 2018 WL 377286 (D. Utah Jan. 11, 2018) ............................ 25

*Department of Commerce v. New York*, 588 U.S. 752 (2019) ........................................ 29

*Destiny USA Holdings, LLC v. Citigroup Global Markets Realty Corp.*, 69 A.D.3d 212 (N.Y. App. Div., 4th Dep't 2009) .................................................................... 25

*General Land Office v. Biden*, 722 F. Supp. 3d 710 (S.D. Tex. 2024) ................................ 34

*Kansas City v. Department of Housing & Urban Development*, 923 F.2d 188 (D.C. Cir. 1991) ........................................................................................................ 29

*\*League of Women Voters of United States v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) ................................................................... 21, 25, 27, 28, 32, 33, 34

*Luokung Technology Corp. v. Department of Defense*, 538 F. Supp. 3d 174 (D.D.C. 2021) ........................................................................................................ 26

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Wertz*, 298 F. Supp. 2d 27 (D.D.C. 2002) ........................................................................................................ 28

*\*Motor Vehicle Manufacturers Ass'n of United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983) .............................................................. 29

*National Ass'n of Mortgage Brokers v. Board of Governors of Federal Reserve System*, 773 F. Supp. 2d 151 (D.D.C. 2011) .................................................................... 23

---

[*] Authorities chiefly relied upon are marked with an asterisk.

*National Council of Nonprofits v. Office of Management & Budget*, No. 25-cv-239,
--- F. Supp. 3d ---, 2025 WL 368852 (D.D.C. Feb. 3, 2025) ........................................23, 27, 34

*National Council of Nonprofits v. Office of Management & Budget*, No. 25-cv-239,
--- F. Supp. 3d ---, 2025 WL 597959 (D.D.C. Feb. 25, 2025) ...................................................23

*National Environmental Development Ass'n's Clean Air Project v. EPA*, 752 F.3d
999 (D.C. Cir. 2014) ..............................................................................................................30

*New York v. Trump*, No. 25-cv-00039, slip op. (D.R.I. Mar. 6, 2025), ECF
No. 161 ................................................................................................................................26, 27

*Northern Mariana Islands v. United States*, 686 F. Supp 2d 7 (D.D.C. 2009) ...........................34

*Open Communities Alliance v. Carson*, 286 F. Supp. 3d 148 (D.D.C. 2017) .........................27, 33

*Pacito v. Trump*, No. 25-cv-255, --- F. Supp. 3d ---, 2025 WL 655075 (W.D. Wash.
Feb. 28, 2025), *appeal docketed*, No. 25-1313 (9th Cir. Mar. 3, 2025) ...................................33

*Patriot, Inc. v. HUD*, 963 F. Supp. 1 (D.D.C. 1997) ...................................................................34

*Train v. City of New York*, 420 U.S. 35 (1975) ..........................................................................31

*United States v. E-Gold, Ltd.*, 521 F.3d 411 (D.C. Cir. 2008), *abrogated on other
grounds by Kaley v. United States*, 571 U.S. 320 (2014) ........................................................32

*United States Lines, Inc. v. Federal Maritime Commission*, 584 F.2d 519 (D.C. Cir.
1978) .......................................................................................................................................30

*Verizon v. F.C.C.*, 740 F.3d 623 (D.C. Cir. 2014) .......................................................................29

*Wagner v. Taylor*, 836 F.2d 566 (D.C. Cir. 1987) .......................................................................23

## STATUTES

2 U.S.C. § 683 ...............................................................................................................................31

*5 U.S.C. § 706(2)(A) ...............................................................................................................20, 29

42 U.S.C. § 7434 ........................................................................................................................4, 31

42 U.S.C. § 7434(a) .........................................................................................................................1

42 U.S.C. § 7434(a)(1) .....................................................................................................................7

*42 U.S.C. § 7434(a)(2) ...........................................................................................................5, 7, 33

42 U.S.C. § 7434(a)(3) ...............................................................................................................5, 33

42 U.S.C. § 7434(b) ...................................................................................................5

42 U.S.C. § 7434(b)(1)(B) .......................................................................................24

42 U.S.C. § 7434(c)(1) ..............................................................................................5

42 U.S.C. § 7434(c)(3) ..............................................................................................5

Inflation Reduction Act 2022, Pub. L. No. 117-169, 136 Stat. 1818 .......................4

**OTHER AUTHORITIES**

2 C.F.R. § 200.113 ...........................................................................................10, 31

2 C.F.R. § 200.208 ..................................................................................................31

2 C.F.R. § 200.305(b)(6) ...................................................................................11, 31

*2 C.F.R. § 200.339 ..........................................................................................11, 31

2 C.F.R. § 200.340(a)(1) .........................................................................................30

2 C.F.R. § 200.340(a)(4) .........................................................................................30

2 C.F.R. § 200.340(b) .............................................................................................30

*2 C.F.R. § 200.341 .....................................................................................10, 11, 29

85 Fed. Reg. 61,571 (Sept. 30, 2020) .....................................................................11

*About the Greenhouse Gas Reduction Fund*, EPA, https://www.epa.gov/green
house-gas-reduction-fund/about-greenhouse-gas-reduction-fund (last updated
Feb. 13, 2025) ...........................................................................................................4

Kyle Cheney, et al., *Senior Prosecutor in Washington Quits, Citing Pressure to
Probe Biden-era Climate Funds*, Politico (Feb. 18, 2025), https://www.politico.
com/news/2025/02/18/denise-cheung-us-attorneys-office-washington-020363 ....18

Zack Colman, *Recipient Isn't Giving in as Trump's EPA Tries to Revoke Climate
Grants*, Politico (Feb. 24, 2025), https://www.politico.com/news/2025/
02/24/climate-grant-recipient-spending-trumps-epa-tries-claw-back-00205814 ....17

Cong. Rsch. Serv., IN12090, *EPA's Greenhouse Gas Reduction Fund* (updated
Feb. 14, 2023), https://crsreports.congress.gov/product/pdf/IN/IN12090 ..............4

EPA, *General Terms and Conditions* (effective Oct. 1, 2024), https://www.epa.
gov/system/files/documents/2024-10/fy_2025_epa_general_terms_and_
conditions_effective_october_1_2024_or_later.pdf ..............................................10

*Frequently Asked Questions about the National Clean Investment Fund (NCIF) and Climate United's Strategy*, Climate United (Aug. 16, 2024), https://wearecli mateunited.org/frequently-asked-questions-ncif-and-climate-united-strategy ......................... 7

*FAQ: What is Climate United?*, Climate United, https://weareclimateunited.org/faq (last visited Mar. 5, 2025) ..................................................................................................... 7

*Frequent Questions About the Fund*, EPA, https://www.epa.gov/greenhouse-gas-reduction-fund/frequent-questions-about-fund (last updated Oct. 17, 2024) ........................... 6

*Green Banks*, EPA, https://www.epa.gov/statelocalenergy/green-banks (last updated Jan. 24, 2025) ............................................................................................................ 4

Spencer Hsu, Maxine Joselow & Nicolas Rivero, *FBI takes up EPA Probe Amid Pushback from Judge, Prosecutors*, Wash. Post (Feb. 27, 2025), https://www. washingtonpost.com/dc-md-va/2025/02/27/trump-fbi-epa-grant-investigation/ .................... 18

Press Release, EPA, *Biden-Harris Administration Announces $20 Billion in Grants to Mobilize Private Capital and Deliver Clean Energy and Climate Solutions to Communities Across America* (Apr. 4, 2024), https://www.epa.gov/ newsreleases/biden-harris-administration-announces-20-billion-grants-mobiliz e-private-capital-and ............................................................................................................... 8

Press Release, EPA, *EPA Formally Refers Financial Mismanagement of $20B "Gold Bars" to Inspector General* (Mar. 3, 2025), https://www.epa.gov/ newsreleases/epa-formally-refers-financial-mismanagement-20b-gold-bars-ins pector-general ...................................................................................................................... 17

Rapid Response 47 (@RapidResponse47), X (Feb. 25, 2025, 10:16 AM), https://x. com/RapidResponse47/status/1894406216052289869 ....................................................... 17

*Read the Resignation Letter by Denise Cheung, a Veteran D.C. Federal Prosecutor*, Wash. Post (Feb. 18, 2025), https://www.washingtonpost.com/dc-md-va/2025/02/18/read-resignation-letter-denise-cheung/ ..................................................... 18

*Review and Selection Process*, EPA, https://www.epa.gov/greenhouse-gas-reduc tion-fund/review-and-selection-process (last updated Aug. 16, 2024) .................................... 6

SundayMorningFutures (@SundayMorningFutures), *X* (Feb. 23, 2025, 11:21 AM), https://x.com/SundayFutures/status/1893697750937505807 ................................................ 17

U.S. Gov't Accountability Off., GAO-17-176, *Revenue Collections And Payments: Treasury Has Used Financial Agents in Evolving Ways but Could Improve Transparency* (Jan. 2017), https://www.gao.gov/assets/gao-17-176.pdf .............................. 12

Jeff Young, *Green Group Wants EPA to Explain Why $20 Billion Accounts Are Frozen*, Newsweek (Mar. 4, 2025), https://www.newsweek.com/climate-unit ed-fund-epa-letter-frozen-bank-accounts-2039608 ............................................................. 20

Lee Zeldin (@EPALeeZeldin), *X* (Feb. 12, 2025, 7:52 PM), https://x.com/epalee
zeldin/status/1889840040622321778 ...............................................................16, 18

Lee Zeldin (@EPALeeZeldin), *X* (Feb. 19, 2025, 4:01 PM), https://x.com/epalee
zeldin/status/1892318587961930086 ........................................................................17

Lee Zeldin (@EPALeeZeldin), *X* (Feb. 22, 2025, 2:10 PM), https://x.com/epalee
zeldin/status/1893377875220332772 ........................................................................17

Lee Zeldin (@EPALeeZeldin), *X* (Feb. 28, 2025, 5:40 PM), https://x.com/epalee
zeldin/status/1895604975860125829 ........................................................................17

Lee Zeldin (@EPALeeZeldin), *X* (Mar. 4, 20255, 6:02 PM), https://x.com/epalee
zeldin/status/1897060177784004921 ........................................................................17

## INTRODUCTION

Plaintiff Climate United Fund ("Climate United") seeks a temporary restraining order that would halt Citibank, N.A.'s ("Citibank") illegal refusal to honor Climate United's requests for funds to which Climate United is legally entitled. Statements by both Citibank and EPA's Administrator strongly suggest that EPA has caused Citibank's illegal actions. As such, Climate United also seeks a temporary restraining order against EPA that would bar EPA from impeding Citibank from complying with its legal obligations. Because Climate United is undergoing immediate and irreparable harm as a result of Defendants' conduct, and because Defendants' conduct undermines an Act of Congress, Climate United requests a temporary restraining order as soon as possible.

In 2022, Congress passed and President Biden signed into law the Inflation Reduction Act. The Act authorized the Greenhouse Gas Reduction Fund, which appropriated $27 billion to invest in clean energy in communities across the country and directed EPA's Administrator to make grants to eligible recipients. *See* 42 U.S.C. § 7434(a). The Climate United coalition—which brings together three established nonprofits that have a combined 120 years of experience managing more than $30 billion of private and institutional capital—applied for grant funding from the Greenhouse Gas Reduction Fund, and was awarded $6.97 billion following EPA's rigorous grant competition process. Climate United's grant funds are held at Citibank, under a Financial Agent Agreement between Citibank and the U.S. Treasury Department and an Account Control Agreement ("ACA") between Citibank, Climate United, and EPA.

Section 2 of the ACA states: "The Bank shall comply with all instructions, notifications, and entitlement orders the Bank receives directing the disposition of funds and financial assets in the Accounts" originated by Climate United "until such time that the Bank receives" a "Notice of

Exclusive Control" from EPA stating EPA "is exercising its right to exclusive control over an Account." In other words, if Climate United requests a disbursement, the Bank "shall" honor that disbursement unless EPA sends a "Notice of Exclusive Control." EPA has never sent a "Notice of Exclusive Control." Thus, the ACA is clear: Citibank must honor Climate United's requests.

On February 18, 2025, however, Citibank stopped honoring Climate United's requests. Despite Climate United's many pleas for information, Citibank has refused to explain this blatant breach of contract. It ignored Climate United's pleas until March 3, 2025, when it made the vague statement that it had forwarded Climate United's communications to EPA and was "awaiting further guidance."

Meanwhile, EPA's Administrator has been making public statements that have apparently caused Citibank to stop disbursing funds to Climate United and other grantees. On February 12, 2025, the Administrator publicly stated, without basis, that "the financial agent agreement with the Bank needs to be instantly terminated," and stated that "the Bank must immediately return" grant funds. On February 23, 2025, the Administrator stated, again without basis, that "the entire scheme, in my opinion, is criminal." On March 4, 2025, the Administrator publicly announced: "The money is now FROZEN."

Climate United does not know why the Administrator is making these statements. After Climate United sought more information from EPA, EPA offered to meet with Climate United during the week of February 24, and Climate United agreed to meet. EPA then proceeded to reschedule the meeting three times and then cancel it altogether without explanation. Climate United requested a smaller meeting, in case scheduling for multiple people was the challenge, and did not receive any response. As of the date of this filing, there has been no substantive communication from EPA.

EPA has never identified any legal basis for freezing these funds. According to public reporting, the government's efforts to find such a legal basis have been rejected. Denise Cheung, the Chief of the Criminal Division at the D.C. U.S. Attorney's Office, was ordered to send a letter to Citibank directing that Citibank freeze grantees' assets. She viewed the order as unlawful and resigned—after 24 years in the office—rather than carry it out. According to a follow-up article, the U.S. Attorney submitted a seizure warrant application, but it was rejected. Prosecutors in a different U.S. Attorney's Office refused a request to seek a court-ordered bank freeze. There is no evidence that Climate United has done anything wrong. It has not.

And yet, despite the absence of any legal basis, Climate United's funds are frozen. On information and belief, other grantees are in the same position. The combined actions of Citibank and EPA effectively nullify a congressionally mandated and funded program.

Climate United is now facing irreparable harm. Under the terms of Climate United's grant, it generally can only seek 14 business days' worth of funds at a time. It has now been more than 14 business days since Citibank started withholding funds. As explained in the attached declaration, Climate United has already been compelled to defer compensation for certain staff to preserve its available cash, while also confronting increasingly unfavorable terms from essential vendors and prospective deal partners. If the freeze continues, Climate United will be forced to furlough staff, to renege on its loan obligations, and to encounter grave economic harm.

Climate United's access to its funds must be restored immediately.

First, Climate United requests that the Court enter a temporary restraining order directing Citibank to comply with the ACA. This is not a close issue. Citibank cannot decline to comply with its legal obligations based on vague statements that it is awaiting "guidance."

Second, by all appearances, EPA is the cause of Citibank's conduct. As explained below, Citibank represented that it was awaiting EPA's guidance; EPA's Administrator announced on March 4 that the funds were "frozen"; and EPA is the sole agency within the federal government with the authority to suspend or terminate the grant. But EPA cannot exercise that authority unless certain conditions are met, and they have not been met. Thus, the Court should restrain EPA from impeding Citibank from complying with the ACA.

The Court cannot permit EPA and Citibank to undermine an Act of Congress and irreparably harm Climate United's business without legal basis. Immediate relief is warranted.

## STATEMENT OF FACTS

### A.     The NCIF Was Established to Allocate Inflation Reduction Act Funding to Create National Clean Financing Institutions.

In 2022, Congress passed and President Biden signed into law the Inflation Reduction Act. Pub. L. No. 117-169, 136 Stat. 1818. The Act amended the Clean Air Act to authorize the Greenhouse Gas Reduction Fund ("GGRF"), which appropriated $27 billion to invest in clean energy in communities across the county. *See* 42 U.S.C. § 7434; *About the Greenhouse Gas Reduction Fund*, EPA, https://www.epa.gov/greenhouse-gas-reduction-fund/about-greenhouse-gas-reduction-fund (last updated Feb. 13, 2025).

The GGRF essentially establishes "green banks," which are "financial institutions aimed at overcoming market barriers and scaling up investment in low-carbon technologies and climate-resilient infrastructure." Cong. Rsch. Serv. IN12090, *EPA's Greenhouse Gas Reduction Fund*, (updated Feb. 14, 2023), https://crsreports.congress.gov/product/pdf/IN/IN12090. Green banks are generally used to "deliver projects that are not sufficiently met by other financial markets." *Green Banks*, EPA, https://www.epa.gov/statelocalenergy/green-banks%20 (last updated Jan. 24, 2025).

4

To establish these green financing institutions, Section 134(a)(2) of the Act appropriated to the Administrator $11.97 billion "to make grants, on a competitive basis …, to eligible recipients for the purposes of providing financial assistance and technical assistance in accordance with subsection (b)." 42 U.S.C. § 7434(a)(2). In addition, Section 134(a)(3) of the Act appropriated to the Administrator $8 billion to "make grants, on a competitive basis …, to eligible recipients for the purposes of providing financial assistance and technical assistance in low-income and disadvantaged communities in accordance with subsection (b)." *Id*. § 7434(a)(3). In turn, subsection (b) provides that an eligible recipient shall use the grant funds in accordance with the following: to facilitate "qualified projects at the national, regional, State, and local levels"; to prioritize "investment in qualified projects that would otherwise lack access to financing"; to "retain, manage, recycle, and monetize all repayments and other revenue received from fees, interest, repaid loans, and all other types of financial assistance provided using grant funds under this section to ensure continued operability"; and to provide "funding and technical assistance to establish new or support existing public, quasi-public, not-for-profit, or nonprofit entities that provide financial assistance to qualified projects." *Id*. § 7434(b).

Grant funding for qualified projects may be awarded to "public, quasi-public, not-for-profit, or nonprofit entities," *id*., that are "designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services" and that meet other eligibility criteria. *Id*. § 7434(c)(1). Qualified projects eligible to receive funding include any "project, activity, or technology" that either "reduces or avoids greenhouse gas emissions and other forms of air pollution" or "assists communities in the efforts of those communities to reduce or avoid greenhouse gas emissions and other forms of air pollution." *Id*. § 7434(c)(3).

Consistent with the statute, in July 2023, EPA issued a Notice of Funding Opportunity ("NOFO") and launched a competition for the approximately $14 billion National Clean Investment Fund to award funding to "finance clean technology deployment nationally." Exhibit 1 at 3.[1] The NCIF program was "funded with $11.97 billion from Section 134(a)(2) and $2.00 billion from Section 134(a)(3)." *Frequent Questions About the Fund*, EPA, https://www.epa.gov/greenhouse-gas-reduction-fund/frequent-questions-about-fund (last updated Oct. 17, 2024). The purpose of the NCIF competition was to "provide grants to 2-3 national nonprofit financing entities to create national clean financing institutions capable of partnering with the private sector to provide accessible, affordable financing for tens of thousands of clean technology projects nationwide." Ex. 1 at 4.

The NOFO "included a robust set of application requirements and corresponding evaluation criteria that were used to assess materials submitted to meet those application requirements." *Review and Selection Process*, EPA, https://www.epa.gov/greenhouse-gas-reduction-fund/review-and-selection-process (last updated Aug. 16, 2024). "Application requirements covered a diverse set of topics and included not just a detailed project narrative but also a robust set of application attachments," such as "organizational and governing documents; resumes of board members and senior management; legal and compliance risk management policies and procedures; financial statements; workplans for the first year of program implementations, and budget narratives." *Id.* EPA established a rigorous process to review and select applications, including the establishment of review panels with broad and deep qualifications who would then present rankings and recommendations to a Selection Official

---

[1] All citations to exhibits refer to the exhibits to the Declaration of Elizabeth Bafford submitted contemporaneously with this Motion ("Decl.").

authorized to make the final selection for awards. Ex. 1 at 54. Under the statute, EPA's Administrator could award grants "on a competitive basis" until September 30, 2024. 42 U.S.C. § 7434(a)(1)-(2).

### B.    EPA Selected Climate United as the Largest Recipient of GGRF Funding.

Climate United is a nonprofit financial institution whose mission is to leverage public and private financing to remove financial barriers to deploying clean energy and "invest in solutions that tackle our nation's toughest economic and environmental challenges." *FAQ, What is Climate United?*, Climate United, https://weareclimateunited.org/faq (last visited Mar. 5, 2025); Decl. ¶ 4. The Climate United coalition brings together three established nonprofits—Calvert Impact, Community Preservation Corporation, and Center for Community Self-Help—that have a combined 120 years of experience (30 years, 50 years, and 40 years, respectively) managing more than $30 billion of private and institutional capital that has unlocked economic opportunity for communities in all 50 states and territories. Specifically, Climate United is focused on "[g]reening and electrifying businesses and commercial buildings, schools and community-supporting institutions; community and C&I solar; electric buses and trucks; [and] other non-residential qualified projects." *Frequently Asked Questions about the National Clean Investment Fund (NCIF) and Climate United's Strategy*, Climate United (Aug. 16, 2024), https://weareclimateunited.org/frequently-asked-questions-ncif-and-climate-united-strategy. Climate United accomplishes these objectives by "leverag[ing] public resources with private capital" to provide financing for qualified projects. *Id.* Because Climate United's investments mobilize private capital, they stretch public dollars further: for every dollar invested in a program or project, Climate United estimates up to four dollars of private capital will flow into communities. Decl. ¶ 6.

Climate United entered the NCIF grant competition with a $13.97 billion proposal to accelerate clean energy adoption across the U.S. economy, including by offering affordable financing for clean technology programs.[2] As part of that application process, Climate United was required to submit a detailed proposed budget to EPA. Decl. ¶ 9. In addition, the Notice of Award, discussed below, included a negotiated, thoroughly reviewed, and EPA-approved final budget. *Id.* ¶ 12.

At the conclusion of the agency's lengthy and rigorous review process, Climate United was awarded $6.97 billion. Decl. ¶ 11. The award was publicly announced by the White House in April 2024, in a press release touting Climate United's credentials and vision. Press Release, EPA, *Biden-Harris Administration Announces $20 Billion in Grants to Mobilize Private Capital and Deliver Clean Energy and Climate Solutions to Communities Across America* (Apr. 4, 2024), https://www.epa.gov/newsreleases/biden-harris-administration-announces-20-billion-grants-mobilize-private-capital-and.

Consistent with the purpose of the Inflation Reduction Act under which the NCIF funds were appropriated, Climate United developed and EPA approved a workplan that was finalized with the award and, like its original application, was posted publicly for full transparency. Decl. ¶ 12.

---

[2] While each of the coalition partners would have been eligible recipients, each formed subsidiaries to act as the grant recipients and subrecipients allowing them to adopt EPA-required policies, procedures, and governance specifically crafted to more efficiently deploy grant funds while mitigating deployment risk. The subsidiaries benefit from the organizational infrastructure and experience of their parent organizations while allowing them to comply fully with EPA oversight requirements, and leverage grant funds with private capital more effectively as stand-alone entities. Decl. ¶ 5.

C.    **Climate United and EPA Entered Into a Grant Agreement Governing the Award, Including Terms and Conditions Regarding Suspension and Termination.**

EPA and Climate United entered into an agreement to govern the grant called a "Notice of Award" or "NOA." NOAs contain the grant award's Terms and Conditions, which are binding on the agency and the recipient. Climate United's award was first memorialized in a NOA dated August 8, 2024. Decl. ¶ 11; Exhibit 2. EPA issued an amended notice of award on December 20, 2024, which was substantially similar to the August NOA but included changes to the Terms and Conditions that reflected the insights gained from the first six months of market and partner feedback as well as other clarifications. Decl. ¶ 11; Exhibit 3.

Importantly, the Terms and Conditions require Climate United to adhere to a rigorous set of reporting requirements to facilitate oversight and transparency. These requirements include Climate United to submit quarterly, semi-annual, annual, and final reports to EPA with "detailed narratives describing program performance … supported with qualitative discussions and quantitative metrics," Ex. 3 at 14**,** submit quarterly transaction-level and project-level data reports, *id*. at 15, and provide ongoing disclosures to EPA, *id*. at 16. In addition, the Terms and Conditions require Climate United to "obtain prior written approval from the EPA Project Officer (who will in turn notify the EPA Award Official) for any transfers that will not be disbursed for an Allowable Activity within 15 business days." *Id*. at 57-59.

The Terms and Conditions also enumerate the specific requirements with which EPA must comply to terminate or suspend Climate United's award. *Id.* at 41. At bottom, EPA may not terminate or suspend the award unilaterally.

Under the Terms and Conditions, EPA may terminate the award *only* in one of three circumstances:

(1) EPA may terminate the Agreement if Climate United engages in "substantial" noncompliance such that "effective performance" is "Materially Impaired." *Id.* Effective performance is "Materially Impaired" if (1) EPA issues a "written determination and finding … that the Recipient has failed to achieve sufficient progress in accordance with the Sufficient Progress clause" and, (2) if EPA determines in its sole discretion that a "corrective action plan" would remedy the issue, EPA issues a "separate written determination and finding" that the Recipient "has not materially addressed its failure." *Id.* at 8-9.

(2) EPA may terminate the Agreement if Climate United engages in "material misrepresentation of eligibility status." *Id.* at 41.

(3) EPA may terminate the Agreement for "Waste, Fraud, or Abuse," *id.*, which is defined with reference to the EPA General Terms and Conditions and 2 C.F.R. § 200.113, *id.* at 12. Those sources require "credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act (31 U.S.C. §§ 3729-3733)." EPA, *General Terms and Conditions* 44 (effective Oct. 1, 2024), https://www.epa.gov/system/files/documents/2024-10/fy_2025_epa_general_terms_and_conditions_effective_october_1_2024_or_later.pdf; 2 C.F.R. § 200.113.

In addition, EPA must take certain procedural steps before it may terminate the grant award. Among other things, EPA must comply with 2 C.F.R. § 200.341, which requires EPA to provide written notice of termination to the recipient that includes "the reasons for termination, the

effective date, and the portion of the Federal award to be terminated, if applicable." 2 C.F.R. § 200.341; Ex. 3 at 41 (incorporating this regulatory requirement into the grant's Terms and Conditions).

As well, EPA may withhold payment for allowable costs during the period of performance only where required by Federal statute or regulations or where (i) the recipient "has failed to comply with the terms and conditions of the Federal award"; or (ii) the recipient is "delinquent in a debt to the United States." 2 C.F.R. § 200.305(b)(6).[3] Moreover, where funding is withheld on the grounds that a recipient failed to comply with the terms and conditions of the award, the agency may "[t]emporarily withhold payments" only where it "determines that noncompliance cannot be remedied by imposing specific conditions." 2 C.F.R. § 200.339.

The December NOA was further amended in January 2025,[4] but the January NOA did not change the operative Terms and Conditions from the December NOA. Exhibit 4 at 1, 4-5 (noting "All Administrative Conditions Remain the Same" and "All Programmatic Conditions Remain the Same"). The Terms and Conditions in the December NOA, described above, are thus the operative provisions that bind both Climate United and EPA.

> **D.    The Account Control Agreement Between Climate United, EPA, and Citibank.**

The grant requires Climate United's grant funds to be held at Citibank, under a Financial Agent Agreement ("FAA") between Citibank and the U.S. Treasury Department and an Account

---

[3] EPA has adopted the Uniform Grant Guidance regulations codified at 2 C.F.R. 200 *et seq. See* 85 Fed. Reg. 61,571 (Sept. 30, 2020).

[4] The amended January NOA reflected relatively minor alterations in the allocation of particular grant funds within existing budget categories. *Compare* Ex. 3 at 3, *with* Ex. 4 at 3. The January NOA did not alter the overall grant award. Ex. 4 at 1.

Control Agreement between Citibank, Climate United, and EPA. Ex. 2 at 58; Ex. 3 at 52.[5] After a thorough review process run by the Treasury Department, Climate United and EPA entered into the ACA with Citibank on November 1, 2024, with an amendment on January 13, 2025. *See* Exhibit 8; Exhibit 9.

Under the ACA, Citibank is "designated and authorized to act as a financial agent of the United States" pursuant to the authority of the Treasury Department. Ex. 8 at 1. EPA, in turn, serves as the "Secured Party." *Id.* at 1.

Citibank's duties with respect to the funding are exclusively "administrative or ministerial." Ex. 8 at 3 (explaining these duties "shall not be construed as fiduciary"). Citibank exercises no responsibility for determining whether Climate United has complied with its obligations under the grant award: the ACA specifies that Citibank "shall not be responsible for any of the agreements referred to or described herein (including without limitation, the Grant Agreement …), or for determining or compelling compliance therewith, and shall not otherwise be bound thereby." *Id.* at 3.

Like the grant agreement, the ACA establishes a system that is transparent and provides for significant oversight by EPA. EPA has complete real-time visibility into both the accounts of

---

[5] The Financial Agent concept is an established mechanism for disbursing government funding that was first authorized in the 1860s and has been used for decades. U.S. Gov't Accountability Off., GAO-17-176, *Revenue Collections And Payments: Treasury Has Used Financial Agents in Evolving Ways but Could Improve Transparency* (Jan. 2017), https://www.gao.gov/assets/gao-17-176.pdf ("Treasury has a long history of using financial agents to support its core functions of disbursing payments and collecting revenue."). Relevant here, the use of a financial agent was referenced in EPA's Notice of Funding Opportunity released in July 2023, and the ACA was described in the Terms and Conditions of the August NOA. Ex. 2 at 58; Ex. 1 at 56. Climate United had no role in EPA's decision to include the financial agent concept in the Notice of Funding Opportunity in July 2023. Decl. ¶ 19. Climate United also had no role in the selection of the financial agent, which was coordinated by EPA and the Treasury Department as part of a competitive process. *Id.*

Climate United and those of its subrecipients. Decl. ¶ 20. The system displays expenditures broken down by budget category, and it provides EPA with full visibility of program income generated by Climate United or any subrecipient. Decl. ¶ 17.

Citibank's main role is to disburse funds to Climate United when Climate United asks for them. Section 2 of the ACA provides that Citibank "shall comply with all instructions, notifications, and entitlement orders the Bank receives directing the disposition of funds and financial assets in the Accounts including, without limitation, directions to distribute proceeds of any such transfer or redemption of interest or dividends on financial assets in the Accounts." Ex. 8 at 3.

The only circumstance in which Citibank is not required to disburse funds to Climate United is if EPA exercises its right of control over the funding under the ACA. *Id.* To do so, EPA must notify Citibank that it is exercising exclusive control over the account in a form substantially similar to a sample Notice of Exclusive Control contained in the ACA. *Id.*; *id.* at Ex. A; *see also id.* at 1 (stating that Climate United and EPA "have agreed that the terms and conditions entitled 'Deposit Account at Financial Agent' in the Grant Agreement indicate the conditions under which [EPA] may exercise its right of control").[6]

The ACA spells out when EPA may take exclusive control over the funds. Under the ACA, as amended, EPA may take exclusive control of the funds when, "[a]s required by the Grant Agreement, the Secured Party [*i.e.*, EPA] has issued a written determination and finding that Pledgor [*i.e.*, Climate United] has failed to comply with the terms and conditions of the Grant Agreement, and that noncompliance is substantial such that effective performance of the Grant

---

[6] The January 13, 2025 amendment clarifies the parties' intent regarding the treatment of certain obligations that were "properly incurred," if EPA issues a Notice of Exclusive Control. Ex. 9.

Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse (as defined in the Grant Agreement)." Ex. 9 at Ex. A**.** In short, EPA may take exclusive control only when termination is warranted under the Terms and Conditions of the grant award. *Compare id.* (incorporating the standard for termination in the Terms and Conditions), *with* Ex. 3 at 41 (discussing termination under "programmatic conditions"), *and* Ex. 4 at 5 ("All Programmatic Conditions Remain the Same"). Further, the ACA requires EPA to affirm that it, as "the Secured Party[,] has initiated action under 2 CFR 200.339 to wholly or partly suspend or terminate the Grant Agreement, as authorized in the terms of the Grant Agreement." Ex. 9 at Ex. A.

Climate United drew down grant funds through the Automated Standard Application for Payments ("ASAP") system from August 2024 until November 2024 when the accounts at Citibank were established. Decl. ¶¶ 16-17. EPA has since disbursed the balance of Climate United's grant funds into the designated Citibank accounts. *Id.* ¶ 17. Approximately every two weeks, Climate United began to draw money from those accounts to do its work and carry out its obligations under the grant. *Id.* ¶ 21.

### E. Climate United Has and Will Invest Its Awarded Funds to Further the Goals of the Inflation Reduction Act.

Consistent with the purpose of the Inflation Reduction Act, Climate United developed and EPA approved a workplan that was finalized with the award and posted publicly. As enumerated in the workplan, the Climate United coalition plans to commit at least $580 million toward qualified projects in the first year of funding (*i.e.*, before July 2025), and to draw the full $6.97 billion award over the first five years of the program. *Id.* ¶ 13. The Climate United coalition has committed $392 million to qualified projects to date. *Id.* Approximately 45% of Climate United investments, or approximately $2.8 billion of the grant award, will focus on investing in energy-efficient buildings and homes. *Id.* ¶ 14. Approximately 20% of Climate United's investments, or

approximately $1.2 billion of the NCIF Award, will focus on electric transportation and charging infrastructure. *Id.* Another approximately 25% of Climate United's investments, or approximately $1.5 billion of the NCIF Award, will focus on producing affordable, clean electricity and heat through renewable energy generation and battery storage, including solar power, hydroelectric and geothermal. *Id.* The remaining 10% of investments will focus on other sectors that cut costs, reduce pollution, and provide direct benefits to American families, including in agriculture. *Id.* Pursuant to its workplan, Climate United will deploy 60% of its investments in low- and moderate-income communities, 20% of its loans in rural communities, and 10% of its investments in tribal communities. *Id.* ¶ 13.

Climate United has already launched three financing projects to date. First, it has committed $31.8 million to finance 18 solar projects benefiting rural communities in Arkansas, comprising the largest commercial solar deployment in the state's history. *Id.* ¶ 24. The project, announced in October 2024, is projected to save over $120 million in energy costs and create hundreds of jobs. *Id.*

Second, Climate United has launched a program to establish affordable leasing options for battery electric heavy-duty trucks to small fleets and independent contractors. *Id.* ¶ 25. In October 2024, Climate United issued a request for proposals from qualified U.S. auto manufacturers to deliver up to 500 electric drayage trucks, which Climate United will then use to support an affordable leasing program at the ports of Long Beach and Los Angeles before expanding the program across the country. *Id.* When completed, these orders will represent some of the largest ever purchases of domestically manufactured battery electric trucks in U.S. history. *Id.* This program will reduce the cost per mile to operate drayage trucks, reduce air pollution in port communities, and increase demand for U.S. manufacturing. *Id.*

Third, Climate United has committed $63 million to finance the design and development of solar power plants in partnership with Tribal governments and communities in Eastern Oregon and Idaho. *Id*. ¶ 26. The project will increase access to affordable energy for rural communities and Indigenous people, in addition to bringing high-quality jobs and accelerating local economic development. *Id.*

In addition to these three projects, Climate United has also recently closed a round of applications for its Climate United NEXT program, which will provide up to $30 million in technical assistance and planning support for clean energy projects to increase energy independence, reduce pollution, and help families and small businesses. *Id.* ¶ 27. Climate United has approved 22 awards across 18 states, and it anticipates issuing over $6.345 million in initial subawards. *Id.*

Consistent with the terms of the award, Climate United has also used grant funds for salaries and benefits of approximately 37 employees who empower Climate United to do its work: selecting partners, ensuring grant compliance, conducting oversight of subrecipients, analyzing financial transactions, engaging with communities, and servicing a portfolio of loans. *Id.* ¶ 23.

### F. Following Statements and Actions by Administration Officials, Citibank Refused to Disburse Funds.

#### 1. EPA, DOJ, and OIG Actions

On January 20, 2025, President Trump assumed office. His nominee for EPA Administrator, Lee Zeldin, was confirmed on January 30, 2025. Less than two weeks later, Administrator Zeldin publicly announced EPA's goal to take possession of grant funds disbursed pursuant to the Inflation Reduction Act, referring to Climate United by name.[7] In that same public

---

[7] Lee Zeldin (@EPALeeZeldin), *X* (Feb. 12, 2025, 7:52 PM), https://x.com/epaleezeldin/status/1889840040622321778.

statement, Administrator Zeldin stated: "the financial agent agreement with the Bank needs to be instantly terminated," "the Bank must immediately return" the funding, and until it has "recovered" the grant funds, the EPA is "not going to rest."[8] Administrator Zeldin did not identify any specific basis for adverse action under the terms of Climate United's grant award—or under the award of any other funding recipient.

On February 19, Administrator Zeldin stated that he had just read a GGRF grant agreement, and called it "wild."[9] He stated on multiple occasions that EPA has cancelled several grant agreements regarding climate and the environment, apparently unilaterally.[10] On February 23, Administrator Zeldin discussed the GGRF program on national television and stated, without basis, that "the entire scheme, in my opinion, is criminal."[11] One week later, EPA issued a letter to its Office of the Inspector General requesting a formal investigation into GGRF funding.[12] Then, on March 4, Administrator Zeldin stated: "The money is now FROZEN and DOJ/FBI is investigating."[13]

---

[8] Rapid Response 47 (@RapidResponse47), *X* (Feb. 25, 2025, 10:16 AM), https://x.com/Rapid Response47/status/1894406216052289869.

[9] Lee Zeldin (@EPALeeZeldin), *X* (Feb. 19, 2025, 4:01 PM), https://x.com/epaleezeldin/status/1892318587961930086.

[10] Lee Zeldin (@EPALeeZeldin), *X* (Feb. 22, 2025, 2:10 PM), https://x.com/epaleezeldin/status/1893377875220332772 (proclaiming EPA has "cancelled" various "DEI and environmental justice grants and contracts"); *see also* @EPALeeZeldin, *X* (Feb. 28, 2025, 5:40 PM), https://x.com/epaleezeldin/status/1895604975860125829.

[11] SundayMorningFutures (@SundayMorningFutures), *X* (Feb. 23, 2025, 11:21 AM), https://x.com/SundayFutures/status/1893697750937505807; *see also* Zack Colman, *Recipient Isn't Giving in as Trump's EPA Tries to Revoke Climate Grants*, Politico (Feb. 24, 2025), https://www.politico.com/news/2025/02/24/climate-grant-recipient-spending-trumps-epa-tries-claw-back-00205814 (collecting quotes).

[12] Press Release, EPA, *EPA Formally Refers Financial Mismanagement of $20B "Gold Bars" to Inspector General* (Mar. 3, 2025), https://www.epa.gov/newsreleases/epa-formally-refers-financial-mismanagement-20b-gold-bars-inspector-general.

[13] Lee Zeldin (@EPALeeZeldin), *X* (Mar. 4, 20255, 6:02 PM), https://x.com/epaleezeldin/status/1897060177784004921.

Administrator Zeldin stated that he would take action with "the Inspector General's Office and will work with the Justice Department" to ensure EPA "reassume[s] responsibility for all of these funds."[14] According to public reporting, the Office of the Deputy Attorney General at the Department of Justice ("ODAG") instructed the U.S. Attorneys' Office in Washington, D.C. ("USAO-DC") that it wished to open a criminal investigation into EPA's award.[15] At that point, the top criminal prosecutor in USAO-DC advised that there was not an adequate factual basis to do so.[16] ODAG instructed that a letter be sent directing Citibank to refuse to release grant funds pursuant to a criminal investigation. *Id*. Senior officials at USAO-DC asserted there was not sufficient evidence to justify issuing that letter, and, consistent with her oath of office, the Chief of the Criminal Division refused to send it. She was then forced to resign. *Id*. According to follow-up reporting, the Interim U.S. Attorney in the USAO-DC then submitted a seizure warrant application, apparently without signoff from any other prosecutor in that office.[17] A Magistrate Judge rejected it. *Id*.

### 2.  Citibank's Failure to Disburse Funds

On February 18, 2025, Citibank began refusing to comply with Climate United's requests for disbursement. On that day, Climate United placed a request to draw funds from its account. In

---

[14] Lee Zeldin (@EPALeeZeldin), *X* (Feb. 12, 2025, 7:52 PM), https://x.com/epaleezeldin/status/1889840040622321778.

[15] *Read the Resignation Letter by Denise Cheung, a Veteran D.C. Federal Prosecutor*, Wash. Post (Feb. 18, 2025), https://www.washingtonpost.com/dc-md-va/2025/02/18/read-resignation-letter-denise-cheung/ [hereinafter *Resignation Letter*]; *see also* Kyle Cheney, et al., *Senior Prosecutor in Washington Quits, Citing Pressure to Probe Biden-era Climate Funds*, Politico (Feb. 18, 2025), https://www.politico.com/news/2025/02/18/denise-cheung-us-attorneys-office-washington-020363.

[16] *Resignation Letter* (noting assessment that no "predicate for opening such a grand jury investigation existed" on the face of the existing documents provided by ODAG).

[17] Spencer Hsu, Maxine Joselow & Nicolas Rivero, *FBI takes up EPA Probe Amid Pushback from Judge, Prosecutors*, Wash. Post (Feb. 27, 2025), https://www.washingtonpost.com/dc-md-va/2025/02/27/trump-fbi-epa-grant-investigation/.

the normal course, Citibank would have distributed funds to Climate United approximately that same day, but no transaction was reflected on Climate United's account. Decl. ¶ 28. After Citibank did not disburse any funds, Climate United emailed Citibank on February 19 requesting disbursement, an explanation, and an opportunity for Climate United to respond to any instruction or action impacting its accounts. *Id.* ¶ 29. Citibank did not respond. *Id.* On February 21, 2025, Climate United placed another request to Citibank to draw funds from Climate United's account. *Id.* ¶ 31. But again, no disbursement occurred. *Id.*

On February 25, counsel for Climate United emailed Citibank requesting disbursement within 24 hours or, alternatively, for Citibank to provide any legal bases for its decision to withhold funding. *Id.* ¶ 32. Citibank again did not respond. *Id.* The next day, counsel left voicemail messages for Citibank, but Citibank did not respond. *Id.* ¶ 33. On March 1, counsel submitted a letter to the Chief Executive and Chief Legal Officers of Citibank explaining that it is illegally withholding Climate United's funds in breach of the ACA. Citibank has ignored Climate United's repeated requests for information; and has failed to provide any legal basis for Citibank's actions. The letter requested a response by March 4. *Id.* ¶ 35. Again, Citibank failed to respond. *Id.*

Finally, Citibank responded to Climate United on a separate email chain on March 3. *Id.* ¶ 36. Citibank stated: "We have received your correspondence and have forwarded it to the United States Environmental Protection Agency and other federal officials for an appropriate response. … Once we have further information available regarding the program we can provide at that time." After Climate United replied requesting clarification, Citibank stated: "We are awaiting further guidance." Ex. 6. On March 4, 2025, counsel for Climate United submitted a letter to EPA by email, notifying EPA that Climate United has been unable to access its funding and to request information regarding the nature of and legal justification for EPA's actions. *Id.* ¶ 37. The letter

requested that EPA immediately reverse its actions and reinstate Climate United's access to its NCIF funding. EPA did not respond. But in an article reporting on the letter, Citibank's spokesman stated that Citibank is working to "address government officials' concerns" and "will of course comply with any binding instructions from the federal government."[18]

Over this period, EPA likewise failed to provide any reasoned explanation for its actions or any meaningful opportunity to object or be heard. When it became apparent that Citibank was not disbursing Climate United's funding, Climate United emailed EPA officials notifying them that they were being denied access to funds. EPA officials replied on February 21 with no additional information, but offered to speak the following week. Decl. ¶ 30. EPA then rescheduled three times. *Id.* ¶ 34. After Climate United informed EPA that outside counsel would be present, an EPA official cancelled the meeting without rescheduling. *Id.* After calling the official on February 27, the official's administrative assistant confirmed that the official was in possession of Climate United's emails and would reach out. *Id.* As of the date of this filing, Climate United is waiting for a response. *Id.*

### G.     Climate United Has Brought This Action to Vindicate Its Rights.

This litigation followed. Climate United's Complaint, ECF No. 1, asserts claims for breach of contract, conversion, and replevin against Citibank, and claims under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), and the Due Process Clause against EPA. Climate United seeks to enjoin Citibank from breaching the ACA and continuing to refuse to disburse funds under the ACA, and to bar EPA from unlawfully suspending or terminating the grant.

---

[18] Jeff Young, *Green Group Wants EPA to Explain Why $20 Billion Accounts Are Frozen*, Newsweek (Mar. 4, 2025), https://www.newsweek.com/climate-united-fund-epa-letter-frozen-bank-accounts-2039608.

On March 1 and 4, 2025, Climate United asked Citibank to disburse funds, and EPA to stay the apparent suspension or termination of Climate United's grant, pending judicial review. Neither Citibank nor EPA have responded to these requests. This motion therefore seeks a temporary restraining order to restrain Citibank from violating the ACA and to restrain EPA from impeding Citibank's compliance with the ACA or unlawfully suspending or terminating the grant.

## LEGAL STANDARD

The same standard of proof applies for a movant to obtain either a temporary restraining order or a preliminary injunction under Federal Rule of Civil Procedure 65. *Bayer HealthCare, LLC v. U.S. FDA*, 942 F. Supp. 2d 17, 23 (D.D.C. 2013).[19] The moving party must "make a clear showing that four factors, taken together, warrant relief: [1] likely success on the merits, [2] likely irreparable harm in the absence of preliminary relief, [3] a balance of the equities in its favor, and [4] accord with the public interest." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (preliminary injunction); *see also, e.g.*, *Chef Time 1520 LLC v. Small Bus. Admin.*, 646 F. Supp. 3d 101, 109 (D.D.C. 2022) (temporary restraining order).

## ARGUMENT

I.     **The Court Should Issue a Temporary Restraining Order Barring Citibank from Failing to Disburse Climate United's Grant Funds Pursuant to the Contract.**

A.     **Climate United Is Likely to Succeed on the Merits of Its Claims Against Citibank.**

Climate United is likely to succeed on the merits of its breach of contract claim because (1) the ACA is a valid enforceable contract; (2) Citibank has breached the contract by failing to perform without any legal or factual basis; and (3) Climate United has been harmed as a result.

---

[19] Case citations and quotations are "cleaned up," with extraneous quotation marks, alterations, and citations removed, unless specified.

Under the ACA, Citibank has a duty to disburse Climate United's grant funds to Climate United. The ACA specifies that Citibank "*shall* comply with *all* instructions, notifications, and entitlement orders the Bank receives directing the disposition of funds and financial assets in the Accounts." Ex. 8 at 2 (emphasis added). The ACA explains that Citibank's duties with respect to Climate United's grant funding are exclusively "administrative or ministerial (and shall not be construed to be fiduciary in nature)," and that Citibank "shall not be responsible" for determining whether Climate United's requests for the disbursement of grant funds comply with any applicable contracts or laws. *Id.* at 3.

Thus, the ACA does not provide Citibank with any discretion to decline to disburse funds in response to Climate United's requests. But since February 18, 2025, Citibank has repeatedly failed to disburse grant funds to Climate United at Climate United's requests. *See supra* pages 18-20.

Citibank has stated that it is waiting for direction from EPA before disbursing any grant funds. *See* Ex. 6. But the ACA does not allow Citibank to withhold Climate United's grant funds unless EPA has given notice that it intends to exercise exclusive control over the account. *See* Ex. 8. EPA has not provided such notice. Nor has EPA undertaken any of the steps to exercise exclusive control described in the ACA's form Notice of Exclusive Control. *See* Ex. 9 at Ex. A.

Citibank is therefore in breach of the ACA, and Climate United is likely to succeed on the merits of its breach of contract claim.[20]

---

[20] Although Climate United also brings claims for conversion and replevin, in this motion Climate United merely seeks to restrain Citibank from withholding grant funds and from refusing to follow the ACA.

### B.  Climate United Will Suffer Irreparable Harm Absent Injunctive Relief Against Citibank.

Climate United has shown a likelihood of irreparable harm as well. "District Courts have broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief." *Wagner v. Taylor*, 836 F.2d 566, 575-76 (D.C. Cir. 1987). Here, Climate United will suffer numerous irreparable harms, both monetary and non-monetary, that justify the grant of injunctive relief.

To begin, Citibank's actions will cause irreparable economic harm to Climate United. Economic harm is irreparable if it is "so severe as to cause extreme hardship to the business or threaten its very existence." *National Ass'n of Mortg. Brokers v. Board of Governors of Federal Reserve System*, 773 F. Supp. 2d 151, 179 (D.D.C. 2011). As a court in this district recently concluded in similar circumstances, a funding freeze results in irreparable harm when imposed on organizations that "rely on continued funding in order to keep their doors open." *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. 25-cv-239, --- F. Supp. 3d ----, 2025 WL 597959, at *18 (D.D.C. Feb. 25, 2025) (granting preliminary injunction); *see also Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. 25-cv-239, --- F. Supp. 3d ----, 2025 WL 368852, at *12 (D.D.C. Feb. 3, 2025) (granting temporary restraining order).

That is the case here. The grants funds in Climate United's Citibank accounts fund Climate United's operations and financing for projects that Climate United either has launched or is planning to launch. The Terms and Conditions of Climate United's grant require Climate United to "obtain prior written approval from the EPA Project Officer (who will in turn notify the EPA Award Official) for any transfers that will not be disbursed for an Allowable Activity within 15 business days." Ex. 3 at 57-59. In other words, under the terms of Climate United's grant, it generally can only seek 14 business days' worth of funds at a time.

23

It has now been more than 14 business days since Citibank started withholding funds. Climate United cannot currently access funds to pay its payroll and other expenses related to immediate implementation of its EPA-approved program workplan. Decl. ¶ 43. Climate United does not have other committed sources of funding to replace the grant funds in its Citibank accounts. *Id.* ¶ 40. Nor is private investment a viable replacement, because Climate United was specifically awarded NCIF funding to "prioritize investment in qualified projects that would otherwise lack access to financing." 42 U.S.C. § 7434(b)(1)(B); *see* Decl. ¶ 41.

Without access to the grant funds in its Citibank accounts, Climate United does not have excess cash or reserves available to pay operating expenses. Decl. ¶ 43. Climate United therefore imminently risks not being able to pay payroll or health, vision, and dental benefits, life insurance, and short- and long-term disability insurance for its employees. *Id.* As a result of Defendants' actions, Climate United has already been compelled to defer compensation for certain employees to preserve its limited cash available. *Id.* Without a stable substitute source of funding, Climate United will no longer be able to pay its employees. *Id.*

Climate United also imminently risks not being able to pay rent or insurance for select offices or to pay third-party contractors who perform necessary roles such as auditing its financial statements, maintaining its IT security and infrastructure, and providing legal services. Decl. ¶ 45. Continued failure to access the funds at Citibank would also prevent Climate United from meeting its commitments under the loans and awards it has already approved and plans to approve. This could force Climate United into breach of its existing agreements. *Id.* ¶¶ 46-48, 50. For example, Climate United has already awarded pre-construction financing to support a monumental solar power project in Arkansas and launched a project to purchase battery electric heavy-duty trucks for leasing to small fleets and independent operators. But neither project could go forward without

continued access to grant funds. *Id.* And future projects for which Climate United recently solicited and received applications would not be funded. *Id.* ¶ 46. This would immediately impact a pre-development grant program, Climate United NEXT, under which Climate United currently has approved 22 awards across 18 states and anticipates issuing $6.345 million in initial subawards. *Id.* ¶¶ 27, 46.

More fundamentally, Citibank's actions render Climate United incapable of fulfilling its core mission of providing financing for qualified projects. An organization has a likelihood of irreparable injury where "the actions taken by the defendant have perceptibly impaired the organization's programs" and "make it more difficult for [an organization] to accomplish [its] primary mission." *League of Women Voters*, 838 F.3d at 8-9. That is the case here: Climate United cannot engage in financing without funds available for financing.

Climate United's economic harm qualifies as irreparable for a second reason. Preliminary injunctions are awarded "where the subject of the action involves a specific fund." *Destiny USA Holdings, LLC v. Citigroup Glob. Mkts. Realty Corp.*, 69 A.D.3d 212, 217 (N.Y. App. Div., 4th Dep't 2009) (holding that borrower was entitled to preliminary injunction against Citigroup when Citigroup failed to honor draw requests from specific account); *see Deem v. Baron*, No. 15-cv-00755, 2018 WL 377286, at *2 (D. Utah Jan. 11, 2018) ("Many cases hold that a monetary damages claim directed at a specific fund is viable as an irreparable injury worthy of an injunction because the property, not the value of the property, is the true subject of the action."). Here, a preliminary injunction is warranted because Climate United is seeking to vindicate its interest in specific accounts containing withheld funds, and its right to draw from those specific accounts.

Climate United will also suffer nonquantifiable harms that independently qualify as irreparable harm warranting injunctive relief. First, if Climate United is unable to pay employees

or is forced to furlough employees, that would seriously impair its ability to retain and attract employees and to enter into beneficial arrangements with necessary contractors in the future. Decl. ¶¶ 43, 45. Courts routinely recognize that "loss of talent and the inability to recruit and retain employees to build—or even maintain—[a plaintiff's] business" constitutes irreparable harm. *Luokung Tech. Corp. v. Dep't of Def.*, 538 F. Supp. 3d 174, 194 (D.D.C. 2021) (alteration in original) (collecting cases).

Second, absent access to its grant funds, Climate United will suffer serious and irreversible reputational harm. Without secure funding, Climate United will be unable to attract high-quality applicants with a demonstrated ability to develop and carry out clean energy projects, as such applicants will not seek funding that is in significant doubt. Decl. ¶ 51. Likewise, Climate United will be significantly impaired in its ability to attract co-investors, who will require proof of stable government funding prior to investing. *Id.* Finally, Climate United will be seen as a greater financial risk by contractual counterparties, which impacts the favorability of terms Climate United can receive in contractual arrangements. *Id.* ¶ 52. This reputational damage reduces the quality and quantity of potential projects Climate United can pursue and the willingness of private capital to co-invest in those projects. That harm qualifies as irreparable. *Atlas Air, Inc. v. International Brotherhood of Teamsters*, 280 F. Supp. 3d 59, 103 (D.D.C. 2017) ("Injury to reputation or goodwill is not easily measurable in monetary terms, and so often is viewed as irreparable").

Third, the injury in this case is irreparable because Climate United is unable to access funds it was awarded pursuant to a program authorized by an Act of Congress. Where, as here, grant recipients "continue to experience interruptions to access and … draw[ing] down funds from grants funded by … [Inflation Reduction Act] appropriations," grant recipients "unquestionably" suffer irreparable harm. *See New York v. Trump*, No. 25-cv-00039, slip op. at 41-42 (D.R.I. Mar. 6, 2025),

26

ECF No. 161. "Congress enacted these statutes and appropriated these funds for legitimate reasons, and the Defendants' categorical freeze, untethered to any statute, regulation or grant term, frustrates those reasons, and causes significant and irreparable harms[.]" *Id*. at 39.

### C.    The Balance of Equities Favors Climate United Over Citibank.

Where an injunction "will not substantially injure other interested parties," the balance of equities tips in plaintiffs' favor. *League of Women Voters*, 838 F.3d at 12. In this case, Citibank "cannot suffer harm from an injunction that merely ends an unlawful practice." *Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017) (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)). Nor can Citibank show it would suffer any harm—let alone substantial harm—as the result of an injunction. Citibank has no right to or interest in the funds it is holding, but rather is the intermediary by which federal funding is provided to Climate United. *Cf. Coastal Cntys. Workforce, Inc. v. LePage*, 284 F. Supp. 3d 32, 60 (D. Me. 2018) (holding that balance of equities favored injunction requiring release of funding by state where "there would be little, if any, burden on the state treasury, since the federal funds pass-through the state on their way to the local areas").

In contrast, Citibank's refusal to disburse Climate United's grant funds poses an "existential consequence" for Climate United's mission and risks forcing Climate United to "shut[ ] down programs, … furlough[ ] and lay[ ] off employees, [or] shutter[ ] altogether," all of which are significant consequences that tilt in its favor. *AIDS Vaccine Advocacy Coal. v. U.S. Dep't of State*, No. 25-cv-400, --- F. Supp. 3d ----, 2025 WL 485324, at *6 (D.D.C. Feb. 13, 2025); *see also Nat'l Council of Nonprofits*, --- F. Supp. 3d ----, 2025 WL 368852, at *13 (similar).

### D.    Enjoining Citibank Is Firmly in the Public Interest.

Finally, ensuring that Climate United can continue to access its awarded funds is strongly in the public interest. "[T]he public interest is served by … enforcing valid contractual provisions

27

[ ] to which parties have voluntarily entered." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Wertz*, 298 F. Supp. 2d 27, 34-35 (D.D.C. 2002). In the ACA, Citibank agreed to a specific procedure by which EPA could issue a Notice of Exclusive Control to prevent Citibank from disbursing funds to Climate United. *See supra* pages 13-14. But Citibank has ignored that procedure by cutting off Climate United's access to funds without having received any Notice of Exclusive Control.

In addition, the public interest in enjoining Citibank's unlawful refusal to disburse funds is particularly acute here. The American public has an interest in the billions of dollars of investment that Congress authorized through the Inflation Reduction Act in 2022. Climate United was awarded funding in line with that interest—for example, by advancing projects to develop solar power and electric vehicles—and intends to continue to do so. Decl. ¶¶ 14, 24-27. Injunctive relief is necessary to permit Climate United to carry out these critical projects, which "Congress, in enacting" the Inflation Reduction Act, "declared to be in the public interest." *League of Women Voters*, 838 F.3d at 13.

## II.    The Court Should Issue a Temporary Restraining Order Barring EPA from Impeding Citibank from Receiving Grant Funds Without Lawful Justification.

### A.    Climate United Is Likely to Succeed on the Merits of Its APA and Due Process Claims.

Although EPA has publicly stated that Citibank is acting "voluntarily," *see* Compl. ¶ 65(h), it appears that EPA has caused Citibank to refuse to honor Climate United's disbursement requests. EPA's Administrator has stated that "the financial agent agreement with the Bank needs to be instantly terminated," stated that "the Bank must immediately return" the grant funds, and stated that EPA is "not going to rest" until it has "recovered" the grant funds. *Supra* page 17. The EPA Administrator publicly stated that the grant funds were "FROZEN." *Id.* Citibank, for its part, represented that it had forwarded Climate United's requests to EPA and was awaiting "guidance." *Supra* page 19.

To the extent EPA has de facto suspended or terminated Climate United's grant, its actions are unlawful. Under the APA, this Court must hold unlawful and set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This standard is satisfied several times over. *First*, EPA has not offered an adequate explanation for its apparent decision to suspend or terminate the award. The APA requires an agency to give adequate reasons for its actions. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48 (1983) ("[A]n agency must cogently explain why it has exercised its discretion in a given manner."). Yet EPA has not offered any reasoned explanation—despite regulations that require EPA to provide written notice of termination that includes "the reasons for termination, the effective date, and the portion of the Federal award to be terminated." 2 C.F.R. § 200.341; Ex. 3 at 41 (incorporating this regulatory requirement into the grant's Terms and Conditions).

Statements in the media by the EPA Administrator and EPA personnel do not provide the reasoned explanation the APA requires. *See Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) (requiring the agency's reasoning to fit the evidentiary record); *Kansas City v. Dep't of Hous. & Urban Dev.*, 923 F.2d 188, 194 (D.C. Cir. 1991) (advising that if a grant is terminated for substantive deficiencies, "then that fact should have been made plain in the agency decisions"). Those statements are particularly insufficient to support EPA's decision to suspend or terminate Climate United's grant given that the grant was awarded following months of rigorous review as part of a competitive application process. *See Verizon v. F.C.C.*, 740 F.3d 623, 636 (D.C. Cir. 2014) ("The APA's requirement of reasoned decision-making ordinarily demands that an agency acknowledge and explain the reasons for a changed interpretation.") (citing *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)).

*Second*, EPA's suspension or termination violates federal regulations which limit the grounds upon which EPA may terminate the award. "It is axiomatic[ ] … that an agency is bound by its own regulations." *Nat'l Envtl. Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014). An agency may not "ignore or violate its regulations while they remain in effect." *U.S. Lines, Inc. v. Fed. Mar. Comm'n*, 584 F.2d 519, 526 n.20 (D.C. Cir. 1978); *see also Nat'l Envtl. Dev. Assocs. Clean Air Project*, 752 F.3d at 1009 (holding that "an agency action may be set aside as arbitrary and capricious if the agency fails to 'comply with its own regulations'").

EPA's grant regulations provide that any unilateral grant termination must be based on the grant award's terms and conditions, 2 C.F.R. § 200.340(a)(1), (4), which must "clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award," *id.* § 200.340(b). The Terms and Conditions governing Climate United's grant award expressly limit EPA *only* to three possible grounds for termination: "when [1] the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially Impaired or [2] there is adequate evidence of Waste, Fraud, or Abuse or [3] material misrepresentation of eligibility status." Ex. 3 at 41.

None of these grounds is satisfied here. EPA has not put forward any evidence to find that Climate United has failed to comply with any Terms and Conditions of the grant, or that Climate United is "substantially noncompliant" such that "effective performance" of the Grant Agreement is "Materially Impaired," *id.*[21]

---

[21] Nor could EPA meet the two conditions necessary to show that Climate United's actions have "materially impaired" the grant agreement. *See* Ex. 3 at 9, 13-15, 22, 40; 2 C.F.R. § 200.339; 2 C.F.R. § 200.208 (requiring EPA to issue "a written determination and finding" that Climate United "has failed to achieve sufficient progress in accordance with the Sufficient Progress clause" in EPA's General Terms and Conditions, and issue a "separate written determination and finding" that "noncompliance cannot be remedied by imposing specific conditions" after giving Climate United an opportunity to remedy any noncompliance).

Nor has EPA offered any evidence of "Waste, Fraud, or Abuse,"[22] or that Climate United has made any material misrepresentations about its eligibility status. Indeed, there is absolutely *no* factual basis for *any* such findings.

As well, EPA may withhold payment for allowable costs during the period of performance only where required by Federal statute or regulations or where (i) the recipient "has failed to comply with the terms and conditions of the Federal award"; or (ii) the recipient is "delinquent in a debt to the United States." 2 C.F.R. § 200.305(b)(6). Moreover, where funding is withheld on the grounds that a recipient failed to comply with the terms and conditions of the award, the federal agency may "[t]emporarily withhold payments" only where it "determines that noncompliance cannot be remedied by imposing specific conditions." 2 C.F.R. § 200.339. Those conditions are not satisfied here.

*Third*, EPA's suspension or termination contravenes a duly enacted statute. In the Inflation Reduction Act, Congress appropriated $27 billion for distribution under the Greenhouse Gas Reduction Fund. 42 U.S.C. § 7434. EPA is legally required to spend those funds unless it satisfies the stringent requirements for rescinding an appropriation, which, as discussed above, EPA has not done. *See* 2 U.S.C. § 683. That is further reason to find EPA's actions are a violation of federal law. *See Train v. City of New York*, 420 U.S. 35 (1975) (holding that EPA violated federal law by implementing President's directive not to spend appropriated funds on grants as required by statute).

---

[22] To qualify as "adequate evidence of waste, fraud, or abuse," EPA must provide "credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act[,] 31 U.S.C. [§§] 3729-3733." Ex. 3 at 12 (defining "Waste, Fraud, or Abuse" according to EPA's General Terms and Conditions and 2 C.F.R. § 200.113). EPA has not put forward facts that would satisfy this standard.

EPA's actions also violate the Due Process Clause. EPA's Administrator has stated that "[t]he money is now FROZEN." It is hornbook law that the government cannot freeze assets, even temporarily, unless it provides due process. *See United States v. E-Gold, Ltd.*, 521 F.3d 411, 416 (D.C. Cir. 2008) (even when an asset seizure is "potentially temporary, the deprivation of property is subject to the constraints of due process"), *abrogated on other grounds by Kaley v. United States*, 571 U.S. 320 (2014). Here Climate United has received no notice, no hearing, and no process of any kind. According to public reporting, a magistrate judge refused to issue a seizure warrant. No one has ever told Climate United what it did wrong. EPA has refused to meet with Climate United. And yet, apparently EPA's actions have caused Climate United's assets to be frozen. That is a due process violation.

For all of these reasons, EPA's suspension and termination is unlawful. Climate United has therefore exceeded the required showing of a likelihood of success on the merits to warrant a temporary restraining order. *See, e.g.*, *League of Women Voters*, 838 F.3d at 9.

**B.    Climate United Will Suffer Irreparable Harm Absent Injunctive Relief Against EPA.**

For the reasons discussed above as to Citibank, Climate United has shown it will suffer irreparable harm if EPA's unlawful suspension or termination of its grant is not enjoined. Specifically, without its grant funds, Climate United will no longer be able to pay its employees, rent, contractors, subawardees, and contractual counterparties. Absent an immediate injunction, Climate United will suffer serious and irreversible reputational harm if its grant appears to be insecure or invalidated.

**C.    The Balance of Equities Favors Climate United Over EPA**

Where an injunction "will not substantially injure other interested parties," the balance of equities tips in plaintiffs' favor. *League of Women Voters*, 838 F.3d at 12. In this case, EPA "cannot

suffer harm from an injunction that merely ends an unlawful practice." *Open Cmtys. All.*, 286 F. Supp. 3d at 179 (quoting *Rodriguez*, 715 F.3d at 1145). Nor can EPA show it would suffer any harm, or substantial harm, as the result of an injunction.

EPA's recent decision to select Climate United for NCIF funding and disburse the grant is evidence that EPA viewed the grant award as consistent with the interests of EPA and undermines any claim to hardship. Moreover, the Inflation Reduction Act prohibits EPA from allocating any funding it withdraws from Climate United for purposes other than those contemplated under the Act. *See* 42 U.S.C. § 7434(a)(2)-(3) (requiring that appropriated funds be used exclusively fund grant awards issued by EPA before September 2024). Injunctive relief would thus not "actually do much, if any, harm" to EPA's "interest[s]." *League of Women Voters*, 838 F.3d at 13.

The potential for waste, fraud, or abuse does not suffice to demonstrate harm to EPA. Where a program has "existing safeguards," the government must identify actual deficiencies in those safeguards for an interest in "preserving taxpayer resources" to weigh in the public interest. *Pacito v. Trump*, No. 25-cv-255, --- F. Supp. 3d ----, 2025 WL 655075, at *24 (W.D. Wash. Feb. 28, 2025); *see also Art-Metal-USA, Inc. v. Solomon*, 473 F. Supp. 1, 8 (D.D.C. 1978) (enjoining agency from blacklisting plaintiff based on vague and generalized allegations of corruption). EPA has not identified any such deficiencies here. EPA designed, structured, and negotiated the financial agent arrangement and the specific terms of the ACA to provide transparency, accountability, and a mechanism for EPA to assume exclusive control of the grant funds. The grant agreement provides EPA with significant oversight over Climate United's spending, which is limited under the Terms and Conditions of the agreement. The grant agreement's Terms and Conditions further require Climate United to provide extensive progress reports, transaction- and project-level reports, organizational disclosures, and ongoing disclosures to EPA. Ex. 3 at 13-17.

33

Those protections—which EPA imposed and deemed sufficient when it entered into the grant agreement—are therefore sufficient to protect EPA's interests.

In contrast, as discussed above, Defendants' conduct poses an "existential consequence" for Climate United's mission and risks forcing Climate United to "shut[ ] down programs, … furlough[ ] and lay[ ] off employees, [or] shutter[ ] altogether," all of which are significant consequences that tilt in its favor. *AIDS Vaccine Advocacy Coal.*, 2025 WL 485324, at *6; *see also Nat'l Council of Nonprofits*, 2025 WL 368852, at *13 (similar).

## D.    An Injunction Is Firmly in the Public Interest.

Finally, ensuring that Climate United can continue to access its awarded funds is strongly in the public interest. "There is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters*, 838 F.3d at 12. Rather, "there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Id.*; *see also Northern Mariana Islands v. United States*, 686 F. Supp 2d 7, 21 (D.D.C. 2009) ("The public interest is served when administrative agencies comply with their obligations under the APA." (citing *New Jersey v. EPA*, 626 F.2d 1038, 1045 (D.C. Cir. 1980))); *Patriot, Inc. v. U.S. HUD*, 963 F. Supp. 1, 6 (D.D.C. 1997) ("[T]he public interest is best served by having federal agencies comply with the requirements of federal law."). Moreover, "the public would be served if the Executive Branch is enjoined from" managing appropriated funds "in a manner that conflicts with the plain language of an appropriations bill." *General Land Office v. Biden*, 722 F. Supp. 3d 710, 745 (S.D. Tex. 2024) (citing *League of Women Voters*, 838 F.3d at 12).

## CONCLUSION

Climate United's motion for a temporary restraining order should be granted. Specifically, the Court should enter the following relief:

- Citibank should be restrained from refusing to comply with Climate United's disbursement requests under the ACA. This restraining order should apply both to already-submitted requests and to future requests while the restraining order is in force, so long as those requests comply with the ACA.

- EPA should be restrained from impeding Citibank from complying with its obligations under this TRO, and from unlawfully suspending or terminating Climate United's grant.

Dated: March 10, 2025

Respectfully submitted:

/s/  Adam G. Unikowsky

Gabriel K. Gillett (*pro hac vice* forthcoming)
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
Tel.: (312) 222-9350

Adam G. Unikowsky (989053)
Kathryn L. Wynbrandt* (1602446)
David B. Robbins (493976)
Tanner J. Lockhead* (90011928)
JENNER & BLOCK LLP
1099 New York Avenue
Suite 900
Washington, D.C. 20001
Tel.: (202) 639-6000
Fax: (202) 639-6066
aunikowsky@jenner.com

* Application to Court pending.

Allison N. Douglis (*pro hac vice* forthcoming)
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, N.Y. 10036
Tel.: (212) 891-1600
Fax: (212) 891-1699
adouglis@jenner.com

*Attorneys for Plaintiff Climate United Fund*