UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CLIMATE UNITED FUND**<br>7550 Wisconsin Avenue 8th Floor<br>Bethesda, Maryland 20814<br><br>                          Plaintiff,<br><br>   v.<br><br>**CITIBANK, N.A.,**<br>5800 South Corporate Place<br>Sioux Falls, South Dakota 57108,<br><br>   and<br><br>**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**<br>1200 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20460,<br><br>   and<br><br>**LEE ZELDIN, in his official capacity as ADMINISTRATOR, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**<br>1200 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20460<br><br>                          Defendants. | ECF CASE<br><br>No. 1:25-cv-00698 |

**DECLARATION OF ELIZABETH BAFFORD IN SUPPORT OF
CLIMATE UNITED FUND'S MOTION FOR TEMPORARY RESTRAINING ORDER**

I, Elizabeth Bafford, declare as follows:

      1.      I am the Chief Executive Officer of Climate United Fund ("Climate United"). I have managed Climate United since its inception in October 2022 and have worked at Climate United's parent entity since January 2014. In my current role, I am responsible for managing all

1

Climate United operations, including staffing and administration, coordination with third-party vendors, and administering financing programs operated by Climate United. I am also responsible for overseeing the management and allocation of funds awarded by the Environmental Protection Agency ("EPA") through its National Clean Investment Fund ("NCIF") in accordance with our EPA-approved workplan.

2. For these reasons, I have personal knowledge of the facts and information in this declaration.

3. I respectfully provide this declaration to detail the ways in which Climate United's mission and programs will be immediately and irreparably impacted by EPA's apparent decision to cause Citibank, N.A. ("Citibank") to cease providing Climate United with access to its NCIF grant funds, and Citibank's refusal to provide Climate United with access to its grant funds in response to requests. This conduct has immediate and harmful impacts on our ability to pay staff and effectively manage the program; pay invoices due from service providers; disburse investments legally obligated and committed to critical energy projects; and provide predevelopment grants to expand energy access in Tribal communities. This termination also affects other investors and organizations depending on Climate United's responsible fulfilment of its obligations and workplan.

**Climate United and Its Mission**

4. Climate United is a nonprofit financial institution whose mission is to leverage public and private financing to remove financial barriers to deploying clean energy. Our work aims to unleash American clean energy, build safe and affordable housing, and build a stronger economy that lowers energy costs, creates jobs, improves water and air quality, and benefits every American, while making the United States more competitive, secure, and energy independent.

5. Following passage of the Inflation Reduction Act, Calvert Impact, Community Preservation Corporation, and Center for Community Self-Help ("Self Help") joined together to form the Climate United coalition to apply for the NCIF competition under the Greenhouse Gas Reduction Fund ("GGRF"). The three coalition members have been in operation for 30 years, 50 years, and 40 years, respectively. Together, the Climate United coalition has more than 120 years' experience managing more than $30 billion in private and institutional capital. While each of the coalition partners would have been eligible recipients, each formed subsidiaries to act as the grant recipients and subrecipients allowing them to adopt EPA-required policies, procedures, and governance specifically crafted to more efficiently deploy grant funds while mitigating deployment risk. The subsidiaries benefit from the organizational infrastructure and experience of their parent organizations while allowing them to comply fully with EPA oversight requirements, and leverage grant funds with private capital more effectively as stand-alone entities.

6. Climate United helps fill gaps where private capital is missing, bringing the economic benefits of clean energy, electric mobility, and building efficiency projects to overlooked markets. From Arkansas to Alaska, these projects will deliver direct benefits to hard-working Americans and communities in the form of lower energy bills, quality jobs, cleaner air and water, and more secure and reliable energy. Climate United focuses its loans and investments in rural, low-income, and Tribal communities across the country, building demand for clean energy and providing markets for domestic manufacturing. Climate United's investments also mobilize private capital, stretching public dollars further: for every dollar invested in a program or project, Climate United estimates up to four dollars of private capital will flow into communities. These investments in American innovation are a down payment on a stronger, more resilient economy that works for all Americans.

**Climate United's NCIF Award**

7. On July 14, 2023, EPA posted a Notice of Funding Opportunity for the NCIF program. A copy of that notice is attached to my declaration as **Exhibit 1**.

8. EPA established a rigorous process to review and select applicants. That process included an evaluation of each applicant's program plan, organizational capacity, previous experience managing third-party capital, and experience managing financial, credit, compliance, and other risks. The review was conducted by expert panels with broad and deep qualifications who would then present rankings and recommendations to a Selection Official authorized to make the final selection for awards. The panels reviewing all applicants included reviewers with a mix of qualifications, who were drawn both from EPA and from a variety of other federal agencies and who received extensive training on how to conduct their reviews and score applications.

9. On October 12, 2023, Climate United entered the competition with a $13.97 billion proposal to accelerate clean energy adoption across the U.S. economy, including by offering affordable financing for clean technology programs. A detailed proposed budget was required to be submitted to EPA as part of Climate United's application, along with policies and letters of support.

10. On March 31, 2024, Climate United and two other applicants were informed that they were selected for NCIF funding after a nine-month-long competitive process that stressed the importance of our ability to effectively manage risk and swiftly implement our strategy.

11. Climate United was ultimately awarded $6,970,000,000 (the "NCIF Award"), which was publicly announced by the White House in a press release in April 2024. The award was memorialized in a final grant agreement, known formally as a Notice of Award (NOA), dated August 8, 2024. A copy of the August 8, 2024 NOA is attached to my declaration as **Exhibit 2**.

That NOA was amended in an amended NOA dated December 20, 2024, and a further amended NOA dated January 16, 2024. The changes primarily reflect adjustments to our workplan and budget informed by our first six months of market and partner feedback, as well as other clarifications. Copies of the December and January NOAs are attached to my declaration as **Exhibit 3** (December NOA) and **Exhibit 4** (January NOA).

12. The NOA included a negotiated, thoroughly reviewed and EPA-approved budget. Climate United's plans for the NCIF Award were outlined in our publicly posted workplan that was agreed to by EPA on June 13, 2024 and codified in the NOA. Following six months of market feedback, EPA agreed to an amended workplan in December 2024, which was codified in the January NOA. A copy of the amended workplan is attached to my declaration as **Exhibit 5**.

13. As detailed in the workplan, the Climate United coalition plans to commit at least $580 million toward qualified projects in the first year of funding (*i.e.*, before July 2025), and to draw the full $6.97 billion over the first five years of the program, with a further commitment to invest at least 60% in low-income and disadvantaged communities, 20% in rural areas, and 10% in Tribal communities. *Id.* at I, 14. To date, the Climate United coalition has committed $392 million to qualified projects in accordance with its workplan, with our first loan committed in September 2024.

14. Approximately 45% of Climate United's investments (the portion of the funds provided through financial assistance), or approximately $2.8 billion of the Initial Award, will focus on investing in energy-efficient buildings and homes. Approximately 20% of Climate United's investments, or approximately $1.2 billion of the NCIF Award, will focus on electric transportation and charging infrastructure. Another approximately 25% of Climate United's investments, or approximately $1.5 billion of the NCIF Award, will focus on producing affordable,

5

clean electricity and heat through renewable energy generation and battery storage, including solar power, hydroelectric and geothermal. The remaining 10% of investments will focus on other sectors that cut costs, reduce pollution, and provide direct benefits to American families, including in agriculture. *See id.* at 10.

15. Climate United estimates that its planned investments will result in private sector leverage of up to $21 billion. *Id.* at 16. In addition, Climate United's investments will help consumers and small businesses save money by purchasing more efficient clean energy technologies, and will help support community infrastructure such as schools, municipal buildings, healthcare facilities, public housing, and other institutions, particularly those that serve rural, Tribal, and low-to-middle income households and businesses.

**Procedures for Climate United's NCIF Funding**

16. Climate United's funds were fully obligated by EPA on August 8, 2024. While the NOA contemplated the financial agent arrangement, Climate United initially accessed funds through the U.S. Treasury's Automated Standard Application for Payments (ASAP) system as Treasury worked to set up the financial agent arrangement.

17. The remainder of Climate United's undrawn funding was disbursed to accounts held at Citibank, after those accounts were established in November 2024, and subject to an Account Control Agreement entered into between Climate United, EPA, and Citibank (the "ACA"). A copy of the ACA is attached to my declaration as **Exhibit 8**. Climate United, EPA, and Citibank executed an amendment on January 13, 2025, to clarify the parties' intent regarding the treatment of certain obligations that were "properly incurred," if EPA issued a Notice of Exclusive Control. A copy of the January 13, 2025 Amendment to the Account Control Agreement is attached to my declaration as **Exhibit 9**. The system displays expenditures broken down by budget category, and

it provides EPA with full visibility of program income generated by Climate United or any subrecipient.

18. From the program's inception, EPA contemplated the need for a funding mechanism which would allow for balance-sheet capitalization allowing recipients to leverage private capital—a fundamental objective of the program. In the July 2023 notice of funding opportunity, which outlined the parameters of the grant competition, EPA contemplated that "additional measures or other arrangements" would be required if the program departed from typical drawdown requirements, and specifically highlighted that one such additional measure would be "financial agent arrangements with U.S. Department of Treasury … to ensure that EPA's interests are protected." *See* **Ex. 1** at 56.

19. Details about this structure were then discussed with selectees in May 2024 and included in Climate United's original grant agreement, dated August 8, 2024. Specifically, the Terms and Conditions included with the August NOA provided that "[t]he Recipient will open a Deposit Account at a depository institution that has been designated as a financial agent of the United States," that "[s]uch account will be used as Recipient's operating account for the award," and that "[t]he Recipient will take all such actions, enter into all such agreements, and execute and deliver all such documentation as may be necessary and/or directed by EPA from time to time to establish and maintain [a perfected security interest held by EPA], including but not necessarily limited to entering into a deposit account control agreement (DACA) with the Financial Agent and EPA." **Ex. 2** at 58. Climate United had no role in EPA's decision to include the financial agent concept in the Notice of Funding Opportunity in July 2023. Climate United also had no role in the selection of the financial agent, which was coordinated by EPA and the Treasury Department as part of a competitive process.

20. The alternative mechanism used to disburse funds under EPA grants is the Automated Standard Application for Payments (ASAP) system, which Climate United used to access funds between August 2024 (when the initial NOA was finalized) and November 2024, while the ACA was being finalized. This system provides a running total of grant funds disbursed to a grant recipient, but does not allow for visibility into the activities of subrecipients or into program income generated by the grant recipient or any subrecipient.

21. After funding was disbursed to Climate United's Citibank accounts, Climate United has drawn money from its accounts approximately once every two weeks to pay operating expenses, as permitted by the terms of the NCIF Award, which require prior approval for drawing of transfers that will not be disbursed in the following fourteen business days. *See* **Ex. 3** at 57-58.

### Climate United's Operations and Projects Before EPA's Recent Actions

22. Since the August NOA was issued, the NCIF Award has accounted for all of Climate United's funding.

23. Climate United currently has 37 employees on its payroll, whose salaries and benefits are covered in part or whole by the NCIF Award. These staff members collectively operate all aspects of Climate United's operations, including establishing financing programs, underwriting potential financial transactions, ensuring compliance with the terms and conditions of the NCIF Award, managing oversight of subrecipients, soliciting and selecting partners, conducting community engagement, and structuring and servicing a portfolio of loans. Climate United's current employees represent approximately half of the total staff that Climate United intends to hire to support its programs. One requirement of the nine-month competitive process was the ability to identify projects and partners quickly so we could get funds moving to benefit

American communities, so we have been expanding our capacity since the award was announced in April 2024 to implement this program.

24. Climate United has launched three financing programs to date. The first is a $31.8 million pre-construction loan to support solar power projects across rural communities in Arkansas, which was announced in October 2024. Through this project, Climate United is financing pre-construction costs for 18 solar projects comprising the largest commercial solar deployment in Arkansas history, which is projected to save more than $120 million in energy costs over the project's life and create hundreds of jobs.

25. The second is a program to offer affordable leasing options for battery electric heavy-duty trucks to small fleets and independent operators. Climate United issued a request for proposals in October 2024 from qualified U.S. auto manufacturers to deliver up to 500 electric drayage trucks, which Climate United intends to begin leasing at the ports of Long Beach and Los Angeles. When completed, these orders will represent some of the largest ever purchases of domestically manufactured battery electric trucks in U.S. history. The communities surrounding these ports have among the highest air pollution and worst health outcomes in the nation. Climate United intends to expand this program nationally. This program will not only reduce the cost per mile of operating drayage trucks for small businesses, but it will also reduce air pollution in port communities and create demand for U.S. manufacturing in factories across the country.

26. The third is $63 million in committed pre-construction financing for projects designed and developed by a Native-owned and Native-led solar developer who develops solar power plants in partnership with Tribal governments and communities. These projects bring access to affordable energy to rural communities and Indigenous people in addition to creating 1,200

quality jobs and local economic development. Initial projects will be located in Eastern Oregon and Idaho, with plans to use funds for future projects in the pipeline.

27. In addition, Climate United has used grant funds to design, develop and launch the Climate United NEXT program. This is a pre-development grant program intended to provide up to $30 million in technical assistance and planning support for community-led projects that increase energy independence and resiliency, reduce pollution, and save money for hard-working American families, small businesses, and communities. The first round of grants focused on projects serving Tribal communities. Climate United publicly committed to announcing the awardees of these pre-development grants through the NEXT program across the United States by the end of February 2025. After reviewing 104 applications for the program in the first round of submissions, Climate United currently has approved 22 awards across 18 states, and anticipates issuing $6.345 million in initial subawards.

### EPA's and Citibank's Recent Actions

28. On February 18, 2025, Climate United placed a request to Citibank to draw funds. In the normal course, Citibank would have sold shares in Climate United's money market account and then distributed the resulting funds to Climate United later that same day. Climate United's accounts with Citibank do not reflect that either the typical money market transaction or disbursement occurred, and Climate United did not receive any funds.

29. On February 19, 2025, Climate United submitted an email to Citibank regarding the status of its funding. Citibank did not respond.

30. On February 20, 2025, Climate United sent an email message to officials at EPA notifying EPA that it was being denied access to its funds and requesting additional information

10

and guidance. A representative from EPA responded on February 21, offering to discuss the following week.

31. On February 21, 2025, Climate United placed a request to Citibank to draw funds. But Climate United's accounts with Citibank do not reflect that the typical money market transaction or disbursement occurred, and Climate United did not receive any funds.

32. On February 25, 2025, counsel for Climate United submitted another email message to Citibank requesting release of the funds within 24 hours or an explanation of the legal bases for Citibank's actions. Citibank again did not respond.

33. On February 26, 2025, counsel for Climate United left voicemail messages for Citibank at Climate United's direction. Citibank did not respond.

34. EPA rescheduled its meeting with Climate United three times. After being informed that Climate United's outside counsel would be present at the meeting, an EPA official cancelled the meeting without rescheduling. Climate United called the official on February 27 and was informed by the official's administrative assistant that the official would respond to Climate United's emails. Neither that official nor any other official at EPA has responded to Climate United's emails as of the date of this declaration.

35. On March 1, 2025, counsel for Climate United submitted a letter in hard copy and by email to the Chief Executive and Chief Legal Officers of Citibank. Citibank did not respond.

36. On March 3, 2025, Climate United contacted Citibank by email requesting information about the status of Climate United's funds and the process for disbursing those funds. For the first time, Citibank responded, stating: "We have received your correspondence and have forwarded it to the United States Environmental Protection Agency and other federal officials for an appropriate response …. Once we have further information available regarding the program we

can provide at that time." In response to a follow-up email from Climate United requesting clarification, Citibank stated: "We are awaiting further guidance." A copy of that correspondence is attached to my declaration as **Exhibit 6**.

37. On March 4, 2025, counsel for Climate United submitted a letter to EPA by email, notifying EPA that Climate United has been unable to access its funding and requesting information regarding the nature of and legal justification for EPA's actions. The letter requested that EPA immediately reverse its actions and reinstate Climate United's access to its NCIF funding. In the alternative, the letter requested that EPA rescind or stay any suspension of termination of Climate United's grant pending judicial review. EPA did not respond. A copy of that letter is attached to my declaration as **Exhibit 7**.

38. Since February 18, 2025, Citibank has refused Climate United access to any of its grant funds.

### Impact on Climate United's Operations and Programs if Climate United Does Not Promptly Regain Access to the Funding Provided by the NCIF Award

39. Climate United cannot currently access funds to pay its payroll and other expenses related to immediate implementation of its program workplan, as was contemplated in the competitive award to allow swift implementation of the program.

40. Climate United does not have other committed sources of funding that could replace the NCIF Award. Even if Climate United attempted to obtain some amount of stopgap funding from other sources while Climate United litigated this dispute, such funding is far from guaranteed and would require, among other costs, substantial investments of time and energy diverted from Climate United's operations that could not be recouped. Moreover, given the size of the program, any funding secured would only be a temporary fix and could not adequately replace

the grant funds. The result would be cutting hours and/or furloughing personnel, defaulting on and cancelling contracts, and defaulting on our existing loan agreements.

41. Part of the reason why it will be difficult for Climate United to find alternative funding is that Climate United's primary goal, and indeed the goal of the NCIF program and policy enacted by Congress, is to provide financing for projects that do not already have a steady source of market-driven investments. *See* **Ex. 5** at 26; 42 U.S.C. § 7434(b)(1)(B) (requiring funding recipients to "prioritize investment in qualified projects that would otherwise lack access to financing").

42. Even temporary loss of access to its primary funding will severely damage Climate United's internal operations, its financing programs for which the NCIF funding was intended, and its long-term reputation and ability to carry out its mission in the market. Continued loss of access will be devastating. If access to grant funding is not restored, millions of dollars in approved transactions with committed partners cannot move forward—to the detriment of the program, the mission of the organization, and the communities that stand to benefit.

*Impact on Internal Operations*

43. As noted above, Climate United has been drawing money from its Citibank accounts approximately every two weeks to pay operating expenses. Without access to the grant funds in its Citibank accounts, Climate United does not have excess cash or reserves available to pay operating expenses. Climate United therefore imminently risks not being able to pay payroll or health, vision, and dental benefits, life insurance, and short- and long-term disability insurance for its employees. As a result of Defendants' actions, Climate United has already been compelled to defer compensation for certain employees to preserve its limited cash available, and if Climate United is unable to obtain a stable substitute source of funding, it will no longer be able to pay its

employees and will face the risk of cutting hours and/or furloughing staff, beyond the compensation it has already deferred. This makes it significantly less likely that Climate United will retain its current staff or be able to hire new staff.

44. In addition, furloughing or laying off staff will eliminate positions that perform critical functions for Climate United, including: (1) monitoring the loans that Climate United has already disbursed to funding recipients and the $392 million that the Climate United coalition has committed to date; (2) timely fulfilling EPA's reporting requirements for grant recipients; and (3) deploying the NEXT grant program discussed in more detail above.

45. Climate United also imminently risks not being able to pay rent and insurance for select offices or to pay critical third-party contractors who perform necessary services such as managing accounts payable, auditing financial statements, maintaining IT security and infrastructure, advising on compliance, supporting communications, and providing legal services. In addition, as Climate United has explained to EPA, continuing uncertainty around Climate United's funding has caused Climate United to confront increasingly unfavorable terms from essential third-party contractors as well as prospective deal partners. This could place Climate United in default of its agreements and damage its ability to obtain services in the future.

*Impact on Climate United's Grant and Financing Programs*

46. Without a committed source of funding, Climate United would not be able to meet its commitments as part of the awards it has already approved through the NEXT program, discussed above. To not issue these subawards on the publicly communicated timeline would erode trust in Climate United as an institution and damage its reputation, especially given the significant effort that the 104 groups referenced above spent putting together applications. And it would specifically harm the 22 selected projects, which will provide affordable and reliable energy access

to Tribal communities, creating jobs and local economic development for small businesses and contractors.

47. Climate United would also not be able to finance programs it has already launched. For example, without a committed source of funding, Climate United cannot purchase electric heavy-duty trucks from the domestic manufacturers that responded to Climate United's request for proposals as part of the electric truck program mentioned above.

48. For the solar projects discussed above, Climate United has approximately $20.8 million of commitments that remain outstanding, which Climate United is obligated to fund if requested by its existing borrowers. Inability to access funding could cause Climate United to be in legal breach of these agreements. Additionally, failure by Climate United to advance funds would harm the projects, which rely on this source of capital to leverage financing from local banks and other private capital providers to get the solar projects built. Finally, inability to access additional funding would harm the projects because our partners entered into the partnership with the understanding that Climate United would be able to fund future stages.

49. In addition, Climate United is currently engaging in outreach and listening events to shape further rounds of NEXT funding and to design financial products across Climate United's market segments, which is a key program in Climate United's workplan. For example, Climate United representatives were scheduled to conduct a focus group with school districts from across America at the Green Schools Conference on March 3 and 4, 2025. Without access to money for travel to this and other critical events, Climate United has cancelled all travel and outreach events and is unable to continue its work of designing capital solutions for schools, hospitals, and other critical American institutions.

*Impact on Climate United's Committed Loans*

50.     Climate United has approximately $20.8 million in committed funds under loan facilities, which may be drawn at any time. As is standard for loan agreements, this draw timing is at the discretion of the borrowers, so we are not able to control the timing of these draws and could be in breach of our agreements if we are unable to fulfill them.

*Impact on Climate United's Reputation*

51.     Climate United's reputation as a reliable and stable source of financing is essential to its ability to, among other things, attract high-quality co-investment to finance programs and to attract high-quality applicants for its pipeline. A further pause in funding would damage that reputation and make it more difficult for Climate United to find partners willing to enter into financing arrangements in the future. We have already heard feedback from potential partners that they are hesitant to work with us because of the uncertainty surrounding the program and our availability of funds.

52.     In addition, a prolonged pause in funding would be likely to cause third parties to view Climate United as having a less stable source of funding going forward, meaning that it will receive increasingly unfavorable terms from essential vendors and prospective deal partners. In effect, if Climate United is seen as having a less stable source of funding, that has a reputational effect akin to a credit downgrade, causing counterparties to place higher premiums on long-term partnerships and seek additional assurances to protect their economic interests—such as requiring Climate United to provide cash collateral for any guarantees or similar credit enhancement on transactions.

* * *

I declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Executed this 10th day of March, 2025, in Bethesda, Maryland.

                                               */s/ Elizabeth Bafford*
                                               ELIZABETH BAFFORD, CEO
                                               Climate United Fund