# EXHIBIT 7

1099 NEW YORK AVENUE, NW SUITE 900 WASHINGTON, DC 20001-4412

**JENNER&BLOCK** LLP

Adam G. Unikowsky
Tel +1 202 639 6041
Fax +1 202 661 4925
AUnikowsky@jenner.com

March 4, 2025

Lee M. Zeldin
Travis Voyles
Julie Zavala
Aileen Nowlan
Karina Baker
U.S. Environmental Protection Agency
Mail Code 1101A
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

**Re:     Climate United Fund**

Administrator Zeldin:

My firm represents Climate United Fund ("Climate United"). Climate United is one of the recipients of a National Clean Investment Fund ("NCIF") grant award through the Inflation Reduction Act's Greenhouse Gas Reduction Fund. *See* 42 U.S.C. § 7434. As of February 18, 2025, Climate United no longer has access to its grant funding. Although the EPA's actions have been opaque, it appears from your recent public statements and Citibank, N.A.'s ("Citibank") communications about why Climate United's funds are frozen—combined with Climate United's inability to access its grant funds—that the EPA has effectuated a suspension or termination of Climate United's grant. I write to request immediate information regarding the nature of and legal justifications for the EPA's actions.

In addition, I request that you reinstate Climate United's access to its NCIF funding immediately. This includes a request to rescind or stay any suspension or termination of Climate United's grant, to direct Citibank to continue allowing Climate United access to its grant funds under the Terms and Conditions of Climate United's grant, and to take whatever additional actions are needed to ensure that Climate United has access to the funds to which it is legally entitled.

My client is committed to achieving the EPA's priorities of clean air and water for every American, increasing domestic energy production, and bringing back American jobs. Its work has always centered on how to effectively leverage private capital to support small businesses, build strong and resilient local communities, save hard-working Americans money, and create good jobs. Indeed, Climate United's grant requires it to deploy 60% of its loans in low- and moderate-income communities, 20% of its loans in rural communities and 10% of its loans in tribal communities.

March 4, 2025
Page 2

As elaborated in this letter, Climate United has attempted to reach out to introduce itself and its work to explore common ground and a path forward but, as of this writing, has been unable to do so. Direct communication would be the preferred path of my client and, I presume, the EPA, so that this Congressionally appropriated lending program can meet its objectives with strong EPA oversight and direct impact on American families and small businesses.

I.      Background

In 2022, Congress passed and President Biden signed into law the Inflation Reduction Act. Pub. L. No. 117-169. Section 134 of the Act amended the Clean Air Act to authorize the Greenhouse Gas Reduction Fund. *See* 42 U.S.C. § 7434. Subsection 134(b) provides that an eligible recipient shall use the grant funds to facilitate "qualified projects at the national, regional, State, and local levels"; to "prioritize investment in qualified projects that would otherwise lack access to financing"; to "retain, manage, recycle, and monetize all repayments and other revenue received from fees, interest, repaid loans, and all other types of financial assistance provided using grant funds under this section to ensure continued operability"; and to "provide funding and technical assistance to establish new or support existing public, quasi-public, not-for-profit, or nonprofit entities that provide financial assistance to qualified projects[.]" *Id*. § 7434(b). Section 134(a)(2) appropriated $11.97 billion "to remain available until September 30, 2024, to make grants, on a competitive basis … to eligible recipients for the purposes of providing financial assistance and technical assistance in accordance with subsection (b)," while Section 134(a)(3) appropriated $8 billion "to remain available until September 30, 2024, to make grants, on a competitive basis … to eligible recipients for the purposes of providing financial assistance and technical assistance in low-income and disadvantaged communities in accordance with subsection (b)." The statute created a new program built on bipartisan principles to leverage public funds with private capital to catalyze investment flows into places and projects that deliver savings for consumers and support local economic development – much like Small Business Administration guarantees and Opportunity Zone incentives.

To carry out those statutory obligations, the EPA launched three grant competitions, including the approximately $14 billion National Clean Investment Fund competition to award funding to finance clean technology deployment nationally. The NCIF program was "funded with $11.97 billion from Section 134(a)(2) and $2.00 billion from Section 134(a)(3)." *Frequent Questions About the Fund*, EPA, https://www.epa.gov/greenhouse-gas-reduction-fund/frequent-questions-about-fund (last updated October 17, 2024). The EPA established a rigorous process to review and select applications, including the establishment of review panels with broad and deep qualifications who would then present rankings and recommendations to a Selection Official authorized to make the final selection for awards.

At the conclusion of the agency's lengthy and rigorous review process, which included an evaluation of each applicant's program plan, organizational capacity, previous experience managing third-party capital, and experience managing financial, credit, compliance, and other

March 4, 2025
Page 3

risks, Climate United was the highest ranked of the NCIF applicants. On March 31, 2024, Climate United and two other applicants were made aware of their selection for awards through the NCIF. Climate United was ultimately awarded $6,970,000,000.

EPA has since alleged that because Climate United was required to attend standard EPA grants training[1] it lacked basic financial competency. This is false. All EPA grant recipients are required complete certain trainings within 90 days of receipt of an EPA grant – regardless if such trainings are relevant to the recipient[2]. Climate United was required to submit a detailed budget to EPA in connection with the grant competition in October 2023 which was evaluated and considered when selecting Climate United as a recipient. Additionally, a negotiated, thoroughly reviewed and approved budget was a required attachment to Climate United's grant agreement.

Climate United's grant funding was memorialized in a Notice of Award dated August 8, 2024, and subsequent amendments. The Notice of Award and subsequent amendments also codified the grant award's Terms and Conditions. The operative Terms and Conditions are those attached to the December 20, 2024 Notice of Award, which then remained the same in the most recent Notice of Award dated January 16, 2025. *See* Exs. 1, 2. Among other things, those Terms and Conditions set forth the specific requirements with which the EPA must comply to suspend or terminate Climate United's award. Ex. 1 at 41. They do not allow the EPA to unilaterally suspend the grant or remove Climate United's ability to access funding.

To administer the grant funds pursuant to the Terms and Conditions, Climate United and the EPA entered into an Account Control Agreement ("ACA") with Citibank. Ex. 3. Climate United was required to enter into this agreement based on the terms of its grant agreement and had no role in the design, identification, or determination of this arrangement.

The ACA provides that Citibank's role with respect to the award is exclusively "administrative or ministerial." *Id*. at 3. Under the ACA, the EPA has a mechanism to assert a "right of control" over disbursed funding by exercising exclusive control over the account in a form substantially

---

[1] One of the modules in the mandatory trainings helps to clarify another point of confusion by EPA (Module 4 "*Accepting a Grant Award*" (https://www3.epa.gov/grants-training/epa_grants_management_training_for_applicants_and_recipients_mod_4/story.html) – that grantees are required to distribute all the total award amount within 21 days. Grantees are required to accept an EPA grant by either drawing down *any* amount of EPA funds or not objecting to the grant agreement within 21 days. This is a standard provision in all EPA grants. All draws taken by Climate United under its grant must be in accordance with the EPA approved budget and the Terms and Conditions of the grant agreement.

[2] Two training series are required: "*EPA Grants Management Training for Applicants and Recipients*" and "*How to Develop a Budget*". The former includes modules on how to apply for a grant and how to accept a grant, both of which are clearly not relevant for a recipient who has already undergone an application, review and award.

March 4, 2025
Page 4

similar to a sample notice contained in the ACA, stating that, "[a]s required by the Grant Agreement, the Secured Party [*i.e.*, the EPA] has issued a written determination and finding that Pledgor [*i.e.*, Climate United] has failed to comply with the terms and conditions of the Grant Agreement, and that noncompliance is substantial such that effective performance of the Grant Agreement is materially impaired or there is adequate evidence of waste, fraud, material misrepresentation of eligibility status, or abuse." *Id.* at 9 (Exhibit A). In turn, the ACA provides that Citibank has been designated to act as a financial agent of the United States pursuant to the authority of the U.S. Department of the Treasury. *Id.* at 1.

The financial agent arrangement (the FAA) with Citibank and the ACA were designed to provide EPA with full transparency into how grant funds are being spent. The EPA has real time view access into all accounts of both Climate United and any of its subrecipients. The alternative mechanism used to disburse funds under EPA grants is the Automated Standard Application for Payments (ASAP) system. Climate United understands that ASAP provides only a running total of grant funds disbursed to a grant recipient and does not allow for transparency into activities of its subrecipients. Therefore, the FAA increases EPA's oversight of funds by requiring both Climate United and its subrecipients to disclose expenditures by budget category in real time. The FAA also provides EPA with full visibility into any program income generated by Climate United which is typically opaque to EPA under the ASAP system. Finally, EPA is permitted to request supporting documentation from Climate United or any subrecipient with respect to any grant funds used – and indeed in November 2024, EPA conducted its first transactional review of all of Climate United's expenditures to date.

> II.    The EPA Has Precluded Climate United from Accessing Its Funds.

On February 12, 2025, you made a public statement on X announcing the EPA's decision to take possession of grant funds disbursed pursuant to the Inflation Reduction Act, referring to Climate United by name.[3] You provided no justification for this action specific to Climate United.[4]

Without mentioning any specific basis for adverse action under the terms of Climate United's award—or that of any other recipient—you stated "the financial agent agreement with the Bank needs to be instantly terminated," and you demanded that "the Bank must immediately return" the grant funds.[5] To ensure the EPA "reassume[s] responsibility for all of these funds," you then stated that you would "refer[] this matter to the Inspector General's Office and will work with

---

[3] @EPALeeZeldin, *X* (Feb. 12, 2025, 7:52 PM), https://x.com/epaleezeldin/status/1889840040622321778.
[4] Instead, you cite a video purportedly recording a former EPA employee making general statements about grant disbursements, with no discussion of any specific award. *See generally id.*
[5] *Id*. at 2:15.

4

March 4, 2025
Page 5

the Justice Department."[6] Since then, you have stated in no uncertain terms that the EPA is "not going to rest" until it has "recovered" those funds.[7]

Consistent with that directive, to our knowledge, the Office of the Deputy Attorney General ("ODAG") at the Department of Justice communicated with the United States Attorney's Office in Washington, D.C. ("USAO-DC"), seeking to open a grand jury investigation into Climate United's contract awarded by the EPA.[8] Denise Cheung, the Chief of the Criminal Division at USAO-DC, advised that there was not an adequate factual basis to open that grand jury investigation.[9] We understand that the Federal Bureau of Investigation's Washington Field Office subsequently issued a "Freeze Letter" to Citibank containing a recommendation that Citibank freeze Climate United's assets.[10] Apparently unsatisfied, ODAG instructed that a second letter be sent to Citibank *demanding* that Citibank implement an asset freeze and refrain from releasing funds pursuant to a criminal investigation.[11] In response, senior officials at the DC-USAO again asserted there was not sufficient evidence to justify issuing that letter.[12] Consistent with her oath of office, the Chief of the Criminal Division, Denise Cheung, refused to send the letter and was forced to resign.[13] Apparently without signoff from other prosecutors at the DC-USAO, Interim U.S. Attorney Ed Martin submitted a seizure warrant application with a magistrate judge, which was rejected.[14] ODAG then reportedly sought a different U.S. attorney's office to carry out the warrant request, but that office likewise refused to do so.[15]

---

[6] *Id*.

[7] @RapidResponse47, *X* (Feb. 25, 2025, 10:16 AM), https://x.com/RapidResponse47/status/1894406216052289869.

[8] *Read the Resignation Letter by Denise Cheung, a Veteran D.C. Federal Prosecutor*, Wash. Post (Feb. 18, 2025), https://www.washingtonpost.com/dc-md-va/2025/02/18/read-resignation-letter-denise-cheung/ [hereinafter *Resignation Letter*]; *see also* Kyle Cheney et al., *Senior Prosecutor in Washington Quits, Citing Pressure to Probe Biden-era Climate Funds*, Politico (Feb. 18, 2025), https://www.politico.com/news/2025/02/18/denise-cheung-us-attorneys-office-washington-020363.

[9] *Resignation Letter*, *supra* note 5 (noting assessment that no "predicate for opening such a grand jury investigation existed" on the face of the existing documents provided by ODAG).

[10] *Id*.

[11] *Id*.

[12] *Id*.

[13] *Id*.

[14] Spencer Hsu, Maxine Joselow & Nicolas Rivero, *FBI investigating Trump EPA claims of fraud in $20B Biden grant fund*, Washington Post (Feb. 27, 2025), https://www.washingtonpost.com/dc-md-va/2025/02/27/trump-fbi-epa-grant-investigation/.

[15] *Id*.

March 4, 2025
Page 6

It appears that the EPA has in fact acted to prevent Citibank from disbursing funds from Climate United's account. In order to provide funding in response to requests from Climate United, Citibank first sells funds from its money market account and then distributes those funds to Climate United. In accordance with the ACA, this process happens either same-day or by close of business the following day, depending on the time of the request. Climate United placed a request to draw funds on Tuesday, February 18, 2025. In the normal course, Citibank would have sold funds from the money market account the morning of February 18 and distributed the funds to Climate United later that same day. Climate United would be able to see both transactions reflected on its account with Citibank. Neither transaction occurred.

On February 19, 2025, at 9:43 am EST, Climate United submitted an email message to Citibank noting that its funding requests remain pending and have not been disbursed. That letter demanded that Citibank provide the legal bases for those actions, advise whether those actions were taken pursuant to a directive by a government agency, and provide a reasonable opportunity to respond to any instruction or request that impacts Climate United's accounts before that instruction or request may be acted upon by Citibank. Citibank did not respond. Then again, on February 25, 2025, at 6:06 pm EST, counsel for Climate United submitted another email message to Citibank demanding release of the funds within 24 hours or, in the alternative, to provide the legal bases for its actions. And again still, on February 26, 2025, counsel left voicemail messages for Citibank. Counsel subsequently followed up with a letter to Citibank on March 1, 2025. On March 3, 2025 Citibank finally responded to Climate United deferring decision making to EPA after Climate United emailed Citibank pointing out it had become aware that Citibank was responding to other subgrantees. Citibank indicated that it had "received [Climate United's] correspondence and forwarded it to the United States Environmental Protection Agency and other federal officials for an appropriate response" and was "awaiting further guidance" from the EPA.

Citibank did not unilaterally decide to freeze funds on its own and stated in writing that it is awaiting further guidance from EPA. Although the EPA's actions have been shrouded in secrecy, your own public statements show that the EPA is responsible for the freeze. You made a public statement on X at 4:01pm EST on February 19, 2025, stating that you had "just read" a "grant agreement" related to the GGRF, characterizing it as "wild."[16] You have repeatedly stated that you have cancelled several grant agreements, apparently unilaterally, regarding climate and

---

[16] @EPALeeZeldin,        X        (Feb.        19,        2025,        4:01        PM), https://x.com/epaleezeldin/status/1892318587961930086.

March 4, 2025
Page 7

the environment.[17]  On February 23, you discussed the GGRF program on a national television broadcast and stated, without basis, that "the entire scheme, in my opinion, is criminal."[18]

Climate United has sought information on why its funds are being frozen and has been stonewalled at every turn.  On February 20, 2025, Climate United sent an email message to officials at the EPA notifying the EPA that it was being denied access to its funds and to demand additional information and guidance by 10am on February 21, 2025.  The EPA team replied on February 21, providing no additional information but offering to discuss the following week.  At the EPA's request, Climate United cleared their schedule for a meeting with the EPA on Monday afternoon, February 24.  Rather than meet on Monday, the EPA then requested a meeting on Tuesday.  Climate United and the EPA agreed to meet on Tuesday, February 25 at 11 am.  After Climate United informed the EPA that outside counsel would be present, the EPA attempted to reschedule the meeting for 5 pm that day, which Climate United confirmed.  At 3:25 pm, Travis Voyles at the EPA cancelled the meeting, and despite outreach from Climate United to Mr. Voyles to reschedule, the meeting has not been rescheduled.  After multiple emails to Mr. Voyles went unanswered, Climate United subsequently telephoned Mr. Voyles' administrative assistant on February 27, who responded that Mr. Voyles was in possession of Climate United's e-mails and would reach out.  As of the date of this letter, Climate United is still awaiting a response.

Exacerbating matters, the terms and conditions of Climate United's grant require Climate United to draw down funds not more than 14 business days in advance of need.  The EPA's delay in this matter impacts Climate United's ability to continue as a going concern.  Further, to the extent the EPA has caused Citibank to freeze Climate United's funds, such an action impacts Climate United's rights to the grant funds.  EPA has therefore taken action that affects Climate United's rights without any process whatsoever.

---

[17]  @EPALeeZeldin, *X* (Feb. 22, 2025, 2:10 PM), https://x.com/epaleezeldin/status/1893377875220332772.

[18]  @SundayMorningFutures, *X* (Feb. 23, 2025, 11:21 AM), https://x.com/SundayFutures/status/1893697750937505807; *see also* Zack Colman, R*ecipient isn't giving in as Trump's EPA tries to revoke climate grants*, Politico (Feb. 24, 2025), https://www.politico.com/news/2025/02/24/climate-grant-recipient-spending-trumps-epa-tries-claw-back-00205814 (collecting quotes).

March 4, 2025
Page 8

### III. A Suspension or Termination of Climate United's Grant Would Be Unlawful.

Climate United has not been provided with any information about the mechanism by which the EPA required Citibank to cease providing Climate United with access to its NCIF funding. It is clear, however, that the EPA has unilaterally made the decision to cut off Climate United's access to its awarded NCIF funds. No other agency within the federal government has the authority to terminate or suspend Climate United's funding, and Citibank is not acting on its own.

The EPA has thus either terminated Climate United's NCIF grant, or at minimum suspended Climate United's grant funding. Either decision would be unlawful final agency action under the Administrative Procedure Act ("APA"). The EPA should therefore reverse its decision to suspend or terminate Climate United's grant.

#### A. Suspension or Termination of the Grant Violates EPA Regulations.

The EPA is bound by its own regulations. *Nat'l Envtl. Dev. Assocs. Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014); 5 U.S.C. § 706(2)(A). Those regulations do not allow the EPA either to suspend funding under these circumstances or to terminate Climate United's grant.[19]

EPA's suspension of the grant is unlawful. The EPA may withhold payment for allowable costs during the period of performance only where required by Federal statute or regulations or where (i) the recipient "has failed to comply with the terms and conditions of the Federal award"; or (ii) the recipient is "delinquent in a debt to the United States." 2 C.F.R. § 200.305(b)(6).[20] Moreover, where funding is withheld on the grounds that a recipient failed to comply with the terms and conditions of the award, the federal agency may "[t]emporarily withhold payments" only where it "determines that noncompliance cannot be remedied by imposing specific conditions." 2 C.F.R. § 200.339. None of these criteria are met here, nor has the EPA made any effort to establish that these criteria are met.

To the extent the EPA has terminated the grant, that action is also unlawful. Federal regulations also set forth the criteria under which the EPA may terminate Climate United's grant award. These regulations dictate that any unilateral grant termination be authorized in the grant award's Terms and Conditions. The EPA must clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award," 2 C.F.R. § 200.340(b), and

---

[19] In addition, any efforts to terminate Climate United's grant would violate the statute establishing the grant fund, 42 U.S.C. § 7434, particularly when considered against the backdrop of the Impoundment Control Act, 2 U.S.C. § 683.

[20] The EPA has adopted the Uniform Grant Guidance regulations codified at 2 C.F.R. 200 *et seq*. *See* 85 Fed. Reg. 61,571 (Sept. 30, 2020).

March 4, 2025
Page 9

unilateral termination is not permissible unless it occurs "pursuant to the terms and conditions," *id.* § 200.340(a)(4), or because the grant recipient "fails to comply with the terms and conditions," *id.* § 200.340(a)(1). The Terms and Conditions governing Climate United's grant award expressly permit termination only in three circumstances: "when [1] the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially Impaired or [2] there is adequate evidence of Waste, Fraud, or Abuse or [3] material misrepresentation of eligibility status." Ex. 1 at 41.[21] Again, none of these criteria are met here, and the EPA has not given any indication that it has found to the contrary.[22]

In addition, the EPA is obligated by regulation to take certain procedural steps to terminate the Agreement. Among other things, the EPA must comply with 2 C.F.R. § 200.341, which requires written notice of termination that includes "the reasons for termination, the effective date, and the portion of the Federal award to be terminated, if applicable." 2 C.F.R. § 200.341. The EPA has of course provided no such notice. Instead, it unilaterally directed Citibank to prohibit Climate United from accessing its grant funds.

### B.     Suspension or Termination of the Grant Is Arbitrary and Capricious.

The EPA's action is also unlawful because EPA is required to give adequate reasons for its actions under the APA, and may not behave arbitrarily and capriciously. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48 (1983); 5 U.S.C. § 706(2)(A). When, as here, an agency provides no contemporaneous "reasoned explanation" for its decision to terminate a grant, the action is arbitrary and capricious. *Kansas City v. HUD*, 923 F.2d 188, 189, 194 (D.C. Cir. 1991).

The EPA's broad announcement precipitating the actions at issue—that it would claw back "every penny" because "the days of irresponsibly shoveling boatloads of cash to far-left activist groups in the name of environmental justice and climate equity are over"[23]—is not a "reasoned explanation." The EPA has offered no evidence that Climate United committed Waste, Fraud, or Abuse, or has otherwise violated the terms of its grant agreement. To the extent your public

---

[21] "Waste, Fraud, or Abuse" has a defined meaning in the Terms and Conditions: it incorporates the EPA's General Terms and Conditions and 2 C.F.R. § 200.113, *see* Ex. 1 at 12, 41, which in turn require "credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act 31 U.S.C. 3729-3733." *Id.* at 12.

[22] Not only is there no basis to claim that Climate United has not complied with its obligations under the terms of its grant award, but also, on February 27, 2025, the EPA cancelled an "Audit & Oversight" workshop for GGRF grant recipients, offering no explanation. The "Audit and Oversight" workshop scheduled for March 6, 2025 was also cancelled, and it has not been rescheduled.

[23] EPA Lee Zeldin, *supra* note 1.

9

March 4, 2025
Page 10

statements expressed concern regarding grant awards made near the end of the Biden Administration, those concerns would be irrelevant to Climate United, whose funds were obligated in August 2024. In short, the EPA has never articulated any reasoned basis whatsoever for its actions.

### C. Suspension or Termination of the Grant Violates Federal Appropriations Law.

In the Inflation Reduction Act, Congress appropriated $27 billion for distribution under the Greenhouse Gas Reduction Fund. 42 U.S.C. § 7434. The EPA is legally required to spend those funds unless it satisfies the stringent requirements for rescinding an appropriation, which it has not done. *See* 2 U.S.C. § 683; *Train v. City of New York*, 420 U.S. 35 (1975) (holding that the EPA violated federal law by implementing President's directive not to spend appropriated funds on grants as required by statute). It appears that the EPA has impounded the appropriated funds in violation of federal law.

### D. Suspension or Termination of the Grant Violates a Recent Preliminary Injunction.

In OMB Memorandum M-25-13, the Acting Director of OMB announced that "Federal agencies must temporarily pause all activities related to obligation or disbursement of all Federal financial assistance, and other relevant agency activities that may be implicated by [the President's] executive orders, including … financial assistance for … the green new deal."[24] That Memorandum referenced the President's separate "Unleashing American Energy" Executive Order, which directed agencies to "immediately pause the disbursement of funds appropriated through the Inflation Reduction Act of 2022."[25]

On February 25, 2025, in *National Council of Nonprofits et al. v. OMB et al.*, No. 25-cv-239, 2025 WL 368852 (D.D.C.), the federal district court issued a preliminary injunction prohibiting OMB from "implementing, giving effect to, or reinstating under a different name the unilateral, non-individualized directives in OMB Memorandum M-25-13 with respect to the disbursement of Federal funds under all open awards." The injunction directs OMB to instruct federal agencies "that they may not take any steps to implement, give effect to, or reinstate under a different name the directives in OMB Memorandum M-25-13 with respect to the disbursement of Federal Funds under all open awards." *Id*. at *14. It further directs OMB to instruct federal agencies "to release any disbursements on open awards that were paused due to OMB Memorandum M-25-13." *Id*.

This injunction flatly prohibits the unilateral, across-the-board funding pause that the EPA has apparently effectuated with respect to the Greenhouse Gas Reduction Fund, and by extension,

---

[24] OMB, Memorandum For Heads Of Executive Departments and Agencies, at 2 (Jan. 27, 2025), https://static01.nyt.com/newsgraphics/documenttools/da3a3829590efbb7/b0c025ff-full.pdf.
[25] *Id*. at 1 (citing Executive Order 14154).

March 4, 2025
Page 11

with respect to Climate United. As such, any continued freeze or pause on the release of funds would be in direct violation of the district court's preliminary injunction.

IV. **Alternatively, The EPA Should Stay Its Decision Pending Judicial Review.**

As already explained, Climate United's preferred path forward is direct communication to find common ground. But if the EPA adheres to its decision to suspend or terminate Climate United's grant, it should stay its decision pending judicial review.

When assessing a motion for emergency relief from an agency action pending review, courts consider: (1) the likelihood of success on the merits; (2) the prospect of irreparable injury to the moving party if relief is withheld; (3) the possibility of substantial harm to other parties if relief is granted; and (4) the public interest. *See Nken v. Holder*, 556 U.S. 418, 434 (2009). For the reasons explained above, Climate United is likely to succeed in showing that the EPA's action is illegal.

In addition, Climate United faces immediate, irreparable harm. The NCIF award is currently the basis of funding for all of Climate United's operations and for all financing projects that Climate United either has launched or is planning to launch. Even temporary inability to access its funding immediately threatens Climate United's operations, its ongoing and future projects, and its long-term reputation.

Climate United does not have other committed sources of funding to replace the NCIF award. Nor is private investment a viable replacement, because Climate United was specifically awarded NCIF funding to "prioritize investment in qualified projects that would otherwise lack access to financing." 42 U.S.C. § 7434(b)(1)(B).

If Climate United cannot find another source of funding, it will shortly run out of funds to pay operating expenses. At that point, it will no longer be able to pay its employees and will face the risk of cutting hours and/or furloughing staff. Climate United also imminently risks not being able to pay rent for select offices or to pay third-party contractors who perform roles such as auditing its financial statements, maintaining its IT security and infrastructure, and providing legal services.

Further, without a source of funding, Climate United would not be able to meet its commitments as part of loans and awards it has already approved. To not issue these funds on the publicly communicated timeline would erode trust in Climate United as an institution and damage its reputation, and it would cause profound harm to its subawardees – local organizations who rely on these funds to develop critical energy projects that increase access, reduce costs, and create jobs. Climate United would also not be able to finance programs it has already launched, including for example the commitment to finance energy projects in rural communities across

March 4, 2025
Page 12

the States of Arkansas, Oregon, and Idaho.  These outcomes would cause extreme harm to Climate United's business and reputation that could not be repaired.

The balance of equities and the public interest favor Climate United.  The EPA's recent decision to select Climate United for NCIF funding and disburse the grant is clear evidence that the EPA, at least until a few weeks ago, viewed the award as consistent with the interests of the EPA; the fact that the EPA has since changed its mind, after the agency had already disbursed the money Congress directed it to disburse, undermines any claim to hardship.  Moreover, the EPA is prohibited from allocating any funding it claws back from Climate United for purposes other than those contemplated under the Act.  Finally, the American public has an interest in the billions of dollars of investment in our economy and communities that Congress guaranteed when it enacted the Inflation Reduction Act in 2022.

\*\*\*

For the foregoing reasons, Climate United respectfully requests that the EPA reverse its actions precluding Climate United from accessing its NCIF funds, including any suspension or termination of Climate United's grant.  Alternatively, Climate United requests that the EPA stay its decision pending judicial review.

Sincerely,

/s/ Adam G. Unikowsky

Adam G. Unikowsky