# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CLIMATE UNITED FUND

        Plaintiff,

    v.

CITIBANK, N.A., UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY,
and LEE ZELDIN, in his official capacity as
ADMINISTRATOR, UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY

        Defendants.

Case No. 1:25-cv-00698 (TSC)

## FEDERAL DEFENDANTS' OPPOSITION TO CLIMATE UNITED FUND'S MOTION FOR TEMPORARY RESTRAINING ORDER

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................... 7

FACTUAL AND REGULATORY BACKGROUND ......................................................... 9

PROCEDURAL HISTORY ........................................................................................... 12

STANDARDS OF DECISION ...................................................................................... 12

    I.    The TRO Standard ............................................................................................ 12

    II.    The APA Standard ............................................................................................ 13

ARGUMENT .................................................................................................................. 13

    I.    The TRO Motion is Moot ................................................................................ 13

    II.    Plaintiffs Are Not Likely to Succeed on the Merits. ........................................ 15

        A.    This Court Lacks Jurisdiction Over Plaintiff's APA and Due Process Claims ............. 15

        B.    Even If Jurisdiction Were Proper Here, EPA's Actions are Not Arbitrary or Capricious…. ........................................................................................... 20

        C.    The Temporary Hold on the Citibank Accounts Was Not Final Agency Action .......... 22

    III.    Plaintiff's Alleged Harm Cannot Justify a TRO ........................................... 22

    IV.    An Injunction Would Be Contrary to the Public Interest. ............................. 24

CONCLUSION .............................................................................................................. 26

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Albrecht v. Comm. on Emp. Benefits*,
    357 F.3d 62 (D.C. Cir. 2004) ...................................................................10, 11, 12

*Already, LLC v. Nike, Inc.*,
    568 U.S. 85 (2013) ............................................................................................... 7

*Am. Sci. & Eng'g, Inc. v. Califano*,
    571 F.2d 58 (1st Cir. 1978) ................................................................................ 14

*Bennett v. New Jersey*,
    470 U.S. 632 (1985) ............................................................................................. 9

*Bennett v. Spear*,
    520 U.S. 154 (1997) ........................................................................................... 16

*Brock v. Pierce Cnty.*,
    476 U.S. 253 (1986) ........................................................................................... 19

*Burlington N. R.R. Co. v. Surface Transp. Bd.*,
    75 F.3d 685 (D.C. Cir. 1996) .............................................................................. 7

*C.G.B. v. Wolf*,
    464 F. Supp. 3d 174 (D.D.C. 2020) .................................................................... 6

*Chaplaincy of Full Gospel Churches v. England*,
    454 F.3d 290 (D.C. Cir. 2006) .......................................................................... 16

*Chemung Cnty. v. Dole*,
    781 F.2d 963 (2d Cir. 1986) .............................................................................. 13

*Clay v. United States*,
    210 F.2d 686 (D.C. Cir. 1953) .......................................................................... 13

*Coal. v. U.S. Dep't of State*, Civ.,
    No. 25-00400 (AHA), 2025 U.S. Dist. LEXIS 42875 (D.D.C. March 10, 2025) ...................... 2

*Coggeshall Dev. Corp. v. Diamond*,
    884 F.2d 1 (1st Cir. 1989) ........................................................................... 13, 14

*Columbia Gulf Transmission v. FERC*,
    106 F.4th 1220 (D.C. Cir. 2024) ....................................................................... 14

*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*,
  38 F.4th 1099 (D.C. Cir. 2022) .................................................................10, 11, 12

*Doe v. Civiletti*,
  635 F.2d 88 (2d Cir. 1980) ......................................................................... 13

*FCC v. Prometheus Radio Project*,
  592 U.S. 414 (2021) ............................................................................ 14, 15

*Florida Dept. of State v. Treasure Salvors, Inc.*,
  458 U.S. 670 (1982) ................................................................................... 13

*Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985) ................................................................... 17

*Henke v. U.S. Dep't of Commerce*,
  83 F.3d 1445 (D.C. Cir. 1996) ..................................................................... 9

*Husky Mktg. & Supply Co. v. FERC*,
  105 F.4th 418 (D.C. Cir. 2024) ................................................................. 14

*Identification Devices, Inc. v. United States*,
  121 F.2d 895 (D.C. Cir. 1941) ................................................................... 13

*Ingersoll-Rand Co. v. U.S.*,
  780 F.2d 74 (D.C. Cir. 1985) ..................................................................... 14

*Kidwell v. Dep't of Army, Bd. for Corr. of Mil. Recs.*,
  56 F.3d 279 (D.C. Cir. 1995) ............................................................... 10, 12

*Larson v. Domestic & Foreign Com. Corp.*,
  337 U.S. 682 (1949) ................................................................................... 13

*Megapulse, Inc. v. Lewis*,
  672 F.2d 959 (D.C. Cir. 1982) ........................................................10, 11, 13, 14

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ....................................................................................... 6

*Navajo Nation v. Azar*,
  292 F. Supp. 3d 508 (D.D.C. 2018) .......................................................... 18

*Nken v. Holder*,
  556 U.S. 418 (2009) ............................................................................... 8, 18

*Olympic Fed. Sav. And Loan Ass'n v. Dir., Office of Thrift Supervision.*,
 CIV. A. No. 90-0482, 1990 WL 134841 (D.D.C. Sept. 6, 1990) ............................... 13

*Pacific Gas & Elec. Co. v. FPC*,
 506 F.2d 33 .................................................................................................................. 16

*Pennhurst State School and Hospital v. Halderman*,
 451 U.S. 1 (1981) ........................................................................................................... 9

*People for the Ethical Treatment of Animals, Inc. v. Gittens*,
 396 F.3d 416 (D.C. Cir. 2005) ...................................................................................... 7

*Perry Capital LLC v. Mnuchin*,
 864 F.3d 591 (D.C. Cir. 2017) ............................................................................... 10, 12

*Preiser v. Newkirk*,
 422 U.S. 395 (1975) ....................................................................................................... 7

*Preserve Overton Park, Inc. v. Volpe*,
 401 U.S. 402 (1971) ..................................................................................................... 15

*Resins, Inc. v. E.P.A.*,
 787 F.3d 544 (D.C. Cir. 2015) .................................................................................... 17

*Sackett v. E.P.A.*,
 566 U.S. 120 (2012) ..................................................................................................... 16

*Sampson v. Murray*,
 415 U.S. 61 (1974) ....................................................................................................... 17

*Santini v. Farris*,
 No. 2:21-cv-13045, 2022 WL 831420 (E.D. Mich. Feb. 15, 2022) ........................... 17

*Shaffer v. Veneman*,
 325 F.3d 370 (D.C. Cir. 2003) .................................................................................... 10

*Sierra Club v. EPA*,
 353 F.3d 976 (D.C. Cir. 2004) ...................................................................................... 7

*Sissel v. Wormuth*,
 77 F.4th 941 (D.C. Cir. 2023) ..................................................................................... 14

*Spectrum Leasing Corp. v. U.S.*,
 764 F.2d 891 (D.C. Cir. 1985) .................................................................................... 12

*Suburban Mortg. Assocs. v. U.S. Dept. of Housing and Urban Dev.*,
    480 F.3d 1116 (Fed. Cir. 2007) ................................................................... 13, 14

*T & L Redemption Ctr. Corp. v. Phoenix Beverages, Inc.*,
    752 F. Supp. 64 (E.D.N.Y. 1989) ........................................................................ 18

*Thermalon Indus., Ltd. v. United States*,
    34 Fed. Cl. 411 (1995) .......................................................................................... 9

*Transohio Sav. Bank v. Dir., Office of Thrift Supervision*,
    967 F.2d 598 (D.C. Cir. 1992) ...................................................................... 10, 12

*United States v. Bolton*,
    468 F. Supp. 3d 1 (D.D.C. 2020) ....................................................................... 18

*United States v. Jones*,
    131 U.S. 1 (1889) ................................................................................................ 12

*United States v. Michigan*,
    230 F.R.D. 492 (E.D. Mich. 2005) ..................................................................... 17

*Westberg v. F.D.I.C.*,
    759 F. Supp. 2d 38 (D.D.C. 2011) ....................................................................... 7

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ................................................................................................ 17

*WP Co. v. U.S. Small Bus. Admin.*,
    502 F. Supp. 3d 1 (D.D.C. 2020) ....................................................................... 19

**Statutes**

5 U.S.C. § 704 ............................................................................................................ 16

5 U.S.C. § 706(2)(A) .............................................................................................. 6, 14

28 U.S.C. 1491(a)(1) ............................................................................................... 2, 9

42 U.S.C. § 7434 ......................................................................................................... 1

**Rules**

Fed. R. Civ. Proc. 65(c) ............................................................................................ 19

**Regulations**

2 C.F.R. § 200.339 ....................................................................................................... 4

2 C.F.R. § 200.341 ........................................................................................................ 4

## INTRODUCTION

Through the Greenhouse Gas Reduction Fund, Congress created a grant program of historic proportion.  Congress tasked EPA with standing up a program to award and distribute $27 billion in grants, by far the largest program EPA has ever administered, and indeed a multiple of EPA's own annual budget.  Congress also gave EPA a hard deadline of September 30, 2024, to obligate the entirety of those funds. 42 U.S.C. § 7434.

Following the presidential transition, EPA learned a series of troubling facts about how certain large program grants had been allocated and structured.  Instead of holding the funds itself and disbursing reimbursements following review of invoices and evaluation of work performed, EPA chose to use an external financial agent, Citibank, to hold the $20 billion appropriated for the EPA's Clean Communities Investment Accelerator (CCIA) and National Clean Investment Fund (NICF) programs for distribution to grant recipients.  The selection of grant recipients also raised a host of concerns.  The initial grant award terms were then modified in December 2024 and again on January 13, 2025—*i.e.*, after the presidential election but before the transition.

Accordingly, the new Administration began to undertake a review the grants, and the post-election amendments and actions on the grants, specifically investigating whether the program as currently structured provides EPA with adequate controls to ensure grant funds are used appropriately.  A criminal investigation was also launched to evaluate the process that led to these grants and the grant modifications.  In view of these investigations, on March 4, EPA asked the Department of Treasury (as the contracting party with Citibank) to instruct Citibank to pause distributions while it continued to evaluate the presence of adequate control mechanisms.  EPA later extended the pause.  Ultimately, EPA concluded that Plaintiff's grant should be terminated,

along with seven other grants like it, sending notices of termination on March 11.  Among the reasons described in the notice, EPA explained that the existing grants lacked adequate controls and should be re-awarded under new agreements that ensure the EPA retains adequate oversight.

EPA's termination moots the claims in Plaintiff's Complaint and its motion for temporary restraining order (the TRO Motion).  The Complaint prays for relief that EPA be enjoined from suspending or terminating the grant "except as permitted in accordance with the ACA, the grant award and applicable law."  And the TRO Motion asks the Court for an order forcing Citibank and EPA to disburse funds under the relevant contracts, on the theory that the grant remains live.  But the temporary pause in distributions has been overtaken by the termination of the grant in accord with its terms and the agency's authority.  On termination, the grant agreement itself precludes Climate United from withdrawing additional money.  The grant agreement then describes the relief Climate United may seek upon termination.  As Judge Ali concluded in an opinion filed earlier this week, *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, Civ. No. 25-00400 (AHA), 2025 U.S. Dist. LEXIS 42875, at *42 (D.D.C. March 10, 2025), challenging a *freeze* on grant distributions does not give the Court authority to adjudicate *termination* of those grants.  Here, the agreement has been terminated, and Plaintiff itself has acknowledged EPA's right to do just that.  Plaintiff's claims are moot, and Plaintiff must now look to its grant agreement for available relief.

That relief—and, for that matter, the now-moot relief Plaintiff seeks in its TRO Motion— must be asserted under the Tucker Act, 28 U.S.C. 1491(a)(1), which bars jurisdiction in this court. Although the intersection between the Administrative Procedure Act (APA) and the Tucker Act can be hazy, this case lies squarely within the well-established confines of Tucker Act jurisdiction. Termination is explicitly governed by the grant agreement, and regulations are incorporated into that agreement.  Plaintiff may pursue its remedies under the agreement and ultimately seek judicial

review and damages in the Court of Federal Claims. But Plaintiff may not ask this Court to force EPA to undo its termination. Congress has not waived the United States' sovereign immunity to allow courts to compel the government to specifically perform agreements.

Setting all of that aside, even under the APA's standard of review, EPA's decision to suspend (and then terminate) was anything but arbitrary and capricious. It was instead a reasonable choice to ensure greater oversight over billions of dollars in taxpayer money. And EPA has announced that it intends to redeploy that money consistent with Congress's authorization. As to the due process claim, Plaintiff may utilize the process it bargained for—that is, judicial review of EPA's termination in the Court of Federal Claims. The law requires no additional process.

In all events, temporary injunctive relief is unavailable because the harm Plaintiff alleges is classically monetary. Nor would an injunction serve the public interest. The relevant program is just beginning—the grant agreement was signed in August 2024, and its terms were modified as recently as January 16, 2025. The injunction Plaintiff seeks would harm the public interest by making billions of dollars immediately available to Climate United when the EPA has concluded that the existing regime provides inadequate oversight and controls.

For these reasons, and as further explained below, the TRO motion should be denied.

## FACTUAL AND REGULATORY BACKGROUND

On August 16, 2022, Congress amended the Clean Air Act to create the Greenhouse Gas Reduction Fund (GGRF): a $27 billion infrastructure investment to establish "green banks." Green banks are "relatively new types of financial institutions" designed to funnel funding to climate related infrastructure and technology investments. Cong. Rsch. Serv. IN12090, *EPA's Greenhouse Gas Reduction Fund* at 2, https://crsreports.congress.gov/product/pdf/IN/IN12090. The GGRF is comprised of three grant programs—the National Clean Investment Fund (NCIF), the Clean

Communities Investment Accelerator (CCIA), and Solar for All (SFA). The Environmental Protection Agency (EPA) oversees the program's administration.

In July 2023, EPA published Notices of Funding Opportunity (NOFO) and began accepting and reviewing applications soon thereafter. EPA announced selectees and funding amounts on April 2, 2024. Climate United Fund (Climate United) was awarded a $6.97 billion dollar grant from the NCIF program, the largest grant amongst the selectees.

On August 8, 2024, EPA and Climate United entered into a grant agreement (Grant Agreement), via a Notice of Award, which included the grant's terms and conditions. Declaration at Exhibit A (Grant Agreement). The Grant Agreement was amended on December 20, 2024, and again just days before the end of the prior administration, on January 16, 2025. Declaration at Exhibit A.

The Grant Agreement incorporates various provisions of the Uniform Grant Guidance, including 2 C.F.R. §§ 200.339, 340 and 341. These regulations describe the procedures EPA must follow if it terminates the Grant Agreement. *See* 2 C.F.R. §§ 200.339, 341.

Rather than funding grant distributions directly through the United States Treasury, the Grant Agreement was unusual in that it allowed the government to use a designated financial agent as the depository institution to administer program distributions. Grant Agreement at 51. Defendant Citibank serves that role. Declaration at B (ACA).

Treasury, Climate United, and EPA then entered an Account Control Agreement (ACA) on November 1, 2024. That agreement, too, was amended just days before the transition of leadership in the Executive Branch, on January 16, 2025. The ACA provides, in relevant part, that EPA possesses a security interest in the Citibank accounts that contain the program funds. ACA at 2. The amendments appear to reduce EPA's oversight.

Upon assuming office, EPA Administrator Lee Zeldin began to learn more about this program and to express concerns with the GGRF program's creation and implementation. *See* Press Release, EPA, Administrator Zeldin Announces that Billions of Dollars Worth of "Gold Bars" Have Been Located at Outside Financial Institution (February 13, 2025), https://www.epa.gov/newsreleases/administrator-zeldin-announces-billions-dollars-worth-gold-bars-have-been-located. EPA sent its Office of Inspector General a letter on March 2, 2025, detailing the concerns with the GGRF program, including allegations of "misconduct, waste, conflicts of interest, and potential fraud" and noting pending investigations by the FBI and DOJ. *See* Declaration at Exhibit C.

On March 4, 2025, Treasury—understanding that EPA anticipated "developing additional account controls, including issuing a series of oversight questions to recipients, consistent with prudent operational standards and EPA's authority under grant agreement documents and Section I.B of Exhibit A to the Financial Agency Agreement (FAA)"—instructed Citibank "not to disburse funds from any of the GGRF accounts" prior to the end of the day Sunday, March 9, 2025. Declaration at Exhibit D. As part of its due diligence, EPA also sent a communication to the eight GGRF primary grant recipients requesting the awardees submit responses, along with documents, to various inquiries about the GGRF program. Declaration at Exhibit D.

On March 6, 2025, Citibank wrote to EPA noting that the bank "awaits further guidance … on the additional account controls and direction" EPA intended to pursue. Declaration at Exhibit E. EPA responded on March 8 and informed Citibank that given "structural challenges, the current lack of critical information, ongoing investigations by the U.S. Department of Justice and Federal Bureau of Investigation, and ongoing reviews by other federal oversight entities, it is time-critical and essential that [the parties] work together to develop and implement necessary safeguards" to

"serve the purposes and interests of the United States."  Declaration at Exhibit F.  On March 9, EPA instructed Citibank "to pause the processing of payment instructions for the GGRF accounts until further notice."  Declaration at Exhibit G.  Treasury also instructed Citibank to comply with EPA's instructions to Citibank pursuant to the FAA.  Declaration at Exhibit H.

On March 11, EPA issued a notice terminating Climate United's Grant Agreement under the GGRF program.  Declaration at Exhibit I (Termination Letter).  In the letter, EPA explained that "termination is based on substantial concerns regarding program integrity, the award process, programmatic fraud, waste, and abuse, and misalignment with the Agency's priorities, which collectively undermine the fundamental goals and statutory objectives of the award."  *Id.*

## PROCEDURAL HISTORY

On March 8, Plaintiff filed its Complaint, followed by a Motion for Temporary Restraining Order (TRO) on March 10.  EPA now opposes the TRO motion pursuant to the deadlines set by this Court's March 10 order.  March 10 Minute Order, 1:25-cv-698-TSC.

## STANDARDS OF DECISION

### I.    The TRO Standard

"The standard for issuance of the 'extraordinary and drastic remedy' of a temporary restraining order or a preliminary injunction is very high, and by now very well established." *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 197 (D.D.C. 2020).  A movant seeking such an extraordinary remedy "bears the burden of making a clear showing" that it is "entitled to such relief."  *Id.*  To make such a showing, Plaintiff bears the burden of establishing (1) it is likely to "succeed on the merits," (2) it is "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of the equities tips in [its] favor," and (4) "an injunction is in the public interest."  *Id.*

## II.    The APA Standard

The scope of review under the "arbitrary and capricious" standard, 5 U.S.C. § 706(2)(A), is "narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). This standard "deems the agency action presumptively valid provided the action meets a minimum rationality standard." *Sierra Club v. EPA,* 353 F.3d 976, 978 (D.C. Cir. 2004).

## ARGUMENT

## I.    The TRO Motion is Moot

Plaintiff's request for TRO is now moot and must be denied. EPA terminated the Grant on March 11, 2025, ending Plaintiff's performance and its right to request disbursement of funds. So the TRO, which sought to lift a temporary suspension of those disbursements while the grant was still live, has been overtaken by events.

"A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013). "No matter how vehemently the parties continue to dispute the lawfulness of the conduct that precipitated the lawsuit, the case is moot if the dispute is no longer embedded in any actual controversy about the plaintiffs' particular legal rights." *Id.* "The rule in federal cases is that an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975). "An intervening event will render a claim moot if it becomes impossible for the court to grant the prevailing party effective relief." *Westberg v. F.D.I.C.*, 759 F. Supp. 2d 38, 43-45 (D.D.C. 2011); *see also People for the Ethical Treatment of Animals, Inc. v. Gittens*, 396 F.3d 416, 421 (D.C. Cir. 2005) ("An appeal from an order granting a preliminary injunction

becomes moot when, because of the defendant's compliance or some other change in circumstances, nothing remains to be enjoined through a permanent injunction."); *Burlington N. R.R. Co. v. Surface Transp. Bd.*, 75 F.3d 685, 688 (D.C. Cir. 1996) (a case is moot when "intervening events make it impossible to grant the prevailing party effective relief" against the originally challenged policy).

Plaintiff brought this motion to challenge Citibank's alleged noncompliance with the ACA and to "restrain EPA from impeding Citibank from complying with the ACA." Motion at 4, 35. But the landscape has changed. Upon termination of the grant, Citibank is no longer bound by the ACA to disburse grant funds to Plaintiff—indeed, it is no longer *permitted* to do so. The TRO is thus moot: Plaintiff is no longer able to make disbursement requests, Citibank can no longer comply with such requests, and, thus, there is no potential compliance that may be impeded. Instead, the Grant Agreement itself now prohibits the relief Climate United seeks. To withdraw funds, Climate United must certify "that the amount of the payment is necessary to execute against the workplan in effect . . ." Grant Agreement at pp. 56. With no workplan in place, Plaintiff cannot make that certification.

Judge Ali's recent decision, in *AIDS Vaccine*, which addressed a similar legal issue on distinguishable facts, is instructive. In that case, the Court had enjoined the agency's freeze of thousands of USAID grants. *AIDS Vaccine,* 2025 U.S. Dist. LEXIS 42875 at *37. The agency thereafter initiated large scale terminations of the grants. *Id.* The court concluded that the decision to freeze was a separate agency action from the later terminations and thus could not be challenged as part of the same case. *See id.* The same is true here. To the extent the motion (and complaint) describes "agency action," it describes EPA's *pause* on disbursements. But now, any injury stems from EPA's *termination* of the grant. Even if EPA's termination could be challenged as an agency

action (which, as explained below, it cannot, and has not been), it would be a "distinct ... agency action that must be challenged as such." *Id.* at *42.

## II.    Plaintiffs Are Not Likely to Succeed on the Merits.

Putting aside that the present claims are now moot, Plaintiff cannot secure injunctive relief because it cannot demonstrate that it is likely to succeed on the merits. *Nken v. Holder*, 556 U.S. 418, 426 (2009). Plaintiff's claims have their source of right in a grant and seek to access grant funds—and so this really amounts to a breach-of-contract suit that is not subject to review in this Court. And even if jurisdiction existed, EPA's suspension (and now termination) of grant funding was not "arbitrary or capricious" but rather was reasonable and in compliance with EPA's rights under the Grant Agreement and its inherent authority to protect the public fisc. It therefore violates neither the APA nor the Due Process Clause.

### A.    This Court Lacks Jurisdiction Over Plaintiff's APA and Due Process Claims

Even if Plaintiff's claims were still viable, the relief Plaintiff seeks is entirely contractual in nature and therefore not properly before the Court. *See* Compl. at 34. Though obscured by references to the APA, Plaintiff asks for monetary relief—disbursement of grant funds pursuant to a grant agreement with EPA, and based on a supposed violation of the terms of that contractual agreement. Jurisdiction over these contract-based claims cannot lie here.

1.    The Tucker Act provides in relevant part that "[t]he United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). Courts routinely treat federal grants as contracts, when they have the classic elements of an offer, an acceptance, and consideration. *See Bennett v. New Jersey*, 470 U.S. 632, 638 (1985) ("Title I, like many other federal grant programs, was 'much in the nature of a contract.'") (quoting

*Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 17 (1981)); *Henke v. U.S. Dep't of Commerce*, 83 F.3d 1445, 1450 (D.C. Cir. 1996) ("An NSF grant agreement includes the essential elements of a contract and establishes what would commonly be regarded as a contractual relationship between the government and the grantee."); *Thermalon Indus., Ltd. v. United States*, 34 Fed. Cl. 411, 415 (1995) ("Viewing the grant terms and conditions in their entirety, the court concludes that the parties intended to be bound contractually."). Indeed, Plaintiff itself repeatedly refers to the "contract" throughout its Complaint. *See* Compl. at 3, 4, 28, and 34.

The D.C. Circuit has "interpreted the Tucker Act as providing the ***exclusive*** remedy for contract claims against the government, at least vis a vis the APA." *Shaffer v. Veneman*, 325 F.3d 370, 373 (D.C. Cir. 2003) (emphasis added) (quoting *Transohio Sav. Bank v. Dir., Office of Thrift Supervision*, 967 F.2d 598, 609 (D.C. Cir. 1992)); *see also Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 618-19 (D.C. Cir. 2017) (explaining that D.C. Circuit has "interpreted the Tucker Act … to 'impliedly forbid[]' contract claims against the Government from being brought in district court under the [sovereign immunity] waiver in the APA")

Regardless of how a claim is styled, a district court lacks jurisdiction if the claim "is in 'its essence' contractual." *Perry Capital,* 864 F.3d at 619 (*quoting Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982)); *see also Albrecht v. Comm. on Emp. Benefits*, 357 F.3d 62, 67 (D.C. Cir. 2004) ("[T]he district court lacks jurisdiction if [plaintiff's claim] is essentially a contract action."). "[E]ven for claims that are not for money damages, the APA confers no 'authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.'" *Albrecht* 357 F.3d at 67 (quoting 5 U.S.C. § 702). Though the D.C. Circuit has "rejected the 'broad' notion 'that any case requiring some reference to or incorporation of a contract is necessarily on the contract and therefore directly within the Tucker Act,'" it has also

warned that plaintiffs cannot avoid the Tucker Act's jurisdictional consequences by crafting a complaint to disguise what is essentially a contract claim as a claim for equitable relief under a separate legal authority. *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1107 (D.C. Cir. 2022); *see also Kidwell v. Dep't of Army, Bd. for Corr. of Mil. Recs.*, 56 F.3d 279, 284 (D.C. Cir. 1995); *Megapulse*, 672 F.2d at 969-70 ("This court retains the power to make rational distinctions between actions sounding genuinely in contract and those based on truly independent legal grounds."). In determining whether a claim "is 'at its essence' contractual" the D.C. Circuit makes determinations based on "both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate)." *Crowley*, 38 F.4th at 1106 (quoting *Megapulse*, 672 F.2d at 968).

Applying the two-prong test described in *Crowley* here, Plaintiff's arbitrary-and-capricious claim is essentially a contract claim for monetary relief against EPA that this Court lacks subject-matter jurisdiction to resolve. *See Albrecht*, 357 F.3d at 68 ("[T]he district court lacks jurisdiction if [the plaintiff's claim] is essentially a contract action.").

*First,* under *Crowley*'s "source of rights" prong, Plaintiff's claims are clearly contractual. In examining the "source of the rights" prong, the D.C. Circuit considers whether "the plaintiff's asserted rights and the government's purported authority arise from statute"; whether "the plaintiff's rights 'exist[] prior to and apart from rights created under the contract'"; and whether "the plaintiff 'seek[s] to enforce any duty imposed upon' the government 'by the … relevant contracts to which' the government 'is a party.'" *Crowley*, 38 F.4th at 1107. Here, Plaintiff's rights to GGRF funding arise solely from its contract with EPA—the Grant Agreement. No statute or regulation entitles Plaintiff to participate or receive funding from the GGRF program, and Plaintiff seeks to enforce the terms and conditions of the Grant Agreement against EPA. Similarly, EPA's

authority to terminate the grant arises from the Grant Agreement and the regulations incorporated into the contract's terms and conditions.

*Second*, under *Crowley's* "type of relief sought" prong, Plaintiff's requested relief also points to the contractual nature of their claims. Climate United seeks to withdraw money that it contends it has a right to access under its grant with EPA. That is an explicitly contractual remedy. *See Perry Capital*, 864 F.3d at 619. As the D.C. Circuit has recently explained, "the crux of" this relief-focused inquiry "boils down to" whether the plaintiff, "in whole or in part, … explicitly or 'in essence' seeks more than $10,000 in monetary relief from the federal government." *Crowley*, 38 F.4th at 1107 (quoting *Kidwell*, 56 F.3d at 284). Plaintiffs here seek payment of *billions* of dollars in grant funding. While Plaintiff does not explicitly demand monetary relief from EPA in its Complaint or TRO Motion, "[t]he plain language of a complaint . . . does not necessarily settle the question of Tucker Act jurisdiction." *Kidwell*, 56 F.3d at 284. In asking the Court to enjoin EPA "from impeding Citibank from complying with its contractual obligations" "or unlawfully suspending or terminating Climate United's grant award," Compl. at 34-35, Plaintiff is effectively seeking "an order compelling the government to pay [it] money," *Spectrum Leasing Corp. v. U.S.*, 764 F.2d 891, 894 (D.C. Cir. 1985), pursuant to the only legal instrument that would entitle them to any program funding at all—*i.e.*, the Grant Agreement. Such relief is indistinguishable from "the classic contractual remedy of specific performance," *id.*, and, as a result, confirms that Plaintiffs' arbitrary-and-capricious claim "sound[s] in contract," *Perry Capital*, 864 F.3d at 619. *See id.* (observing that "specific performance is an explicitly contractual remedy"); *Albrecht*, 357 F.3d at 69 (concluding that the plaintiff's claim "sound[ed] in contract" in part because the terms of the contract at issue "w[ould] determine whether the relief sought—recovery of past contributions and termination of future payments—[was] available"); *Transohio Sav. Bank*, 967

F.2d at 613 (recognizing the D.C. Circuit's "very specific holdings that the APA does *not* waive sovereign immunity for contract claims seeking specific relief").

This is not merely a technical distinction. It bears directly on the remedies that Plaintiff may seek. In particular, specific performance does not lie against the government, *United States v. Jones*, 131 U.S. 1 (1889), and "[f]ederal courts do not have the power to order specific performance by the United States of its alleged contractual obligations," *Coggeshall Dev. Corp. v. Diamond*, 884 F.2d 1, 3 (1st Cir. 1989) (citing *Florida Dept. of State v. Treasure Salvors, Inc.,* 458 U.S. 670, 689 (1982); *see also Larson v. Domestic & Foreign Com. Corp.,* 337 U.S. 682, 701–02 (1949); *Doe v. Civiletti,* 635 F.2d 88, 89 (2d Cir. 1980); *Chemung Cnty. v. Dole*, 781 F.2d 963, 970 (2d Cir. 1986). The Court therefore cannot undo EPA's termination of the grant or force it to reinstate the grant agreement and specifically perform the grant. *See Coggeshall*, 884 F.2d at 3 ("We are unaware of any waiver of sovereign immunity by the United States as to specific performance for breach of contract."); *Identification Devices, Inc. v. United States*, 121 F.2d 895 (D.C. Cir. 1941) (denying injunctive relief); *Clay v. United States*, 210 F.2d 686 (D.C. Cir. 1953) (action to void assignment of patents to United States).

In sum, "despite [Plaintiff's] valiant effort to frame the suit as one for declaratory or injunctive relief, this kind of litigation should be understood for what it is"—"a suit for money for which the Court of Federal Claims can provide an adequate remedy, and it therefore belongs in that court." *Suburban Mortg. Assocs. v. U.S. Dept. of Housing and Urban Dev.* 480 F.3d 1116, 1118 (Fed. Cir. 2007).

2.     Plaintiff's due process claim is also contractual in nature and does not belong in this court. *See Olympic Fed. Sav. And Loan Ass'n v. Dir., Office of Thrift Supervision.*, CIV. A. No. 90-0482, 1990 WL 134841, at *8-9 (D.D.C. Sept. 6, 1990) (quoting *Megapulse,* 672 F.2d at

967).  The due process claim is nothing more than an attempt to enforce its rights under the Grant "through an alternative legal vehicle."  *Id.* at *8.  "Where the focus of the complaint is on an alleged breach of contract ... a plaintiff cannot avoid the Tucker Act's jurisdictional and remedial restrictions by recasting its claim as a constitutional due process claim."  *Id.* at *9.  Inclusion of an allegation that EPA deprived the Plaintiff of due process is not enough to establish jurisdiction.  *See Am. Sci. & Eng'g, Inc. v. Califano*, 571 F.2d 58, 63 (1st Cir. 1978) (declining to exercise federal question jurisdiction where aim of suit was to enforce agreements or receive money damages).

This dispute does not arise on "independent legal grounds" outside the grant.  *See Ingersoll-Rand Co. v. U.S.*, 780 F.2d 74, 78 (D.C. Cir. 1985) (quoting *Megapulse*, 672 F.2d at 969-70).  Despite Plaintiff's efforts to re-package its grant claim into due process claims against EPA, "this dispute [is] entirely contained with the terms of [the Grant]."  *Id.*  The claim that EPA violated due process "by refusing performance under [the Grant] is substantively indistinguishable from a breach of contract claim."  *Suburban Mortg. Assocs.*, 480 F.3d at 1128.  Indeed, the TRO Motion points to the Grant Agreement as governing, including "specific requirements with which EPA must comply to terminate or suspend" the Grant.  TRO Motion at 9-11; *see also id.* at 11-14 (outlining the rights and obligations of the parties under ACA).  In fact, the TRO Motion's conclusion demonstrates why this is a contract case: Plaintiff seeks to enforce its rights to money under the ACA and to prevent EPA from suspending the grant.

**B.    Even If Jurisdiction Were Proper Here, EPA's Actions are Not Arbitrary or Capricious**

The APA's "arbitrary and capricious" standard, 5 U.S.C. § 706(2)(A), "is deferential and narrow in scope."  *Husky Mktg. & Supply Co. v. FERC*, 105 F.4th 418, 421 (D.C. Cir. 2024); *see also Sissel v. Wormuth,* 77 F.4th 941, 947 (D.C. Cir. 2023) ("[O]rdinary arbitrary-and-capricious review is highly deferential and presumes the validity of agency action." (cleaned up)).  As a result,

a court reviewing agency action under the arbitrary-and-capricious standard "may not substitute its own judgment for that of the agency." *Columbia Gulf Transmission v. FERC,* 106 F.4th 1220, 1230 (D.C. Cir. 2024). Instead, the court must "simply ensure[] that the agency has acted within a zone of reasonableness," and an agency decision must be upheld so long as it is "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency decision is set aside only if "there has been a clear error of judgement" "based on a consideration of the relevant factors." *Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).

EPA's suspension of Plaintiff's grant (and, to the extent that it is before the Court, the termination of that grant) was eminently reasonable—not arbitrary or capricious. When an agency observes highly unusual features and late-breaking modifications to a grant, and when its Office of Inspector General along with the FBI and DOJ are accordingly investigating and conducting due diligence, it should be obvious that the only responsible course in the interim is to suspend further grant disbursements that might otherwise be unrecoverable. Likewise, EPA's decision to terminate the grant—based on "substantial concerns regarding program integrity, objections to the award process, programmatic fraud, waste, and abuse, and misalignment with the Agency's priorities, which collectively undermine the fundamental goals and statutory objectives of the award," Declaration at Exhibit I—plainly falls well within "a zone of reasonableness," *Prometheus Radio Project*, 592 U.S. at 423.

In short, EPA permissibly determined that various deficiencies in the GGRF program "pose[d] an unacceptable risk to the efficient and lawful execution of [the GGRF] grant that cannot be remedied by imposing specific conditions, necessitating immediate termination to safeguard taxpayer funds and ensure compliance with federal assistance regulations." Declaration at Exhibit I. Insofar as any APA review applies, this Court should defer to EPA's judgment. And, again,

insofar as Plaintiff wishes to pursue contract-based claims asserting breach of grant terms, it is free to do that—but not in this forum or through these causes of action.

### C.    The Temporary Hold on the Citibank Accounts Was Not Final Agency Action

While EPA's termination of the grant moots any basis for seeking relief associated with EPA's instructions to Citibank to pause payment of money to Climate United and other grantees, EPA's directive to Citibank was not a final agency action, and therefore it is not reviewable under the APA for this additional reason.

The APA makes reviewable only *final* agency action, as opposed to "preliminary, procedural, or intermediate" agency actions.    5 U.S.C. § 704.    "Often the agency's own characterization of a particular order provides some indication of the nature of the announcement," *Pacific Gas & Elec. Co. v. FPC*, 506 F.2d 33, 39 & n. 20, (D.C.Cir.1974), but the judiciary has also developed a test for finality.    In part, an action is final only if it marks "the consummation of the agency's decisionmaking process." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).    A decision reflects the "consummation" of the agency decisionmaking process when that decision is subject to no further agency review.  *Sackett v. E.P.A.*, 566 U.S. 120, 127 (2012).    Here the temporary pause placed on the Citibank accounts was a precautionary measure to ensure that funds were not transferred or disbursed as EPA conducted a responsible and comprehensive review of the $20 billion program.  Declaration at E.  EPA remained free to lift the pause at any time.  The temporary hold on the Citibank account was thus not reviewable under the APA.

### III.    Plaintiff's Alleged Harm Cannot Justify a TRO

Plaintiff's request for a temporary restraining order should be denied for the additional, independent reason that its claimed harms are purely monetary and therefore are not irreparable.

As Plaintiff acknowledges, Climate United is an entity created and operated solely for the purpose of applying for and spending the NCIF grant.  *See* ECF No. 2-2, Bafford Dec. ¶¶ 5, 40;

*see also id.* ¶ 41 (acknowledging that its purpose is to fund projects that the market does not want to fund).  The D.C. Circuit "has set a high standard for irreparable injury."  *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). "Where the injuries alleged are purely financial or economic, the barrier to proving irreparable injury is higher still, for it is 'well settled that economic loss does not, in and of itself, constitute irreparable harm.'" *Mexichem Spec. Resins, Inc. v. E.P.A.*, 787 F.3d 544, 555 (D.C. Cir. 2015) (quoting *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). "The Supreme Court has echoed this message, finding that 'the temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury.'" *Id.* (citing *Sampson v. Murray*, 415 U.S. 61, 90 (1974)).  Important here, Plaintiff must prove "not just that [it] faces an irreparable harm, but that the injunction would clearly avoid this injury." *Santini v. Farris*, No. 2:21-cv-13045, 2022 WL 831420, at *3 (E.D. Mich. Feb. 15, 2022), *report and recommendation adopted*, No. 21-13045, 2022 WL 831224 (E.D. Mich. Mar. 18, 2022) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

As explained above, upon termination Climate United must look to the Grant Agreement for relief.  Any judicial review is then limited to claims for monetary contract damages.  *See supra*, Part II.  The financial harms to Climate United caused by termination are therefore not irreparable. "The rule that equitable remedies cannot issue when the damages are monetary in nature has been ingrained in law for 'half a millennium or so,' and no judge within the English common law tradition has the luxury of ignoring it." *United States v. Michigan*, 230 F.R.D. 492, 495 n.1 (E.D. Mich. 2005). This is true even where a movant claims that waiting for money is harmful because of a lack of other funds.  *See id.* ("[Movant] argues that its ratepayers are low-income and do not have the luxury of saying, 'It's only money.'").

Further, much of the harm alleged in the motion is out of date.  Plaintiff's claimed need to pay for committed sources of funding, programs it has launched, and programs it intends to launch, Bafford Dec. ¶¶ 46-50, are superseded by termination.  So are Plaintiff's concerns with the "impact on internal operations," Bafford Dec. ¶¶ 43-45, and its need to design, conduct outreach about, or deploy additional programs that it would have funded with the now-terminated grant, Bafford Dec. ¶ 49.  "Since injunctive relief is intended to prevent future irreparable harm, where, as here, the harm to the moving party has already occurred, such relief is inappropriate." *T & L Redemption Ctr. Corp. v. Phoenix Beverages, Inc.*, 752 F. Supp. 64, 67 (E.D.N.Y. 1989) (declining to enter preliminary injunction where harms could not be avoided because plaintiff was already effectively out of business); *see also United States v. Bolton*, 468 F. Supp. 3d 1, 6 (D.D.C. 2020) (ruling that preliminary injunction would not prevent irreparable harm from publication of classified materials where publication had already occurred).  Once again, Plaintiff's remedy, if any, now lies in the Court of Federal Claims under the terms of its contracts—not in this Court, and certainly not in the extraordinary relief of a preliminary injunction or temporary restraining order.

## IV.    An Injunction Would Be Contrary to the Public Interest.

Lastly, the balance of equities and public interest weigh against the extraordinary remedy of a preliminary injunction. "Where the federal government is the opposing party, the balance of equities and public interest factors merge." *Harris v. Bessent*, --- F. Supp. 3d ---- (D.D.C. 2025) (citing *Nken*, 556 U.S. at 435).

As explained above, Plaintiff has failed to clearly show that it will face "great, certain, [and] imminent" harm absent such relief.  *Navajo Nation v. Azar*, 292 F. Supp. 3d 508, 513 (D.D.C. 2018).  Meanwhile, any injunction allowing immediate the grantees to access billions of dollars in grant funds would be contrary to the public interest.  In light of EPA's "comprehensive

review" of the grant and a determination that it has "substantial concerns regarding program integrity," "programmatic fraud, waste, and abuse," and "the absence of adequate oversight and account controls to prevent financial mismanagement," any relief that would reopen Climate United's access to grant funds would severely compromise EPA's protection of the public fisc— among its most important duties to the public.  Moreover, any relief purporting to reverse grant termination and force EPA to specifically perform, in addition to being legally unavailable, would compromise EPA's ability to ensure that the grant funds are eventually re-obligated to a qualified applicant after addressing the agency's concerns with inadequate account controls.  The Court should not interfere with that core exercise of Article II executive authority, consistent with Congress's delegation.

There is significant risk that potentially billions in grant funds disbursed to Climate United based on a temporary injunction will not be recovered should Climate United later be required to repay them under the terms of the grant.  Climate United was formed specifically to seek an award under the GGRF and is not otherwise capitalized.  *See* Compl. at 9 ¶ 33.  At minimum, to ensure that the government's interests are fully protected, any relief the Court orders must be accompanied by a security sufficient to "pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. Proc. 65(c).

At bottom, "the protection of the public fisc is a matter that is of interest to every citizen." *Brock v. Pierce Cnty.*, 476 U.S. 253, 262 (1986).  "Numerous cases, accordingly, have recognized a public interest in determining whether government programs dispensing taxpayer money involve fraud, waste, or abuse." *WP Co. v. U.S. Small Bus. Admin.*, 502 F. Supp. 3d 1, 23 (D.D.C. 2020).  Here, EPA has significant concerns of inadequate control over Climate United's use of funds—and for good reason.  The public interest is not served by forcing the government

to undo its termination and allowing plaintiff free rein to continue disbursing funds despite the EPA's termination of its grant—much less doing so in this extraordinarily expedited posture. A dispute over $20 billion in grant funding should not be effectively adjudicated in three business days.

## CONCLUSION

Defendants respectfully request that the Court deny Plaintiff's TRO motion as moot, or in the alternative, for lack of subject matter jurisdiction to award injunctive relief, for lack of any likelihood of success on the merits, for lack of any irreparable harm, or because the public interest favors denying the TRO.

Dated: March 12, 2025

Respectfully Submitted,

YAAKOV ROTH
Acting Assistant Attorney General

KIRK T. MANHARDT
Director

*/s/ Kevin P. VanLandingham*
MARC S. SACKS (Ga. Bar No. 621931)
*Deputy Director*
KEVIN P. VANLANDINGHAM (NY Reg
No. 4741799)
*Assistant Director*
U.S. Department of Justice
Civil Division
Corporate/Financial Section
P.O. Box 875
Ben Franklin Stations
Washington D.C. 20044-0875
 Tel: (202) 307-1104
Email: marcus.s.sacks@usdoj.gov

*Attorneys for the United States*
*Environmental Protection Agency*