IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Climate United Fund, | ) Civil Action |
| | ) No. 25-cv-698 |
| Plaintiff, | ) |
| | ) MOTION HEARING |
| vs. | ) |
| | ) Washington, DC |
| Citibank, N.A., et al., | ) March 12, 2025 |
| | ) Time: 4:03 p.m. |
| Defendants. | ) |

---

TRANSCRIPT OF MOTION HEARING
HELD BEFORE
THE HONORABLE JUDGE TANYA S. CHUTKAN
UNITED STATES DISTRICT JUDGE

---

A P P E A R A N C E S

For Plaintiff: Adam Unikowsky
David B. Robbins
Jenner & Block LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
(202) 639-6041
Email: AUnikowsky@jenner.com
Email: DRobbins@jenner.com

For Defendant
Citibank: Kenneth Winn Allen
Kirkland & Ellis LLP
1301 Pennsylvania Avenue, NW
Washington, DC 20004
(20) 238-9500
Email: Winn.Allen@kirkland.com

EPA: Marcus S. Sacks
Kevin P. VanLandingham
DOJ-CIV
1100 L Street, NW
Room 8142
Washington, DC 20530
(202) 307-1104
Email: Marcus.S.Sacks@usdoj.gov
Email: Kevin.P.VanLandingham@usdoj.gov

Court Reporter: Janice E. Dickman, RMR, CRR, CRC
Official Court Reporter
United States Courthouse, Room 6523
333 Constitution Avenue, NW
Washington, DC 20001
202-354-3267

* * * * * * *P R O C E E D I N G S* * * * * * *

THE COURTROOM DEPUTY: Good afternoon, Your Honor. This is civil action 25-698, *Climate United Fund versus Citibank, et al.* And this matter is set for a motion hearing.

Parties please introduce yourselves for the record, starting with the plaintiff. Please come to the podium.

THE COURT: We don't have a jury, you can either stay at counsel table, but make sure the microphone is on and speak into the microphone, or you can approach the podium, whatever you prefer.

MR. UNIKOWSKY: Sorry, Your Honor. Can you hear now?

THE COURT: Yes. More importantly, she has to hear.

MR. UNIKOWSKY: Thank you, Your Honor. My name is Adam Unikowsky. I'm here on behalf of plaintiff, Climate United Fund, and I'm here with my colleague, David Robbins.

THE COURT: Good afternoon.

MR. SACKS: Good afternoon, Your Honor. Marc Sacks, with the Department of Justice, on behalf of EPA.

THE COURT: I don't see your name on here. Can you spell your name for me, please?

MR. SACKS: Sure. Marc, M-A-R-C. And last name is Sacks, S-A-C-K-S.

THE COURT: On behalf of the EPA. Okay. Thank you.

MR. SACKS: My colleague is Kevin VanLandingham.

THE COURT: Kevin -- I'm sorry.

MR. SACKS: VanLandingham.

THE COURT: Okay. And on behalf of Citibank?

MR. ALLEN: Good afternoon, Your Honor. Winn Allen, on behalf of Citibank.

THE COURT: All right. I have a Kenneth Allen. Is that --

MR. ALLEN: My mother calls me Kenneth, that's my first name.

THE COURT: If you're in big trouble?

MR. ALLEN: I'm in big trouble. I go by my middle name.

THE COURT: Okay. Thank you, Mr. Allen. All right. Anybody else?

Okay. We're here for a hearing on plaintiff's motion for a temporary restraining order. Since the time that plaintiffs have filed this motion, there have been some additional events. Plaintiff is a nonprofit financial institution, made up of three nonprofits which are focused on deploying public and private financing to investments in clean energy.

In 2023 plaintiffs applied for grant funding from the EPA through the National Clean Investment Fund and in 2024 of last year the EPA awarded plaintiffs $6.97 billion in grant funding. This past Saturday, Climate United sued Citibank, the EPA, and EPA administrator Lee Zeldin, bringing claims for

breach of contract, conversion, and replevin against Citibank, and APA claims and due process claims against the EPA.

On Monday, plaintiffs moved for a temporary restraining order against all defendants. In support of that motion they filed several exhibits, including a declaration from the CEO of Climate United. They've also attached the account control agreement between Climate United, Citibank, and EPA, and the grant award agreement.

Defendant EPA has filed its opposition to the TRO and accompanied that with nine exhibits, including some of the same contracts, plus certain communications between EPA and plaintiffs and EPA and Citibank.

Citibank also filed its opposition, along with seven exhibits, also including various communications, as well as the financial agent agreement between Citibank and Treasury. And last night, EPA filed a notice of grant termination, which has been filed at ECF 13, which included as an exhibit a letter from EPA to CEO of Climate United indicating that EPA was terminating Climate United's grant effective immediately, for reasons that I'll discuss in a moment. And then finally, today Climate United filed its response to the EPA's notice.

So I've reviewed all these documents and the filings. Plaintiffs initially sought a TRO against Citibank for preventing them from violating the ACA and continuing to refuse to disburse Climate United's funds and against the EPA to bar

it from impeding Citibank from disbursing those funds, and to bar the EPA from unlawfully suspending or terminating the grant, except as permitted in the account control agreement.

Now, in light of the termination letter, there now seem to be a few additional issues that I have to address. First, I wanted to hear from the parties regarding the letter. According to the letter, EPA has terminated the grant based on, and I quote, concerns regarding program integrity, the award process, programmatic fraud, waste and abuse, and misalignment with the agency's priorities which collectively undermine the goals and statutory objectives of the award.

EPA determined that its existing process for awarding and overseeing execution of the grant agreement lacks sufficient protections to guard against potential violations of the Constitution, particularly the appointments clause and private nondelegation doctrine.

As I see it, EPA has to take certain procedural steps before it can terminate the award, including providing -- when I say "as I see it," by virtue of the documents that have been provided to me thus far. It has to take certain procedural steps, including providing written notice of termination that includes the reasons for termination, the effective date, and the portion of the federal award to be terminated, if applicable. And that's from 2 CFR § 200.341. And it looks like EPA does this in the letter.

But, under the contract, if terminating for waste, fraud, or abuse, EPA is required to produce credible evidence of the commission of a violation of federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code, or a violation of the Civil False Claims Act. EPA has not proffered this information.

So, I guess I have some questions for counsel, for plaintiff's counsel first. I mean, I can go through the various relevant provisions from the award agreement, but I think you all are familiar enough with that.

How does the grant termination affect your request for TRO at all? I mean, you see the position that this puts Citibank in, which has the money, but has been told by EPA not -- that it would be impermissible to distribute the funds and, as most banks are cautious institutions, they are between a rock and a hard place here.

MR. UNIKOWSKY: Yes, I understand, Your Honor. Should I come to the podium or should I stay --

THE COURT: You can come on up. I mean, I take it by your response that you're asking me to issue a TRO against Citibank, ordering it to disburse the funds. And you also ask me to issue a TRO against EPA, to freeze the status quo ante and to restrain them from giving effect to the notice of termination. But, can I do that with regard to Citibank, at

least?

MR. UNIKOWSKY: Yes. So let's begin with Citibank.

THE COURT: What -- I'm sorry. What would maintaining the status quo ante look like here?

MR. UNIKOWSKY: Okay. So, first, with respect to Citibank, what would maintain the status quo ante would be a TRO directing Citibank to comply with the provisions of the ACA, as it was doing until February the 18th. The ACA is fairly straightforward, it says that if Climate United Fund asks for money or requests -- or instructs Citibank to issue a disbursement, Citibank has to do it. It has no discretion to say no, unless there's a notice of exclusive control that's issued by the EPA, which hasn't happened here. And that's how things were working until February 18th.

So I think a status quo order that would maintain the status quo would be to issue a TRO directing Citibank to comply with the provisions of the ACA. And I do understand that it's difficult for Citibank to say no to the FBI when the FBI recommends to freeze someone's funds, even without a court order. But if there's a court order issued by this Court, then I think Citibank would be in a better position in saying no.

THE COURT: But then my question to you is: How does the notice of termination issued last night affect Citibank's obligations?

MR. UNIKOWSKY: So I think that we view that notice

as unlawful and I think the status quo order the Court should enter would be one that temporarily freezes the status quo and enjoins the notice of termination during the period of a TRO.

THE COURT: I would have to find that that was an unlawful termination.

MR. UNIKOWSKY: Yes, Your Honor, I think it is unlawful for several of the reasons we express in our filing today. It plainly does not comply with the requirements for a termination. There's no showing of waste, fraud, or abuse, as Your Honor described it, by Climate United.

THE COURT: Would granting the TRO require me to reinstate a contract that's already been terminated?

MR. UNIKOWSKY: I don't think that's the case because we don't view this -- we view this termination as *ultra vires*, Your Honor. We think it's so plainly unlawful it shouldn't have legal effect and the Court should --

THE COURT: It does have a bit of a ready, fire, aim --

MR. UNIKOWSKY: I think the Court does have the authority to issue that type of TRO, especially -- I mean, I would point out that in the filing today, EPA contends that this case is moot. So, first of all, we don't think it's moot because there's clearly a case of controversy between the parties. We've asked the Court to enjoin what we refer to in our complaint as a *de facto* termination. Now we got this

termination letter, there's even more adversity than there was before.

Plainly, we still have standing to try to stop this what we view as an unlawful termination. The fact that EPA has done the very thing that we contend is unlawful doesn't eliminate case or controversy between the parties. Also, courts have been very reluctant to essentially reward last-minute efforts by the government to moot a case, in this case on the literal eve of the hearing. It was actually after the originally scheduled time for the hearing. The government asked for an extension as a professional courtesy, which I granted. So under the circumstances --

THE COURT: Won't be doing that again, will you?

MR. UNIKOWSKY: No, Your Honor, I will not. But under these unusual circumstances, I would ask the Court to hesitate to the find the case moot and say there's still a live controversy.

THE COURT: Are you asking me to rule on the legality of the contract?

MR. UNIKOWSKY: I think that we have a likelihood of success on the merits of establishing the termination was unlawful, not as breach of contract. We're not bringing a breach of contract claim.

So what we're going to do is amend our complaint. I don't think we had a fair shot to do that, given that this came

in after business hours last night. If the Court issues a TRO and preserves the status quo, we will shortly amend our complaint and pursue not a breach of contract claim, a pure APA claim alleging violations of the Constitution, statutes, and applicable federal regulations and saying that the government's action is arbitrary and capricious and unlawful.

And I think, absolutely, the Court has the authority to issue a TRO freezing the status quo, ensuring our case doesn't really become moot and the money leaves Citibank, to allow us to file that complaint.

THE COURT: Do you currently have a work plan in place? EPA argues that it does not, that you don't, and that you can't certify that the amount of the payment is necessary to execute the workplace plan in effect.

MR. UNIKOWSKY: We have a work plan in place. We were working up until February. We have several products in process -- several projects, excuse me, in process that are described in detail in Ms. Bafford's declaration. So we do face extreme irreparable harm if we don't get relief today or this week.

THE COURT: And that's really where I need to get to because that is the show upon which many a motion for TRO flounders.

Clearly there's harm if you can't pay your vendors and you can't pay your staff and rent, other such things. But

as you know, and I have said and other judges have said, a TRO is not just a really, really meritorious PI. It's saying that something is going to happen immediately and that can't be undone. It's like a wrecking ball that's going to tear down the building and it has to be stopped.

So, putting aside economic damages, which are recoverable in due course, what's your imminent irreparable harm that warrants -- in other words, what's going to happen in the next four days that couldn't be remedied by a motion for preliminary injunction?

MR. UNIKOWSKY: Okay. A few things will happen, Your Honor. So first of all, we anticipate that because of yesterday's termination, EPA is going to ask Citibank to send all of the money to the U.S. Treasury. It's not clear that could possibly be undone. That's one thing, just based on the late-breaking development last night.

THE COURT: What do you mean? Why?

MR. UNIKOWSKY: The government would say that that's a court order that the Court doesn't have jurisdiction to enter.

THE COURT: Can you slow down a little bit?

MR. UNIKOWSKY: Excuse me. I apologize.

THE COURT: Thank you.

MR. UNIKOWSKY: I suspect, and it's a question for, I guess, counsel for the EPA. But the EPA will say that once the

money goes from Citibank back to the Treasury, the Court can't order it to be sent back to Citibank. But that's -- I suspect we will hear that argument, but I guess that's an argument for government's counsel.

But even setting that aside, we are out of money, Your Honor, and we will have permanent irreparable harm. First of all, at the end of this week we're out of money. We'll have to start furloughing our employees. We'll never be able to get them back. Okay?

THE COURT: Wait a minute. I'm not minimizing at all that harm, but what do you mean, you'll never be able to get them back? They'll be hired by somebody else?

MR. UNIKOWSKY: Probably. We've think that once we furlough these employees, we're unlikely to see a lot of them again. Once we can't pay rent, we might be evicted. It's going to be hard to get back to where we were.

THE COURT: You see, every time you use the word "might" --

MR. UNIKOWSKY: It's not "might," Your Honor. I can tell you certainly, with 100 percent certainty that at the end of this week we are out of money. We cannot pay our employees anymore. We will -- not might -- furlough. We cannot pay our next rent payment. That's it. We are out of money. It is over because under the terms of the grant agreement, we only get 14 days' worth of operating expenses. We waited because we

didn't know what was happening.

There's a lot of information in Citibank's brief about, you know, this FBI letter and these Treasury notices. These aren't private, like -- this was put into a public filing, it's not confidential, but we were never told any of this. So we were waiting this whole period, trying to negotiate to get more information. Finally, at the end of the 14 days, we had no choice but to sue. Now we're completely out of money. So we certainly can no longer pay rent, we certainly can no longer pay employees. We also certainly --

THE COURT: Slow down again.

MR. UNIKOWSKY: Sorry, Your Honor. We certainly cannot comply with the terms of our agreements with our subgrantees. We are essentially a green bank. We exist to give money to these subgrantees.

THE COURT: Right, and I understand that. But I'm trying to discern what's going to happen right away that can't be undone.

MR. UNIKOWSKY: I think we will have extreme reputational harm if we suddenly default on all of our loan agreements that we've already signed, suddenly have to furlough our employees who are going to have to look for other employment. I don't think it is realistic to expect that if we don't get money by the end of this week, we can just resurrect ourselves as an organization, and that's why we had to wait

until now.

I'd also point out, Your Honor, again, the reason we had to file a TRO is that we waited the 14 days. And the reason we did that is because we didn't know that Treasury and FBI were doing all the things that have been disclosed for the first time in Citibank's filing, which are public information. If we had known what was happening, we would have filed earlier.

It's not even just that we weren't told, we were affirmatively mislead. EPA made a public statement on March 3rd, in it's OIG investigation, saying Citibank is acting voluntarily. However, in Citibank's filing from earlier today, it said it was legally obligated under the provisions of its agreement with the Treasury to withhold these funds and that's why it did that, which are completely inconsistent statements. If we had known about this legal obligation, which we weren't told about and isn't confidential, we would have sued earlier and not had the need to ask for a TRO. But we were kept in the dark, based on these statements, and that's why we're in court today, Your Honor.

THE COURT: All right. Just a minute. Is the harm that you've set out based entirely on existing contracts or is it also on expectations of future funding?

MR. UNIKOWSKY: I think it is both of those things. So it is both existing grants -- so, we have existing loans in

which our grantees can ask us for money under the terms of the agreement. We're financing solar projects, we're financing electric semi trucks, things like that, and we can't provide that money, so those existing loans will just have to default if we don't get this imminently. As well, you know, it's a large grant and so we're currently in the process of planning additional projects, which Ms. Bafford's declaration discusses, which we're going to have to abandon. No one is ever going to contract with us ever again if we run out of money.

THE COURT: How much of the $7 billion has already been committed to projects?

MR. UNIKOWSKY: I will get that answer for you shortly. I don't want to say something incorrect.

THE COURT: Okay. All right. I will hear from counsel from EPA.

All right. Mr. Sacks.

MR. SACKS: Good afternoon.

THE COURT: What procedural steps did EPA take prior to canceling the grant? Under the award agreement's general terms and conditions, you have to put forth credible evidence of the commission of a violation of federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations. Has there been a grand jury indictment? Has a grand jury issued an indictment in this case?

MR. SACKS: Not that I'm aware of, Your Honor.

THE COURT: Have there been any charges at all filed?

MR. SACKS: Not that I'm aware of.

THE COURT: So what is this based on?

MR. SACKS: The termination is --

THE COURT: In fact, let me ask you -- and I can take judicial notice of reports -- is it correct that a grand jury was presented with the evidence in this case and refused to issue a bill?

MR. SACKS: I'm sorry. I don't know the answer to that question, Your Honor.

THE COURT: Can you find out?

MR. SACKS: I certainly can find out.

THE COURT: Because that would be extremely important for me to know in assessing the legality of the termination.

MR. SACKS: I understand, Your Honor.

THE COURT: The notice also contains a vague reference to waste, fraud, and abuse, but does not provide the credible evidence that's required to find that Climate United violated federal criminal law. I mean, there's a lot of statements floating out there about the EPA administrator's opinion of this contract, but as far as I'm aware, the contract can't be terminated just because the EPA administrator doesn't like it.

There are certainly a lot of media reports about attempts to freeze these funds, attempts to cancel these

contracts, none of which have to be sanctioned by law enforcement as yet. So can you tell me what this termination is based on?

MR. SACKS: The termination is based on the information contained in the termination letter.

THE COURT: That's pretty circular.

MR. SACKS: Sure. Can I speak a little bit more and explained to Your Honor?

THE COURT: Yes. Yes.

MR. SACKS: So the question you raised about the right to terminate a contract and you asked this question: Are you being asked to rule upon the legality of the contract? And that's exactly what the plaintiff is asking you to rule upon.

THE COURT: Well, no, I think the plaintiff is asking me to rule on the legality of the termination of the contract. If what you're saying is the contract was never legal -- that's not what you're saying?

MR. SACKS: No.

THE COURT: You're saying that the contract has been -- that there's evidence of some kind of skulduggery here?

MR. SACKS: What I'm saying is the government has the right to terminate a contract. The question then becomes: Is that termination pursuant to the terms and conditions of the contract such that it complies with the contract, or perhaps is that termination not in line with what the contract says,

creating a breach claim and a potential suit for damages?

THE COURT: I think it's pretty clear that the plaintiffs are claiming that the contract's been terminated and not in accordance with the terms of the contract. In other words, the agreements provide that the contract can be terminated for certain reasons. And you provide none of those.

MR. SACKS: And that's exactly what a breach question and a breach claim is. And when you look at their analysis, that analysis is: What was our termination? What information did we have? Why did we do what we did? And was that in compliance with --

THE COURT: See, I know why EPA wants this to be a breach of contract claim. I understand that because, you know, there's some jurisdictional issues. But it's not a -- in other words, if your term -- I'm not being asked to interpret one of the terms of the contract. I'm being asked to find that EPA unlawfully instructed Citibank not to disburse funds, as they were obligated to do, and then unlawfully terminated the contract. Not unlawfully broke a contract term, but unlawfully terminated the contract, as -- you know, because of fraud, abuse, bribery, whatever.

I'm not sure that it is a breach of contract claim. There may be a breach of contract claim in there somewhere, but I don't think this motion is based on a breach of contract claim, especially, frankly, now that you terminated it.

MR. SACKS: Sure. The complaint and the motion are based on an allegation of a pause or a stay in the plaintiff's ability to access funds. That's the issue currently before the Court.

THE COURT: Well, this is sort of a moving target because plaintiffs brought one claim based on Citibank's refusal to disburse the funds as they were obligated to do under their agreement. Before they could get a hearing on that -- and, you know, there's a question as to whether the request for an additional day was made in good faith. I'm not even going to go into that because I do have some questions there myself. But before they could get a hearing on that, the contract was, last night, on the eve of this hearing, terminated, and facially, based on not very much that I'm able to see.

So that then complicates things because then Citibank, unsurprisingly, says we're not -- you know, before they said we are uncertain as to whether we can legally disburse these funds. I may not be putting it the way you would. But after the termination, they're saying we definitely can't disburse these funds. Am I right?

MR. SACKS: (No response.)

THE COURT: More or less. Okay. For a lot less money than you're charging.

But, what you've done is sort of -- you know,

plaintiffs now have an additional claim because it's gotten even more difficult for them to make a claim to get their funds from Citibank based on unilateral action that EPA took last night that doesn't seem to be based on a whole lot. And so it's not just a breach of contract claim, as I see it. And so that's why I'm asking you: What's this termination based on?

MR. SACKS: And, again, the termination, to my knowledge, is based on what's set forth in the --

THE COURT: The termination letter.

MR. SACKS: -- that letter.

THE COURT: Tell me, can you proffer to me the evidence of commission of a violation of federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations? Any one of those things?

MR. SACKS: I cannot, Your Honor. And I think the reason I cannot is because this Court is not in a position to rule upon whether or not this termination was consistent with the contracts.

THE COURT: That's why you can't provide it to me or you don't have it?

MR. SACKS: No, I don't have it. Yeah, I don't have it.

THE COURT: So you're coming in here, defending a notice of termination that was issued last night, but you don't have any -- you don't have any evidence or a proffer for me as

to why that issuance of termination -- that termination was issued? You can't tell me what the fraud, conflict of interest, bribery, or gratuity violation was? All you know is that it was issued?

MR. SACKS: That's correct. And, Your Honor, I don't believe I'm here to defend the termination.

THE COURT: Oh, I think you are.

MR. SACKS: Okay. Well, my ability do that is what I'm telling you today.

THE COURT: I understand the position you're in.

MR. SACKS: I can explain to you the history of what -- how these grants were created, issued, and the review of the current administration into those grants, the pause on the grant to allow time for that review and the ultimate determination that the government no longer wanted to proceed with this contract and party.

THE COURT: Tell me, what procedural steps did the EPA take prior to canceling the grant?

MR. SACKS: Well, I think we know from the record that EPA conducted -- began conducting an investigation into the grant. We know there are at least two independent investigations into the grants.

THE COURT: What are those?

MR. SACKS: From reporting, I believe there is an EPA OIG investigation and there is a federal criminal

investigation.

THE COURT: When you say "from reporting," you mean what you've read in the media?

MR. SACKS: Yes, Your Honor.

THE COURT: All right. So under the contract, EPA must follow several regulations when terminating for waste, fraud, or abuse, including under 2 CFR § 200.339, there has to be an allegation that they violated a constitutional provision, statute, regulation, term or condition of the grant. Any evidence of that?

MR. SACKS: No, Your Honor.

THE COURT: Under § 200.340, is there any contention that they failed to comply with any terms or condition of the grant?

MR. SACKS: We don't know enough, Your Honor, but I think the agency cited both of those regulations within their termination letter.

THE COURT: You can cite things, but if you don't -- I mean, I could cite cases all day long, but you have to some kind of evidence or proffer to back it up. What about 2 CFR § 200.208? Did EPA provide Climate United an opportunity to remedy any violations?

MR. SACKS: I don't believe that's required by the contract. But, if ultimately EPA's termination violated their contractual rights, then that will be remedied through a breach

of contract claim and a Court will fully consider all of these issues in the appropriate court.

THE COURT: Are there any costs or funds still owed to Climate United? What about the projects it's already committed funding to?

MR. SACKS: Well, anytime there's a grant with the government or a contract that's terminated, there are closeout procedures set forth in 200.344, I think. And so those closeout procedures have a way of determining -- and I'm not an expert in those, but what are allowable costs? What money a grantee has that must be reimbursed to the government? What, perhaps, a grantee can ask the government to repay them? There's a process for how that works once the period of performance has ended, which has happened here. So Climate United may well be entitled to additional monies under the closeout provisions.

THE COURT: But that's a breach of contract claim, is that what you're saying?

MR. SACKS: Well, no, not perhaps. I mean, if they argue that we failed to follow those regulations in closing out the grant and not pay them what they're entitled to, sure, that's a claim under the contract.

THE COURT: I think they're arguing that you just unlawfully terminated the contract.

MR. SACKS: And that's also a claim under our

contract.

THE COURT: What's -- EPA alludes to its inherent authority. What inherent authority are you referring to?

MR. SACKS: Well, again, this letter was written by EPA. I think I can explain to you what I think are some inherent authorities that the agency has. We're talking about a $27 billion program that was -- grants were given in August. I believe Citibank was installed as the financial agent in November. The grant agreements were changed seven days before the inauguration to essentially give the grantees greater ability to retain funds if there was a notice of exclusive control issued by EPA.

THE COURT: Do you have any -- can you proffer any evidence that that was illegal or evidence of abuse or fraud or bribery? That any of that was improperly or unlawfully done, other than the fact Mr. Zeldin doesn't like it?

MR. SACKS: I certainly am not suggesting any of that was illegal or improper, but I am suggesting that the administration wanted to take a look at the account controls that the agency had as a steward of federal funds to ensure that it is satisfying congressional mandates for what this money should do.

THE COURT: Is it correct that at least one, or perhaps two -- well, at least one assistant attorney, assistant U.S. attorney was asked to do that, found no wrongdoing, and

was fired for refusing to tell Citibank to freeze the funds?

MR. SACKS: I mean, you've read the papers, just like I have.

THE COURT: I have, too.

MR. SACKS: I do believe that there was an effort to, I believe, perhaps put a criminal freeze on the money.

THE COURT: Unsuccessful?

MR. SACKS: Obviously it wasn't successful because that didn't happen. So I don't know any more than you do about that.

THE COURT: Okay. And I'm sorry if I interrupted you. Do you plan on issuing a notice of exclusive control to Citibank, or have you?

MR. SACKS: We have not and will not because there is no longer a need to do that because the grant has terminated. And notice of exclusive control, as I see it, is essentially a right of a secured party, right? Under this setup EPA is a secured party. So to the extent the grant is ongoing and we want to take control over the money in the Climate United's account, we can issue a notice of exclusive control. Once we have terminated the grant, there is no longer a right to that money or a right to perform.

THE COURT: What if I find that the notice of termination was unlawful? Then are you going to issue a notice of exclusive control? Can you?

MR. SACKS: I think we could, if we believed we'd met the standard set forth in the contractual documents. We could, absolutely. But again, I would question gently this Court's right to declare a termination unlawful as a matter of contract law.

THE COURT: I'm not -- I'm not -- well, I don't think plaintiff is asking me to declare the termination unlawful as a matter of contract law. But, I question a termination that's issued on such conclusory language. I mean, you can't even tell me what the evidence of malfeasance is. And I recognize you're in a -- I know your position as counsel here, but it's a very circular argument. The contract was terminated because of the reasons set forth in the termination, which don't give me any evidence or any grounding.

MR. SACKS: I think the most important point here is there is no effort to prevent the plaintiff from vindicating its rights in the appropriate forum, under the appropriate jurisdiction, under the appropriate claims. And this letter may well, or may well not, give rise to those claims. The question for this Court to decide is whether it has the jurisdiction to remedy this.

THE COURT: The problem, Mr. Sacks, is if I -- if it turns out that I do have the jurisdiction and we litigate that issue, by the time that's resolved Climate United won't have any employees, it won't have an office. It's -- it will

basically have ceased to exist because of the -- it's run out of money, which I guess may be the point. But that's the reason they're asking for this kind of emergency relief.

MR. SACKS: But I think that the government has the right to decide who it wants to contract with and when it no longer wants to contract with someone.

THE COURT: Absolutely. Absolutely. And that's not at issue here. What's at issue here is having the -- the government did decide who it wanted to contract with. A new administration came in, didn't like the contract anymore. That's what new administrations do, but there are procedures. There are procedures that have to be followed, and doesn't appear, at least on the record before me, that those procedures have been followed. And Citibank, obviously, is in the middle of all of this.

But we have a plaintiff who is saying, you know, they've terminated this contract without any kind of due process, without complying with the APA, and it's going to basically result in our collapse as an organization.

MR. SACKS: So, Your Honor, I think when you said there are procedures to be followed, those procedures are set forth in the grant and they're grant terms and conditions. And so whether or not the government followed them is a question of whether or not we've breached the contact.

THE COURT: So you don't think they're also

conditions that are governed by the EPA or by constitutional due process?

MR. SACKS: No, Your Honor. Not in this case, no, not when there is a contract setting forth the parties' rights. And that's the mechanism the government chose to interact with the plaintiff in this case.

And I'll just note one final thing, that the flip side of this coin, of issuing injunctive relief that forces the government to continue to perform on this contact, is an order of specific performance against the government. Because the government has decided it does not want to continue in this contract, any ruling to the contrary is ordering it specifically to perform. I don't know if the Court has the authority do that.

THE COURT: The issue is not just that the government has decided, the government still has to -- you know, there are still rules that even the government has to follow, last I checked. And, you know, the government can't just void contracts and void agreements and terminate agreements without following the terms and following its own regulations, and that's what I'm here to talk about. And, I guess, what I would ask is what would you interpret maintaining the status quo look like in this case?

MR. SACKS: Well, I think the status quo is that the contract has been -- the grant has been terminated, so --

THE COURT: In other words, if I do what plaintiffs are asking me to do, issue a temporary restraining order, maintain the status quo ante, what would that mean? That the contract at this point has not been terminated? I would have to -- are you saying I would have to rule that the contact was unlawfully terminated, or at least provisionally that I'm going to stay termination of the contract?

MR. SACKS: I don't know how the Court does that, but I guess you could do that, yes.

THE COURT: All right. Go ahead.

MR. SACKS: No, that's all.

THE COURT: I'll hear from Citibank now.

MR. SACKS: Thank you, Your Honor.

THE COURT: Thank you. And Mr. Sacks, I would -- I'm going to ask that you -- the government, EPA file -- some sort of a declaration setting forth the basis for the termination. In other words, providing -- proffering to me the evidence of the fraud, waste and abuse, or proffer the credible evidence that Climate United violated criminal law, the False Claims Act. You know, the information that forms the basis for the termination. Thank you.

MR. ALLEN: Good afternoon, Your Honor. Winn Allen on behalf of Citibank.

Your Honor, Citibank has been designated as a financial agent of the United States by the Department of

Treasury and our relationship in that regard is governed by the financial agency agreement that we have between Citi and Treasury.

THE COURT: Prior to the termination, when Citibank began refusing to disburse the funds, was that -- did Citibank receive any instruction or communication from EPA about those funds?

MR. ALLEN: I'll take the Court through the history. On March 4th Citibank received a directive from the Treasury Department to pause further distributions out of the GGRF accounts.

THE COURT: And what is the basis for that directive?

MR. ALLEN: The directive was -- I'll pull it up for the Court. One second.

THE COURT: Sure.

MR. ALLEN: The basis for that directive, Your Honor, was, according to the Department of Treasury, was that the U.S. Environmental Protection Agency has informed the Treasury Department of their concerns regarding potential fraud and/or conflicts of interest related to the GGRF fund.

THE COURT: Did the Treasury provide any documents or any more information about those concerns?

MR. ALLEN: Not to Citibank, Your Honor. And then they cited various provisions to us under the FAA which requires Citibank to follow instructions --

THE COURT: Is that from one of your exhibits?

MR. ALLEN: Yes, Your Honor. This is Exhibit 7 to the motion we filed with the Court.

So we received that directive from the Treasury Department on March 4th, and then late in the evening on March 9th -- or the morning March 10th, depending how you count. It was after midnight on March 9th -- we received a directive from EPA. It's a long email, I won't read the whole thing to the Court, but it's Exhibit 2 to our brief, stating that EPA was working to establish additional account controls, which it can do under Exhibit A to the FAA. And it instructed Citibank that while it was doing that, EPA instructed Citibank to pause the processing of payment instructions of the GGRF accounts until further notice.

And we also received, that same evening, a direction from Treasury, instructing Citibank, in its capacity as fiduciary, to comply with EPA's instructions to Citibank pursuant to the FAA. So, Your Honor, we're a fiduciary of the United States under the FAA. We're bound to follow directives that we receive from Treasury and EPA and we, at the moment, have been instructed to pause processing of payment instructions by EPA and we're obligated to comply with that instruction, which we have been doing.

THE COURT: All right. I don't think I have too many more questions for you. You're sort of in the middle of all of

this. All right.

MR. ALLEN: Thank you, Your Honor.

THE COURT: Mr. Unikowsky, do you want to respond?

MR. UNIKOWSKY: Yes. Thank you, Your Honor. Just a couple things.

First, I apologize for not knowing the answer to your question about how much committed funds we have. It's $392 million right now, and if we're all terminated, all those investments just, you know, go away, and that is irreparable harm in the sense those investments will never be refunded before terminating.

THE COURT: Wait. Those are funds you've already expended?

MR. UNIKOWSKY: We've committed them. We've spent or owe them, but they're already committed.

I would just like to say a few other words. With respect to Citibank, so Citibank referred to this instruction on March 4th from the Treasury. So our funds have actually been frozen since February the 17th, just based on this, like, recommendation from the FBI. We didn't get any notice of that, there was no process. We don't think it's based on anything. That, we think, was plainly unlawful. I understand Citibank being concerned about the FBI, but there's just no legal basis in anything.

THE COURT: But you understand Citibank's position

now?

MR. UNIKOWSKY: Look, it's difficult for the FBI to send threatening letters, I get that, but there's certainly no legal basis in the ACA. It's also another alarming due process violation here for us. Right? They tried and failed to get a seizure warrant, according to public reporting. So then it's just the FBI just demanding that our accounts be frozen. There was no notice to us, there was no probable cause, there was no sworn affidavit, there was no neutral third-party magistrate. Nothing. Just -- now we're going bankrupt and nobody knows why.

THE COURT: I think I did read also that an attempt was rejected by a magistrate judge.

MR. UNIKOWSKY: That's right. It's public reporting that they went to a magistrate judge, it was denied, and that FBI just said we'll take matters in our own hands.

THE COURT: Let me stop you, though. I mean, I don't dispute any of that, but with regard to Citibank's position, if their position was difficult before the termination, but -- maybe erroneous, but understandable. Their position now that they can't release those funds I think is stronger because they've received an order from the Treasury Department.

MR. UNIKOWSKY: I think that's incorrect. So, first of all, there's a contract, the ACA, between us and Citibank. Citibank says the contract says that until the notice of

exclusive control, they have to release and serve funds. There's lots of requests we made before the notice of exclusive control, so --

THE COURT: Are you saying that Citibank is free -- no notice of control having being issued, Citibank could, if they chose, to disburse the funds still, even though the -- even after termination?

MR. UNIKOWSKY: No, I think they -- the notice of exclusive control just follows termination. Let me invite the Court to look at what the notice of exclusive control is. It's a letter that's in the amendment to the ACA and it requires the EPA to make the same findings that it would make in a termination. So it's Exhibit A to Exhibit 9 to Ms. Bafford's declaration. And it's the form of the notice of exclusive control. And you'll see, in the third paragraph -- I'll let the Court go to that.

THE COURT: Which exhibit did you say it was?

MR. UNIKOWSKY: Exhibit 9 to Ms. Bafford's declaration, which is the amendment to the ACA. And then that Exhibit 9 itself has an exhibit, it's the form of the notice of exclusive control.

THE COURT: Hang on. Let me get there. Page --

MR. UNIKOWSKY: It's like the -- it's right after -- it's a pretty short document, Your Honor.

THE COURT: Oh, I'm looking at the wrong one then. I

have -- hold on. Sorry. I'm on Exhibit 7. Hold on. Hang on a minute. Nine. All right.

MR. UNIKOWSKY: So you can see Exhibit A to that document, which is just a couple pages in, it says: Form of notice of exclusive control.

THE COURT: Yes.

MR. UNIKOWSKY: Okay. So that's what -- that's what, you know, EPA has to send. You'll see it says, "As required by the grant agreement, the secured party has issued a written determination" --

THE COURT: Now, when we read, we tend to speed up. So slow down.

MR. UNIKOWSKY: Okay. I'm sorry Your Honor.

THE COURT: No, I do it too.

MR. UNIKOWSKY: "As required by the grant agreement, the secured party has issued a written determination and finding that pledgor" -- that's us -- "has failed to comply with the terms and conditions of the grant agreement, and that noncompliance is substantial such that effective performance of the grant agreement is materially impaired or there's adequate evidence of waste, fraud, or abuse, or material misrepresentation of eligibility status." Those are just reiterating the termination conditions.

So that notice hasn't been sent because those conditions are just plainly not satisfied. And until the

notice is sent, the ACA just requires Citibank to comply with our requests.

But can I just say one more thing? I mean, I understand the termination throws a wrench into things, that's why we're asking the Court to issue a status quo order which would essentially freeze that termination. And if the termination is frozen, then there's no problem directing Citibank to --

THE COURT: You're not asking me to freeze the termination, you're asking me to void it. You're asking me to declare it unlawful.

MR. UNIKOWSKY: To restrain it, yes. TRO to restrain it temporarily. Just issue the status quo -- make sure the status quo stays in place. And then, what we will do if the Court does that -- so if the Court does that, then there's no problem with Citibank giving us this money.

THE COURT: Oh, I think Citibank would disagree with you there.

MR. UNIKOWSKY: If there's a court order directing you to do it, then Citibank has said in its filing that it will comply with any court order. Everyone complies with court orders, and so -- well, most people do.

THE COURT: You know, that seemed to be the expectation in the before times.

MR. UNIKOWSKY: If Citibank has represented that if

there is a TRO that's issued that directs it to comply with our request going backwards and forwards, it's going to do it. And I understand, again, it's not pleasant to have the FBI send you letters. I'm sure Citibank would much rather if a Court told it what to do. And so that's why we've come to court today.

THE COURT: Everybody wants the Court to tell them what to do.

All right. Can you respond to Mr. Sacks's argument that this is really a breach of contract case?

MR. UNIKOWSKY: It's emphatically not, Your Honor. And we would appreciate at least the ability to amend our complaint to explain why this is not a breach of contract. The termination has nothing to do with the termination provisions in the contract. It has nothing do to with our performance under the contract. You'll notice, Your Honor, in the letter that we got, it's totally silent on our performance. It has nothing to do with anything we've done or the terms of the contract. Instead, it just simply asserts that EPA can unilaterally, fundamentally alter this program because the administrator doesn't like it.

We're not going to say that's a violation of any contractual provision. We are going to say that that violates the Constitution, due process, and the appropriations clause. We're going say it violates the applicable statute. We're going to say it violates the pertinent regulations in the FAR,

and we're going to say it violates the APA. You will not hear any mention of any breach of contract claim, nor will we seek money damages.

THE COURT: How much time do you need to amend your complaint?

MR. UNIKOWSKY: As soon as Your Honor wants. We can do it by Monday, or sooner, if the Court prefers.

THE COURT: Mr. Sacks, how much time do you need to get me the declaration or the information I've asked you for?

MR. SACKS: I don't know, Your Honor. I would --

THE COURT: How many courtrooms are you appearing in? In this building are you appearing in, Mr. Sacks?

MR. SACKS: Just this one today, Your Honor.

THE COURT: Today. All right.

MR. SACKS: But we'll do our best, if the Court sets a deadline.

THE COURT: Okay. All right. Here's what I want: I'm going to allow you leave to amend, address the breach of contract claims and any of the other arguments of Mr. Sacks by 5 p.m. Monday. Is that reasonable? I mean, that totally destroys your weekend, but mine is already destroyed, so --

Mr. Sacks, similarly, Monday, 5 p.m., for that information? And that can take the form of declaration, affidavit. But what I'm looking for is the evidence or a proffer of the evidence of violation of federal criminal law

involving fraud, conflict of interest, bribery, or gratuity violations or -- and/or, waste, fraud, and abuse. Because I don't have the credible evidence that's required.

MR. SACKS: I understand, Your Honor. If the Court is going to enter a TRO, could we be heard on the scope of that TRO? Obviously we don't think that the Court should, but we haven't spoken about that yet. If the Court is inclined --

THE COURT: Are you -- I'm sorry. Mr. Unikowsky, are you agreeing to hold off requesting issuance of a TRO until you can amend your complaint?

MR. UNIKOWSKY: No, Your Honor. We need a TRO now because we are going to have to furlough most of our workers on Friday. We've already deferred compensation for essential workers. We are going to have irreparable, immediate harm if we don't get a TRO today from the Court. And again, the reason we're in this situation is because I feel we've been intentionally left in the dark. So I don't think that we should encounter this sort of harm, with employees leaving, possibly never to come back, and, you know, failing to pay our grant --

THE COURT: You say intentionally left in the dark, and that implies a lack of information about what's going on. That's not really irreparable harm.

MR. UNIKOWSKY: I know, I'm just saying --

THE COURT: Obviously, having to furlough employees

on Friday and perhaps losing those employees to other employment opportunities -- have you been threatened with eviction?

MR. UNIKOWSKY: Yes, Your Honor. I mean, absolutely. We have already been made clear that we will not be able to pay rent when it comes due.

THE COURT: When is that?

MR. UNIKOWSKY: I think it's at the end of the month. We'll be evicted at that time. But even before that, there's also these funded projects which we are funding every day and we can no longer pay the people we're funding. They have to stop work.

THE COURT: But, again, those are economic losses that may be recoverable, and that is not really the purpose of a TRO. A TRO is designed to allay imminent harm that is not recoverable.

MR. UNIKOWSKY: Well, let me just give an example. So we've spent several months recruiting investment professionals to our banking organization.

THE COURT: I'm sorry. Can you hear?

THE COURT REPORTER: (Nods head.)

MR. UNIKOWSKY: I'm sorry. We've spent several months recruiting investment professionals to work with us. These are very experienced people who are managing large amounts of funds. If we tell them on Friday you're out, which

is where we're going to be, then we feel there's a very serious risk that they'll never come back. Right? And so that is one significant concern that we have. I also, by the way, raised at the beginning of the hearing, I'm concerned that if there's no TRO, Citi is going to send the money, all of the money back to Treasury and then there's going to be a huge fight as to whether Treasury ever can or will send it back.

THE COURT: What if the Court just says let -- keep the money where it is? In other words, if I order Citibank to just hold onto that money. Obviously that doesn't address your financial constraints.

MR. UNIKOWSKY: Severe reputational harm. If someone comes to us on Thursday and says, hey, you're a financier, you know, we're asking for money on this loan because we're building trucks, we have to pay a vendor, and we say no, I think that is going to have permanent affects on our business. We'll never be trustworthy ever again.

So, you know, like I'm -- I'm saying this seriously, Your Honor, we are in a desperate situation because we are out of money because our 14-day period has now elapsed.

THE COURT: At least under the terms of the agreement, how much -- what are the amount of the funds that you're due at this juncture?

MR. UNIKOWSKY: It's -- let me ask.

THE COURT: You can go and consult with her, because

she can't yell it out.

(Pause.)

MR. UNIKOWSKY: Sorry.

THE COURT: Just come on up to the podium.

MR. UNIKOWSKY: Sorry, Your Honor. It's about $3 million in pending disbursements, and there's also about $300 million for the pending reserve, that's the money that we're going to allocate to projects. But current disbursements is about $3 million.

THE COURT: To keep the lights on and the doors open, you're talking about $3 million?

MR. UNIKOWSKY: Roughly, yes.

THE COURT: Okay. Thank you all for coming in. Obviously, I realize that time is of the essence so I will try and issue some kind of ruling. And I expect to have the amended complaint and the information I've requested from the government by close of business on Monday.

Thank you all.

* * *

CERTIFICATE OF OFFICIAL COURT REPORTER

I, JANICE DICKMAN, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenograph notes and is a full, true and complete transcript of the proceedings to the best of my ability.

Dated this 13th day of March, 2025

/s/__________________________

Janice E. Dickman, CRR, RMR
Official Court Reporter
Room 6523
333 Constitution Avenue NW
Washington, D.C. 20001