# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CLIMATE UNITED FUND**<br>7550 Wisconsin Avenue 8th Floor<br>Bethesda, Maryland 20814<br><br>     Plaintiff,<br><br> v.<br><br>**CITIBANK, N.A.,**<br>5800 South Corporate Place<br>Sioux Falls, South Dakota 57108,<br><br>  **and**<br><br>**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**<br>1200 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20460,<br><br>  **and**<br><br>**LEE ZELDIN, in his official capacity as ADMINISTRATOR, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**<br>1200 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20460<br><br>     Defendants. | **ECF CASE**<br><br>No. 1:25-cv-00698 |

## AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1. This case seeks to vindicate the right of Plaintiff Climate United Fund ("Climate United") to access grant funds to which it is legally entitled and to enjoin EPA's illegal termination of its grant.

1

2.     On October 12, 2023, Climate United applied for grant funding from EPA through the National Clean Investment Fund ("NCIF"), a program under the Greenhouse Gas Reduction Fund ("GGRF"). Climate United sought this grant funding to support Climate United's efforts to offer financing for critical clean energy projects that accelerate local economic development, save money for American families and small businesses, spur demand for domestic manufacturing, create jobs, and reduce air pollution.

3.     In April 2024, Climate United was awarded a grant after a rigorous and competitive application process. Climate United brought together three well-established nonprofits with a combined 120 years of experience managing more than $30 billion in private and institutional capital. Climate United did not have any relationship with anyone inside EPA or, to its knowledge, with any reviewers across the agencies during the application and selection process. Since being announced as a grantee, Climate United has funded projects across the United States that support domestic clean energy development, build healthy and affordable housing, accelerate American-made electric vehicle manufacturing, and save hard-working Americans money on their bills.

4.     The grant requires Climate United's award funds to be held at Citibank, N.A. ("Citibank") under a Financial Agency Agreement ("FAA") between Citibank and the U.S. Treasury Department, and an Account Control Agreement ("ACA") between Citibank, Climate United, and EPA. Arrangements like the FAA have been used by the Federal Government since the 1860s to allow the federal government to contract for financial services that the government cannot provide itself—in this case, to create accounts in the name of a recipient. EPA contemplated this arrangement from the program's inception, and described it in the original Notice of Funding Opportunity ("NOFO") in July 2023 as critical both to allow recipients to leverage private capital and to "ensure that EPA's interests are protected."

5.    EPA designed, structured, and negotiated the FAA and the ACA to provide transparency and accountability and to protect EPA's interests. The FAA requires that Citibank provide online access to EPA personnel "to allow full account visibility" into each account.[1] The ACA includes provisions that allow EPA to take "exclusive control" of the funds at Citibank under certain specified conditions: if Climate United engages in "substantial" noncompliance with the Terms and Conditions of the grant; if EPA finds "adequate evidence" of "Waste, Fraud, or Abuse," defined as "credible evidence" of a violation of federal criminal law or the False Claims Act; or if Climate United made a "material misrepresentation of eligibility status." The ACA also specifies the procedure that EPA must follow to take exclusive control of the funds—namely, delivering a "Notice of Exclusive Control," with a "written determination and finding" that Climate United has triggered one of the three grounds for terminating the grant. If EPA does not deliver a Notice of Exclusive Control with that written determination and finding, then Citibank must disburse funds at Climate United's request.

6.    Although no Notice of Exclusive Control had been delivered, Citibank began refusing to process Climate United's disbursement requests, despite Citibank's unambiguous contractual obligation to do so under the ACA. This left Climate United unable to access the grant funds to which it is entitled.

7.    Prior to Climate United's filing of this lawsuit on March 8, 2025, Citibank provided no explanation for its refusals. Nor did EPA. Although EPA's Administrator made numerous public statements expressing hostility to the GGRF program, he provided no legal justification for Citibank's withholding of funds, despite Climate United's many inquiries.

---

[1] Pursuant to the Court's March 12, 2025 sealing order, Climate United has quoted only portions of the FAA that were quoted in Citibank's TRO opposition, Dkt. 14.

8.     On March 8, 2025, Climate United filed this lawsuit. It moved for a temporary restraining order ("TRO") on March 10, 2025. When EPA and Citibank filed their response briefs on March 12, 2025, they revealed for the first time what was happening behind the scenes. Among other things:

a.  On February 17, FBI, at EPA's behest, sent a letter to Citibank "recommending" that Citibank freeze GGRF funds for 30 days. The letter did not cite any facts indicating Climate United had engaged in any misconduct. Still, Citibank construed that letter as imposing a legal obligation under the FAA to cooperate with FBI's request. EPA's actions were unconstitutional. The government lacked probable cause (indeed, had no evidence) that this freeze was justified; did not obtain a warrant after submitting a sworn affidavit to a neutral magistrate; gave Climate United no notice of the freeze; affirmatively misled Climate United by publicly declaring that Citibank was acting "voluntarily"; and afforded Climate United no process. Citibank's actions also were beyond Citibank's authority under the ACA and FAA, which do not permit Citibank to freeze funds based on an FBI "recommendation." And Citibank had no other legal basis for freezing Climate United's funds based on this illegal "recommendation" from FBI.

b.  On March 4 and March 10, the Department of the Treasury, at EPA's behest, directed Citibank not to disburse funds from Climate United's accounts for a specified period. Climate United received no notice of these actions, even though it had specifically asked Citibank if the funds had been frozen because of a governmental directive. These actions were unconstitutional and were beyond Citibank's authority under the FAA and ACA.

9.     Climate United's March 10, 2025 motion for TRO requested, among other things, that EPA be enjoined from unlawfully suspending or terminating the grant. This Court tentatively scheduled a hearing for the afternoon of March 11, 2025. After the parties received notice of the tentative hearing time, EPA's counsel requested a 24-hour extension of time, purportedly as a matter of "courtesy." Climate United consented to that extension.

10.     EPA took advantage of that courtesy. After business hours on March 11, 2025—*after* the originally scheduled time for the TRO hearing—EPA purported to accomplish precisely what Climate United was seeking to enjoin at the TRO hearing: the unlawful termination of the grant. Specifically, EPA served Climate United with a purported "Notice of Termination." The next day, EPA filed a brief stating that because it had served this "Notice" prior to the TRO hearing, the case was now moot. EPA has stated that it terminated not just Climate United's grant, but all eight grants under NCIF and a related program.

11.     The "Notice of Termination" claimed that EPA was terminating the grant based on EPA's "authority under 2 C.F.R. §§ 200.339-40, the General Terms and Conditions of EPA assistance award agreements, the terms and conditions of the Grant Agreement, and the Agency's inherent authority to reconsider prior determinations in light of new information." Dkt. 13-1 at 1. The "Notice" also mentioned EPA's interest in transparency and oversight. Tellingly, however, the "Notice" did not say *anything* about Climate United, and did not provide *any* legal or factual basis to believe that any of the ACA's or the grant's termination conditions had been satisfied.

12.     EPA's "Notice of Termination" was illegal for numerous reasons. It violated EPA's own regulations, which did not permit EPA to terminate the grant based on generic assertions regarding transparency and oversight. It violated the Inflation Reduction Act, the Appropriations Clause, and bedrock separation-of-powers principles by nullifying a duly enacted statute purely

because the Administrator disagreed with it. Finally, it was arbitrary and capricious. It made vague accusations of waste, fraud, and abuse, with nothing to back up those accusations. In point of fact, not one of EPA's documents, public statements, or investigations has identified *anything* Climate United has done improperly, much less something that would rise to the level that permits termination of the grant.

13.     Citibank's refusals to honor Climate United's requests are also illegal. Until Citibank receives a Notice of Exclusive Control, it must honor Climate United's requests. The purported "Notice of Termination" is no basis for Citibank to disregard Climate United's requests because that Notice is itself illegal and must be enjoined. Nor is the FAA, which allows Citibank to freeze assets only "in accordance with" the ACA, and only in response to "lawful instructions" from EPA. FAA § 5.B.iv; FAA Ex. A § I.B.4. But here, the freeze was not "in accordance with" the ACA and there were no "lawful instructions" from EPA or any other agency. The freeze was based on statements by EPA, the unlawful FBI "recommendation"—which provided no evidence, much less probable cause, of any criminal activity—and unsupported and unlawful statements by Treasury.

14.     EPA's unlawful actions are causing Climate United to suffer real and immediate harm. Aside from stopgap charitable grants covering solely essential operating expenses, which Climate United will need to pay back if its funding is restored, Climate United does not have other committed sources of funding to replace the NCIF grant funds. As a result of Defendants' actions, to preserve its available cash, Climate United has already been compelled to defer compensation for certain employees, slash staff salaries, terminate multiple vendors, cancel travel, and instruct non-essential lawyers, accountants, and consultants to cease work.

15.    Climate United's reliability as a source of capital is fundamental to its ability to carry out its mission and workplan. As a lender, and in particular as a lender to infrastructure and construction projects which are funded over a period of months or years, developers require confidence that Climate United is able to fulfill its all of its funding commitments for the life of their projects. But without a stable source of funding, Climate United's reputation will be irreparably and irreversibly harmed, and Climate United will be unable to attract the high-quality partners and co-investors, and secure the attractive deal terms, necessary to develop and carry out clean energy projects. Indeed, as a result of its funds being frozen, Climate United has confronted increasingly unfavorable terms from essential vendors and prospective transaction partners, many of whom have explicitly said they are unwilling to do deals with Climate United while its funding is uncertain.

16.    If Climate United does not obtain a preliminary injunction, and is forced to wait to have access to its grant funding restored, Climate United would not survive as it exists today and would need to wind-down as a going concern. Climate United likely would be forced to lay off substantially all staff and may not be able to reopen for business again, given the lost staff, deals, and reputational harm. Without additional funding, Climate United would not be able to litigate this case to judgment.

17.    Climate United's access to its grant funding should be restored and its rights should be vindicated. The Court should enjoin EPA's illegal "Notice of Termination" and enjoin EPA from taking actions premised on that illegal termination, including directing Citibank to withhold funds and sending Citibank a Notice of Exclusive Control. The Court should also enjoin Citibank from violating the unambiguous terms of the ACA.

## JURISDICTION AND VENUE

18.     This is an action for declaratory and injunctive relief based on EPA's violation of the Administrative Procedure Act, federal regulations and statutes, and the Constitution's Appropriations Clause and Due Process Clause. This action also seeks declaratory and injunctive relief and replevin based on Citibank's breach of contract and conversion.

19.     The Court has jurisdiction over Climate United's claims against Defendants EPA and Administrator Zeldin under 28 U.S.C. § 1331 and 5 U.S.C. § 702.

20.     The Court has jurisdiction over Climate United's claims against Citibank under 28 U.S.C. § 1367, because those claims are so related to Climate United's claims against EPA that they are part of the same case or controversy.[2]

21.     Venue is proper in this district because EPA is located in this district and a substantial part of the acts or omissions giving rise to the claim occurred in this district. 28 U.S.C. § 1391(e).

22.     This case presents a live controversy about whether EPA lawfully terminated Climate United's grant, or instead whether EPA's termination is unlawful because it is arbitrary and capricious and violates multiple regulations, statutes, and constitutional provisions. This case also presents a live controversy about whether Citibank breached and is continuing to breach the ACA.

## PARTIES

23.     Climate United, a Delaware corporation with its principal place of business in Maryland, is a nonprofit financial institution whose mission is to leverage public and private

---

[2] Even if EPA was not named as a defendant, the Court would have jurisdiction over Climate United's claims against Citibank under 28 U.S.C. § 1332 because the parties are of diverse citizenship and the amount in controversy exceeds $75,000.

financing to remove financial barriers to deploying clean energy. Climate United's work aims to unleash American clean energy and build a stronger, more efficient, and more resilient economy that lowers energy costs, creates jobs, improves public health, and benefits every American, while making the United States more competitive, secure, and energy independent.

24.     The Climate United coalition brings together three established nonprofits—Calvert Impact, Inc. and its affiliates ("Calvert Impact"), Community Preservation Corporation, and Center for Community Self-Help and its affiliates ("Self-Help")—that have a combined 120 years of experience managing more than $30 billion in private and institutional capital that has unlocked economic opportunity for communities in all 50 states and territories.

25.     Climate United helps fill market gaps where private capital is missing, bringing the economic benefits of clean energy, electric mobility, and building efficiency projects to overlooked markets. From Arkansas to Alaska, these projects will deliver direct benefits to hard-working Americans and communities in the form of lower energy bills, quality jobs, cleaner air and water, and more secure and reliable energy. Climate United focuses its loans and investments in rural, low-income, and Tribal communities across the country, building demand for clean energy and providing markets for domestic manufacturing. Climate United's investments also mobilize private capital, stretching public dollars to go further: for every dollar invested in a program or project, Climate United estimates up to four dollars of private capital flow into communities.

26.     Defendant Citibank, N.A. is a national banking association organized and existing under the laws of the United States of America, with headquarters in South Dakota. Citibank is the wholly owned subsidiary of Citigroup, Inc., headquartered in New York.

27.    Defendant EPA is the agency of the federal government of the United States responsible for administering the GGRF and its constituent NCIF program. EPA is an agency within the meaning of the APA.

28.    Defendant Lee Zeldin is the EPA Administrator and the agency's highest ranking official. Climate United sues Administrator Zeldin in his official capacity.

## BACKGROUND

### A.    Congress Establishes the NCIF Program.

29.    In 2022, Congress passed and President Biden signed into law the Inflation Reduction Act. Pub. L. No. 117-169, 136 Stat. 1818. The Act amended the Clean Air Act to authorize the GGRF, which appropriated $27 billion to invest in clean energy in communities across the county. *See* 42 U.S.C. § 7434; *About the Greenhouse Gas Reduction Fund*, EPA, https://www.epa.gov/greenhouse-gas-reduction-fund/about-greenhouse-gas-reduction-fund (last updated Feb. 13, 2025).

30.    The statute created this new program to leverage public funds with private capital and catalyze investment into places and projects that support local economic development, much like other government programs such as Small Business Administration loan guarantees, New Market Tax Credits, and Opportunity Zones.

31.    The GGRF essentially establishes "[g]reen banks," which are "financial institutions aimed at overcoming market barriers and scaling up investment in low-carbon technologies and climate-resilient infrastructure." Cong. Rsch. Serv. IN12090, *EPA's Greenhouse Gas Reduction Fund* (updated Feb. 14, 2023), https://crsreports.congress.gov/product/pdf/IN/IN12090. Green banks are generally used "to deliver projects that are not sufficiently met by other financial

markets." *Green Banks*, EPA, https://www.epa.gov/statelocalenergy/green-banks (last updated Jan. 24, 2025).

32.      Specifically, Section 134(a)(2) of the Inflation Reduction Act appropriated to the EPA Administrator $11.97 billion "to make grants, on a competitive basis … , to eligible recipients for the purposes of providing financial assistance and technical assistance in accordance with subsection (b)." 42 U.S.C. § 7434(a)(2).

33.      Section 134(a)(3) of the Act appropriated to the EPA Administrator $8 billion to "make grants, on a competitive basis … , to eligible recipients for the purposes of providing financial assistance and technical assistance in low-income and disadvantaged communities in accordance with subsection (b)." *Id.* § 7434(a)(3).

34.      In turn, Section 134(b) of the Act, entitled "Use of funds," provides that an eligible recipient shall use the grant as follows: (1) to "provide financial assistance to qualified projects at the national, regional, State, and local levels"; (2) to "prioritize investment in qualified projects that would otherwise lack access to financing"; (3) to "retain, manage, recycle, and monetize all repayments and other revenue received from fees, interest, repaid loans, and all other types of financial assistance provided using grant funds under this section to ensure continued operability"; and (4) to "provide funding and technical assistance to establish new or support existing public, quasi-public, not-for-profit, or nonprofit entities that provide financial assistance to qualified projects." *Id.* § 7434(b).

35.      An "eligible recipient" is defined to include a nonprofit organization that "is designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services," that "does not take deposits other than deposits from repayments and other revenue

received from financial assistance provided using grant funds under this section," that "is funded by public or charitable contributions," and that "invests in or finances projects alone or in conjunction with other investors." *Id.* § 7434(c)(1).

36.    Qualified projects are defined to include any "project, activity, or technology" that either "reduces or avoids greenhouse gas emissions and other forms of air pollution in partnership with, and by leveraging investment from, the private sector," or "assists communities in the efforts of those communities to reduce or avoid greenhouse gas emissions and other forms of air pollution." *Id.* § 7434(c)(3).

37.    Congress imposed a statutory deadline that required the EPA Administrator to use the appropriated funds "to make grants, on a competitive basis," between February 12, 2023 and September 30, 2024. 42 U.S.C. § 7434(a)(2), (3).

38.    In July 2023, EPA launched three grant competitions, including the approximately $14 billion National Clean Investment Fund competition geared at "financ[ing] clean technology deployment nationally." NOFO at 3. The NCIF program was "funded with $11.97 billion from Section 134(a)(2) and $2.00 billion from Section 134(a)(3)." *Frequent Questions About the Fund*, EPA, https://www.epa.gov/greenhouse-gas-reduction-fund/frequent-questions-about-fund (last updated Oct. 17, 2024).

39.    The purpose of the NCIF competition was to "provide grants to 2-3 national nonprofit financing entities to create national clean financing institutions capable of partnering with the private sector to provide accessible, affordable financing for tens of thousands of clean technology projects nationwide." NOFO at 4.

**B.**    **Climate United Is Awarded NCIF Grant Funding.**

40.    Following passage of the Inflation Reduction Act, Calvert Impact, Community Preservation Corporation, and Self-Help joined together to form a coalition to apply for the GGRF competition.

41.    Calvert Impact has been in operation for 30 years in the private markets, investing in job creation, affordable housing, clean energy, and local economic development. The other Climate United coalition members have been in operation for 50 years and 40 years respectively, executing investment portfolios and strategies that directly relate to Climate United's workplan. Combined, the members of the Climate United coalition have more than 120 years' experience managing more than $30 billion in private and institutional capital.

42.    In 2022, Climate United was created as a separate legal entity, and structured as a subsidiary of Calvert Impact, Inc., to apply for GGRF funding. It is common practice for established organizations to set up subsidiaries for specific projects and programs.

43.    While each of the coalition partners would have been eligible recipients for GGRF funds, each deliberately formed bespoke subsidiaries to act as the grant recipients and subrecipients. As Climate United explained to EPA, this structure allowed them "to adopt custom policies, procedures, and governance specifically crafted to most efficiently deploy NCIF funds while mitigating deployment risk." *See CUF Narrative Proposal* at 4, EPA (Apr. 4, 2024), https://www.epa.gov/system/files/documents/2024-04/cuf_narrative_proposal1.pdf.    The subsidiaries benefit from the organizational infrastructure and experience of their parent organizations while allowing them to leverage grant funds with private capital more effectively as stand-alone entities.

44.    On July 14, 2023, EPA issued a Notice of Funding Opportunity for the NCIF. The NOFO "included a robust set of application requirements and corresponding evaluation criteria

that were used to assess materials submitted to meet those application requirements.[3] "Application requirements covered a diverse set of topics and included not just a detailed project narrative but also a robust set of application attachments," such as "organizational and governing documents; resumes of board members and senior management; legal and compliance risk management policies and procedures; financial statements; workplans for the first year of program implementations, and budget narratives."[4]

45.    The NOFO provided that the NCIF competition was open for applications until October 12, 2023. NOFO at 1. The NOFO further provided that the "Anticipated Notification of Selections" would occur by March 2024, and that the "Anticipated Start of Period of Performance" would be July 2024. *Id.* The NOFO also mentioned that the "EPA General Terms and Conditions may be subject to measures or other arrangements," such as "financial agent arrangements with the U.S. Department of Treasury," to "ensure that EPA's interests are protected." *Id.* at 56.

46.    EPA established a rigorous process to review and select applications. That process included an evaluation of each applicant's program plan, organizational capacity, previous experience managing third-party capital, and experience managing financial, credit, compliance, and other risks. The review was conducted by expert panels with broad and deep qualifications who would then present rankings and recommendations to a Selection Official authorized to make the final selection for awards. *Id.* at 54.

47.    Climate United entered the NCIF grant competition with a $13.97 billion proposal to accelerate clean energy adoption across the U.S. economy, including by offering affordable financing for clean technology programs. As part of the application process, Climate United was

---

[3] *Greenhouse Gas Reduction Fund, Review and Selection Process*, EPA (last updated Aug. 16, 2024), https://www.epa.gov/greenhouse-gas-reduction-fund/review-and-selection-process.
[4] *Id.*

required to submit a detailed budget to EPA, along with proposed policies and organizational documents. Climate United's application also included letters of support from financial institutions, developers, labor organizations, affordable housing organizations, and state and local government—a testament to the coalition's deep and extensive experience backing up its proposed program plan. Additionally, prior to receiving the Notice of Award, Climate United was required to attach a negotiated, thoroughly reviewed, and approved budget to its grant agreement.

48.      Following the agency's lengthy and rigorous review process, Climate United was awarded $6.97 billion. The award was publicly announced by the White House in April 2024, in a press release touting Climate United's credentials and vision.[5]

49.      Consistent with the purpose of the Inflation Reduction Act under which the NCIF funds were appropriated, Climate United developed and EPA approved a workplan that was finalized with the award and posted publicly for full transparency. As enumerated in the workplan, the Climate United coalition plans to commit at least $580 million toward qualified projects in the first year of funding (*i.e.*, before July 2025), and to draw the full $6.97 billion over the first five years of the program. To date, the Climate United coalition has committed $392 million to qualified projects. Approximately 45% of Climate United investments (the portion of the funds provided through financial assistance), or approximately $2.8 billion of the NCIF Award, will focus on investing in energy-efficient buildings and homes. Approximately 20% of Climate United investments, or approximately $1.2 billion of the NCIF Award, will focus on electric transportation and charging infrastructure. Another approximately 25% of Climate United investments, or

---

[5] *Biden-Harris Administration Announces $20 Billion in Grants to Mobilize Private Capital and Deliver Clean Energy and Climate Solutions to Communities Across America*, EPA (last updated Aug. 16, 2024), https://www.epa.gov/newsreleases/biden-harris-administration-announces-20-billion-grants-mobilize-private-capital-and.

approximately $1.5 billion of the NCIF Award, will focus on producing affordable, clean electricity and heat through renewable energy generation and battery storage, including through solar, hydroelectric, and geothermal power. The remaining 10% of investments will focus on other sectors that cut costs, reduce pollution, and provide direct benefits to American families, including in agriculture. Further, consistent with the terms of the grant award, Climate United will deploy 60% of its investments in low- and moderate-income communities, 20% of its investments in rural communities and 10% of its investments in Tribal communities.

**C.    The Terms and Conditions of the Grant, Including Suspending or Terminating the Grant.**

50.    On April 11, 2024, shortly after the award was publicly announced, EPA held a "terms and conditions briefing" for awardees. Among other things, EPA explained the process for agreeing upon the terms and conditions that would govern the grant. EPA explained that it expected to share draft terms in mid-to-late April, and that EPA expected the terms to change based on awardee feedback, to ensure they were clear and would be viable for awardee workplans. While noting the "dates are tentative," EPA expected a "final" set of terms to be included in a final grant agreement known as a Notice of Award ("NOA") in late June, modified terms to be agreed upon in September/October, additional modifications to occur in October/November, and further modifications "over the remainder of the performance period."

51.    Climate United's award was memorialized in the NOA dated August 8, 2024 [hereinafter "August NOA"]. The August NOA appended Terms and Conditions governing the grant. The Terms and Conditions in the August NOA included several requirements regarding the use of GGRF funding, including labor and workforce requirements, *id*. at 34, "Buy America" requirements, *id*. at 28, consumer protection requirements, *id*. at 36, and training requirements, *id*. at 33-34.

16

52.     The Terms and Conditions in the August NOA required Climate United to adhere to a rigorous set of reporting requirements. These include requirements to produce quarterly, semi-annual, annual, and final reports to EPA with "detailed narratives describing program performance … supported with qualitative discussions and quantitative metrics," *id*. at 16, submit quarterly transaction-level and project-level data reports, *id*. at 17-18, and provide ongoing disclosures to EPA, *id*. at 18-19.

53.     The Terms and Conditions in the August NOA provided that Climate United "must obtain prior written approval from the EPA Project Officer (who will in turn notify the EPA Award Official) for any transfers that will not be disbursed for an Allowable Activity within 15 business days." *Id*. at 61.

54.     In addition, the Terms and Conditions required Climate United (as well as other GGRF recipients) to complete standard EPA grants training within 90 days of receipt of the grant, including the "*EPA Grants Management Training for Applicants and Recipients*" and "*How to Develop a Budget*." *Id*. at 8. Climate United complied with this requirement, even though Climate United had already submitted a detailed budget to EPA in connection with the grant competition selection process, and had already attached a negotiated, reviewed, and approved budget to its grant agreement before receiving the Notice of Award.

55.     As EPA had initially envisioned, the August NOA was amended on December 20, 2024 [hereinafter "December NOA"] to update the Terms and Conditions which apply to all NCIF recipients. The December NOA was substantially similar to the August NOA, and notably did not substantively change the overall grant award or provisions regarding EPA's oversight or underlying reporting and transparency requirements. The changes primarily reflected the insights gained from months of feedback from going to market with the program, in particular clarifying

the applicability of "Build America, Buy America" requirements and the applicability of Davis Bacon and Related Acts to projects. The December NOA also updated the Terms and Conditions to account for Citigroup being selected by the Treasury Department to serve as its financial agent under the Financial Agency Agreement entered into on September 19, 2024, *see infra* ¶¶ 60-70; clarified the definitions of "Waste, Fraud, and Abuse" and "Materially Impaired"; clarified which versions of the applicable regulations govern termination of the grant; and specified certain procedures involved in issuing notices about the grant funds to financial institutions. December NOA at 12, 41, 56. The changes in the December NOA were unrelated to any changes in Administration.

56.    The Terms and Conditions in the December NOA describe the three specific requirements with which EPA must comply to suspend or terminate Climate United's award. December NOA at 41. The Terms and Conditions do not allow EPA to unilaterally suspend the grant or remove Climate United's ability to access funding. The Terms and Conditions state that "EPA maintains the right to terminate the Assistance Agreement *only*" in the following situations. December NOA at 41 (emphasis added):

a.    *First*, EPA may terminate the Agreement if Climate United engages in "substantial" noncompliance such that "effective performance" is "Materially Impaired." *Id.* Effective performance is "Materially Impaired" if (1) EPA issues a "written determination and finding … that the Recipient has failed to achieve sufficient progress in accordance with the Sufficient Progress clause" and, (2) if EPA determines in its sole discretion that a "corrective action plan" would remedy the issue, EPA must issue a "separate written determination and finding" that the Recipient "has not materially addressed its failure." *Id.* at 8-9.

b. *Second*, EPA may terminate the Agreement if Climate United engages in "material misrepresentation of eligibility status." *Id.* at 41.

c. *Third*, EPA may terminate the Agreement if there is "adequate evidence" of "Waste, Fraud, or Abuse," *id.*, which is defined with reference to EPA's General Terms and Conditions and 2 C.F.R. § 200.113. Those sources require "credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act (31 U.S.C. [§§] 3729-3733)." *See* EPA, *General Terms and Conditions* (effective Oct. 1, 2024), https://www.epa.gov/system/files/documents/2024-10/fy_2025_epa_general_terms_and_conditions_effective_october_1_2024_or_later.pdf; 2 C.F.R. § 200.113.

57.    In addition, EPA is obligated by regulation to take certain procedural steps if it wishes to terminate the grant agreement. Among other things, EPA must comply with 2 C.F.R. § 200.341, which requires EPA to provide written notice of termination to the recipient that includes "the reasons for termination, the effective date, and the portion of the Federal award to be terminated, if applicable." 2 C.F.R. § 200.341; December NOA at 41 (incorporating this regulatory requirement into the Terms and Conditions).

58.    The Terms and Conditions of the award set forth the EPA requirements, including all relevant oversight, reporting, termination and programmatic requirements, and apply to all NCIF recipients. The workplan and budget reflect Climate United's proposed investment and deployment strategy. There are two different workstreams within EPA, with different approval processes and different personnel, that address the grant's Terms and Conditions and the grant's budget and workplan. This led to separate NOA amendments in December and January.

19

59.    As EPA envisioned from the outset, there was a further amendment to the NOA on January 16, 2025. This amendment modified Climate United's workplan and budget—to tweak the allocation of grant funds within specified budget categories, to align with updates to the Code of Federal Regulations, and to update the workplan to reflect market feedback. *Compare* December NOA at 3, *with* January NOA at 3. The January NOA did not change the operative Terms and Conditions attached to the December NOA or alter the overall grant award. January NOA at 1, 4-5. The Terms and Conditions in the December NOA are thus the operative Terms and Conditions that remain binding on Climate United and EPA. The changes in the January NOA were unrelated to any changes in Administration.

### D.    The Financial Agency Agreement Between Citibank and the Treasury Department.

60.    The July 2023 NOFO envisioned entering into "financial agent arrangements with the U.S. Department of Treasury" to "ensure that EPA's interests are protected." NOFO at 56. Climate United had no role in EPA's decision to include the financial agent concept in the July 2023 NOFO.

61.    The financial agent concept is an established mechanism for disbursing government funding that was first authorized in the 1860s and has been used for decades.[6]

62.    After a selection process run by the Treasury Department, Citibank was selected as the Financial Agent. Citibank and Treasury entered into the FAA on September 19, 2024.

63.    Climate United is not a party to the FAA. Citibank's selection as the Financial Agent was announced to Climate United on September 26, 2024. Climate United had no role in

---

[6] *Revenue Collections and Payments: Treasury Has Used Financial Agents in Evolving Ways but Could Improve Transparency*, GAO-17-176 (Jan. 2017), https://www.gao.gov/assets/gao-17-176.pdf ("Treasury has a long history of using financial agents to support its core functions of disbursing payments and collecting revenue.").

the selection of the financial agent, which was coordinated by EPA and the Treasury Department as part of a competitive process.

64.    The FAA provides that Citibank will provide "commercial banking and finance services" "related to programs under the Inflation Reduction Act … including grant programs" such as the NCIF. FAA at 1, A-1. The FAA is not specific to Climate United's grant and Climate United is not mentioned in the FAA.

65.    The FAA provides that Citibank "acknowledges and agrees that it owes a fiduciary duty of loyalty and fair dealing to the United States when acting as a financial agent of the United States." *Id.* § 5.A. The FAA further provides that as a financial agent, Citibank will "act at all times in the best interests of the United States when carrying out its responsibilities under this FAA and in all matters connected with this agency relationship." *Id.* The FAA further states that Citibank's fiduciary obligations include the duty to "construe the terms of this FAA and any related instructions from Treasury in a reasonable manner to serve the purposes and interests of the United States" and "to act only within the scope of its actual authority and to comply with all lawful instructions or directions received from Treasury." *Id.*

66.    The FAA authorizes Citibank to "freeze accounts, and transfer funds in frozen accounts, at the direction of the relevant secured party [*i.e.*, EPA], in accordance with the account control agreements." *Id.* at Ex. A § I.B.4.

67.    The FAA provides EPA with "full account visibility," *id.* at Ex. A § I.D.1. The FAA thus gives EPA full, real time view access into all accounts of Climate United and its subrecipients, and full transparency into how grant funds are being spent. Climate United and its subrecipients each have seven distinct accounts, for twenty-one accounts in total.

68.     EPA has traditionally used the Automated Standard Application for Payments ("ASAP") system to disburse award funds. The ASAP system allows recipients to draw funds as needed—for example, for funding a project or paying for administrative costs. While the entire award amount would be obligated to the recipient, the recipient's balance sheet would only reflect those award funds drawn down. One of the primary objectives of the NCIF program is to use government funds to spur private capital. The traditional ASAP mechanism would not allow for a recipient to raise private capital on its own balance sheet. EPA understood the need to solve for this technical accounting problem, and EPA's original design of the program, described in the July 2023 NOFO, proposed a financial agent mechanism. NOFO at 56. The ability of the recipient to draw down award funds would remain unchanged, but the balance sheet of the recipients would reflect the entire award amount rather than only the funds already expended.

69.     The oversight and accountability provisions of Climate United's award are contained within its agreement with EPA, specifically within the NCIF Terms and Conditions. The Treasury Department under the ASAP system does not conduct oversight—it simply reports to EPA the amounts which have been drawn by the recipient and what amounts remain. Under the FAA between Citibank and Treasury, Citibank agreed to assume this ministerial funding responsibility. *See* FAA at Ex. A § I. EPA's oversight functions remain identical under the FAA and under ASAP. This is why the FAA agreement is between Treasury and Citibank, not between EPA and Citibank—Citibank is taking over Treasury's functions, not EPA's.

70.     Climate United used the ASAP system to access funds between August 2024 (when the initial NOA was finalized) and November 2024, while the ACA was being finalized. But ASAP is far less transparent than the FAA by comparison. ASAP provides only a running total of grant funds disbursed to a grant recipient—it does not allow for visibility into the activities of

22

subrecipients. Therefore, the financial agent arrangement increases EPA's oversight of funds by requiring Climate United and its subrecipients to disclose expenditures by budget category in real time. The financial agent arrangement also provides EPA with full visibility into any program income generated by Climate United or any subrecipient, which is typically opaque to EPA under the ASAP system.

### E. The Account Control Agreement Between Climate United, EPA, and Citibank.

71.    The grant agreement required Climate United to enter into an Account Control Agreement. Climate United entered into the ACA with EPA and Citibank on November 1, 2024. Climate United, EPA, and Citibank executed an amendment on January 13, 2025, to clarify the parties' intent regarding the treatment of certain obligations that were "properly incurred," if EPA issued a Notice of Exclusive Control [hereinafter "Amended ACA"]. This was only a clarification and did not alter the substance of the ACA.

72.    Under the ACA, Citibank administers the funds provided under the NCIF, in its role "as a financial agent of the United States pursuant to the authority" of the Treasury Department, and EPA serves as the "Secured Party." ACA at 1.

73.    The ACA specifies that Citibank's duties with respect to the funding are exclusively "administrative or ministerial (and shall not be construed to be fiduciary in nature)." ACA at 3. The ACA further specifies that Citibank "shall not be responsible for any of the agreements referred to or described herein (including, without limitation, the Grant Agreement …), or for determining or compelling compliance therewith, and shall not otherwise be bound thereby." *Id*.

74.    Under the ACA, Citibank is required to disburse funds to Climate United upon Climate United's request. ACA § 2 provides that Citibank "shall comply with all instructions, notifications, and entitlement orders the Bank receives directing the disposition of funds and

financial assets in the Accounts including, without limitation, directions to distribute proceeds of any such transfer or redemption of interest or dividends on financial assets in the Accounts."

75.    Citibank is not required to disburse funds to Climate United *if* EPA exercises its "right to exclusive control" under the ACA. ACA § 2; *see also* Amended ACA § 1 (amending ACA § 2 to clarify that "after the delivery of a Notice of Exclusive Control, Bank shall continue to disburse funds and financial assets associated with financial obligations 'properly incurred' by the Pledgor prior to the issuance of, but not in anticipation of, a delivery of a Notice of Exclusive Control … except for any specific funds or financial assets, identified by Secured Party in the applicable Notice of Exclusive Control as not being 'properly incurred' by the Pledgor in accordance with 2 [C.F.R. §] 200.343.").

76.    To exercise its right of control, EPA must notify Citibank of its intention to exercise exclusive control over the accounts, in a form substantially similar to a sample Notice of Exclusive Control contained in the ACA. *Id*.; Amended ACA at 10 (Exhibit A: Sample NOEC); *see also* ACA at 1 (stating that Climate United and EPA "have agreed that the terms and conditions entitled 'Deposit Account at Financial Agent' in the Grant Agreement indicate the conditions under which the [EPA] may exercise its right of control").

77.    The operative form Notice of Exclusive Control states: "As required by the Grant Agreement, the Secured Party [*i.e.*, EPA] has issued a written determination and finding that Pledgor [*i.e.*, Climate United] has failed to comply with the terms and conditions of the Grant Agreement, and that noncompliance is substantial such that effective performance of the Grant Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse (as defined in the Grant Agreement) or material misrepresentation of eligibility status, and that the Secured Party has initiated action under 2 [C.F.R. §] 200.339 to wholly or partly suspend or

24

terminate the Grant Agreement, as authorized in the terms of the Grant Agreement." Amended ACA at 10.

78.    The form NOEC thus incorporates the standard for termination of the award specified under the Terms and Conditions. *Compare id.*, *with* December NOA at 41 (discussing termination under programmatic conditions) *and* January NOA at 5 ("All Programmatic Conditions Remain the Same").

79.    The ACA does not refer to the FAA or purport to incorporate by reference any of the FAA's terms.

80.    The ACA does not provide that Citibank may decline to disburse funds to Climate United under the ACA if such disbursement is not in accordance with the FAA. To the contrary, the ACA states that "[e]ach of the Pledgor [*i.e.*, Climate United] and the Secured Party [*i.e.*, EPA] acknowledges and agrees that … the duties, responsibilities and obligations of the Bank shall be limited to those expressly set forth in this Agreement [*i.e.*, the ACA], each of which is administrative or ministerial (and shall not be construed to be fiduciary in nature)." ACA § 6(a). The ACA further states: "The Bank shall be entitled to rely upon any instruction, notice, request or other instrument delivered to it without being required to determine the authenticity or validity thereof, or the truth or accuracy of any information stated therein." ACA § 6(b). In addition, the ACA states that it "constitutes the entire agreement between the parties and sets forth in its entirety the obligations and duties of the Bank with respect to the assets in the Accounts." ACA § 9.

**F.    Climate United Uses Grant Funds Provided By Citibank In The Normal Course.**

81.    Climate United's funds were fully obligated by EPA on August 8, 2024. Climate United initially accessed funds through Treasury's ASAP system as Treasury worked to implement

the financial agent arrangement. The remainder of Climate United's undrawn funding was disbursed to accounts held at Citibank, after those accounts were established, subject to the ACA.

82.     Thereafter, Climate United drew money from its Citibank accounts approximately once every two weeks to pay operating expenses, as permitted by the governing Terms and Conditions, which requires prior approval for drawing of transfers that will not be disbursed in the following fourteen business days. *See* December NOA at 57-58.

83.     Climate United has used grant funds for salaries and benefits for 37 employees on its payroll. These staff members collectively operate all aspects of Climate United's operations, including establishing financing programs, underwriting potential financial transactions, ensuring compliance with the Terms and Conditions of the NCIF Award, soliciting and selecting partners, conducting community engagement, and structuring and servicing a portfolio of loans.

84.     Climate United has used grant funds to launch three financing programs to date. The first is a $31.8 million pre-construction loan to support solar power projects across rural communities in Arkansas, which was announced in October 2024. Through this project, Climate United is financing pre-construction costs for 18 solar projects comprising the largest commercial and industrial solar deployment in Arkansas history, which is projected to save more than $120 million in energy costs over the project's life and create hundreds of jobs.

85.     The second is a program to offer affordable leasing options for battery electric heavy-duty trucks to small fleets and independent operators. Climate United issued a request for proposals in October 2024 from qualified U.S. auto manufacturers to deliver up to 500 electric drayage trucks, which Climate United intends to begin leasing at the ports of Long Beach and Los Angeles. When completed, these orders will represent some of the largest-ever purchases of domestically manufactured battery electric trucks in U.S. history. Climate United intends to

expand this program nationally. This program will not only reduce the cost per mile of operating drayage trucks for small businesses, but it will also reduce air pollution in port communities and create demand for U.S. manufacturing in factories across the country.

86.     The third is $63 million in committed pre-construction financing for projects to design and develop solar power plants in partnership with Tribal governments and communities. These projects bring access to affordable energy to rural communities and Indigenous people in addition to quality jobs and local economic development. Initial projects will be located in Eastern Oregon and Idaho.

87.     In addition, Climate United has used grant funds to design, develop and launch the Climate United NEXT program. This is a pre-development grant program intended to provide up to $30 million in technical assistance and planning support for community-led projects that increase energy independence and resiliency, reduce pollution, and save money for families, small businesses, and communities. The first round of grants focused on projects serving Tribal communities. Climate United publicly committed to announcing pre-development grants through the NEXT program across the United States by the end of February 2025. After reviewing 104 applications for the program in the first round of submissions, Climate United approved 22 awards across 18 states, and anticipates issuing $6.345 million in initial subawards.

88.     Throughout this period, EPA has exercised its oversight and supervisory authority in the following ways:

        a.     The terms of the grant agreement require quarterly, semi-annual, and annual reports to be submitted to EPA, detailing Climate United's transactions, activities, progress against its workplan, and expenditures by budget category, including mandatory quarterly conflict-of-interest reporting by each of the Climate United coalition

partners and Climate United's subgrantees. Climate United's inaugural semi-annual report covering the period from the start of the grant to December 31, 2024 is publicly available;

b. EPA has held meetings at least weekly, and frequently two to three times a week, to discuss Climate United's program plans, reporting, oversight, and application of the EPA Terms and Conditions;

c. EPA has view access to each of Climate United's seven Citibank accounts and each of the fourteen accounts of Climate United's subrecipients, allowing EPA to see funds being spent and what budget category that spending relates to, as well as allowing EPA to see program income in the form of portfolio earnings or repayment of loans;

d. Climate United is required to provide a certification each time it submits a draw request to Citibank for a financial assistance transaction establishing that the draw is necessary to execute against its EPA-approved workplan. The certification states: "The amount of the transfer is necessary to execute against the EPA-approved workplan, and the financing agreements for identified qualified projects necessitating the transfer have been reviewed by Climate United's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions.";

e. Climate United was required to obtain EPA approval for a detailed budget for the term of its award, and EPA must approve any material changes;

f.  Climate United has adopted detailed policies as required by EPA, including investment policies and procedures to approve projects, many of which require further reporting from project borrowers;

g.  Climate United is subject to standard audit requirements by a third-party auditor, including both financial audits and a Single Audit for federal grant compliance; and

h.  In November, EPA conducted transaction testing, which is a systematic examination and verification of financial transactions to ensure they comply with the grant's terms, conditions, and applicable regulations. EPA recently issued additional oversight requests.

**G.    EPA Takes Actions to Attempt to Suspend or Terminate Climate United's Grant, and to Cause Citibank to Not Disburse Climate United's Funds, While Ignoring Climate United's Requests for Information.**

89.    On January 30, 2025, Administrator Zeldin was sworn in as the EPA Administrator.

90.    On February 12, 2025, Administrator Zeldin made a public statement announcing EPA's goal of taking possession of grant funds disbursed pursuant to the Inflation Reduction Act, referring to Climate United by name.[7] Without mentioning any specific basis for adverse action under the terms of Climate United's award—or that of any other recipient—Administrator Zeldin stated that "the financial agent agreement with the Bank needs to be instantly terminated," and stated that "the Bank must immediately return" the grant funds.[8] To ensure EPA "reassume[s] responsibility for all of these funds," Administrator Zeldin then stated that he would "refer[] this

---

[7] Lee Zeldin (@EPALeeZeldin), X, at 1:40 (Feb. 12, 2025, 7:52 PM), https://x.com/epaleezeldin/status/1889840040622321778.
[8] *Id.* at 2:15.

matter to the Inspector General's Office and will work with the Justice Department," and that EPA is "not going to rest" until it has "recover[ed]" the grant funds.[9]

91.    EPA, acting directly and through other government officials, thereafter took multiple actions designed to cause Citibank to withhold grant funds from Climate United. Those actions include, but are not limited to:

a.    On February 17, 2025, the Office of the Deputy Attorney General ("ODAG") at the Department of Justice communicated with the United States Attorney's Office in Washington, D.C. ("USAO-DC"), seeking to open a grand jury investigation into grants awarded by EPA under the GGRF, including to Climate United.[10] Denise Cheung, the Chief of the Criminal Division at USAO-DC, after reviewing the documentation provided by ODAG, advised that there was not an adequate factual basis to open that grand jury investigation.[11]

b.    On February 17, 2025, FBI "recommended" that Citibank freeze assets in the accounts of Climate United and every other prime recipient of a GGRF grant.[12] FBI did not refer to the FAA between Citibank and Treasury, or any obligations under the FAA. FBI did not produce a warrant issued by a judge who found probable cause based on a sworn affidavit. FBI did not articulate exigent circumstances

---

[9] Rapid Response 47 (@RapidResponse47), X (Feb. 25, 2025, 10:16 AM), https://x.com/Rapid Response47/status/1894406216052289869.

[10] *Read the Resignation Letter by Denise Cheung, a Veteran D.C. Federal Prosecutor*, Wash. Post (Feb. 18, 2025), https://www.washingtonpost.com/dc-md-va/2025/02/18/read-resignation-letter-denise-cheung/; *see also* Kyle Cheney, et al., *Senior Prosecutor in Washington Quits, Citing Pressure to Probe Biden-era Climate Funds*, Politico (Feb. 18, 2025), https://www.politico.com/news/2025/02/18/denise-cheung-us-attorneys-office-washington-020363.

[11] *Resignation Letter*, *supra* note 10 (noting assessment that no "predicate for opening such a grand jury investigation existed" on the face of the existing documents provided by ODAG).

[12] Dkt. 14-5 at 2-3 (listing Account Control Agreements between EPA and eight [NCIF/GGRF] grantees, including Climate United).

justifying an immediate seizure of Climate United's assets without notice to Climate United. FBI did not identify any substantive factual basis for this "recommendation." FBI took this action even though Ms. Cheung had advised that there was not "sufficient evidence to tell the bank that there is probable cause to seize the particular accounts identified."[13]

c.  That same day, the ODAG instructed that a second letter be sent to Citibank directing that Citibank implement an asset freeze and refrain from releasing funds in accounts of 28 other GGRF awardees and subawardees pursuant to a criminal investigation.[14] In response, senior officials at the DC-USAO again asserted there was not sufficient evidence to justify issuing that letter.[15] Consistent with her oath of office, Ms. Cheung refused to send the letter and was forced to resign on February 18, 2025.[16]

d.  Apparently without signoff from other prosecutors at the DC-USAO, Interim U.S. Attorney Ed Martin submitted a seizure warrant application with a magistrate judge, which was rejected.[17] After that, ODAG reportedly sought a different U.S. attorney's office to carry out the warrant request in order to launch a grand jury investigation and obtain a court-ordered bank freeze, but prosecutors in that office likewise refused to do so.[18]

---

[13] *Resignation Letter*, *supra* note 10.
[14] *Id*.; *see* Dkt. 14-5 at 5-6.
[15] *Resignation Letter*, *supra* note 10.
[16] *Id*.
[17] Spencer Hsu, Maxine Joselow & Nicolas Rivero, *FBI Takes Up EPA Probe Amid Pushback from Judge, Prosecutors*, Wash. Post (Feb. 27, 2025), https://www.washingtonpost.com/dc-md-va/2025/02/27/trump-fbi-epa-grant-investigation/.
[18] *Id*.

e.  On February 19, 2025, Administrator Zeldin stated on X that he had "just read" a "grant agreement" related to the GGRF, characterizing it as "wild."[19]

f.  On February 23, 2025, Administrator Zeldin discussed the GGRF program on national television and stated, without basis, that "the entire scheme, in my opinion, is criminal."[20]

g.  On March 2, 2025, EPA Deputy Administrator McIntosh sent a letter to EPA's Office of the Inspector General asking for an OIG investigation into GGRF funding.[21] That letter, which was public, states that Citibank was withholding the funds "voluntarily." The letter did not disclose FBI's "recommendation" to freeze the funds or EPA's role in procuring that "recommendation."

h.  EPA then sent a copy of that letter to Citibank by email, asserting that the letter "highlights several of the egregious instances of misconduct regarding $20 billion GGRF distributions that have been improperly funneled through your financial institution," and stating that "EPA will continue our efforts to re-establish accountability and oversight over the GGRF, which is riddled with self-dealing, conflicts of interest, extraordinarily unqualified recipients, improperly reduced government oversight, and much more."[22] Beyond these generalized statements,

---

[19] Lee Zeldin (@EPALeeZeldin), X (Feb. 19, 2025, 4:01 PM), https://x.com/epaleezeldin/status/1892318587961930086.

[20] Sunday Morning Futures (@SundayMorningFutures), X (Feb. 23, 2025, 11:21 AM), https://x.com/SundayFutures/status/1893697750937505807; *see also* Zack Colman, *Recipient Isn't Giving in as Trump's EPA Tries to Revoke Climate Grants*, Politico (Feb. 24, 2025), https://www.politico.com/news/2025/02/24/climate-grant-recipient-spending-trumps-epa-tries-claw-back-00205814 (collecting quotes).

[21] *EPA Formally Refers Financial Mismanagement of $20B "Gold Bars" to Inspector General*, EPA (last updated Mar. 3, 2025), https://www.epa.gov/newsreleases/epa-formally-refers-financial-mismanagement-20b-gold-bars-inspector-general.

[22] Dkt. 14-6.

the communication to Citibank offers no basis for its assertions of "conflicts of interest, extraordinarily unqualified recipients," or "improperly reduced government oversight" with respect to Climate United.

i.  On March 4, 2025, after EPA received a letter from Climate United outlining the legal and factual basis for why access to its funding must be restored, the Department of Treasury directed Citibank not to disburse funds from any of the GGRF accounts for a specified period." Dkt. 14 at 7. In an email to Citibank at 10:02 PM, Treasury stated that "Treasury is instructing Citibank, in its capacity as fiduciary, to work directly with the EPA to establish and implement reasonable account controls to serve the purposes and interests of the United States, in accordance with Section 5 of the FAA. Further, in order to provide the EPA with the necessary time to develop reasonable account controls, we are further instructing Citibank not to disburse funds from any of the GGRF accounts prior to the end of the day Sunday, March 9, 2025." Dkt. 14-7. Neither the ACA nor the FAA permit such a direction based on vague and unfounded suspicions. The FAA only permits Citibank to freeze funds "in accordance with the account control agreements," but the ACA did not permit this freeze. The FAA requires Citibank to comply with "all lawful instructions or directions received from Treasury," but the instructions on March 4 and 10 were not lawful. Citibank's role as a fiduciary of the United States does not extend to suborning unlawful conduct by EPA or Treasury.

j.  On March 8, 2025, EPA sent Citibank a letter regarding GGRF grant recipients. *See* Dkt. 14-2. On information and belief, that communication directed Citibank to

"not resume processing payment instructions for GGRF accounts," Dkt. 14-2, or language to that effect.

k.  On March 10, 2025, in an email to Citibank with the timestamp of 12:28 AM eastern time, EPA directed Citibank to continue to refrain from processing payments. Dkt. 14 at 7. The message stated: "In its communication to the Bank this week, the U.S. Department of the Treasury (Treasury) directed the Bank to cooperate with EPA on account controls. To prevent the misuse of funds in the interim, EPA instructs the Bank, pursuant to this Treasury directive, the grant agreements, and Section I.B of Exhibit A to the [FAA], to pause the processing of payment instructions for the GGRF accounts until further notice." Dkt. 14-2. This direction was also illegal: Section I.B of Exhibit A to the FAA did not permit Treasury to take this step unless the grant was lawfully terminated. As of March 10, the grant had not been terminated and no termination would have been lawful.

92.    Amid these events, Citibank failed to comply with Climate United's normal-course requests for disbursements, as required by the ACA. When Climate United inquired, Citibank did not respond and did not provide Climate United with any legal or factual basis for its failure to act.

a.  On February 14, 2025, Climate United requested an inter-account transfer, to move funds related to the purchase of electric trucks from Climate United's budget account to Climate United's reserve account. The transfer did not occur.

b.   On February 18, 2025, Climate United placed a request to Citibank to draw funds from Climate United's account. In the normal course, Citibank would have sold shares in Climate United's money market account, and then distributed the resulting funds to Climate United later that same day. But Climate United's accounts with

Citibank do not reflect that the typical money market transaction or disbursement occurred, and Climate United did not receive any funds from its account.

c. On the morning of February 19, 2025, Climate United submitted an email message to Citibank noting that its funding requests remained pending and had not been disbursed. That letter requested that Citibank provide the legal bases for those actions, advise whether those actions were taken pursuant to a directive by a government agency, and provide a reasonable opportunity to respond to any instruction or request that impacts Climate United's accounts before that instruction or request may be acted upon by Citibank. Citibank did not respond.

d. On February 21, 2025, Climate United placed a request to Citibank to draw funds from Climate United's account. But Climate United's accounts with Citibank do not reflect that the typical money market transaction or disbursement occurred, and Climate United did not receive any funds from its account.

e. On the evening of February 25, 2025, counsel for Climate United submitted another email message to Citibank requesting release of the funds within 24 hours or, in the alternative, to provide the legal bases for its actions. Citibank again did not respond.

f. On February 26, 2025, counsel left voicemail messages for Citibank. Citibank again did not respond.

g. On March 1, 2025, counsel submitted a letter in hard copy and by email to the Chief Executive and Chief Legal Officers of Citibank. The letter explained that Citibank is illegally withholding Climate United's funds in breach of the ACA; has ignored Climate United's repeated requests for information by phone, voicemail, and email; and has failed to provide any colorable legal basis for Citibank's actions. The letter

demanded a response by no later than close of business on Tuesday, March 4, 2025. Citibank did not respond.

93.    When Citibank finally responded to Climate United, Citibank stated that it was not disbursing funds because it was waiting for direction from EPA. Citibank did not disclose that it had frozen Climate United's funds based on FBI's "recommendation" or based on direction from EPA and Treasury.

a.    On March 3, 2025, Climate United contacted Citibank by email requesting information about the status of Climate United's funds and the process for disbursing those funds. Citibank responded: "We have received your correspondence and have forwarded it to the United States Environmental Protection Agency and other federal officials for an appropriate response. … Once we have further information available regarding the program we can provide at that time." In response to a follow-up email from Climate United requesting clarification, Citibank stated: "We are awaiting further guidance."

b.    On March 4, 2025, in "a statement emailed to *Newsweek* … , a spokesperson for Citibank said Citi has been working with federal officials to 'address government officials' concerns' regarding the GGRF. 'Our role as financial agent does not involve any discretion over which organizations receive grant funds,' the bank said in its statement. 'Citi will of course comply with any binding instructions from the federal government.'"[23]

---

[23] Jeff Young, *Green Group Wants EPA to Explain Why $20 Billion Accounts Are Frozen*, Newsweek (Mar. 4, 2025), https://www.newsweek.com/climate-united-fund-epa-letter-frozen-bank-accounts-2039608.

94.    Citibank's communications with Climate United and its public statements were misleading. Citibank did not assert that it was obligated under the FAA to freeze Climate United's funds. Citibank did not mention that EPA and Treasury had illegally caused Citibank to freeze Climate United's funds. Citibank did not state or suggest that it was withholding funds from Climate United based on a "recommendation" from FBI that cited no evidence and was not accompanied by a court order supported by probable cause and a sworn affidavit.

95.    Citibank also never described EPA's and Treasury's stated bases for withholding Climate United's funds. For example, Citibank never informed Climate United that the communications recommending or directing Citibank not to disburse funds to Climate United solely cited the FAA (to which Climate United is not a party), did not cite the ACA, did not assert that termination was warranted under the ACA, and did not suggest that a Notice of Exclusive Control had been issued or would be forthcoming. Citibank also never informed Climate United that the communications recommending or directing Citibank not to disburse Climate United's funds did not proffer adequate, let alone credible, evidence that any of the ACA's three bases for terminating Climate United's grant had been satisfied. And Citibank never gave Climate United an opportunity to respond. So Climate United never had an opportunity to explain that the FAA only permits accounts to be frozen "in accordance with the account control agreements," and that the ACA did not permit Climate United's assets to be frozen under these circumstances. Climate United also never had an opportunity to point out that the FAA requires Citibank to comply with "lawful instructions or directions" and act as a fiduciary, which did not require complying with the unlawful instructions and direction given by FBI, EPA, and Treasury. Instead, Citibank waited to reveal the truth until March 12—nearly a month after it began withholding Climate United's grant funds, and with Climate United on the brink of suffering irreparable harm.

96.    For its part, EPA never informed Climate United that EPA had been trying to freeze, suspend, or terminate Climate United's grant or its access to grant funds, or that EPA had directed Citibank to stop disbursing funds to Climate United. EPA never provided Climate United with a reasoned explanation, or any explanation, for its actions. EPA never even responded to Climate United's communications—even while EPA was simultaneously pressing Citibank to continue to prevent Climate United from accessing its funds, and directing Treasury to order Citibank to withhold Climate United's funds. Indeed, Climate United was not notified of these events until March 12, 2025, when it was served with briefs responding to its motion for a TRO.

a.  On February 20, 2025, Climate United sent an email message to officials at EPA notifying EPA that it was being denied access to its funds and requesting additional information and guidance. The EPA team replied on February 21, providing no additional information but offering to discuss the following week. The following week, however, EPA rescheduled the meeting three times. After being informed that Climate United's outside counsel would be present at the meeting, an EPA official cancelled the meeting without rescheduling.

b.  Climate United subsequently called the EPA official on February 27. The official's administrative assistant responded that the official was in possession of Climate United's e-mails and would reach out. As of the date of this filing, Climate United is still awaiting a response.

c.  On March 4, 2025, Climate United submitted a letter to EPA by email, notifying EPA that Climate United has been unable to access its funding and requesting information regarding the nature of and legal justification for EPA's actions. The letter requested that EPA immediately reverse its actions and reinstate Climate

United's access to its NCIF funding. In the alternative, the letter requested that EPA

rescind or stay any suspension of termination of Climate United's grant pending

judicial review. EPA did not respond.

d.  On March 8, 2025, Climate United sued EPA after EPA had failed to respond to

earlier communications. Counsel for Climate United served Citibank and EPA by

email with a copy of the complaint and informed them that Climate United intended

to file a motion for a Temporary Restraining Order at the opening of business on

Monday, March 10, 2025. EPA did not respond.

**H.      EPA Files A Purported "Notice of Termination"**

97.      On March 10, 2025, Climate United moved for a TRO that would have, among

other things, enjoined EPA from "unlawfully suspending or terminated Climate United's grant

award except as is permitted in accordance with the Account Control Agreement, the grant award,

and applicable law." Dkt. 2 at 2. The Court tentatively scheduled a hearing for March 11, 2025, at

4:00 PM.  The government's attorney requested a 24-hour extension as a purported "courtesy."

Climate United consented.

98.      On March 11, 2025, at approximately 6:22 PM—after the originally scheduled time

for the TRO hearing—EPA did precisely what Climate United was seeking to restrain EPA from

doing at the TRO hearing: it terminated Climate United's grant award in a manner that violated

the ACA, the grant award, and applicable law. At the TRO hearing, EPA then used the purported

termination as a basis for arguing that the case was moot.

99.      Specifically, after business hours on March 11, 2025, EPA served what it described

as a "Notice of Termination" ("Notice"). Dkt. 13-1. The "Notice" states that EPA is terminating

Climate United's grant "[p]ursuant to [EPA's] authority under 2 C.F.R. §[ ] 200.339." 2 C.F.R.

§ 200.339 applies only when "the recipient … fails to comply with the U.S. Constitution, Federal statutes, regulations, or terms and conditions of the Federal award." EPA's "Notice" does not offer any evidence that Climate United violated any constitutional provision, statute, regulation, term, or condition of the grant.

100.    The "Notice" states that EPA is terminating Climate United's grant "[p]ursuant to [EPA's] authority under … 2 C.F.R. §§ 200.340." 2 C.F.R. § 200.340, which is the only termination authority mentioned in EPA's General Terms and Conditions for grants, permits termination "[b]y the Federal agency … if the recipient … fails to comply with the terms and conditions of the Federal award" or "[b]y the Federal agency … pursuant to the terms and conditions of the Federal award …." 2 C.F.R. § 200.340(a)(1) and (4). EPA's "Notice" does not offer any evidence that Climate United has failed to comply with any Terms and Conditions of its grant.

101.    The "Notice" states that EPA is terminating Climate United's grant "[p]ursuant to [EPA's] authority under … the General Terms and Conditions of EPA assistance award agreements." EPA's "Notice" does not offer any evidence that Climate United has failed to comply with any General Terms and Conditions of EPA assistance award agreements.

102.    The "Notice" states that EPA is terminating Climate United's grant "[p]ursuant to [EPA's] authority under … the terms and conditions of the Grant Agreement." The Grant Agreement specifies that termination may occur only in three situations: (1) noncompliance with the grant's Terms and Conditions; (2) "adequate evidence of Waste, Fraud, or Abuse," which in turn requires "credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code

40

or a violation of the civil False Claims Act"; and (3) "material misrepresentation of eligibility status." EPA's "Notice" does not offer any evidence that any of these three situations has occurred.

103.    The "Notice" states that EPA is terminating Climate United's grant "[p]ursuant to … the Agency's inherent authority to reconsider prior determinations in light of new information." EPA's "Notice" does not identify the source of such inherent authority or any new information to support reconsidering the prior determination to award the grant to Climate United less than one year ago.

104.    The "Notice" states that the "termination is based on substantial concerns regarding program integrity, the award process, programmatic fraud, waste, and abuse, and misalignment with the Agency's priorities, which collectively undermine the fundamental goals and statutory objectives of the award." EPA's "Notice" does not identify any legal or factual basis for terminating the grant on these grounds.

105.    The "Notice" states that EPA has identified certain deficiencies, such as "the absence of adequate oversight and account controls," "allocation of funds inconsistent with EPA's oversight and fiscal responsibilities," and the "circumvention and defeat of key oversight mechanisms." EPA's "Notice" does not substantiate these concerns or identify any legal or factual basis for terminating the grant on these grounds.

106.    The "Notice" asserts that EPA has "determined that its existing process for awarding and overseeing execution of the Grant Agreement" may violate the "Appointments Clause and private nondelegation doctrine." EPA's "Notice" does not explain any legal or factual basis for terminating the grant on these grounds. Indeed, neither the Appointments Clause nor the private nondelegation doctrine is implicated by this grant agreement.

107.    By press release dated March 11, 2025, EPA confirmed that it had "notified National Clean Investment Fund and Clean Communities Investment Accelerator recipients of the termination of their grant agreements."[24]

I.    **Citibank and EPA's Actions Have Harmed Climate United.**

108.    The NCIF award is currently the basis of funding for all of Climate United's operations and for all financing projects that Climate United either has launched or is planning to launch, aside from emergency charitable grants (which Climate United must pay back if funding is restored) to support operations while NCIF funds are unavailable. Even temporary inability to access its funding immediately threatens Climate United's operations, its ongoing and future projects, and its long-term reputation.

109.    Other than stopgap emergency charitable grants, which Climate United will need to repay if its access to funding is restored, Climate United does not have other committed sources of funding to replace the NCIF award. Nor is private investment a viable replacement. In fact, Climate United was specifically awarded NCIF funding to "prioritize investment in qualified projects that would otherwise lack access to financing." 42 U.S.C. § 7434(b)(1)(B).

110.    Without another source of funding aside from stopgap emergency charitable grants, Climate United does not have funds to pay operating expenses. Without that funding, Climate United also will not be able to pay its employees, pay rent, pay critical service providers and contractors, or meet its commitments under the loans and awards it has already approved. As a result of Defendants' actions, to preserve its available cash Climate United has already been compelled to defer compensation for certain employees, slash staff salaries, terminate multiple

---

[24] *See* Press Release, EPA, Administrator Zeldin Terminates Biden-Harris $20B 'Gold Bar' Grants (Mar. 11, 2025), https://www.epa.gov/newsreleases/administrator-zeldin-terminates-biden-harris-20b-gold-bar-grants.

vendors, cancel travel, and instruct non-essential lawyers, accountants, and consultants to cease work.

111.    The work of Climate United is highly specialized. It structures financial transactions in hard-to-finance markets, which requires a deep understanding of various capital sources, including government programs (*e.g.*, low-income housing tax credits, solar investment tax credits, etc.) and private investors (*e.g.*, banks and insurance companies). Structuring and underwriting these transactions requires experience in the private credit markets to assess expected and unexpected risks based on prior knowledge of similar transactions, market data, and industry dynamics. To execute on this program, Climate United has hired a team of investment professionals with expertise in credit underwriting, structuring, and asset management— frequently from other financial institutions where they had higher compensation, on the promise of being able to serve Climate United's mission and the impact on the communities that benefit from Climate United's projects. If Climate United is unable to pay its staff, they are likely to leave and find other employment. Climate United has spent over two years cultivating relationships to develop its pipeline of bespoke transactions specifically tailored for this award; the departure of existing Climate United staff would irreparably harm Climate United's ability to fulfill its mission and workplan.

112.    Continuing uncertainty around Climate United's funding has caused Climate United to confront increasingly unfavorable terms from essential vendors and prospective deal partners, some of whom have explicitly said they are unwilling to do deals with Climate United while its funds are frozen. Climate United also imminently risks not being able to pay rent and insurance for select offices or to pay critical third-party contractors who perform necessary services such as managing accounts payable, auditing financial statements, maintaining IT security

and infrastructure, advising on compliance, supporting communications, and providing legal services.

113.    Continued uncertainty over Climate United's funding and inability to meet its existing commitments will have a devastating effect on Climate United's reputation. Climate United is primarily a lender, and borrowers who are uncertain about Climate United's sustained ability to deliver on funding commitments would not be willing to partner with Climate United to finance infrastructure projects. Climate United's loans typically disburse over a series of months or years and security of funding is paramount, in particular because many of the Climate United coalition's projects are construction projects.

114.    Climate United has already heard from both borrowers and prospective financing partners about the impact Defendants' actions are having on their decision-making. One existing partner responded to Climate United's latest Request for Proposals to support community lenders with asset purchases by saying it was "not allocating resources to this RFP at the present moment as [it] monitor[s] the NCIF situation and look[s] for resolution of some of the uncertainty." A manufacturer informed Climate United: "given the status of the current environment, we are going to pause any engagement with Climate United until the relationship between Climate United and the EPA is stable and we can be more confident that funds will not be clawed back."

115.    Further, without a source of funding, Climate United would not be able to meet its commitments under the loans and awards it has already approved. This could render Climate United in breach of its existing agreements and would cause profound harm to the local organizations who rely on these funds to develop critical energy projects that reduce costs and create jobs. As examples, Climate United will be unable to support the worthwhile projects described above—including the solar projects in Arkansas, the project to develop and lease electric

heavy-duty drayage trucks in the ports of Long Beach and Los Angeles, the projects to design and develop solar power plants in partnership with Tribal governments and communities in Eastern Oregon and Idaho, and the 22 Tribal projects across 18 states as part of the NEXT program.

116.    If Climate United is unable to carry out its projects, it will harm the communities across the country that it was awarded the NCIF grant to serve. The following are examples of some of the negative impacts on U.S. businesses and consumers, as estimated in Climate United's EPA-approved workplan:

    a.    10,000 households would not get solar systems on their roofs, of which 60% are families living in low-to-moderate-income communities. This would result in a total annual loss to low-to-moderate-income consumers of $8.8 million annually. The total lifetime loss to consumers is estimated at nearly $100 million.

    b.    11 solar power plants in Arkansas would not be built, which would be equivalent to $120 million in energy savings not realized for Arkansas taxpayers. In addition, 1,500 jobs, primarily in skilled trades, would not be created or preserved.

    c.    Climate United would not be able to place an order of approximately 500 Class 8 heavy duty electric trucks that would generate demand for U.S. manufacturing facilities, allow truck drivers to realize a lower cost per mile by leasing the trucks, and reduce prices for consumers.

    d.    Climate United's subgrantees would not be able to fund a pipeline of 232 multifamily housing properties to increase energy efficiency and electrify core

building systems to reduce building operating costs and keep rents affordable for low-income families.

117.    In addition, if Climate United's investment portfolio stalls, it will not be able to invest in programs and technologies that will reduce or avoid 11 million MT CO2e, bring economic benefits to millions of Americans, and mobilize at least $21 billion in private capital, benefiting consumers and businesses in the areas of housing, passenger and heavy-duty vehicles, and commercial and community buildings.

**CLAIMS FOR RELIEF**

**COUNT ONE: VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT—
ARBITRARY AND CAPRICIOUS
(CHALLENGE TO TERMINATION)
(Defendants EPA, Administrator Zeldin)**

118.    Climate United repeats and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

119.    The APA authorizes this Court to hold unlawful and set aside final agency action that is "arbitrary" or "capricious." 5 U.S.C. § 706(2)(A).

120.    On March 11, 2025, EPA purported to terminate Climate United's grant by delivering a "Notice of Termination."

121.    EPA's termination of Climate United's grant constitutes final agency action under the APA.

122.    EPA's termination of Climate United's grant is arbitrary and capricious because EPA had no legal or factual basis for the termination and EPA did not provide an adequate or reasoned basis for the termination.

　　　　a.    The "Notice" states that EPA is terminating Climate United's grant "[p]ursuant to [EPA's] authority under 2 C.F.R. §§ 200.339-40, the General Terms and Conditions

of EPA assistance award agreements, the terms and conditions of the Grant Agreement, and the Agency's inherent authority to reconsider prior determinations in light of new information." But EPA's "Notice" does not offer any evidence or explanation to support termination on those grounds. Indeed, there is no legal or factual basis for termination on any of those grounds. Climate United has not violated any constitutional provision, statute, or regulation; has not failed to comply with any Terms or Conditions of its grant; has not failed to comply with any General Terms and Conditions of EPA assistance award agreements; has not engaged in "Waste, Fraud, or Abuse," which is defined as "the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act"; and has not triggered any of the grounds for termination under the Terms and Conditions of its grant.

b. EPA's "Notice" does not identify the source of any inherent authority to terminate the grant; does not identify any new information to support reconsidering the prior determination to award the grant to Climate United less than one year ago; does not identify any basis to terminate the grant based on concerns about program integrity, the award process, programmatic fraud, waste, and abuse, misalignment with the Agency's priorities, or sufficiency of oversight mechanisms or account controls; and does not explain any legal or factual basis for terminating the grant based on the Appointments Clause or the private nondelegation doctrine.

c. EPA's termination reflects an arbitrary and capricious change in position. EPA has provided no reasoned explanation for its decision to terminate Climate United's

grant on March 11, 2025, when the grant was awarded in April 2024, following

months of rigorous review as part of a competitive application process.

    d.  EPA's "Notice" provides no explanation for its abrupt change of position that

accounts for upsetting the reliance interests of Climate United and its subgrantees.

123.    Climate United is entitled to an injunction against EPA's wrongful action.

124.    Pursuant to 28 U.S.C. § 2201, Climate United is entitled to a declaration that EPA's

termination of the grant is arbitrary and capricious, in violation of the APA.

### COUNT TWO: VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT - NOT IN ACCORDANCE WITH FEDERAL REGULATIONS (CHALLENGE TO TERMINATION) (Defendants EPA, Administrator Zeldin)

125.    Climate United repeats and incorporates herein by reference each and every

allegation contained in the preceding paragraphs as if fully set forth herein.

126.    The APA authorizes this Court to hold unlawful and set aside final agency action

that is "not in accordance with law." 5 U.S.C. § 706(2)(A).

127.    On March 11, 2025, EPA purported to terminate Climate United's grant by

delivering a "Notice of Termination."

128.    EPA's termination of Climate United's grant constitutes final agency action under

the APA.

129.    EPA's termination of Climate United's grant is not in accordance with law because

it violates multiple federal regulations. For example:

    a.  EPA's termination of the grant violates EPA regulations and Uniform Grant

Guidance regulations codified at 2 C.F.R. § 200 *et seq.*, which do not allow EPA to

terminate Climate United's grant under these circumstances.

    b.  EPA's termination of the grant has not complied with EPA's regulatory obligation

to take certain procedural steps to terminate the grant agreement, such as providing written notice of termination that includes "the reasons for termination, the effective date, and the portion of the Federal award to be terminated, if applicable." 2 C.F.R. § 200.341(a). The Notice only provides vague references to "waste" and "accountability," among other things, with no supporting evidence or facts as to what Climate United is alleged to have done wrong.

c. EPA's termination of the grant has resulted in improperly withholding payment for allowable costs without establishing that Climate United has either "failed to comply with the terms and conditions of the Federal award" or is "delinquent in a debt to the United States." 2 C.F.R. § 200.305(b)(6).

d. EPA's termination of the grant has resulted in improperly withholding payment without first making a "determin[ation] that noncompliance cannot be remedied by imposing specific conditions." 2 C.F.R. § 200.339. Although the Notice includes a vague reference to "material deficiencies" and asserts that "these deficiencies … cannot be remedied by imposing specific conditions," EPA does not explain these statements or offer facts to support them.

e. EPA's termination of the grant does not comply with 2 C.F.R. § 200.340(b), which states: "The Federal agency or pass-through entity must clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award." EPA's termination decision is not grounded in the "terms and conditions of the Federal award." Instead, the termination is based on EPA's disagreement with the GGRF program.

130.     Although EPA's "Notice" states that EPA is terminating Climate United's grant "[p]ursuant to [EPA's] authority under 2 C.F.R. §§ 200.339-40," those regulations do not provide EPA with grounds to terminate the grant.

    a.   2 C.F.R. § 200.339 applies only when "the recipient … fails to comply with the U.S. Constitution, Federal statutes, regulations, or terms and conditions of the Federal award." EPA has not provided any reasoned legal or factual basis to conclude that Climate United has violated any constitutional provision, statute, regulation, or term or condition of the grant. Indeed, Climate United has not violated any constitutional provision, statute, regulation, or term or condition of the grant.

    b.   2 C.F.R. § 200.340 permits termination "[b]y the Federal agency … if the recipient … fails to comply with the terms and conditions of the Federal award" or "[b]y the Federal agency … pursuant to the terms and conditions of the Federal award …." 2 C.F.R. § 200.340(a)(1) and (4). EPA has not provided any reasoned legal or factual basis to conclude that Climate United has failed to comply with any Terms and Conditions of its grant.

131.     Climate United is entitled to an injunction against EPA's wrongful action.

132.     Pursuant to 28 U.S.C. § 2201, Climate United is entitled to a declaration that EPA's termination of the grant is not in accordance with federal regulations, in violation of the APA.

**COUNT THREE: VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT—
NOT IN ACCORDANCE WITH INFLATION REDUCTION ACT
(CHALLENGE TO TERMINATION)
(Defendants EPA, Administrator Zeldin)**

133.     Climate United repeats and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

134.    The APA authorizes this Court to hold unlawful and set aside final agency action that is "not in accordance with law." 5 U.S.C. § 706(2)(A).

135.    On March 11, 2025, EPA purported to terminate Climate United's grant by delivering a "Notice of Termination."

136.    EPA's termination of Climate United's grant constitutes final agency action under the APA.

137.    EPA's termination of the grant violates the Inflation Reduction Act. The Act requires EPA to spend the funds appropriated for grants to be awarded under the Greenhouse Gas Reduction Fund, 42 U.S.C. § 7434. EPA violated the Act because it has not satisfied the stringent requirements for rescinding an appropriation under 2 U.S.C. § 683.

138.    Even if EPA "re-obligate[s] lawfully appropriated funds within the GGRF program," Dkt. 13-1, as EPA claims it will do, EPA's action would still be illegal. The Inflation Reduction Act sets a September 30, 2024 deadline for all grants to be awarded. 42 U.S.C. § 7434(a)(1), (2). Illegally terminating the entire program, and then re-awarding grants to unspecified new recipients, is inconsistent with that September 30, 2024 deadline.

139.    As a result of EPA's conduct, Climate United has suffered and will continue to suffer irreparable injury.

140.    Climate United is entitled to an injunction against EPA's wrongful action.

141.    Pursuant to 28 U.S.C. § 2201, Climate United is entitled to a declaration that EPA's termination of the grant is not in accordance with the Inflation Reduction Act, in violation of the APA.

## COUNT FOUR: VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT
## (CHALLENGE TO SUSPENSION)
## (Defendants EPA, Administrator Zeldin)

142.    Climate United repeats and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

143.    The APA authorizes this Court to hold unlawful and set aside final agency action that is "arbitrary, capricious, … or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

144.    Prior to March 11, 2025, EPA effectuated a suspension of Climate United's grant by causing Citibank to withhold Climate United's grant funds.

145.    EPA's suspension of Climate United's grant constitutes final agency action under the APA.

146.    EPA's suspension of Climate United's grant is not in accordance with federal regulations, as described above. For example, EPA's actions resulted in improperly withholding payment for allowable costs without establishing that Climate United has either "failed to comply with the terms and conditions of the Federal award" or is "delinquent in a debt to the United States." 2 C.F.R. § 200.305(b)(6).

147.    EPA's suspension of Climate United's grant is arbitrary and capricious.

a.    EPA had no legal or factual basis to open a grand jury investigation into Climate United's grant. Indeed, EPA's efforts to do so caused the Chief of the Criminal Division of the United States Attorneys' Office in Washington, D.C. to resign from that office after 24 years of service.

b.    EPA had no legal or factual basis to cause a Freeze Letter to be issued to Citibank, or to cause Citibank or Treasury to freeze Climate United's grant funds, particularly when the freeze "recommendation" was not supported by an order issued by a judge

based on probable cause and cited no evidence in support of freezing Climate United's grant funds.

c. EPA had no legal or factual basis to direct Treasury to demand that Citibank stop disbursing funds. Further, Treasury's action did not comply with the FAA, which states that any freeze of Climate United's accounts must occur in accordance with the ACA and must be lawful.

d. EPA refused to meet with Climate United, and never responded to Climate United's communications about its inability to access its funds—even while EPA was simultaneously acting to prevent Climate United from accessing its grant funds.

148. Climate United continues to experience ongoing injury from the suspension because during the suspension period it has not received funds to which it is lawfully entitled. Further, even if the termination is enjoined, any suspension that remains in effect would cause harm to Climate United.

149. Climate United is entitled to an injunction against EPA's wrongful action.

150. Pursuant to 28 U.S.C. § 2201, Climate United is entitled to a declaration that EPA's suspension of the grant is arbitrary, capricious, and not in accordance with law, in violation of the APA.

## COUNT FIVE: VIOLATION OF THE APPROPRIATIONS CLAUSE
### (Defendants EPA, Administrator Zeldin)

151. Climate United repeats and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

152. The Appropriations Clause provides: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7.

153.    The provision of the Inflation Reduction Act authorizing the GGRF is an "appropriation" because it authorizes EPA to expend $27 billion for purposes of carrying out the GGRF program.

154.    In the Inflation Reduction Act, Congress "appropriated to the [EPA] Administrator … $[19],970,000,000, to remain available until September 30, 2024, to make grants, on a competitive basis." 42 U.S.C. § 7434(a)(2), (3). The Appropriations Clause therefore forbids EPA from using appropriated funds to award grants after the statutory deadline.

155.    In the "Notice of Termination," EPA states: "EPA will work to re-obligate lawfully appropriated funds within the GGRF program …" Dkt. 13-1. In doing so, EPA seeks to spend money in a manner Congress has not permitted, in violation of the Appropriations Clause.

156.    If EPA re-obligates GGRF's grant funds to its preferred recipients, EPA would be violating Congress's intention for the funds to be obligated to clean-energy grants *that were completed prior to September 30, 2024*.

157.    Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr, Inc.*, 575 U.S. 320, 327 (2015).[25]

158.    Climate United is entitled to an injunction against EPA's wrongful action.

159.    Pursuant to 28 U.S.C. § 2201, Climate United is entitled to a declaration that EPA's suspension and termination of the grant violates the Appropriations Clause.

---

[25] The APA independently authorizes Climate United to bring this claim. 5 U.S.C. § 706(2).

## COUNT SIX: VIOLATION OF THE DUE PROCESS CLAUSE
### (Defendants EPA, Administrator Zeldin)

160.    Climate United repeats and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

161.    Under the Fifth Amendment to the United States Constitution, the government may not deprive a person or entity of a protected property interest without due process of law.

162.    Climate United has a protected property interest in the grant funds it was awarded under the NCIF and in the accounts at Citibank to which those funds were disbursed.

163.    The government's actions preceding the termination, up to and including the termination, violated the Due Process Clause. For example:

a.    EPA caused Citibank to freeze Climate United's assets without first obtaining a court order based on probable cause and supported by a sworn affidavit. Indeed, EPA initiated the freeze despite a judge having expressly rejected an application for a seizure warrant on the basis that no probable cause existed.

b.    EPA never informed Climate United that EPA was trying to freeze, suspend, or terminate Climate United's grant or its access to grant funds, or that EPA was coordinating in secret with Treasury and FBI to direct Citibank to stop disbursing funds to Climate United. EPA thus deprived Climate United of its property in the grant funds without providing Climate United notice or an opportunity to be heard prior to the initiation of the freeze.

c.    EPA also failed to provide Climate United notice or an opportunity to challenge the freeze once it had been implemented. After Climate United deduced that its funds had been frozen, EPA refused to respond to Climate United's multiple requests for information or to meet with Climate United, and never notified Climate United that

its funds had been frozen at EPA's direction. At the same time—and again without providing Climate United notice of its actions—EPA was continuing to pressure Citibank to keep Climate United from accessing funds in its accounts, and ultimately directed Treasury to order Citibank to withhold Climate United's funds.

d.  In an attempt to extend the unlawful freeze of Climate United's assets in the wake of the filing of this litigation, EPA issued the "Notice of Termination" without any legal or factual basis. It offered no notice or process to Climate United before doing so; and the "Notice" provides no opportunity for Climate United to challenge the purported "termination" of its grant funds after the fact. EPA issued the "Notice" hours before a court hearing, which had been extended as a professional courtesy, despite being notified by Climate United days earlier that Climate United had filed a lawsuit and intended to seek temporary emergency relief.

164.    Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr, Inc.*, 575 U.S. 320, 327 (2015).[26]

165.    EPA's weekslong effort to deprive Climate United of its property in the grant funds violates the Due Process Clause. Climate United is entitled to an injunction preventing EPA from continuing to deprive Climate United of access to the funds in its accounts without due process.

## COUNT SEVEN: BREACH OF CONTRACT
### (Defendant Citibank)

166.    Climate United repeats and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

---

[26] The APA independently authorizes Climate United to bring this claim. 5 U.S.C. § 706(2).

167.    Citibank has a duty under the ACA to disburse Climate United's grant funds to Climate United, as Climate United requests. Under the ACA, Citibank "shall comply with all instructions, notifications, and entitlement orders the Bank receives directing the disposition of funds and financial assets in the Accounts." ACA at 2.

168.    When Climate United requested that Citibank disburse grant funds held in Climate United's accounts, as required by the ACA, Citibank failed to disburse such funds.

169.    Citibank has no legal or factual basis for failing to disburse grant funds from Climate United's accounts, as required by the ACA.

170.    Under the ACA, Citibank's duties with respect to Climate United's grant funding are exclusively "administrative or ministerial (and shall not be construed as fiduciary in nature)," and Citibank "shall not be responsible" for determining whether Climate United's requests for the disbursement of grant funds comply with any applicable contracts or laws. ACA at 3.

171.    EPA (as the Secured Party under the ACA) has not delivered to Citibank a Notice of Exclusive Control and has stated that it has no intention of delivering such a notice to Citibank. Indeed, there is no factual basis to support such a notice.

172.    EPA has not "issued a written determination and finding that [Climate United] has failed to comply with the terms and conditions of the Grant Agreement, and that noncompliance is substantial such that effective performance of the Grant Agreement is materially impaired or there is adequate evidence of waste, fraud, material misrepresentation of eligibility status, or abuse." ACA Exhibit A. Indeed, there is no factual basis to support such a written determination or finding.

173.    EPA has not "initiated action under 2 CFR 200.339 to wholly or partly suspend or terminate the Grant Agreement, as authorized in the terms of the Grant Agreement." Indeed, there is no factual basis to support such an action.

174.    The FAA between Citibank and Treasury, to which Climate United is not a party, does not provide Citibank with a legal basis to fail to disburse Climate United's grant funds as required by the ACA. The FAA authorizes Citibank to "freeze accounts … in accordance with" the ACA, and in compliance with "lawful instructions or directions received from Treasury." But Citibank froze Climate United's funds without following the ACA's termination provisions and based on instructions that were not lawful. And Citibank was not obligated to withhold funds based on FBI's "recommendation," which did not provide any factual or legal basis for freezing the funds in Climate United's accounts. No such basis exists.

175.    By failing to disburse grant funds held in Climate United's accounts, Citibank has breached the ACA.

176.    Citibank's failure to disburse funds, as required under the ACA, has caused damage to Climate United. Such damage has resulted solely from Citibank's own gross negligence or willful misconduct.

177.    Pursuant to 28 U.S.C. § 2201, Climate United is entitled to a declaration that Citibank's failure to disburse funds from Climate United's accounts is a breach of the ACA.

178.    Climate United is entitled to an injunction against Citibank's wrongful refusal to honor Climate United's disbursement requests.

## COUNT EIGHT: REPLEVIN
### (Defendant Citibank)

179.    Climate United repeats and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

180.    Climate United has an immediate legal right to possess the grant funds that Climate United lawfully requested that Citibank disburse from Climate United's accounts, pursuant to the ACA.

181.    Citibank has wrongfully detained the grant funds by unlawfully failing to disburse the grant funds that Climate United lawfully requested.

182.    Citibank's intentional actions have caused damage to Climate United.

## COUNT NINE: CONVERSION
### (Defendant Citibank)

183.    Climate United repeats and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

184.    Climate United has a legal right to possess and control the grant funds held in its accounts at Citibank, pursuant to the ACA.

185.    Citibank has wrongfully and intentionally exercised dominion or control over the grant funds in Climate United's accounts, including by failing to disburse grant funds to Climate United from Climate United's accounts in response to Climate United's valid and proper requests.

186.    Citibank has intentionally permanently or substantially interfered with Climate United's property rights, including by failing to disburse grant funds to Climate United from Climate United's accounts in response to Climate United's valid and proper requests.

187.    Citibank has acted without Climate United's consent and has no legal basis or valid justification for its actions.

188.    Citibank's intentional actions have caused damage to Climate United.

189.    Climate United is entitled to an injunction against Citibank's wrongful retention of Citibank's funds.

190.    Pursuant to 28 U.S.C. § 2201, Climate United is entitled to a declaration that Citibank's failure to disburse funds from Climate United's accounts constitutes a conversion of Climate United's funds.

## PRAYER FOR RELIEF

WHEREFORE, Climate United respectfully asks this Court to:

1.    Declare that EPA's purported "Notice of Termination" is null, void, and of no legal effect;

2.    Declare that EPA and Administrator Zeldin's actions violate the Administrative Procedure Act because they are arbitrary and capricious, not in accordance with federal regulations, and not in accordance with federal statutes;

3.    Declare that EPA and Administrator Zeldin's actions violate the Appropriations Clause;

4.    Declare that EPA and Administrator Zeldin's actions violate the Due Process Clause;

5.    Enjoin EPA, Administrator Zeldin, and others in active concert or participation therewith, including officials at the U.S. Department of the Treasury, from impeding Citibank or from causing Citibank to deny, obstruct, delay, or otherwise prevent Climate United from accessing its funds as permitted under the terms of the ACA and the grant award;

6.    Enjoin EPA and Administrator Zeldin from unlawfully suspending or terminating

Climate United's grant award, including by effectuating the Notice of Termination or sending a Notice of Exclusive Control under the ACA, except as permitted in accordance with the ACA, the grant award, and applicable law;

7.     Declare that Citibank's failure to disburse grant funds from Climate United's accounts is a breach of the ACA;

8.     Order Citibank to process, disburse, and release all funds in accounts established in connection with Climate United's grant, at Climate United's request, in accordance with the ACA, both with respect to requests Climate United has already submitted and with respect to future requests;

9.     Order that Citibank may not transfer or otherwise move funds out of accounts established in connection with Climate United's grant, except at Climate United's direction as permitted under the ACA;

10.    Grant such other and further relief as may be just and proper.

Dated: March 17, 2025                         Respectfully submitted:

                                              /s/ Adam G. Unikowsky

Gabriel K. Gillett (admitted *pro hac vice*)
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
Tel.: (312) 222-9350

Adam G. Unikowsky (989053)
Kathryn L. Wynbrandt* (1602446)
David B. Robbins (493976)
Tanner J. Lockhead* (90011928)
JENNER & BLOCK LLP
1099 New York Avenue
Suite 900
Washington, D.C. 20001
Tel.: (202) 639-6000
Fax: (202) 639-6066
aunikowsky@jenner.com

* Application to Court pending.

Allison N. Douglis (admitted *pro hac vice*)
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, N.Y. 10023
Tel.: (212) 891-1600
Fax: (212) 891-1699
adouglis@jenner.com

*Attorneys for Plaintiff Climate United Fund*