IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CLIMATE UNITED FUND<br><br>    Plaintiff,<br><br>  v.<br><br>CITIBANK, N.A., UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, and LEE ZELDIN, in his official capacity as ADMINISTRATOR, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY<br><br>    Defendants. | Case Nos. 1:25-cv-00698 (TSC) |

## **DECLARATION OF ERIC AMIDON**

I, Eric Amidon, hereby declare as follows:

  1.  I am the Chief of Staff of the Environmental Protection Agency (EPA). I have held this position since January 21, 2025. In this position, I am responsible for overseeing EPA initiatives, managing EPA operations, and coordinating activities across EPA's various mission offices.

  2.  I have been advised by counsel that in a March 12, 2025 hearing, the Court required EPA to submit a "declaration setting forth the basis for the termination." The termination letter says "termination is based on substantial concern regarding program integrity, the award process, programmatic fraud, waste, and abuse, and misalignment with the Agency's priorities, which collectively undermine the fundamental goals and statutory

objectives of the award." I submit this declaration on behalf of the EPA to comply with the Court's order. This declaration incorporates information known to me and collected through reasonable diligence from those involved in the decision.

## I. EPA's $6.97 Billion Grant to Climate United Fund (CUF)

### *The Greenhouse Gas Reduction Fund*

3. In the Inflation Reduction Act, Congress amended the Clean Air Act (CAA) to establish the Greenhouse Gas Reduction Fund (GGRF). Pub. L. No. 117-169, § 60103, 136 Stat. 1818, 2066 (2022). CAA section 134 appropriated $27 billion to EPA for grants and technical assistance "to States, municipalities, Tribal governments, and eligible recipients" relating to "zero-emission technologies" and "other greenhouse gas emission reduction activities, as determined appropriate by the Administrator in accordance with this section." 42 U.S.C. § 7434(a)(1).

4. The statute defines "eligible recipient" as a "nonprofit organization" that "is designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services;" "does not take deposits other than deposits from repayments and other revenue received from financial assistance provided using grant funds under this section;" "is funded by public or charitable contributions;" and "invests in or finances projects alone or in conjunction with other investors." 42 U.S.C. § 7473(c)(1).

5. The statute further defines "qualified project" as "any project, activity, or technology" that "reduces or avoids greenhouse gas emissions and other forms of air pollution in partnership with, and by leveraging investment from, the private sector" or

"assists communities in the efforts of those communities to reduce or avoid greenhouse gas emissions and other forms of air pollution." 42 U.S.C. § 7473(c)(3).

To implement the GGRF, EPA established three grant programs: the National Clean Investment Fund (NCIF), Clean Communities Investment Accelerator (CCIA), and Solar for All.

### *EPA's Selection of CUF*

6. On July 14, 2023, EPA began implementing the GGRF program by issuing a Notice of Funding Opportunity (NOFO) seeking applications by October 12, 2023, from eligible recipients that could satisfy applicable statutory and regulatory requirements.

7. On February 21, 2024, EPA issued a selection memo stating the Agency's intent to award GGRF funds to CUF and seven other selectees for NCIF and CCIA grants.

8. On April 1, 2024, EPA publicly announced that CUF and seven other entities had been selected to receive NCIF and CCIA grants. Because CAA section 143 appropriated GGRF funds only until September 30, 2024, 42 U.S.C. § 7434, that date became the applicable project start date although EPA had not yet issued grant agreements to govern the expenditure of grant funds.

### *EPA's Grant Agreement With CUF*

9. On June 27, 2024, then President Joe Biden participated in a televised presidential debate with former President Donald Trump. President Biden subsequently withdrew from the presidential race on July 21, 2024.

10. On August 8, 2024, EPA issued a Grant Agreement to CUF awarding $6.97 billion in total project funds. Dkt. 16-2 at 2-63. The Grant Agreement instructed CUF to indicate acceptance by either drawing down funds within 21 days or not filing a notice of

disagreement with the award terms and conditions within 21 days, *id.*, and incorporated EPA's General Terms and Conditions for grant awards, *id.* at 3.

11. The Grant Agreement provided that CUF would work as a pass-through that provided subawards to subrecipients that do not have an independent contractual relationship with EPA. Dkt. 16-2 at 12, 15-16, 28-29. CUF was responsible for assuring subrecipient compliance with statutory and contractual requirements, including quality assurance conditions. *E.g.*, *id.* at 22, 28-29, 31-32, 34-37, 46.

12. The Grant Agreement also required CUF to complete a "How to Develop a Budget" training within 90 days of receiving the award. Dkt. 16-2 at 68. Although this training is not generally required for applications received prior to March 4, 2024, including CUF's application, EPA may determine that the training should be required on a case-by-case basis.

13. Section III.S, titled "Remedies for Noncompliance," provided that EPA may impose remedies for noncompliance, including termination, with a limited set of circumstances where CUF would receive notice and opportunity to cure:

> The Recipient agrees to comply with the terms and conditions of the Award Agreement. Should the Recipient fail to adhere to the terms and conditions of the Award Agreement, the EPA may impose additional conditions as set forth in 2 CFR 200.208. If the EPA determines that noncompliance cannot be remedied by imposing additional conditions, the EPA may seek remedies under 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as provided in 2 CFR 200.343. ...Notwithstanding any other provision of this Award Agreement, EPA will not determine that Recipient has failed to comply with the terms and conditions of the Award Agreement, without providing an opportunity to remedy under 2 CFR 200.208, for good faith efforts to comply with the Additional Programmatic Terms and Conditions regarding Build America, Buy America or Labor and Equitable Workforce Development Requirements.

Dkt. 16-2 at 41.

14. Section III.T.4, titled "Termination," purported to modify EPA's General Terms and Conditions and applicable regulations:

> Notwithstanding the General Term and Condition "Termination," EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 applicable to EPA grants as of July 1, 2024, pursuant to 89 FR 55262 (July 3, 2024), when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is materially impaired or there is adequate evidence of waste, fraud, material misrepresentation of eligibility status, or abuse, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the Assistance Agreement, EPA must (1) de-obligate uncommitted funds and re-obligate them to another Eligible Recipient to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 days of the de-obligation and (2) amend the Recipient's Assistance Agreement to reflect the reduced amount, based on the de-obligation. In accordance with 2 CFR 200.341, EPA will provide the Recipient notice of termination.

Dkt. 16-2 at 42.

15. The Grant Agreement issued on August 8, 2024, did not define the terms "Materially Impaired" or "Waste, Fraud, and Abuse," and used the terms in a manner that left EPA with significant discretion to administer the agreement.

### *EPA's Amended Grant Agreement With CUF*

16. On November 5, 2024, then former President Donald Trump defeated then Vice President Kamala Harris in the presidential election. State electors formally cast their votes in the Electoral College on December 17, 2024.

17. On December 20, 2024, EPA issued an amended Grant Agreement to CUF that revised the compliance and termination provisions and specifically defined the terms "Materially Impaired" and "Waste, Fraud, and Abuse." Dkt. 16-2 at 64-123. The amendment did not define any other additional terms or materially alter the existing terms of other provisions of the Grant Agreement as relevant here.

18. As amended, Section III.S, titled "Remedies for Noncompliance," added several critical oversight provisions to the list of conditions for which CUF would receive notice and opportunity to cure before EPA could assert contractual authority to find noncompliance (changes bolded):

> The Recipient agrees to comply with the terms and conditions of the Award Agreement. Should the Recipient fail to adhere to the terms and conditions of the Award Agreement, the EPA may impose additional conditions as set forth in 2 CFR 200.208. If the EPA determines that noncompliance cannot be remedied by imposing additional conditions, the EPA may seek remedies under 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as provided in 2 CFR 200.343. ...Notwithstanding any other provision of this Award Agreement, EPA will not determine that Recipient has failed to comply with the terms and conditions of the Award Agreement, without providing a reasonable opportunity to remedy under 2 CFR 200.208, for good faith efforts to comply with the **Performance Reporting National Programmatic Term and Condition**, Additional Programmatic Terms and Conditions regarding Build America, Buy America or Labor and Equitable Workforce Development Requirements, **requirements for Subrecipient oversight, or to obligate or expend funds for allowable activities**.

Dkt. 16-2 at 102. By adding these terms to the list of conditions, EPA removed its contractual authority to find CUF in immediate noncompliance for failing to report the expenditure of grant funds, audit results, and project status (Performance Reporting), *id.* at 77-79, to oversee subrecipient compliance with statutory, regulatory, and contractual requirements (Subrecipient oversight), *e.g.*, *id.* at 88-89, and to spend grant funds only on activities allowed by CAA section 134 (allowable activities), *id.* at 87.

19. As amended, Section III.T.4, titled "Termination," incorporated new defined terms for "Materially Impaired" and "Waste, Fraud, or Abuse" (changes bolded):

> EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 **effective as of October 1, 2024**, when the noncompliance with the terms and conditions is substantial such

> that effective performance of the Assistance Agreement is **Materially Impaired** or there is adequate evidence of **Waste, Fraud, or Abuse** or material misrepresentation of eligibility status, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the Assistance Agreement, EPA must (1) de-obligate uncommitted funds and re-obligate them to another Eligible Recipient **selected under Funding Opportunity Number 66.957 (NCIF)** to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 days of the de-obligation and (2) amend the Recipient's Assistance Agreement to reflect the reduced amount, based on the de-obligation. In accordance with 2 CFR 200.341, EPA will provide the Recipient notice of termination. **If an Eligible Recipient has assumed a legal obligation properly incurred for an allowable activity entered into by a suspended or terminated Recipient, EPA will re-obligate funds to the Eligible Recipient to satisfy the legal obligation and accept an amended workplan and budget to that effect.**

Dkt. 16-2 at 104. As explained further below, this revision purported to restrict EPA's contractual authority to terminate absent evidence of severe criminal or civil violations.

20. The new definition of "Materially Impaired" in the amended Grand Agreement specified that:

> EPA defines 'Materially Impaired' in the context of effective performance of the Assistance Agreement as 1) the issuance of a written determination and finding from EPA that the Recipient has failed to achieve sufficient progress in accordance with the Sufficient Progress clause under the Clarifications to EPA General Terms and Conditions Programmatic Term and Condition and 2) if EPA in its sole discretion determines that a corrective action plan is an appropriate means of remedying the lack of sufficient progress, the subsequent issuance of a separate written determination and finding from EPA that the Recipient has not materially addressed its failure to achieve sufficient progress after implementing a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

Dkt. 16-2 at 71-72. Read together with the amended termination provision, this language purported to revise EPA's contractual right to terminate for noncompliance absent written determinations and opportunities to cure for elements that were not required under the terms of the original agreement of August 8, 2024.

21. The new definition of "Waste, Fraud, and Abuse" in the amended Grant Agreement specified that:

> For the definition and application of these terms under this Assistance Agreement … and any associated legal documentation related to the Assistance Agreement, refer to their use in the Reporting Waste, Fraud, and Abuse clause in the EPA General Terms and Conditions effective October 1, 2024 and 2 CFR 200.113: "credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act 31 U.S.C. 3729-3733.

Dkt. 16-2 at 75. Read together with the amended termination provision, this language purported to revise EPA's contractual right to terminate for misconduct to "credible evidence" that CUF committed one or more serious federal crimes or actionable civil violations under the False Claims Act. That heightened determination was not required under the terms of the original agreement of August 8, 2024, to which the definition now applied.

### *Funding Structure for the CUF Grant*

22. Although EPA's grant funds are typically distributed through the United States Treasury when requested by grant recipients for particular projects, the prior administration instead opted to use a designated financial agent as the depository institution. That meant the $6.97 billion in public funds awarded to CUF would reside in accounts controlled by CUF, with EPA having a claim on the funds as a secured party.

23. On September 19, 2024, the U.S. Department of the Treasury (Treasury) concluded a Financial Agency Agreement (FAA) with Citibank, NA that selected Citibank to serve as financial agency for the funds awarded to CUF and the seven additional NCIF and CCIA grantees. EPA was not a party to the FAA but retained certain rights to issue account controls in addition to the rights retained by Treasury to issue instructions to the

financial agent. A true and correct copy of the Financial Agency Agreement is attached as **Exhibit A**.

24. On November 1, 2024, EPA, Citibank, and CUF entered into an Account Control Agreement (ACA) governing the grant funds held at Citibank. The ACA provided that Citibank would process CUF payment instructions and transactions without prior approval from EPA, which held an interest in the funds as a secured party, provided that CUF certified the amount of payment was necessary to execute against the workplan and copied EPA on the transaction notice. Dkt. 16-2 at 132-133. Related provisions in the Grant Agreement authorized CUF to withdraw funds without prior EPA approval so long as the withdrawal "d[id] not exceed 10% of the total budget approved at time of award" for a given category. *Id.* at 52, 113.

25. The ACA provided that EPA could exercise its right as a secured party to take control over grant funds held at Citibank by filing a "Notice of Exclusive Control." As originally worded, Section 2 of the ACA stated that:

> The Bank shall comply with all instructions, notifications, and entitlement orders the Bank receives directing the disposition of funds and financial assets in the Accounts including, without limitation, directions to distribute proceeds of any such transfer or redemption of interest or dividends on financial assets in the Accounts, substantially in the form attached hereto as Exhibit B Account Direction the Pledgor, until the time that that Bank receives a notice, substantially in the form attached hereto as Exhibit A Notice of Exclusive Control from the Secured Party that the Secured Party is exercising its right to exclusive control over an Account, and after such time that the Bank receives a Notice of Exclusive Control, the Secured Party for such Account, without further consent by the Pledgor.

Dkt. 16-2 at 132; *see also id.* at 139 (standard form for Notice of Exclusive Control).

26. On January 13, 2025, EPA, Citibank, and CUF signed an amendment to the ACA that revised Section 2 with respect to the effect of EPA's filing of a Notice of Exclusive Control. New language at the end of Section 2 stated that:

> ; provided that notwithstanding the foregoing, after the delivery of a Notice of Exclusive Control, Bank shall continue to disburse funds and financial assets associated with financial obligations "properly incurred" by the Pledgor prior to the issuance of, but not in anticipation of, delivery of a Notice of Exclusive Control, in Pledgor's "Reserve" Account pursuant to Account Directions originated by Pledgor except for an specific funds or financial assets, identified by Secured Party in the applicable Notice of Exclusive Control as not being "properly incurred" by the Pledgor in accordance with 2 CFR 200.343.

Dkt. 16-2 at 148. Because of this amendment, EPA's filing of a Notice of Exclusive Control would no longer result in CUF needing to obtain EPA's consent before instructing Citibank to disburse funds for expenses CUF considers "properly incurred."

### *EPA's Grant Termination Policies*

27. Under EPA's General Terms and Conditions for grant agreements from August 13, 2020 – October 1, 2024, "EPA may unilaterally terminate [the] award in whole or in part: (a) If a recipient fails to comply with the terms and conditions of the award including statutory or regulatory requirements; or (b) if the award no longer effectuates the program goals or agency priorities." EPA, General Terms and Conditions 2-3 (effective Oct. 1, 2023). Situations "in which EPA may terminate an award under this provision include when" EPA "obtains new evidence that was not considered in making the award" that brings the award's effectiveness or feasibility into question or when "EPA determines that the objectives of the award are no longer consistent with funding priorities for achieving program goals." *Id.* at 3.

28. This policy is consistent with termination provisions in grant regulations at 2 C.F.R. § 200.340, which provided that a federal grant "may be terminated in whole or in part ... [b]y the Federal awarding agency ... to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(2) (2020).

29. On April 22, 2024, the Office of Management and Budget issued a final rule amending its generally applicable guidance on federal grants at 2 C.F.R. § 200.340. 89 Fed. Reg. 30,046. As amended, the regulation provides that a federal grant "may be terminated in part or in its entirety ... by the Federal agency ... pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4).

30. Although the updated guidance was not effective until October 1, 2024, EPA elected to adopt the updated regulations at 2 C.F.R. § 200.340 for awards and amended awards beginning on July 3, 2024. 89 Fed. Reg. 55,262 (July 3, 2024). EPA did not adopt the updated regulations through notice and comment procedures. *See id.*

## II. EPA's Termination of the CUF Grant

### *EPA Determined the Grant Lacked Adequate Oversight*

31. On January 20, 2025, President Trump was inaugurated as the 47th President of United States. Administrator Lee Zeldin was nominated to lead the EPA and confirmed by the Senate on January 29, 2025.

32. Incoming EPA officials expressed concerned about potential waste, fraud, abuse, and conflicts of interests in the GGRF program in light of public media reporting from December 2024 to February 2025. At his confirmation hearing, Administrator Zeldin noted in response to questions from several Senators that media coverage on the expenditure of GGRF funds had been concerning.

33. EPA officials expressed concern after a video circulated in which Brent Efron, a Biden Administration official tasked with implementing the GGRF at EPA, stated that EPA's focus had shifted after the 2024 election from protecting against fraud to

"get[ting] the money out as fast as possible before they come in" to the tune of "billions" of dollars, and that "[i]t truly feels we're on the Titanic and we're throwing gold bars off the edge." Mr. Efron further indicated an interest in working for the grant recipients after the inauguration.

34. EPA officials also expressed concern that the GGRF program had been affected by conflicts of interest. In a June 27, 2024 ethics complaint, recently resubmitted to Administrator Zeldin, the White House Counsel, and the EPA Office of Inspector General (OIG) on March 7, 2025, a watchdog organization revealed that David Hayes, a Biden Administration climate advisor previously on the board of the Coalition for Green Capital (CGC), rejoined the board in 2023 while the organization was applying for GGRF funding (which it ultimately received).

35. Relatedly, a March 4, 2025 media article identified a number of potential conflicts of interests regarding personnel at several grantees, including CUF. For example, the media article noted that Beth Bafford, CUF's CEO, served as a special assistant in the Office of Management and Budget during the Obama Administration, and that Phil Aroneanu, CUF's Chief Strategy Officer, served as a strategic advisor to the Department of Energy during the last two years of the Biden Administration. The media article also noted that Jahi Wise, the policy director of grantee Coalition for Green Capital until 2021, left Coalition for Green Capital to work at President Biden's Climate Policy Office on GGRF implementation.

36. EPA initiated a review of the CUF grant, including the December 20, 2024 and January 13, 2025 amendments to key provisions in the Grant Agreement and ACA, to assess the adequacy of the remaining oversight mechanisms for ensuring the $6.97 billion

in public funds included within the award are spent effectively and lawfully to accomplish the objectives of CAA section 143.

37. EPA determined that the CUF grant agreements do not provide sufficient oversight and transparency to accomplish these stewardship obligations and objectives.

38. On February 26, 2025, EPA's Acting Inspector General Nicole Murley testified to the House Subcommittee on Oversight and Investigations that EPA was "particularly concerned about" the GGRF program, including because the grant "structure makes providing effective oversight challenging," and that EPA is "concerned that there will be critical gaps in monitoring, accountability, and compliance in the GGRF."

39. On March 2, 2025, EPA referred its findings on financial mismanagement, conflicts of interest, and oversight failures within the GGRF program to EPA's OIG for further investigation. Dkt. 16-2 at 159-162. The referral letter explained that:

    a. The prior administration's unprecedented choice to use a financial agent for EPA grants deprives the Government of immediate control over money held in CUF accounts at Citibank, particularly under Section 2 of the ACA as amended on January 13, 2025;

    b. EPA lacks sufficient oversight and transparency into the use of grant funding because CUF acts as a pass-through for subrecipients, many of which are themselves pass-throughs, and EPA is not a party to agreements between CUF and the subrecipients;

    c. Conflicts of interest involving high-level EPA GGRF officials raise questions about EPA's selection processes;

    d. Grants were awarded to entities that apparently failed to meet statutory and regulatory requirements for eligibility, including because they had insufficient experience managing substantial funding and may not have been operative prior to 2023; and

    e. Last-minute modifications to the Grant Agreement and ACA appeared intentionally designed to reduce EPA's oversight and control over grant funding.

### *EPA Determined the Grant Was Inconsistent with Agency Policy and Priorities*

40. Under Administrator Zeldin's leadership, EPA has reassessed and adopted agency policies and priorities that materially differ from the prior administration. For example, on March 3, 2025, the Administrator issued a public statement emphasizing that the "American people deserve accountability and responsible stewardship of their tax dollars" and that "[i]t is my pledge to be accountable for every penny EPA spends." The Administrator noted that this policy "marks a stark turn from the waste and self-dealing of the Biden-Harris Administration intentionally tossing 'gold bars off the Titanic.'" EPA has also initiated a review of prior actions for consistency with the Constitution and the best reading of applicable statutes. *See* Exec. Order 14222, 90 Fed. Reg. 11,095 (Mar. 3, 2025).

41. With respect to the CUF grant, EPA determined that the Grant Agreement and related contracts raise serious constitutional concerns under the Appointments Clause and private nondelegation doctrine. Specifically, EPA determined that the financial structure of the grant effectively delegates EPA's authority to distribute grant funds under CAA section 134 to a private entity that is not properly appointed as an officer of the United States and over which EPA lacks sufficient oversight and control to retain ultimate

authority over fund expenditure. Moreover, EPA determined that the amendments of December 20, 2024 and January 13, 2025—which limited EPA's contractual rights to terminate for misconduct short of a federal crime and limited EPA's contractual rights to assert exclusive control over funds in the Citibank accounts—left EPA with insufficient authority to retain control of funds short of outright termination.

### *Ongoing Criminal and Civil Investigations*

42. The Department of Justice and Federal Bureau of Investigation have initiated a criminal investigation into the GGRF program, including potential fraud, waste, abuse, and impermissible conflicts of interest in connection with NCIF and CCIA grants. EPA is cooperating fully in that investigation, which remains ongoing.

43. EPA OIG has initiated an investigation into the GGRF program, including based on the March 2, 2025 referral letter. EPA is cooperating fully in that investigation, which remains ongoing.

### *EPA Terminates the Grant Agreement*

44. On March 11, 2025, EPA terminated the Grant Agreement with CUF by sending a Notice of Termination to the Agency's contact of record for the grant. Dkt. 13. EPA specified that the termination was effective immediately, *id.* at 2, included the entirety of the grant, *id.*, and was executed in accordance with Sections III.S and III.T.4 of the Grant Agreement, EPA's General Terms and Conditions, and EPA's inherent authority to reconsider prior decisions, *id.* at 3.

45. EPA noted that the termination was based on substantial concerns regarding program integrity, the award process, and programmatic fraud, waste, and abuse. *Id.* EPA

also noted that the grant no longer aligned with the Agency's priorities or effectuated the fundamental goals of the underlying statute. *Id.*

46. EPA explained that the grant lacked "adequate oversight and account controls to prevent financial mismanagement," was deficient with respect to "the improper or speculative allocation of funds inconsistent with EPA's oversight and fiscal responsibilities," and involved "the circumvention and defeat of key oversight mechanisms in the disbursement of federal funds." Dkt. 13 at 2.

47. EPA further explained its determination that the grant lacked sufficient protections to guard against violations of the Appointments Clause and private nondelegation doctrine. Specifically, EPA reconsidered the previous administration's apparent position that the Grant Agreement contained sufficient controls to ensure that EPA retailed ultimate oversight and approval over use of the grant funds. Dkt. 13 at 3.

48. Finally, EPA confirmed that the Agency and CUF would proceed to the closeout process as provided by 2 C.F.R. §§ 200.344-45 and the Closeout Agreement. Dkt. 13 at 3.

I HEREBY DECLARE TO THE BEST OF MY KNOWLEDGE AND BELIEF, UNDER PENALTY OF PERJURY under the laws of the United States of America, that the foregoing is true and correct.

EXECUTED this 17th day of March, 2025 at Washington, DC.

_____
Eric Amidon