**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **CLIMATE UNITED FUND**<br><br>Plaintiff,<br><br>v.<br><br>**CITIBANK, N.A.**, *et al.*<br><br>Defendants. | Civil Action No. 25-cv-698-TSC |
| **COALITION FOR GREEN CAPITAL**<br><br>Plaintiff,<br><br>v.<br><br>**CITIBANK, N.A.**, *et al.*<br><br>Defendants. | Civil Action No. 25-cv-735-TSC |
| **POWER FORWARD COMMUNITIES, INC.**<br><br>Plaintiff,<br><br>v.<br><br>**CITIBANK, N.A.**, *et al.*<br><br>Defendants. | Civil Action No. 25-cv-762-TSC |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' CONSOLIDATED MOTION FOR PRELIMINARY INJUNCTION**

Vincent Levy (NY 0487)
Kevin D. Benish (NY 0495)
Patrick J. Woods*
Daniel Fahrenthold (NY0603)
HOWELL SHUSTER & GOLDBERG LLP
425 Lexington Avenue, 14th Floor
New York, NY 10017
Tel.: (646) 837-5151
vlevy@hsgllp.com
*Application for admission pending.

*Attorneys for Plaintiff Coalition for Green Capital*

Beth C. Neitzel (103611)
Jack C. Smith (1725229)
Kevin Y. Chen (admitted *pro hac vice*)
FOLEY HOAG LLP
155 Seaport Boulevard, Suite 1600
Boston, MA 02210
Tel. (617) 832-1000
bneitzel@foleyhoag.com
jcsmith@foleyhoag.com
kchen@foleyhoag.com

Noah C. Shaw (*pro hac vice* forthcoming)
James M. Gross (admitted *pro hac vice*)
FOLEY HOAG LLP
1301 Ave. of the Americas, 25th Floor
New York, NY 10019
Tel.: (212) 812-0400
ncshaw@foleyhoag.com
jgross@foleyhoag.com

*Attorneys for Plaintiff Power Forward Communities*

Adam G. Unikowsky (989053)
Kathryn L. Wynbrandt* (1602446)
David B. Robbins (493976)
Tanner J. Lockhead* (90011928)
JENNER & BLOCK LLP
1099 New York Avenue, Suite 900
Washington, D.C. 20001
Tel.: (202) 639-6000
Fax: (202) 639-6066
aunikowsky@jenner.com
*Application for admission pending.

Gabriel K. Gillett (admitted *pro hac vice*)
Simon A. de Carvalho (*pro hac vice* forthcoming)
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
Tel.: (312) 222-9350
ggillett@jenner.com
sdecarvalho@jenner.com

Allison N. Douglis (admitted *pro hac vice*)
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036
Tel.: (212) 891-1600
Fax: (212) 891-1699
adouglis@jenner.com

*Attorneys for Plaintiff Climate United Fund*

## TABLE OF CONTENTS


INTRODUCTION .......... 1

STATEMENT OF FACTS .......... 4

A. Congress Funds the NCIF Competition Through the Inflation Reduction Act. .......... 4

B. EPA Selects Climate United, CGC, and PFC as Recipients of NCIF Grants. .......... 6

C. The Grants Are Memorialized in Grant Agreements That Govern the Awards and Set Out the Exclusive Means for EPA to Suspend or Terminate the Awards. .......... 8

D. Plaintiffs Enter Into Account Control Agreements With EPA and Citibank. .......... 10

E. Plaintiffs Invest Funds as Permitted by the Inflation Reduction Act. .......... 13

F. EPA Causes Citibank to Withhold Plaintiffs' Grant Funds, Without Notice, an Explanation, or an Opportunity to Object. .......... 15

G. EPA Serves a Purported "Notice of Termination" on Each Plaintiff. .......... 19

H. This Court Issues a Temporary Restraining Order. .......... 21

LEGAL STANDARD .......... 21

ARGUMENT .......... 22

I. This Court Has Jurisdiction. .......... 22

II. The Court Should Issue a Preliminary Injunction Barring EPA From Terminating Plaintiffs' Grants or Impeding Citibank From Disbursing Grant Funds. .......... 27

A. Plaintiffs Are Likely to Succeed on the Merits of Their APA Claims. .......... 27

1. EPA's Terminations Are Arbitrary and Capricious. .......... 27

2. EPA's Notices of Termination Violate Federal Regulations. .......... 32

3. EPA's Notices of Termination Violate the Inflation Reduction Act. .......... 34

4. EPA's Suspension of the Grants Violates the APA. .......... 35

5. EPA's Proffer Confirms Plaintiffs Will Prevail on Their APA Claims. .......... 36

B. Plaintiffs Are Likely to Succeed on Their Appropriations Clause Claims. .......... 40

C. Plaintiffs Are Likely to Succeed on Their Due Process Claims. .......... 41

D. Plaintiffs Will Suffer Irreparable Harm Absent Injunctive Relief Against EPA. ........... 44

1. Climate United Will Suffer Irreparable Harm. ..................................................... 44

2. CGC Will Suffer Irreparable Harm. ..................................................................... 47

3. PFC Will Suffer Irreparable Harm. ...................................................................... 51

4. Plaintiffs Will Be Irreparably Harmed if the Funds Are Diverted to Any Entity Other Than the Accountholders. ....................................................................... 54

E. The Balance of Equities Favors Plaintiffs Over EPA. ................................................. 54

F. An Injunction Is Firmly in the Public Interest. ........................................................... 55

III. The Court Should Issue a Preliminary Injunction Barring Citibank From Failing to Disburse Plaintiffs' Grant Funds Pursuant to the ACAs. ................................................................ 56

A. Plaintiffs Are Likely to Succeed on Their Claims Against Citibank ............................. 56

B. The Other Preliminary Injunction Factors Favor Plaintiffs. ......................................... 59

C. The Preliminary Injunction Should Cover Subgrantees. ............................................... 60

CONCLUSION ........................................................................................................................ 60

# TABLE OF AUTHORITIES

## CASES

**AIDS Vaccine Advocacy Coalition v. United States Department of State*, 2025 WL 752378 (D.D.C. Mar. 10, 2025) .......... 24, 30, 35, 55

*In re Aiken County*, 725 F.3d 255 (D.C. Cir. 2013) .......... 34

*Alpine Securities Corp. v. FINRA*, 121 F.4th 1314 (D.C. Cir. 2024) .......... 31

*American School of Magnetic Healing v. McAnnulty*, 187 U.S. 94 (1902) .......... 26

*Amerijet, International, Inc. v. Pistole*, 753 F.3d 1343 (D.C. Cir. 2014) .......... 27

*Apter v. Department of Health & Human Services*, 80 F.4th 579 (5th Cir. 2023) .......... 25

*Armour & Co. v. Freeman*, 304 F.2d 404 (D.C. Cir. 1962) .......... 52

*Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320 (2015) .......... 25

*Atlas Air, Inc. v. International Brotherhood of Teamsters*, 280 F. Supp. 3d 59 (D.D.C. 2017) .......... 47

*Bartlett v. Bowen*, 816 F.2d 695 (D.C. Cir. 1987) .......... 26

*Beacon Associates, Inc. v. Apprio, Inc.*, 308 F. Supp. 3d 277 (D.D.C. 2018) .......... 47, 49

*Clevinger v. Advocacy Holdings, Inc.*, 2023 WL 4560839, at *5 (D.D.C. July 15, 2023) .......... 51

*CFPB v. Community Financial Services Ass'n*, 601 U.S. 416 (2024) .......... 40

*Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142 (2012) .......... 31

*Confederated Tribes of Chehalis Reservation v. Mnuchin*, 2020 WL 3791874 (D.D.C. July 7, 2020) .......... 54

**Crowley Services v. General Services Administration*, 38 F.4th 1099 (D.C. Cir. 2022) .......... 22, 24, 25-26

*Dart v. United States*, 848 F.2d 217 (D.C. Cir. 1988) .......... 25

*Deem v. Baron*, 2018 WL 377286 (D. Utah Jan. 11, 2018) .......... 46

*Dellinger v. Bessent*, 2025 WL 471022 (D.D.C. Feb. 12, 2025) .......... 54

*Department of Commerce v. New York*, 588 U.S. 752 (2019) .......... 30

*Department of Navy v. FLRA*, 665 F.3d 1339 (D.C. Cir. 2012) .......... 40, 41

*Destiny USA Holdings, LLC v. Citigroup Global Markets Realty Corp.*, 69 A.D.3d 212 (N.Y. App. Div., 4th Dep't 2009) .......... 46

*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016) .......... 31

*Endo Par Innovation Co., LLC v. Becerra*, 2024 WL 2988904 (D.D.C. 2024) .......... 54

*General Land Office v. Biden*, 722 F. Supp. 3d 710 (S.D. Tex. 2024) .......... 55

*Guerrero-Lasprilla v. Barr*, 589 U.S. 221 (2020) .......... 26

*Henke v. United States Department of Commerce*, 83 F.3d 1445 (D.C. Cir. 1996) .......... 40

*Kansas City v. Department of Housing & Urban Development*, 923 F.2d 188 (D.C. Cir. 1991) .......... 29

**League of Women Voters of United States v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) .......... 21, 45, 53, 54, 56

*Lucia v. SEC*, 585 U.S. 237 (2018) .......... 31

**Luokung Technology Corp. v. Department of Defense*, 538 F. Supp. 3d 174 (D.D.C. 2021) .......... 47, 49, 53

*Massachusetts v. NIH*, 2025 WL 702163 (D. Mass. Mar. 5, 2025) .......... 24

*Mass. Law Reform Inst. v. Legal Servs. Corp.*, 581 F. Supp. 1179 (D.D.C. 1984) .......... 49

*Mathews v. Eldridge*, 424 U.S. 319 (1976) .......... 41

*Mathis v. U.S. Parole Comm'n*, 749 F. Supp. 3d 8 (D.D.C. 2024) .......... 25

*Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982) .......... 22

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Wertz*, 298 F. Supp. 2d 27 (D.D.C. 2002) .......... 60

*Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67, 77 (D.D.C. 2001) .......... 51

**Motor Vehicle Manufacturers Ass'n of United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983) .......... 27, 30, 37

*Nalco Co. v. EPA*, 786 F. Supp. 2d 177 (D.D.C. 2011) .......... 48

*National Ass'n of Mortgage Brokers v. Board of Governors of Federal Reserve System*, 773 F. Supp. 2d 151 (D.D.C. 2011) .......... 44, 52

*National Council of Nonprofits v. Office of Management & Budget*, 2025 WL 597959 (D.D.C. Feb. 25, 2025) ........ 44, 54

*National Environmental Development Ass'n's Clean Air Project v. EPA*, 752 F.3d 999 (D.C. Cir. 2014) ........ 32

*New Jersey Conservation Foundation v. FERC*, 111 F.4th 42 (D.C. Cir. 2024) ........ 24

**New York v. Trump*, 2025 WL 715621 (D.R.I. Mar. 6, 2025) ........ 30, 46

*OPM v. Richmond*, 496 U.S. 414 (1990) ........ 40

*Pacito v. Trump*, 2025 WL 655075 (W.D. Wash. Feb. 28, 2025) ........ 55

*Patriot, Inc. v. Department of Housing & Urban Development*, 963 F. Supp. 1 (D.D.C. 1997) ........ 49

*Population Inst. v. McPherson*, 797 F.2d 1062 (D.C. Cir. 1986) ........ 54

*Schron v. Troutman Sanders LLP*, 20 N.Y.3d 430 (2013) ........ 57, 58

*SEC v. Chenery Corp.*, 318 U.S. 80 (1943) ........ 37

*Sierra Club v. Salazar*, 177 F. Supp. 3d 512 (D.D.C. 2016) ........ 31

*Texas Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224 (D.D.C. 2014) ........ 48

*Train v. City of New York*, 420 U.S. 35 (1975) ........ 34

*United States v. E-Gold, Ltd.*, 521 F.3d 411 (D.C. Cir. 2008) ........ 42

*United States v. James Daniel Good Real Prop.*, 510 U.S. 43 (1993) ........ 42

*United States Conference of Catholic Bishops v. Department of State*, 2025 WL 763738 (D.D.C. Mar. 11, 2025) ........ 24, 25

*Verizon v. F.C.C.*, 740 F.3d 623 (D.C. Cir. 2014) ........ 31

*Whitman-Walker Clinic, Inc. v. United States HHS*, 485 F. Supp. 3d 1 (D.D.C. 2020) ........ 54

*Wiener v. AXA Equitable Life Insurance Co.*, 113 F.4th 201 (2d. Cir. 2024) ........ 56

*Zampatori v. UPS*, 479 N.Y.S.2d 470 (N.Y. Sup. Ct. 1984) ........ 58

### CONSTITUTIONAL PROVISIONS AND STATUTES

U.S. Const. amend. V ........ 41

U.S. Const. art. I, § 9, cl. 7 ........ 40

5 U.S.C. § 706(2) ........ 24

5 U.S.C. § 706(2)(A) ........ 27

28 U.S.C. § 1331 ........ 22

28 U.S.C. § 1491(a)(1) ........ 22

42 U.S.C. § 7434 ........ 4, 34

42 U.S.C. § 7434(a) ........ 1, 4, 5

42 U.S.C. § 7434(a)(1) ........ 35

42 U.S.C. § 7434(a)(2) ........ 35

42 U.S.C. § 7434(a)(3) ........ 35

42 U.S.C. § 7434(b) ........ 4

42 U.S.C. § 7434(c)(1) ........ 5

### OTHER AUTHORITIES

2 C.F.R. § 200.206(b)(1) ........ 50

2 C.F.R. § 200.206(b)(2)(iii) ........ 50

2 C.F.R. § 200.208 ........ 28

2 C.F.R. § 200.305 ........ 23

2 C.F.R. § 200.305(b)(6) ........ 10, 32, 36

*2 C.F.R. § 200.339 ........ 10, 23, 28, 32, 36

2 C.F.R. § 200.340 ........ 23, 32, 40

2 C.F.R. § 200.340(a) ........ 32

2 C.F.R. § 200.340(a)(1) ........ 28, 30, 32, 33

2 C.F.R. § 200.340(a)(4) ........ 28, 30, 33

*2 C.F.R. § 200.340(b) ........ 28, 30, 33

*2 C.F.R. § 200.341 ........ 10, 23, 32

2 C.F.R. § 200.341(a) ........ 33

*2 C.F.R. § 200.342 ........ 23, 32, 34

85 Fed. Reg. 61,571 (Sept. 30, 2020) ........ 10

*About the Greenhouse Gas Reduction Fund*, EPA, .https://www.epa/gov greenhouse-gas-reduction-fund/about-greenhouse-gas-reduction-fund (last updated Feb. 13, 2025) ........ 4

Zack Colman, *Recipient Isn't Giving in as Trump's EPA Tries to Revoke Climate Grants*, Politico (Feb. 24, 2025) ........ 15

Cong. Rsch. Serv. *IN12090*, *EPA's Greenhouse Gas Reduction Fund*, (updated Feb. 14, 2023), https://crsreports.congress.gov/product/pdf/IN/IN1209 ........ 4

*Frequently Asked Questions about the National Clean Investment Fund (NCIF) and Climate United's Strategy*, Climate United (Aug. 16, 2024), https://weareclimateunited.org/-frequently asked-questions-ncif-and-climate-united-strategy ........ 7

Fed. R. Crim. P. 41(d)(1) ........ 43

Fed. R. Crim. P. 41(g) ........ 43

Spencer Hsu, Maxine Joselow & Nicolas Rivero, FBI takes up EPA Probe Amid Pushback from Judge, Prosecutors, Wash. Post (Feb. 27, 2025) ........ 16

Press Release, EPA, Administrator Zeldin Terminates Biden-Harris $20B 'Gold Bar' Grants (Mar. 11, 2025) ........ 19

Press Release, EPA, Biden-Harris Administration Announces $20 Billion in Grants to Mobilize Private Capital and Deliver Clean Energy and Climate Solutions to Communities Across America (Apr. 4, 2024) ........ 6

Press Release, EPA, EPA Administrator Lee Zeldin Announces EPA's "Powering the Great American Comeback" Initiative (Feb. 4, 2025) ........ 39

Press Release, EPA, ICYMI: Administrator Lee Zeldin Announces EPA Found Billions of Dollars Parked at an Outside Financial Institution by Biden Administration (Feb. 15, 2025) ........ 35

Press Release, EPA, EPA Formally Refers Financial Mismanagement of $20B "Gold Bars" to Inspector General (Mar. 3, 2025) ........ 15

Press Release, Power Forward Communities, *Fact Sheet: Power Forward Communities Announces More Than Half a Billion Dollars in Investments to Lower Housing Costs and Utility Bills for Families Nationwide* (Feb. 24, 2025), /https://a-us.storyblok.com/f/1014573/x/0f93107325pfc-press-release-announcement_022425.pdf ..................................................... 8

Rapid Response 47 (@RapidResponse47), X (Feb. 25, 2025, 10:16 AM)................................ 15

*Read the Resignation Letter by Denise Cheung, a Veteran D.C. Federal Prosecutor*, Wash. Post (Feb. 18, 2025) ..................................................... 16

Restatement (Third) Agency § 7.02..................................................... 58

Restatement (Third) Agency § 8.09..................................................... 59

*Review and Selection Process*, EPA, https://www.epa.gov/greenhouse-gas-reduction-fund/review-and-selection-process (last updated Aug. 16, 2024)..................................................... 6

SundayMorningFutures (@SundayMorningFutures), X (Feb. 23, 2025, 11:21 AM)................. 15

U.S. Gov't Accountability Off., GAO-17-176 (Jan. 2017)..................................................... 10

Lee Zeldin (@EPALeeZeldin), X (Feb. 12, 2025, 7:52 PM)............................................ 15, 42

Lee Zeldin (@EPALeeZeldin), X (Mar. 4, 2025, 6:02 PM) ..................................................... 15

Lee Zeldin (@EPALeeZeldin), X (Mar. 18, 2025, 10:21 PM) .......................................... 30, 35

## GLOSSARY OF TERMS

| **Term or Abbreviation** | **Definition** | **Citation(s)** |
|---|---|---|
| ACA | Account Control Agreement with Citibank, related to Plaintiffs' grants. | CU Ex. 8<br>CGC Ex. A<br>PFC Ex. D |
| Bafford Decl. | Declaration of Elizabeth Bafford (CU) | |
| Brown Decl. | Declaration of Stephen Brown (CGC) | |
| Buendia Decl. | Declaration of Jessica Buendia (CGC) | |
| CGC | Coalition for Green Capital | |
| CGC Ex. | Exhibits to the Declaration of Vincent Levy. | |
| CU | Climate United Fund | |
| CU Ex. | Exhibits to the Declaration of Elizabeth Bafford | CU Exs. 1-11 |
| Dkt. | Docket entry in *Climate United Fund v. Citibank, N.A., et al.*, 25-cv-698 | Dkt. |
| Donovan Decl. | Declaration of Shaun Donovan (PFC) | |
| FAA | Financial Agency Agreement between Citibank and U.S. Department of the Treasury | Dkt. 14-1 |
| GGRF | Greenhouse Gas Reduction Fund | |
| Hopson Decl. | Declaration of Eli Hopson (CGC) | |
| Kauffman Decl. | Declaration of Richard Kauffman (CGC) | |
| Matusiak Decl. | Declaration of Ari Matusiak (PFC) | |
| Mayopoulos Decl. | Declaration of Timothy J. Mayopoulos (PFC) | |
| Moon Decl. | Declaration of John Moon (PFC) | |
| NOA | Notice of Award | |
| NOFO | Notice of Funding Opportunity | |
| Notice | Notice of Termination of grant issued by EPA to each Plaintiff, dated March 11, 2025 | CU Ex. 11<br>CGC Ex. I<br>PFC Ex. J |
| ODAG | Office of the Deputy Attorney General | |
| PFC | Power Forward Communities, Inc. | |
| PFC Ex. | Exhibits to the Complaint in *Power Forward Communities, Inc. v. Citibank, N.A., et al.*, 25-cv-762. | |
| USAO-DC | Office of the U.S. Attorney for the District of Columbia | |

# INTRODUCTION

Plaintiffs Climate United Fund ("Climate United"), Coalition for Green Capital ("CGC"), and Power Forward Communities ("PFC") seek an order preliminarily enjoining EPA from implementing its illegal termination of Plaintiffs' grants and from causing Plaintiffs' assets to be frozen. Plaintiffs also seek an order preliminarily enjoining Citibank, N.A. from violating its contractual obligations under Account Control Agreements ("ACA") related to Plaintiffs' grants and to restore access to the grant funds to which Plaintiffs and their subgrantees are legally entitled.

In the Inflation Reduction Act, Congress appropriated $27 billion for the EPA to make grants to invest in clean energy through the Greenhouse Gas Reduction Fund ("GGRF"). *See* 42 U.S.C. § 7434(a). The $13.97 billion National Clean Investment Fund ("NCIF") program is part of the GGRF. Following a lengthy process involving public comment and a rigorous competition, each Plaintiff was awarded an NCIF grant: $6.97 billion to Climate United, $5 billion to CGC, and $2 billion to PFC. The funds were then disbursed to accounts at Citibank, held under a Financial Agency Agreement ("FAA") between Citibank and the U.S. Treasury Department, and under an ACA between Citibank, EPA, each Plaintiff, and in some cases subgrantees.

Upon his confirmation on January 30, 2025, EPA Administrator Lee Zeldin began publicly expressing his desire to terminate GGRF grants. But EPA has no legal basis for doing so. Congress authorized the GGRF program and appropriated the funds, and EPA then obligated and disbursed the funds. EPA may not now override Congress's will. Instead, under the terms of the grant and applicable regulations, EPA can terminate a grant *only* if the grantee violates the grant's terms and conditions, engages in certain illegal activity, or misrepresents its eligibility status. None of these conditions is satisfied with respect to any Plaintiff—and EPA does not claim otherwise. EPA has no statutory or regulatory basis for dismantling the entire congressionally enacted program, either by freezing grant recipients' assets, issuing blanket termination letters, or any other means.

Yet that is what EPA has endeavored to do here. Without any legal justification, EPA began by illegally and clandestinely freezing access to Plaintiffs' grant funds. Apparently at the recommendation of EPA, the Justice Department directed the top criminal prosecutor in the U.S. Attorney's Office for the District of Columbia to send a letter to Citibank demanding that it freeze the assets of Plaintiffs and their subgrantees. She resigned rather than carry out that illegal order.

Undeterred, on February 17, 2025, the FBI—apparently at EPA's behest—sent Citibank a letter "recommending" that Citibank freeze assets related to Plaintiffs' grants. The letter stated that the FBI had "credible information" that the accounts "ha[d] been involved in possible criminal violations." Dkt. 14-5 at 1-4. It offered no facts to support those statements. Neither EPA nor Citibank gave Plaintiffs notice of this letter or an opportunity to contest it. Nevertheless, Citibank froze Plaintiffs' assets—without telling Plaintiffs the reason why.

EPA and Citibank ignored repeated requests for information about why the assets were frozen. Meanwhile, EPA secretly directed Treasury to order Citibank to freeze the grant funds—again, without telling Plaintiffs. EPA's directive to Treasury was illegal. Under the FAA, account freezes must occur "in accordance with the account control agreements." Dkt. 21 at Ex. A § I.B.4.[1] The ACAs, in turn, specify that Citibank must honor disbursement requests unless EPA sends a "notice of exclusive control," CU Ex. 8 at 2 & Ex. A, which it cannot do unless one of three requirements for grant termination is satisfied. EPA has never sent a notice of exclusive control nor even claimed that any of those requirements is satisfied, despite ample motive and opportunity.

Indeed, demonstrating EPA's lack of information to support lawful termination, EPA sent Plaintiffs identical information requests on March 4 with a deadline of March 28. As it later

[1] All FAA descriptions or quotes appear in Citibank's publicly filed response brief, Dkt. 14. Unless otherwise noted, docket citations refer to entries on the *Climate United* docket, No. 25-cv-698.

recounted to Citibank, EPA sent these requests because it was investigating "concerns" and "potential patterns of fraud, waste or abuse," as it then "lack[ed] critical information." Dkt. 16-2 at 184-85. On March 10, EPA reiterated that it was "working to … address concerns regarding potential fraud and/or conflicts of interest related to the [GGRF], including based on incoming responses to oversight questions" due March 28, 2025. Dkt. 14-2 at 2.

The next day, however, EPA announced that it was dismantling the grant program and had issued termination notices to all Plaintiffs, which were sent within minutes of each other. EPA's termination came on the eve of a hearing on Climate United's motion for a TRO in this lawsuit, and after Climate United consented to DOJ's request for a one-day extension as a professional courtesy.

The "Notices of Termination" were illegal. Among other things, they do not even attempt to show that any conditions for terminating Plaintiffs' grants were satisfied. EPA's actions violate EPA's own regulations prescribing when and how a grant can be terminated. They violate the Administrative Procedure Act's requirement that agencies engage in reasoned decision making that is consistent with the law. They violate the Inflation Reduction Act's express statutory deadline for grantmaking. And, as Citibank's filing in this Court revealed for the first time, the purported terminations are the fruit of EPA's clandestine, weekslong effort to freeze Plaintiffs' money without ever giving Plaintiffs notice of what was happening or an opportunity to contest it.

Effectively accepting the weakness of its case before this Court, EPA chiefly contends that Plaintiffs' sole remedy is through breach-of-contract actions in the Court of Federal Claims. But this is not a breach of contract action in disguise. By simultaneously serving similar "Notices" purporting to terminate all other NCIF grants, EPA made clear that it aims to wipe out this part of the GGRF program and nullify an act of Congress. As such, this challenge centers on federal

regulations, statutes, and the Constitution, as well as the APA's procedural standards—not the terms of any particular grant. And it seeks to enjoin the terminations—not obtain damages or specific performance. Accordingly, this Court has jurisdiction to consider Plaintiffs' claims.

On the merits, this is not a close case. EPA's hastily crafted "Notices of Termination" are facially unlawful and unsupported by the facts. Plaintiffs and their subgrantees face irreparable harm if they do not obtain injunctive relief to enjoin the effectiveness of the "Notices" and bar EPA from taking other steps to freeze or terminate their grants.

As for Citibank, each ACA unambiguously requires it to disburse grant funds unless Citibank receives a Notice of Exclusive Control or a court order, and it has received neither. Citibank claims it is obliged to do what the Government tells it to do. But the ACAs do not permit Citibank to withhold funds based on illegal government directives. The Court should therefore also enjoin Citibank from violating the ACAs.

## STATEMENT OF FACTS

### A. Congress Funds the NCIF Competition Through the Inflation Reduction Act.

In 2022, the Inflation Reduction Act created the GGRF grant program. 42 U.S.C. § 7434.[2] The GGRF seeks to promote investments in clean energy projects and establishes "green banks," which are "financial institutions aimed at overcoming market barriers and scaling up investment in low-carbon technologies and climate-resilient infrastructure."[3]

The Act appropriated $19.97 billion to the Administrator to use "to make grants, on a competitive basis," for direct and indirect investment in green energy projects. 42 U.S.C. § 7434(a), (b). Congress required the Administrator to make those grants by September 30, 2024,

---

[2] *About the Greenhouse Gas Reduction Fund*, EPA, https://www.epa.gov/greenhouse-gas-reduction-fund/about-greenhouse-gas-reduction-fund (last updated Feb. 13, 2025).
[3] Cong. Rsch. Serv. IN12090, *EPA's Greenhouse Gas Reduction Fund*, (updated Feb. 14, 2023), https://crsreports.congress.gov/product/pdf/IN/IN12090.

*id.* § 7434(a), and to award the grants to entities "designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services," *id*. § 7434(c)(1).

In July 2023, EPA issued a Notice of Funding Opportunity ("NOFO") for the NCIF competition, through which EPA would award $13.97 billion of GGRF funds. CU Ex. 1 at 3.[4] The NOFO stated that EPA would "provide grants to 2-3 national nonprofit financing entities to create national clean financing institutions capable of partnering with the private sector" to finance "tens of thousands of clean technology projects." *Id.* at 4. The NOFO anticipated that awardees would be selected in March 2024 and performance would begin in July 2024. *Id.* at 1. The NOFO also mentioned that the awards "may be subject to … financial agent arrangements with the U.S. Department of Treasury," to "ensure that EPA's interests are protected." *Id.* at 56.

Both individual and coalition applicants were eligible. *Id.* at 21. The NOFO described coalition applicants as "composed of one lead applicant, which partners with … non-lead coalition members that are named in the application and would receive subawards (in the form of subgrants) to carry out a portion of the grant's activities." *Id.* at 6. If a coalition is selected for an award, the NOFO explained, "the lead applicant will become the grantee, administer the grant as a pass-through entity for the purposes of 2 CFR Part 200 and the EPA Subaward Policy, and be accountable to EPA for effectively carrying out the full scope of work and the proper financial management of the grant (including subawards to non-lead coalition members)." *Id.* at 7.

The NOFO "included a robust set of application requirements and corresponding

---

[4] Exhibits indicated by "CU Ex. _" refer to Climate United's exhibits attached to the Declaration of Elizabeth Bafford, submitted along with this motion. References to "PFC Ex. _" indicate exhibits attached to PFC's complaint in case No. 25-cv-762, at *Power Forward Communities* Dkt. 1-1 through 1-10. References to "CGC Ex. _" indicate exhibits attached to the Declaration of Vincent Levy, submitted along with this motion.

evaluation criteria that were used to assess materials submitted to meet those application requirements."[5] Among other things, applicants were required to provide "a detailed project narrative"; "organizational and governing documents; resumes of board members and senior management; legal and compliance risk management policies and procedures; financial statements; workplans for the first year of program implementations, and budget narratives." *Id.* EPA established a rigorous process to review and select applications, including establishing review panels with broad and deep qualifications who would then present rankings and recommendations to a Selection Official authorized to make the final selection for awards. CU Ex. 1 at 54.

**B. EPA Selects Climate United, CGC, and PFC as Recipients of NCIF Grants.**

In April 2024, EPA awarded $13.97 billion in NCIF grants to three entities: Plaintiffs Climate United ($6.97 billion), CGC ($5 billion), and PFC ($2 billion).[6]

***Climate United.*** Plaintiff Climate United is a coalition of three established nonprofits with a combined 120 years of experience managing more than $30 billion. Decl. of Elizabeth Bafford ¶ 7 ("Bafford Decl."). Climate United was incorporated for the purpose of joining these three experienced entities together to apply for the NCIF grants, *id.*,[7] an arrangement the NOFO expressly contemplated when it made NCIF grants available to "coalition[s]" that would include

---

[5] *Review and Selection Process*, EPA, https://www.epa.gov/greenhouse-gas-reduction-fund/review-and-selection-process (last updated Aug. 16, 2024).

[6] Press Release, EPA, Biden-Harris Administration Announces $20 Billion in Grants to Mobilize Private Capital and Deliver Clean Energy and Climate Solutions to Communities Across America (Apr. 4, 2024).

[7] It is common for established organizations to set up subsidiaries for specific projects. While each coalition partner would have been an eligible recipient, each formed subsidiaries to act as the grant recipients and subgrantees. As Climate United explained in its NCIF grant application, this structure allowed them to adopt EPA-required policies, procedures, and governance specifically crafted to more efficiently deploy grant funds while mitigating deployment risk. The subsidiaries benefit from the organizational infrastructure and experience of their parent organizations while allowing them to comply fully with EPA oversight requirements, and leverage grant funds with private capital more effectively as stand-alone entities. Bafford Decl. ¶ 8.

"members [that] would each receive grant funds." CU Ex. 1 at 6-7. Climate United focuses on "leverag[ing] public resources with private capital" to provide financing for "[g]reening and electrifying businesses and commercial buildings, schools and community-supporting institutions; community and C&I solar; [and] electric buses and trucks," among other projects.[8]

Climate United entered the NCIF grant competition with a $13.97 billion proposal to accelerate clean energy adoption across the U.S. economy. Bafford Decl. ¶ 14. After EPA's lengthy and rigorous review process, Climate United was awarded $6.97 billion. *Id.* ¶ 17. Climate United developed, and EPA approved, a workplan that was posted publicly. *Id.* ¶ 22.

***CGC.*** Plaintiff CGC was founded in 2010 to support the development of state and local green banks across the country; since its inception it has supported or created over forty green banks. Decl. of Eli Hopson ¶ 3 ("Hopson Decl."). CGC created the American Green Bank Consortium, whose members deployed over $25 billion across the country. *Id.* ¶ 5. With its NCIF grant, CGC has successfully established the country's first national green bank, advancing CGC's goal of leveraging private capital for deployment in state, local, and municipal projects. *Id.* ¶ 4.

CGC applied for grants totaling $11.9 billion across all three grant competitions EPA created under GGRF. *See id.* ¶ 7. EPA awarded CGC $5 billion from the NCIF, and CGC's EPA-approved NCIF workplan is accessible to the public on EPA's website. *See id.*

***PFC.*** Plaintiff PFC is a coalition of leading nonprofit organizations with nearly a century of combined experience in financing, managing, and implementing affordable housing projects for Americans in need. Decl. of Timothy J. Mayopoulos ¶¶ 3-4 ("Mayopoulos Decl."). Those projects total more than $100 billion and have added approximately 1.5 million affordable homes and

[8] *Frequently Asked Questions about the National Clean Investment Fund (NCIF) and Climate United's Strategy*, Climate United (Aug. 16, 2024), https://weareclimateunited.org/frequently-asked-questions-ncif-and-climate-united-strategy.

apartments in communities across the United States. *Id*. ¶¶ 3-4. Through its coalition members, PFC invests in clean-energy housing nationwide to advance its mission of expanding and preserving affordable housing, improving community health and safety, and creating well-paying jobs. *Id*. ¶ 4. As contemplated by the NOFO for the NCIF program, PFC was established to serve as the coalition's lead award applicant and to administer the NCIF grant. *Id*. ¶ 5.

PFC was awarded a $2 billion NCIF award. *Id*. ¶ 6. Following its EPA-approved work plan, PFC has already committed $539 million to projects. *Id*.[9]

### C. The Grants Are Memorialized in Grant Agreements That Govern the Awards and Set Out the Exclusive Means for EPA to Suspend or Terminate the Awards.

To govern the grants, EPA entered into separate agreements called a "Notice of Award," or "NOA," with each plaintiff. These NOAs contain each grant award's Terms and Conditions, which are binding on both the agency and the recipient. Each NOA was executed in August 2024. *See* Bafford Decl. ¶ 17; CU Ex. 2; Hopson Decl. ¶ 8; CGC Ex. E; Mayopoulos Decl. ¶ 6; PFC Ex. B.

From the beginning, EPA envisioned entering into initial NOAs with Plaintiffs in the summer, amending those NOAs in the fall and winter, and revising the Terms and Conditions as needed thereafter to more effectively carry out program objectives. *See, e.g.*, Bafford Decl. ¶¶ 18-19; CU Ex. 10. That is what happened. EPA issued amended NOAs in December 2024, which were very similar to the August NOAs but included changes to the Terms and Conditions reflecting insights gained from the first six months of market and partner feedback as well as other clarifications. *See* Bafford Decl. ¶¶ 17-20; Hopson Decl. ¶ 11; PFC Mayopoulos Decl. ¶ 6. These

---

[9] *See* Press Release, Power Forward Communities, Fact Sheet: Power Forward Communities Announces More Than Half a Billion Dollars in Investments to Lower Housing Costs and Utility Bills for Families Nationwide (Feb. 24, 2025), https://a-us.storyblok.com/f/1014573/x/0f93107325/pfc-press-release-announcement_022425.pdf.

NOAs, which contain the operative Terms and Conditions of the grants, are all dated December 20, 2024. *See* CU Ex. 3; CGC Ex. F; PFC Ex. C.[10]

The Terms and Conditions in each Plaintiff's NOA are materially identical. *Compare* CU Ex. 3, *with* CGC Ex. F, *and* PFC Ex. C. For simplicity, below we cite only Climate United's NOA.

As an initial matter, the NOAs require Plaintiffs to adhere to a rigorous set of reporting requirements to facilitate EPA's oversight. *See, e.g.*, Bafford Decl. ¶ 35 (describing EPA's many mechanisms for oversight). Among other things, Plaintiffs are required to submit quarterly, semi-annual, annual, and final reports to EPA with "detailed narratives describing program performance … supported with qualitative discussions and quantitative metrics," CU Ex. 3 at 14, and submit quarterly transaction-level and project-level data reports and conflict-of-interest reports, *id.* at 15. The Terms and Conditions also require Plaintiffs to "obtain prior written approval" from EPA "for any transfers that will not be disbursed … within 15 business days." *Id.* at 57-59.

The Terms and Conditions give EPA "the right to terminate the Assistance Agreement[s] *only* as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 effective as of October 1, 2024, *when*" one of three specific criteria are met. CU Ex. 3 at 41 (emphases added). Specifically, termination is permitted if and only if:

(1) A recipient engages in "substantial" noncompliance such that "effective performance" is "Materially Impaired." CU Ex. 3 at 41. Effective performance is "Materially Impaired" if (1) EPA issues a "written determination and finding … that the Recipient has failed to achieve sufficient progress in accordance with the Sufficient Progress clause" and, (2) if EPA determines in its sole discretion that a "corrective action plan" would remedy the issue, EPA issues a "separate written determination and finding" that the Recipient "has not materially addressed its failure." *Id.* at 8-9.

(2) A recipient makes a "material misrepresentation of eligibility status." *Id.* at 41.

---

[10] The December NOAs were further amended in January 2025, to update the budget and workplan, but not the operative Terms and Conditions. *Compare* CU Ex. 3 at 1, 3, *with* CU Ex. 4 at 1, 3-5 (noting that "All Administrative" and "All Programmatic Conditions Remain the Same").

(3) There is "adequate evidence" of "Waste, Fraud, or Abuse," *id.*, which is defined to require "credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act (31 U.S.C. [§§] 3729-3733)." EPA, *General Terms and Conditions* 44 (effective Oct. 1, 2024; 2 C.F.R. § 200.113).

Critically, the Terms and Conditions do not give EPA the right to terminate the grants for convenience or based on a change in EPA's policy priorities. *See* CU Ex. 3.

Additionally, before terminating a grant, EPA must first take certain procedural steps. *See* 85 Fed. Reg. 61,571 (Sept. 30, 2020). Among other things, EPA must provide written notice of termination that includes "the reasons for termination." 2 C.F.R. § 200.341; CU Ex. 3 at 41 (incorporating this requirement into the grants' Terms and Conditions). EPA may withhold payment for allowable costs only if required by federal statute or regulations; if Plaintiffs "ha[ve] failed to comply with the terms and conditions" of the award; or if Plaintiffs are "delinquent in a debt to the United States." 2 C.F.R. § 200.305(b)(6). If Plaintiffs fail to comply with the Terms and Conditions, EPA may "[t]emporarily withhold payments," but only if EPA "determines that noncompliance cannot be remedied by imposing specific conditions." *Id.* § 200.339.

**D. Plaintiffs Enter Into Account Control Agreements With EPA and Citibank.**

To "ensure that EPA's interests are protected," CU Ex. 1 at 56, each grant requires the recipient's funds to be held at Citibank. Citibank's actions are governed by a Financial Agency Agreement ("FAA") between Citibank and Treasury covering all NCIF grants, Dkt. 21, as well as separate ACAs between Citibank, EPA, and each Plaintiff. CU Ex. 2 at 58; CU Ex. 3 at 52; CGC Ex. F at 56; PFC Ex. C at 56. This setup is consistent with Treasury's "long history of using financial agents," which since the 1860s have "support[ed] its core functions of disbursing payments and collecting revenue."[11]

[11] U.S. Gov't Accountability Off., GAO-17-176 (Jan. 2017).

Citibank and Treasury entered into the FAA on September 18, 2024. Dkt. 21 at 1. In the FAA, Citibank agreed "to comply with all lawful instructions or directions received from Treasury." Dkt. 21 at Ex. A § 5.A. The FAA authorizes Citibank to "freeze accounts, and transfer funds in frozen accounts, at the direction of the relevant secured party [*i.e.*, EPA]," but only "in accordance with the account control agreements." Dkt. 21 at Ex. A § I.B.4. The FAA also requires Citibank to provide EPA "full account visibility," *id.* at Ex. A § I.D.1, which includes real-time view access into every Citibank account held by Plaintiffs and their subgrantees.

With the FAA in place, Plaintiffs each entered into a materially identical ACA with Citibank and EPA in November 2024, *see* CU Ex. 8; CGC Ex. B; PFC Ex. D. These ACAs were amended on January 13, 2025, to clarify the treatment of certain "properly occurred" obligations if EPA issues a Notice of Exclusive Control, *e.g.*, CU Ex. 9; Bafford Decl. ¶¶ 27-28. Once again, for simplicity's sake, citations below are solely to Climate United's ACA.

Under the ACAs, Citibank is "designated and authorized to act as a financial agent of the United States," and EPA serves as the "Secured Party." CU Ex. 8 at 1. The ACAs do not refer to the FAA or incorporate by reference the FAA's terms. Instead, the ACAs state that each party "acknowledges and agrees" that Citibank's "duties, responsibilities and obligations … shall be limited to those expressly set forth in" the ACAs. CU Ex. 8 at 3. Like the grant agreements, the ACAs facilitate transparency and give EPA significant oversight tools, such as real-time visibility into Plaintiffs' accounts and those of their subgrantees. *See, e.g.*, Bafford Decl. ¶ 33.[12]

---

[12] Consistent with the structure designed by EPA under Congress's directive, subgrantees have their own Accounts and ACAs at Citibank where they maintain their own funds. These accounts also require Citibank to abide by subgrantees' instructions, subject only to the issuance of a Notice of Exclusive Control—which in that context can be issued only by a grantee, and *not EPA*. *See* CGC Ex. C at 2 & Ex. A (exemplar subgrantee ACA); *see also* PFC Exs. E-G at 2 & Ex. A (each subgrantee ACA). These subgrantee ACAs do not permit Citibank to disburse funds to the Government, whether on issuance of a Notice of Exclusive Control or grant termination.

The ACAs provide that Citibank "shall comply with all instructions, notifications, and entitlement orders the Bank receives directing the disposition of funds and financial assets in the Accounts … ." CU Ex. 8 at 3. Citibank may refuse to follow instructions under an ACA *only* if EPA exercises its option to take "exclusive control" over the accounts by providing Citibank with a Notice of Exclusive Control similar to a sample attached to each ACA. *Id.*; *id.* at Ex. A. To take "exclusive control," EPA must "issue[] a written determination and finding" that one of the three exclusive grounds for termination listed in the grant's Terms and Conditions has been triggered. CU Ex. 9 at Ex. A; *see also* CU Ex. 8 at 1 (parties "agree[] that the terms and conditions … in the Grant Agreement indicate the conditions under which [EPA] may exercise its right of control").

Beginning in August 2024 and prior to the opening of the Citibank accounts in November 2024, Plaintiffs drew down grant funds through Treasury's Automated Standard Application for Payments ("ASAP") system. *See* Bafford Decl. ¶¶ 26, 31; Hopson Decl. ¶ 9; Mayopoulos Decl. ¶¶ 7-11. EPA has since disbursed the balance of Plaintiffs' grant funds into their respective Citibank accounts. Bafford Decl. ¶ 27; Hopson Decl. ¶ 9; Mayopoulos Decl. ¶¶ 7-11. Plaintiffs have regularly drawn money from those accounts for operations and to carry out their obligations under their grants. Bafford Decl. ¶ 34;CFC Hopson Decl. ¶ 13; PFC Mayopoulos Decl. ¶¶ 11, 19, 21-23, 25. As they have done so, EPA has overseen Plaintiffs' activities, including by reviewing periodic financial and conflict-of-interest reports; regularly meeting with Plaintiffs; holding view access to all accounts affiliated with Plaintiffs' grants; requiring third-party audits; and transaction-testing payments to ensure they are proper under the grants. Bafford Decl. ¶ 35; Hopson Decl. ¶ 13; PFC Mayopoulos Decl. ¶¶ 15-16, 27. Plaintiffs also must certify, under threat of criminal penalties, that each draw request for a financial assistance transaction is proper under their grants. *E.g.*, Bafford Decl. ¶ 35(d); CGC Ex. F at 57; PFC Ex. C at 58.

### E. Plaintiffs Invest Funds as Permitted by the Inflation Reduction Act.

Plaintiffs have wasted no time getting to work on their EPA-approved, publicly posted workplans to carry out Congress's objectives in enacting the GGRF program.

***Climate United.*** The Climate United coalition plans to commit at least $580 million toward qualified projects before July 2025, and to deploy the full $6.97 billion within five years. Bafford Decl. ¶ 23. To date, the Climate United coalition has committed $392 million to qualified projects, focusing on investments in energy-efficient buildings and homes; electric transportation and charging infrastructure; and producing affordable, clean electricity and heat through renewable energy generation and battery storage. *Id.* ¶¶ 23-24.

Climate United uses NCIF funds primarily to finance green energy projects, and has already launched and committed capital for three financing projects: $31.8 million for solar projects in Arkansas; up to $250 million for manufacturing and leasing battery electric heavy-duty trucks in California; and $63 million for solar power plants in Eastern Oregon and Idaho. *Id.* ¶¶ 38-40. Climate United also accepted applications for up to $30 million in technical assistance and planning support grants, and it has approved an initial 22 awards across 18 states. *Id.* ¶ 41.

Consistent with the grant, Climate United uses NCIF funds to pay approximately 37 employees, including highly specialized and sophisticated investment professionals who empower Climate United to do its congressionally mandated work: selecting partners, ensuring grant compliance, conducting oversight of subgrantees, analyzing financial transactions, engaging with communities, and servicing a portfolio of loans. *Id.* ¶ 37.

***CGC.*** CGC has used its NCIF funding to establish the first national green bank in the country, creating a coalition of subrecipients (which are subgrantees) including 16 state and local green banks and two national nonprofits. Decl. of Richard Kauffman ¶¶ 5-7 ("Kauffman Decl."). In December 2024 and January 2025, CGC concluded definitive agreements with each subgrantee,

which paralleled the NCIF terms and conditions and included a robust internal investment policy to help address risks. *Id.* ¶ 5.

These agreements have allowed CGC to distribute approximately $1.8 billion among the subgrantees to support the creation of a self-sustaining nationwide network of state and local green banks and drive the deployment of clean energy projects. *Id.* ¶ 6. As of December 31, 2024, CGC's subgrantees closed six qualifying projects totaling $33.7 million in NCIF fund allocations, which are expected to mobilize an additional $192 million in private capital. *Id.* CGC helped develop and launch the Municipal Investment Fund, which seeks to partner CGC with two local entities in each State to support public-private partnerships oriented toward clean energy projects and award grants to local communities. Decl. of Jessica Buendia ¶ 3-6 ("Buendia Decl."). In November 2024, CGC launched "RFP1," an open and rolling solicitation for clean energy developers, commercial projects, community lenders, and financial investors (including private credit and equity firms) to submit proposals for green energy projects. Kauffman Decl. ¶ 8-9. By December 31, 2024, CGC received 82 investment proposals totaling $30.9 billion, and CGC scored these for further consideration, culminating in the identification of 24 projects totaling $5.3 billion and expected to create 240,700 clean energy jobs. *Id.* ¶ 4.

***PFC.*** PFC uses its NCIF award to expand and preserve affordable housing, finance energy-efficient improvements in homes nationwide, and create well-paying jobs. As noted above, PFC has already committed $539 million of its $2 billion NCIF award. PFC Mayopoulos Decl. ¶ 6. That commitment includes nearly $100 million in NCIF funding for affordable housing construction and rehabilitation projects under term sheets executed by PFC subgrantee Enterprise Green Accelerator ("EGA") in Michigan, Texas, Virginia, New York, Washington, and Maryland. Decl. of Shaun Donovan ¶ 16 ("Donovan Decl."). It also includes approximately $86.5 million of

financial assistance that PFC subgrantee LISC Green committed to affordable home construction and rehabilitation, together with other projects, in Ohio, Texas, New Jersey, Massachusetts, Iowa, Florida, Michigan, Wisconsin, Illinois, Kentucky, and Georgia. Decl. of John Moon ¶ 16.

### F. EPA Causes Citibank to Withhold Plaintiffs' Grant Funds, Without Notice, an Explanation, or an Opportunity to Object.

Beginning on February 12, 2025, EPA Administrator Zeldin announced EPA's goal to take possession of GGRF grant funds, including the NCIF grant funds awarded to Plaintiffs.[13] In that same public statement, Administrator Zeldin stated: "the [FAA] with the Bank needs to be instantly terminated" and "the Bank must immediately return" the funds.[14] Thereafter, Administrator Zeldin made multiple statements attacking the GGRF program. For example, he stated that the "the entire scheme" of the GGRF, "in my opinion, is criminal,"[15] and asserted that he would take action with "the Inspector General's Office and will work with the Justice Department" to ensure EPA "reassume[s] responsibility for all of these funds."[16] One week later, EPA issued a letter to its Office of the Inspector General requesting a formal investigation.[17] Then, on March 4, Administrator Zeldin stated: "The money is now FROZEN and DOJ/FBI is investigating."[18] Neither EPA nor Administrator Zeldin offered any specific basis for their allegations.

EPA and other federal agencies also engaged in behind-the-scenes efforts to freeze Plaintiffs' funds. On February 17, 2025, the Office of the Deputy Attorney General ("ODAG")

---

[13] Lee Zeldin (@EPALeeZeldin), X (Feb. 12, 2025, 7:52 PM).

[14] Rapid Response 47 (@RapidResponse47), *X* (Feb. 25, 2025, 10:16 AM).

[15] SundayMorningFutures (@SundayMorningFutures), X (Feb. 23, 2025, 11:21 AM); *see also* Zack Colman, Recipient Isn't Giving in as Trump's EPA Tries to Revoke Climate Grants, Politico (Feb. 24, 2025) (collecting quotes).

[16] Lee Zeldin (@EPALeeZeldin), X (Feb. 12, 2025, 7:52 PM).

[17] Press Release, EPA, EPA Formally Refers Financial Mismanagement of $20B "Gold Bars" to Inspector General (Mar. 3, 2025).

[18] Lee Zeldin (@EPALeeZeldin), X (Mar. 4, 2025, 6:02 PM).

asked the U.S. Attorney's Office in Washington, D.C. ("USAO-DC"), apparently at EPA's behest, to open a criminal investigation into grants awarded by EPA under the GGRF.[19] Denise Cheung, the Chief of the Criminal Division at USAO-DC, after reviewing the documentation provided by ODAG, advised that no "predicate for opening such a grand jury investigation existed."[20]

That same day, FBI sent a letter to Citibank "recommend[ing]" that Citibank freeze assets in all of Plaintiffs' accounts. Dkt. 14-5 at 1-4. The letter stated that FBI had "credible information" that Plaintiffs' accounts have "been involved in possible criminal violations," *id.*, but provided no supporting evidence for that assertion. Nonetheless, Citibank froze Plaintiffs' accounts without notifying Plaintiffs or giving them a chance to respond.

According to published reports, ODAG then instructed that a second letter be sent to Citibank, this time *directing* that Citibank freeze the accounts of 28 GGRF grantees and subgrantees pursuant to a criminal investigation. *See* Dkt. 14-5 at 5-6. In response, senior officials at the DC-USAO again asserted there was insufficient evidence to justify it.[21] Consistent with her oath of office, Cheung refused to send the letter. She was forced to resign on February 18, 2025.[22]

Published reports also state that, without signoff from other prosecutors, the Interim U.S. Attorney in Washington submitted a seizure warrant application to a magistrate judge, who rejected it.[23] After that, ODAG sought a different U.S. attorney's office to carry out the warrant request to obtain a court-ordered freeze, but prosecutors in that office likewise refused to do so.[24]

---

[19] Read the Resignation Letter by Denise Cheung, a Veteran D.C. Federal Prosecutor, Wash. Post (Feb. 18, 2025).
[20] *Id.*
[21] *Id.*
[22] *Id.*
[23] Spencer Hsu, Maxine Joselow & Nicolas Rivero, FBI takes up EPA Probe Amid Pushback from Judge, Prosecutors, Wash. Post (Feb. 27, 2025).
[24] *Id.*

In parallel, Citibank began failing to comply with disbursement and processing instructions related to Plaintiffs' grant funds. *See, e.g.*, Bafford Decl. ¶¶ 42-43, 46 (describing instructions on February 14, 18, and 21 that have not been processed); Mayopoulos Decl. ¶¶ 12-14 (describing disbursement instructions on February 14 and March 10 that have not been processed). And Citibank ignored multiple requests seeking information and answers about why instructions were not being followed. *See, e.g.*, Bafford Decl. ¶¶ 44, 46, 47, 48, 50 (describing communications to Citibank between February 19 and 25); Compl. ¶¶ 83-96 (describing communications to Citibank between February 14 and March 1); Dkt. 16-2 (Citibank letter referring to "approximately $450 million in pending transfer instructions" and "demands from prime recipients and subrecipients" on February 28, March 1, and March 6 "seeking disbursement of funds or an explanation").

On March 2, 2025, EPA Deputy Administrator McIntosh sent a letter asking for EPA's Office of the Inspector General to investigate GGRF funding. *See* Dkt. 14-6. That letter asserts that Citibank was withholding Plaintiffs' funds "voluntarily," notwithstanding EPA's efforts to procure the FBI's "recommendation" and freeze the funds. *Id.* The letter generally asserts, without supporting facts, that Plaintiffs were "extraordinarily unqualified recipients," that the grants were infected with "conflicts of interest," and that the grants "improperly reduced government oversight." *Id.* EPA then sent a copy of that letter to Citibank, stating that the letter "highlights several of the egregious instances of misconduct regarding $20 billion GGRF distributions that have been improperly funneled through your financial institution." *Id.* Mr. McIntosh cited a "publicly circulated video of a former Biden Administration EPA political appointee boasting that officials were 'tossing gold bars off the Titanic.'" *Id.* at 4. This video made no reference to the GGRF program and could not have been referring to it, as the Inflation Reduction Act required all grants to be made by September 30, 2024, and EPA complied with that deadline.

In an email to Citibank at 10:02 PM on March 4, Treasury sent a communication "instructing Citibank not to disburse funds from any of the GGRF accounts prior to the end of the day Sunday, March 9, 2025," citing unspecified "concerns regarding potential fraud and/or conflicts of interest related to the [GGRF]." Dkt. 14-7. That same day, March 4, Plaintiffs received letters from Mr. McIntosh containing 36 requests for documents and information. *See, e.g.*, Dkt. 16-2 at 164-67; CGC Ex. H; Mayopoulous Decl. ¶ 27. These letters each requested a response by March 28, 2025, and stated that "[f]ailure to fully respond to this request on time will be considered a violation of the Grant Agreement and may result in further compliance actions, which may include withholding payments, suspension of funding, or other enforcement measures." *Id.*

On March 6, Citibank's counsel wrote to EPA regarding the March 4 email it received from Treasury, explaining that, as of that time, Citibank had "approximately $450 million in pending transfer instructions from the prime recipients and subrecipients," and had "received additional demands from prime recipients and subrecipients seeking disbursement of funds or an explanation." Dkt. 16-2 at 169. The email urged that "EPA establish a direct line of communication with the recipients and subrecipients regarding its future decisions." *Id*.

On March 8, Mr. McIntosh responded to Citi's March 6 communication, explaining to Citi's counsel that the information requests issued to the NCIF grantees were "part of a compliance review of [the grant recipients'] organization, activities, and funds," and that "[t]he purpose of the compliance review is to inform EPA of any further oversight issues and noncompliance as well as alert us to *potential* patterns of waste, fraud or abuse." *Id.* at 184 (emphasis added). The letter reiterated that EPA's March 2 referral to the acting inspector general "detail[ed] numerous concerns" about supposed "self-dealing, conflicts of interest, recipient qualifications, and actions taken to deliberately undermine federal government oversight" and emphasized "ongoing

investigations" in light of a "current lack of critical information." *Id.* at 185.

On March 10, 2025, at 12:28 AM, EPA sent an email to Citibank, again alluding only to "*concerns* regarding *potential* fraud and/or conflicts of interest." Dkt. 14-2 at 2 (emphases added). In a follow-up email to Citibank at 1:13 AM, Treasury directed Citibank to continue to refrain from processing payments to Plaintiffs. Dkt. 14-3. Neither EPA nor Treasury notified Plaintiffs.

**G. EPA Serves a Purported "Notice of Termination" on Each Plaintiff.**

Faced with continued refusal by Citibank to disburse Plaintiffs' funds, continued silence from both Citibank and EPA, and with no information to go on other than public reporting and the EPA's March 4 document request, Plaintiffs sued.

Climate United filed its complaint on Saturday, March 8, 2025, and immediately informed the parties that it would file a motion for TRO on the morning of Monday, March 10, which it did. Climate United's motion for TRO sought to restrain Citibank from violating the ACA and to restrain EPA from impeding Citibank's compliance with the ACA or unlawfully suspending or terminating the grant. After the Court tentatively scheduled a hearing for March 11, 2025, EPA's counsel requested a 24-hour extension as a "courtesy" so he could "speak further and in detail with our clients regarding the issues here and the alleged harm." Climate United consented.

After business hours on March 11—after the TRO hearing would have occurred—Administrator Zeldin announced EPA's termination of all NCIF grants.[25] EPA sent Climate United, CFC, and PFC materially identical letters entitled "Notice of Termination" within minutes of each other. CU Ex. 11 at 1; CFC Ex. I at 1; PFC Ex. J at 1. Each Notice states that EPA is terminating the grant based on its "authority under 2 C.F.R. §§ 200.339-40, the General Terms and Conditions of EPA assistance award agreements, the terms and conditions of the Grant Agreement,

---

[25] Press Release, EPA, Administrator Zeldin Terminates Biden-Harris $20B 'Gold Bar' Grants (Mar. 11, 2025).

and the Agency's inherent authority to reconsider prior determinations in light of new information." *Id.* The Notices do not contain any individualized determinations, and do not make any findings of noncompliance with any Terms and Conditions by any Plaintiff. Instead, they state that termination "is based on substantial concerns regarding program integrity, the award process, programmatic fraud, waste, and abuse, and misalignment with the Agency's priorities." *Id.*

"[W]hen questioned at the March 12 hearing" on Climate United's TRO motion, "EPA Defendants proffered no evidence to support their basis for the termination … or that they followed the proper procedures." Dkt. 28 at 14. "When pressed to, at a minimum, even proffer such evidence, counsel for EPA Defendants was unable to" do so, instead offering "circular" responses. *Id*. at 17. This Court then ordered EPA to "file a declaration addressing the basis for the grant termination" and "the proffer of evidence discussed at the hearing," which included information about the reported government investigations. *Id*. at 16; *see* Dkt. 22 at 22-23.

On March 17, per this Court's order, EPA submitted a declaration from EPA's Chief of Staff "setting forth the basis for the termination." Dkt. 25-1. That declaration contained no new relevant and material facts about any of the Plaintiffs. Instead, it traced the history of the amendments to the grant agreement, elaborating on EPA's general dislike for the structure of the award. *Id*. It concluded with "vague and unsubstantiated assertions of fraud," Dkt. 18 at 22, pointing, without evidence, to concerns with "program integrity," "programmatic fraud, waste, and abuse," and "the absence of adequate oversight and account controls." Dkt. 25-1.

On March 17, Climate United amended its complaint to challenge EPA's Notice of Termination and supplement the factual allegations with the documentary evidence of EPA's due process violations. On the same day, the Court held an additional hearing on CGC and PFC's TRO motions and consolidated the three cases. *See* Minute Entries (Mar. 17 & 20, 2025).

**H. This Court Issues a Temporary Restraining Order.**

On March 18, 2025, the Court entered a TRO, holding that Plaintiffs established a "substantial likelihood of success on the merits of [their] APA and due process claims," and recognizing that "without release of the grant funds, imminent harm is unavoidable." Dkt. 28 at 14, 19. The Court enjoined EPA and Citibank "from giving effect to EPA Defendants' Termination Letter[s]" and enjoined EPA from "transmitting or taking action to implement the termination of Plaintiffs' grants, including taking action that results in the transfer, re-obligation, or re-allocation of the grant funds in Plaintiffs' Citibank accounts, or issuing a Notice of Exclusive Control under its agreements." Dkt. 29 at 2. The Court enjoined Citibank from "moving or transferring Plaintiffs' grant funds to any party other than the accountholders, absent an Order from this court." *Id*.

Plaintiffs now seek a preliminary injunction to enjoin EPA from enforcing any Notice of Termination as to Plaintiffs, unlawfully suspending or terminating Plaintiffs' grants, issuing a Notice of Exclusive Control, and impeding Citibank from complying with the ACAs and disbursing funds associated with Plaintiffs' grants. Plaintiffs also seek to enjoin Citibank from violating any ACA and failing to disburse funds as instructed to Plaintiffs and their subgrantees.

**LEGAL STANDARD**

To obtain a preliminary injunction, the moving party must "make a clear showing that four factors, taken together, warrant relief: [1] likely success on the merits, [2] likely irreparable harm in the absence of preliminary relief, [3] a balance of the equities in its favor, and [4] accord with the public interest." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016).[26]

[26] Case citations and quotations are "cleaned up" unless otherwise specified.

# ARGUMENT

## I. This Court Has Jurisdiction.

In granting a TRO, this Court found that it has jurisdiction over Plaintiffs' claims. Dkt. 28 at 10-12. This Court rejected EPA's argument that jurisdiction is lacking because Plaintiffs' suits are "in essence" breach of contract suits that belong in the Court of Federal Claims. *Id.* This Court reached the right conclusion. Plaintiffs' claims are not "in essence" for breach of contract, and EPA cannot unilaterally nullify an act of Congress without judicial review by an Article III court. Instead, Plaintiffs seek to enjoin agency action that violates federal regulations, a federal statute, and the Constitution—exactly the type of case that Article III courts hear every day.

Federal district courts have jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Plaintiffs' claims meet that description, and EPA does not claim otherwise. Instead, EPA invokes an implied exception to federal jurisdiction. The Tucker Act waives sovereign immunity for claims "founded … upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). Although the Tucker Act says nothing about jurisdiction under the APA, the D.C. Circuit has interpreted it to "impliedly forbid contract claims against the Government from being brought in district court under the waiver in the APA." *Crowley Servs. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1106 (D.C. Cir. 2022). EPA claims that Plaintiffs bring contract claims subject to that implied exception.

EPA is wrong. To determine whether the Tucker Act impliedly precludes jurisdiction over non-contract claims, courts consider "both … the source of the rights upon which the plaintiff bases its claims, and … the type of relief sought (or appropriate)." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982). Both factors support this Court's exercise of jurisdiction.

*First*, Plaintiffs' claims against EPA are based in the Constitution, federal statutes, and federal regulations—not contract terms. As this Court recognized, "[u]nlike normal contractual

undertakings, federal grant programs originate in and remain governed by statutory provisions expressing the judgment of desirable public policy." Dkt. 28 at 11. Plaintiffs are suing over EPA's arbitrary, capricious, and unlawful actions in directing a freeze of Plaintiffs' grant funds and purporting to terminate the grant program and Plaintiffs' grants in violation of law. *See infra* at 27-31. Plaintiffs are also suing over EPA's violation of a federal statute, and five federal regulations: 2 C.F.R. §§ 200.339, 200.340, 200.341, 200.342, and 200.305. *See infra* at 32-35. Independent of the APA, Plaintiffs bring a Due Process claim challenging the government's extraordinary pattern of *ultra vires* actions—which are disconnected from the parties' performance under the grant—and an Appropriations Clause claim challenging EPA's re-obligation of funds in violation of a clear statutory deadline.

Further, compliance with contractual requirements—the core issue in virtually every case litigated in the Court of Federal Claims—is not at issue here. The essentially identical Notices of Termination served on each Plaintiff does not suggest that any Plaintiff breached any term or condition of its agreements or engaged in other conduct warranting termination under the terms of the grants. Each Notice uses the same stock language, and describes the *programmatic* concerns EPA has about the way the GGRF program was established, structured, and implemented. *See, e.g.*, CU Ex. 11 at 1 (citing "the absence of adequate oversight and account controls to prevent financial mismanagement," "improper or speculative allocation of funds inconsistent with EPA's oversight and fiscal responsibilities," and "the circumvention and defeat of key oversight mechanisms in the disbursement of federal funds"). Those concerns are misplaced. *See infra* at 28-30. But they also have *nothing* to do with an alleged breach of the grant contracts themselves.

*Megapulse*'s second factor—"the type of relief sought (or appropriate)"—also favors this Court's jurisdiction. Plaintiffs do not seek a money judgment or specific performance of a contract.

Instead, Plaintiffs seek to "hold unlawful and set aside agency action," 5 U.S.C. § 706(2), for which "[v]acatur is the normal remedy." *N.J. Conservation Found. v. FERC*, 111 F.4th 42, 63 (D.C. Cir. 2024). And Plaintiffs seek declaratory and injunctive relief to restore the pre-existing status quo.

To be sure, if Plaintiffs prevail on this motion, their access to NCIF grant funds held at Citibank would be restored. But that is not a basis to decline jurisdiction. *Crowley*, 38 F.4th at 1108 ("[E]ven if the plaintiff filed the complaint with an eye to future monetary awards, a district court with otherwise appropriate jurisdiction may hear the claim and grant the proper equitable relief."). Indeed, courts have rejected the same argument in recent cases raising similar challenges. *See Massachusetts v. NIH*, 2025 WL 702163, at *7 (D. Mass. Mar. 5, 2025) (district court had jurisdiction because "Plaintiffs do not bring claims for past pecuniary harms," but instead seek to "preserve their ongoing and prospective agreements with [the government]"); *AIDS Vaccine Advocacy Coal. v. U.S. Dep't of State*, 2025 WL 752378, at *8-9 (D.D.C. Mar. 10, 2025) (similar).

*U.S. Conference of Catholic Bishops v. Department of State*, 2025 WL 763738 (D.D.C. Mar. 11, 2025), is not to the contrary. The Conference contracted with the State Department to provide refugee services. Following a public announcement, State sent a letter suspending payments because they "may no longer effectuate agency priorities." *Id.* at *2. State later sent termination notices articulating the same rationale. *Id.* at *3. The Conference sued to compel State to "stop withholding the money due" for past work under and "to keep paying up" for future work, arguing the termination violated statutes and the APA. *Id.* at *3-4. The court found it lacked jurisdiction for what it deemed a breach of contract claim.

This case differs from *Catholic Bishops* in many respects. First, Plaintiffs here seek an injunction, not an order for "the Government to pay money due on a contract." *Id.* at *5. Indeed, unlike the Conference, Plaintiffs are not asking the government to pay anything: the funds here

were already disbursed, and the money is at Citibank in accounts affiliated with Plaintiffs' grants, on their balance sheets. Of note, *Catholic Bishops* left open the possibility that the plaintiffs *could* seek the other relief in their complaint, which was "notably different than that sought in the present motion." *Id.* at *8. That relief—"Hold unlawful and set aside the Refugee Funding Suspension," No. 25-cv-00465-TNM, Dkt. 29 at 40—parallels what Plaintiffs seek here. Moreover, Plaintiffs here allege that EPA's purported termination had nothing to do with the termination grounds in the grants, an allegation with no analogue in *Catholic Bishops*. Plaintiffs also bring constitutional claims that are disconnected from any breach-of-contract allegation, unlike in *Catholic Bishops*.

Even if Plaintiffs' APA claims were impliedly preempted by the Tucker Act (they are not), the Tucker Act would not affect Plaintiffs' non-APA claims. It has been long been settled that private plaintiffs may bring claims for "injunctive relief" for "violations of federal law by federal officials" under this Court's equity jurisdiction wholly apart from any federal right of action under the APA. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015); *e.g.*, *Apter v. Dep't of Health & Hum. Servs.*, 80 F.4th 579, 589-92 (5th Cir. 2023) (plaintiffs had separate "nonstatutory" cause of action to challenge statements the FDA allegedly had "no authority" to make). Even where "Congress never created a cause of action for private individuals to enforce [provision of federal law]," a plaintiff can "still obtain the relief they seek because the Court has inherent equitable power to enjoin the Government from further violating [the statute]." *Mathis v. U.S. Parole Comm'n*, 749 F. Supp. 3d 8, 17 (D.D.C. 2024); *see also Dart v. United States*. 848 F.2d 217, 224 (D.C. Cir. 1988) ("Nothing in the subsequent enactment of the APA altered" doctrine permitting equitable jurisdiction). Here, each Plaintiff brings non-APA claims invoking that equitable authority. The D.C. Circuit has interpreted the Tucker Act to preclude contract claims "from being brought in district court *under the waiver in the APA*," *Crowley*, 38 F.4th at

1106 (emphasis added)—not to narrow this Court's inherent equitable jurisdiction. As a result, Plaintiffs' non-APA claims alleging violations of federal law may proceed.

The Court should be particularly reluctant to refuse jurisdiction because the practical effect of the government's position would be to authorize EPA's nullification of a federal statute with no judicial review. Where a federal official has acted in excess of statutory authority, courts "must have power in a proper proceeding to grant relief." *American Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 110 (1902). "Otherwise, the individual is left to the absolutely uncontrolled and arbitrary action of a public and administrative officer, whose action is unauthorized by any law, and is in violation of rights of the individual." *Id.* Although EPA represents it will re-obligate the $20 billion in GGRF funds from grants it purports to terminate, nothing in EPA's position depends on that—according to EPA, even if it illegally pocketed all of that money, Plaintiffs' sole remedy would still be in the Court of Federal Claims because the money was awarded under contracts. And a breach of contract action, if successful, would not revive the NCIF program and the investments that Congress mandated; instead, contractors would merely receive a lump sum of money to compensate them for the government's breach of contract.

In sum, in view of the "well-settled" and "strong presumption" favoring "judicial review of administrative action," *Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 229 (2020), the Court should not adopt an interpretation of the APA that would allow the government to avoid any meaningful review of its violation of a federal statute, and alternatively it should permit Plaintiffs to proceed under the Court's longstanding equitable jurisdiction to enjoin unlawful government conduct. The Court should be even more reluctant to foreclose jurisdiction here because Plaintiffs also bring constitutional claims, where "only the clearest evocation of congressional intent" can "overcome the presumption" of judicial review. *Bartlett v. Bowen*, 816 F.2d 695, 699 (D.C. Cir. 1987).

## II. The Court Should Issue a Preliminary Injunction Barring EPA From Terminating Plaintiffs' Grants or Impeding Citibank From Disbursing Grant Funds.

### A. Plaintiffs Are Likely to Succeed on the Merits of Their APA Claims.

EPA's termination of each Plaintiff's grant is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under the APA in several respects. 5 U.S.C. § 706(2)(A).

#### 1. EPA's Terminations Are Arbitrary and Capricious.

The APA requires an agency to give adequate reasons for its actions and to "cogently explain why it has exercised its discretion in a given manner." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 48 (1983). EPA's Notices of Termination fails this standard. EPA's Notices offer no cogent explanation or supporting facts, and they do not mention any grounds for termination specific to Plaintiffs. They are unlawful.

First, it is settled that agency action that "merely parrot[s] the language of" a regulation "explains nothing about *why* the agency" did what it did and is therefore arbitrary and capricious for that reason. *Amerijet, Intern., Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (rejecting agency decision that "restated the rules from which [plaintiff] sought exceptions," which was "not a statement of reasoning, but of conclusion"). That is what happened here: the Notices of Termination simply incant the same formulaic language about waste, fraud, abuse, internal controls, and conflicts of interest contained in EPA's statements. But "the termination letters … offer no specific information about … investigations, factual support for the decision, or an individualized explanation for each Plaintiff. This is insufficient." Dkt. 16 at 16.

Second, EPA states that it is terminating Plaintiffs' grants "[p]ursuant to [EPA's] authority under 2 C.F.R. §§ 200.339-40, the General Terms and Conditions of EPA assistance award agreements," and "the terms and conditions of the Grant Agreement." *E.g.*, CU Ex. 11 at 1. But none of these sources support termination of Plaintiffs' grants.

Unlike prior versions of the federal regulations that permitted termination on the ground of changed priorities, the applicable regulations permit unilateral grant termination only when based on the grant award's terms and conditions, 2 C.F.R. § 200.340(a)(1), (4), and the agency must "clearly and unambiguously specify all termination provisions in the terms and conditions," *id.* § 200.340(b). The Terms and Conditions governing Plaintiffs' grants limit EPA *only* to three possible grounds for termination: (1) if Plaintiffs' "noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially Impaired;" (2) if "there is adequate evidence of Waste, Fraud, or Abuse," by Plaintiffs, which in turn requires "credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations … or a violation of the civil False Claims Act"; or (3) if Plaintiffs made a "material misrepresentation of eligibility status." CU Ex. 3 at 12 (NOA); *id.* at 12 (defining "Waste, Fraud, or Abuse"). There is no right to terminate based on changed priorities.

But the Notices offer no basis to find that any of the termination conditions occurred. They say nothing at all about Plaintiffs' conduct or actions, and EPA has not identified any evidence to support criminal charges of fraud, conflicts of interest, or misconduct. The Notices offer *no* factual basis for *any* such allegation.[27] Although EPA's Notices contain generic references to "fraud, waste, and abuse," they contain no explanation of what EPA is referring to, and no indication that *Climate United*, *CGC*, or *PFC* engaged in any "Waste, Fraud, and Abuse" that warrants

---

[27] Nor could EPA meet the two conditions necessary to show that performance of any Plaintiff's grant agreement has been "materially impaired." *See* Ex. 3 at 9, 13-15, 22, 40; 2 C.F.R. § 200.339; 2 C.F.R. § 200.208 (requiring EPA to issue "a written determination and finding" that a recipient "has failed to achieve sufficient progress" as defined in EPA's General Terms and Conditions, and issue a "separate written determination and finding" that "noncompliance cannot be remedied by imposing specific conditions" after giving the recipient an opportunity to correct the issue).

termination under the Terms and Conditions. That makes each of EPA's terminations a classic example of arbitrary and capricious agency action. *See Kansas City v. Dep't of Hous. & Urban Dev.*, 923 F.2d 188, 194 (D.C. Cir. 1991) (advising that if a grant is terminated for substantive deficiencies, "then that fact should have been made plain in the agency decisions").

Indeed, it is clear that the vague references to lowercase "fraud, waste, and abuse" in the Notices are pretextual cover to shut down a program approved by Congress that the new Administration does not like. Again, the agency terminated every NCIF grant agreement at once on March 11, 2025, issuing identical Notices to every grant recipient within minutes of each other. And again, the record leading up to the termination highlights the pretextual nature of EPA's stated invocation of waste, fraud, and abuse. On March 8, Acting Deputy Administrator McIntosh wrote on EPA's behalf that on March 4, EPA had sent each NCIF grant recipient information requests, with a deadline of March 28, as part of what he said was "a compliance review of [the grant recipients'] organization, activities, and funds." Dkt. 16-2 at 184. He further told Citibank on March 8 that "[t]he purpose of the compliance review is to inform EPA of any further oversight issues or noncompliance as well as alert us to *potential* patterns of fraud, waste or abuse." *Id.* (emphasis added). The letter added that EPA had sent a letter to the Office of Inspector General regarding "concerns," and that there was then a "*lack* of *critical* information" as well as "*ongoing* investigations." *Id.* at 185 (emphasis added). Two days later, on March 10, EPA again alluded to "*concerns* regarding *potential* fraud and/or conflicts of interest." Dkt. 14-2 at 2.

There is no reasonable explanation for Acting Deputy Administrator McIntosh to have issued termination Notices the very next day—weeks before the March 28 deadline EPA had set for its "compliance review"—when EPA had just acknowledged a "lack of critical information." Dkt. 16-2 at 185. Administrator Zeldin underscored the point when, after this Court issued its TRO,

he reiterated that he "will not rest" until the grant funds "are returned to the U.S. Treasury."[28] The record thus demonstrates arbitrary and capricious agency action, and pretextual justifications. *See Dep't of Commerce v. New York*, 588 U.S. 752, 784 (2019) (affirming remand to agency where "the evidence tells a story that does not match the explanation the Secretary gave for his decision" because "[a]ccepting contrived reasons would defeat the purposes of … judicial review").

Third, EPA cites the generalized need for "rigorous oversight and accountability in the administration of public funds" and concerns about a lack of "oversight and account controls." CU Ex. 11 at 1. EPA does not cite any legal basis to terminate Plaintiffs' grants on these grounds. The applicable regulations do not permit termination on these bases, because they are not "clearly and unambiguously specif[ied]" in the grant agreement. 2 C.F.R. § 200.340(b); *see id.* § 200.340(a)(1), (4). Nor does EPA offer any factual basis to suggest that *Climate United*, *CGC*, or *PFC* has done anything to raise concerns about oversight and accountability. Vague and unsubstantiated assertions cannot justify termination of a grant, particularly where the termination upends well-founded reliance interests. *See AIDS Vaccine Advocacy Coal.*, 2025 WL 752378, at *10 (rejecting termination of grants due to oversight concerns when grantees were acting "pursuant to contractual terms"); *New York v. Trump*, 2025 WL 715621, at *12 (D.R.I. Mar. 6, 2025) (rejecting funding freeze based on "unsubstantiated 'wasteful or fraudulent expenditures'"). And EPA does not explain why the program's many oversight and accountability mechanisms are insufficient, particularly when they provide more real-time visibility than the Treasury ASAP system that is typically used. *See supra* at 12; Bafford Decl. ¶¶ 31, 33. EPA's concerns thus cannot justify termination. *State Farm*, 463 U.S. at 43 ("offer[ing] an explanation for its decision that runs counter to the evidence before" the agency is arbitrary and capricious).

---

[28] Lee Zeldin (@EPALeeZeldin), X (Mar. 18, 2025, 10:21 PM) (emphasis omitted).

Fourth, EPA cites its "inherent authority to reconsider prior determinations in light of new information." Dkt. 13-1. EPA cites no basis for such authority to reconsider prior grants, much less when doing so would violate applicable regulations and the grant's terms. And EPA identifies no "new information" about Plaintiffs that has come to light. To the contrary, EPA terminated all NCIF grants on the same day, using the same notice, based on supposed program-wide concerns—less than a year after awarding the grants following a rigorous review, when the program's structures and aims were fully disclosed and fully vetted along the way.[29]

Even if EPA had authority to terminate the grants based on the right to "chang[e] its course," it "is obligated to supply a reasoned analysis for the change." *Sierra Club v. Salazar*, 177 F. Supp. 3d 512, 537-58 (D.D.C. 2016); *see also Verizon v. F.C.C.*, 740 F.3d 623, 636 (D.C. Cir. 2014) ("[R]easoned decision-making ordinarily demands that an agency acknowledge and explain the reasons for a changed interpretation."). EPA does not offer any explanation, much less a reasoned one, for its stark about-face in just a year's time. More is required, especially given Plaintiffs' "good-faith reliance" on EPA's prior position. *See Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156-57 (2012); *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 224 (2016); Bafford Decl. ¶¶ 11, 72, 74; Buendia Decl. ¶ 6; Donovan Decl. ¶¶ 16-23; Decl. of Ari Matusiak ¶¶ 16-18 ("Matusiak Decl.").

---

[29] EPA refers in passing to a purported lack of "sufficient protections to guard against potential violations of the Constitution, particularly the Appointments Clause and private nondelegation doctrine." Ex. 11 at 1-2. Neither the Appointments Clause nor the private nondelegation doctrine is implicated by this grant agreement. No one at Citibank, Climate United, CGC, or PFC is an officer of the United States, which is a necessary prerequisite for the Appointments Clause to apply. *See Lucia v. SEC*, 585 U.S. 237, 241 (2018). And neither Citibank nor Climate United exercises the type of delegated regulatory authority that would trigger the private non-delegation doctrine. *See Alpine Securities Corp. v. FINRA*, 121 F.4th 1314, 1325 (D.C. Cir. 2024).

**2. EPA's Notices of Termination Violate Federal Regulations.**

EPA's terminations are unlawful under the APA for the additional reason that they violate federal regulations. "[A]n agency action may be set aside as arbitrary and capricious if the agency fails to 'comply with its own regulations.'" *Nat'l Envtl. Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014). Here, EPA's Notices represent that EPA is exercising its authority under 2 C.F.R. §§ 200.339 and 340 and serving a notice of termination under 2 C.F.R. § 200.341. But the Notices violate all three regulations, as well as 2 C.F.R. § 200.342.

First, 2 C.F.R. § 200.339 recites:

> "The Federal agency … may implement specific conditions if the recipient or subrecipient fails to comply with the U.S. Constitution, Federal statutes, regulations, or terms and conditions of the Federal award. … When the Federal agency … determines that noncompliance cannot be remedied by imposing specific conditions, the Federal agency … may … terminate the Federal award."

Here, the Notices contain no finding that "the recipient or subrecipient fail[ed] to comply with the U.S. Constitution, Federal statutes, regulations, or terms and conditions of the Federal award." *Id.* Further, while the Notices include a vague reference to "material deficiencies" and assert that "these deficiencies … cannot be remedied by imposing specific conditions," EPA provided no explanation. CU Ex. 11 at 1. Plaintiffs have no idea what the "deficiencies" are or why they cannot be remedied, and EPA does not link them to any legal obligations. Further, although EPA asserts that there was "noncompliance [that] cannot be remedied by imposing specific conditions," it fails to explain that assertion and simultaneously states EPA will "re-obligate lawfully appropriated funds within the GGRF program with enhanced controls." CU Ex. 11 at 2. EPA fails to explain why those "enhanced controls" could not be imposed here.

Second, 2 C.F.R. § 200.340(a) prescribes when a "Federal award may be terminated." As relevant here, EPA may terminate a grant if a recipient "fails to comply with the terms and

conditions of the Federal Award." *Id.* § 200.340(a)(1). Plaintiffs have not failed to comply with the Terms and Conditions of their grants, and EPA does not argue otherwise.

EPA also may terminate a grant "pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." *Id.* § 200.340(a)(4). The termination here does not comply with this provision either. The regulation clearly states that EPA may not terminate the grant because it does not "effectuate[] program goals or agency priorities" *unless* the termination is "*pursuant to the terms and conditions of the Federal award*." *Id*. (emphasis added). The grant agreements here specify that the grants can be terminated for three reasons—none of which is a change in "program goals or agency priorities." *See supra* at 9-10 (describing three exclusive grounds for termination). Besides, even where (unlike here) the agency may terminate an award due to inconsistency with "program goals or agency priorities," that is permissible only when "clearly and unambiguously specif[ied]" in the grant's terms and conditions, 2 C.F.R. § 200.340(b), *and* "to the extent authorized by law." *Id*. Here, EPA's terminations do not satisfy either of these requirements.

Third, 2 C.F.R. § 200.340(b) provides: "The Federal agency … must clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award." The Terms and Conditions of Plaintiffs' grants clearly and unambiguously describe "only" three grounds for termination. CU Ex. 3 at 41. But EPA's Notices do not rely on those three grounds, and instead describe many others—none of which is "clearly and unambiguously specified" in the relevant Terms and Conditions. So EPA's terminations violate this rule too.

Fourth, 2 C.F.R. § 200.341(a) states: "The written notice of termination should include the reasons for termination." As described above, EPA's Notices do not do so. Generic references to potential "waste" and "accountability," with no supporting evidence, do not suffice

Finally, 2 C.F.R. § 200.342 requires that upon "termination," an agency "must provide the recipient with an opportunity to object and provide information challenging the action." That did not happen here: EPA terminated the grants without warning and without hearing from Plaintiffs.

**3. EPA's Notices of Termination Violate the Inflation Reduction Act.**

"[T]he President may not decline to follow a statutory mandate or prohibition simply because of policy objections." *In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013). Here, Congress appropriated GGRF funds to EPA to be obligated by September 30, 2024. 42 U.S.C. § 7434. EPA ran the competitive process required by the statute, granted the awards, obligated the funds, and disbursed them. It would violate the statutory directive set forth in Congress's enactment to undo the program, and EPA has zero statutory authority to take the money back. *In re Aiken Cnty.*, 725 F.3d at 266 ("Prosecutorial discretion does not include the power to disregard other statutory obligations that apply to the Executive Branch, such as statutory requirements to issue rules, … or to pay benefits, or to implement or administer statutory projects or programs").

Indeed, even if the Administrator canceled the program *before* the grants were made, the Administrator's actions would be illegal because they would conflict with Congress's directive to obligate the appropriated funds. *See Train v. City of New York*, 420 U.S. 35, 42-43 (1975) (holding that EPA lacked authority to impound appropriated funds based on policy disagreement with Congress). Here, the funds in question were not just appropriated, as in *Train*, but disbursed to grantees. They are now the grantees' funds. Congress provided no authority to take them back.

EPA's termination letters represent that the agency will seek "to re-obligate lawfully appropriated funds within the GGRF program." CU Ex. 11 at 2; CGC Ex. I at 2; PFC Ex. J at 2. This is irrelevant for two reasons. *First*, the funds have not just been appropriated; they have been obligated and disbursed to grantees. Nothing in the Inflation Reduction Act authorizes EPA to claw back these funds and re-obligate them. *Second*, EPA's action violates the Inflation Reduction

Act's deadline. By terminating all NCIF grants and re-obligating all the funds, EPA would be effecting a new grant-awarding program in 2025—after the September 30, 2024 deadline for GGRF award. 42 U.S.C. § 7434(a)(1)-(3).

Moreover, there is reason to doubt whether these funds will be re-obligated. As in *AIDS Vaccine*, "the record here shows that Defendants are acting to rescind or defer the funds Congress has appropriated and have no intent to spend them." 2025 WL 752378, at *15. As in *AIDS Vaccine*, there are "multiple public statements in which the President and other senior officials have said Defendants' actions are being undertaken to end [GGRF] funding" altogether. *Id.* Administrator Zeldin consistently referred to the GGRF as the "Biden Harris Administration's $20 billion 'gold bar' scheme," falsely claiming that EPA "found $20 billion dollars [sic] parked at a financial institution by the Biden-Harris Administration to fund partisan pet projects."[30] President Trump referred to one of Plaintiffs' awards as an example of alleged "flagrant waste[s] of taxpayer dollars" during his March 4, 2025 speech to Congress. And again, the Court should consider what Administrator Zeldin stated after the TRO—that he would "not rest until these hard-earned taxpayer dollars are returned to the U.S. Treasury."[31]

**4. EPA's Suspension of the Grants Violates the APA.**

Before EPA terminated the grants, EPA effectuated a suspension of the grants, including by inducing FBI to send its "recommendation" to Citibank and inducing Treasury to direct Citibank to freeze Plaintiffs' assets. That suspension also violated the APA and the Constitution. To the extent EPA contends that its illegal suspension remains in force even if its illegal termination is enjoined, that illegal suspension should be enjoined as well.

---

[30] Press Release, EPA, ICYMI: Administrator Lee Zeldin Announces EPA Found Billions of Dollars Parked at an Outside Financial Institution by Biden Administration (Feb. 15, 2025).
[31] Lee Zeldin (@EPALeeZeldin), X (Mar. 18, 2025, 10:21 PM) (emphasis omitted).

The ACAs authorize only one way for EPA to direct Citibank to disregard disbursement requests from Plaintiffs' accounts: by delivering a Notice of Exclusive Control. CU Ex. 8 § 2. That, in turn, requires the conditions for terminating the grant be satisfied. CU Ex. 9 at Ex. A. EPA never sent any Notice of Exclusive Control; it could not, because the conditions are not satisfied.

No source of law authorized EPA to induce the FBI to send an intimidating "recommendation" to Citibank to freeze funds related to Plaintiffs' grants. Nor was EPA authorized to induce Treasury to direct Citibank to freeze those funds. The FAA permits Citibank to freeze assets only "in accordance with the [ACAs]," Dkt. 21 at Ex. A, § I.B.4, and only in response to "lawful instructions or directions" from Treasury, *id.* § 5.A. Here, the freeze was not undertaken "in accordance with" the ACAs. And Treasury's "instructions or directions" to freeze funds related to Plaintiffs' grants were not lawful because they had no legal or factual basis, *see supra* at 27-31, and violated Plaintiffs' due process rights, *see infra* at 41-44.

The suspension also violated federal regulations. Under 2 C.F.R. § 200.305(b)(6), EPA may not withhold payment for allowable costs during the period of performance unless it is: required by Federal statute or regulations; the recipient "has failed to comply with the terms and conditions" of the award; or the recipient is "delinquent in a debt to the United States." None of those conditions is satisfied. Where funding is withheld because a recipient failed to comply with terms and conditions of the award, the agency may "[t]emporarily withhold payments" only where it "determines that noncompliance cannot be remedied by imposing specific conditions." 2 C.F.R. § 200.339. That condition is also not satisfied as there was no violation of terms or conditions.

**5. EPA's Proffer Confirms Plaintiffs Will Prevail on Their APA Claims.**

At the March 12 hearing, this Court ordered EPA to file a declaration "setting forth the basis for the termination," including "evidence of the fraud, waste, and abuse, or … credible evidence that Climate United violated criminal law [or] the False Claims Act." Dkt. 22 at 30.

EPA's response, a sworn declaration from Chief of Staff Eric Amidon (Dkt. 25-1), was not among the "grounds upon which the agency acted" when it purported to terminate Climate United's grant (or the grants for CGC or PFC), so it cannot be used to "sustain[]" the agency's decision. *See SEC v. Chenery Corp.*, 318 U.S. 80, 95 (1943); *State Farm*, 463 U.S. at 50 (noting court "may not accept" any "post hoc rationalizations" for agency action).

Even so, the Amidon Declaration confirms that EPA has still "proffered no evidence to support the basis for … the sudden terminations, or that they followed the proper procedures," Dkt. 28 at 14. It repeats many of the same generic and irrelevant grounds EPA offered in the Notice, and cites the same investigations into "potential" misconduct that have been publicly reported. Yet it offers no *evidence*, much less *credible evidence*, of any misconduct, and contains no basis to terminate any Plaintiff's grant. *See* Dkt. 25-1 ¶ 42-43. Indeed, EPA never explains why it makes sense to terminate grant programs *before* its review and other investigations are completed. *See* Dkt. 28 at 16-17. The mere existence of the reviews and investigations, which are tainted by dubious circumstances, do not support termination. *See supra* at 15-19.

The few statements specific to Plaintiffs do not support termination. As to PFC, the Amidon Declaration includes no individualized allegations at all.

In the only statement specific to Climate United, the declaration notes that an unspecified "media article" identified "potential conflicts of interest" because Climate United's CEO served as a community organizer on the Obama campaign and as an assistant in the Office of Management and Budget in the Obama Administration, and Climate United's Chief Strategy Officer worked as a contractor at the Department of Energy during the Biden Administration. Dkt. 25 ¶ 35; *see* Bafford Decl. ¶ 16 & n.1. These individuals' prior employment is not "credible evidence of the commission of a violation of Federal criminal law involving" a "conflict of interest." Ex. 3 at 13.

Indeed, it does not even qualify as a conflict of interest under applicable EPA regulations or under EPA's own policy referenced in the award's Terms and Conditions. Ex. 3 at 44. And these work histories did not impact Climate United's selection because "Climate United did not have any relationship with anyone inside EPA or, to its knowledge, with any reviewers across the agencies during the application and selection process." Bafford Decl. ¶ 16.

As to CGC, the Amidon Declaration references "concern that the GGRF program had been affected by conflicts of interest," referencing a June 27, 2024 ethics complaint "recently resubmitted" on March 7, 2025 regarding a Biden Administration climate advisor who had served on CGC's board prior to joining the administration and rejoined it "in 2023 while the organization was applying for GGRF funding." Dkt. 25-1 ¶ 34. But Mr. Hayes's employment in the administration similarly presented no "conflict of interest" with respect to CGC's selection as a GGRF grantee, as Mr. Hayes had no role in the Administration in any respect in working on the GGRF provisions that were ultimately included in the Inflation Reduction Act, and no role on the implementation of the program, and could not have had any role in selection of CGC has he departed prior to the NOFO being issued. Hopson Decl. ¶ 23.

The declaration also references the same unspecified "media article" identifying a "potential conflict[] of interest[]" because a former policy director at CGC left CGC in 2021 to "work at President Biden's Climate Policy Office on GGRF implementation." Dkt. 25-1 ¶ 35. This too is publicly available information, and omits that the referenced individual worked in the Climate Policy Office and then at EPA, so any credible evidence of a conflict of interest would be in EPA's hands. The Amidon Declaration cites no such evidence, however.

The Amidon Declaration cites GGRF's structure, including use of a financial agent and subgrantees. *See* Dkt. 25-1 ¶ 39. These are not grounds for terminating Plaintiffs' grants. As EPA

described from the outset, they are features designed to make the "green bank" concept function properly—not bugs. *See* Bafford Decl. ¶¶ 29-32. Moreover, Plaintiffs were "not involved in EPA's decision to include the financial agent concept" in the NOFO and "had no role in the selection of the financial agent, which was coordinated" by EPA and Treasury. *E.g.*, *id.* ¶ 30.

The Amidon Declaration describes the content and timing of the NOA and ACA amendments, suggesting they improperly limit EPA's ability to terminate and oversee the grant. Dkt. 25-1 ¶¶ 17-21, 26, 37, 39, 41. Yet again, EPA's statements contain no fact or law that would support terminating any Plaintiff's grant. And EPA ignores that the amendments' clarifications were expected, routine, transparent, and designed to ensure program success. EPA also ignores that the structure and grant terms here provide the agency with *more* transparency, and include many ways for EPA to both conduct oversight and prevent mismanagement. *See* Bafford Decl. ¶¶ 21, 33. Tellingly, EPA offers no legal or factual basis to terminate a grant simply because new leadership would prefer a do-over in designing and implementing the program.

Finally, EPA cites "misalignment" with certain of "leadership['s] … policies and priorities." Dkt. 25-1 ¶ 1, 40-41, 44; *see also id.* ¶¶ 37, 39.[32] EPA does not cite any regulation, statute, grant term, or legal authority that permits it to terminate grants based merely on a change in priorities. Instead, as EPA seems to acknowledge, *id.* ¶¶ 28-30, the regulations that apply to *Plaintiffs'* grants do not permit termination on policy grounds because those grounds are not stated in the terms of the awards. *See* 2 C.F.R. § 200.340. In response to the Court's explicit Order, EPA still has not provided any evidence to satisfy any of those grounds.

---

[32] EPA ignores that the NCIF program supports three of the Administrator's new stated priorities: "Clean Air, Land, and Water for Every American," "Restore American Energy Dominance," and "Protecting and Bringing Back American Auto Jobs." Press Release, EPA, EPA Administrator Lee Zeldin Announces EPA's "Powering the Great American Comeback" Initiative (Feb. 4, 2025).

### B. Plaintiffs Are Likely to Succeed on Their Appropriations Clause Claims.

EPA's terminations violate the Appropriations Clause, which states: "No Money shall be drawn from the Treasury, but in consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. "[A]n appropriation is simply a law that authorizes expenditures from a specified source of public money for designated purposes." *CFPB v. Cmty. Fin. Servs. Ass'n*, 601 U.S. 416, 424 (2024). The Inflation Reduction Act's provisions authorizing $27 billion to be spent under the GGRF program are "appropriations" under that definition.

Congress was explicit in the GGRF: EPA was required to obligate all GGRF grant funds through competitive processes, following the criteria Congress imposed, by September 30, 2024. And because "grants" are legally binding agreements, *see Henke v. U.S. Dep't of Com.*, 83 F.3d 1445, 1451 (D.C. Cir. 1996), and Congress presumably expected EPA to act lawfully, Congress anticipated that the grants that were in existence as of September 30, 2024 would remain in place so long as EPA did not have a legal basis for terminating them. But by cancelling all the grants unlawfully, based on new policy priorities, and re-obligating the funds according to those new priorities, EPA violates Congress's directive about how to spend public money—*i.e.*, on clean-energy grants that meet certain criteria and are awarded before September 30, 2024. EPA therefore violated the Appropriations Clause's core promise that "public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents." *OPM v. Richmond*, 496 U.S. 414, 427-28 (1990).

EPA's action also raises grave separation-of-powers concerns. "The Appropriations Clause is … a bulwark of the Constitution's separation of powers among the three branches of the National Government." *Dep't of Navy v. FLRA*, 665 F.3d 1339, 1347 (D.C. Cir. 2012). "It is particularly important as a restraint on Executive Branch officers: If not for the Appropriations Clause, 'the executive would possess an unbounded power over the public purse of the nation; and might apply

all its monied resources at his pleasure.'" *Id.* (quoting 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1342, at 213-14 (1833)). By terminating GGRF grants awarded based on EPA's policy priorities as of September 30, 2024, then using those funds for awards based on EPA's policy priorities after that date, EPA would be violating Congress's clear direction. This unilateral authority to re-obligate government funds, directly contrary to the intent of Congress, is precisely the outcome the Appropriations Clause was designed to prevent.

### C. Plaintiffs Are Likely to Succeed on Their Due Process Claims.

The Fifth Amendment provides that "[n]o person shall … be deprived of … property, without due process of law." U.S. Const. amend. V. "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner" before being "finally deprived of a property interest." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). EPA repeatedly failed to provide Plaintiffs with any notice or any opportunity to be heard before depriving it of its vested property rights in NCIF grant funds. That violated due process.

Plaintiffs have a protected property interest in the grant funds EPA awarded under the NCIF because they are in Citibank accounts in Plaintiffs' names or affiliated with Plaintiffs' grants, and subject to their control. These are not funds in the Treasury that Plaintiffs have a future legal interest in obtaining; they are Plaintiffs' funds right now. NCIF grant "funds were fully obligated by EPA" under the notices of award. Bafford Decl. ¶ 26; *see* Ex. CU 3 at 1 (confirming obligation on August 8, 2024). They were deposited at Citibank, and, since then, the funds have belonged to Plaintiffs and their subgrantees. Bafford Decl. ¶ 27; *see* CU Ex. 8 ¶ 1(c) (describing grantees as the "entitlement holder[s] with respect to all financial assets"); CU Ex. 3 at 56 (authorizing grantees to "legally obligate[]" grant funds "for financial obligations" to third parties). Though EPA retains "a perfected security interest" in the grant funds—an interest "grant[ed] to EPA" by Plaintiffs, Ex. 3 at 56—EPA cannot exercise its security interest except in limited specific

circumstances and lacks discretion to revoke those funds unilaterally. *See supra* at 11-12.

EPA violated Plaintiffs' right to due process by freezing and then terminating Plaintiffs' grant funds without notice or an opportunity to be heard. EPA spurred the FBI to launch an investigation and "recommend" that Citibank freeze Plaintiffs' assets: Administrator Zeldin publicly announced that he would "work with the Justice Department" to ensure EPA "reassume[s] responsibility for all of these funds."[33] Similarly, EPA is responsible for Treasury's decision to direct Citibank to freeze Plaintiffs' funds, as Treasury itself has made clear. *See* Dkt. 14-7.

The asset freeze—for which EPA is responsible—violated the Due Process Clause. Assets cannot be frozen, even temporarily, without due process. *United States v. E-Gold, Ltd.*, 521 F.3d 411, 416 (D.C. Cir. 2008). "[T]he general rule" is that due process "requir[es] predeprivation notice and hearing." *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 53 (1993). That certainly did not happen here. EPA failed to provide Plaintiffs with notice of the freeze, then repeatedly ignored Plaintiffs' requests for information once their grant funds were inaccessible.

While post-deprivation notice and a hearing may suffice in "extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after" the deprivation of property, *id.*, EPA has never explained or suggested why this case presents such an "extraordinary situation"—and in any event, Plaintiffs did not receive post-deprivation process. EPA refused repeated requests for information *after* Plaintiffs' grant funds were secretly frozen as a result of the FBI "recommendation" on February 17. And Plaintiffs were kept in the dark on March 4, when EPA caused Treasury to order the freeze to continue until March 9, Dkt. 14-7, and on March 10, when EPA ordered the freeze to continue "until further notice." Dkt. 14-2. *Citibank*, not EPA, finally revealed the truth in its brief in this Court on March 12.

[33] Lee Zeldin (@EPALeeZeldin), X (Feb. 12, 2025, 7:52 PM).

Under the egregious circumstances of this case, the Court should find that EPA's actions violate the Due Process Clause. The facts are extraordinary, and bear repeating.

To obtain a seizure warrant, a government official must submit a sworn affidavit to a judge upon probable cause; once the warrant issues, the affected party receives notice of the seizure and an opportunity to contest it. *See* Fed. R. Crim. P. 41(d)(1), (g). Here, the government did not obtain a seizure warrant (and published reports indicate that the U.S. Attorney attempted to get a seizure warrant and failed). Instead, FBI sent a purported "recommendation" letter to Citibank to freeze Plaintiffs' funds for 30 days. This purported "recommendation" was not based on a sworn affidavit. FBI lacked probable cause that any crime was committed. No neutral magistrate approved the seizure (indeed, a neutral magistrate rejected it). Citibank, upon receiving this letter from FBI, predictably acquiesced, freezing Plaintiffs' accounts. But Plaintiffs received no notice or hearing. In the days that followed, EPA repeatedly ignored Plaintiffs' requests for information about what was happening and why, failed to engage when Plaintiffs attempted to initiate discussions, refused to meet, and stated publicly that Citibank was acting "voluntarily." *See* Bafford Decl. ¶¶ 45 (Feb. 20), 49 (Feb. 27), 52 (Mar. 4), 54 (Mar. 8), 55 (Mar. 10); Dkt. 14-6.

Meanwhile, EPA worked with Treasury to "direct" and "instruct" Citibank to maintain, and then to extend, the freeze on Plaintiffs' accounts. Yet EPA informed Plaintiffs about none of this, and Plaintiffs never received an opportunity to be heard.

EPA's subsequent attempt to terminate Plaintiffs' grants was a continuation of the illegal freeze, and part and parcel of the same due process violation. EPA issued its facially unlawful termination notices on the evening of March 11 in a blatant effort to moot the TRO hearing this Court had set for the next day. EPA was able to do so only because counsel for Climate United agreed, out of professional courtesy, to EPA's request for a 24-hour extension of time to respond

to Climate United's TRO motion. That context makes it particularly clear that EPA's illegal termination should be understood as an extension of the illegal freeze: EPA decided that it would unilaterally freeze Plaintiffs' assets without legal justification and without due process, and, on the eve of a court hearing to address that freeze, EPA served a facially illegal "termination" letter to attempt to insulate its unlawful asset freeze from judicial review. That effort must fail.

**D. Plaintiffs Will Suffer Irreparable Harm Absent Injunctive Relief Against EPA.**

As the Court has recognized, Defendants' actions have caused and will continue to cause Plaintiffs irreparable harm that warrants the grant of injunctive relief.

**1. Climate United Will Suffer Irreparable Harm.**

Climate United faces numerous irreparable harms from EPA's action.

First, financial harm can "constitute irreparable harm … where the loss threatens the very existence of the movant's business." Dkt. 28 at 21 (citing *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). EPA's actions have resulted in "extreme hardship" to Climate United that threatens its "very existence." *Nat'l Ass'n of Mortg. Brokers v. Board of Governors of Fed. Res. Sys.*, 773 F. Supp. 2d 151, 179 (D.D.C. 2011); *see Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 2025 WL 597959, at *18 (D.D.C. Feb. 25, 2025) (granting preliminary injunction where funding freeze impacted organizations that "rely on continued funding in order to keep their doors open"). Climate United meets this standard. It will also suffer nonquantifiable harm to its reputation and mission that independently qualifies as irreparable harm.

Other than emergency charitable recoverable grants, Climate United has no funding beyond its NCIF grants. Bafford Decl. ¶¶ 4, 59. Thus, "if Climate United does not obtain a preliminary injunction, and is forced to wait to have access to its grant funding restored, Climate United would not survive as it exists today and would need to wind down its operations." *Id.* ¶ 5. "Climate United likely would be forced to lay off substantially all staff and may not be able to

reopen for business again, given the lost staff, deals, and reputational harm." *Id.* "Without access to its funds or a viable alternative funding source," Climate United likely "would not be able to litigate this case to judgment," even if its claims are meritorious. *Id.*

Climate United faces an imminent risk of not being able to pay payroll or health, vision, and dental benefits, life insurance, and short- and long-term disability insurance for its employees. *Id.* ¶ 62. It has already been forced to defer compensation for certain employees, terminate multiple vendors, cancel travel, and instruct non-essential lawyers, accountants, and consultants to cease work to preserve its available cash. *Id.* It also risks not being able to pay rent or insurance for select offices or to pay contractors who perform necessary roles like auditing financial statements, maintaining IT security and infrastructure, and providing legal services. *Id.* ¶ 67.

Moreover, Climate United will suffer irreparable economic harm because the withdrawal of grant funding will "perceptibly impair[] the organization's programs" and "make it more difficult" for Climate United "to accomplish [its] primary mission." *League of Women Voters*, 838 F.3d at 8-9. For example, Climate United has already awarded pre-construction financing for a major solar power project in Arkansas and launched a project to purchase and lease battery electric heavy-duty trucks in California. Neither project could go forward without continued access to grant funds. Bafford Decl. ¶¶ 69-70. And future projects, such as the 22 awards across 18 states that were recently approved as part of the Climate United NEXT program, would not be funded. *Id.* ¶ 68. Importantly, there is no way Climate United could fund these projects unless it obtained a *preliminary* injunction. *Id.* ¶¶ 68-70. Again, without preliminary relief, Climate United will have no choice but to abandon its operations. *Id.* It would be unlikely to litigate this case to final judgment. And its projects—those Congress sought to bring about—would never materialize.

As a consequence of the dire consequences of grant termination, Climate United has searched, and continues to search, for emergency financial assistance. *See* Dkt. 26 at 2 (discussing potential receipt of emergency recoverable charitable grant). It has done so because, as the Court has recognized, Climate United's "operations and projects all derive from the grant money, which is used to pay employees, pay rent, and fund projects." Dkt. 28 at 10. For that reason, absent an injunction "release[ing] the grant funds, imminent harm is unavoidable." Dkt. 28 at 19.

Climate United's harm also qualifies as irreparable for two additional reasons. First, courts find irreparable harm where "the subject of the action involves a specific fund"—and the issue here is Climate United's access to specific Citibank accounts containing specific funds. *Destiny USA Holdings, LLC v. Citigroup Glob. Mkts. Realty Corp.*, 69 A.D.3d 212, 217 (N.Y. App. Div., 4th Dep't 2009) (granting preliminary injunction against Citigroup when Citigroup failed to honor draw requests from specific account); *see Deem v. Baron*, 2018 WL 377286, at *2 (D. Utah Jan. 11, 2018) ("Many cases hold that a monetary damages claim directed at a specific fund is viable as an irreparable injury worthy of an injunction because the property … is the true subject of the action."). Second, courts find irreparable harm where a party is unable to access funds awarded pursuant to an act of Congress—which is precisely the situation here. *See New York v. Trump*, 2025 WL 715621, at *15 (finding plaintiffs "unquestionably" suffered "significant and irreparable harm" where they "continue to experience interruptions to access and … draw[] down funds from grants funded by" the Inflation Reduction Act).

Even if Climate United could somehow keep the lights on until this case reaches final judgment, it would still be irreparably harmed without a preliminary injunction. Climate United's work is highly specialized and requires sophisticated and skilled investment professionals "with expertise in credit underwriting, structuring, and asset management," and "experience in the

private credit markets to assess expected and unexpected risks based on prior knowledge of similar transactions, market data, and industry dynamics." Bafford Decl. ¶¶ 63-64. Without stable funding, these individuals are likely to leave and find other employment, and Climate United will not be able to attract quality replacements—even if its access to funds is later reinstated. *Id*. ¶¶ 64-65. This "loss of talent and the inability to recruit and retain employees to build—or even maintain—[a plaintiff's] business" constitutes irreparable harm. *Luokung Tech. Corp. v. Dep't of Def.*, 538 F. Supp. 3d 174, 194 (D.D.C. 2021) (collecting cases).

Climate United's reputation will also be irreparably and irreversibly harmed absent access to its grant funds. Without secure funding, Climate United will be unable to attract the high-quality partners and co-investors, and secure the attractive deal terms, necessary to develop and carry out clean energy projects. Bafford Decl. ¶¶ 72-75; *see, e.g., Beacon Assocs., Inc. v. Apprio, Inc.*, 308 F. Supp. 3d 277, 288 (D.D.C. 2018) ("termination for alleged default" would have clear reputational harms). Indeed, multiple current and potential partners have expressed unwillingness to work with Climate United while its funding is frozen—including a manufacturer who paused all engagement until it could be "more confident that funds will not be clawed back," and a partner who said it was "not allocating resources to [Climate United's] RFP" until there is "resolution of some of the uncertainty" around NCIF funds. Bafford Decl. ¶ 75. This reputational damage reduces the quality and quantity of potential projects Climate United can pursue and the willingness of private capital to co-invest in those projects. That harm qualifies as irreparable. *Atlas Air, Inc. v. Int'l Brotherhood of Teamsters*, 280 F. Supp. 3d 59, 103 (D.D.C. 2017).

**2. CGC Will Suffer Irreparable Harm.**

For similar reasons, CGC and its subgrantees have suffered and will continue to suffer irreparable harm absent injunctive relief, including injury to reputation, loss of goodwill, an inability to implement ongoing programs, loss of business opportunities and clients, harm to their

organizational missions, and harm from loss of access to a congressionally authorized program.

***Injury to CGC's programs and CGC's lost partnerships and investment opportunities.*** Defendants' conduct deprived CGC and its subgrantees of known and unknown opportunities and partnerships. *See Nalco Co. v. EPA*, 786 F. Supp. 2d 177, 188 (D.D.C. 2011). These sorts of losses when suffered by a non-profit organization—like CGC—are "different in kind from economic loss suffered by a for-profit entity" and deemed irreparable even if not franchise-terminating. *Tex. Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 242-44 & n.7 (D.D.C. 2014) ("Plaintiffs may not be driven out of business, but the programs they provide may be.").

As CGC explains, the allegations have already harmed CGC's efforts to partner with investors, financial institutions, and vendors, preventing it from carrying out its mission:

- CGC's program to partner with nascent green banks across the country, the Network Loan Program, has been stopped in its tracks. Decl. of Stephen Brown ¶¶ 6-10 ("Brown Decl."). EPA's allegations and Administrator Zeldin's unlawful efforts to terminate the GGRF have already led at least one local partner, a green bank in the Midwest, to refuse funds from CGC. *Id.* ¶ 9. Other participants have delayed joining CGC's program or deploying *any* funds under loans received from it, rather than carry out the investments as planned, stalling the growth of CGC's network. *Id.* ¶¶ 6-7, 11.

- Another major CGC initiative, the Municipal Investment Fund, has also been hamstrung by the Defendants. Buendia Decl. ¶¶ 7-14. The program launched in January, with applications closing on March 5. *Id.* ¶ 5. Following EPA's accusations against GGRF participants and Citi's freeze on CGC's funds, CGC staff began to face questions and concerns from potential applicants who feared that "the new EPA administration's attempts to freeze GGRF [would] impact the viability" of CGC's program, or expressed concern that the "likelihood of recapture" of CGC's funds meant that CGC's program did not have "a high likelihood of success." *Id.* ¶ 9. Ultimately, CGC received applications from less than 20% of the interested parties. *Id.* ¶ 8.

- And CGC's efforts to identify and direct funding to investment projects have suffered. For example, CGC launched its first grant and financing program, "Request for Proposals One" or "RFP1," in November 2024. Kauffman Decl. ¶¶ 8-9. At least one potential investment recipient has already suspended negotiations with CGC, stating that it feared that closing the deal with CGC would invite unnecessary and harmful scrutiny of the project. *Id.* ¶ 12. In addition, CGC has funded investment vehicles intended to bolster private-sector investment in clean energy projects and market these vehicles. *Id.* ¶ 13. Because of the EPA's actions, CGC's partners have halted any plans

to market the investment vehicles pending this litigation, threatening the viability of CGC's program.

These losses are certain to continue unless an injunction is issued. Brown Decl. ¶ 6; Buendia Decl. ¶ 10-11; Hopson Decl. ¶¶ 25-27. CGC's loss of these potential clients and vendors, and the reputational injury that will impede its efforts to recruit new ones (described below), are irreparable harm. And by freezing CGC's funding, Defendants have blocked access to the administration funds CGC and its partners need to vet project applications, blocking CGC's ability to move forward in implementing the program. Buendia Decl. ¶¶ 11-14, 18 (describing harms to CGC and its partner ICLEI). CGC has had to pause its technical assistance and knowledge sharing activities. Brown Decl. ¶¶ 5, 7, 12. And CGC cannot disburse funds that were already committed. This irreparable injury is not quantifiable. *See Luokung*, 538 F. Supp. 3d at 192-93 (loss of customers that would "accelerate" without injunction was irreparable harm); *Mass. Law Reform Inst. v. Legal Servs. Corp.*, 581 F. Supp. 1179, 1187-88 (D.D.C. 1984).

***Reputational and competitive harms***. That EPA purported to terminate CGC's grant agreement for cause is sufficient to find irreparable harm. *See Beacon Assocs.*, 308 F. Supp. 3d at 288 (irreparable harm from "termination for alleged default"). EPA, without any basis or evidence, charged CGC with "fraud, waste, and abuse," and "the improper and speculative allocation of funds," and EPA invoked its "duty to protect public funds and maintain the integrity of its grant programs." CGC Dkt. 6-1. EPA's unsubstantiated and dishonest accusations compound the reputational damage. *See Patriot, Inc. v. Dep't of Hous. & Urb. Dev.*, 963 F. Supp. 1, 3-4, 5 (D.D.C. 1997); *Luokung*, 538 F. Supp. 3d at 194 (similar).

As CGC's staff has explained, CGC's reputation as a reliable and trustworthy partner and investor is critical to CGC's operations, including in maintaining its nationwide network of member institutions, locating high-quality investments around the country, and bringing in private-

sector investments to clean energy projects that might otherwise fail to attract capital. Brown Decl. ¶¶ 11-13, Buendia Decl. ¶¶ 16-18; Kauffman Decl. ¶¶ 7-8, 13. EPA's and Citibank's actions have harmed this reputation. Brown Decl. ¶¶ 11-13; Kauffman Decl. ¶¶ 18-24.

The reputational injury to CGC will have far-reaching consequences for CGC and its partners and subgrantees. Under federal regulations, agencies must "conduct[] a risk assessment to evaluate the risks posed by applicants before issuing Federal awards." 2 C.F.R. § 200.206(b)(1). This requires consideration of an applicant's "[h]istory of performance" and its "compliance with reporting requirements and conformance to *the terms and conditions of Federal awards*." *Id.* § 200.206(b)(2)(iii). EPA's actions, if permitted to stand, would place a for-cause termination on CGC's performance record, endangering CGC's (and its subgrantees') future efforts to win grant funding from the federal government and any state or local governments with similar requirements. Buendia Decl. ¶¶ 20-23. These reputational harms may spread to private-sector investments as well. Buendia Decl. ¶ 24. Citibank's freezing of CGC's funds at EPA's direction has also harmed CGC's reputation as a lender and, if allowed to continue, will harm it further. Again, CGC must be perceived as a reliable investor and partner to succeed in its mission. Kauffman Decl. ¶ 18. A longstanding delay in CGC's ability to disburse funds and to execute on its programs will irreparably harm this reputation. *Id*. ¶¶ 16-17; Brown Decl. ¶¶ 11-13; Buendia Decl. ¶¶ 15-18.

A prolonged inability to deliver will also harm CGC's value proposition and consumer perception, Brown Decl. ¶ 12, especially where there are alternative organizations to which CGC's members could turn, *id.* ¶ 13. CGC's network is integral to its long-term strategy, because they help invest alongside CGC, identify and support suitable investment opportunities, and build partnerships in local communities. *Id.* ¶¶ 11-12; Hopson Decl. ¶¶ 3-5; Buendia Decl. ¶ 16-17; Kauffman Decl. ¶¶ 11-14. The knock-on effects of CGC's loss of such partnerships cannot be

calculated. *Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67, 77 (D.D.C. 2001); *Clevinger v. Advocacy Holdings, Inc.*, 2023 WL 4560839, at *5 (D.D.C. July 15, 2023).

***CGC's organizational mission***. Defendants' actions irreparably impede CGC's efforts to accomplish Congress's objectives. Hopson Decl. ¶¶ 27-28. In authorizing and funding the GGRF, Congress directed the EPA to allocate funds to develop projects that will "reduce[] or avoid[] greenhouse gas emissions and other forms of air pollution in partnership with, and by leveraging investment from, the private sector." 42 U.S.C. § 7434(c)(3)(A). CGC has worked ceaselessly since 2012 to accomplish this objective. Hopson Decl. ¶¶ 3-5. So long as EPA's and Citibank's actions stand, CGC cannot do so. In the meantime, specific internal goals and objectives CGC has set, such as its intent to partner with local organizations in all fifty States, are jeopardized by EPA's and Citibank's harm to CGC's reputation, and are certain to fail so long as the freeze on CGC's funding remains in place. *Id.* ¶ 26; Buendia Decl. ¶¶ 7, 10, 15.

**3. PFC Will Suffer Irreparable Harm.**

PFC, too, has suffered and—in the absence of a preliminary injunction—will continue to suffer irreparable harm in multiple respects. To begin, EPA's purported termination of PFC's award "for cause" has harmed PFC's reputation. According to EPA, after all, PFC's award was terminated because PFC engaged in "fraud, waste, and abuse" and/or its award was somehow tainted by "conflicts of interest." PFC Ex. J at 1. Despite the falsity of those accusations, the result has been a chilling effect on key vendors and investment partners who now view business with PFC and its subgrantees as financially and reputationally risky. Mayopoulos Decl. ¶¶ 20, 26; *see also* Matusiak Decl. ¶ 20 ("[T]he 'on again, off again' nature of the conversations with lenders on account of EPA's and Citibank's actions has lessened those lenders' confidence in the reliability of these dollars," leaving "RCIF [] at risk of losing these partnerships altogether."). Unless EPA defendants are enjoined from implementing their unlawful termination, PFC will continue to suffer

reputational harm that impedes its operations and mission. *See Armour & Co.*, 304 F.2d 404, 406 (D.C. Cir. 1962).

The impact of EPA's and Citibank's unlawful actions has been "so severe as to cause extreme hardship to [PFC's] business or threaten its very existence." *Nat'l Ass'n of Mortg. Brokers,* 773 F. Supp. 2d at 179. As a result of EPA's purported termination and the uncertainty surrounding PFC's award, PFC has lost essential services—including the compliance, accounting, and financial management services of its key contractor. PFC Mayopoulos Decl. ¶ 21. PFC is in discussions with this contractor to resume work on a limited set of projects, but even if that arrangement is finalized, it will leave PFC without critical services going forward. *Id.* And now that EPA has assertedly terminated PFC's award, PFC and its subgrantees face the prospect of having to cease operations altogether. *Id.* ¶ 28; Donovan Decl. ¶ 26; Matusiak Decl. ¶ 24; Moon Decl. ¶ 31. That is irreparable harm, as courts in this district have recognized.

Citibank's suspension of PFC's accounts, at EPA's direction, also impedes PFC's ability to pay its people and to recruit and hire essential new employees. All of PFC's staff are either employees whose positions are funded entirely by the NCIF award or secondees on loan to PFC under secondment and services agreements. Mayopoulos Decl. ¶ 23. The suspension of PFC's NCIF funds has threatened its ability to compensate these individuals—as well as to recruit and onboard badly needed new hires. *Id*. PFC's budget called for a team of 30 employees (24 more than it currently has), including a Chief Financial Officer, a Chief Legal Officer, and a Director of Human Resources. *Id.* ¶ 24. PFC had identified candidates for each of those executive positions, but, given its current funding status, cannot move forward with hiring the preferred candidates and may permanently lose the ability to do so. *Id*. Subgrantee EGA also has been forced to pause hiring, and was required to rescind an outstanding offer to a candidate in February due to its lack of access

to funds. Donovan Decl. ¶ 24. This inability to recruit and hire talented employees constitutes irreparable harm. *See Luokung*, 538 F. Supp. 3d at 194.

Beyond these impacts, Defendants' unlawful actions have made it "more difficult for [PFC and its subgrantees] to accomplish their primary mission[s]." *League of Women Voters*, 838 F.3d at 9. Without access to their funds, these organizations are not able to move forward with the projects they committed to undertake. For example, through its NCIF funding, EGA is expected to provide $11.5 million in financing to renovate an affordable senior-living housing apartment complex. Donovan Decl. ¶ 22. Rehabilitation is urgently needed because the property is at risk of being uninsurable due to the absence of fire sprinklers. *Id*. Yet, EGA cannot provide this financial assistance without access to its NCIF funds, leaving EGA unable to meet its commitment and the seniors residing in this apartment complex without safe or reliable housing. *Id*. Multiple affordable housing projects slated to be financed by subgrantee LISC Green are similarly poised to fall through—including one that will fail if LISC Green is unable to make a $90,000 deposit by March 31, 2025. Moon Decl. ¶¶ 16-23 (describing projects at risk due to Defendants' actions).

PFC's and its subgrantees' inability to carry out their organizational missions has a direct and devastating impact on their constituents. Among the projects in EGA's pipeline are affordable housing construction projects, including a 160-home rent-subsidized apartment community in Detroit, Michigan and a 192-unit project in Virgina—both of which will likely fail if access to funds is not restored imminently. Donovan Decl. ¶¶ 18-19. The same is true of LISC Green's NCIF-funded housing projects. Absent immediate access to funds, projects expected to provide affordable housing to 182 lower-income families in Iowa, Texas, and Michigan will likely fail. Subgrantee RCIF, too, is at risk of defaulting on obligations that will deprive American families of essential services like heating and cooling at affordable rates. Matusiak Decl. ¶¶ 19-20. Without

injunctive relief, families and communities will be "denied access to programs that … house [and protect] them." *See Nat'l Council of Nonprofits*, 2025 WL 368852, at *13.

**4. Plaintiffs Will Be Irreparably Harmed if the Funds Are Diverted to Any Entity Other Than the Accountholders.**

Plaintiffs will also suffer irreparable injury absent a preliminary injunction because, if EPA is not enjoined from transferring funds back to Treasury, this Court will be unable to order Defendants to redirect funds to Plaintiffs in the future. Dkt. 28 at 19; *see also Confed. Tribes of Chehalis Rsrv. v. Mnuchin*, 2020 WL 3791874, at *2 (D.D.C. July 7, 2020); *Population Inst. v. McPherson*, 797 F.2d 1062, 1081 (D.C. Cir. 1986). Here, EPA has publicly stated its intent to seize the funds awarded under the GGRF and eventually "re-obligate lawfully appropriated funds" to other recipients. If the funds are transferred to Treasury, Plaintiffs will need to contend with sovereign immunity in any effort to recoup them. Absent a preliminary injunction, these outcomes would greatly magnify the scale of Plaintiffs' injuries and may make full recovery impossible. *See Whitman-Walker Clinic, Inc. v. United States HHS*, 485 F. Supp. 3d 1, 58 (D.D.C. 2020) ("[W]here economic loss will be unrecoverable, such as in a case against a Government defendant where sovereign immunity will bar recovery, economic loss can be irreparable.").

Moreover, should the funds be clawed back from Plaintiffs' accounts, Plaintiffs will be deprived of a statutory entitlement. *See Endo Par Innovation Co., LLC v. Becerra*, 2024 WL 2988904, *7 (D.D.C. 2024); *cf. Dellinger v. Bessent*, 2025 WL 471022, at *9 (D.D.C. Feb. 12, 2025). The unlawful revocation of funds at this stage thus constitutes irreparable harm that warrants the issuance of a preliminary injunction. *See, e.g.*, *Endo Par*, 2024 WL 2988904, at *7.

**E. The Balance of Equities Favors Plaintiffs Over EPA.**

If an injunction "will not substantially injure other interested parties," the balance of equities tips in plaintiffs' favor. *League of Women Voters*, 838 F.3d at 12. As this Court has

recognized, EPA "cannot suffer harm from an injunction that merely ends an unlawful practice." Dkt. 28 at 18 (citing *TikTok Inc. v. Trump*, 507 F. Supp. 3d 92, 115 (D.D.C. 2020)).

EPA's recent decisions to select Plaintiffs for NCIF funding and disburse the grants—after a rigorous application, review, selection, and post-selection negotiation process—undermine any claim to hardship. EPA, just like "Citibank[,] previously anticipated disbursing the funds to Plaintiffs." Dkt. 28 at 22. And EPA cannot claim hardship from potential waste, fraud, or abuse while a preliminary injunction is in place because EPA itself imposed a multitude of "existing safeguards," including through audits and the ability to disallow costs, that provide transparency and "preserv[e] taxpayer resources." *Pacito v. Trump*, 2025 WL 655075, at *24 (W.D. Wash. Feb. 28, 2025); *see supra* at 9, 12; Bafford Decl. ¶ 35 (describing EPA's oversight mechanisms).

In contrast, as detailed above, continued inability to access funding risks major harms "ranging from shutting down programs, to furloughing and laying off employees, to shuttering altogether." *AIDS Vaccine Advocacy Coal.*, 2025 WL 485324, at *6.

**F. An Injunction Is Firmly in the Public Interest.**

Finally, the public interest strongly favors an injunction. "There is generally no public interest in the perpetuation of unlawful agency action." Dkt. 28 at 23 (citing *League of Women Voters*, 838 F.3d at 12). Rather, "there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Id*. And "the public would be served if the Executive Branch is enjoined from" managing funds "in a manner that conflicts with the plain language of an appropriations bill." *General Land Office v. Biden*, 722 F. Supp. 3d 710, 745 (S.D. Tex. 2024) (citing *League of Women Voters*, 838 F.3d at 12).

The public has an acute interest in enjoining EPA's efforts to prevent disbursement of Plaintiffs' grant funds. The public has an interest in the billions of dollars of investments that Congress authorized in the Inflation Reduction Act. Plaintiffs were awarded funding in line with

that interest—for example, by advancing projects related to solar power, electric vehicles, energy-efficient affordable housing, and low-emissions heating and cooling systems for families across the country. Bafford Decl. ¶¶ 76-80; Donovan Decl. ¶¶ 18-22; Matusiak Decl. ¶¶ 19-20. Injunctive relief is necessary to permit Plaintiffs to carry out these critical projects, which "Congress, in enacting" the Inflation Reduction Act, "declared to be in the public interest." *League of Women Voters*, 838 F.3d at 13. "Here, [preliminary] relief ensures the government abides by the statues and regulations governing the NCIF, which serves the public interest." Dkt. 28 at 23.

## III. The Court Should Issue a Preliminary Injunction Barring Citibank From Failing to Disburse Plaintiffs' Grant Funds Pursuant to the ACAs.

### A. Plaintiffs Are Likely to Succeed on Their Claims Against Citibank.

Plaintiffs are likely to succeed on the merits of their breach of contract claims because (1) the ACAs are valid and enforceable contracts; (2) Citibank has breached them by failing to perform without legal or factual basis to do so; and (3) Plaintiffs have been harmed as a result. *Wiener v. AXA Equitable Life Ins. Co.*, 113 F.4th 201, 214 (2d. Cir. 2024).

Citibank has a duty to follow instructions regarding funds related to Plaintiffs' NCIF grant funds. The ACAs specify that Citibank "*shall* comply with *all* instructions, notifications, and entitlement orders the Bank receives directing the disposition of funds and financial assets in the Accounts." CU Ex. 8 at 2 (emphases added). The ACAs explain that Citibank's duties are exclusively "administrative or ministerial," and that Citibank "shall not be responsible" for determining whether" requests for grant funds comply with any contracts or laws. *Id.* at 3.

Thus, the ACAs do not provide Citibank with any discretion to decline to act in response to instructions unless EPA has given notice that it intends to exercise exclusive control over an account. *See* CU Ex. 8. EPA has not provided such notice. Nor has EPA undertaken any steps to exercise exclusive control described in the ACAs. *See* CU Ex. 9 at Ex. A. But since mid-February,

Citibank has repeatedly failed to follow instructions about what to do with Plaintiffs' grant funds in Plaintiffs' accounts and in the accounts of their subgrantees. *See supra* at 17.

Moreover, Citibank also breached the ACAs governing Plaintiffs' subgrantees' accounts. These ACAs are similar to Plaintiffs', except that EPA may not issue a Notice of Exclusive Control; EPA is not even a party to those ACAs. Thus, Citibank must comply with the subgrantee's instructions regarding assets in their accounts unless *Plaintiffs* issue a Notice of Exclusive Control.

Citibank has stated it was authorized to breach the ACAs because, under the FAA, it is a fiduciary of the United States, required to "act at all times in the best interests of the United States" and to "comply with all lawful instructions or directions received from Treasury." Dkt. 14 at 4. But if the Court grants Plaintiffs' preliminary injunction with respect to EPA, this defense would disappear; Citibank cannot claim it is obeying lawful government orders when a court finds those orders unlawful. Accordingly, if the Court enjoins EPA from terminating or suspending the grant, it should also direct Citibank to follow the ACAs—as it is legally required to do.

Regardless, Citibank's goal of complying with the FAA does not justify its breach of the ACAs. Plaintiffs are not a party to the FAA, and the ACAs do not allow Citibank to decline to disburse funds based on any supposed inconsistency with the FAA. Section 9 of the ACAs specifically states that each ACA "constitutes the entire agreement between the parties and sets forth in its entirety the obligations and duties of the Bank with respect to the assets in the Accounts." Because of this merger clause, "a court is obliged to require full application of the parol evidence rule in order to bar the introduction of extrinsic evidence to vary or contradict the terms of the writing." *Schron v. Troutman Sanders LLP*, 20 N.Y.3d 430, 433 (2013).

Section 6(a) of the ACAs is in accord. It instructs that each Plaintiff *and the EPA* "acknowledges and agrees that (i) the duties, responsibilities, and obligations of the Bank shall be

limited to those expressly set forth in this Agreement …, and no duties, responsibilities or obligations shall be inferred or implied." Had these "sophisticated … entities, represented by counsel" intended to condition Citibank's obligations under an ACA upon the FAA, "they easily could have included a provision to that effect." *Schron*, 20 N.Y.3d at 437.

Contrary to Citibank's claim, the FAA does not require, or even permit, Citibank to deny disbursement requests related to Plaintiffs' grant funds. The fact that Citibank acts as an agent of the Government is simply irrelevant. It does not mean that the funds from Plaintiffs' grants belong to the Government (they don't). It does not mean that Citibank has the right to withhold those funds, any more than Citibank has the right to take funds belonging to any other private party sitting in any other account at Citibank. And it certainly does not mean that Citibank can convert the funds and send them to the Government, simply because the Government so requested.

Indeed, it has long been a settled principle at common law that "a party may not escape liability simply because he was acting at the time at the behest of his principal." *Zampatori v. UPS*, 479 N.Y.S.2d 470, 473-474 (N.Y. Sup. Ct. 1984). As the Restatement instructs, "[a]n agent is subject to liability to a third party … when the agent's conduct breaches a duty that the agent owes the third party." Restatement (Third) Agency § 7.02. That duty, and the agent's own responsibility, "may be derived … from a contract between the third party and the principal when the agent is a party to the contract" as well as "from the agent's assumption of duties toward the third person that are independent of the duties the agent owes the principal." *Id.* That plainly occurred here: Citibank did not sign the ACAs on behalf of the Government, but on its own behalf, and it took on specific obligations to both the accountholders and EPA to comply with instructions within the scope of the ACAs. So, the Court may and should hold Citibank to the bargains it struck even if Citibank was acting at the direction of Treasury or EPA.

Nor are the FAA provisions that Citibank principally invokes relevant. The FAA authorizes Citibank to "freeze accounts, and transfer funds in frozen accounts" at EPA's direction "*in accordance with the account control agreements*." Dkt. 21 at Ex. A § I.B.4 (emphasis added). Plaintiffs' ACAs only allow EPA to exercise control over Plaintiffs' funds if EPA delivers a Notice of Exclusive Control, which requires EPA to certify that it has "issued a written determination and finding" that the recipient has triggered one of the three termination conditions. CU Ex. 8 at Ex. A. But EPA never delivered any Notice of Exclusive Control or the required certification and written determination. *See* Dkt. 14; Mar. 12, 2025, Hrg Tr. at 26:11-22.

Second, the FAA provisions that Citibank invokes are irrelevant. These instruct Citibank "to act only within the scope of its actual authority and to comply with all *lawful* instructions or directions received from Treasury," *see* Dkt. 14-1 § 5.B.iv (emphasis added). The FAA merely adopts the same obligation that applies at common law. Restatement (Third) Agency § 8.09. But Citibank initially froze Plaintiffs' accounts not on the "instructions or directions" of Treasury, but based on a "recommendation" from the FBI. There was also no order issued by a neutral magistrate based on probable cause. *See supra* at 16. And Treasury's subsequent communications directing Citibank to maintain the freeze were no more lawful.

Again, Citibank ignores that it signed the ACA limiting its obligations with regard to the funds—and it would not be "lawful" to breach the ACA's control provision. Underscoring the point, the FAA specifies that Plaintiffs and their subgrantees would have control over funds related to the ACAs, subject only to the issuance of a Notice of Exclusive Control. Dkt. 21 at Ex. A.

**B. The Other Preliminary Injunction Factors Favor Plaintiffs.**

For the reasons discussed above as to EPA, Plaintiffs will suffer irreparable harm if Citibank is not enjoined from rejecting or ignoring instructions regarding the disposition of funds related to Plaintiffs' grants. *See supra* at 44-54. Further, as previously explained, the balance of

equities favors Plaintiffs. *See supra* at 54-55. Citibank will not be harmed by an injunction requiring it to honor the ACAs and disburse funds in which it has no right or interest. By contrast, without a preliminary injunction requiring Citibank to disburse funds under the ACAs, Plaintiffs' viability is threatened. Finally, ensuring access to NCIF grant funds is in the public interest. "[T]he public interest is served by … enforcing valid contractual provisions … to which parties have voluntarily entered." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Wertz*, 298 F. Supp. 2d 27, 34-35 (D.D.C. 2002).

### C. The Preliminary Injunction Should Cover Subgrantees.

Finally, the injunction should expressly cover Plaintiffs' subgrantees' accounts. As noted above, the grant program expressly contemplated that grant recipients could "receive subawards (in the form of subgrants) to carry out a portion of the grant's activities" and if so "the lead applicant will … be accountable to EPA for effectively carrying out the full scope of work and the proper financial management of the grant (including subawards to non-lead coalition members)." CU Ex. 1 at 6-7. In line with this design, Plaintiffs have disbursed funds to accounts at Citibank subject to ACAs. *See supra* at 10-12. Citibank has no legal basis to deny the subgrantees access to their accounts, both because the termination is unlawful and because the ACAs provide EPA no right to control the accounts. But to avoid any confusion, the preliminary injunction should expressly cover Plaintiffs' subgrants and ensure Plaintiffs' subgrantees' access to accounts at Citibank.

## CONCLUSION

Plaintiffs' motion for preliminary injunction should be granted.

Dated: March 21, 2025

/s/ *Vincent Levy*
Vincent Levy (NY 0487)

Respectfully submitted:

/s/ *Adam G. Unikowsky*
Adam G. Unikowsky (989053)

Kevin D. Benish (NY0495)
Patrick J. Woods*
Daniel Fahrenthold (NY0603)
HOWELL SHUSTER & GOLDBERG LLP
425 Lexington Avenue, 14th Floor
New York, NY 10017
Tel.: (646) 837-5151
vlevy@hsgllp.com
*Application for admission pending.

*Attorneys for Plaintiff Coalition for Green Capital*

/s/ *Beth C. Neitzel*
Beth C. Neitzel (103611)
Jack C. Smith (1725229)
Kevin Y. Chen (admitted *pro hac vice*)
FOLEY HOAG LLP
155 Seaport Boulevard, Suite 1600
Boston, MA 02210
Tel. (617) 832-1000
bneitzel@foleyhoag.com
jcsmith@foleyhoag.com
kchen@foleyhoag.com

Noah C. Shaw (*pro hac vice* forthcoming)
James M. Gross (admitted *pro hac vice*)
FOLEY HOAG LLP
1301 Ave. of the Americas, 25th Floor
New York, NY 10019
Tel.: (212) 812-0400
ncshaw@foleyhoag.com
jgross@foleyhoag.com

*Attorneys for Plaintiff Power Forward Communities*

Kathryn L. Wynbrandt* (1602446)
David B. Robbins (493976)
Tanner J. Lockhead* (90011928)
JENNER & BLOCK LLP
1099 New York Avenue, Suite 900
Washington, D.C. 20001
Tel.: (202) 639-6000
Fax: (202) 639-6066
aunikowsky@jenner.com
*Application for admission pending.

Gabriel K. Gillett (admitted *pro hac vice*)
Simon A. de Carvalho (*pro hac vice* forthcoming)
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
Tel.: (312) 222-9350
ggillett@jenner.com
sdecarvalho@jenner.com

Allison N. Douglis (admitted *pro hac vice*)
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036
Tel.: (212) 891-1600
Fax: (212) 891-1699
adouglis@jenner.com

*Attorneys for Plaintiff Climate United Fund*