**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **CLIMATE UNITED FUND** | |
| Plaintiff, | |
| v. | Civil Action No. 25-cv-698-TSC |
| **CITIBANK, N.A.**, *et al.* | |
| Defendants. | |
| **COALITION FOR GREEN CAPITAL** | |
| Plaintiff, | |
| v. | Civil Action No. 25-cv-735-TSC |
| **CITIBANK, N.A.**, *et al.* | |
| Defendants. | |
| **POWER FORWARD COMMUNITIES, INC.** | |
| Plaintiff, | |
| v. | Civil Action No. 25-cv-762-TSC |
| **CITIBANK, N.A.**, *et al.* | |
| Defendants. | |

**DECLARATION OF ELIZABETH BAFFORD IN SUPPORT OF**
**CLIMATE UNITED FUND'S MOTION FOR PRELIMINARY INJUNCTION**

I, Elizabeth Bafford, declare as follows:

1.      I am the Chief Executive Officer of Climate United Fund ("Climate United"). I have managed Climate United since its inception in October 2022 and have worked at Climate United's parent entity since January 2014. In my current role, I am responsible for managing all Climate United operations, including staffing and administration, coordination with third-party vendors, and administering financing programs operated by Climate United. I am also responsible for overseeing the management and allocation of funds awarded by the Environmental Protection Agency ("EPA") through its National Clean Investment Fund ("NCIF") in accordance with our EPA-approved workplan.

2.      For these reasons, I have personal knowledge of the facts and information in this declaration.

3.      I respectfully provide this declaration to detail the ways in which Climate United's reputation, mission and programs will imminently be irreparably impacted if the Court does not invalidate EPA's purported termination of Climate United's NCIF grant on March 11, 2025, order Citibank, N.A. ("Citibank") to provide Climate United with access to its grant funds as required, and enjoin EPA and others it is acting in concert with from interfering with Climate United's access to its grant funds. Climate United's inability to access its grant funds has immediate, harmful, and irreparable impacts on our reputation, which is vital to effectively carrying out our mission, and our ability to pay and retain essential staff; effectuate and manage the program; pay invoices due from critical service providers like lawyers and auditors; disburse funds that are already legally obligated and committed under loan agreements; and provide approved predevelopment grants to expand energy access in Tribal communities. This termination and Defendants' other conduct also

impacts numerous other investors and organizations depending on Climate United's responsible fulfilment of its obligations and workplan.

4.      Aside from stopgap charitable grants covering solely essential operating expenses, which Climate United will need to pay back if its funding is restored, Climate United does not have other committed sources of funding to replace the NCIF grant funds. As a result of Defendants' actions, to preserve its available cash, Climate United has already been compelled to defer compensation for certain employees, terminate multiple vendors, cancel travel, and instruct non-essential lawyers, accountants, and consultants to cease work.

5.      If Climate United does not obtain a preliminary injunction and is forced to wait to have access to its grant funding restored, Climate United would not survive as it exists today and would need to wind down its operations. Climate United likely would be forced to lay off substantially all staff and may not be able to reopen for business again, given the lost staff, lost deals, and reputational harm. Without access to its funds or a viable alternative funding source, Climate United would not be able to litigate this case to judgment.

**Climate United and Its Mission**

6.      Climate United is a nonprofit financial institution whose mission is to leverage public and private financing to remove financial barriers to deploying clean energy. Our work aims to unleash American clean energy, build safe and affordable housing, and build a stronger economy that lowers energy costs, creates jobs, improves water and air quality, and benefits every American, while making the United States more competitive, secure, and energy independent.

7.      Following passage of the Inflation Reduction Act, Calvert Impact, Inc. and its affiliates ("Calvert Impact"), Community Preservation Corporation, and Center for Community Self-Help and its affiliates joined together to form a coalition to apply for the NCIF competition

under the Greenhouse Gas Reduction Fund ("GGRF"). In 2022, Climate United was created as a separate legal entity, and structured as a subsidiary of Calvert Impact, Inc., to apply for GGRF funding. Calvert Impact has been in operation for 30 years in the private markets investing in job creation, affordable housing, clean energy, and local economic development. The other Climate United coalition members have been in operation for 50 years and 40 years respectively, reflecting decades of experience executing investment portfolios and strategies that directly relate to Climate United's workplan. Combined, the members of the Climate United coalition have more than 120 years' experience managing more than $30 billion in private and institutional capital that has unlocked economic opportunity for communities in all 50 states and territories.

8.      It is common practice for established organizations to set up subsidiaries for specific projects and programs. While each of the coalition partners would have been eligible recipients for NCIF funds, each deliberately formed bespoke subsidiaries to act as the grant recipients and subrecipients. As Climate United explained to EPA in its proposal, this structure allowed them "to adopt custom policies, procedures, and governance specifically crafted to most efficiently deploy NCIF funds while mitigating deployment risk," *See CUF Narrative Proposal*, EPA (Apr. 4, 2024), https://www.epa.gov/system/files/documents/2024-04/cuf_narrative_proposal1.pdf. The subsidiaries benefit from the organizational infrastructure and experience of their parent organizations while allowing them to leverage grant funds with private capital more effectively as stand-alone entities.

9.      Climate United helps fill gaps where private capital is missing by providing loans to finance projects that will bring the economic benefits of clean energy, electric mobility, and building efficiency projects to overlooked markets. From Arkansas to Alaska, these projects will deliver direct benefits to hard-working Americans and communities in the form of lower energy

bills, quality jobs, cleaner air and water, and more secure and reliable energy. Climate United focuses its loans and investments in rural, low-income, and Tribal communities across the country, building demand for clean energy and providing markets for domestic manufacturing. Climate United's investments also mobilize private capital, stretching public dollars further: for every dollar invested in a program or project, Climate United estimates up to four dollars of private capital will flow into communities. These investments in American innovation are a down payment on a stronger, more resilient economy that works for all Americans.

10.     Climate United uses the grant funds it has been awarded primarily to make loans to finance green energy projects. Each coalition partner directly finances such projects, with Climate United responsible for oversight of its two coalition partners. Climate United's borrowers choose Climate United as their lender because, as a result of the grant funding, Climate United is able to offer loans that other private sector lenders could not offer due to risk, economic terms, and/or flexibility. Climate United's loans are typically funded over months or years, with the loan recipients drawing down committed funds as needed for their project's development or construction. This delayed drawdown mechanism ensures oversight by Climate United—allowing it to confirm that projects remain on track and funds are being used in accordance with loan and grant terms and conditions.

11.     A fundamental consideration for Climate United's lending partners is the reliability of Climate United's funding. Even if Climate United offers better terms, transaction partners will refuse to enter into projects with Climate United if they believe that Climate United will not serve as a stable source of capital. Many of Climate United's loans are long-term loans to finance infrastructure projects. It is vital to developers to ensure that funding is available to complete their entire project. As one example, one of the core strategies of one of our subgrantees is to support

the development and preservation of affordable and workforce housing across the country. Real estate transactions take time to incubate and to build a reliable capital structure, which is difficult because it requires bringing together multiple sources and forms of funding (*e.g.*, various layers of debt and equity). Current pipeline includes interest from developers to create more than 60,000 units of housing where funds from the award are a critical part of the financing. Losing these funds, even temporarily, will delay and kill deals, further straining the country's inadequate supply of affordable housing and perpetuating our housing crisis.

**Climate United's NCIF Award**

12.    On July 14, 2023, EPA posted a Notice of Funding Opportunity for the NCIF program. A copy of that notice is attached to my declaration as **Exhibit 1**.

13.    EPA established a rigorous process to review and select applicants. That process included an evaluation of each applicant's vision, investment strategy, reporting plan, detailed budget, organizational background and track record, governance and management structure, consumer protection plan, risk management, and financial history. The review was conducted by expert panels with broad and deep qualifications who would then present rankings and recommendations to a Selection Official authorized to make the final selection for awards. The panels reviewing all applicants included reviewers with a mix of qualifications, who were drawn both from EPA and from a variety of other federal agencies and national laboratories, and who received extensive training on how to conduct reviews and score applications.

14.    On October 12, 2023, Climate United entered the competition with a $13.97 billion proposal to accelerate clean energy adoption across the U.S. economy, including by offering affordable financing for clean technology programs. A detailed proposed budget was required to be submitted to EPA as part of Climate United's application, along with proposed policies and

organizational documents. Climate United's application also included letters of support from financial institutions, developers, labor organizations, affordable housing organizations, and state and local governments—a testament to the coalition's combined 120 years of deep and extensive experience backing up its proposed program plan.

15.    On March 31, 2024, Climate United and two other applicants were informed that they were selected for NCIF funding after a nine-month-long competitive process that stressed the importance of our ability to effectively manage risk and swiftly implement our strategy.

16.    Climate United won its grant based on merit and merit alone.[1] As Climate United explained in its application, its coalition brought together three well-established nonprofits with a combined 120 years of experience managing more than $30 billion in private and institutional capital. Climate United did not have any relationship with anyone inside EPA or, to its knowledge, with any reviewers across the agencies during the application and selection process.

17.    Climate United was ultimately awarded $6,970,000,000 (the "NCIF Award"), which was announced by the White House in a press release in April 2024. The award was memorialized in a final grant agreement, known formally as a Notice of Award (NOA), dated August 8, 2024. A copy of the August 8, 2024 NOA is attached to my declaration as **Exhibit 2**. That NOA was amended in an amended NOA dated December 20, 2024 to reflect an update to the

---

[1] Public reporting and the Declaration of Eric Amidon filed by EPA on March 17, 2025, referred to "potential conflicts" because, "Beth Bafford, CUF's CEO, served as a special assistant in the Office of Management and Budget during the Obama Administration," and "Phil Aroneanu, CUF's Chief Strategy Officer, served as a strategic advisor to the Department of Energy during the last two years of the Biden Administration." I worked for the Obama for America campaign from April to November 2008 as a community organizer and for the Obama Administration as an assistant from February 2009 to July 2010. I primarily performed administrative tasks for the President's economic advisors 15 years ago. Since 2010, I have worked exclusively in the private sector, primarily in private credit and structured finance. Phil Aroneanu was a contractor for the Department of Energy and was not a political appointee.

Terms and Conditions, and a further amended NOA dated January 16, 2024 to reflect an updated budget and workplan.

18.    My understanding is that there are two different workstreams within EPA, with different approval processes and different personnel. One workstream addresses the grant's Terms and Conditions and another addresses the grant's budget and workplan. The Terms and Conditions set forth the terms of Climate United's award, including EPA's program-specific reporting and oversight requirements. Climate United's workplan sets forth our projected projects and the specifics of our program which must be executed in accordance with the Terms and Conditions. My understanding is that these two different workstreams resulted in the separate December 2024 and January 2025 NOA amendments.

19.    The process for amending the Terms and Conditions began shortly after the award was announced, where all awardees were asked for input. EPA from the outset anticipated a series of amendments to the Terms and Conditions on approximately a quarterly basis, as communicated with awardees throughout the award process. On April 11, 2024, shortly after the award was publicly announced, EPA held a "terms and conditions briefing" for awardees. Among other things, EPA explained the process for agreeing upon the terms and conditions that would govern the grant. EPA explained that it expected to share draft terms in mid-to-late April, and that EPA expected the terms to change based on awardee feedback, to ensure they were clear and would be viable for awardee workplans. While noting the "dates are tentative," EPA expected a "final" set of terms to be included in a NOA in late June, modified terms to be agreed upon in September/October, additional modifications to occur in October/November, and further modifications "over the remainder of the performance period." Screenshots of this training are attached to my declaration as **Exhibit 10**.

20.     The amendment dated December 20, 2024 reflected changes along these lines to the Terms and Conditions, including updating disbursement procedures, clarifying reporting, and adjusting terms such as Davis-Bacon and Build America Buy America requirements to ensure more successful program execution for smaller scale projects. Climate United's first set of recommended changes to the NOA were contemplated in early October, after we had completed our first financial transaction and while we were in the process of shifting to the Financial Agent. The changes in the January NOA primarily reflect adjustments to our workplan and budget informed by market and partner feedback, implications of the shift to the Financial Agent (*e.g.*, accounting treatment based on feedback from auditors), as well as other clarifications. Copies of the December and January NOAs are attached to my declaration as **Exhibit 3** (December NOA) and **Exhibit 4** (January NOA).

21.     I do not believe that changes made in the December and January NOAs reduced EPA oversight of the Climate United award or altered the overall grant award. To my knowledge, the changes proposed were unrelated to any changes in Administration but were focused on the long-term viability of this financing program in a dynamic market. As noted earlier, from the beginning of the process we were told by EPA to expect that the NOA would be first issued in the summer and then amended in the fall, the winter, and as necessary.

22.     The NOA included a negotiated, thoroughly reviewed and EPA-approved budget. Climate United's plans for the NCIF Award were outlined in our publicly posted workplan, a revised version of the publicly posted program plan included in our application, that was agreed to by EPA on June 13, 2024 and codified in the NOA. Following several months of market feedback from partners, capital providers, and potential borrowers, EPA agreed to an amended

workplan in December 2024, which was codified in the January NOA. A copy of the amended workplan is attached to my declaration as **Exhibit 5** and is available on our website.

23.     As detailed in the workplan, the Climate United coalition plans to commit at least $580 million toward qualified projects in the first year of funding (*i.e.*, before July 2025), and to deploy the full $6.97 billion within the first five years of the program, with a further commitment to invest at least 60% in low-income and disadvantaged communities, 20% in rural areas, and 10% in Tribal communities. *Id.* at I, 14. To date, the Climate United coalition has committed $392 million to qualified projects in accordance with its workplan, with our first loan committed in September 2024.

24.     Approximately 45% of Climate United's investments (the portion of the funds provided through financial assistance), or approximately $2.8 billion of the NCIF Award, will focus on investing in energy-efficient buildings and homes. Approximately 20% of Climate United's investments, or approximately $1.2 billion of the NCIF Award, will focus on electric transportation and charging infrastructure. Another approximately 25% of Climate United's investments, or approximately $1.5 billion of the NCIF Award, will focus on producing affordable, clean electricity and heat through renewable energy generation and battery storage, including solar power, hydroelectric and geothermal. The remaining 10% of investments will focus on other sectors that cut costs, reduce pollution, and provide direct benefits to American families, including in agriculture. *See id.* at 10.

25.     Climate United estimates that its planned investments will result in private sector leverage of up to $21 billion—approximately four times the public funds invested in qualified projects. *Id.* at 16. In addition, Climate United's investments will help consumers and small businesses save money by purchasing more efficient clean energy technologies, and will help

support community infrastructure such as schools, municipal buildings, healthcare facilities, public housing, and other institutions, particularly those that serve rural, Tribal, and low-to-middle-income households and businesses.

**Procedures for Climate United's NCIF Funding**

26.     Climate United's funds were fully obligated by EPA on August 8, 2024. Climate United initially accessed funds through the Treasury Department's Automated Standard Application for Payments ("ASAP") system while Treasury worked to implement the financial agency agreement ("FAA") that was described in the original Notice of Funding Opportunity in July 2023 and is discussed in more detail below.

27.     Climate United's undrawn funding was disbursed to accounts held at Citibank, after those accounts were established in November 2024, and subject to an Account Control Agreement entered into between Climate United, EPA, and Citibank (the "ACA"). The process to establish the accounts began on September 26, 2024, once Citibank was selected by the U.S. Department of the Treasury as Financial Agent. A copy of the ACA is attached to my declaration as **Exhibit 8**.

28.     Climate United, EPA, and Citibank executed an amendment to the ACA on January 13, 2025, to clarify the parties' intent regarding the treatment of certain obligations that were "properly incurred" if EPA issued a Notice of Exclusive Control. A copy of the January 13, 2025 Amendment to the ACA is attached to my declaration as **Exhibit 9**. This was only a clarification and did not alter the substance of the ACA.

29.     From the program's inception, EPA contemplated the need for a funding mechanism which would allow for balance-sheet capitalization enabling recipients to leverage private capital—a fundamental objective of the program. In the July 2023 Notice of Funding Opportunity, which outlined the parameters of the grant competition, EPA contemplated that "additional

measures or other arrangements" would be required if the program departed from typical drawdown requirements, and specifically highlighted that one such additional measure would be "financial agent arrangements with U.S. Department of Treasury … to ensure that EPA's interests are protected." *See* Ex. 1 at 56.

30.     Details about this structure were then discussed with selectees in May 2024 and included in Climate United's original grant agreement, dated August 8, 2024. Specifically, the Terms and Conditions in the August NOA provided that "[t]he Recipient will open a Deposit Account at a depository institution that has been designated as a financial agent of the United States," that "[s]uch account will be used as Recipient's operating account for the award," and that "[t]he Recipient will take all such actions, enter into all such agreements, and execute and deliver all such documentation as may be necessary and/or directed by EPA from time to time to establish and maintain [a perfected security interest held by EPA], including but not necessarily limited to entering into a deposit account control agreement (DACA) with the Financial Agent and EPA." Ex. 2 at 58. Climate United was not involved in EPA's decision to include the financial agent concept in the Notice of Funding Opportunity in July 2023. Climate United also had no role in the selection of the financial agent, which was coordinated by EPA and the Treasury Department as part of a competitive process.

31.     The alternative mechanism used to disburse funds under EPA grants is the ASAP system, which Climate United used to access funds while the ACA was being finalized between August 2024 (when the initial NOA was finalized) and November 2024. The ASAP system allows recipients to draw funds as needed—for example, to fund a project or pay administrative costs. Under the ASAP system, the entire award amount would be obligated to the recipient, but the recipient's balance sheet would only reflect those award funds already drawn down.

32.    One of the primary objectives of the NCIF program is to use government funds to spur private capital. The traditional ASAP mechanism would not allow for a recipient to raise private capital on the recipient's own balance sheet. My understanding, from reading the NOFO, is that EPA understood the need to solve for this technical accounting problem. EPA included a financial agent mechanism in its original program design from July 2023. *See* Ex. 1 at 56. The ability of the recipient to draw down award funds would remain unchanged, but the balance sheet of the recipients would reflect the entire award amount rather than only the funds already expended.

33.    My understanding is that the Treasury Department under the ASAP system does not conduct oversight—it simply reports to EPA the amounts which have been drawn by the recipient and what amounts remain. Under the FAA between Citibank and Treasury, Citibank agreed to assume this ministerial funding responsibility. EPA's oversight functions remain identical under the FAA and under ASAP. I believe this is why the FAA is between Treasury and Citibank, not between EPA and Citibank—Citibank is taking over Treasury's ministerial functions, not EPA's oversight functions. However, Citibank's interface displays Climate United's expenditures broken down by budget category, and it provides EPA with full, real-time view access into all 21 accounts of Climate United and its subrecipients.

34.    After funding was disbursed to Climate United's Citibank accounts, Climate United has drawn money from its accounts approximately once every one to two weeks, as permitted by the terms of the NCIF Award, including in accordance with its approved budget. Absent EPA's prior approval, Climate United is only permitted to draw funds which will be disbursed in the following fourteen business days. *See* Ex. 3 at 57-58.

35.    Throughout this period, EPA has overseen Climate United's activities. Climate United's actions have been transparent and visible to EPA, and EPA has at all times had the ability

to view and audit any expenditures of Climate United. EPA has exercised its oversight and

supervisory authority in the following ways, among others:

    a. EPA has required Climate United to submit quarterly, semi-annual, and annual reports, detailing its transactions, activities, progress against its workplan, and expenditures by budget category, including mandatory quarterly conflict-of-interest reporting by Climate United and each of Climate United's subgrantees. Climate United's inaugural semi-annual report covering the period from the start of the grant to December 31, 2024 is publicly available online;

    b. EPA has held meetings at least weekly, and, at times, two to three times per week, to discuss Climate United's program plans, reporting, oversight, and compliance with the EPA Terms and Conditions;

    c. EPA has view access to each of Climate United's seven Citibank accounts and each of the fourteen accounts of Climate United's subgrantees. EPA's view access allows EPA to see what funds Climate United is spending and what budget category that spending relates to. EPA's view access also allows EPA to see program income in the form of portfolio earnings or repayment of loans;

    d. EPA receives a certification from Climate United each time Climate United submits a draw request to Citibank for a financial assistance transaction, certifying: "The amount of the transfer is necessary to execute against the EPA-approved workplan, and the financing agreements for identified qualified projects necessitating the transfer have been reviewed by Climate United's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions." Each of Climate United's subgrantees is required to make similar certifications;

    e. EPA approved Climate United's detailed budget for the term of its award, and EPA must approve any material changes;

    f. EPA has required Climate United to adopt and deliver to EPA detailed policies, including investment policies, risk policies, consumer protection policies, subaward oversight policies, and conflict of interest policies;

    g. EPA requires Climate United to be subject to standard audit requirements by a third-party auditor, including both financial audits and a Single Audit for federal grant compliance;

    h. In November, EPA conducted transaction testing, which is a systematic examination and verification of every dollar spent by Climate United to ensure they comply with the grant's terms, conditions, and applicable regulations; and

i. EPA has also issued additional oversight requests. For example, on March 4, 2025, EPA asked Climate United for answers and documents related to 35 questions addressing a wide range of topics, many of which ask for documentation or information previously provided to EPA, giving Climate United less than three weeks to respond while its funds are inaccessible.

**Climate United's Operations and Projects Before EPA's Recent Actions**

36.    Since the August NOA was issued, the NCIF Award has accounted for all of Climate United's funding, aside from emergency charitable grants and recoverable grants to support operations while funds are unavailable (and which Climate United must pay back if funding is restored).

37.    Climate United currently has 37 employees on its payroll, whose salaries and benefits are covered in part or whole by the NCIF Award. These staff members collectively operate all aspects of Climate United's operations, including establishing financing programs, underwriting potential financial transactions, ensuring compliance with the Terms and Conditions of the NCIF Award, managing oversight of subrecipients, soliciting and selecting partners, conducting community engagement, and structuring and servicing a portfolio of loans. That number represents approximately half of the total staff that Climate United intends to hire to support its programs. As noted above, we have been rapidly expanding our capacity since the award was announced in April 2024 to implement this program, fulfill the requirement that we identify projects and partners quickly, and get funds moving to benefit American communities.

38.    Climate United has launched three financing programs to date. The first is a $31.8 million pre-construction loan to support solar power projects across rural communities in Arkansas, which was announced in October 2024. Through this project, Climate United is financing pre-construction costs for 18 solar projects comprising the largest commercial solar deployment in Arkansas history, which is projected to save more than $120 million in energy costs over the project's life and create hundreds of jobs.

15

39.     The second is a program to offer affordable leasing options for battery electric heavy-duty trucks to small fleets and independent operators. Climate United issued a request for proposals in October 2024 from qualified U.S. auto manufacturers to deliver up to 500 electric drayage trucks, which Climate United intends to begin leasing at the ports of Long Beach and Los Angeles. When completed, these orders will represent some of the largest ever purchases of domestically manufactured battery electric trucks in U.S. history. The communities surrounding these ports have among the highest air pollution and worst health outcomes in the nation. Climate United intends to expand this program nationally. This program will not only reduce the cost per mile of operating drayage trucks for small businesses, but it will also reduce air pollution in port communities and create demand for U.S. manufacturing in factories across the country.

40.     The third is $63 million in committed pre-construction financing for projects designed and developed by a Native-owned and Native-led solar developer who develops solar power plants in partnership with Tribal governments and communities. These projects bring access to affordable energy to rural communities and Indigenous people in addition to creating more than 1,000 quality jobs and local economic development. Initial projects will be located in Eastern Oregon and Idaho, with plans to use funds for future projects in the developer's pipeline.

41.     In addition, Climate United has used grant funds to design, develop and launch the Climate United NEXT program. This is a pre-development grant program intended to provide up to $30 million in technical assistance and planning support for community-led projects that increase energy independence and resiliency, reduce pollution, and save money for hardworking American families, small businesses, and communities. The first round of grants focused on projects serving Tribal communities. Climate United publicly committed to announcing the awardees of these pre-development grants through the NEXT program across the United States by

the end of February 2025. After reviewing 104 applications for the program in the first round of submissions, Climate United currently has approved 22 awards across 18 states, and anticipates issuing $6.345 million in initial subawards.

### EPA's and Citibank's Recent Actions And Failure to Inform Climate United

42.     On February 14, 2025, Climate United requested an inter-account transfer within Citibank, to move funds related to the purchase of electric trucks from Climate United's budget account to Climate United's reserve account. The transfer did not occur.

43.     On February 18, 2025, Climate United placed a request to Citibank to draw funds. In the normal course, Citibank would have sold shares in Climate United's money market account and then distributed the resulting funds to Climate United later that same day. Climate United's accounts with Citibank do not reflect that either the typical money market transaction or disbursement occurred, and Climate United did not receive any funds.

44.     On the morning of February 19, 2025, Climate United submitted an email message to Citibank noting that its funding requests remained pending and had not been disbursed. That letter requested that Citibank provide the legal bases for those actions, advise whether those actions were taken pursuant to a directive by a government agency, and provide a reasonable opportunity to respond to any instruction or request that impacts Climate United's accounts before that instruction or request may be acted upon by Citibank. Citibank did not respond.

45.     On February 20, 2025, Climate United sent an email message to officials at EPA notifying EPA that it was being denied access to its funds and requesting additional information and guidance. A representative from EPA responded on February 21, offering to discuss the following week.

46.     On February 21, 2025, Climate United placed a request to Citibank to draw funds. But Climate United's accounts with Citibank do not reflect that the typical money market transaction or disbursement occurred, and Climate United did not receive any funds.

47.     On the evening of February 25, 2025, counsel for Climate United submitted another email message to Citibank requesting release of the funds within 24 hours or an explanation of the legal bases for Citibank's actions. Citibank again did not respond.

48.     On February 26, 2025, counsel for Climate United left voicemail messages for Citibank at Climate United's direction. Citibank did not respond.

49.     EPA rescheduled its meeting with Climate United three times. After being informed that Climate United's outside counsel would be present at the meeting, an EPA official cancelled the meeting without rescheduling. Climate United called the official on February 27 and was informed by the official's administrative assistant that the official would respond to Climate United's emails. Neither that official nor any other official at EPA has responded to Climate United's emails as of the date of this declaration.

50.     On March 1, 2025, counsel for Climate United submitted a letter in hard copy and by email to the Chief Executive and Chief Legal Officers of Citibank. The letter explained that Citibank is illegally withholding Climate United's funds in breach of the ACA; has ignored Climate United's repeated requests for information by phone, voicemail, and email; and has failed to provide any colorable legal basis for Citibank's actions. The letter demanded a response by no later than close of business on Tuesday, March 4, 2025. Citibank did not respond.

51.     On March 3, 2025, Climate United contacted Citibank by email requesting information about the status of Climate United's funds and the process for disbursing those funds. For the first time, Citibank responded, stating: "We have received your correspondence and have

forwarded it to the United States Environmental Protection Agency and other federal officials for an appropriate response .… Once we have further information available regarding the program we can provide at that time." In response to a follow-up email from Climate United requesting clarification, Citibank stated: "We are awaiting further guidance." Citibank did not disclose that it had frozen Climate United's funds based on FBI's "recommendation" or based on direction from EPA and Treasury. A copy of that correspondence is attached to my declaration as **Exhibit 6**.

52.    On March 4, 2025, counsel for Climate United submitted a letter to EPA by email, notifying EPA that Climate United has been unable to access its funding and requesting information regarding the nature of and legal justification for EPA's actions. The letter requested that EPA immediately reverse its actions and reinstate Climate United's access to its NCIF funding. In the alternative, the letter requested that EPA rescind or stay any suspension of termination of Climate United's grant pending judicial review. EPA did not respond. A copy of that letter is attached to my declaration as **Exhibit 7**.

53.    Amid these events, Citibank has refused Climate United access to any of its grant funds. Prior to this litigation, Citibank never revealed to Climate United that it was being asked by EPA and other government officials to withhold Climate United's grant funds. For example, Citibank did not state or suggest that it was withholding funds from Climate United based on a "recommendation" from the FBI or based on a supposed obligation under the FAA, even when Climate United inquired about why its accounts had been frozen. Nor did Citibank tell Climate United that the communications recommending or directing Citibank not to disburse funds to Climate United solely cited the FAA (to which Climate United is not a party), did not cite the ACA, did not assert that termination was warranted under the ACA, and did not suggest that a Notice of Exclusive Control had been issued or would be forthcoming. Citibank also never informed Climate

United that the communications recommending or directing Citibank not to disburse Climate United's funds did not proffer adequate, let alone credible, evidence that any of the ACA's three bases for terminating Climate United's grant had been satisfied. For its part, other than vague public statements, EPA never informed Climate United that EPA had been trying to freeze, suspend, or terminate Climate United's grant or its access to grant funds, or that EPA had directed Citibank to stop disbursing funds to Climate United. EPA also never provided Climate United with any explanation for its actions.

**Climate United Is Forced to Take Legal Action**

54.     On March 8, 2025, Climate United filed this litigation, naming Citibank, EPA, and EPA's Administrator Lee Zeldin as defendants. Through counsel, Climate United served Citibank and EPA by email with a copy of the complaint and informed them that Climate United intended to file a motion for a Temporary Restraining Order at the opening of business on Monday, March 10, 2025. EPA did not respond.

55.     On March 10, 2025, Climate United filed a Motion for Temporary Restraining Order. Later that day, the Court proposed a briefing schedule whereby Defendants would be required to file responsive briefs on March 11, 2025, followed by a hearing. Counsel for EPA then emailed "ask[ing] for the courtesy of agreeing to ask the Court to push back these deadlines by 24 hours, proposing that our opp. would be due March 12 at noon, with argument at 4:00 p.m. that day." The government's attorney "recognize[d] from [Climate United's] papers that [Climate United] has been without access to the money for some time and that voluntarily agreeing to even a short extension from the proposed schedule is not what [Climate United] would prefer," but stated that "we'd appreciate the courtesy of an additional 24 hours." Climate United consented as

a professional courtesy. The Court then granted that extension, setting Defendants' deadline as noon on Wednesday, March 12, 2025, and setting a hearing for later that afternoon.

56.     At approximately 6:22 pm the evening of Tuesday, March 11, 2025, EPA's Acting Deputy Administrator, sent Climate United a letter entitled "Notice of Termination." A copy of that letter is attached to my declaration as **Exhibit 11**.

### Impact on Climate United's Operations and Programs if Climate United Does Not Promptly Regain Access to the Funding Provided by the NCIF Award

57.     Climate United cannot currently access grant funds to pay its payroll and other expenses related to immediate implementation of its program workplan.

58.     As noted above, Climate United had been drawing money from its Citibank accounts approximately every one to two weeks to pay operating expenses and had been drawing periodically to fund transactions. Without access to the grant funds in its Citibank accounts, Climate United does not have excess cash or reserves available to pay operating expenses or to support its programs.

59.     Climate United does not have other committed sources of funding that could replace the NCIF Award. Climate United has sought to obtain some amount of stopgap funding from other sources while Climate United litigated this dispute, but thus far has been able to only raise recoverable grant funds to cover its operations for a short period of time. Moreover, obtaining such funding has required, among other costs, substantial investments of time and energy diverted from Climate United's operations that could not be recouped. Even though Climate United has been able to obtain some additional funds as a further stopgap, given the size of the program, the funding secured is only a temporary fix and does not adequately replace the grant funds. Climate United does not anticipate being able to raise grant funds to cover its programmatic needs.

21

60.    Part of the reason why it is difficult for Climate United to find alternative funding is that Climate United's primary goal, and indeed the goal of the NCIF program and policy enacted by Congress, is to provide financing for projects that do not already have a steady source of market-driven investments. *See* Ex. 5 at 26; 42 U.S.C. § 7434(b)(1)(B) (requiring funding recipients to "prioritize investment in qualified projects that would otherwise lack access to financing").

61.    Loss of access to its primary funding will severely damage Climate United's internal operations, its financing programs for which the NCIF funding was intended, and its long-term reputation and ability to carry out its mission in the market. Continued loss of access will be devastating. If access to grant funding is not restored imminently, millions of dollars in approved transactions with committed partners cannot move forward—to the detriment of the program, the mission of the organization, and the communities that stand to benefit.

*Impact on Internal Operations*

62.    Without another source of funding, such as stopgap charitable grants, Climate United does not have funds to pay payroll or health, vision, and dental benefits, life insurance, and short- and long-term disability insurance for its employees. As a result of Defendants' actions, to preserve its available cash Climate United has already been compelled to defer compensation for certain employees, terminate multiple vendors, cancel travel, and instruct non-essential lawyers, accountants, and consultants to cease work.

63.    The work of Climate United is highly specialized. We structure financial transactions in hard-to-finance markets, which requires a deep understanding of various capital sources, including government programs (*e.g.*, low-income housing tax credits, solar investment tax credits, etc.) and private investors (*e.g.*, banks and insurance companies). Structuring and underwriting these transactions requires experience in the private credit markets to assess expected

and unexpected risks based on prior knowledge of similar transactions, market data, and industry dynamics.

64.    To execute on this program, we have hired a team of excellent investment professionals with expertise in credit underwriting, structuring, and asset management. In many cases, we hired them from other financial institutions where they had higher compensation. They came to Climate United to do this work because of our mission and impact on the communities that benefit from our projects.

65.    If we are unable to pay our staff, they are likely to leave and find other employment. Without a stable source of funding, we will not be able to replace our current staff with quality employees or attract additional talent to fill out our teams. That will leave Climate United unable to fulfill its mission. It will also have reverberating impacts that will harm the public. If we lose our current talented staff because we are no longer able to pay them, many of them may not continue working on investments that generate benefits for the public good.

66.    In addition, furloughing or laying off staff will eliminate positions that perform critical functions for Climate United, including: (1) monitoring the loans that Climate United has already disbursed to funding recipients and the $392 million that the Climate United coalition has committed to date; (2) timely fulfilling EPA's reporting requirements for grant recipients; and (3) deploying the NEXT grant program discussed in more detail above.

67.    Climate United also imminently risks not being able to pay rent and insurance for select offices or to pay critical third-party contractors who perform necessary services such as managing accounts payable, auditing financial statements, maintaining IT security and infrastructure, advising on compliance, supporting communications, and providing legal services. In addition, as Climate United has explained to EPA, continuing uncertainty around Climate

United's funding has caused Climate United to confront increasingly unfavorable terms from essential third-party contractors as well as prospective deal partners. This could place Climate United in default of its agreements and damage its ability to obtain services in the future.

*Impact on Climate United's Grant and Financing Programs*

68.     Without a committed source of funding, Climate United would not be able to meet its commitments as part of the awards it has already approved through the NEXT program, discussed above. To not issue these subawards on the publicly communicated timeline would erode trust in Climate United as an institution and damage its reputation, especially given the significant effort that the 104 groups referenced above spent putting together applications over the holidays. And it would specifically harm the 22 selected projects, which will provide affordable and reliable energy access to Tribal communities, creating jobs and local economic development for small businesses and contractors.

69.     Climate United would also not be able to finance programs it has already launched. For example, without a committed source of funding, Climate United cannot purchase electric heavy-duty trucks from the domestic manufacturers that responded to Climate United's request for proposals as part of the electric truck program mentioned above.

70.     For the solar projects discussed above, Climate United has approximately $20.8 million of commitments that remain outstanding, which Climate United is obligated to fund if requested by its existing borrowers. These funds may be drawn at any time, as is standard for loan agreements, and this draw timing is at the discretion of the borrowers. If a draw is requested while Climate United is unable to access funding, it could cause Climate United to be in legal breach of these agreements. Additionally, failure by Climate United to advance funds would harm the projects, which rely on this source of capital to leverage financing from local banks and other

private capital providers to get the solar projects built. Finally, inability to access additional funding would harm the projects because our partners entered into the partnership with the understanding that Climate United would be able to fund future stages of project development.

71.    In addition, Climate United is currently engaging in outreach and listening events to shape further rounds of NEXT funding and to design financial products across Climate United's market segments, which is a key program in Climate United's workplan. For example, Climate United representatives were scheduled to conduct a focus group with school districts from across America at the Green Schools Conference on March 3 and 4, 2025. Without access to money for travel to this and other critical events, Climate United has cancelled all travel and outreach events and is unable to continue its work of designing capital solutions for schools, hospitals, and other critical American institutions.

*Impact on Climate United's Reputation*

72.    Climate United is primarily a lender, which means that to do business, we have to find willing clients—*i.e.*, borrowers—to borrow money from us. In many cases, we make long-term loans to finance infrastructure projects. These are market transactions that require trust and certainty, similar to the trust and certainty a homeowner would want from their mortgage lender or a small business would want from their banker. The freeze of our funds and the unlawful cancellation of our grant agreement have all caused significant uncertainty and unease about our ability to operate in the near-term and our ability to be a long-term partner to developers, small businesses, and American families.

73.    Our stability as a lending institution has always been our strength in the markets we serve, and the current legal limbo caused by actions from EPA and Citibank have dramatically impacted our ability to go to market as a stable source of funding. Climate United's reputation as

a reliable and stable source of financing is essential to its ability to, among other things, attract high-quality co-investment to finance programs and to attract high-quality projects for its pipeline. If Climate United's funding is not restored imminently, Climate United's reputation would be irreparably damaged. That would make it more difficult, if not impossible, for Climate United to find partners willing to enter into financing arrangements and to find qualified employees willing to work at Climate United.

74.     In addition, a prolonged pause in funding would be likely to cause third parties to view Climate United as having a less stable source of funding going forward, meaning that it will receive increasingly unfavorable terms from essential vendors and prospective deal partners. In effect, if Climate United is seen as having a less stable source of funding, that has a reputational effect akin to a credit downgrade, causing counterparties to place higher premiums on long-term partnerships and seek additional assurances to protect their economic interests—such as requiring Climate United to provide cash collateral for any guarantees or similar credit enhancement on transactions or prefunding commitments.

75.     If our funding is not restored, many partners will cease to engage with us. One existing partner responded to Climate United's latest Request for Proposals to support community lenders with asset purchases by saying it was "not allocating resources to this RFP at the present moment as [it] monitor[s] the NCIF situation and look[s] for resolution of some of the uncertainty." A manufacturer informed Climate United: "given the status of the current environment, we are going to pause any engagement with Climate United until the relationship between Climate United and the EPA is stable and we can be more confident that funds will not be clawed back." It is also less likely that organizations will work with us on pre-development activities, technical assistance

activities, or financial transactions, given the freeze on the funds. In turn, this hinders our ability to generate demand and finance additional projects.

**Impact on the Public**

76.     The benefits from our existing and future investment pipeline will not come to fruition and cannot be easily replaced. At the end of the day, this program is about delivering direct, tangible benefits to American communities in the form of energy savings, energy access and stability, job creation, and healthier communities through access to capital that is not happening in the private markets alone.

77.     Examples of benefits from ***near-term*** transactions that will not happen if we are unable to finance our near-term pipeline include the following:

    a.    Thousands of households would not get solar systems on their roofs, of which 60% are families living in low-to-moderate income communities. The average energy cost savings per household expected for these households is $74 per month, which would be a total annual loss to low-to-moderate-income consumers of millions of dollars annually. The total lifetime loss to consumers is estimated at tens of millions of dollars.

    b.    11 solar power plants in Arkansas would not be built as part of the project I discuss above, which would be equivalent to $120 million in energy savings not realized for Arkansas taxpayers. In addition, 1,500 jobs, primarily in skilled trades, would not be created or preserved.

    c.    We would not be able to place an order of approximately 500 Class 8 heavy duty electric trucks through the project I discuss above, which would represent approximately 15-30% of expected heavy-duty electric truck manufacturing capacity over the deal period. All trucks to be purchased by Climate United are compliant with Build America Buy America standards, which means lost demand for U.S. manufacturing facilities. The truck drivers hoping to lease these trucks will not realize the lower cost per mile from accessing these electric trucks. And the operators of these trucks will also have to continue paying the ports of Los Angeles and Long Beach $10 per twenty-foot equivalent unit for non-electric trucks, which is passed on to consumers.

78.     If Climate United's funding is not restored, it will harm our subgrantees as well. For example, loss of grant funding will harm a pipeline of 232 multifamily housing properties that

would use loans from our subgrantees to increase energy efficiency and electrify core building systems to reduce building operating costs and keep rents affordable for low-income families.

79.    In addition, Climate United will be unable to obtain the long-term benefits derived from Climate United's investment portfolio, the first five years of which (April 2024-June 2029) are detailed in our workplan. It predicts that in the first five years of the program, Climate United's investments will reduce or avoid 11 million metric tons of $CO_2e$, bring economic benefits to millions of Americans, and mobilize at least $21 billion in private capital. The investment strategy is projected to directly result in:

a.    10,000-25,000 single-family homes with lower energy use and reduced emissions;

b.    30,000-60,000 units of multifamily housing with lower energy use and reduced emissions;

c.    100-300 small commercial and community facilities (including public school buildings and other municipal facilities) with lower energy use and reduced emissions;

d.    10,000-35,000 passenger vehicles electrified, savings costs for consumers and reducing tailpipe emissions;

e.    500-2,000 heavy-duty vehicles electrified, saving costs for truck drivers and school districts and reducing tailpipe emissions;

f.    500-750 other vehicles electrified, saving costs and reducing tailpipe emissions;

g.    10,000-35,000 residential solar installations and/or access to community solar and/or storage for single family homes, reducing energy bills for families;

h.    250-300 small commercial and community facilities with access to solar and/or storage, reducing energy bills for small businesses and nonprofits; and

i.    100-150 school and/or university buildings with access to solar and/or storage.

Ex. 5 at 11-12.

80.    Taken as a whole, our investment strategy will yield improved indoor and outdoor air quality, an increase in affordable and sustainable housing, the creation of quality jobs, demand

for clean technologies manufactured and distributed in America, savings for American households, small businesses, and nonprofits, green homeownership and wealth creation for American families, and the adoption of net-zero and net-zero ready building standards in the commercial, multifamily and single-family markets.

81.     There is also the matter of lost time and opportunity cost. Numerous individuals from Calvert Impact and our coalition partners, including myself, have spent two-and-a-half years (starting in August 2022) preparing for the implementation of this program. We have conducted listening sessions, hundreds of meetings with partners, and hosted events to inform our investment strategy and approach, in addition to drawing on our direct experience making loans and investments in these markets. If EPA's unlawful termination and Defendants' related conduct is permitted to continue, we will have lost that time that could have been spent more productively to generate financial and impact benefits for our organization and the communities we serve.

* * *

I declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.


Executed this 21st day of March, 2025, in Bethesda, Maryland.

*/s/ Elizabeth Bafford*
ELIZABETH BAFFORD, CEO
Climate United Fund