**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CLIMATE UNITED FUND,<br>*Plaintiff*,<br>-against-<br>CITIBANK, N.A., *et al.*,<br>*Defendants*. | Case No. 25-cv-00698-TSC |
| COALITION FOR GREEN CAPITAL,<br>*Plaintiff*,<br>-against-<br>CITIBANK, N.A., *et al.*,<br>*Defendants*. | Case No. 25-cv-00735-TSC |
| POWER FORWARD COMMUNITIES, INC.,<br>*Plaintiff*,<br>-against-<br>CITIBANK, N.A., *et al.*,<br>*Defendants*. | Case No. 25-cv-00762-TSC |

**DECLARATION OF ELI HOPSON IN SUPPORT OF COALITION FOR GREEN CAPITAL'S MOTION FOR A PRELIMINARY INJUNCTION**

I, Eli Hopson, declare under penalty of perjury as follows:

1. I am an adult citizen of the United States and am competent to testify as to the matters set forth in this declaration. I submit this declaration in support of Coalition for Green Capital's ("CGC") application for a preliminary injunction in the above-captioned suit.

2. I am the Chief Administrative and Development Officer at CGC. I joined CGC in October 2022, and previously held the title of Executive Director and Chief Operating Officer. In

my role, I lead the legal, strategy, and people teams at CGC and am responsible for fundraising and partnerships with impact investors. The information set forth herein is true, to the best of my knowledge and belief.

## I. Background

### A. CGC's Founding and Purpose

3. Founded in 2012, CGC aims to support the development of state and local green banks across the country to facilitate private–public partnerships in driving clean and affordable energy development, and has supported or created over 40 green banks since its inception.

4. Since its creation, CGC has aimed to create a national green bank to develop a new approach centered on public–private partnerships for affordable clean energy development, perceiving that existing municipal and commercial financial systems lacked the tools to accelerate the affordable clean energy transition independently, and that private sector investment was being hampered by hesitancy to invest in new geographies, newer management teams, small-scale projects, newer technologies, less well-understood revenue models, or transactions that were not perfectly suited to traditional bank and insurance project finance lenders.

5. CGC has worked to coordinate and facilitate billions of dollars in clean-energy investment in the United States. As part of its financing support efforts, CGC created the American Green Bank Consortium, a network of green banks, clean energy financing organizations, community development financial institutions, and other lending partners, to expand and accelerate innovative clean energy investments across the United States. Consortium members have collectively deployed over $25 billion in clean energy investments since 2011.

6. The Inflation Reduction Act authorized the EPA to create the Greenhouse Gas Reduction Fund ("GGRF") to "combat the climate crisis by mobilizing financing and private

capital for greenhouse gas- and air pollution-reducing projects in communities across the country."[1] Congress allocated $27 billion in funding for the GGRF. *See* 42 U.S.C. § 7434(a).

7. In October 2023, CGC applied for grants totaling $11.9 billion under all three grant competitions created under the GGRF: the National Clean Investment Fund ("NCIF"), Solar for All ("SFA"), and the Clean Communities Investment Accelerator ("CCIA") programs. CGC's application for the NCIF focused on swift deployment of capital to begin generating savings for consumers and mobilize private capital quickly. CGC was awarded $5 billion from the NCIF and $125 million from SFA. CGC's workplan for its NCIF grant from August 2024 with the EPA is available publicly on the EPA's website. *See* "National Clean Investment Fund Program Work Plan of Coalition for Green Capital," Coal. for Green Cap., *available at* https://www.epa.gov/system/files/documents/2024-08/ncif-workplan-cgc.pdf.

**B. CGC's Grant from the EPA**

8. Following negotiations, the EPA finalized CGC's NCIF grant award on August 8, 2024 pursuant to the terms set forth in a grant agreement ("Grant Agreement"). The Grant Agreement required that, when a depository institution—ultimately, Citibank, N.A. ("Citi")—was designated as a financial agent of the United States ("the Financial Agent"), CGC was required to open a deposit account at the Financial Agent and such account was to be used as CGC's operating account. CGC had no role in the EPA's selection of Citi as Financial Agent.

9. On November 1, 2024, CGC entered into a three-party Account Control Agreement ("ACA") with the EPA and Citi, pursuant to which CGC's deposit account with Citi would be regulated, and the EPA's security interest in the account was perfected. The ACA included a Form

[1] *See* "About the Greenhouse Gas Reduction Fund," Env't Prot. Agency (Feb. 13, 2025), https://www.epa.gov/greenhouse-gas-reduction-fund/about-greenhouse-gas-reduction-fund.

of Notice of Exclusive Control as Exhibit A that the EPA could utilize to exercise its security interest in accordance with the Grant Agreement. After capitalization of CGC's deposit account at Citi with the balance of the funds awarded by the EPA, CGC began operating its EPA award through this account pursuant to the Grant Agreement (also known as an "NOA") and ACA. Prior to the disbursement into CGC's deposit account at Citi, CGC had been using the federal Automated Standard Application Payments ("ASAP") system to draw down funds and execute on its commitments under the Grant Agreement. The ACA granted EPA increased transactional visibility and a security interest in CGC's accounts not otherwise possible under the ASAP system.

10. The deposit account established by the ACA consists of three sub-account types ('Budget,' 'Reserve', and 'Program Income from Operations'), each of which serves a distinct purpose. The Budget Account holds funds that have yet to be used for any of the allowable activities. The Reserve Account is intended to enable funds to be set-aside within the Financial Agent for use for any form of Financial Assistance (as that term is defined in the Grant Agreement) that requires CGC to pledge award funds for a future expenditure to a third party to meet a legal obligation, and from which properly incurred commitments could continue to be funded following a Notice of Exclusive Control. The Program Income from Operations Account within the Deposit Account enables Program Income from Operations (as defined under the Grant Agreement) to be held, tracked, and segregated in accordance with the Grant Agreement. Funds in the Program Income from Operations Account may be transferred to either the Budget Account or Reserve Account to be used for grant performance purposes.

11. The Grant Agreement was amended on December 19, 2024 to update the terms and conditions and to approve CGC's amended workplan and budget. On January 17, 2025, the EPA

further amended CGC's Grant Agreement to reflect an updated workplan and detailed budget modification, and limit CGCs amount of indirect costs that could be drawn.

12. The January 17, 2025 revision of the Grant Agreement did not modify any of the underlying terms and conditions of the Grant Agreement and maintained the financial agent structure and the accompanying protections that were reflected in the original Grant Agreement, such as obligations to execute the workplan in accordance with EPA policies and procedures on legal, compliance, and financial risk, and to regularly report to the EPA on its performance and its Subgrantees' activities.

13. Consistent with these obligations, the EPA has monitored CGC's performance under the Grant Agreement since the performance period began, and CGC has interfaced regularly with EPA staff and shared periodic reports as required under the Grant Agreement.

14. Each of CGC's 19 Subgrantees hold its subaward funds at an account at Citi, and CGC and Citi have entered into an ACA with each Subgrantee, with a parallel structure to the ACA among CGC, Citi, and the EPA. CGC maintains a security interest in the subaward funds and the authority to issue a Notice of Exclusive Control directing Citi to cease compliance with the Subgrantees' instructions regarding the accounts.

**C. Citi Freezes CGC's and the Subgrantees' Funds, and EPA Purports to Terminate the NCIF Program**

15. Since February 18, 2025, CGC and its Subgrantees have been unable to access funds and financial assets in accounts subject to the ACAs with Citi. This followed public comments from EPA Administrator Lee Zeldin, beginning on February 12, 2025, calling for the termination of GGRF programs and for the clawback of funds disbursed to GGRF grantees.

16. With no first-hand information as to why Citi was declining to follow the instructions of CGC and its Subgrantees regarding the disposition of funds and assets in the ACA

accounts, CGC filed a complaint against Citi in the Southern District of New York seeking access to those funds. CGC subsequently voluntarily dismissed this suit.

17. On March 4, 2025, CGC received a "Compliance and Oversight Review of EPA Greenhouse Gas Reduction Fund" request from EPA Acting Deputy Administrator W.C. McIntosh that asked for responses by March 28, 2025. I responded on March 5, 2025, to confirm receipt and that we would prepare a response by the date indicated.

18. On March 11, 2025, CGC received a "Notice of Termination" (or "Notice") signed by EPA Acting Deputy Administrator W.C. McIntosh. The Notice purported to terminate CGC's grant agreement with the EPA, and was previously provided to the Court. ECF 6-1.

19. Before or since issuing the Notice, the EPA has never provided any substantiation or evidence that it considered any of CGC's conduct to be a breach of the NCIF terms and conditions, the grant award, or applicable law, or that it constituted Waste, Fraud, or Abuse within the meaning of applicable law. The EPA also provided no warning that it would seek to terminate CGC's grant agreement on March 11 and, to the contrary, the EPA requested on March 4 that CGC provide it additional information as part of a review, with a deadline of March 28.

**D. EPA's Alleged "Conflicts of Interest"**

20. I am aware that, in response to the Court's request to counsel for the EPA Defendants at the March 12 hearing on Climate United's motion for a temporary restraining order, the EPA Defendants submitted a declaration from EPA Chief of Staff Eric Amidon ("Amidon Decl."). *See Climate United*, ECF 25-1.

21. In his declaration, Mr. Amidon references an unspecified March 4, 2025 "media article identif[ying] a number of potential conflicts of interests regarding personnel at several grantees," which "noted that Jahi Wise, the policy director of grantee Coalition for Green

Capital until 2021, left Coalition for Green Capital to work at President Biden's Climate Policy Office on GGRF implementation." Amidon Decl. ¶ 35. But Mr. Wise's prior employment with CGC presented no such "conflict of interest" with respect to CGC's selection as a GGRF grantee.

22. As a first order matter, it is inaccurate to say that Mr. Wise left CGC in 2021 to work "on GGRF implementation," as the GGRF was not established until the passage of the Inflation Reduction Act in 2022. Mr. Wise was indeed appointed as a Senior Advisor to the Administrator at EPA, and also served as Acting Director for the Greenhouse Gas Reduction Fund at EPA. When CGC was considering preparing an application for the expected funding opportunity, we consulted with counsel to insure that we were following all applicable rules regarding contact with former employees and potential conflicts of interest. Counsel contacted EPA, who provided a copy of Mr. Wise's recusal statement (CGC Ex. J), which noted that the Biden Ethics Pledge expired on January 21, 2023, and that following that time period would be covered by EPA's competition policy. Consistent with our ethical obligations, EPA Order 5700.5A1, EPA's Policy for Competition of Assistance Agreements, and the rigorous ethics and conflict-of-interest review carried out by EPA during the review and selection process for GGRF funding, CGC did not contact Mr. Wise regarding the program and Mr. Wise was recused from reviewing, evaluating, selecting, or approving funding on any grant competition for GGRF funding for which CGC submitted an application. In other words, Mr. Wise did not even review applications from CGC's competitors for GGRF funds. It is not clear why EPA's Chief of Staff would cite an unspecified "media article" referencing an alleged conflict of interest with respect to Mr. Wise, or why in the EPA's referral letter from the Administrator that EPA's Chief of Staff relies on in paragraph 39 of his declaration would state that Mr. Wise did not recuse himself, when the documentation regarding his recusal is readily available to EPA.

23. Mr. Amidon also references a June 27, 2024 ethics complaint, later resubmitted on March 7, 2025, regarding an alleged conflict of interest with respect to David Hayes, a CGC board member who has never received compensation from CGC. Mr. Hayes served on CGC's board first from January 2017 until January 2021, when he resigned to join the Biden Administration as Special Assistant to the President for Climate Policy. After departing the administration in October 2022, he rejoined CGC's board in August 2023. But Mr. Hayes's employment in the administration similarly presented no "conflict of interest" with respect to CGC's selection as a GGRF grantee, as Mr. Hayes had no role in the Administration in any respect in working on the GGRF provisions that were ultimately included in the Inflation Reduction Act, and no role on the implementation of the program, and could not have had any role in selection of CGC has he departed prior to the NOFO being issued.

## II. CGC's Ability to Carry Out Its Mission, and Congress's Purpose, Is Suffering

24. As described in the declarations of my colleagues Stephen Brown, Jessica Buendia, and Richard Kauffman, the EPA's and Citi's actions have caused immediate and irreparable harm to CGC and its Subgrantees. They have damaged its reputation, caused it to lose opportunities for funding and investment, and frustrated its operations and the achievement of its and Congress's objectives.

25. Without an order from this Court staying the effect of the EPA's purported Notice of Termination and ordering the EPA and Citi to immediately release the assets and resume compliance with CGC's and the Subgrantees' lawful instructions concerning their use or disposition, CGC will continue to suffer permanent and irreparable harm.

26. These actions have obstructed, and are continuing to obstruct, CGC's efforts to carry out its mission in ways that cannot be undone. For instance, CGC and its Subgrantees have been unable to fully implement their investment programs, have had their day-to-day operations

impeded because of the reputational damage and the inability to access funds at Citi, and have lost known and unknown opportunities to work with companies and governmental organizations to direct funding toward affordable clean energy projects across the country.

27. Unless CCG obtains relief from the EPA's actions and Citi's decision to freeze CGC's and the Subgrantees' accounts, specific milestones that CGC is obligated to meet in its EPA approved workplan—for example, its efforts to mobilize $14 for every NCIF dollar awarded—will not succeed. Given my experience, I expect that these companies and governmental organizations will not be willing to partner with CGC unless its reputation is maintained and it can reliably access the resources around which CGC has spent significant time and effort planning.

28. And the EPA's and Citi's actions frustrate CGC's efforts to accomplish the objectives that *Congress* set out when it authorized and funded the Greenhouse Gas Reduction Fund, including to provide financial assistance to "qualified projects" "in partnership with, and by leveraging investment from, the private sector." 42 U.S.C. § 7434(c)(3)(A).

*[continued on next page]*

29. At the broadest level, the EPA and Citi are impeding CGC's efforts to mobilize private capital. CGC was founded to find solutions to the market failures that impeded the development of cheap clean energy, and Congress and the EPA gave funding to CGC to help accomplish this mission. Every delay and lost opportunity hurts CGC's efforts to accelerate the deployment of affordable clean energy nationwide. Quite simply, CGC cannot implement the NCIF grant as intended by Congress and required by the contract.

* * *

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Executed this 21st day of March 2025.

*/s/ Eli Hopson*
ELI HOPSON
Coalition for Green Capital