IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CLIMATE UNITED FUND,<br><br>　　　　　　　　*Plaintiff*,<br>　　-against-<br>CITIBANK, N.A., *et al.*,<br><br>　　　　　　　　*Defendants*. | Case No. 25-cv-00698-TSC |
| COALITION FOR GREEN CAPITAL,<br><br>　　　　　　　　*Plaintiff*,<br>　　-against-<br>CITIBANK, N.A., *et al.*,<br><br>　　　　　　　　*Defendants*. | Case No. 25-cv-00735-TSC |
| POWER FORWARD COMMUNITIES, INC.,<br><br>　　　　　　　　*Plaintiff*,<br>　　-against-<br>CITIBANK, N.A., *et al.*,<br><br>　　　　　　　　*Defendants*. | Case No. 25-cv-00762-TSC |

**DECLARATION OF RICHARD KAUFFMAN IN SUPPORT OF
COALITION FOR GREEN CAPITAL'S MOTION FOR A
PRELIMINARY INJUNCTION**

I, Richard Kauffman, declare under penalty of perjury as follows:

1.  I am an adult citizen of the United States and am competent to testify as to the matters set forth in this declaration. I submit this declaration in support of Coalition for Green Capital's ("CGC") application for a preliminary injunction in the above-captioned suit.

1

2.  Since 2021, I have been a member of CGC's Board of Directors and became its Chief Executive Officer on January 6, 2025. In my current role, I am responsible for managing CGC's operations, including the administration of its financing and investment programs.

3.  Before joining CGC, I held positions in major private-sector financial institutions including Goldman Sachs, where I was a partner and chaired the Global Financing Group, and Morgan Stanley, where I served as Vice Chairman of the Institutional Securities business and co-Head of its Banking Department.  I am currently Chair of Generate Capital PBC, a leading financier, owner, and operator of sustainable infrastructure.  In the public sector, I served as Chair of Energy and Finance for the State of New York, and spearheaded the creation of the New York Green Bank, the nation's largest state green bank, which has mobilized more than $8 billion for clean energy projects.

4.  The information set forth herein is true, to the best of my knowledge and belief.

**I.     CGC's Structure and Activities**

5.  With funding from the NCIF, CGC has used its expertise—including proven past experience establishing self-sustaining green banks in Connecticut, New York, and elsewhere—to establish the first national green bank in the United States, creating a coalition of subrecipients (the "Subgrantees") that includes 16 well-established state and local green banks and two national nonprofit organizations.  In December 2024 and January 2025, CGC concluded definitive subgrant agreements with the 19 Subgrantees, which paralleled the terms and conditions of the NCIF grant to CGC itself, and required the Subgrantees to comply with oversight and reporting obligations to both CGC and the EPA.  CGC also developed and implemented an internal investment policy to help address risks and safeguard public funds, which Subgrantees were required to accept and apply to their own investments, except where CGC reviewed and approved an alternative investment policy.

6. I have reviewed CGC's 2024 Semi-Annual Report and am familiar with its contents. As described therein, and with the agreements and oversight mechanisms in place, CGC distributed approximately $1.8 billion among the Subgrantees to support the creation of a self-sustaining nationwide network of state and local green banks and drive the deployment of qualifying clean energy projects. As of December 31, 2024, the Subgrantees had already closed 6 qualifying projects totaling $33.7 million in NCIF fund allocations, which are expected to mobilize an additional $192 million in private capital and $2.2 million in non-NCIF public capital (for a public–private capital mobilization ratio of nearly 7:1).

7. In addition to its partnership and grant activities, CGC operates to identify affordable clean energy investment opportunities throughout the United States, and to assist in funding those opportunities through its own assets and by mobilizing private-sector investment. CGC's investment activities are commercial, not concessional; they aim to generate positive returns on invested capital to drive a self-sustaining organization and facilitate continuous reinvestment in clean energy projects.

8. CGC seeks to do business with direct participants in clean energy technology and infrastructure, including renewable energy developers, but also with a wide variety of investment firms and other financial institutions. CGC's 2024 Semi-Annual Report states that, in the latter part of 2024, CGC received 82 proposals through a program titled "Requests for Proposals One" ("RFP1") from clean energy developers, commercial partners, community lenders, and financial investors (including private credit and equity firms) to pursue qualified green energy projects in the United States. As indicated in the report, RFP1 enables CGC to efficiently allocate capital across various strategies, assets, technologies, and locations, and to execute these investments in a

manner that will enhance mobilization of CGC capital and incorporate market-best underwriting practices, without sacrificing accountability or limiting oversight of how funds are invested.

9. CGC's 2024 Semi-Annual details that between the launch of RFP1 and December 31, 2024, CGC received 82 investment proposals totaling $30.9 billion in requested funds. Of these proposals, 24 projects totaling $5.3 billion were positively scored for further consideration for investment by CGC, with associated expected job creation of 240,700 and total project costs of $85.1 billion—a mobilization ratio of 16:1. Proposals for qualified projects that scored high enough to demonstrate viability but that were not selected for CGC funding—generally, either because the projects were too small for CGC direct investments or because the type of transaction was better suited to a network partner with more applicable expertise—were considered for referral to the CGC Subgrantees and nascent green banks in the CGC Network Loan Program. Among the total 82 proposals, CGC also received 37 proposals from various financial intermediaries totaling $22.6 billion in requested funds, of which 17 were positively scored and with whom CGC had extensive commercial discussions.

## II. CGC Is Suffering Irreparable Harm to its Investment Activities

10. If Defendants continue to freeze CGC's funds for the uncertain duration of litigation, I expect that CGC will lose out on vital investment opportunities necessary to carry out CGC's core mission, namely, to invest in clean energy projects in partnership with other public and private organizations. Indeed, the EPA's and Citi's actions have harmed CGC's direct investment activities by depriving CGC and its Subgrantees of known and unknown direct investment opportunities and partnerships.

11. CGC has already faced concerns from its investment partners and co-investors about the status of the investment and grant commitments CGC has made. Indeed, the quality and

4

number of investment proposals and applications appear to have been negatively impacted since EPA's funding freeze.

12. Based on my knowledge and experience in the industry, I believe that the Defendants' actions have severely impacted CGC's pipeline of activities. CGC will never know how many opportunities it lost as a result of potential partners' concerns that CGC's funding will be delayed for months or years of litigation.

A. **CGC's Direct Investment Efforts Have Been Impeded**

13. CGC's efforts to invest directly in clean energy projects and to attract private financing to invest alongside it have been disrupted by the Defendants' actions. To be an effective financing counterparty, CGC (or any organization) must have certainty of funding sources, be able to move efficiently and reliably in negotiations, and be viewed as credible by involved parties. CGC is made ineffective if potential partners cannot rely on when CGC's capital will become available. No credible counterparty will take this funding risk, or be willing to be associated financially with CGC.

14. For example, CGC was in negotiations with a renewable energy company concerning CGC's potential investment in an interregional energy transmission project. Although CGC and the company were able to reach agreement in principle on a term sheet and a letter of intent, the company suspended negotiations on March 17, 2025 as a result of recent events.

15. Consistent with CGC's workplan approved by EPA and the terms and conditions of CGC's grant agreement, one of CGC's strategies was to invest with large-scale institutional asset managers to magnify the impact of CGC's capital and community-investment expertise with private-sector operational capabilities and resources. In doing so, CGC intended to create investment funds to increase accessibility to private capital from institutional investors such as

pension funds, and lead to greater access to investment tools that maximize targeted impact. Unfortunately, as a result of the EPA's and Citi's actions, plans to market these investment vehicles have been put on hold, harming CGC's objectives and jeopardizing the viability of this program. Similarly, CGC had been in conversation with philanthropic entities that were interested in partnering with us on a fund-of-funds strategy, with at least one such entity indicating interest, on a preliminary basis, in investing up to $250 million in such a strategy with CGC. Following the Defendants' actions, discussions with these entities have been suspended.

16. CGC's operations with respect to its Subgrantees have also been affected. For example, CGC intended to partner with a consulting firm that would assist CGC by helping to evaluate the investment policies of CGC's network partners and by periodically ensuring its Subgrantees were in compliance with CGC's investment policy. This consulting firm is widely accepted in commercial markets to evaluate lenders' operations and procedures, and its use would have provided an additional control to ensure that Subgrantee investments were being made in local markets in a sound and scalable manner. The use of such a service provider is embedded in CGC's investment policies with respect to Subgrantees. Following a public request for proposals and negotiations, this firm was prepared to deliver scope of services and an engagement letter, but following the EPA's allegations and the freezing of CGC's funds, the consulting firm broke off negotiations and declined to work with CGC.

17. Because of this loss, CGC has been deprived of the ability to use a best-in-class provider, delaying the implementation of its investment programs.

### B. CGC Is Suffering Reputational Harm

18. Financial institutions like CGC rely on their reputation and public trust. CGC's reputation as a reliable institution is therefore essential to its mission. It facilitates CGC's efforts

to locate qualifying investment projects across the country, and to partner with and pursue those opportunities. And because part of CGC's purpose is to bridge market failures and attract private co-investment to projects that might otherwise be deemed too risky, confidence in CGC's commitments as an investor is vital to achieving buy-in from private sector investors.

19. The transactions CGC is involved in are highly significant for CGC's counterparties, and these counterparties rely on CGC's reputation as a credible organization that is capable of delivering on its investment commitments without risk of negative publicity or default.

20. Citi's freeze on CGC's funds, EPA's public statements and purported termination of the NCIF program, have already caused significant reputational harm to CGC, and will cause more if the freeze is allowed to stand.

21. Moreover, Citi's freezing of CGC's and its Subgrantees' funds at EPA's direction separately injured CGC's reputation and goodwill—even before the EPA's Notice of Termination. That conduct signaled to current and potential future partners of CGC and its Subgrantees that they could not be relied upon to deliver on investment proposals and commitments.

22. I have been told that CGC officers and employees have heard from industry participants that potential partners and investment opportunities are reluctant to work with CGC following Citi's freeze of its accounts and the "Notice of Termination." As I understand it, the freeze has undermined the perception of CGC's ability to provide funds, raising concerns among our counterparties.

23. The longer the freeze on CGC's funds continues, the more difficult it will be for CGC to originate deals and secure co-investors. CGC may be unable to attract applications from high-quality investments, and those investors that are willing to work with CGC may not be willing to risk CGC taking a large position in any investments CGC funds. In the medium to long term,

CGC's and its Subgrantees' programs may fail without access to the funding CGC has committed to them, permanently damaging CGC's reputation as a credible counterparty.

24. It is impossible to know what other investment or partnership opportunities may have come available to CGC but for the freeze. And these lost opportunities compound the reputational injury to CGC and its Subgrantees.

*     *     *

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Executed this 21st day of March 2025.

/s/ Richard Kauffman
RICHARD KAUFFMAN
Coalition for Green Capital