UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CLIMATE UNITED FUND,**<br><br>        Plaintiff,<br><br>v.<br><br>**CITIBANK, N.A.,** *et al.,*<br><br>        Defendants. | Civil Action No. 1:25-cv-00698-TSC |
| **COALITION FOR GREEN CAPITAL,**<br><br>        Plaintiff,<br><br>v.<br><br>**CITIBANK, N.A.,** *et al.,*<br><br>        Defendants. | Civil Action No. 1:25-cv-00735-TSC |
| **POWER FORWARD COMMUNITIES, INC.,**<br><br>        Plaintiff,<br><br>v.<br><br>**CITIBANK, N.A.,** *et al.,*<br><br>        Defendants. | Civil Action No. 1:25-cv-00762-TSC |

**DECLARATION OF TIMOTHY J. MAYOPOULOS**

I, Timothy J. Mayopoulos, declare as follows:

1.    I am the President and Chief Executive Officer of Power Forward Communities, Inc. ("PFC"). I submit this declaration in support of Plaintiff PFC's motion for a preliminary injunction in this matter. The statements made in this declaration are based on my personal

1

knowledge, materials I have reviewed, and information made available to me pursuant to my duties at PFC.

2. I joined PFC as its Acting President and Chief Executive Officer in October 2023, and have served as PFC's President and Chief Executive Officer since June 30, 2024. Prior to my current role, I held executive-level positions at multiple large-scale organizations, including serving as the President and Chief Executive Officer of Silicon Valley Bridge Bank, N.A. in 2023; the President and Chief Executive Officer of Fannie Mae from 2012 to 2018; the Executive Vice President, Chief Administrative Officer, General Counsel, and Corporate Secretary of Fannie Mae from 2009 to 2012; and the Executive Vice President and General Counsel of Bank of America from 2004 to 2008. I have a bachelor's degree from Cornell University and a juris doctorate degree from New York University School of Law.

3. PFC is a nonprofit organization that comprises a coalition of some of the most trusted nonprofit organizations in the country: Enterprise Community Partners, Local Initiatives Support Corporation (LISC), and Rewiring America. PFC's coalition members have nearly a century of combined experience in financing, managing, and implementing affordable housing projects for Americans in need. Those projects total more than $100 billion and have added approximately 1.5 million affordable homes and apartments across the United States.

4. PFC's mission is to help lower housing costs and utility bills for American families and communities through clean-energy investments. In partnership with its coalition members, PFC aims to expand and preserve affordable housing, improve air quality, and create well-paying jobs by ramping up simple energy-efficiency and other improvements in single-family and multifamily homes nationwide.

5. As contemplated by the Notice of Funding Opportunity for the U.S. Environmental Protection Agency's National Clean Investment Fund ("NCIF") (a true and correct copy of which is attached to the Complaint as Exhibit A), PFC was established to serve as the lead applicant for coalition applicants and operates as a pass-through entity for purposes of administering the NCIF grant. As such, it is "accountable to EPA for effectively carrying out the full scope of work and the proper financial management of the grant." *See* Complaint Ex. A at 7.

6. PFC received a $2 billion award from the U.S. Environmental Protection Agency ("EPA") under the NCIF program. PFC's award is governed by the terms of an Award Agreement between EPA and PFC entered into on August 8, 2024 (a true and correct copy of which is attached to the Complaint as Exhibit B) and as amended on December 20, 2024 (a true and correct copy of which is attached to the Complaint as Exhibit C). Among other terms, the Award Agreement authorizes PFC to issue subawards to designated subrecipients to carry out parts of its NCIF workplan. The coalition members and/or their affiliates are designated subrecipients of the grant funds awarded to PFC, and in this role are obligated to implement certain objectives of the grant (collectively, the "Subrecipients"). On February 24, 2025, PFC announced that it had committed $539 million of its $2 billion award.

7. The Award Agreement required that PFC drawdown the entire award amount into an account at the designated Financial Agent, i.e., Citibank, N.A ("Citibank"). PFC would then allocate NCIF grant funds to its designated subrecipients across various accounts at Citibank.

8. PFC has no assets or funding other than from the NCIF award.

9. PFC entered into an Account Control Agreement ("ACA") with EPA and Citibank in connection with its own accounts (a true and correct copy of which is attached to the complaint as Exhibit D), and Account Control Agreements with Citibank and each Subrecipient

with respect to each Subrecipient's accounts ("Subrecipient ACAs") (true and correct copies of which are attached to the Complaint as Exhibits E-G).  In the ACA with PFC, Citibank agreed to "comply with all instructions, notifications, and entitlement orders [it] receives directing the disposition of funds and financial assets in the Accounts including, without limitation, directions to distribute proceeds of any such transfer or redemption of interest or dividends on financial assets in the Accounts … originated by [PFC]."  Complaint Ex. D, Section 2.

10. Citibank has identical obligations under the Subrecipient ACAs.  Specifically, in the Subrecipient ACAs, Citibank agreed to "comply with all instructions, notifications, and entitlement orders [it] receives directing the disposition of funds and financial assets in the Accounts including, without limitation, directions to distribute proceeds of any such transfer or redemption of interest or dividends on financial assets in the Accounts … originated by [Subrecipients]."  Complaint Exs. E-G, Section 2.

11. Prior to February 13, 2025, Citibank satisfied its contractual obligation to PFC by complying with disbursement instructions submitted by PFC within 24 hours.  If PFC submitted a disbursement instruction prior to 11 a.m., Citibank would generally disburse the funds during the same business day.  For example, PFC submitted a disbursement instruction at 10:41 a.m. on February 12, 2025, and Citibank processed the request the same day.  If PFC submitted a disbursement instruction after 11 a.m., Citibank would generally disburse the funds the next business day.

12. On February 14, 2025, at 4:14 p.m., PFC directed Citibank to disburse $1,085,683.50.

13. On March 10, 2025, at 10:18 a.m., PFC directed Citibank to disburse $224,765.15.

14. As of the date of this declaration, Citibank has not disbursed funds in response to those directions.

15. In keeping with its monitoring and oversight responsibilities, PFC's current practice is to review all Subrecipients' directions to Citibank for disbursement prior to their issuance to Citibank. PFC has view-only access to all Subrecipients' accounts at Citibank. Under the terms of the ACAs among PFC, the Subrecipients, and Citibank, Citibank must provide copies of statements and confirmations for the accounts simultaneously to the applicable Subrecipient and PFC.

16. Because of these monitoring and oversight functions, PFC is aware that certain Subrecipients have also submitted disbursement instructions to Citibank since February 14, 2025 that Citibank has refused, as of the date of this filing.

17. On March 11, 2025, at 5:24 p.m., EPA informed PFC that it was terminating the Award Agreement, effectively immediately. A true and correct copy of EPA's purported termination notification is attached to the Complaint as Exhibit J.

18. PFC has been and will continue to be harmed by Citibank's refusal to disburse funds and EPA's unlawful termination of the Award Agreement. Since Defendants suspended PFC's accounts and purportedly terminated PFC's award, PFC has not secured a committed source of funding to replace the NCIF award.

19. Without access to its funds, PFC has been unable to pay outstanding invoices from contractors for work completed on PFC's behalf and, as a result, PFC is incurring default risk with respect to these contracts. These include contracts for legal and management consultant services that are necessary for PFC to administer the grant in compliance with the terms of the Award Agreement. They also include contracts for essential financial management and IT

services. If PFC is not able to make payment on these outstanding invoices, which it cannot do without access to its NCIF funds, PFC is at imminent risk of losing these services due to default.

20. Further, EPA's Notice of Termination and Citibank's freeze of PFC's accounts—no matter how meritless—have caused PFC reputational harm by signaling the effective cancellation of PFC's NCIF grant and, thus, uncertainty regarding PFC's ability to satisfy current and future financial obligations. EPA's purported termination of PFC's award "for cause," and its unsupported accusations of "fraud, waste, and abuse," "conflicts of interest," and other alleged misconduct, have compounded this reputational harm. EPA's and Citibank's actions have chilled the willingness of key vendors and investment partners to do business with PFC, impeding PFC's ability to carry out its mission.

21. As a result of EPA's purported termination and the uncertainty surrounding PFC's grant award, PFC has lost essential services. For example, on March 11, 2025, PFC's key contractor advised that PFC had until March 17, 2025 to make payment or it may cease providing services. That contractor subsequently went "pencils down," stopping its work for PFC. As of March 19, PFC was in discussions with this contractor to resume work on a narrow set of projects, and discussing what the compensation would be for such work. The revised scope of work will leave PFC without essential services going forward.

22. PFC is also unable to pay contractors to complete, or in some cases to begin, critical work for PFC. This includes the completion of a financial reporting audit and work to improve PFC's website that is necessary to help make information available to the public. As of the day of this filing, PFC has not secured alternative sources of funding to pay for such work. As a result of Citibank's funding freeze, moreover, PFC has paused procurement processes to engage additional contractors.

23. Citibank's account freeze is also impairing PFC's ability to support its staff. All PFC staff members are secondees on loan to PFC under secondment agreements that are to be paid for by grant funds. PFC's inability to access its NCIF funds threatens PFC's ability to compensate these staff members. PFC owes funds under the secondment and services agreements and is at risk of default under those agreements.

24. Citibank's refusal to disburse PFC's funds has also hindered PFC's ability to recruit necessary and skilled employees to carry out its mission under the NCIF program. PFC's budget contemplated a staff of more than thirty, but PFC remains staffed by only six employees. Due to PFC's budget uncertainty, it is unable to hire the remaining employees needed to ensure regulatory compliance and to carry out PFC's obligations under the NCIF work plan. Recently, for example, PFC conducted search and interview processes for a Chief Financial Officer, a Chief Legal and Risk Officer, and a Vice President of Human Resources. PFC had candidates in mind for each of these positions but had to delay these hires due to its inability to access funding. Because of Citibank's continued freeze of PFC's funds, moreover, PFC could permanently lose the opportunity to hire one or more of these accomplished candidates as they pursue other opportunities.

25. Finally, Citibank's freeze prejudices PFC's ability to fulfill its obligations under the Award Agreement. By the terms of its Award Agreement with EPA, PFC must demonstrate sufficient progress towards achieving the grant's objectives by certain dates. In accordance with the Award Agreement, PFC relies on its Subrecipients to fulfill those objectives and timely achieve certain grant progress milestones. Citibank's refusal to disburse funds from the Subrecipients' accounts negatively impacts the Subrecipients' ability to fulfill those obligations,

which, in turn, jeopardizes PFC's ability to fulfill its obligations under the Award Agreement as the prime recipient of the NCIF grant funds.

26. For example, certain of PFC's Subrecipients are in the process of negotiating affordable housing financing projects involving hundreds of millions of grant dollars and over $1 billion of total development costs (grant costs plus private capital). These projects are at risk of failing due to the unavailability of NCIF grant funds. Because time is of the essence, the lack of access to funds in the Citibank accounts jeopardizes these transactions and subjects PFC to reputational harm.

27. Under the Award Agreement, PFC is also required to report to EPA regarding its progress in implementing the objectives of the grant. For example, PFC recently received from EPA a lengthy demand letter requesting information and seeking the production of various categories of documents. Among other things, the letter threatens the imposition of sanctions if PFC fails to respond in a timely manner. But PFC's ability to timely respond to these requests has been and continues to be slowed by Citibank's refusal to disburse the NCIF funds, as PFC cannot access the funding necessary to compensate the staff or third-party professionals responsible for addressing EPA's requests.

28. A termination of the Award Agreement would exacerbate all the harms detailed above. If EPA is indeed permitted to terminate the Award Agreement, PFC would lose access to its award funds permanently. In such a scenario, PFC, which has no source of funding other than from the NCIF award, would be forced to lay off its employees and close its doors for good. More importantly, PFC would be unable to carry out the important work for which its NCIF award was made—and for which Congress appropriated the funds allotted to the NCIF program and obligated to PFC: to deploy "low- and zero-emission products, technologies, and services,"

42 U.S.C. § 7434(c)(1), to lower Americans' utility bills, improve community health and safety, and help address the climate crisis.

I declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge. Executed this 21st day of March, 2025.

_____
Timothy J. Mayopoulos