# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CLIMATE UNITED FUND,**<br><br>Plaintiff,<br><br>v.<br><br>**CITIBANK, N.A.,** *et al.*<br><br>Defendants. | Case No. 1:25-cv-00698 (TSC) |
| **COALITION FOR GREEN CAPITAL,**<br><br>Plaintiff,<br><br>v.<br><br>**CITIBANK, N.A.,** *et al.*<br><br>Defendants. | Case No. 1:25-cv-00735 (TSC) |
| **POWER FORWARD COMMUNITIES, INC.,**<br><br>Plaintiff,<br><br>v.<br><br>**CITIBANK, N.A.,** *et al.*<br><br>Defendants. | Case No. 1:25-cv-00762 (TSC) |

## <u>FEDERAL DEFENDANTS' OPPOSITION TO PLAINTIFFS' CONSOLIDATED MOTION FOR PRELIMINARY INJUNCTION</u>

## TABLE OF CONTENTS

**INTRODUCTION**................................................................................................... 1

**FACTUAL AND REGULATORY BACKGROUND** ................................................ 3

**PROCEDURAL HISTORY** ................................................................................... 7

**LEGAL STANDARDS** ......................................................................................... 8

**ARGUMENT** ........................................................................................................ 8

**I.    Plaintiffs Cannot Invoke the APA To Challenge Alleged Breaches of Contract.......... 8**

    A.    Plaintiffs' Claims Are Contract Claims for Specific Performance. ................................ 9

    B.    Plaintiffs Improperly Challenge Funding Decisions Committed to Agency Discretion...
................................................................................................................................ 16

**II.   Plaintiffs' Constitutional and Statutory Claims Do Not Support Relief. ................... 17**

    A.    Termination Does Not Implicate the Appropriations Clause, and Plaintiffs Lack Standing Under the Clause. ................................................................................................... 18

    B.    Termination Does Not Implicate the Appropriations Deadline in the Inflation Reduction Act. .................................................................................................................................. 19

    C.    Termination Did Not Violate Due Process, Because the Tucker Act Provides All the Process Due. ............................................................................................................... 20

**III.  Even If Jurisdiction Existed, Plaintiffs Are Not Likely to Succeed on the Merits. ... 21**

    A.    EPA's Termination of Plaintiffs' Grant Agreements Was Not Arbitrary or Capricious  22

        i.    EPA's Termination of Plaintiffs' Grants was Reasonable and Reasonably Explained.
................................................................................................................................ 22

        ii.   EPA Complied with its Regulations in Terminating the Grants............................... 25

        iii.  EPA's Suspension, Prior to Termination, Did Not Violate the APA........................ 26

**IV.   Plaintiffs' Alleged Harm Cannot Justify a Preliminary Injunction. .......................... 26**

    A.    Plaintiffs' Alleged Harm is Not Irreparable. ................................................................ 26

    B.    Plaintiffs' Alleged Harm is Not Immediate.................................................................. 28

    C.    Plaintiffs' Alleged Reputational Harm Fails to Justify Entry of a Preliminary Injunction.
................................................................................................................................ 29

**V.    An Injunction Would Be Contrary to the Public Interest. ........................................... 29**

**VI.   Any Relief Should be Limited. ....................................................................................... 30**

**VII.  Bond is Required if the Court Issues a Preliminary Injunction. ................................. 31**

**CONCLUSION** .................................................................................................... 31

## TABLE OF AUTHORITIES

**Cases** .................................................................................................................... **Pages (s)**

*Ahuruonye v. U.S. Dep't of Interior,*
   312 F.Supp.3d 1 (D.D.C. 2018) ................................................................... 29

*Albrecht v. Comm. on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.,*
   357 F.3d 62 (D.C. Cir. 2004) ........................................................................ 9

*Alexander v. Sandoval,*
   532 U.S. 275 (2001) ..................................................................................... 21

*Armstrong v. Exceptional Child Ctr., Inc.,*
   575 U.S. 320 (2015) ..................................................................................... 21

*Benderson Dev. Co., Inc. v. U.S. Postal Serv.,*
   998 F.2d 959 (Fed. Cir. 1992) ..................................................................... 16

*Boaz Hous. Auth. v. United States,*
   994 F.3d 1359 (Fed. Cir. 2021) ................................................................... 16

*Bowen v. Massachusetts,*
   487 U.S. 879 (1988) ..................................................................................... 14

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.,*
   419 U.S. 281 (1974) ..................................................................................... 24

*Brock v. Pierce Cnty.,*
   476 U.S. 253 (1986) ..................................................................................... 30

*C.G.B. v. Wolf,*
   464 F. Supp. 3d 174 (D.D.C. 2020) ............................................................. 8

*Chaplaincy of Full Gospel Churches v. England,*
   454 F.3d 290 (D.C. Cir. 2006) ..................................................................... 26

*Charlesbank Equity Fund II v. Blinds To Go, Inc.,*
   370 F.3d 151 (1st Cir. 2004) ....................................................................... 27

*City of New Haven, Conn. v. United States,*
   809 F.2d 900 (D.C Cir. 1987) ..................................................................... 19

*Coggeshall Dev. Corp. v. Diamond,*
   884 F.2d 1 (1st Cir. 1989) ............................................................................ 13

*Columbia Gulf Transmission v. FERC*,
   106 F.4th 1220 (D.C. Cir. 2024) ........................................................ 22

*Crowley Gov't Services, Inc. v. GSA*,
   38 F.4th 1099 (D.C. Cir. 2022) ..................................................... 14, 15

*Davis v. Pension Benefit Guar. Corp.*,
   571 F.3d 1288 (D.C. Cir. 2009) ......................................................... 27

*Dennis Melancon, Inc.* v. *City of New Orleans*,
   703 F.3d 262 (5th Cir. 2012) ............................................................. 28

*Dep't of Com.* v. *New York*,
   588 U.S. 752 (2019) ........................................................................... 22

*DSE, Inc. v. United States*,
   169 F.3d 21 (D.C. Cir. 1999) ............................................................. 31

*Encino Motorcars, LLC v. Navarro*,
   579 U.S. 211 (2016) ........................................................................... 19

*Faculty Senate of Fla. Int'l Univ. v. Winn*,
   477 F. Supp. 2d 1198 (S.D. Fla. 2007) ............................................. 27

*FCC* v. *Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) ........................................................................... 24

*FCC v. Prometheus Radio Project*,
   592 U.S. 414 (2021) ..................................................................... 22, 24

*Hall* v. *McLaughlin*,
   864 F.2d 868 (D.C. Cir. 1989) ........................................................... 24

*Heckler v. Chaney*,
   470 U.S. 821 (1985) ........................................................................... 16

*Hein v. Freedom Religion Found., Inc.*,
   551 U.S. 587 (2007) ........................................................................... 18

*Horwitz-Matthews, Inc. v. City of Chicago*,
   78 F.3d 1248 (7th Cir. 1996) ............................................................. 16

*Hughes Commc'ns Galaxy, Inc. v. United* States,
   271 F.3d 1060 (Fed. Cir. 2001) ......................................................... 20

*Husky Mktg. & Supply Co. v. FERC*,
105 F.4th 418 (D.C. Cir. 2024) ............................................................. 22

*In re Aiken Cnty.*,
725 F.3d 255 (D.C. Cir. 2013) ............................................................... 18

*In re Joliet-Will Cnty. Cmty. Action Agency*,
847 F.2d 430 (7th Cir. 1988) ................................................................. 20

*In re TelexFree Sec. Litig.*,
No. 4:14-md-002566-TSH, 2021 WL 11604879 (D. Mass. Apr. 21, 2021) ............ 27

*Ingersoll-Rand Co. v. United States*,
780 F.2d 74 (D.C. Cir. 1985) ............................................................. 9, 10

*John Doe Co. v. Consumer Fin. Prot. Bureau*,
849 F.3d 1129 (D.C. Cir. 2017) .............................................................. 29

*Larson v. Domestic & Foreign Com. Corp.*,
337 U.S. 682 (1949) ............................................................................ 13

*Lincoln v. Vigil*,
508 U.S. 182 (1993) ............................................................................ 17

*Madsen v. Women's Health Ctr., Inc.*,
512 U.S. 753 (1994) ............................................................................ 30

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
567 U.S. 209 (2012) .............................................................................. 8

*McKay v. United States*,
516 F.3d 848 (10th Cir. 2008) ............................................................... 13

*Mead Johnson & Co. v. Abbott Labs.*,
201 F.3d 883 (7th Cir. 2000) ................................................................. 31

*Megapulse, Inc. v. Lewis*,
672 F.2d 959 (D.C. Cir. 1982) ........................................... 9, 11, 12, 15, 21

*Mexichem Spec. Resins, Inc. v. E.P.A.*,
787 F.3d 544 (D.C. Cir. 2015) ............................................................... 27

*Mobil Oil Exp. and Producing Se. v. United States*,
530 U.S. 604 (2000) .............................................................................. 1

v

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
　463 U.S. 29 (1983) .................................................................................................... 22

*Nat'l Ass'n of Chain Drug Stores v. U.S. Dep't of Health & Hum. Servs.*,
　631 F. Supp. 2d 17 (D.D.C. 2009) ........................................................................... 30

*Neb. Dep't of Health & Hum. Servs. v. U.S. Dep't of Health & Hum. Servs.*,
　435 F.3d 326 (D.C. Cir. 2006) .................................................................................. 30

*Nken v. Holder*,
　556 U.S. 418 (2009) .................................................................................................. 21

*Off. of Pers. Mgmt. v. Richmond*,
　496 U.S 414 (1990) .................................................................................................. 18

*Olympic Fed. Sav. And Loan Ass'n v. Dir., Off. of Thrift Supervision.*,
　CIV. A. No. 90-0482, 1990 WL 134841 (D.D.C. Sept. 6, 1990) .............................. 21

*Pacific Gas & Elec. Co. v. FPC*,
　506 F.2d 33 (D.C. Cir. 1974) .................................................................................... 26

*Palisades Gen. Hosp., Inc. v. Leavitt*,
　426 F.3d 400 (D.C. Cir. 2005) ..................................................................................11

*Planned Parenthood Ass'n of Utah v. Schweiker*,
　700 F.2d 710 ............................................................................................................. 29

*Preserve Overton Park, Inc. v. Volpe*,
　401 U.S. 402 (1971) .................................................................................................. 22

*Printing Packaging and Prod. Union of N. Am. v. Int'l Bhd. of Teamsters*,
　No. 23-1872 (TJK),  2024 WL 3835353 (D.D.C. Aug. 15, 2024) ........................... 16

*Robbins v. U.S. Bureau of Land Mgmt.*,
　438 F.3d 1074 (10th Cir. 2006) ................................................................................ 13

*Sackett v. E.P.A.*,
　566 U.S. 120 (2012) .................................................................................................. 26

*Sampson v. Murray*,
　415 U.S. 61 (1974) .................................................................................................... 27

*Sharp v. Weinberger*,
　798 F.2d 1521 (D.C. Cir. 1986) ........................................................................... 3, 13

*Sissel v. Wormuth,*
  77 F.4th 941 (D.C. Cir. 2023) ................................................................. 22

*Spectrum Leasing Corp. v. United States,*
  764 F.2d. 891 (D.C. Cir. 1985).......................................................... 10, 12

*Srour v. Barnes,*
  670 F. Supp. 18 (D.D.C. 1973) ............................................................... 21

*Steir v. Girl Scouts of the USA,*
  383 F.3d 7 (1st Cir. 2004) ...................................................................... 28

*Train v. City of New York,*
  420 U.S. 35 (1975).................................................................................. 19

*Transohio Sav. Bank. v. Dir. Office of Thrift Supervision,*
  967 F.2d 598 (D.C. Cir. 1992)................................................................. 15

*Trudeau v. Fed. Trade Com'n,*
  384 F.Supp.2d 281 (D.D.C. 2005) .......................................................... 30

*U.S. Conf. of Catholic Bishops* v. *United States Department of State,*
  No. 25-cv-465, 2025 WL 763738 (D.D.C. Mar. 11, 2025)...................... 15

*United States v. McIntosh,*
  833 F.3d 1163 (9th Cir. 2016) ................................................................ 18

*United States v. Michigan,*
  230 F.R.D. 492 (E.D. Mich. 2005).......................................................... 28

*United States v. Stone,*
  394 F. Supp. 3d 1 (D.D.C. 2019) ............................................................ 18

*United States v. Trump,*
  740 F. Supp. 3d 1245 (S.D. Fla 2024)..................................................... 19

*United States v. Winstar Corp.,*
  518 U.S. 839 (1996)............................................................................. 1, 16

*Wisc. Gas Co. v. FERC,*
  758 F.2d 669 (D.C. Cir. 1985)................................................................. 27

**Statutes**
5 U.S.C. § 701 ......................................................................................... 16

5 U.S.C. § 702 ........................................................................................... 8

5 U.S.C. § 704 ........................................................................................................... 26

5 U.S.C. § 706 ......................................................................................................11, 21

28 U.S.C. § 1491 ........................................................................................................ 9

42 U.S.C. § 7434 ..................................................................................... 3, 17, 18, 20

**Regulations**

2 C.F.R. § 200.339 ..................................................................................................... 4

2 C.F.R. § 200.340 ............................................................................................. passim

2 C.F.R. § 200.341 ..................................................................................................... 4

2 C.F.R. § 200.342 ................................................................................................... 26

## GLOSSARY OF TERMS

| Term or Abbreviation | Definition | Citation(s) |
|---|---|---|
| ACA | Account Control Agreement with Citibank, related to Plaintiffs' grants. | Coogan Decl., Exhibit B |
| Amidon Decl. | March 26, 2025 Declaration of Eric Amidon | |
| APA | Administrative Procedure Act | |
| Bafford Decl. | Declaration of Elizabeth Bafford (CU) | |
| Bailey Decl. | Declaration of Kevin Bailey | |
| CCIA | Clean Communities Investment Accelerator | |
| CGC | Coalition for Green Capital | |
| CU | Climate United Fund | |
| DOJ | Department of Justice | |
| ECF No. | Docket entry in *Climate United Fund v. Citibank, N.A., et al.*, 25-cv-698 | |
| EPA | U.S. Environmental Protection Agency | |
| EPA TRO Opp. | Federal Defendants' Opposition to Climate United Fund's Motion For Temporary Restraining Order | ECF No. 16 |
| FAA | Financial Agency Agreement between Citibank and U.S. Department of the Treasury | |
| FBI | Federal Bureau of Investigations | |
| GGRF | Greenhouse Gas Reduction Fund | |
| Grant Agreement | Notice of Award (including grant terms and conditions) for each Plaintiff | Coogan Decl., Exhibit A |
| NCIF | National Clean Investment Fund | |
| NOFO | Notice of Funding Opportunity | |
| OIG | EPA's Office of Inspector General | |
| PFC | Power Forward Communities, Inc. | |
| PI Motion | Plaintiffs' Consolidated Motion for Preliminary Injunction | ECF No. 33 |
| SFA | Solar for All | |
| Termination Letter | Notice of Termination of grant issued by EPA to each Plaintiff, dated March 11, 2025 | Coogan Decl., Exhibit I |
| Treasury | U.S. Department of Treasury | |
| Treml Decl. | Declaration of Gregg Treml | |
| Coogan Decl. | Dan Coogan Declaration | |

## INTRODUCTION

Plaintiffs invoke the Constitution, statutes, and regulations as ostensible bases for a claimed right to continue to access billions of dollars in grants that were awarded by the Environmental Protection Agency (EPA), but that EPA has since terminated.  None of those authorities entitles Plaintiffs to these funds.  Plaintiffs' claims for relief are instead necessarily dependent on their assertion that the grant agreements themselves restrict the power that EPA would otherwise enjoy to terminate the grants.  The agreements do purport to restrict EPA, in language that appears to have been intentionally added in the waning days of the prior Administration in order to tie the new Administration's hands with respect to disbursement of grant funds (those new contract terms may be void or voidable as a matter of contract law).  But neither those contract defenses, nor Plaintiffs' affirmative claims, are properly before this Court.  At bottom, this is just a run-of-the-mill (albeit large) contract dispute.  And, at most, Plaintiffs are entitled to claim damages for this asserted breach of contract in the Court of Federal Claims.  After all, EPA has the same rights as every other party when it enters contracts. *See Mobil Oil Expl. and Producing Se. v. United States*, 530 U.S. 604, 607 (2000).  That includes the right to breach and face remedies. *See United States v. Winstar Corp.,* 518 U.S. 839, 919-20 (1996) (Scalia, J, concurring).

To distract from this reality, Plaintiffs try to dress up their claims in constitutional, statutory, and regulatory garb.  None of this works.  Nothing in the Constitution or any statute compels EPA to make *these* grants to *these* Plaintiffs; at most, those authorities direct EPA to re-obligate the funds for specified purposes, which EPA has stated it will do.  As for the lengthy list of regulations that Plaintiffs cite to manufacture Administrative Procedure Act (APA) review, none confers any right on Plaintiffs to perform their grants.  The regulations actually authorize sweeping termination authority; Plaintiffs' only response is that the contracts do not repeat that language.  Of course, that simply confirms that these claims rest, ultimately, on the contractual terms.

The real gist of Plaintiffs' complaints is their contention that EPA did not terminate the agreements properly because EPA relied on a reason—its assessment of the agency's priorities, which EPA supposedly did not adequately explain—that the agreements did not include as a stated ground to justify termination.[1]  To be clear, applicable regulations *allow* an agency to terminate for consideration of its priorities, which is a determination typically not subject to any APA review because it is committed to agency discretion.  Here, Plaintiffs' agreements originally incorporated that basis for termination—but subsequent post-election and post-award amendments stripped away the agency's right.  Even if the amendment modifications are binding (which is questionable under contract law), the change to the grant agreements would at most restrict EPA's right to terminate *for cause*—that is, without any consequences of breach.  It would not, and could not, remove EPA's right to cease performance and incur any applicable contract liability.

Put another way, the parties have a legitimate disagreement over whether, as a matter of contract law, EPA's terminations comported with the terms of their agreements.  If Plaintiffs are correct, they may be entitled to relief.  But it would be *contract* relief, which could be sought only in the Court of Federal Claims.  And that relief would *not* include specific performance—forcing EPA to proceed with billions of dollars in grants that it has decided no longer advance the interests of the United States.  Specific performance is not available against the government.  Plaintiffs'

---

[1]  EPA terminated Plaintiffs' grants based upon "substantial concerns regarding program integrity" and "misalignment with the Agency's priorities," which it further explained include

> 1) the absence of adequate oversight and account controls to prevent financial mismanagement; 2) the improper or speculative allocation of funds inconsistent with EPA's oversight and fiscal responsibilities; and 3) the circumvention and defeat of oversight mechanisms in the disbursement of federal funds.

Coogan Decl., Exhibit I (Termination Letter) at 1.  EPA also determined that the agreements insufficiently guarded against the constitutional proscription against the delegation of authority to non-federal actors.  *Id.* at 2.

APA claims are simply a vehicle to circumvent that black-letter limitation on contract remedies against the federal government. The D.C. Circuit has long forbidden that maneuver. *See Sharp v. Weinberger*, 798 F.2d 1521, 1523-24 (D.C. Cir. 1986) ("The waiver of sovereign immunity in the [APA] does not run to actions seeking . . . specific performance in contract cases, because . . . the Tucker Act and Little Tucker Act impliedly forbid such relief.").

In short, Plaintiffs are not entitled to the relief they seek because their non-contract claims are a mirage, and they offer no authority that would deny the government the same rights that every party enjoys when it chooses to conduct its affairs through contract. For these reasons, and as explained further below, Plaintiffs' motion for a preliminary injunction should be denied and the complaints should instead be dismissed for lack of jurisdiction.

## FACTUAL AND REGULATORY BACKGROUND

**A. The Grant Programs and Awards.** On August 16, 2022, Congress amended the Clean Air Act, through the Inflation Reduction Act, to create the Greenhouse Gas Reduction Fund (GGRF). In doing so, Congress appropriated $27 billion towards funding groups to invest in certain climate projects aimed at reducing or avoiding greenhouse gas emissions. 42 U.S.C. § 7434(b), (c). Congress tasked the EPA with determining, on a competitive basis, which particular groups should receive this funding. *Id.* § 7434(a)(2). The EPA accordingly announced three grant programs—the National Clean Investment Fund (NCIF), the Clean Communities Investment Accelerator (CCIA), and Solar for All (SFA). In July 2023, EPA published Notices of Funding Opportunity (NOFO) and began accepting applications.

In August 2024, EPA awarded Climate United Fund (Climate United) a grant with an amount of $6.97 billion and grants to Coalition for Green Capital (CGC) and Power Forward Communities (PFC) in the amounts of $5 billion and $2 billion respectively.

The Grant Agreements included specific terms and conditions, incorporated various

provisions of the Uniform Grant Guidance, 2 C.F.R. §§ 200.339, 340 and 341, and were subject to EPA's then-current 2023-24 General Terms and Conditions.[2]  Declaration of Dan Coogan (Coogan Decl.) Declaration Exhibit A (Grant Agreement).[3]  The General Terms and Conditions provided EPA with the right to terminate the grants "if the award no longer effectuates the program goals or agency priorities."  EPA, General Terms and Conditions 2-3 (effective Oct. 1, 2023).  The Grant Agreement contains a "Termination" provision, which is preceded by a statement that EPA's following "clarifications to the EPA General Terms and Conditions. . . . expand on, rather than replace or modify, the EPA General Terms and Conditions."  Grant Agreement at 40 (§ T).  The Termination provision purports to establish the "only" bases for termination, but could not "replace or modify" the bases for termination set out in EPA's General Terms and Conditions.  Grant Agreement at 40 (§ T).

**B.  The Late-Breaking Modifications.**  After the 2024 presidential election—but before the Inauguration—EPA and Plaintiffs amended their Grant Agreements.  The December 2024 amendments incorporated new, then-current 2024-25 EPA Terms and Conditions.[4]  The amendments also purported to limit EPA's contractual right to "terminate for noncompliance" by requiring "written determinations and opportunities to cure," March 26, 2025 Declaration of Eric

---

[2] EPA, General Terms and Conditions (effective Oct. 1, 2023), https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2023-or-later.

[3] Each of the Plaintiffs' grant agreements, and any amendments there to, are materially the same. For purposes of this filing, Federal Defendants cite to Climate United's Grant Agreement, for the Court's convenience. Coogan Decl. Exhibit A contains Climate United's original August 2024 grant agreement (begins PDF page 2), followed by the December 2024 amendment (Modification Number: 1) (begins PDF page 64), and the January 2025 amendment (Modification Number: 2) (begins PDF page 124).  Citations to the Grant Agreement herein are by PDF page number.

[4] EPA, General Terms and Conditions (effective Oct. 1, 2024), https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2024-or-later.

Amidon, EPA, Chief of Staff, (Amidon Decl.) ¶ 28, and to limit EPA's right to "terminate for misconduct" by defining misconduct as limited "to 'credible evidence' that [the awardee] committed one or more serious federal crimes or actionable civil violations under the False Claims Act." Amidon Decl. ¶ 29; Grant Agreement at 75.

**C. The Unusual Structure of the Awards.**  The Grant Agreements utilized an uncommon method for financial management of these enormous awards.  Instead of operating through EPA (which would allow EPA real-time oversight of the use of the funds and control over disbursements), the Grant Agreements called for the use of a designated financial agent to hold the entire $20 billion allocated for the NCIF and CCIA grant programs and to administer program distributions.  Grant Agreement at 58.  Defendant Citibank was selected to that role under a Financial Agent Agreement (FAA) with the Department of Treasury.  *See* Coogan Decl., Exhibit B (ACA) at 2.  EPA was not a party to the FAA, but retained certain rights to issue account controls in addition to the rights retained by Treasury to issue instructions to Citibank. Amidon Decl. ¶ 31. According to EPA's Acting Chief Financial Officer, "EPA had never used a financial agent in connection with a grant program prior to 2024" and "EPA's use of a financial agent in connection with the GGRF program was the first use of a financial agent for a nonexchange grant program administered by the federal government."   Declaration of Gregg Treml, EPA Acting Chief Financial Officer, (Treml Decl.) ¶¶ 6-7.

Next, Treasury, EPA, and each grantee entered an Account Control Agreement (ACA) on November 1, 2024.  The ACAs provide, in relevant part, that EPA possesses a security interest in the Citibank accounts holding program funds.  The ACAs also provide that EPA could exercise its rights as a secured party to take control over grant funds held at Citibank by filing a "Notice of Exclusive Control."  Amidon Decl. ¶ 33; ACA at 2.  Like the Grant Agreements, the ACA

agreements were also amended just days before the presidential transition.  ACA 19.  On January 13, 2025, EPA, Citibank, and the grantees amended the ACAs so that "EPA's filing of a Notice of Exclusive Control would no longer result in [awardees] needing to obtain EPA's consent before instructing Citibank to disburse funds for expenses [the awardees] consider[] 'properly incurred'." Amidon Decl. ¶ 34; ACA at 19.  Another vestige of accountability was thus stripped away.

**D.  The New Administration's Investigation and Terminations of the Grants.**  Upon assuming office, EPA Administrator Lee Zeldin and other EPA officials began to learn more about this program and to express concerns with the GGRF program's creation and implementation.[5] *See* EPA TRO Opp. at 11 and Amidon Decl. ¶¶ 3-12.

Upon review of the Grant Agreements, the ACAs, and their amendments, "EPA determined that the Biden Administration's contractual scheme for administering the NCIF grants did not provide sufficient oversight and transparency to accomplish these stewardship obligations and objectives."  Amidon Decl. ¶ 19.  EPA also determined that "the amendments of December 20, 2024 and January 13, 2025—which limited EPA's contractual rights to terminate for misconduct short of a federal crime and limited EPA's contractual rights to assert exclusive control over funds in the Citibank accounts—left EPA with insufficient authority to retain control of funds short of

---

[5] These concerns were not new.  The House Committee on Energy and Commerce expressed serious concerns about EPA's "unusually accelerated timeline for disbursement" and "new and complex funding structure" in October 2023,  Declaration of Kevin Bailey (Bailey Decl.) Declaration Exhibit A, and subsequently investigated "recipient eligibility issues," "the fairness and uniformity of the selection process," and the fact that "individuals with strong ties to Democratic politics hold significant leadership roles within some of the organizations the EPA selected to receive funding" in December 2024, *id.* Ex. B.  The Committee also held an oversight hearing on the subject in January 2024.  Amidon Decl. ¶ 14.  And EPA's Inspector General testified to the Committee in September 2024 that EPA's Office of Inspector General lacked sufficient resources to protect against fraud risks in the GGRF program and ensure efficient use of public funds given EPA's "pace of spending."  *Id.* ¶ 15.

outright termination." *Id*. ¶ 37.

EPA referred to its Office of Inspector General its findings "on financial mismanagement, conflicts of interest, and oversight failures with the GGRF program" for further investigation. Amidon Decl. ¶¶ 35, 38; Coogan Decl., Exhibit C (OIG Letter) at 1.  An investigation was initiated and remains ongoing.  Amidon Decl. ¶ 40.  The Department of Justice and the Federal Bureau of Investigation have also initiated criminal investigations into the GGRF program for "potential fraud, waste, abuse, and impermissible conflicts of interest in connection with NCIF and CCIA grants"; these too remain ongoing. *Id.*  ¶ 39.

On March 11, EPA issued a notice terminating each Plaintiff's Grant Agreement under the GGRF program.  Coogan Decl., Exhibit I (Termination Letter) at 1.  In the notice, EPA explained that "termination is based on substantial concerns regarding program integrity, the award process, programmatic fraud, waste, and abuse, and misalignment with the Agency's priorities, which collectively undermine the fundamental goals and statutory objectives of the award."[6]  *Id.*

## PROCEDURAL HISTORY

Plaintiffs Climate United, CGC, and PFC filed complaints for declaratory and injunctive relief on March 8, March 12 and March 14, 2025, respectively.  *See* No. 25-cv-698, ECF No.1 (Climate United Complaint) [7]; No. 25-cv-735, ECF No. 1 (CGC Complaint); No. 25-cv-762, ECF No. 1 (PFC Complaint).   Plaintiffs  followed  those  complaints  with  motions  for  temporary

---

[6] On March 17, 2025, pursuant to the Court's instructions at the March 12, 2025 hearing and in the March 14, 2025 minute order, EPA filed the declaration of Eric Amidon, EPA's Chief of Staff, setting forth the basis for its March 11, 2025 termination of the Plaintiffs' Grant Agreements.  ECF No.. 25-1.  With the benefit of additional time, EPA provides a second, supplemental declaration of Mr. Amidon that provides a more comprehensive discussion of the "decision to reconsider the EPA's approach to administering the [NCIF Program] and to terminate [Plaintiffs'] NCIF grant awards . . . on March 11, 2025."  Amidon Decl. ¶ 2.

[7] Climate United amended its complaint on March 17, 2025.  No. 25-cv-698, ECF No. 24 (CU Amended Compliant)

restraining orders.  *See* No. 25-cv-698, ECF No. 2 (Climate United) No. 25-cv-735, ECF No. 9 (CGC); No. 25-cv-762, ECF No. 4 (PFC).  On March 12 and March 17, the Court heard arguments on Plaintiffs' motions.  No. 25-cv-698, ECF No. 21 (March 12 Hearing), ECF No. 26 (March 17 Hearing), ECF No. 30 (Consolidation Order).  On March 18, the Court granted Plaintiffs' temporary relief, which effectively froze the grant funds in the Citibank accounts pending further proceedings.  No. 25-cv-698, ECF Nos. 28, 29.  The instant motion for preliminary injunctive relief followed.  EPA intends in due course to move to dismiss the actions for lack of jurisdiction.

## LEGAL STANDARDS

"The standard for issuance of the 'extraordinary and drastic remedy' of a temporary restraining order or a preliminary injunction is very high, and by now very well established." *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 197 (D.D.C. 2020).  A movant seeking such an extraordinary remedy "bears the burden of making a clear showing" that it is "entitled to such relief."  *Id.*  To make such a showing, Plaintiff bears the burden of establishing (1) it is likely to "succeed on the merits," (2) it is "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of the equities tips in [its] favor," and (4) "an injunction is in the public interest."  *Id.*

## ARGUMENT

### I.    Plaintiffs Cannot Invoke the APA To Challenge Alleged Breaches of Contract.

Plaintiffs principally rely on the APA to challenge the EPA's grant terminations.  But, despite Plaintiffs' best efforts to recast them, these claims sound in contract—which means this Court cannot exercise jurisdiction under the APA.  The APA provides a limited waiver of the government's sovereign immunity for claims "seeking relief other than monetary damages."  5 U.S.C. § 702.  But the APA's waiver "comes with an important carve-out":  it does not apply "'if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.'"  *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians* v. *Patchak*, 567 U.S. 209,

215 (2012) (quoting 5 U.S.C. § 702).  That carve-out "prevents plaintiffs from invoking the APA's waiver to evade limitations on suit contained in other statutes."  *Id.*

That is what Plaintiffs are trying to do here.  Their complaints and motions seek access to funds that they believe the government is obligated to pay them under the terms of their contracts (the Grant Agreements)—indeed, they effectively seek to compel specific performance of those alleged contractual commitments.  But contract claims must be pursued under the Tucker Act, not the APA.  The Tucker Act provides that the "United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded" on "any express or implied contract with the United States."  28 U.S.C. § 1491(a).  The D.C. Circuit has long recognized that "the Tucker Act impliedly forbids" the bringing of "contract actions" against "the government in a federal district court" under the APA.  *Albrecht v. Comm. on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 67-68 (D.C. Cir. 2004).  That jurisdictional divide ensures that contract claims against the government are channeled to the court that has "unique expertise" in that area.  *Ingersoll-Rand Co.* v. *United States*, 780 F.2d 74, 78 (D.C. Cir. 1985).  Here, that principle precludes the relief that Plaintiffs seek from this Court.

## A.  Plaintiffs' Claims Are Contract Claims for Specific Performance.

Plaintiffs seek to enjoin EPA from terminating their Grant Agreements.  But both the "source of the rights" they invoke, and "type of relief" they seek, demonstrate that these are contract claims beyond the jurisdiction of this Court to entertain.  *See Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982).

As to the source of rights, everything hinges on the terms of the Grant Agreements.  Plaintiffs assert that EPA violated the APA in terminating the Grant Agreements to further EPA's own program goals or agency priorities because "the Terms and Conditions do not give EPA the right to terminate the grants for convenience or based on a change in EPA's policy priorities."  PI

Motion at 4.  The regulation that Plaintiffs rely upon is incorporated into the terms of the Grant Agreements. Grant Agreements at 41.  While the provisions incorporate regulations, that "does not transform the action into one based solely on those regulations."  *Ingersoll-Rand Co. v. United States*, 78 F.2d 74, 78 (D.C. Cir. 1985).  In *Ingersoll*, the D.C. Circuit rejected a plaintiff's attempt to recharacterize breach of contract claims as APA claims by arguing that the agency's decision to terminate a contract also violated federal regulations.  *Id.* at 77-78.  The same reasoning applies here.

Plaintiffs' own arguments demonstrate that their source of rights stem from their agreements. Plaintiffs argue that the "regulations that apply to Plaintiffs' grants do not permit termination on policy grounds because those grounds are not stated in the *terms of the awards*," *see* PI Motion at 39 (emphasis added); *see also id.* at 9 (asserting that the Grant Agreements Terms and Conditions applied the version of 2 C.F.R. § 200.340 effective as of October 1, 2024).  The only reason why "[t]here is no right to terminate based on changed priorities," as argued by Plaintiffs, is because the "Terms and Conditions governing Plaintiffs' grants limit EPA *only* to three possible grounds for termination."  *Id.* at 28 (emphasis in original); *see also id.* at 4 (stating that the Grant Agreements' Terms and Conditions limit EPA to only three grounds for termination); *id.* at 30 (stating that EPA may not terminate based on its need for oversight and concerns about lack of control under the regulations because they are not included in the Grant Agreements); *id.* at 33 (stating that the Grant Agreements do not allow termination for changes in agency priorities)

Thus, absent the Grant Agreements, Plaintiffs would have no claim to NCIF funds and axiomatically no right to perform under their Grant Agreements.  As discussed further below, the Constitution affords no right to receive or perform a grant.  Neither does the Inflation Reduction Act.  At most, those sources of law impose certain duties on EPA—but they plainly confer no

relevant rights on these Plaintiffs. *See Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985) (plaintiffs "right to . . . payments is created in the first instance by the contract, not by the Debt Collection Act. The DCA, even if it applied, confers no such right in the absence of the contract itself. Although the DCA might impose procedural requirements on the government having some impact on the contract, the Act in no way creates the substantive right to the remedy [plaintiff] seeks.).

Plaintiffs also cite a host of regulations. Certain regulations may define the parameters under which the grant may operate, but they too afford no individual rights to Plaintiffs that would exist independent of their contractual rights or separate from their status as parties to the Grant Agreements. To the contrary, the regulations repeatedly refer to the *terms of the grant agreements* to specify the agency's rights to terminate. *See, e.g.*, 2 C.F.R. § 200.340 (a)(1), (4) (award may be terminated if the "recipient . . . fails to comply with the terms and conditions of the Federal award" or "pursuant to the terms and conditions of the Federal award"). Ultimately, then, it is clear that Plaintiffs' source of rights lies in the fact that they are grant recipients, that is, contracting parties. And their only meaningful claim of injury is that their grants were terminated for reasons not authorized by their Grant Agreements. There is no source for Plaintiffs' asserted rights other than their claim of the contractual right to perform under the grants they were awarded.

As to the second *Megapulse* factor, the type of relief sought, Plaintiffs seek relief that is contractual—namely, specific performance. This is not a case in which the Court has been asked to simply "set aside" agency action. 5 U.S.C. § 706. Plaintiffs complain about the sufficiency of EPA's explanation of the reasons for its termination decisions, but they do not ask the Court to order EPA to provide a more fulsome explanation for why the grants no longer effectuate agency priorities. *Cf. Dep't of Homeland Sec. v. Regents of Univ. of Cal.,* 140 S. Ct 1891 (2020); *Palisades*

*Gen. Hosp., Inc. v. Leavitt,* 426 F.3d 400, 403 (D.C. Cir. 2005).  Instead, Plaintiffs conflate APA and contract concepts to pray for a remedy that would deny EPA any right to end the parties' agreements even when EPA determines the agreements no longer effectuate the agency's goals and priorities.  That remedy is not relief available under the APA.  Calling it "vacatur" of the termination decisions is merely slapping an APA label on what, in function and practice, amounts to the classic contractual remedy of specific performance.  *See Spectrum*, 764 F.2d at 894 ("Spectrum seeks an order compelling the government to pay money owed in exchange for goods procured under an executory contract. In other words, Spectrum seeks the classic contractual remedy of specific performance.").  If that sufficed, nothing would be left of the *Megapulse* line of precedent or the principle that it vindicates.

To be clear, this is not a case in which EPA has acted outside statutory or regulatory authority separate and apart from contractual terms.  Again, applicable regulations allow an agency to terminate a grant when that grant "no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4).  Plaintiffs' grants expressly recognized EPA's authority to terminate for that very reason when they were first awarded in August 2024.[8]  To be sure, Plaintiffs assert that EPA voluntarily relinquished that contractual right in the December 2024 amendment to the Grant

---

[8] The Grant Agreements provide that specific clauses, including the Termination provision (§ T.4), do not "replace or modify[] the EPA General Terms and Conditions." § T.  EPA's then-current 2023-24 General Terms and Conditions, incorporated into the original Grant Agreements, provided EPA with the right to terminate the grants "if the award no longer effectuates the program goals or agency priorities." EPA, General Terms and Conditions 2-3 (effective Oct. 1, 2023).  Inexplicably, section T.4 begins with contradictory language:  "Notwithstanding the General Term and Condition 'Termination' . . . "

The Grant Agreement was bilaterally negotiated and it provides explicitly that modifications can only be made through bilateral consent.  § AI.  As such, the parties share responsibility for the confusion caused by this drafting.  However, the fact remains that EPA's General Terms and Conditions as originally adopted in the Grant Agreements preserved EPA's right to terminate the agreements to effectuate program goals and agency priorities.

Agreements.  But even if that alteration were binding as a matter of contract, it is *a matter of contract*.  It is not the *regulations* that bar EPA from terminating on this basis; at most, it is the *contract terms*.  That leaves no doubt that Plaintiffs' claims, at bottom, are rooted in contract.

There is another problem that exposes the contractual nature of Plaintiffs' claims.  In asking the Court to compel EPA to continue to act as their contractual counterparty, Plaintiffs seek to deny EPA its own inherent contractual right to breach.  Like any other contracting party, the government is entitled to decide to breach a contract and incur the resulting liability (such as reliance damages).  Recognizing that principle, "a distinct line of authority preserves the sovereign's immunity from being compelled to perform obligations it prefers to breach and compensate financially, holding that what are 'in essence' claims for breach of contract cannot circumvent the Tucker Act and its prohibition on equitable relief by being artfully pled as something else."  *McKay v. United States*, 516 F.3d 848, 851 (10th Cir. 2008).  The D.C. Circuit has long adopted that principle.  *See Sharp*, 798 F.2d at 1523-24 ("The waiver of sovereign immunity in the [APA] does not run to actions seeking . . . specific performance in contract cases, because . . . the Tucker Act and Little Tucker Act impliedly forbid such relief."); *see also Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 704 (1949); *Robbins v. U.S. Bureau of Land Mgmt.*, 438 F.3d 1074, 1083 (10th Cir. 2006); *Coggeshall Dev. Corp. v. Diamond*, 884 F.2d 1, 3 (1st Cir. 1989) ("We are unaware of any waiver of sovereign immunity by the United States as to specific performance for breach of contract.").  Treating claims like these as APA claims leading to the relief of "vacatur" would allow Plaintiffs to evade the prohibition on specific performance through artful pleading.  Or, put another way, even if Plaintiffs were entirely correct about the terms and meaning of the Grant Agreements, and about the material facts, that would still entitle them at most to certain contract remedies—it would not subject EPA to compulsion to proceed with contracts it wants to terminate.

The prohibition against compelling the government's performance exists for good reason. As the Supreme Court explained, "it is one thing to provide a method by which a citizen may be compensated for a wrong done to him by the Government.  It is a far different matter to permit a court to exercise its compulsive power to restrain the Government from acting, or to compel it to act." *Larson*, 337 U.S. at 704.  This is exactly what Plaintiffs seek here: for the court to use its "compulsive power" to "restrain" the government from cancelling its agreements and "compel" the government to indefinitely maintain the contractual arrangement against its will.

Finally, the cases Plaintiffs rely upon do not support the exercise of jurisdiction here.  The best-reasoned recent decision on this issue actually confirms EPA's position and refutes Plaintiffs' theory.

To start, Plaintiffs cannot take refuge in *Bowen v. Massachusetts,* 487 U.S. 879 (1988).  In *Bowen,* the Supreme Court recognized that setting aside agency action could permit a party to receive money authorized by statute, and would therefore be in the nature of specific relief, not money damages.  That is surely correct, but this case is very different.  Here, the monetary relief is not merely some downstream consequence of vacating agency action like a regulation or order— the action that Plaintiffs directly challenge is itself *contractual* in nature (the termination of the grants).  Their request to the Court is to bind EPA to (their interpretation) of the contract terms, and thereby limit EPA to the specific bases for termination in the December 2024 Grant Agreements' amendments.  To provide that relief would be to compel specific performance of the amended termination clause in the agreement.  No fair or plausible reading of *Bowen* provides authority to specifically enforce a contractual promise.  This is a transparent end-run.

Plaintiffs also cite *Crowley Gov't Services, Inc. v. GSA*, 38 F.4th 1099 (D.C. Cir. 2022), which reviewed this Court's well-settled test for distinguishing APA claims from Tucker Act claims

but did so in circumstances that were completely different than this case. In *Crowley,* the plaintiffs' complaint concerned administrative action undertaken by an agency that had no contractual relationship with the plaintiff. *Id.* at 1109.

As for *Megapulse,* 672 F.2d 959, its test governs but its facts are even farther afield. The case concerned the release of proprietary information and the plaintiff's claimed injury involved that release—not the contract. Here, by contrast, Plaintiffs would have no basis to allege injury (let alone any violation of rights) absent their Grant Agreements. The principle that applies here is therefore straightforward: "Under [the D.C. Circuit's] decisions, if the case before us is a 'contract case,' the APA does not waive the sovereign's immunity from suit." *Transohio Sav. Bank. v. Dir. Office of Thrift Supervision*, 967 F.2d 598, 609 (D.C. Cir. 1992) (abrogated on other grounds by *Perry Capital LLC v. Mnuchin,* 864 F.3d 591 (D.C. Cir. 2017)).

Another Judge of this Court recently adopted the government's view on this issue, and rejected Plaintiffs' circumvention, in *U.S. Conference of Catholic Bishops* v. *U.S. Dep't of State*, No. 25-cv-465, 2025 WL 763738, at *5 (D.D.C. Mar. 11, 2025). There, the Court held that the Tucker Act precluded plaintiffs from asserting, in federal district court, putative APA claims asserting that the agency violated the very same termination provision relied on here, 2 C.F.R. § 200.340.[9] EPA respectfully submits that Judge McFadden analyzed this issue correctly, and this Court should follow that ruling here.

Ultimately, this Court should recognize that EPA retains the ability to end its agreements, whether or not doing so complies with a (contested) for-cause termination provision. Contract law recognizes every party's right to perform or face remedies for breach. *Winstar*, 518 U.S. at 919-

---

[9] The plaintiff in that case has filed an appeal and sought relief pending appeal, which remains pending at this time. *See* No. 25-5066 (D.C. Cir.).

20 (Scalia, J. concurring); *Boaz Hous. Auth.* v. *United States*, 994 F.3d 1359, 1368 (Fed. Cir. 2021) (to the extent that the government has implemented its grant programs by "employ[ing] contracts to set the terms of and receive commitments from recipients," the proper recourse for any asserted violation of those grant terms is a "suit in the Claims Court for damages"); *Horwitz-Matthews, Inc. v City of Chicago,* 78 F.3d 1248, 1250-51 (7th Cir. 1996); *Benderson Dev. Co., Inc. v. U.S. Postal Serv.,* 998 F.2d 959, 962 (Fed. Cir. 1992). That principle applies equally to the government. *See Spectrum,* 764 F.2d. at 894 (rejecting "an injunction requiring the government to pay monies owed" where "right to these payments is created in the first instance by the contract, not by the" relevant statute, because the statute "confers no such right in the absence of the contract itself").

As another Judge of this Court recently put it: "When a contract is terminated, *even wrongfully*, there is no longer a contract – no duty to perform and no right to demand performance, . . . there is only a right to seek and a duty to pay damages caused by the termination. . . .Thus, even a party that lacks the authority to terminate a contract may do so anyway." *Printing Packaging & Prod. Union of N. Am. v. Int'l Bhd. of Teamsters*, No. 23-1872 (TJK), 2024 WL 3835353, at *7 (D.D.C. Aug. 15, 2024). That principle alone defeats Plaintiffs' APA claims here.

## B. Plaintiffs Improperly Challenge Funding Decisions Committed to Agency Discretion.

Plaintiffs are also unlikely to succeed in this case because they challenge funding decisions that are committed to agency discretion by law. 5 U.S.C. § 701(a)(2). Review under the APA is unavailable "if a statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). There is no waiver of sovereign immunity where agency action requires "complicated balancing of a number of factors which are peculiarly within [agency's] expertise": whether its "resources are best spent" on one program or another; whether it "is likely to succeed" in fulfilling its statutory mandate; whether a particular program "best fits the agency's overall policies"; and, "indeed,

whether the agency has enough resources" to fund a program "at all" and the "agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Lincoln v. Vigil*, 508 U.S. 182, 193 (1993) (quoting *Heckler*, 480 U.S. at 831-32).

EPA's determination that the current structure of the Grant Agreements does not afford the agency the oversight and account controls necessary for the agency to properly discharge the agency's responsibilities is a matter uniquely within EPA's expertise and a matter committed to its discretion. *See Lincoln,* 508 U.S. at 192. In *Lincoln*, the Supreme Court recognized that an agency decision to change prior funding decisions presented a matter committed to agency discretion by law. *Id.* at 185-88. Here, Congress entrusted EPA "to make grants, on a competitive basis" for distinct purposes, 42 U.S.C. § 7434(a), and left it to EPA to design its programs and provide appropriate oversight and control. *See id.* § 7434(a)(1) ("carry out other greenhouse gas emission reduction activities, *as determined appropriate by the Administrator*" (emphasis added)). As in *Lincoln,* Congress gave the agency "the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way," *id.* at 192, and Plaintiffs are unlikely to succeed on their effort to intrude upon the agency's exercise of discretion.

## II.    Plaintiffs' Constitutional and Statutory Claims Do Not Support Relief.

Although their APA claims are the main focus of the briefing, Plaintiffs also assert claims under the Appropriations Clause, Due Process Clause, and the authorizing and appropriating legislation of the Inflation Reduction Act itself. Plaintiffs are unlikely to succeed on any of those ill-fitting claims—and none of them could possibly support the preliminary injunctive relief that Plaintiffs seek here.

17

**A.  Termination Does Not Implicate the Appropriations Clause, and Plaintiffs Lack Standing Under the Clause.**

There is no plausible Appropriations Clause claim here, and it is difficult to discern Plaintiffs' basis for maintaining such a claim.  The Appropriations Clause provides "simply that no money can be paid out of the Treasury unless it has been appropriated by an act of Congress." *Off. of Pers. Mgmt. v. Richmond*, 496 U.S 414, 424 (1990).  EPA has not paid any money out of the Treasury absent appropriation by Congress and Plaintiffs make no argument to the contrary. Nor has EPA failed to use appropriations as directed by Congress.  EPA timely awarded grants in accord with 42 U.S.C. § 7434 and now simply seeks to manage the program in a manner with which Plaintiffs disagree.  Plaintiffs have no Appropriations Clause claim.  *Cf. Hein v. Freedom Religion Found., Inc.*, 551 U.S. 587, 593 (2007) ("federal courts would cease to function as courts of law and would be cast in the role of general complaint bureaus" if "every federal taxpayer could sue to challenge any Government expenditure.").

The few decisions that have entertained private party claims under the Appropriations Clause have not sought to compel the government to disburse money, as Plaintiffs do here.  Rather, they sought to *halt* the Executive from disbursing funding.  *See United States v. McIntosh*, 833 F.3d 1163, 1173-75 (9th Cir. 2016) (plaintiffs had standing to pursue Appropriations Clause claim where the ostensibly unappropriated funding was used to prosecute them); *United States v. Trump*, 740 F. Supp. 3d 1245, 1304 n.65 (S.D. Fla 2024) (similar); *United States v. Stone*, 394 F. Supp. 3d 1, 19 n.13 (D.D.C. 2019) (similar).  Plaintiffs cite no authority supporting their reliance upon the Appropriations Clause to force the government to fund their grants—which is quite backwards.

Finally, *In re Aiken Cnty.,* 725 F.3d 255 (D.C. Cir. 2013), and *Train v. City of New York*, 420 U.S. 35 (1975), have no relevance here.  Those cases concerned policy disagreements with Congress.  *In re Aiken Cnty.,* 725 F.3d at 259; *Train*, 420 U.S. at 42-43.  Here, EPA terminated

Plaintiffs' Grant Agreements as part of its administration of the programs Congress authorized it to administer. There is no separation of powers concern with what EPA did (only with what Plaintiffs are asking this Court to do). The Executive Branch remains free to change positions upon changes in administration. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016). That is exactly what happened here; EPA, for the "normal and orderly operation of the government," *City of New Haven, Conn. v. United States*, 809 F.2d 900, 907 (D.C Cir. 1987) (quoting H.R. Rep. No. 658, 93d Cong., 1st Sess. 41, reprinted in 1974 U.S. Code Cong. & Admin. News 3462, 3486–87), terminated the grants and in so doing announced its intention to "work to re-obligate lawfully appropriated funds, within the GGRF program with enhanced controls to ensure adequate governance, transparency, and accountability, consistent with applicable regulatory and statutory requirements." Once more, if Plaintiffs claim injury based upon EPA's decision, their remedy lies only in contract. The Appropriations Clause has nothing to do with it.

## B. Termination Does Not Implicate the Appropriations Deadline in the Inflation Reduction Act.

Plaintiffs' Inflation Reduction Act claim has no foundation whatsoever. Although they raise a specter that deadlines have been violated, statutory mandates may not be followed, and funds may not be used appropriately, those contentions have no basis in fact.

Section 134 (42 U.S.C. § 7434) required that EPA "make grants" and stated that the appropriated funds would be available for that purpose until September 30, 2024. EPA fulfilled that statutory requirement timely. Plaintiffs' very existence demonstrates that EPA satisfied the requirements of the statute. No part of the statute constrains EPA's authority to reprogram funds as part of its GGRF program operation. In fact, Plaintiffs' contentions to the contrary contradict their own agreements. In the Grant Agreements, in two separate places, Plaintiffs expressly agreed and recognized conditions under which EPA was required to de-obligate and re-obligate funding.

19

Grant Agreement at 39 (T.4) and at 52 (AF). And Plaintiffs confirmed EPA's right to de-obligate and re-obligate funds in December 2024, well after the September 30, 2024 date they now, for litigation purposes, contend is somehow inviolate. Grant Agreement (amended December 2024) at 41 (T.4) and 51 (AF).

## C. Termination Did Not Violate Due Process, Because the Tucker Act Provides All the Process Due.

Plaintiffs' complaints about due process and assertions of property rights in NCIF grant funds have no purchase. Plaintiffs have only those rights granted under their contracts, and a party whose rights derive from a federal contract cannot maintain a separate claim based upon a property interest. *Hughes Commc'ns Galaxy, Inc. v. United States*, 271 F.3d 1060, 1070 (Fed. Cir. 2001).

Plaintiffs are incorrect in asserting that they own the grant funds obligated by their agreements. Under the Grant Agreements, Plaintiffs "must maintain" the grant funds at their Citibank accounts, which are subject to EPA's perfected security interest, "until the Closeout Agreement goes into effect." Grant Amendment at 118. Only if Plaintiffs had completed performance would Plaintiffs possess a contract basis "to transfer any remaining funds ... to an account ... of [Plaintiffs'] choosing." *Id*. Plaintiffs otherwise were required to spend the funds on allowed uses under the grants. *See id.* at 27 ("[Plaintiffs agree] to only use the award to support the following allowable activities: [listed allowed activities]"). The Notice of Award reflected EPA's agreement to a "cost-share of 100% of all approved budget period costs incurred" up to the award amount. Grant Agreement at 1. Stated simply, Plaintiffs had to perform the grants to become entitled to the funds outright. Until they incur a program cost on an approved budget, Plaintiffs have no claim to the money. *See In re Joliet-Will Cnty. Cmty. Action Agency*, 847 F.2d 430, 432 (7th Cir. 1988) (finding that federal grant funds did not constitute debtor's bankruptcy

estate because the debtor had no property interest in the grant money and property purchased with that money).

Because Plaintiffs only gained an interest in the NCIF grant funds by performing the contracts, their due process claims are nothing more than another set of contract claims. *See Olympic Fed. Sav. And Loan Ass'n v. Dir., Off. of Thrift Supervision.*, Civ. A. No. 90-0482, 1990 WL 134841, at *8-9 (D.D.C. Sept. 6, 1990) (quoting *Megapulse,* 672 F.2d at 967). Plaintiffs may not use their due process claim as "an alternative legal vehicle" through which to enforce their contract rights under the Grant Agreements.[10] *Id.* at *8.

### III. Even If Jurisdiction Existed, Plaintiffs Are Not Likely to Succeed on the Merits.

Beyond their jurisdictional deficiencies, Plaintiffs are unlikely to succeed on the merits and therefore are not entitled to injunctive relief. *Nken v. Holder*, 556 U.S. 418, 426 (2009). Faced with grant agreements under which the agency had failed to ensure appropriate oversight, EPA made a lawful and reasoned decision to terminate Plaintiffs' grants and announced its intention to re-obligate GGRF funds under more responsible agreements. That decision was rational and supported by the terms of the grants. Indeed, it was compelled by basic principles of fiduciary duty, good government, and respect for taxpayers. As explained above, termination also did not violate the Constitution or the Inflation Reduction Act.

---

[10] The Court should disregard Plaintiffs' appeal to general equitable powers. *See* PI Motion 25-26. "It is axiomatic that federal courts are courts of limited jurisdiction." *Srour v. Barnes*, 670 F. Supp. 18, 20 (D.D.C. 1973). "The power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). And the "express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001). Plaintiffs' reliance on broad and generalized statements regarding equitable jurisdiction adds nothing to the merits of their claims.

**A. EPA's Termination of Plaintiffs' Grant Agreements Was Not Arbitrary or Capricious**

The APA's "arbitrary and capricious" standard, 5 U.S.C. § 706(2)(A), is "highly deferential and presumes the validity of agency action." *Sissel v. Wormuth,* 77 F.4th 941, 947 (D.C. Cir. 2023); *see also Husky Mktg. & Supply Co. v. FERC*, 105 F.4th 418, 421 (D.C. Cir. 2024) (judicial review under APA standard is "is deferential and narrow in scope."). A court reviewing agency action under the arbitrary-and-capricious standard should only set aside an agency decision if "there has been a clear error of judgement" "based on a consideration of the relevant factors." *Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). The court "may not substitute its own judgment for that of the agency." *Columbia Gulf Transmission v. FERC,* 106 F.4th 1220, 1230 (D.C. Cir. 2024). Instead, the court must "simply ensure[] that the agency has acted within a zone of reasonableness," and an agency decision must be upheld so long as it is "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

      i.    <u>EPA's Termination of Plaintiffs' Grants was Reasonable and Reasonably Explained.</u>

EPA's termination of Plaintiffs' Grant Agreements was reasonable. Under the new administration, new EPA officials prudently reviewed EPA's spending. Amidon Decl. ¶ 36. A change in administration "is a perfectly reasonable basis for an executive agency's reappraisal of the costs and benefits of its programs." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 59 (1983) (Rehnquist, J., concurring in part, dissenting in part). "As long as the agency remains within the bounds established by Congress, it is entitled to assess administrative records and evaluate priorities in light of the philosophy of the administration." *Id.; see also Dep't of Com.* v. *New York*, 588 U.S. 752, 781 (2019). Within the bounds set by Congress, the agency discretion applies in the grants context as readily as it does in other spheres of activity.

Upon review, EPA determined that the level of oversight provided in Plaintiffs' Grant Agreements was exceedingly insufficient.[11]  Modifications to the agreements post-election, on December 20, 2024 and January 13, 2025, purportedly "limit[ing] EPA's contractual rights," "left EPA with insufficient authority to retain control of funds short of outright termination."  Amidon Decl. ¶ 37.

The Termination Letter explains that the Grant Agreements lacked "adequate oversight and account controls to prevent financial mismanagement," was deficient with respect to "the improper or speculative allocation of funds inconsistent with EPA's oversight and fiscal responsibilities," and involved "the circumvention and defeat of key oversight mechanisms in the disbursement of federal funds."  Termination Letter at 1.  The letter further explains that the GGRF program "pose[d] an unacceptable risk to the efficient and lawful execution of [the GGRF] grant that cannot be remedied by imposing specific conditions, necessitating immediate termination to safeguard taxpayer funds and ensure compliance with federal assistance regulations."  *Id.*  EPA also reasonably terminated the grants based on concerns that the previous Administration had significantly reduced federal oversight and control to Plaintiffs and a financial agent that the contractual scheme violated constitutional limitations on the delegation of Executive Branch authority to private parties.  Amidon Decl. ¶ 37.  The December 20, 2024 and January 13, 2025 amendments diminished EPA's control over the recipients, as the contracts purported to prevent termination absent credible evidence of an enumerated list of crimes and violations.  *Id.*

---

[11] To reiterate, EPA has not  abandoned the GGRF program.  The Termination Letter provides that "EPA will work to re-obligate lawfully appropriated funds within the GGRF program with enhanced controls to ensure adequate governance, transparency, and accountability, consistent with applicable regulatory and statutory requirements." Termination Letter at 2.

These explanations—as described in Mr. Amidon's declaration; the pending criminal investigations by the DOJ and FBI; and the EPA Office of Inspector General's ongoing investigation—confirm that EPA's decision to terminate Plaintiffs' grant agreements falls plainly well within "a zone of reasonableness," *Prometheus Radio Project*, 592 U.S. at 423, that merits this Court's deference under APA review.  The APA merely requires an explanation clear enough for "the agency's path [to] reasonably be discerned" and to facilitate effective review.  *Bowman Transp., Inc.* v. *Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974).  The fact that the Plaintiffs' Grant Agreements were treated similarly and terminated in tandem does not undermine the reasonableness of EPA's decision making.  To the contrary, treating similarly situated grants equally honors the APA, for "[r]easoned decisionmaking requires treating like cases alike." *Hall* v. *McLaughlin*, 864 F.2d 868, 872 (D.C. Cir. 1989).

Even if the terminations are deemed a change in agency policy (which they are not), EPA's priorities are matters of policy discretion and not a result of "factual findings"; accordingly, a shift in those priorities does not require any additional explanation under the APA.  *FCC* v. *Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).  EPA needed only to "display awareness that it *is* changing position," *id.*, which it plainly did.

In reality, Plaintiffs' problem with EPA's grant terminations is not that EPA failed to give sufficient explanation—their objection is that the reasonable explanation that EPA provided does not align with what are (in Plaintiffs' view) the exclusive grounds for termination that are set forth in the Grant Agreements.  Once again, that returns to where we began: Even if that were all true, it proves these are contract claims at heart, not APA reasoned-decisionmaking claims.

ii.    <u>EPA Complied with its Regulations in Terminating the Grants.</u>

EPA's termination did not violate 2 C.F.R. § 200.340, which sets out four methods by which an agency "may" terminate a grant, including when "an award no longer effectuates the program goals or agency priorities."  § 200.340(a)(4).  The currently operative version of the regulation then provides that the agency "must clearly and unambiguously specify all termination provisions in the terms and conditions of the" grant.  § 200.340(b).  EPA satisfied this requirement at contract formation, by incorporating EPA's then-current General Terms and Conditions, which provided EPA with the right to terminate the grants "if the award no longer effectuates the program goals or agency priorities."  EPA, General Terms and Conditions 2-3 (effective Oct. 1, 2023).  At issue is whether EPA breached a subsequent contractual promise in the early phase of contract performance.

Although § 200.340 provides bases for termination and obligates an agency to include those bases in grant agreements, the regulation does not (a) mandate what grant termination provisions must or must not say, or (b) limit an agency's ability to terminate a grant to those bases agreed to in a grant agreement.  To the extent EPA's termination of Plaintiffs' Grant Agreements based upon program goals and agency priorities was contrary to the Grant Agreements' termination provision, that may be a breach of the agreements, but it is not a violation of the plain language of § 200.340.  In other words, if EPA did not specifically incorporate § 200.340(a)(4) into the Grant Agreements, that is a contract issue, not a regulatory one.

EPA's termination of the grants does not implicate 2 C.F.R. § 200.342 either, because EPA did not terminate for Plaintiffs' noncompliance.  Thus, the regulation's requirement that a grantee facing an agency's remedy for noncompliance be provided the opportunity to object is not applicable here and cannot form the basis of an APA claim.  Even if § 200.342 had applied, any

25

failure to provide an opportunity to object would be harmless error, because, as described above, EPA's bases for termination were the grants' structure and terms, including the changes to those terms made in the twilight of the prior administration, and not conduct of Plaintiffs for which they could use the opportunity to object to explain or justify.

### iii.    EPA's Suspension, Prior to Termination, Did Not Violate the APA.

Though mooted by the subsequent termination, EPA's direction to Citibank to freeze disbursements to the GGRF grantees did not violate the APA. Only *final* agency action, as opposed to "preliminary, procedural, or intermediate" agency actions, is reviewable under the APA. 5 U.S.C. § 704. The pause placed on Plaintiffs' Citibank accounts was a precautionary measure to ensure that funds were not transferred or disbursed as EPA continued its review of the $20 billion program. *See* EPA TRO Opp. at 22, citing *Pacific Gas & Elec. Co. v. FPC*, 506 F.2d 33, 39 & n. 20, (D.C. Cir. 1974), *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997), and *Sackett v. E.P.A.*, 566 U.S. 120, 127 (2012) (A decision reflects the "consummation" of the agency decision making process when that decision is subject to no further agency review). Because the temporary hold on the Citibank accounts was not final agency action, it is not reviewable under the APA.

Even it was, the suspension was reasonable for many of the same reasons that termination was reasonable: the GGRF program's unusual features, post-election amendments, and ongoing DOJ, FBI and EPA OIG investigations. *See* EPA TRO Opp. at 9 and 21.

## IV.    Plaintiffs' Alleged Harm Cannot Justify a Preliminary Injunction.

An injunction should be denied when Plaintiffs' alleged harms are monetary and may be remedied by damages.

### A.  Plaintiffs' Alleged Harm is Not Irreparable.

The D.C. Circuit "has set a high standard for irreparable injury." *Chaplaincy of Full Gospel*

*Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). "Where the injuries alleged are purely financial or economic, the barrier to proving irreparable injury is higher still, for it is 'well settled that economic loss does not, in and of itself, constitute irreparable harm.'" *Mexichem Spec. Resins, Inc. v. E.P.A.*, 787 F.3d 544, 555 (D.C. Cir. 2015) (quoting *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). "The Supreme Court has echoed this message, finding that 'the temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury.'" *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1295 (D.C. Cir. 2009). (citing *Sampson v. Murray*, 415 U.S. 61, 90 (1974)).

In terminating Plaintiffs' grants, EPA has not prohibited or made it unlawful for Plaintiffs (or their subgrantees) to carry out their work. Nor has any other government action. The government is not preventing Plaintiffs from providing services; EPA has just terminated the contracts under which the government would provide reimbursement for those services. *See e.g.*, *Faculty Senate of Fla. Int'l Univ. v. Winn*, 477 F. Supp. 2d 1198, 1208 (S.D. Fla. 2007) ("There is no irreparable harm here because the plaintiffs can fund the desired travel themselves and then, if they prevail in this suit, obtain reimbursement. In other words, the harm is financial."). The only harm to Plaintiffs' mission here is not getting paid under the terms of the agreements. That is insufficient for injunctive relief.

Further, "Plaintiffs must show that irreparable harm is *likely*, not merely possible." *In re TelexFree Sec. Litig.*, No. 4:14-md-002566-TSH, 2021 WL 11604879, at *7 (D. Mass. Apr. 21, 2021) (citing *Steir v. Girl Scouts of the USA*, 383 F.3d 7, 16 (1st Cir. 2004)). That showing "must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004). Plaintiffs' brief and declarations are full of speculative language, pointing

the Court to harms that "may"—but have not and might not—occur.

**B. Plaintiffs' Alleged Harm is Not Immediate.**

Plaintiffs' claimed immediate injury—delayed disbursement of funds—would be remedied at the conclusion of this case (or a case brought in the Court of Federal Claims) if they are meritorious. And Plaintiffs' inability to collect money unless and until they prevail on the merits is a standard part of litigation that does not justify a preliminary injunction. "The rule that equitable remedies cannot issue when the damages are monetary in nature has been ingrained in law for 'half a millennium or so,' and no judge within the English common law tradition has the luxury of ignoring it." *United States v. Michigan*, 230 F.R.D. 492, 495 n.1 (E.D. Mich. 2005). This is true even where a plaintiff claims that it does not have ready reserves or charitable donors or that waiting for money is harmful because of a lack of other funds. *See id.* (movant failed to show irreparable harm beyond monetary damages even though "[movant] argue[d] that its ratepayers are low-income and do not have the luxury of saying, 'It's only money.'"); *see also., Dennis Melancon, Inc.* v. *City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (the "possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, [weighs] heavily against a claim of irreparable harm") (citation omitted).

The risks Plaintiffs primarily expound upon are all financial—like the possibility of missed payments, inability to cover expenses, and paused disbursements to subgrantees. While Plaintiffs' attempt to emphasize the depth and breadth of the work they have begun under the GGRF program, the impact of terminating that work may be exaggerated. This litigation comes at the beginning of the GGRF's programmatic work. Plaintiffs' GGRF funding was obligated just a little over six months ago. Many of Plaintiffs' employees are recent hires or have not yet been hired at all. *See* PI Motion at 52; Bafford Decl. ¶7 (Climate United created as a separate legal entity in 2022). Plaintiffs' projects are not years in the making. And to the extent the work of Plaintiffs, their

28

various coalition partners, or their subgrantees predate the GGRF program, that longevity suggests that their work can survive a pause in funding as this litigation continues or the termination of Plaintiffs' grants should Plaintiffs' challenge prove unsuccessful.

**C. Plaintiffs' Alleged Reputational Harm Fails to Justify Entry of a Preliminary Injunction.**

Plaintiffs' alleged reputational harm boils down to anticipated difficulties in attracting investors and partners. Any anticipatory difficulties arising from the reduction of Plaintiffs' budget is "'strictly economic' and therefore not irreparable ... [and] the discontinuance of funds did not injure [Plaintiffs'] reputation because it reflected no more than a decision based on reasons of policy." *Planned Parenthood Ass'n of Utah v. Schweiker*, 700 F.2d 710, 718 n.16 (noting the discontinuance of Title X funding was not sufficient to justify preliminary injunction). The loss of potential investment stemming from EPA's efforts to impose oversight and control over the grant funds is an economic loss, which does not constitute irreparable harm. *Ahuruonye v. U.S. Dep't of Interior*, 312 F. Supp. 3d 1, 24 (D.D.C. 2018). The anticipated reputational injuries are also hypothetical and do not justify preliminary injunction "especially when [the alleged injuries are] nothing more than speculation about how third parties might respond." *John Doe Co. v. Consumer Fin. Prot. Bureau*, 849 F.3d 1129, 1134 (D.C. Cir. 2017). "As with all other forms of irreparable harm, the showing of reputational harm must be concrete and corroborated, not merely speculative." *Trudeau v. Fed. Trade Com'n*, 384 F.Supp.2d 281, 297 (D.D.C. 2005); *see also Ahuruonye*, 312 F. Supp. 3d at 24 (quoting *Trudeau*).

**V. An Injunction Would Be Contrary to the Public Interest.**

As detailed in the EPA Defendants' Opposition to Plaintiffs' motion for a TRO, the balance of equities and public interest continue to weigh against the extraordinary remedy of a preliminary injunction. *See* EPA TRO Opp. at 24-26. "[T]he protection of the public fisc is a matter that is of

interest to every citizen," *Brock v. Pierce Cnty.*, 476 U.S. 253, 262 (1986).  Granting Plaintiffs' requested relief here puts a significant portion of the public fisc out of the government's protection.

The public interest is also not served by "reinstating" a Grant Agreement that would force EPA into a multiple year, $20 billon spending obligation, which it has no ability to unilaterally terminate without allegedly violating the APA.  Adopting Plaintiffs' reasoning would have grave consequences on procurement, healthcare, and any arena in which the federal government plays a role. Taken to its logical conclusion, Plaintiffs' theory would bind the Executive to perform contracts, even if the agreements no longer serve any public purpose, or instead run counter to the public interest. The need to protect against such circumstances demonstrates why Congress adopted a limited waiver of sovereign immunity under the Tucker Act. The public interest is served by furthering the Tucker Act's policy choice, not by evading it.

## VI.     Any Relief Should be Limited.

For the reasons explained above, Plaintiffs are not entitled to any preliminary injunctive relief.   But in the event the Court concludes otherwise, injunctive relief "must be narrowly tailored to remedy the specific harm shown," *Neb. Dep't of Health & Hum. Servs. v. U.S. Dep't of Health & Hum. Servs.*, 435 F.3d 326, 330 (D.C. Cir. 2006) (citation omitted), and "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted).  The scope of any relief granted here should not extend beyond the Court's Temporary Restraining Order, *see* ECF No. 28, especially considering the significant risk that any monies disbursed to Plaintiffs' may not be recoverable.  Any granted relief should also be (1) limited to the specific agency action Plaintiffs' challenge—the Termination Letter—not any other conduct whose lawfulness is not before this Court, *see Nat'l Ass'n of Chain Drug Stores v. U.S. Dep't of Health & Hum.*

*Servs.*, 631 F. Supp. 2d 17, 21 (D.D.C. 2009); and (2) limited to the Plaintiffs' alone who have shown imminent and irreparable harm.

### VII.    Bond is Required if the Court Issues a Preliminary Injunction.

If the Court decides to grant any preliminary injunctive relief, the Court should order security with any preliminary injunction. Under Federal Rule of Civil Procedure 65(c), the Court may issue a preliminary injunction "only if the movant gives security" for "costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined." Fed. R. Civ. P. 66(c). Although this Rule provides "broad discretion in the district court to determine the appropriate amount of an injunction bond," *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999), when setting security, courts "should err on the high side" because setting a bond amount too low might produce injury since "the damages for an erroneous preliminary injunction cannot exceed the amount of the bond." *Mead Johnson & Co. v. Abbott Labs.,* 201 F.3d 883, 888 (7th Cir. 2000). Should the Court issue an injunction at this preliminary stage that exceeds the scope of the temporary restraining order and allows Plaintiffs to draw down on the Citibank accounts, the Courts must require Plaintiffs to post a bond.

### CONCLUSION

EPA respectfully requests that the Court deny Plaintiffs' motion for preliminary injunction.

Dated: March 26, 2025                          Respectfully Submitted,


                                               YAAKOV ROTH
                                               Acting Assistant Attorney General

                                               KIRK T. MANHARDT
                                               Director

                                               */s/ Marc S. Sacks*
                                               MARC S. SACKS (Ga. Bar No. 621931)
                                               *Deputy Director*
                                               KEVIN P. VANLANDINGHAM (NY Reg No. 4741799)
                                               *Assistant Director*
                                               U.S. Department of Justice
                                               Civil Division
                                               Corporate/Financial Section
                                               P.O. Box 875
                                               Ben Franklin Stations
                                               Washington D.C. 20044-0875
                                               Tel: (202) 307-1104
                                               Email: marcus.s.sacks@usdoj.gov

                                               *Attorneys for the United States*
                                               *Environmental Protection Agency*