# Exhibit A

5G - 84094001 - 0    Page 1

| U.S. ENVIRONMENTAL PROTECTION AGENCY | Grant Agreement | | |
|---|---|---|---|
| **GRANT NUMBER (FAIN):** 84094001<br>**MODIFICATION NUMBER:** 0<br>**PROGRAM CODE:** 5G | | **DATE OF AWARD** 08/08/2024 | |
| **TYPE OF ACTION** New | | **MAILING DATE** 08/13/2024 | |
| **PAYMENT METHOD:** ASAP | | **ACH#** | |

| **RECIPIENT TYPE:** | **Send Payment Request to:** |
|---|---|
| Not for Profit | Contact EPA RTPFC at ███████ |

| **RECIPIENT:** | **PAYEE:** |
|---|---|
| Climate United Fund<br>7550 WISCONSIN AVE<br>Fl 8<br>BETHESDA, MD 20814-3559<br>EIN: ███████ | Climate United Fund<br>7550 WISCONSIN AVE<br>Fl 8<br>BETHESDA, MD 20814-3559 |

| **PROJECT MANAGER** | **EPA PROJECT OFFICER** | **EPA GRANT SPECIALIST** |
|---|---|---|
| Elizabeth Bafford<br>7550 Wisconsin Ave<br>Fl 8<br>Bethesda, MD 20814<br>Email: ███████<br>Phone: ███████ | Michelle Tucker<br>1200 Pennsylvania Ave, NW, 19-H16<br>Washington, DC 20460<br>Email: ███████<br>Phone: ███████ | Walker Oneil<br>OGD- GMBOD, 3093R<br>1200 Pennsylvania Ave, NW<br>Washington, DC 20460-0001<br>Email: ███████<br>Phone: ███████ |

**PROJECT TITLE AND DESCRIPTION**

GGRF NCIF: Climate United

See Attachment 1 for project description.

| **BUDGET PERIOD** 04/01/2024 - 06/30/2029 | **PROJECT PERIOD** 04/01/2024 - 06/30/2029 | **TOTAL BUDGET PERIOD COST** $ 6,970,000,000.00 | **TOTAL PROJECT PERIOD COST** $ 6,970,000,000.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 10/12/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 6,970,000,000.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 6,970,000,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| ISSUING OFFICE (GRANTS MANAGEMENT OFFICE) | AWARD APPROVAL OFFICE |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| Environmental Protection Agency, Grants Management & Business Operations Division<br>1200 Pennsylvania Ave, NW Mail code 3903R<br>Washington, DC 20460 | Environmental Protection Agency, OGGRF<br>OA - Office of the Administrator<br>1200 Pennsylvania Ave, NW<br>Washington, DC 20460 |

| THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY | |
|---|---|
| Digital signature applied by EPA Award Official Katherine Tsing-Choy - Associate Award Official | **DATE** 08/08/2024 |

5G - 84094001 - 0    Page 2

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 0 | $ 6,970,000,000 | $ 6,970,000,000 |
| EPA In-Kind Amount | $ 0 | $ 0 | $ 0 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 0 | $ 6,970,000,000 | $ 6,970,000,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.957 - Greenhouse Gas Reduction Fund: National Clean Investment Fund | Clean Air Act: Sec. 134(a)(2) and (3) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

| Fiscal | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Site Name | Req No | FY | Approp. Code | Budget Organization | PRC | Object Class | Site/Project | Cost Organization | Obligation / Deobligation |
| - | 2411U41083 | 2224 | E1SF3 | QU | 000MGBXG3 | 4131 | - | - | $ 5,972,147,459 |
| - | 2411U41082 | 2224 | E1SF3 | QU | 000MGBXAC | 4131 | - | - | $ 997,852,541 |
| | | | | | | | | | $ 6,970,000,000 |

5G - 84094001 - 0     Page 3

Budget Summary Page

| Table A - Object Class Category<br>(Non-Construction) | Total Approved Allowable<br>Budget Period Cost |
|---|---|
| 1. Personnel | $ 89,871,170 |
| 2. Fringe Benefits | $ 33,252,333 |
| 3. Travel | $ 4,697,854 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 1,080,080 |
| 6. Contractual | $ 861,952,518 |
| 7. Construction | $ 0 |
| 8. Other | $ 5,950,949,314 |
| 9. Total Direct Charges | $ 6,941,803,269 |
| 10. Indirect Costs: 10.00 % Base de minimis MTDC | $ 28,196,731 |
| 11. Total (Share: Recipient ___0.00 % Federal __100.00 %) | $ 6,970,000,000 |
| 12. Total Approved Assistance Amount | $ 6,970,000,000 |
| 13. Program Income | $ 315,000,000 |
| 14. Total EPA Amount Awarded This Action | $ 6,970,000,000 |
| 15. Total EPA Amount Awarded To Date | $ 6,970,000,000 |

## Attachment 1 - Project Description

This agreement provides funding under the Inflation Reduction Act (IRA) to Climate United (CU). The recipient will utilize the funding to reduce emissions of greenhouse gases and other air pollutants; deliver benefits of greenhouse gas- and air pollution-reducing projects to American communities, particularly low-income and disadvantaged communities; and mobilize financing and private capital to stimulate additional deployment of greenhouse gas- and air pollution-reducing projects.

Specifically, the recipient will endeavor to accomplish this by working with community groups, technical assistance providers, financial institutions, and workforce development entities to reduce the barriers and limit the inefficiencies that have prevented broad adoption and financing of clean technologies. To ensure clean energy acceleration and market transformation beyond the National Clean Investment Fund (NCIF), Climate United will integrate this capital resource into existing lending products and processes so that all lenders, (i.e., beyond just the community, green and nonprofit sectors) learn to address decarbonization in their routine lending practices. Greening existing lending with NCIF support will have the broadest transformative impact on the capital markets nationwide.

The activities include developing a sustainable fund that can be revolved while offering products that meet borrowers and markets where they are. Specifically, they intend to leverage EPA funds with private capital to provide adequate levels of subsidy to spur the adoption of green alternatives. As costs come down and markets mature, they plan to slowly decrease the amount of subsidy per transaction to ensure their products are additive and to maximize sustainability of the fund. Climate United's plan is to build a supportive ecosystem for the financing of Qualified Projects (QP) that leverage national networks of local implementation partners and coordination with labor and workforce organizations to ensure financed projects are (i) generating high-quality jobs with a diverse, skilled workforce trained in DBRA compliance and reporting where applicable, (ii) delivering high-performing buildings for owners and occupants or access to clean energy or transportation for American families, businesses, and organizations, and (iii) eliminating the barriers that have historically prevented the scaling of clean energy technologies across segments.

Their capital demand side market-building plan focuses on broad awareness building, targeted outreach and education, and straightforward conversion to address historic barriers. The foundation of their strategy will be potential partnerships with national networks of local organizations that will engage, educate, and equip local partners with the tools to facilitate QP development. Climate United will develop or partner to deliver ongoing training to lenders, contractors, owners, community organizations, building operators, and other priority segments, in conjunction with established, on the ground community organizations. They will work with CCIA partners creating training programs to provide the most up-to-date information on their products and processes to build the continuation of support for community lenders and build training for Community Based Organizations around how to access Climate United financial assistance.

Their capital supply side market-building plan focuses on asset and data standardization, financial product development, portfolio analysis, and market education. Through a cooperative design process with Transaction Partners, they will create and refine their standardized products so they can more quickly scale and support the development of viable secondary markets.Climate United (CU) is targeting the following outputs and outcomes resulting from the award and its investment strategy. Performance against these outputs is dependent on market conditions, market demand, and ultimate cost of Qualified Projects across various market segments. It is expected that some of these outputs may be hard to achieve over the five-year performance period. After three years, if they are not on track to meet the

target outputs, they will shift strategy and adjust the information below to reflect the realities of the market once they are actively in it.

Climate United is striving for at least 60 percent of the beneficiaries to either be located in Low Income and Disadvantaged Communities (LIDAC) or serving LIDAC beneficiaries. The anticipated deliverables include:

– single family homes decarbonized

– units of multifamily housing decarbonized

– small commercial and community facilities decarbonized

– school buildings decarbonized

– passenger vehicles electrified

– school buses electrified

– heavy-duty trucks electrified

– other vehicles electrified

– residential solar installations and/or access to community solar and/or storage for single family homes

– small commercial and community facilities with access to solar and/or storage

– school buildings with access to solar and/or storage

The expected outcomes include CU leveraging this program to mobilize and engage the private sector to address the climate crisis. CU's strategy drives capital to demonstrate the benefits and the ability to finance a carbon free economy that will deliver significant, tangible benefits to American communities through lower energy bills, stable and reliable energy sources, and cleaner air; will reinvigorate American manufacturing and develop new supply chains that strengthen our national security; and will support the development of a workforce made of high-quality jobs that expand and deepen the American middle-class. This will be accomplished through reducing GHG emissions by increasing efficiency and electrifying systems in buildings, which improves indoor air quality and health of beneficiaries, reducing GHG emissions by electrifying vehicles, which improves outdoor air quality and the health of effected communities, and increasing renewable generation to expand clean generation of energy and reduce emissions, which reduces the carbon intensity of our electricity sector and lowers energy bills.

The intended beneficiaries include geographically diverse communities across all 50 States with a specific focus on rural communities, Tribal communities, and Low Income and Disadvantaged Communities.

A portion will be deployed to balance sheets investing in and with transaction partners to facilitate standardized and tailored loans into QPs that may stay on the balance sheets of the Community Lenders. Subaward loans include loans to the balance sheets of Community Lenders who use the funds combined with private funds to provide financial assistance to Qualified Projects.

Based upon the Transaction Partner type and the relevant market segments, Climate United may conduct a Counterparty Assessment that reviews the operational and lending or investment history, current financial position, pipeline, community impact, and operational ability to execute QPs in accordance with CU's Investment and Fair & Responsible Lending Policies. Climate United and its Coalition Partners may provide subawards and/or procurement contracts, as appropriate, for the purpose of assisting with Counterparty Assessments.

In addition to subaward loans to financial intermediaries for the purpose of providing financial assistance to qualified projects as described in the workplan, CU will also provide subawards to it's two coalition partners who specialize in housing decarbonization and transportation.

# Administrative Conditions

## A. General Terms and Conditions

The Recipient agrees to comply with the current EPA general terms and conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2023-or-later. These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award. The EPA repository for the general terms and conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

## B. Correspondence Condition

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA.  Unless otherwise noted, all such correspondence should be sent to the following email addresses:

- Federal Financial Reports (SF-425): ███████████████ and EPA Grants Specialist listed on the award
- MBE/WBE reports (EPA Form 5700-52A): ████████████████████ and EPA Grants Specialist listed on the award
- All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to Recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: EPA Grants Specialist and EPA Project Officer listed on the award
- Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: EPA Project Officer listed on the award

## C. Intergovernmental Review Period

In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period when a Recipient or Subrecipient intends to provide Financial Assistance to Qualified Project(s) that involves construction or land use planning. With the exception of Qualified Project(s) that will be carried out in the State of California, the Recipient must ensure that directly affected State, areawide, regional, and local government entities have 60 calendar days to review the description of the Qualified Project(s) and provide comments to the EPA Project Officer. Qualified Project(s) that will be carried out in the State of California must be submitted to the California Single Point of Contact at https://cfda.opr.ca.gov for review as provided in California law.

The Recipient agrees to comply with the provisions of 40 CFR Part 29, implementing the Demonstration Cities, Metropolitan Development Act, the Intergovernmental Cooperation Act, and Executive Order 12372 as amended in 1983, to ensure that projects funded under federal programs are consistent with local planning requirements.

## D. Pre-Award Costs

As provided in 2 CFR 200.458, Recipients are authorized to incur pre-award costs, which are costs that would have been allowable if incurred after the date of the Federal award. For competitive grants, EPA

interprets the requirement in the regulation that pre-award costs be incurred "directly pursuant to the negotiation and in anticipation of the Federal award" to limit allowable pre-award costs to those a Recipient incurs after EPA has notified the Recipient that its application has been selected for award consideration. The pre-award costs must be included in the workplan and budget to be eligible. As provided in 2 CFR 1500.9, Recipients incur pre-award costs at their own risk. Please refer to *Section I.C: Pre-Award Costs* of the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance for additional information.

## E. New Recipient Training Requirement

The Recipient agrees to complete the EPA Grants Management Training for Applicants and Recipients and the How to Develop a Budget training within 90 calendar days of the date of award of this agreement. The Recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the Recipient should refer to RAIN-2024-G01.

# Programmatic Conditions

## I. DEFINITIONS

**Acquisition of Intangible Property:** 2 CFR 200.1 defines Intangible Property as "property having no physical existence, such as trademarks, copyrights, patents and patent applications and property, such as loans, notes and other debt instruments, lease agreements, stock and other instruments of property ownership (whether the property is tangible or intangible)." Acquisitions of Intangible Property involve the purchase of Intangible Property through procurement contracts.

**Air Pollutant:** Air Pollutant means any air pollutant that is listed pursuant to Section 108(a) of the Clean Air Act (or any precursor to such an air pollutant). This includes particulate matter, ozone, carbon monoxide, sulfur dioxide, nitrogen dioxide, and lead (see 40 CFR Part 50) and their precursors (e.g., volatile organic compounds).

**Award Agreement:** Award Agreement means the set of legally binding documents between EPA and the Recipient under the federal award. Award Agreement is used interchangeably with Assistance Agreement and Notice of Award.

**Apprentice:** Apprentice means an individual working on a project receiving Financial Assistance who is participating in a Registered Apprenticeship program under the National Apprenticeship Act that meets the requirements of 29 CFR Parts 29 and 30.

**Environmental Information:** Environmental Information is defined in EPA's Environmental Information Quality Policy. Environmental Information includes "data and information that describe environmental processes or conditions which support EPA's mission of protecting human health and the environment. Examples include but are not limited to: direct measurements of environmental parameters or processes; analytical testing results of environmental conditions (e.g., geophysical or hydrological conditions); information on physical parameters or processes collected using environmental technologies; calculations or analyses of environmental information; information provided by models; information compiled or obtained from databases, software applications, decision support tools, websites, existing literature, and other sources; development of environmental software, tools, models, methods and applications; and design, construction, and operation or application of environmental technology."

**Environmental Information Operations:** Environmental Information Operations is defined in EPA's Environmental Information Quality Policy. Environmental Information Operations means "[a] collective term for work performed to collect, produce, evaluate, or use environmental information and the design, construction, operation or application of environmental technology."

**EPA Award Official:** EPA Award Official means the award official from the Office of Grants and Debarment that is authorized to execute the Award Agreement, as well as any subsequent amendments to the Award Agreement, and to make any other final determinations required by law or regulation on behalf of the EPA.

**EPA Project Officer:** EPA Project Officer means the project officer from the Office of the Greenhouse Gas Reduction Fund that is assigned, along with the EPA Grants Specialist, to monitor the Recipient on programmatic and technical aspects of the project and is typically authorized to make programmatic approvals on behalf of the EPA. Where required, the Recipient must notify or request approval from the EPA Project Officer through the EPA Project Officer's individual EPA email address as well ███████████

█ such that the Office of the Greenhouse Gas Reduction Fund may delegate an alternative EPA Project Officer in the case of any absence.

**Financial Assistance:** Section 134(b)(1) of the Clean Air Act directs that the Recipient use funds for "Financial Assistance." Consistent with the definition of *Federal financial assistance* in 2 CFR 200.1, Financial Assistance means financial products, including debt (such as loans, partially forgivable loans, forgivable loans, zero-interest and below-market interest loans, loans paired with interest rate buydowns, secured and unsecured loans, lines of credit, subordinated debt, warehouse lending, loan purchasing programs, and other debt instruments), equity investments (such as equity project finance investments, private equity investments, and other equity instruments), hybrids (such as mezzanine debt, preferred equity, and other hybrid instruments), and credit enhancements (such as loan guarantees, loan guarantee funds (whether full or partial), loan loss reserves, and other credit enhancement instruments). Expenditures for Financial Assistance are in the form of Subawards (other than subgrants), Participant Support Costs, or Acquisitions of Intangible Property, as defined in this Award Agreement. Subgrants are not eligible as Financial Assistance.  The characterization of a Financial Assistance transaction as a Subaward, Participant Support Costs, or Acquisition of Intangible Property is limited to the transaction. For example, the same entity may be a Subrecipient for one transaction and a Program Beneficiary or a Contractor for another transaction.

**Freely Associated States:** Freely Associated States means the Republic of the Marshall Islands (the Marshalls), the Federated States of Micronesia (FSM), and the Republic of Palau (Palau).

**Greenhouse Gas:** Greenhouse Gas means carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons, and sulfur hexafluoride, as defined in Section 134(c)(2) of the Clean Air Act. Greenhouse Gas Emissions mean emissions of Greenhouse Gases.

**Low-Income and Disadvantaged Communities**: Section 134(a)(3) of the Clean Air Act appropriates funds "for the purposes of providing financial assistance and technical assistance in low-income and disadvantaged communities." Low-Income and Disadvantaged Communities means CEJST-Identified Disadvantaged Communities, EJScreen-Identified Disadvantaged Communities, Geographically Dispersed Low-Income Households, Properties Providing Affordable Housing, and Federally Recognized Tribal Entities, as defined below.

• *CEJST-Identified Disadvantaged Communities:* All communities identified as disadvantaged through version 1.0 of the Climate and Economic Justice Screening Tool (CEJST), released on November 22, 2022, which includes census tracts that meet the thresholds for at least one of the tool's categories of burden and land within the boundaries of Federally Recognized Tribes.

• *EJScreen-Identified Disadvantaged Communities:* All communities within version 2.2 of EJScreen that fall within either (a) the limited supplemental set of census block groups that are at or above the 90th percentile for any of EJScreen's supplemental indexes when compared to the nation or state or (b) geographic areas within Tribal lands as included in EJScreen, which includes the following Tribal lands: Alaska Native Allotments, Alaska Native Villages, American Indian Reservations, American Indian Off-reservation Trust Lands, and Oklahoma Tribal Statistical Areas.

• *Geographically Dispersed Low-Income Households:* Low-income individuals and households living in Metropolitan Areas with incomes not more than 80% AMI or 200% FPL (whichever is higher), and low-income individuals and households living in Non-Metropolitan Areas with incomes not more than 80% AMI, 200% FPL, or 80% Statewide Non-Metropolitan Area AMI (whichever is highest). Federal Poverty Level (FPL) is defined using the latest publicly available

figures from the U.S. Department of Health and Human Services. Area Median Income (AMI) is defined using the latest publicly available figures from the U.S. Department of Housing and Urban Development (HUD). Metropolitan Area and Non-Metropolitan Area are defined using the latest publicly available figures for county-level designations from the Office of Management and Budget. Statewide Non-Metropolitan Area AMI is defined using the latest publicly available figures from the U.S. Department of the Treasury's CDFI Fund, with an adjustment for household size using HUD's Family Size Adjustment factor.

- *Properties Providing Affordable Housing:* Properties providing affordable housing that fall within either of the following two categories: (a) multifamily housing with rents not exceeding 30% of 80% AMI for at least half of residential units and with an active affordability covenant from one of the following housing assistance programs: (1) Low-Income Housing Tax Credit; (2) a housing assistance program administered by HUD, including Public Housing, Section 8 Project-Based Rental Assistance, Section 202 Housing for the Elderly, Section 811 Housing for Disabled, Housing Trust Fund, Home Investment Partnership Program Affordable Rental and Homeowner Units, Permanent Supportive Housing, and other programs focused on ending homelessness that are funded under HUD's Continuum of Care Program; (3) a housing assistance program administered by USDA under Title V of the Housing Act of 1949, including under Sections 514 and 515; (4) a housing assistance program administered by a tribally designated housing entity, as defined in Section 4(22) of the Native American Housing Assistance and Self-Determination Act of 1996 (25 USC § 4103(22)); or (5) a housing assistance program administered by the Department of Hawaiian Homelands as defined in Title VIII of the Native American Housing Assistance and Self-Determination Act of 1996 (24 CFR 1006.10) or (b) naturally-occurring (unsubsidized) affordable housing with rents not exceeding 30% of 80% AMI for at least half of residential units.

- *Federally Recognized Tribal Entities:* All Federally Recognized Tribal entities, which are considered disadvantaged regardless of whether a Federally Recognized Tribe has land, consistent with M-23-09 and CEJST.


**Market-Building Activities:** Market-Building Activities means activities that meet all three of the following criteria: (1) build the market for financeable Qualified Projects, (2) are not tied directly to Qualified Projects the Recipient intends to finance, and (3) are necessary and reasonable for the deployment of Financial Assistance to Qualified Projects.

**Named Subrecipient:** Named Subrecipient means an entity that is named on the EPA-approved workplan to receive a Subaward in the form of a Subgrant from the Recipient in order to carry out part of the award.

**Participant Support Costs**: 2 CFR 200.1 defines Participant Support Costs as "direct costs for items such as stipends or subsistence allowances, travel allowances, and registration fees paid to or on behalf of participants or trainees (but not employees) in connection with conferences, or training projects." EPA regulations at 2 CFR 1500.1(a)(1) expand the definition of Participant Support Costs to include "subsidies, rebates, and other payments to program beneficiaries to encourage participation in statutorily authorized environmental stewardship programs," which includes the Greenhouse Gas Reduction Fund. In this program, Participant Support Costs may include expenditures by the Recipient as Predevelopment Activities, Market-Building Activities, and Program Administration Activities (which may include subsidies, rebates, and other payments) as well as Financial Assistance to Qualified Projects.

**Period of Closeout**: Period of Closeout means the time interval between the beginning of the closeout

period (the date that the award has been closed out, in accordance with 2 CFR 200.344) to the end of the closeout period (the date that the Closeout Agreement has been terminated). The Period of Closeout may also be referred to as the Closeout Period.

**Period of Performance**: 2 CFR 200.1 defines Period of Performance as "the total estimated time interval between the start of an initial Federal award and the planned end date, which may include one or more funded portions, or budget periods." For the purposes of this Award Agreement, the Period of Performance means the time interval between the start of the Federal award (either the first date that the Recipient has incurred allowable pre-award costs or the date on the Notice of Award, whichever is earlier) and the end of the Federal award (the date that the award has been closed out, in accordance with 2 CFR 200.344). The Period of Performance may also be referred to as the Performance Period.

**Post-Closeout Program Income**: Post-Closeout Program Income means Program Income retained at the end of the Period of Performance, which is subject to the terms and conditions of the Closeout Agreement, as well as Program Income earned by the non-Federal entity that is directly generated by a supported activity or earned as a result of the Federal award during the Period of Closeout, which is also subject to the terms and conditions of the Closeout Agreement. Under the Closeout Agreement, the Recipient is authorized to deduct the cost of generating Post-Closeout Program Income under 2 CFR 200.307(b) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of Post-Closeout Program Income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Post Closeout Program Income. Costs of generating Post-Closeout Program Income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the Post-Closeout Program Income, provided the Recipient can account for the actual costs incurred.

**Predevelopment Activities:** Predevelopment Activities means activities that meet all three of the following criteria: (1) improve the likelihood of the Recipient financing Qualified Projects, (2) are tied directly to Qualified Projects the Recipient intends to finance, and (3) are necessary and reasonable for the Recipient to deploy Financial Assistance to Qualified Projects.

**Priority Project Categories:** Priority Project Categories means Distributed Energy Generation and Storage, Net-Zero Emissions Buildings, and Zero-Emissions Transportation, as defined below.

- *Distributed Energy Generation and Storage:* Projects, activities, and technologies that deploy small-scale power generation and/or storage technologies (typically from 1 kW to 10,000 kW), plus enabling infrastructure necessary for deployment of such generation and/or storage technologies. Projects, activities, and technologies within this category must support *carbon pollution-free electricity,* which is electrical energy produced from resources that generate no carbon emissions, consistent with the definition specified in Executive Order 14057 (Catalyzing Clean Energy Industries and Jobs Through Federal Sustainability).

- *Net-Zero Emissions Buildings:* Projects, activities, and technologies that either (1) retrofit an existing building, making a substantial contribution to that building being a net-zero emissions building and as part of a plan for that building achieving net-zero emissions over time, or (2) construct a new net-zero emissions building in a Low-Income and Disadvantaged Community. A *net-zero emissions building* is a building that meets the requirements of Version 1 of the National Definition for a Zero Emissions Building (June 2024).

- *Zero-Emissions Transportation:* Projects, activities, and technologies that deploy zero-emissions

transportation modes, plus enabling infrastructure necessary for zero-emissions transportation modes—especially in communities that are overburdened by existing diesel pollution, particulate matter concentration, and degraded air quality. Projects, activities, and technologies within this category must be consistent with the zero-emissions transportation decarbonization strategies in The U.S. National Blueprint for Transportation Decarbonization.

**Program Administration Activities:** Program Administration Activities means activities that support administration of the grant program, to the extent such activities meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. Program Administration Activities include but are not limited to establishing and convening advisory councils, as described in Item 2 of EPA's Guidance on Selected Items of Cost for Recipients, and fund raising, as described in Item 4 of EPA's Guidance on Selected Items of Cost for Recipients.

**Program Beneficiary:** Program Beneficiary means an entity (either an individual or an organization) that receives Financial Assistance as an end-user, except when such Financial Assistance is characterized as an Acquisition of Intangible Property (in which case the entity is a Contractor, as defined in 2 CFR 200.1). Expenditures for Financial Assistance to Program Beneficiaries are in the form of Participant Support Costs, as defined in 2 CFR 1500.1. A Program Beneficiary is distinct from a Subrecipient, as defined in 2 CFR 200.1.

**Program Income:** 2 CFR 200.1 defines Program Income as "gross income earned by the non-Federal entity that is directly generated by a supported activity or earned as a result of the Federal award during the period of performance except as provided in § 200.307(f)." 2 CFR 200.1 notes that Program Income "includes but is not limited to income from fees for services performed, the use or rental or real or personal property acquired under Federal awards, the sale of commodities or items fabricated under a Federal award, license fees and royalties on patents and copyrights, and principal and interest on loans made with Federal award funds." For this program, Program Income also includes but is not limited to income from origination fees, servicing fees, and asset management fees; dividends from equity investments; revenue from asset sales; release of grant funds previously used as Financial Assistance (such as through loan guarantees, loan loss reserves, or similar transactions); interest and other earnings on disbursements of grant funds that have not been transferred to third parties; and funds raised with costs charged against the grant award (such as private debt, philanthropic contributions, and other funds raised). Program Income must be treated in accordance with the Program Income Programmatic Term and Condition. EPA-specific rules on Program Income are provided at 2 CFR 1500.8, and rules on allowable fund raising costs are provided under 2 CFR 200.442 (with additional details in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients). Under this award agreement, the Recipient is authorized to deduct the cost of generating program income under 2 CFR 200.307(b) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of program income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Program Income. Costs of generating program income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the program income, provided the Recipient can account for the actual costs incurred. Program Income requirements flow down to Subrecipients but not to Contractors or Program Beneficiaries.

**Qualified Project:** Section 134(c)(3) of the Clean Air Act provides that a Qualified Project is any project, activity, or technology that (A) reduces or avoids greenhouse gas emissions and other forms of air pollution in partnership with, and by leveraging investment from, the private sector; or (B) assists

communities in the efforts of those communities to reduce or avoid greenhouse gas emissions and other forms of air pollution. For this Assistance Agreement, Qualified Project means any project, activity or technology meeting all six requirements listed below at the time that Financial Assistance is provided to the project, activity, or technology:

- The project, activity, or technology would reduce or avoid Greenhouse Gas Emissions, consistent with the climate goals of the United States to reduce Greenhouse Gas Emissions 50-52 percent below 2005 levels in 2030, reach 50 percent zero-emission vehicles share of all new passenger cars and light trucks sold in 2030, achieve a carbon pollution-free electricity sector by 2035, and achieve net-zero emissions by no later than 2050. The project, activity, or technology may reduce or avoid such emissions through its own performance or through assisting communities in their efforts to deploy projects, activities, or technologies that reduce or avoid such emissions.

- The project, activity, or technology would reduce or avoid emissions of other Air Pollutants. The project, activity, or technology may reduce or avoid such emissions through its own performance or through assisting communities in their efforts to deploy projects, activities, or technologies that reduce or avoid such emissions.

- The project, activity, or technology would deliver additional benefits (i.e., in addition to primarily reducing or avoiding emissions of greenhouse gases and other Air Pollutants) to communities within one or more of the following seven categories: climate change; clean energy and energy efficiency; clean transportation; affordable and sustainable housing; training and workforce development; remediation and reduction of legacy pollution; and development of critical clean water infrastructure.

- The project, activity, or technology may not have otherwise been financed.

- The project, activity, or technology would mobilize private capital.

- The project, activity, or technology would support only commercial technologies, defined as technologies that have been deployed for commercial purposes at least three times for a period of at least five years each in the United States for the same general purpose as the project, activity, or technology.


**Senior Management:** Senior Management means the chief executive officer, chief risk officer, general counsel, chief compliance officer, chief investment officer, chief reporting officer, and chief financial officer (or equivalent positions).

**Subaward:** 2 CFR 200.1 defines a Subaward as "an award provided by a pass-through entity to a Subrecipient for the Subrecipient to carry out part of a Federal award received by the pass-through entity." A Subgrant refers to a Subaward in the form of a grant.

**Subrecipient:** Consistent with 2 CFR 200.1, Subrecipient means "an entity that receives a Subaward from a pass-through entity to carry out part of a Federal award but does not include an entity that is a Program Beneficiary of such an award." A Subrecipient is distinct from a Program Beneficiary, which is referenced in 2 CFR 1500.1. In this program, there are three main types of Subrecipients: (1) a Subrecipient that receives a Subgrant that will be used, either in whole or in part, to provide Financial Assistance to Qualified Projects, or a "Financial Assistance Subrecipient"; (2) a Subrecipient that receives a Subgrant that will be used exclusively for Predevelopment Activities, Market-Building Activities, and/or Program Administration Activities, or a "Technical Assistance Subrecipient"; and (3) a Subrecipient that receives Financial Assistance in the form of a Subaward, with the Subrecipient then using the Subaward to provide Financial Assistance to Qualified Projects, or a "Financial Intermediary Subrecipient". In

accordance with 2 CFR 200.332, each Subrecipient is accountable to the Recipient for proper use of EPA funding. Note that a financial transaction is a Subaward to a Financial Intermediary Subrecipient if the following two characteristics are true: (i) the financial transaction provides an award by a pass-through entity to a Subrecipient through a form of *Federal financial assistance*, other than a grant, and (ii) the proceeds of the award are used directly as Financial Assistance to Qualified Projects, carrying out part of a Federal award received by the pass-through entity.

The EPA Subaward Policy applies to Subgrants made to Financial Assistance Subrecipients and Technical Assistance Subrecipients, including but not limited to Named Subrecipients. However, the EPA Subaward Policy does not apply to Subawards made to Financial Intermediary Subrecipients.

## II. NATIONAL PROGRAMMATIC TERMS AND CONDITIONS

### A. Performance Reporting

In accordance with 2 CFR 200.329 and 2 CFR 200.337, the Recipient agrees to the following four requirements of performance reporting: (1) reports, (2) transaction-level and project-level data, (3) organizational disclosures, and (4) ongoing disclosures. These performance reporting requirements "flow-down" as needed to enable the Recipient to comply with the requirements described in this term and condition. The Recipient must ensure that these reports cover its own grant-related activities, and where applicable to a certain performance report or element of a performance report, the grant-related activities of its Subrecipients, Contractors, and/or Program Beneficiaries. To comply with these performance reporting requirements, the Recipient agrees to use information collection instruments authorized by GGRF Accomplishment Reporting (███████████████████████████████████ ██████████ once such instruments are authorized; to the extent that information is not available for transactions that were closed prior to authorization of these instruments, the Recipient will not be out of compliance with the performance reporting requirements.

The Recipient agrees to have its chief executive officer (or equivalent) and chief reporting officer (or equivalent) review, sign, and submit performance reporting electronically to the EPA Project Officer. To the extent it is known, or should have been known, by the chief executive officer (or equivalent) and chief reporting officer (or equivalent) that the reporting is not compliant with the terms and conditions, or demonstrates material noncompliance with the terms and conditions, the chief executive officer (or equivalent) and chief reporting officer (or equivalent) must note such noncompliance to the EPA Project Officer alongside the submission. Should the chief executive officer (or equivalent) and chief reporting officer (or equivalent) signing the submission knowingly and willfully make any material false statement, they may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

EPA intends to make performance reporting information available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the Recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) prior to submission to EPA. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the Recipient.

The EPA Project Officer may extend the due date for performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. On a case-by-case basis, the EPA Project Officer may waive or modify performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344.

Where applicable, the intervals for reporting are authorized by 2 CFR 200.329(c)(1), as more frequent reporting is necessary for the effective monitoring of the Federal award and could significantly affect program outcomes.

## 1. Reports

### _Semi-Annual Report_

The Recipient agrees to submit semi-annual reports covering six months of the calendar year in accordance with information collection instruments approved through GGRF Accomplishment Reporting ███████████████████████████████████. A single semi-annual report must be submitted to cover grant-related activities of the Recipient and its Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the semi-annual report.

The Recipient agrees to submit semi-annual reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The first semi-annual reporting period ends on December 31 and covers all activities beginning on the first day of the Period of Performance.

### _Annual Report_

The Recipient agrees to submit annual reports that contain detailed narratives describing program performance over the Recipient's fiscal year, supported with qualitative discussions and quantitative metrics. A single annual report must be submitted to cover grant-related activities of the Recipient and its Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the annual report.

The Recipient must include the following broad, non-exhaustive elements in its annual reports:

- Progress towards objectives on key performance metrics over the reporting period,
- Summary of key activities completed in the reporting period, including case studies across different types of Financial Assistance to Qualified Projects,
- Geographic coverage of Financial Assistance to Qualified Projects made in the reporting period,
- Descriptions and examples of actions taken to meaningfully involve the communities the program serves in program design and operations,

- Case studies of different types of Market-Building and/or Predevelopment Activities, and
- Plans for key activities (including anonymized current transaction pipeline) to be completed as well as outputs and outcomes to be achieved in the next reporting period.

These reports must be submitted ready to be published on the EPA website for public consumption and must not include any material that the Recipient considers to be Confidential Business Information (CBI) or Personal Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or claims of CBI. Should EPA identify PII or claims of CBI in reports, the EPA Project Officer will require that the Recipient re-submit the report without the PII or claims of CBI so that it can be published without redaction.

The Recipient agrees to submit **annual reports** electronically to the EPA Project Officer within 90 calendar days after the Recipient's fiscal year end date. The first annual report is due 90 calendar days after the Recipient's fiscal year that ends in 2025.

*Final Report*

The Recipient agrees to submit a final report containing two documents. First, the recipient must submit a report containing all of the elements described above for the annual report, covering the entire Period of Performance and overall assessment of its program performance and implementation of its EPA-approved workplan. Second, the recipient must submit its investment strategy for the Closeout Period to detail its use of Post-Closeout Program Income over the Closeout Period. EPA intends to make the investment strategy, either in whole or in part, available to the public through disclosing copies of the investment strategy as submitted or using the content of the investment strategy. Pursuant to 2 CFR 200.338, the Recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the Recipient.

The two documents for the final report must be submitted to cover the grant-related activities of the Recipient and its Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the final report.

The Recipient agrees to submit the two documents for the final report electronically to the EPA Project Officer no later than 120 calendar days after the end date of the Period of Performance.

## 2. Transaction-Level and Project-Level Data

The Recipient agrees to submit quarterly transaction-level and project-level data in accordance with information collection instruments approved through GGRF Accomplishment Reporting . The data submission must cover the grant-related activities of the Recipient and its Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the data submission.

The recipient agrees to submit the transaction-level and project-level data electronically to the EPA Project Officer within 30 calendar days after the quarterly reporting period ends. The Recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request

may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the quarterly reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The four quarterly reporting periods for data submission are as follows: July 1 to September 30; October 1 to December 31; January 1 to March 31; and April 1 to June 30. The data submissions must cover transactions originated in the preceding quarter. For the quarterly reporting period that ends September 30, the Recipient must provide information on transactions originated from April 1 to June 30 rather than from July 1 to September 30. For the quarterly reporting period that ends December 31, the Recipient must provide information on transactions originated from July 1 to September 30 rather than October 1 to December 31. For the quarterly reporting period that ends March 31, the Recipient must provide information on transactions originated from October 1 to December 31 rather than January 1 to March 31. For the quarterly reporting period that ends June 30, the Recipient must provide information on transactions originated from January 1 to March 31 rather than April 1 to June 30. The first transaction-level and project-level data submission is due 30 calendar days after December 31, 2024 and must cover all transactions originated from the beginning of the Performance Period through September 30, 2024.

## 3. Organizational Disclosures

The Recipient agrees to submit annual organizational disclosures electronically to the EPA Project Officer within 30 calendar days after submission of its Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. The organizational disclosures must cover the Recipient's fiscal year and be submitted in accordance with information collection instruments approved through GGRF Accomplishment Reporting ███████████████████████████████ Additionally, the Recipient agrees to submit such organizational disclosures for each Financial Assistance Subrecipient that has received in excess of $10,000,000 in NCIF subgrants to provide Financial Assistance to Qualified Projects under the National Clean Investment Fund (to be delivered within 30 calendar days after submission of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System). The requirement for organizational disclosures is not applicable for any fiscal year in which the reporting entity did not meet the requirements of 2 CFR Subpart F—Audit Requirements. The first Organizational Disclosures are due in 2025.

## 4. Ongoing Disclosures

In addition to other ongoing disclosure obligations within the regulations and terms and conditions of this Award Agreement, the Recipient agrees to notify the EPA Project Officer of the following events in accordance with 2 CFR 200.329(e):

1. Changes to the Recipient's independent certified public accounting firm;

2. Non-reliance by the Recipient or its independent auditor on previously issued financial statements or a related audit report or completed interim audit review;

3. Changes in fiscal year end of the Recipient;

4. Material impairments to the Recipient's assets;

5. Intention to file bankruptcy petition or enter into receivership;

6. Submission of annual Form 990 to the IRS, with provision of copy to EPA Project Officer upon request (only if submission of the Form 990 is otherwise required).

Additionally, the Recipient agrees to submit such ongoing disclosures for each Financial Assistance Subrecipient that has received in excess of $10,000,000 to provide Financial Assistance to Qualified Projects under the National Clean Investment Fund. The Recipient agrees to submit ongoing disclosures electronically to the EPA Project Officer within 15 calendar days of the event.

## B. Cybersecurity Condition

(a) The Recipient agrees that when collecting and managing environmental data under this Assistance Agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward Agreements and, during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(d), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

## C. Competency Policy

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the Recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the Recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The Recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process.  A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA

Project Officer for this award.

## D. Signage Required

### 1. Signage Requirements

a. Investing in America Emblem: The Recipient will ensure that a sign is placed at construction sites supported in whole or in part by this award displaying the official Investing in America emblem and must identify the project as a "project funded by President Biden's Inflation Reduction Act," where the Financial Assistance used to fund the construction project exceeds $250,000. The Recipient will also make optional signage available for projects where the construction is less than $250,000. The sign must be placed at construction sites in an easily visible location that can be directly linked to the work taking place and must be maintained in good condition throughout the construction period. The Recipient will ensure compliance with the guidelines and design specifications provided by EPA for using the official Investing in America emblem available at: https://www.epa.gov/invest/investing-america-signage.

b. Procuring Signs: Consistent with section 6002 of RCRA, 42 USC 6962, and 2 CFR 200.323, the Recipient is encouraged to use recycled or recovered materials when procuring signs. Signage costs are considered an allowable cost under this Assistance Agreement provided that the costs associated with signage are reasonable. Additionally, to increase public awareness of projects serving communities where English is not the predominant language, the Recipient is encouraged to translate the language on signs (excluding the official Investing in America emblem or EPA logo or seal) into the appropriate non-English language(s). The costs of such translation are allowable, provided the costs are reasonable.

### 2. Public or Media Events

For public or media events that are planned more than 15 calendar days in advance, the Recipient agrees to notify the EPA Project Officer of public or media events it has organized publicizing the accomplishment of significant activities related to execution of the EPA-approved workplan and provide the opportunity for attendance and participation by federal representatives with at least 15 calendar days' notice.

## E. Geospatial Data Standards

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards.  Information on these standards may be found at https://www.fgdc.gov/.

## F. Leveraging and Fund Raising

### 1. Leveraging

The Recipient agrees to make commercially reasonable efforts to provide the proposed leveraged funding that is described in its EPA-approved workplan. If the proposed leveraging does not substantially materialize during the Period of Performance, and the Recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future grant applications from the Recipient. In addition, if the proposed leveraging does not substantially materialize during the Period of Performance and the Recipient does not provide a satisfactory explanation, then EPA may reconsider the legitimacy of the award; if EPA determines that the Recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the EPA-approved workplan, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

## 2. Fund Raising

2 CFR 200.442 provides coverage on allowable fund-raising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients. Fund raising costs are an allowable cost and may include costs that are reasonable and necessary for raising capital from private investors to provide Financial Assistance to Qualified Projects.

Allowable fund-raising costs must meet the following two criteria, in addition to meeting the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500: (1) must be in support of the Greenhouse Gas Reduction Fund's third program objective to mobilize financing and private capital and (2) must be reasonable and necessary to raise capital from private investors. Funds a Recipient raises for its own use with costs borne by an EPA Financial Assistance Agreement are considered Program Income, which must be treated in accordance with the Program Income Programmatic Term and Condition. When fund raising costs are paid for by both the award as well as other sources, a portion of the funds raised equal to the share of fund-raising costs charged to the award will be treated as Program Income.

## G. Quality Assurance

Authority: Quality Assurance applies to all assistance agreements involving Environmental Information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The recipient shall ensure that subawards involving Environmental Information issued under this agreement include appropriate quality requirements for the work. The recipient shall ensure sub-award recipients develop and implement Quality Assurance (QA) planning documents in accordance with this term and condition; and/or ensure sub-award recipients implement all applicable approved QA planning documents. EPA will not approve any QA planning documents developed by a Subrecipient; the Recipient is responsible for reviewing and approving its Subrecipient QA planning document(s), if required based on the Subrecipient's Environmental Information Operations.

## 1. Quality Management Plan (QMP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the recipient must: (i) develop a QMP, (ii) prepare the QMP in accordance with the current version of EPA's Quality Management Plan (QMP) Standard and submit the document for EPA review, and (iii) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the Recipient may (i) submit a previously EPA-approved and current QMP and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the QMP is acceptable for this agreement.

The Recipient must submit the QMP within 90 calendar days after grant award, unless the Recipient requests a one-time extension that is granted by the QAM.

The Recipient must review their approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the Recipient shall revise its QMP to incorporate minor changes and notify the EPA PO and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a

copy of any QMP revision(s) made during the year should be submitted to the EPA PO and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

## 2. Quality Assurance Project Plan (QAPP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QAPP, (ii) prepare the QAPP in accordance with the current version of EPA's Quality Assurance Project Plan (QAPP) Standard, (iii) submit the document for EPA review, and (iv) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the Recipient may (i) submit a previously EPA-approved QAPP proposed to ensure the collected, produced, evaluated, or used environmental information is of known and documented quality for the intended use(s) and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the recipient and EPA Project Officer (PO) in writing if the previously EPA-approved QAPP is acceptable for this agreement.

The Recipient must submit the QAPP within 90 calendar days after grant award, unless the Recipient requests a one-time extension that is granted by the QAM.

The Recipient must notify the PO and QAM when substantive changes are needed to the QAPP. EPA may require the QAPP be updated and re-submitted for approval.

The recipient must review their approved QAPP at least annually. The results of the QAPP review and any revisions must be submitted to the PO and the QAM at least annually and may also be submitted when changes occur.

## For Reference:

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• EPA's Quality Program website has a list of QA managers, and Non-EPA Organizations Quality Specifications.

## H. Real Property

In accordance with 2 CFR 200.311, title to Real Property acquired or improved under this agreement will vest upon acquisition by the Recipient, including but not limited to title to Real Property acquired through exercise of a remedy for default of a Financial Assistance arrangement. This Real Property must be used for the originally authorized purpose as long as needed for that purpose, during which time the Recipient must not dispose of or encumber its title or other interests. The Real Property Programmatic Term and Condition flows down to Subrecipients but not to Program Beneficiaries or Contractors that receive Financial Assistance to Qualified Projects, which may acquire title to Real Property after receiving Financial Assistance to Qualified Projects.

The Recipient must obtain prior approval from the EPA Award Official for the acquisition of Real Property. Note that the Recipient may meet this requirement by specifying the types of acquisitions of Real Property it plans to carry out (including in cases where the Recipient would acquire title to Real Property through exercise of a remedy for default) in its EPA-approved workplan.

<u>Disposition</u>

If the Recipient disposes of the Real Property and uses the proceeds for the originally authorized purpose (i.e., under the terms and conditions of the Award Agreement), then the proceeds will be treated as Program Income and there are no further disposition requirements.

Otherwise, when Real Property is no longer needed for the originally authorized purpose, the Recipient must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

1. Retain title after compensating EPA. The amount paid to EPA will be computed by applying EPA's percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where Recipient is disposing of Real Property acquired or improved with a Federal award and acquiring replacement Real Property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

2. Sell the property and compensate EPA. The amount due to EPA will be calculated by applying EPA's percentage of participation in the cost of the original purchase (and cost of any improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the Recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

3. Transfer title to EPA or to a third party designated/approved by EPA. The Recipient is entitled to be paid an amount calculated by applying the Recipient's percentage of participation in the purchase of the Real Property (and cost of any improvements) to the current fair market value of the property.

<u>Recordation</u>

As authorized by 2 CFR 200.316, EPA requires that Recipients who use EPA funding to purchase and improve Real Property through an EPA funded construction project record a lien or similar notice in the Real Property records for the jurisdiction in which the Real Property is located, which indicates that the Real Property has been acquired and improved with federal funding and that use and disposition conditions apply to the Real Property.

## I. Program Income

In accordance with Clean Air Act Section 134(b)(1)(C) as well as 2 CFR 200.307(e)(2) and 2 CFR 1500.8 (b), the Recipient must retain Program Income earned during the Period of Performance. Program Income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the Assistance Agreement and beyond the Period of Performance based on a Closeout Agreement.

In any period of time before such a Closeout Agreement is effective but after the Recipient has fully used the award for allowable activities, the Recipient is authorized to use Program Income under the terms and conditions of the Assistance Agreement, as opposed to the terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition. The terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition will supplant the terms and conditions of the Assistance Agreement once the Closeout Agreement becomes effective.

In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, under ordinary circumstances, the Recipient may only use Program Income once the initial award funds are fully used for allowable activities or the Period of Performance ends for a different reason. However, Program Income may be used by the Recipient in advance of the initial award funds being fully used where reasonable and necessary to execute the activities in the EPA-approved workplan.

## J. Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the Recipient or Subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the Recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.

## III. ADDITIONAL PROGRAMMATIC TERMS AND CONDITIONS

### A. Eligible Recipient

**The Recipient agrees to maintain its status as an Eligible Recipient, which includes:**

a. Meeting the definition of *Nonprofit organization* set forth in 2 CFR 200.1;

b. Having an organizational mission consistent with being "designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services;"

c. Not receiving any "deposit" (as defined in Section 3(l) of the Federal Deposit Insurance Act) or "member account" or "account" (as defined in Section 101 of the Federal Credit Union Act);

d. Being funded by public or charitable contributions; and

e. Having the legal authority to invest in or finance projects.

### B. Workplan and Budget

The Recipient agrees to execute the EPA-approved workplan. This document, once approved by the EPA, will reflect an agreement between the Parties and will be incorporated into and be a part of the agreement between the Recipient and the EPA.

The Recipient agrees to conduct an annual review of the EPA-approved workplan within 90 calendar days of June 30 of each calendar year. If material changes are made during the annual review or in between annual reviews, the Recipient agrees to submit the updated workplan to the EPA Project Officer.

The Recipient also agrees to conduct an annual review of the EPA-approved detailed budget table within 90 calendar days of June 30 of each calendar year. If material changes are made during the annual review or in between annual reviews, the Recipient agrees to submit the updated detailed budget table to the EPA Project Officer. Such submissions are not subject to prior approval unless otherwise required by the regulations or the terms and conditions of the Award Agreement.

## C. Recipient Organizational Plan

The Recipient agrees to execute the workplan in accordance with the documents listed below, as submitted to EPA through Grants.gov for EPA-R-HQ-NCIF-23 or provided to EPA after the application submission deadline.

1. Organizational Plan, pursuant to *Section IV.C: Content of Application Submission* of the Notice of Funding Opportunity;

2. Legal Entity Structure Diagram, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity; and

3. Organizational and Governing Documents, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity.

The Recipient agrees to maintain its incorporation in the United States, as reflected in the above documents.

The Recipient agrees to conduct an annual review of the documents within 90 calendar days of June 30 of each calendar year. If material changes are made during the annual review or in between annual reviews, the Recipient agrees to submit the updated documents to the EPA Project Officer. Such submissions are not subject to prior approval unless otherwise required by the regulations or the terms and conditions of the Award Agreement.

## D. Recipient Policies and Procedures

The Recipient agrees to execute the workplan in accordance with the documents listed below (or other documents submitted in lieu of the documents listed below), as submitted to EPA through Grants.gov for EPA-R-HQ-NCIF-23 or provided to EPA after the application submission deadline.

1. Legal and Compliance Risk Management Policies and Procedures, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity;

2. Financial Risk Management Policies and Procedures, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity;

3. Board Policies and Procedures, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity;

4. Management Policies and Procedures, pursuant to *Section IV.B: Application Materials* of the Notice of Funding
Opportunity;

5. Consumer Protection Policies and Procedures, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity;

6. Equity Policies and Practices, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity; and

7. Conflict of Interest Mitigation Plan, which include all documents submitted upon EPA's request regarding measures that will be taken to eliminate, neutralize, mitigate or otherwise resolve conflicts of interest.

8. Documentation of Personnel and Fringe Benefit Charges, which includes all documents submitted upon EPA's request to document how personnel and fringe benefits will be charged against the grant award in accordance with 2 CFR 200.430 *Compensation—personal services* and 2 CFR 200.431 *Compensation—fringe benefits*. Notwithstanding the content of the Recipient's EPA-approved budget, the Recipient is not authorized to charge the grant award for personnel and fringe benefits against employees without using the W-2 as the definitive definition of "employee" until the Documentation of Personnel and Fringe Benefit Charges has been reviewed and approved by the EPA, as communicated by the EPA Project Officer.

The Recipient agrees to conduct an annual review of the documents within 90 calendar days of June 30 of each calendar year. If material changes are made during the annual review or in between annual reviews, the Recipient agrees to submit the updated documents to the EPA Project Officer. With the exception of the Documentation of Personnel and Fringe Benefit Charges, where changes will be subject to prior approval, such submissions are not subject to prior approval unless otherwise required by the regulations or the terms and conditions of the Award Agreement.

## E. Allowable and Unallowable Activities

The Recipient agrees to only use the award to support the following allowable activities: Financial Assistance to Qualified Projects; Predevelopment Activities; Market-Building Activities; and Program Administration Activities. The Recipient must use awards funds exclusively for allowable activities within the ten EPA regions, with the exception of the Freely Associated States. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500.

The Recipient agrees to not use the award for the following unallowable activities: (a) Financial Assistance to Qualified Projects in the form of Subgrants; (b) Subgrants for the purposes of providing Financial Assistance to Qualified Projects (other than Subgrants from the Recipient to first-tier Subrecipients); and (c) activities that support deployment of projects that do not meet the definition of Qualified Projects. The Recipient also agrees not to use the award for activities associated with defending against, settling, or satisfying a claim by a litigant, except when (1) the claim stems from the Recipient's implementation of its EPA-approved workplan in compliance with the terms and conditions of the Award Agreement and (2) the Recipient has obtained prior written approval from the EPA Award Official.

## F. Foreign Entity of Concern

As part of carrying out this award, the Recipient agrees to ensure that entities the Recipient contracts with, the Recipient makes Subawards to, or that receive funds as Program Beneficiaries at any tier of funding under this grant agreement are not—

    (A) an entity owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);

    (B) an entity headquartered in a covered nation under 10 U.S.C. 4872(d); or

    (C) a subsidiary of an entity described in (A) or (B).

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

## G. LIDAC Expenditure Requirement

The Recipient agrees to ensure that a minimum of 40% of the award is used for the purposes of providing Financial Assistance in Low-Income and Disadvantaged Communities, with compliance maintained over each annual reporting period (i.e., from July 1 to June 30). Funds used for the purposes of providing Financial Assistance may include Financial Assistance to Qualified Projects; Predevelopment Activities; Market-Building Activities; and Program Administration Activities. This requirement applies to the entire award provided to the Recipient but does not "flow down" to each Subrecipient.

## H. Revolving Loan Fund Characterization

EPA considers the portion of the award used to provide Financial Assistance to Qualified Projects that may generate Program Income as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). Such Financial Assistance may include Subawards, Participant Support Costs, and/or Acquisitions of Intangible Property. In accordance with section 2.0 *Applicability and Effective Date* and the definition of *Subaward* in section 3.0 of the EPA Subaward Policy, the EPA Subaward Policy does not apply to the Recipient's Subawards from the capitalization of a revolving loan fund.

EPA does not consider the remaining portion of the award as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). As such, all Subgrants made by the Recipient are subject to the EPA Subaward Policy.

## I. Subawards

### Subawards to Technical Assistance Subrecipients

The Establishing and Managing Subawards General Term and Conditions applies to Technical Assistance Subrecipients.

### Subawards to Financial Intermediary Subrecipients

The following requirements apply when the Recipient provides a Subaward to a Financial Intermediary Subrecipient. These requirements apply to the Recipient and Subrecipient in lieu of those specified in the

Establishing and Managing Subawards General Term and Condition, as the EPA Subaward Policy does not apply to Financial Intermediary Subrecipients.

1. The Recipient must establish and follow a system that ensures all Subawards to Financial Intermediary Subrecipients are in writing and contain all of the elements required by 2 CFR 200.332(a), with the exception of the indirect cost provision of 2 CFR 200.332(a)(4) (which does not apply to loans). EPA has developed an optional template for Subaward Agreements available in Appendix D of the EPA Subaward Policy, which may also be used for such Subaward Agreements with Financial Intermediary Subrecipients.

2. The Financial Intermediary Subrecipient must comply with the internal control requirements specified at 2 CFR 200.303 and is subject to the 2 CFR Part 200, Subpart F, *Audit Requirements*. The pass-through entity must include a condition in all Subawards that requires Financial Intermediary Subrecipients to comply with these requirements. No other provisions of the Uniform Grant Guidance, including the Procurement Standards, apply directly to the Subrecipient.

3. Prior to making the Subaward, the Recipient must ensure that the Financial Intermediary Subrecipient has a "unique entity identifier." This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR 200.332(a)(1). The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining a UEI is available in the General Condition of the pass-through entity's agreement with EPA entitled *"System for Award Management and Universal Identifier Requirements."*

Subawards to Financial Assistance Subrecipients

The following requirements apply when the Recipient provides a Subaward to a Financial Assistance Subrecipient. These requirements apply to the Recipient and Subrecipient in addition to those specified in the Establishing and Managing Subawards General Term and Condition.

1. The Recipient must obtain written approval from the EPA Award Official prior to providing a Subgrant to a Financial Assistance Subrecipient that would exceed $10,000,000 cumulatively in Financial Assistance Subawards under the National Clean Investment Fund and Capitalization Funding under the Clean Communities Investment Accelerator.

2. Prior to providing a Subgrant not named on the application to a Financial Assistance Subrecipient, the Recipient must obtain disclosure from the potential Subgrantee regarding award funds that it has sought and/or received under the National Clean Investment and Clean Communities Investment Accelerator programs.

## J. Participant Support Costs

The Recipient may provide Financial Assistance to Qualified Projects in the form of Participant Support Costs. In addition, the Recipient may provide Participant Support Costs for other purposes, including Predevelopment Activities, Market-Building Activities, and Program Administration Activities, to the extent such purposes are authorized under the Award Agreement.

The Recipient agrees to the following eligibility, restrictions, timelines, and other programmatic requirements on Participant Support Costs, in addition to other requirements included in the terms and conditions of this Award Agreement:

1. The Recipient and Program Beneficiaries are responsible for taxes, if any, on payments made to or on behalf of entities participating in this program that are allowable as Participant Support Costs under 2 CFR 200.1, 2 CFR 200.456, or 2 CFR 1500.1. EPA encourages the Recipient and Program Beneficiaries to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of subsidies, rebates, and other participant support cost payments. However, EPA does not provide advice on tax issues relating to these payments.

2. Participant support cost payments are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and the Suspension and Debarment General Term and Condition. The Recipient, therefore, may not make participant support cost payments to entities excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180 and must ensure that Subrecipients adhere to this requirement as well. The Recipient is responsible for checking that Program Beneficiaries (i.e., entities receiving Participant Support Costs) are not excluded from participation through either (1) checking the System for Award Management (SAM) or (2) obtaining eligibility certifications from the Program Beneficiaries.

The Recipient agrees to provide written guidelines for Participant Support Costs that must be approved by the EPA prior to making payments to Program Beneficiaries, unless already described in the Recipient's EPA-approved workplan. These guidelines must: (a) describe the activities that will be supported by the Participant Support Costs; (b) specify the range of funding to be provided through the Participant Support Costs; (c) identify which types of entities will have title to equipment (if any) purchased with the funds; (d) establish source documentation requirements (e.g., invoices) for accounting records; and (e) describe purchasing controls to ensure that the amount of the participant support cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

## K. Acquisitions of Intangible Property

### 2 CFR 200 Procurement Standards

The Recipient may provide Financial Assistance to Qualified Projects in the form of Acquisitions of Intangible Property. The Recipient agrees to acquire Intangible Property in compliance with the conflict of interest and competition requirements described in the 2 CFR Part 200 Procurement Standards. This includes but is not limited to the requirements at 2 CFR 200.318 to:

- Have and use documented procurement procedures to govern acquisitions of Intangible Property;
- Maintain oversight to ensure that contractors perform in accordance with the terms, conditions, and specifications of their contracts;
- Maintain written standards of conduct covering conflicts of interest and governing the actions of employees engaged in the selection, award, and administration of contracts as well as maintain written standards of conduct covering organizational conflicts of interest;
- Prioritize entering into inter-entity agreements where appropriate for procurement or use of common or shared goods and services as the Recipient seeks to mobilize financing and private capital;
- Award contracts only to responsible contractors possessing the ability to perform successfully under the terms and conditions of the proposed procurement; and
- Maintain records sufficient to detail the history of procurement.

Disposition

If the Recipient disposes of the Intangible Property and uses the proceeds for the originally authorized purpose (i.e., under the terms and conditions of the Award Agreement), then the proceeds will be treated as Program Income and there are no further disposition requirements.

Recordation

The Recipient agrees to record liens or other appropriate notices of record to indicate that Intangible Property has been acquired with Federal funding and that use and disposition conditions apply to the Intangible Property, in cases where Financial Assistance to Qualified Projects is in the form of an Acquisition of Intangible Property. As provided in 2 CFR 200.1: "…loans, notes and other debt instruments, lease agreements, stock and other instruments of property ownership (whether the property is tangible or intangible)" are *Intangible Property* for the purposes of the restrictions described at 2 CFR 200.315(a). "Other appropriate notices of record" is not limited to filing Uniform Commercial Code instruments and may also include a notice of record in the legally-binding transaction documents.

Additional guidance is available at Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance Agreements.

## L. Labor and Equitable Workforce Development Requirements

### 1. Davis-Bacon and Related Acts (DBRA)

### A. Program Applicability

As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to projects assisted by grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this Award Agreement shall be paid wages at rates not less than those prevailing for the same type of work on similar construction in the locality as determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Greenhouse Gas Reduction Fund, the relevant construction type and prevailing wage classifications would be "Building" and "Residential." The Secretary of Labor's wage determinations are available at https://sam.gov/content/wage-determinations.

Therefore, the Recipient must ensure that any construction work financed in whole or in part with such Financial Assistance, as defined in these Terms and Conditions, provided under this agreement complies with Davis-Bacon and Related Act requirements and the requirements of these Terms and Conditions. The Recipient must ensure that these requirements apply to all construction projects assisted by such Financial Assistance.

If the Recipient encounters a situation that presents uncertainties regarding DBRA applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with a Subrecipient, Program Beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with the requirements of this Term and Condition or the Davis-Bacon and

Related Act, the Recipient agrees to promptly inform the EPA Project Officer for possible referral to the U.S. Department of Labor for guidance or enforcement action.

Note, the use of the term project in this term and condition is distinct from the use of the term project within the definition of Qualified Project under Clean Air Act Section 134(c)(3), which is broader and includes "any project, activity, or technology." Consistent with the definitions at 29 CFR § 5.2, the term "construction" refers to all types of work done on a particular building or work at the site of the work by laborers and mechanics employed by a contractor or subcontractor. Additional guidance is available in the definition of the term "building or work" in 29 CFR § 5.2.

## B. Davis-Bacon and Related Acts

Davis-Bacon and Related Acts (DBRA) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

- Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;
- Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and
- Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

## C. Recipient Responsibilities When Entering Into and Managing Contracts:

### a. Solicitation and Contract Requirements:

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** Recipients are responsible for complying with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

### b. After Award of Contract:

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1) (iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

## D. Recipient Responsibilities When Establishing and Managing Additional Subawards:

### a. Include DBRA Requirements in All Subawards (including Loans): Include the following text on all Subawards under this grant: "By accepting this award, the EPA Subrecipient acknowledges

and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

**b. Provide Oversight to Ensure Compliance with DBRA Provisions:** Recipients are responsible for oversight of Subrecipients and must ensure Subrecipients comply with the requirements in 29 CFR 5.6.

**c. Provide Oversight to Ensure Compliance with Participant Support Cost Requirements:** Recipients are responsible for oversight of Subrecipients and must ensure that Subrecipients comply with the requirements in subsection E, below.

## E. Recipient/Subrecipient Responsibilities When Managing Participant Support Costs to Program Beneficiaries

Any Financial Assistance provided in the form of a participant support cost to a Program Beneficiary shall include the following text:

"[Name of Recipient/Subrecipient providing the Financial Assistance] retains the following responsibilities for all contracts and subcontracts assisted by this [form of Financial Assistance]:

**a. Solicitation and Contract Requirements:**

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:**

"[Name of Recipient/Subrecipient providing the Financial Assistance] is responsible for ensuring that any contracts or subcontracts made by Program Beneficiaries and/or assisted by Participant Support Costs comply with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include the following text "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

**b. After Award of Contract:**

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1) (iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

The contract clauses set forth in this term and condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

## F. DBRA Compliance Monitoring Requirement

Reasonable and necessary costs for DBRA compliance are allowable and allocable grant costs. Such costs include, but are not limited to, the procurement of a payroll reporting and compliance management software product to meet the documentation and reporting requirements under 29 CFR 5.5(a)(3)(ii) for all construction projects assisted under this award.

## 2. Mega Construction Project Program

The Recipient must work with the U.S. Department of Labor's Office of Federal Contract Compliance Programs (OFCCP) to identify projects that are within the scope of OFCCP's Mega Construction Project Program, which includes federally-assisted projects with a total project value above $35,000,000. If those projects are selected from a wide range of federally-assisted projects over which OFCCP has jurisdiction, those projects will be required to participate and partner with OFCCP in the OFCCP Mega Construction Projects program.

## 3. Compliance with Federal Statutes and Regulations

The Recipient agrees to comply with other applicable federal statutes and regulations related to labor and equitable workforce development as well as to enforce compliance with Subrecipients, contractors, and other partners (e.g., by including such provisions in contractual agreements). This includes but is not limited to applicable health and safety regulations as administered by the Occupational Safety and Health Administration.

## 4. Free and Fair Choice to Join a Union

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), the Recipient agrees to design and implement a policy to increase high-quality job opportunities for American workers and improving equitable access to these jobs, including in traditional energy communities, through the timely implementation of requirements for prevailing wages and registered apprenticeships and by focusing on high labor standards and the free and fair chance to join a union.

In accordance with the EPA General Terms and Conditions, grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

## 5. Labor and Equitable Workforce Development Implementation Plan

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), by December 31, 2024,the Recipient must submit a Labor and Equitable Workforce Development Implementation Plan to the EPA Project Officer. The Implementation Plan should articulate policies, practices, and procedures adopted by the Recipient to maximize high-quality jobs and workforce development outcomes on projects assisted with the award. Examples of how this can be demonstrated include, but are not limited to:

- Mechanisms for promoting job quality and evaluating labor standards on projects being considered for and/or receiving Financial Assistance;
- Plans to support workforce development as part of Market-Building Activities;

- Current and planned partnerships with labor and workforce development organizations, including the purpose of those partnerships;
- Mechanisms for maximizing training and employment opportunities for participants in Registered Apprenticeship Programs on projects, including apprenticeship utilization targets, as applicable;
- Mechanisms for creating high-quality job training and employment opportunities available to residents of low-income and disadvantaged communities through projects and other program activities; and
- Processes for promoting Project Labor Agreements on construction projects above $25,000,000, as appropriate, in alignment with Executive Order 14063 (Use of Project Labor Agreements for Federal Construction Projects) and Executive Order 13502 (Use of Project Labor Agreements for Federal Construction Projects), as well as other types of binding agreements that promote strong workforce outcomes, such as Community Workforce Agreements and Community Benefits Agreements.

The Recipient may use or reference materials already submitted to EPA as part of its submission of the Implementation Plan, where relevant.

Note that EPA may make the information from this plan available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the Recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the Recipient.

## M. Build America, Buy America Act

The Build America, Buy America Act – Public Law 117-58, requires the EPA to ensure that for any activity related to the construction, alteration, maintenance, or repair of infrastructure, "none of the funds made available for a Federal Financial Assistance program for infrastructure, including each deficient program, may be obligated for a project unless all of the iron, steel, manufactured products, and construction materials used in the project are produced in the United States." (P.L. 117-58, Secs 70911 – 70917).

The Recipient is bound to the EPA Build America, Buy America General Term and Condition, which outlines the Build America, Buy America requirements that all Recipients of EPA Financial Assistance awards must comply with.

If the Recipient encounters a situation that presents uncertainties regarding Build America, Buy America applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

## N. Governance Requirements

The Recipient agrees to comply with the following governance requirements starting December 31, 2024. The governance requirements "flow-down" to Financial Assistance Subrecipients that have received in excess of $10,000,000 in NCIF subgrants but not to other subrecipients. The governance requirements

are waived for (i) any entity that has been determined by the U.S. Treasury's CDFI Fund to meet the CDFI certification requirements set forth in 12 CFR 1805.201 and (ii) any entity whose specific governance structure is set forth in State, Tribal, or local law.

The Recipient (or Subrecipient) may meet all or some of the governance requirements through the parent entity, provided the Recipient (or Subrecipient) is subject to the governance of the parent entity and the Recipient (or Subrecipient) is wholly-controlled by the parent entity. Similarly, the governance requirements may be waived for the Recipient (or Subrecipient) through the parent entity meeting the CDFI certification requirements set forth in 12 CFR 1805.201, provided the Recipient (or Subrecipient) is wholly-controlled by the parent entity.

## 1. Board Size and Composition

The Recipient agrees to ensure that its board size in terms of number of members (excluding advisory committees) is commensurate with the scope of oversight and monitoring activities as well as the scale, complexity, and risk profile of the Recipient's EPA-approved workplan as well as other business activities. The board must have a sufficient number of members to adequately staff each of its committees.

The Recipient agrees to ensure that its board consists of members that are qualified with relevant expertise, skills, and track record as well as representative members (including from Low-Income and Disadvantaged Communities).

## 2. Board Independence

The Recipient agrees to ensure that the majority of the board is independent, in accordance with the Internal Revenue Service's definition of "independent" for the purposes of Form 990 reporting.

## 3. Board Committees

The Recipient agrees to have the following board-level committees to oversee and monitor management, with each committee staffed by members qualified to execute the committee's objectives. While the Recipient need not adhere to the exact naming convention or structure in this term and condition, each of the responsibilities must be covered by board-level committees at all times during the Period of Performance; for the avoidance of doubt, one committee may perform the responsibilities of one or more of the committees specified below.

1. An investment or credit committee to oversee and approve investment or credit decisions;

2. A risk management committee to oversee the formulation and operationalization of the risk management framework;

3. An audit committee to oversee the integrity of reporting and internal controls and the performance of audit functions, with a majority independent members on such committee;

4. A nomination/governance committee to oversee nomination and succession of board and senior management, with a majority independent members on such committee; and

5. A compensation committee to oversee board as well as senior management and staff compensation,

with a majority independent members on such committee.

Further, the Recipient agrees to act in good faith to ensure each committee obtains information from management, auditors, or other third-parties necessary to discharge their duties.

### 4. Board Policies and Procedures

The Recipient agrees to enforce board policies and procedures including, among others, those that ensure strong ethics and mitigate conflicts of interest; ensure appropriate board training to review and assess internal risk assessments for all of the organization's significant activities; and ensure regular board engagement, including frequency of meetings and attendance procedures.

The Recipient agrees to require recusals from any officers or members of the board of directors with a personal or organizational conflict of interest in the decision-making and management related to financial transactions under this award. Such recusals must include but not be limited to decision-making and management of Subawards, participant support cost payments, Acquisitions of Intangible Property to or from any organization in which an officer or member of the board of directors or their immediate family is directly employed by or has a consulting or other contractual relationship with, serves on the board, or is otherwise affiliated with the organization. The term "immediate family" has the same meaning as that term in the EPA's Final Financial Assistance Conflict of Interest Policy.

## O. Consumer Protection Requirements

The Recipient agrees to carry out the following consumer protection requirements to the extent that the Recipient directly interacts, transacts, or contracts with consumers in the provision of Financial Assistance to Qualified Projects:

> 1. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply;

> 2. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;

> 3. With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process;

> 4. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and

> 5. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.

The Recipient agrees to monitor and oversee Subrecipients and contractors with respect to these consumer financial protection requirements to the extent that they directly interact, transact, or contract

with consumers, in accordance with 2 CFR 200.332(d) and 2 CFR 200.318.

## P. Financial Risk Management Requirements

### 1. Cash Management Requirements

The Recipient must deposit and maintain advance payments of Federal funds exclusively in insured accounts, in accordance with 2 CFR 200.305(b)(7)(ii). As provided in 2 CFR 200.1, an advance payment is "a payment that a Federal awarding agency or pass-through entity makes by any appropriate payment mechanism, including a predetermined payment schedule, before the non-Federal entity disburses the funds for program purposes;" a Recipient drawing down funds from ASAP prior to disbursement for actual and allowable project costs constitutes an advance payment. Interest income earned on the advance payment from EPA to the Recipient prior to disbursement is subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9); consequently, such interest earned in excess of $500 must be remitted annually to the Department of Health and Human Services Payment Management System.

The Recipient is authorized to maintain Program Income in two types of accounts:

1. Insured accounts, including in amounts in excess of the federal insurance limit of $250,000.

2. Accounts where such income is used to purchase (i) U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days and that such instruments are held-to-maturity if purchased directly, or (ii) short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions.

Interest income and other returns earned on funds that have already been disbursed is considered additional Program Income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9).

### 2. Financial Health Metrics

The Recipient agrees to report the following financial health metrics at the entity-level on an annual basis in accordance with its fiscal year as well as on behalf of each Financial Assistance Subrecipient that receives in excess of $10,000,000 in NCIF subgrants. The metrics are due to the EPA Project Officer within 30 calendar days after submission of the reporting entity's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System and may be submitted through the Organizational Disclosures form. The requirement for submission of financial health metrics is not applicable for any fiscal year in which the reporting entity did not meet the requirements of 2 CFR Subpart F—Audit Requirements. The first financial health metrics are due in 2025.

1. Net Asset Ratio: The net asset ratio is defined as net assets divided by total assets.

2. Current Ratio: The current ratio is defined as current assets divided by current liabilities, where current assets is equal to the value of all assets that are reasonably expected to be converted into cash within the coming 12-month period in the normal course of business and current liabilities is equal to the total value of all debts or obligations that must be paid in the coming 12-month period.

3. Delinquency Rate: The delinquency rate is defined as the value of loans outstanding that are 90+ calendar days delinquent divided by the value of loans outstanding, where loans 90+ calendar days delinquent includes those with outstanding balances 90+ calendar days overdue and still accruing interest as well as those in nonaccrual status.

4. Net Charge-Off Rate: The net charge-off rate is defined as the value of loans charged-off over the past fiscal year, minus the value of loan recoveries over the past fiscal year, divided by the value of loans outstanding.

5. Concentration: The concentration of the portfolio, as demonstrated by calculating and reporting on recipient-level exposure, defined as on-balance sheet exposures to a single consolidated entity over all on-balance sheet exposures, for top ten highest exposures.

Note, the Delinquency Rate and Net Charge-Off Rate may exclude the value of loans which include an element of forgiveness, if and only if such forgiveness was established in the terms governing the financial product at origination.

The EPA Project Officer will consider Recipient and, where applicable, Subrecipient performance against these financial health metrics only to the extent by which they materially impair the Recipient's ability to execute the EPA-approved workplan when assessing whether the Recipient is making sufficient progress in implementing the EPA-approved workplan under this Assistance Agreement, as specified in the Sufficient Progress General Term and Condition.

### 3. Climate-Related Financial Risks

The Recipient agrees to comply with Executive Order 11988 (Floodplain Management). This may include accounting for and evaluating practicable alternatives or other mitigation related to ameliorating flood risks and protecting flood plains as part of its financial risk management policies and procedures.

The Recipient agrees to comply with Executive Order 14030 (Climate-Related Financial Risk). This may include accounting for climate-related financial risks—including physical and transition risks—in its financial risk management policies and procedures.

### 4. Additional Requirements

The Recipient agrees to not subordinate EPA's interest in grant funds that have not yet been used for program purposes in a manner that waives EPA's claim for compensation under any applicable statutory claims, 2 CFR Part 200, or common law. Once a Recipient uses grant funds for program purposes and incurs a financial obligation, as defined under 2 CFR 200.339, EPA will only seek claims on those funds in the event that they were used for costs that do not comply with the terms and conditions of the Award Agreement or if there is adequate evidence of waste, fraud, or abuse, prompting adverse action by EPA per 2 CFR 200.339. This does not prohibit the use of subordinated debt as a form of Financial Assistance.

The Recipient agrees to provide Financial Assistance Subrecipients with training and technical assistance on program-related matters, including on prudent financial risk management practices, in accordance with 2 CFR 200.332(e).

### Q. Historic Preservation

## National Historic Preservation Act (NHPA)

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The Recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties can include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (c) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The Recipient should work with their Project Officer to ensure that Subrecipients are available to work with EPA on any required consultation process with the State Historic Preservation Office (SHPO) or Tribal Historic Preservation Office (THPO) prior to commencing the project to ensure compliance with Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

## Archeological and Historic Preservation Act (AHPA)

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific, prehistorical, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The Recipient must ensure that Subrecipients performing construction projects are aware of this requirement, and the Recipient must notify EPA if the AHPA is triggered.

## R. Uniform Relocation Assistance and Real Property Acquisition Policies Act

The Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require the Recipient to follow certain procedures for acquiring property for purposes under the federal award, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing. The Recipient must comply with, and ensure Subrecipients comply with, the URA and 49 CFR Part 34 if an EPA-funded acquisition of property results in permanent displacement of individuals or businesses. Note that although the URA does not apply to temporary displacement of residents, the cost for temporary relocation of residents may be an allowable cost under the "necessary and reasonable for the performance of the federal award" provision of 2 CFR 200.403(a). The Recipient must obtain prior approval of the EPA Project Officer and EPA Award Official for the allowability of costs for temporary relocation of residents.

## S. Remedies for Non-Compliance

The Recipient agrees to comply with the terms and conditions of the Award Agreement. Should the Recipient fail to adhere to the terms and conditions of the Award Agreement, the EPA may impose additional conditions as set forth in 2 CFR 200.208. If the EPA determines that noncompliance cannot be remedied by imposing additional conditions, the EPA may seek remedies under 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as provided in 2 CFR 200.343. As specified in 2 CFR 200.343, which will remain in effect throughout the term of this award, costs during suspension or after termination are allowable if (a) the costs result from financial obligations which were properly incurred by the non-Federal entity before the effective date of suspension or termination, are not in anticipation of it, and (b) the costs would be allowable if the Federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect.

The Recipient agrees to comply with the statutory requirements of Section 134 of the Clean Air Act. Should the Recipient violate the statutory requirements of Section 134 by failing to use grant funds in accordance with Section 134 or by failing to ensure that the activities of Subrecipients are in accordance with Section 134, EPA may seek remedies under Section 113, which may subject the Recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or criminal penalties through a DOJ criminal judicial enforcement action.

Notwithstanding any other provision of this Award Agreement, EPA will not determine that Recipient has failed to comply with the terms and conditions of the Award Agreement, without providing an opportunity to remedy under 2 CFR 200.208, for good faith efforts to comply with the Additional Programmatic Terms and Conditions regarding Build America, Buy America or Labor and Equitable Workforce Development Requirements.

## T. Clarifications to EPA General Terms and Conditions

EPA agrees to make the following clarifications to the EPA General Terms and Conditions. These clarifications expand on, rather than replace or modify, the EPA General Terms and Conditions. The Recipient agrees to comply with these clarifications.

### 1. Access to Records

In accordance with 2 CFR 200.337, EPA and the EPA Office of Inspector General (OIG) have the right to access any documents, papers, or other records, including electronic records, of the Recipient and any Subrecipient which are pertinent to this award in order to make audits, examinations, excerpts, and transcripts. This right of access also includes timely and reasonable access to the Recipient and Subrecipient's personnel for the purpose of interview, discussion, and on-site review related to such documents. This right of access shall continue as long as the records are retained.

### 2. Indirect Cost Rate

The Recipient must exclude costs for acquisitions of Intangible Property from any calculations of modified total direct costs (MTDC), as defined in 2 CFR 200.1. Intangible Property is not a "service" and therefore is not included in MTDC. The Recipient should note that Subrecipients that receive loans cannot charge an indirect cost rate against their loans and that entities that receive Participant Support Costs cannot charge an indirect cost rate against their participant support cost payments.

*MTDC* means all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $25,000 of each Subaward (regardless of the Period of Performance of the Subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, Participant Support Costs and the portion of each Subaward in excess of $25,000.

In the event that the Recipient is compensating an affiliated entity for its direct and indirect costs related to use of employees, the Recipient must not charge its indirect cost rate against any of these costs.

## 3. Sufficient Progress

The EPA Project Officer may assess whether the Recipient is making sufficient progress in implementing the EPA-approved workplan under this Assistance Agreement within 90 calendar days of June 30, 2025 as well as within 90 calendar days of June 30 of each year thereafter during the Period of Performance. "Sufficient progress" shall be assessed based on a comparison of the Recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes. As noted under the Financial Risk Management Programmatic Term and Condition, the Recipient's financial health, as measured by the required Financial Health Metrics, are also an input in this process. This term and condition "flows down" to Subrecipients, with the Recipient required to assess whether each Subrecipient is making sufficient progress in implementing the workplan under its Subaward Agreement; the Recipient may increase the frequency and scope of the review of sufficient progress of Subrecipients, in accordance with 2 CFR 200.332 *Requirements for Pass-Through Entities.*

If the EPA Project Officer determines that the Recipient has not made sufficient progress in implementing its EPA-approved workplan, the Recipient, if directed to do so, must implement a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

EPA will not find that the Recipient has failed to make sufficient progress in implementing its EPA-approved workplan based on shifts between types of Financial Assistance and/or Qualified Projects over the Period of Performance (or other shifts in portfolio allocation, such as by region or market segment, over the Period of Performance). If EPA finds the Recipient has failed to achieve sufficient progress on deployment of Financial Assistance to Qualified Projects in general, the Recipient will have an opportunity to implement a corrective action plan pursuant to 2 CFR 200.208.

## 4. Termination

Notwithstanding the General Term and Condition "Termination," EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 applicable to EPA grants as of July 1, 2024, pursuant to 89 FR 55262 (July 3, 2024), when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is materially impaired or there is adequate evidence of waste, fraud, material misrepresentation of eligibility status, or abuse, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the Assistance Agreement, EPA must (1) de-obligate uncommitted funds and re-obligate them to another Eligible Recipient to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 days of the de-obligation and (2) amend the Recipient's Assistance Agreement to reflect the reduced amount, based on the de-obligation. In accordance with 2 CFR 200.341, EPA will provide the Recipient notice of termination.

## U. Period of Performance

The Period of Performance under this Award Agreement will end on the date specified in the Notice of Award. However, the Period of Performance may end prior to the date specified in the Notice of Award if all required work of the Federal award has been completed, in accordance with 2 CFR 200.344. In accordance with 2 CFR 200.344(b), the Recipient agrees to liquidate all financial obligations incurred under the award no later than 120 calendar days after the end date of the Period of Performance. In this context, to "liquidate all financial obligations" means to pay outstanding bills, such as the payment of staff salaries accrued during the Period of Performance but for which the due date falls after the end date of the Period of Performance. To "liquidate all financial obligations" does not mean to liquidate, terminate, or accelerate outstanding obligations related to the provision of Financial Assistance to Qualified Projects at the end of the Period of Performance, which would continue to be subject to the Closeout Agreement.

The Recipient should note that the Recipient will not be considered to have met the requirements for closeout under its award under 2 CFR 200.344 so long as any Subrecipient has not met the requirements for closeout under its subaward under 2 CFR 200.344.

Notwithstanding the Extension of Project/Budget Period Expiration Date General Term and Condition, in accordance with 2 CFR 200.308(e)(2), the Recipient is authorized to initiate a one-time extension of the Period of Performance by up to 12 months without prior EPA approval, provided that the extension complies with the requirements 2 CFR 200.308(e)(2). In accordance with 2 CFR 200.308(e)(2), the Recipient must "notify the Federal awarding agency in writing with the supporting reasons and revised period of performance at least 10 calendar days before the end of the period of performance specified in the Federal award."

## V. Closeout Agreement

As provided at 2 CFR 200.307(f) and 2 CFR 1500.8(d), after the end of the Period of Performance of the Assistance Agreement, the Recipient may keep and use Program Income remaining at the end of the Assistance Agreement and use Post-Closeout Program Income in accordance with this term and condition. The Closeout Agreement goes into effect for this Assistance Agreement the day after the Assistance Agreement Period of Performance ends, unless the Recipient and the EPA Grants Management Officer or Award Official mutually agree on an alternative date.

In accordance with 2 CFR 200.344, EPA will proceed to closeout the Award Agreement and enter the Closeout Period even if the Recipient has not met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition). As provided in 2 CFR 200.344: "If the non-Federal entity fails to complete the requirements, the Federal awarding agency or pass-through entity will proceed to close out the Federal award with the information available." This Closeout Agreement is therefore self-executing.

This term and condition is the entire Closeout Agreement between the EPA and the Recipient. If any provisions of this Closeout Agreement are invalidated by a court of law, the parties shall remain bound to comply with the provisions of this Closeout Agreement that have not been invalidated. The Closeout Agreement will be interpreted and, if necessary, enforced under Federal law and regulations. The Recipient shall comply with the requirements specified below as part of the Closeout Agreement. Definitions within 2 CFR 200.1, including as supplemented through *I. Definitions* of this award agreement, apply identically to how they do under the Period of Performance, unless otherwise noted.

As specified in the Flow-Down Requirements Programmatic Term and Condition, the Closeout Agreement Programmatic Term and Condition flows down to Subrecipients such that the Recipient must enter into a corresponding Closeout Agreement with any Subrecipient that has Program Income or anticipates generating Post-Closeout Program Income at the end of the Subrecipient's Period of Performance.

## 1. Allowable Activities

The Recipient shall use Post-Closeout Program Income in accordance with the Allowable and Unallowable Activities Programmatic Term and Condition, as applicable.

## 2. Reporting Requirements

The Recipient shall submit program performance reports to the EPA Project Officer in accordance with the Performance Reporting Programmatic Term and Condition through September 30, 2031, as applicable. After September 30, 2031, the Recipient shall disclose annual reports publicly, as described in the Performance Reporting Programmatic Term and Condition, rather than meeting the reporting requirements described in the Performance Reporting Programmatic Term and Condition.

## 3. LIDAC Expenditure Requirements

The Recipient shall expend 40% of Post-Closeout Program Income for the purposes of providing Financial Assistance in Low-Income and Disadvantaged Communities and comply with this requirement in accordance with the LIDAC Expenditure Requirement Programmatic Term and Condition, as applicable. Funds used for the purposes of providing Financial Assistance may include Financial Assistance to Qualified Projects; Predevelopment Activities; Market-Building Activities; and Program Administration Activities. This requirement applies to the entire award provided to the Recipient but does not "flow down" to each Subrecipient.

## 4. Cash Management Requirements

The Recipient must maintain Post-Closeout Program Income in accordance with the Cash Management Requirements in the Financial Risk Management Requirements Programmatic Term and Condition, as applicable. However, the Recipient may submit a Cash Management Policy for review and approval by the EPA Project Officer, which can authorize the Recipient to deviate from the aforementioned Cash Management Requirements.

## 5. Financial Health Metrics

The Recipient agrees to report financial health metrics to the EPA Project Officer in accordance with the Financial Health Metrics in the Financial Risk Management Requirements Programmatic Term and Condition (on behalf of the Recipient as well as any Financial Assistance Subrecipient that has received in excess of $10,000,000 in NCIF subgrants) through September 30, 2031, as applicable. The requirement for submission of financial health metrics is not applicable for any fiscal year in which the reporting entity did not meet the requirements of 2 CFR Subpart F—Audit Requirements. The Recipient agrees to add the following two financial health metrics as part of the financial health metrics for the Closeout Period.

1. Self-Sufficiency Ratio: The self-sufficiency ratio is defined as earned revenue divided by operating

expenses, where earned revenue is equal to the value of all income earned from normal business transactions and operating expenses is equal to the value of all expenses incurred as a part of normal business operations over the prior 12-month period, not including interest, financing, depreciation, amortization, and loan loss provision expense.

2. Operating Cash Ratio: The operating cash ratio is defined as cash and cash equivalents divided by operating expenses, where cash and cash equivalents is equal to the total value of all cash and cash equivalent items that can be converted into cash immediately and operating expenses is equal to the value of all expenses incurred as a part of normal business operations over the prior 12-month period, not including interest, financing, depreciation, amortization, and loan loss provision expense.

After September 30, 2031, the Recipient shall report on these financial health metrics publicly rather than disclosing the metrics to the EPA.

## 6. Conflicts of Interest

The Recipient agrees to comply with the conflict of interest requirements described in the Conflicts of Interest Programmatic Term and Condition through September 30, 2031.

## 7. Remedies for Non-Compliance

The Recipient agrees to identical remedies for non-compliance that are specified in the Remedies for Non-Compliance Programmatic Term and Condition, as applicable. During the Closeout Period, the workplan and budget submitted for the Period of Performance are no longer applicable.

## 8. Suspension and Debarment

The Recipient agrees to ensure that Post-Closeout Program Income is not transferred to entities that are currently suspended, debarred, or otherwise declared ineligible under 2 CFR Part 180. The Recipient can maintain compliance with this requirement through either (1) checking the System for Award Management (for Subrecipients, Contractors, or Program Beneficiaries) or (2) obtaining eligibility certifications from counterparties (for Program Beneficiaries). The Recipient may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM to determine whether an entity is presently excluded or disqualified.

## 9. Non-Discrimination

The Recipient must use Post-Closeout Program Income in compliance with EPA regulations at 40 CFR Part 7 regarding non-discrimination in EPA-funded programs, as applicable.

**Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, The Age Discrimination Act of 1975.** The Recipient agrees to comply with these laws, prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency" in 40 CFR Part 5 and 40 CFR Part 7, the Recipient agrees, and will require all Subrecipients to agree, not to discriminate on the basis of race, color, national origin, sex, disability or age.

**Executive Order 11246 Part III of Executive Order No. 11246 (September 24, 1965) as amended prohibits discrimination in Federally assisted construction activities.** As provided in section 301 of the Executive Order, the Recipient will ensure that Subrecipients include the seven clauses specified in section 202 of the Order in all construction contracts. Section 302 defines "Construction contract" as "any contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to Real Property." Contracts less than $10,000 are exempt from the requirements of the Order.

## 10. Record-Keeping

In accordance with 2 CFR 200.334(e), the Recipient shall maintain appropriate records to document compliance with the requirements of the Closeout Agreement (i.e., records relating to the use of Post-Closeout Program Income) for a three-year period following the end of the Closeout Agreement, unless one of the conditions specified in the regulation applies. Note that this requirement applies if and when the Closeout Agreement is terminated, in accordance *with Item 14. Termination of the Closeout Agreement*. EPA may obtain access to these records to verify that Post-Closeout Program Income has been used in accordance with the terms and conditions of this Closeout Agreement. Records and documents relating solely to performing the grant agreement prior to closeout may be disposed of in accordance with 2 CFR 200.334.

Additionally, the Recipient must maintain adequate accounting records for how Post-Closeout Program Income is managed and spent as well as all other appropriate records and documents related to the activities conducted using Program Income.

The Recipient agrees to ensure that Subrecipients comply with Federal Funding Accountability and Transparency Act (FFATA) reporting requirements. The Recipient may use the terms of its Subaward Agreements or other effective means to meet its responsibilities.

## 11. Other Federal Requirements

The following other federal requirements apply to the use of Post-Closeout Program Income under the Closeout Period to the same extent they do under the terms of the Performance Period:

- Davis-Bacon and Related Acts, as specified in the Labor and Equitable Workforce Development Requirements Programmatic Term and Condition;
- Build America, Buy America Act, as specified in the Build America, Buy America Act Programmatic Term and Condition and Build America, Buy America General Term and Condition; and
- National Historic Preservation Act, as specified in the Historic Preservation Programmatic Term and Condition.

No other federal requirements apply to the use of Post-Closeout Program Income under the terms of this Closeout Agreement, other than those specified in this Closeout Agreement.

## 12. Audit Requirements

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Closeout Period, as activities related to the Federal award referenced in 2 CFR 200.502(a) include

activities during the Closeout Period.

Through September 30, 2031, the Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## 13. Amendments to the Closeout Agreement

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Closeout Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

## 14. Termination of the Closeout Agreement

The Closeout Agreement terminates when either of the following situations occur: (1) the Recipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Recipient and the EPA Award Official or Grants Management Officer mutually agree to terminate the Closeout Agreement, with the Recipient remitting current and future Post-Closeout Program Income to the federal government.

The ability to terminate the Closeout Agreement flows down to Subrecipients, as a Closeout Agreement between the Recipient and Subrecipient terminates when either (1) the Subrecipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Subrecipient and the Recipient mutually agree to terminate the Closeout Agreement, with the Subrecipient remitting current and future Post-Closeout Program Income to the Recipient.

The de minimis amount must be agreed-upon in writing by the Recipient and the Director of the Office of the Greenhouse Gas Reduction Fund (or equivalent), prior to the Recipient using the "de minimis" criteria to terminate the Closeout Agreement.

## 15. Points of Contact

The points of contact for the Closeout Agreement are the EPA Project Officer (for the EPA) and the Authorized Representative on the EPA Key Contacts Form most recent submitted to the EPA Project Officer (for the Recipient). If changes are made to these points of contact, the respective party must notify the other within 30 calendar days of the planned change.

## W. Legal Counsel

The Recipient agrees to appoint appropriate legal counsel if counsel is not already available.

## X. Accounting Principles

The Recipient must account for all award funds in accordance with Generally Accepted Accounting Principles (GAAP) as in effect in the United States.

The Recipient must segregate and account for the award funds separately from all other program and business accounts. Additionally, the Recipient must segregate and account for Program Income separately from all other program and business accounts.

## Y. Internal Controls

The Recipient must comply with standards for internal controls described at 2 CFR 200.303. The "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States referenced in § 200.303 are available online at https://www.gao.gov/assets/gao-14-704g.pdf

## Z. Audits

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Period of Performance, as described in the Audit Requirements General Term and Condition. Additionally, in accordance with 2 CFR 200.332 and 2 CFR 200.501(h), the Recipient agrees to disclose directly to the EPA Project Officer audited financial statements from any for-profit Subrecipient that expends $750,000 or more of EPA funds from the Recipient's grant program in the Subrecipient's fiscal year. Any for-profit Subrecipient that must disclose such financial statements is required to select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.). The Subrecipient must submit the audit to the Recipient within 9 months of the end of the Recipient's fiscal year or 30 days after receiving the report from an independent auditor, whichever is earlier.

The Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## AA. EPA Project Officer Oversight and Monitoring

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that specific conditions are necessary to ensure that the National Clean Investment Fund program is effectively carried out by Eligible Recipients that have not previously managed grants with the same scale and complexity of this agreement. These specific conditions will remain in effect throughout the Period of Performance unless the EPA Award Official determines, based on a request by the Recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer, will oversee and monitor the grant agreement through activities including:

1. Upon request, requiring the Recipient to participate in an annual workshop (i.e., one workshop per calendar year) with other Recipients under the National Clean Investment Fund and/or Clean Communities Investment Accelerator; the EPA Project Officer will contact the Recipient to finalize details for each annual workshop.

2. Participating in project activities, to the extent permissible under EPA policies, such as: consultation on

effective methods of carrying out the workplan, provided the Recipient makes the final decision on how to perform authorized activities; coordination by EPA staff with other Recipients under the Greenhouse Gas Reduction Fund and with other EPA programs; and coordination by EPA staff with other federal programs to avoid duplication of effort;

3. Closely monitoring the Recipient's management and oversight of Subrecipients and procedures for ensuring that Program Beneficiaries adhere to program participation guidelines;

4. Closely monitoring the Recipient's performance to verify compliance with the EPA-approved workplan and achievement of environmental results;

5. Participating in periodic telephone conference calls with Recipient personnel to discuss project successes and challenges as well as similar items impacting program performance;

6. Reviewing and commenting on performance reports prepared under the Award Agreement. Note that the final decision on the content of performance reports rests with the Recipient;

7. Verifying that the Recipient is expending the award on allowable activities, including but not limited to reviewing a sample of Financial Assistance transactions to verify compliance with regulatory requirements and the terms and conditions of the Award Agreement; and

8. Periodically reviewing costs incurred by the Recipient as well as its contractors and Subrecipients if needed to ensure appropriate expenditure of grant funds. Note that Recipients are not required to submit documentation of costs incurred before obtaining payments of grant funds.

Subject to approval by the EPA Award Official, the EPA Project Officer and the Recipient may agree to additional areas of oversight and monitoring.

*Method for Reconsideration.* If the Recipient believes that one or more of these specific conditions are not warranted or requires modification, the Recipient must file a written objection naming the specific condition(s) within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The Recipient must submit the written objection via email to the Award Official, Grant Specialist, and Project Officer identified in the Notice of Award.

## AB. Compliant URL Links

The EPA may elect to develop informational materials to publicize the key characteristics of the Recipient's GGRF award. These materials may include links to Recipient and/or Subrecipients' websites. The Recipient agrees to work with the EPA Project Officer or another member of GGRF program staff to ensure any such links are compliant with pertinent EPA and government-wide standards.

## AC. Conflicts of Interest

The Recipient must comply with requirements on transfers of funds that create actual and potential conflicts of interest, as specified in this term and condition. Transfers of funds include Subawards, Contracts (including but not limited to Acquisitions of Intangible Property), and Participant Support Costs. The definitions in the EPA's Financial Assistance Conflict of Interest Policy (COI Policy) apply to this term and condition.

There are three categories of transfers of funds, with the requirements differing by each category (as specified in this term and condition):

    1. <u>Transfers with Affiliated Entities:</u> Subawards, Contracts, and Participant Support Costs to Affiliated Entities or co-invested in projects with Affiliated Entities. An Affiliated Entity is any entity that is related to the Recipient in accordance with the indicia of control described in 2 CFR 180.905.

    2. <u>Financial Assistance to Qualified Projects:</u> Subawards, Contracts (in the form of Acquisitions of Intangible Property), and Participant Support Costs as forms of Financial Assistance to Qualified Projects, unless such transfers are with Affiliated Entities. These transfers are not within the scope of the COI Policy, which states that "subawards in the form of loans, loan guarantees, interest subsidies and principal forgiveness, purchases of insurance or similar transactions entered into with borrowers by recipients of revolving loan fund capitalization grants or other EPA financial assistance agreements where Agency funds may be used for lending activities."

    3. <u>Subgrants and Contracts:</u> Subgrants and Contracts (other than Acquisitions of Intangible Property), unless such transfers are with Affiliated Entities.

    Note that all Contracts (including Acquisitions of Intangible Property) must also comply with the conflict of interest standards in 2 CFR 200.318(c).

## 1. Transfers with Affiliated Entities

### Prior Approval of COI Mitigation Plan

The Recipient must not transfer funds with Affiliated Entities unless those transfers have been included in an EPA-approved COI Mitigation Plan on Transfers of Funds with Affiliated Entities. The Recipient agrees to seek prior EPA approval for changes to the COI Mitigation Plan on Transfers of Funds with Affiliated Entities.

### Quarterly Disclosure Requirement

The Recipient agrees to disclose, on a quarterly basis, a list of newly originated transfers of funds with Affiliated Entities that are within the scope of its EPA-approved COI Mitigation Plan on Transfers of Funds with Affiliated Entities. Each quarterly disclosure must include (1) a list of such transfers of funds made over the quarter and (2) steps taken to taken to eliminate, neutralize or mitigate any conflicts of interest, in accordance with the EPA-approved COI Mitigation Plan on Transfers of Funds with Affiliated Entities. The Recipient must disclose its own transfers as well as transfers made by Subrecipients.

The quarterly periods for such disclosures are defined as follows: April 1 to June 30; July 1 to September 30; October 1 to December 31; and January 1 to March 31. The Recipient must make the disclosures to the EPA Project Officer within 30 calendar days of the end of the quarterly period.

### Project Officer Review

In accordance with 2 CFR 200.337, the EPA Project Officer may access records relating to a subset of transactions disclosed to review for compliance with the Recipient's EPA-approved COI Mitigation Plan on Transfers of Funds with Affiliated Entities as well as this term and condition. The EPA Project Officer

will not have approve transfers of funds in advance but rather will review transfers of funds that have already occurred for compliance.

## Waivers and Modifications

EPA agrees that, for transfers of funds with Affiliated Entities, the requirements of this term and condition apply in lieu of the requirements of the Disclosing Conflict of Interest General Term and Condition.

On a case-by-cases basis, the EPA Project Officer may extend the due date for disclosures on transfers of funds with Affiliated Entities. On a case-by-case basis, the EPA Project Officer may waive or modify the disclosure requirements on transfers of funds with Affiliated Entities.

## 2. Financial Assistance to Qualified Projects

### Quarterly Disclosure Requirement

The Recipient agrees to disclose, on a quarterly basis, a list of transfers of funds as Financial Assistance to Qualified Projects with actual and potential conflicts of interest. Each quarterly disclosure must include (1) a list of such transfers of funds made over the quarter and (2) steps taken to taken to eliminate, neutralize or mitigate any conflicts of interest, in accordance with any EPA-approved documents related to eliminating, neutralizing, and mitigating conflicts of interest. The Recipient must disclose its own transfers as well as transfers made by Subrecipients.

The quarterly periods for such disclosures are defined as follows:  April 1 to June 30; July 1 to September 30; October 1 to December 31; and January 1 to March 31. The Recipient must make the disclosures to the EPA Project Officer within 30 calendar days of the end of the quarterly period.

### Project Officer Review

In accordance with 2 CFR 200.337, the EPA Project Officer may access records relating to a subset of transactions disclosed to review for compliance with the Recipient's EPA-approved documents related to eliminating, neutralizing, and mitigating conflicts of interest as well as this term and condition. The EPA Project Officer will not have approve transfers of funds in advance but rather will review transfers of funds that have already occurred for compliance.

### Waivers and Modifications

On a case-by-cases basis, the EPA Project Officer may extend the due date for disclosures on transfers of funds as Financial Assistance to Qualified Projects. On a case-by-case basis, the EPA Project Officer may waive or modify the disclosure requirements on transfers of funds as Financial Assistance to Qualified Projects.

## 3. Subgrants and Contracts

The Recipient agrees to comply with the Disclosing Conflict of Interest General Term and Condition for Subgrants and Contracts (excluding Acquisitions of Intangible Property), unless such transfers are with Affiliated Entities. If such transfers are with Affiliated Entities, then the Recipient is required to include them in the process specified in *1. Transfers with Affiliated Entities*.

## AD. Prior Approvals

EPA will only have authority to review and approve revisions to the Recipient's EPA-approved workplan, budget, and other documents if authorized by 2 CFR 200.308 or 2 CFR 200.208. The Recipient must contact the EPA Project Officer when the EPA has prior approval authority specified below.

### Workplan

For the purposes of this Award Agreement, EPA interprets 2 CFR 200.308(c)(1) to enable the Recipient to revise the activities specified in its **EPA-approved workplan** without prior EPA approval, provided the activities still comply with the terms and conditions of the Award Agreement. The allowable and allocable grant costs are narrowly defined, pursuant to the terms and conditions of the Award Agreement; in accordance with 2 CFR 200.308(c)(1), any changes to the EPA-approved workplan that comply with the statute as well as the terms and conditions would not be a "change in the scope or objective of the project or program." Therefore, so long as the Recipient is updating its EPA-approved workplan with the revised activities in accordance with the terms and conditions of the Award Agreement, EPA will not require prior approval.

### Budget

For the purposes of this Award Agreement, EPA implements 2 CFR 200.308(f) in accordance with Item 1 of the Transfer of Funds General Term and Condition to enable the Recipient to revise the **EPA-approved budget** included in its Award Agreement without prior EPA approval, provided the cumulative funding transfers among Object Class Categories (Personnel, Fringe Benefits, Travel, Equipment, Supplies, Contractual, Construction, Other, Indirect) do not exceed 10% of the total budget approved at time of award. Therefore, so long as the Recipient is updating its EPA-approved budget by transferring funds by less than or equal to these amounts, EPA will not require prior approval.

However, notwithstanding the requirements of 2 CFR 200.308(f), if the Recipient seeks to increase the **amount of funds budgeted for Participant Support Costs,** then it must seek prior approval pursuant to 2 CFR 200.308(c)(5). Further, if the Recipient seeks to **transfer funds for any of the items listed in 2 CFR 200.407,** then it must seek prior approval pursuant to that regulation as well as Item 2 of the Transfer of Funds General Term and Condition.

### Transfers of Funds

2 CFR 200.308(c)(6) requires the Recipient to obtain prior agency approval for "Subawarding, transferring or contracting out of any work under a Federal award." If the **types of transfers are described in the EPA-approved workplan** (including types of transfers to be conducted through Subawards, Participant Support Costs, Acquisitions of Intangible Property, and other Contracts as defined in 2 CFR 200.1), then EPA has provided approval only for the purposes of 2 CFR 200.308(c)(6). Approval for the purposes of this regulation does not mean that such transfers of funds are compliant with the statutes, regulations, and terms and conditions.

### Changes in Key Personnel

2 CFR 200.308(c)(2) requires the Recipient to obtain prior agency approval for a "[c]hange in a key person specified in the application or the Federal award." If the Recipient is seeking to change a "key person," as defined by members of the board of directors and senior management whose roles are

specified in the most recently submitted Organizational Plan, then the Recipient must obtain prior EPA approval of the qualifications of the key person.

The Recipient must request prior agency approval for a change in "key person" via email through the EPA Project Officer, who will have 8 calendar days to communicate EPA's disapproval of their qualifications via email. If 8 calendar days have passed without notification of EPA disapproval of the key person's qualifications pursuant to 2 CFR 200.308(c)(2), the Recipient is authorized to change the "key person." Once the change is effective, the Recipient must submit an updated Organizational Plan to the EPA Project Officer.

## AE. Flow-Down Requirements

As described in 2 CFR 200.101, the terms and conditions of Federal awards flow down to Subawards unless a particular section of 2 CFR 200.101 or the terms and conditions of the Federal award specifically indicate otherwise. As required by 2 CFR 200.332(a)(2) and in accordance with the Establishing and Managing Subawards General Term and Condition, the Recipient agrees to ensure that Subrecipients are subject to the same requirements as those that apply to the pass-through entity's EPA award.

For the purposes of this Award Agreement, all terms and conditions must flow down to Subawards to the extent they are applicable. The EPA Project Officer is authorized to waive the applicability of programmatic terms and conditions to Subawards, unless the term and condition implements statutory, regulatory, or executive order requirements.

## AF. Resolution of Disputes Termination Provision

The Recipient is precluded from drawing down more than 78.46% of the Total Approved Assistance Amount until this condition is removed, which will occur when: a) the EPA Award Official, at the direction of the Grants Competition Disputes Decision Official (GCDDO), provides written confirmation that all administrative disputes under the National Clean Investment Fund and the Clean Communities Investment Accelerator are resolved in accordance with the dispute resolution procedures in Appendix A of the EPA Order 5700: Policy for Competition of Assistance Agreements; or b) the administrative disputes are withdrawn, abandoned or dismissed; or c) December 31, 2024, whichever is sooner.

If EPA does need to alter the Selection Official's selection and partial funding decisions for this agreement based on a GCDDO determination the EPA Award Official will partially terminate this assistance agreement, de-obligate a portion of the funds that have been obligated and use the de-obligated funds to satisfy the terms of a GCDDO remedy benefiting another entity. The Recipient will then provide an updated workplan and budget information, as needed, to amend the agreement.

For the purposes of this term and condition, EPA's partial termination may apply not just to obligated funds that have not been drawn down from ASAP but also to Program Income that has been generated and retained by the Recipient under 2 CFR 1500.8(d) and the Program Income Programmatic Term and Condition of this agreement. In accordance with 2 CFR 200.307(e)(1), EPA may require that the amount of funds committed by EPA to the Recipient be reduced by all or some of the Program Income that has been generated by the Recipient.

## AG. Deposit Account at Financial Agent

When a depository institution is designated as a financial agent of the United States (the Financial Agent) for the Greenhouse Gas Reduction Fund, then the Recipient will be required to set up and utilize an Account or Accounts at the Financial Agent in accordance with the terms of the Account or Accounts that EPA will set forth in the Award Agreement, including but not limited to through amendments to the Award Agreement.

## AH. Interim SF-425 Requirement

The Recipient must submit an SF-425 within 30 calendar days of receiving access to an Account or Accounts at the Financial Agent, with the SF-425 covering all activities supported by funds drawn from ASAP and disbursed for actual and allowable costs, other than funds disbursed into the Account or Accounts at the Financial Agent.

## AI. Interim Drawdown Procedures

### Authority

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that specific conditions are necessary to ensure that the National Clean Investment Fund and Clean Communities Investment Accelerator programs are effectively carried out by Eligible Recipients that have not previously managed grants with the same scale and complexity of this agreement. These specific conditions will remain in effect throughout the Period of Performance unless the EPA Award Official determines, based on a request by the Recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

### General Term and Condition

During the interim period between the start of the Federal award and the date on which the Deposit Account at the Financial Agent is first made available and accessible to the Recipient, the Recipient is subject to the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down General Term and Condition.

This requirement "flows down" to Subrecipients; if a Subrecipient has an actual and immediate cash requirement, then the Recipient is required to draw funds from ASAP on behalf of the subrecipient and disburse the funds to the Subrecipient and the Subrecipient is required to disburse the funds for the actual and immediate cash requirement. Alternatively, as authorized by 2 CFR 200.332(c), the Recipient may impose the reimbursement method as opposed to the advance payment method with Subrecipients as part of "specific subaward conditions" if appropriate as described in 2 CFR 200.208.

### Interim ASAP Cap

During the interim period between the start of the Federal award and the date on which the Deposit Account at the Financial Agent is first made available and accessible to the Recipient, the Recipient is subject to a cap on the cumulative amount of its drawdowns. This cap starts at 8.33% (or one-twelfth) of the Recipient's EPA-approved first-year budget, plus allowable pre-award costs, and increases by 8.33% (or one-twelfth) of the Recipient's EPA-approved first-year budget on the first calendar day of each month after the date on the Notice of Award until the Deposit Account at the Financial Agent is available and accessible to the Recipient. The cap shall not exceed 25% (or one-fourth) of the Recipient's EPA-

approved first-year budget, plus allowable pre-award costs. The cap shall cease to apply once the Deposit Account at the Financial Agent is available and accessible to the Recipient.

Note that this cap is in addition to, rather than in lieu of, the cap described in the Resolution of Disputes Termination Provision.

## Interim ASAP Payment Request

During the interim period between the start of the Federal award and the date on which the Deposit Account at the Financial Agent is first made available and accessible to the Recipient, the Recipient must abide by the following process for ASAP payment requests.

1. The Recipient must only initiate payment requests from ASAP each Thursday (for next business day payments) or Friday (for same business day payments).

2. The Recipient must submit payment requests to ASAP falling into the following four categories, with no more than one payment request in each category per week: (1) Recipient Financial Assistance Activities; (2) Recipient Other Allowable Activities; (3) First-Tier Subrecipient Financial Assistance Activities; or (4) First-Tier Subrecipient Other Allowable Activities. The first category is not applicable under the CCIA.

3. Prior to receiving the payment, the Recipient must provide the EPA Project Officer with the following information: (a) amount of payment requested, (b) category of payment, (c) type(s) of Financial Assistance anticipated, (d) descriptions of Qualified Project(s) anticipated, and (e) a certification from the Recipient's chief executive officer (or equivalent), chief financial officer (or equivalent), chief reporting officer (or equivalent), or chief compliance officer (or equivalent) that the amount of the payment is necessary to execute against the EPA-approved workplan and that financing agreements for identified Qualified Project(s) necessitating the payment have been reviewed by the Recipient's counsel for legal sufficiency. The certification must include the following language: "This certification is a material representation for the purposes of an EPA Financial Assistance Agreement, and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions." Requirements (c), (d), and (e) are applicable to payment requests for Recipient Financial Assistance Activities and "flow-down" as part of payment requests for First-Tier Subrecipient Financial Assistance Activities, as described below.

The EPA Project Officer is authorized to provide case-by-case modifications or exceptions to these requirements, provided those modifications or exceptions remain compliant with the ASAP and Proper Payment Draw Down General Term and Condition.

These requirements "flow down" to Subrecipients; if a Subrecipient has an actual and immediate cash requirement, then it must submit payment requests to the Recipient pursuant to these requirements. As authorized at 2 CFR 200.337, EPA may request records of payment requests to the Recipient and would expect documentation to show that, for each payment to a Subrecipient, the Subrecipient has provided the Recipient with the information described above.

## Disbursement of Payment

During the interim period between the start of the Federal award and the date on which the Deposit Account at the Financial Agent is first made available and accessible to the Recipient, for each payment, if the Recipient has not disbursed the entire payment amount within 5 business days of drawdown, the

Recipient must provide the EPA Project Officer with the amount of payment not yet disbursed. The Recipient must then follow the procedures described in the ASAP and Proper Payment Drawdown General Term and Condition for the amount of payment not yet disbursed within 5 business days of drawdown.

<u>Method for Reconsideration</u>

If the Recipient believes that one or more of these specific conditions are not warranted or requires modification, the Recipient must file a written objection naming the specific condition(s) within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The Recipient must submit the written objection via email to the Award Official, Grant Specialist, and Project Officer identified in the Notice of Award.

## AJ. Amendments to Award Agreement

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Award Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.


## IV. ADMINISTRATIVE TERMS AND CONDITIONS (SEE ABOVE ADMINISTRATIVE CONDITIONS)

## V. FINANCIAL AGENT TERMS AND CONDITIONS

### A. Revisions to Award Agreement to Account for Financial Agent Arrangement

When a depository institution is designated as a financial agent of the United States (the Financial Agent) for the Greenhouse Gas Reduction Fund, the following revisions to the Award Agreement will become effective without further action or notice required by the Recipient or EPA.

### 1. Revisions to Section I. Definitions

*The following **new definition** will be added to the Award Agreement:*

**Capitalization by Nonexchange Capital Contribution:** Capitalization by Nonexchange Capital Contribution means award funds that (1) the Recipient draws down from the Automated Standard Application Payments (ASAP) system and (2) disburses into the 'Budget Account' as defined under the Deposit Account at Financial Agent Programmatic Term and Condition to capitalize itself for subsequent use for any of the following Allowable Activities: Financial Assistance to Qualified Projects; Predevelopment Activities; Market-Building Activities; and Program Administration Activities.  Under this two-step transaction, which involves both a drawdown and disbursement, the Recipient's drawdown from ASAP is deemed (a) an advance payment of Federal funds in accordance with 2 CFR 200.305(b)(1); while the disbursement into the Deposit Account at Financial Agent is deemed (b) an allowable cost to be charged to the EPA award, and (c) a "nonexchange transaction", consistent with the definition of this term in the Statement of Federal Financial Accounting Standards No. 5. The full amount of the Capitalization by Nonexchange Capital Contribution must be recognized, reported, and accounted for as Program Income in accordance with the Program Income Programmatic Term and Condition once clauses (a) and (b) are fulfilled. Any Subrecipient with a Deposit Account at Financial Agent will be entitled to receive its

payments from Recipient as a Capitalization by Nonexchange Capital Contribution.

*The definition of **Program Income** under the Award Agreement will be amended and replaced with:*

**Program Income:** 2 CFR 200.1 defines Program Income as "gross income earned by the non-Federal entity that is directly generated by a supported activity or earned as a result of the Federal award during the period of performance except as provided in § 200.307(f)." 2 CFR 200.1 notes that Program Income "includes but is not limited to income from fees for services performed, the use or rental or real or personal property acquired under Federal awards, the sale of commodities or items fabricated under a Federal award, license fees and royalties on patents and copyrights, and principal and interest on loans made with Federal award funds." For this program, there are two types of Program Income: (1) "Program Income from Operations" and (2) "Program Income from Capitalization by Nonexchange Capital Contribution".

Program Income from Operations includes but is not limited to income from origination fees, servicing fees, and asset management fees; dividends from equity investments; revenue from asset sales; release of grant funds previously used as Financial Assistance (such as through loan guarantees, loan loss reserves, or similar transactions); interest and other earnings on disbursements of grant funds that have not been transferred to third parties; and funds raised with costs charged against the grant award (such as private debt, philanthropic contributions, and other funds raised). Under this award agreement, the Recipient is authorized to deduct the cost of generating Program Income from Operations under 2 CFR 200.307(b) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of Program Income from Operations include origination, servicing, and management costs that are not charged as direct costs to the Federal award. Program Income from Operations can be earned prior to the availability of the 'Program Income from Operations' account as defined under the Deposit Account at Financial Agent Programmatic Term and Condition.

Program Income from Capitalization by Nonexchange Capital Contribution means award funds from the ASAP system that the Recipient draws down and immediately deposits into the 'Budget Account' at the Financial Agent in accordance with (a) the definition of Capitalization by Nonexchange Capital Contribution and (b) the Deposit Account at Financial Agent Programmatic Term and Condition. Program Income from Capitalization by Nonexchange Capital Contribution cannot be earned prior to the availability of the 'Budget Account' as defined under the Deposit Account at Financial Agent Programmatic Term and Condition.

Both forms of Program Income under this program must be treated in accordance with the Program Income Programmatic Term and Condition. EPA-specific rules on Program Income are provided at 2 CFR 1500.8, and rules on allowable fund raising costs are provided under 2 CFR 200.442 (with additional details in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients). Program Income requirements flow down to Subrecipients but not to Contractors or Program Beneficiaries.

## 2. Revisions to Section II. National Programmatic Terms and Conditions

*The **Program Income Programmatic Term and Condition** will be amended and replaced with:*

## Program Income

In accordance with Clean Air Act Section 134(b)(1)(C) as well as 2 CFR 200.307(e)(2) and 2 CFR 1500.8

(b), the Recipient must retain Program Income earned during the Period of Performance. Program Income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the Assistance Agreement and beyond the Period of Performance based on a Closeout Agreement.

In any period of time before such a Closeout Agreement is effective but after the Recipient has fully used the award for allowable activities, the Recipient is authorized to use Program Income under the terms and conditions of the Assistance Agreement, as opposed to the terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition. The terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition will supplant the terms and conditions of the Assistance Agreement once the Closeout Agreement becomes effective.

In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, under ordinary circumstances, the Recipient may only use Program Income from Operations once the initial award funds are fully used for allowable activities or the Period of Performance ends for a different reason. However, Program Income from Operations may be used by the Recipient in advance of the initial award funds being fully used where reasonable and necessary to execute the activities in the EPA-approved workplan.

### 3. Revisions to Section III. Additional Programmatic Terms and Conditions

*The Allowable and Unallowable Activities Programmatic Term and Condition will be amended and replaced with:*

### Allowable and Unallowable Activities

The Recipient agrees to only use the award to support the following allowable activities: Capitalization by Nonexchange Capital Contribution; Financial Assistance to Qualified Projects; Predevelopment Activities; Market-Building Activities; and Program Administration Activities. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500.

Capitalization by Nonexchange Capital Contribution generates Program Income for the Recipient in an amount equal to the available EPA award balance drawn down from ASAP into the 'Budget Account' as defined under the Deposit Account at Financial Agent Programmatic Term and Condition. Program Income from Capitalization by Nonexchange Capital Contribution must be expended on Financial Assistance to Qualified Projects, Predevelopment Activities, Market-Building Activities, and Program Administration activities in accordance with the EPA-approved workplan.

The Recipient agrees to not use the award for the following unallowable activities: (a) Financial Assistance to Qualified Projects in the form of Subgrants; (b) Subgrants for the purposes of providing Financial Assistance to Qualified Projects (other than Subgrants from the Recipient to first-tier Subrecipients); (c) activities that support deployment of projects that do not meet the definition of Qualified Projects; and (d) activities that support deployment of projects outside the boundaries of the ten EPA regions. The Recipient also agrees not to use the award for activities associated with defending against, settling, or satisfying a claim by a litigant, except when (a) the claim stems from the Recipient's implementation of its EPA-approved workplan in compliance with the terms and conditions of the Award Agreement and (b) the Recipient has obtained prior written approval from the EPA Award Official.

*The Deposit Account at Financial Agent Programmatic Term and Condition will be amended and replaced with:*

## Deposit Account at Financial Agent

The Recipient will open a Deposit Account at a depository institution that has been designated as a financial agent of the United States (the Financial Agent). Such account will be used as Recipient's operating account for the award.  Upon establishment of the Deposit Account, the Recipient will drawdown the entire available EPA award balance from ASAP and disburse it into the Deposit Account, where it must be maintained until the Closeout Agreement goes into effect in accordance with the Closeout Agreement Programmatic Term and Condition. Note, this requirement applies to any and all drawdowns from ASAP by the Recipient while the Deposit Account is available and accessible. Once the Closeout Agreement goes into effect, the Recipient will be entitled to transfer any remaining funds in the Deposit Account to an account at a financial institution of its choosing, provided such account is insured.

The Recipient will grant EPA a perfected security interest in all funds held in the Deposit Account. The Recipient will take all such actions, enter into all such agreements, and execute and deliver all such documentation as may be necessary and/or as directed by EPA from time to time to establish and maintain such security interest, including but not necessarily limited to entering into a deposit account control agreement (DACA) with the Financial Agent and EPA.

Notwithstanding any other provision of this Award Agreement, EPA will only furnish the Financial Agent with a Notice of Exclusive Control under a DACA when EPA issues a written determination and finding that the Recipient has failed to comply with the terms and conditions of this Award Agreement, and that noncompliance is substantial such that effective performance of the Assistance Agreement is materially impaired or there is adequate evidence of waste, fraud, material misrepresentation of eligibility status, or abuse, and that EPA has initiated action under 2 CFR 200.339 to wholly or partly suspend or terminate the Federal award, as authorized in the terms of the Award Agreement. Note, funds in the Deposit Account that were legally committed to 3rd parties under valid financing agreements prior to the issuance of, but not in anticipation of, a Notice of Exclusive Control constitute "financial obligations which were properly incurred" by the Recipient in accordance with 2 CFR 200.343 and are to remain allowable costs during suspension or after termination.

Funds held in the Recipient's account at the Financial Agent may be invested in accordance with the Cash Management Requirements in the Financial Risk Management Programmatic Term and Condition. The Financial Agent will be compensated in accordance with the terms of a valid Financial Agency Agreement (FAA).

The Deposit Account will consist of three distinct account types ('Budget,' 'Reserve', and 'Program Income from Operations'), each of which serves a distinct purpose (while the exact naming convention and structure of these accounts may differ from the below, the accounts must perform a substantively similar function). The Recipient is required to utilize the accounts at the Financial Agent for their intended purpose during any period in which the accounts are available and accessible, with exceptions to this requirement permitted by the EPA Project Officer only on a case-by-case basis, to the extent such exceptions are necessary to execute against the EPA-approved workplan.

## 1. Budget Account

This account within the Deposit Account will hold funds that have yet to be used for any of the following

allowable activities: Financial Assistance to Qualified Projects; Predevelopment Activities; Market-Building Activities; and Program Administration Activities. It will hold funds within a number of sub-accounts that correspond to more specific allowable expenditures under the particular type of award or subaward.

**Transferring Funds Into the Budget Account.** Upon establishment of the Deposit Account, the Recipient will drawdown the entire available EPA award balance from ASAP directly into the Budget Account. The Recipient will direct the Financial Agent to allocate funds across the various sub-accounts in the Budget Account in accordance with its EPA-approved workplan. Recipient need not submit a certification notice to transfer funds within the Budget Account, but remains subject to the Transfer of Funds EPA General Term and Condition and any associated pre-approval or notification requirements therein.

**Transferring Funds Out of the Budget Account.**  When transferring award funds out of the Budget Account to provide Financial Assistance to Qualified Projects, Recipient must provide the EPA Project Officer with a certification notice from the Recipient's chief executive officer (or equivalent), chief financial officer (or equivalent), chief reporting officer (or equivalent), or chief compliance officer (or equivalent) that the amount of the payment is necessary to execute against the EPA-approved workplan and that financing agreements for identified Qualified Projects necessitating the payment have been reviewed by the Recipient's counsel for legal sufficiency, with notice provided to the Financial Agent with the transfer request. The certification notice must include the following language: "This certification is a material representation for the purposes of an EPA Financial Assistance Agreement, and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions." The Recipient must "flow-down" this requirement to Subrecipients, with each Subrecipient required to provide a substantively similar certification notice to Recipient when transferring subaward funds out of the Budget Account to provide Financial Assistance to Qualified Projects, with notice provided to the Financial Agent with the transfer request. In accordance with 2 CFR 200.337, the Recipient must make those certifications available to the EPA, upon request.

While transfers out of the Budget Account are not formally subject to any of the requirements established in either the EPA General Term and Condition on Automated Standard Application Payments (ASAP) and Proper Payment Draw Down or the Interim Drawdown Procedures Programmatic Term and Condition, Recipient agrees to the following requirements:

a) When the need for a longer disbursement window is known in advance of the transfer, Recipient must notify the EPA Project Officer prior to executing the transfer and follow-up to inform the EPA Project Officer of the amount of the transfer that has been disbursed for an Allowable Activity in 5, 10, and 14 business days. Recipient must return any undisbursed amounts to the Deposit Account at the Financial Agent on the 15th business day, or

b) When the need for a longer disbursement window is not known in advance of the transfer, Recipient must notify the EPA Project Officer of the delay no later than 5 business days after the transfer and follow-up to inform the EPA Project Officer of the amount of the transfer that has been disbursed for an Allowable Activity in 10 and 14 business days. Recipient must return any undisbursed amounts to the Deposit Account at the Financial Agent on the 15th business day.

Recipients must obtain prior written approval from the EPA Project Officer (who will in turn notify the EPA Award Official) for any transfers that will not be disbursed for an Allowable Activity within 15 business days.

These requirements "flow down" to Subrecipients, who agree to provide the same notifications to and seek prior approval from Recipients where applicable.

## 2. Reserve Account

This account within the Deposit Account is intended to enable funds to be set-aside within the Financial Agent for use for any form of Financial Assistance that requires the Recipient to pledge award funds for a future expenditure to a third party to meet a legal obligation.

**Transferring Funds Into the Reserve Account.** The Recipient may only transfer award funds into the Reserve Account for grant performance purposes if the Recipient's chief executive officer (or equivalent), chief financial officer (or equivalent), chief reporting officer (or equivalent), or chief compliance officer (or equivalent) certify to the EPA Project Officer, with notice provided to the Financial Agent with the transfer request, that the amount of the expenditure is necessary to execute against the EPA-approved workplan, and that financing agreements for identified qualified projects necessitating the expenditure have been reviewed by Recipient's counsel for legal sufficiency. The certification notice must include the following language: "This certification is a material representation for the purposes of an EPA financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions." The Recipient must "flow-down" this requirement to Subrecipients, with each Subrecipient required to provide a substantively similar certification notice to Recipient when transferring subaward funds into the Reserve Account to provide Financial Assistance to Qualified Projects, with notice provided to the Financial Agent with the transfer request. In accordance with 2 CFR 200.337, the Recipient must make those certifications available to the EPA, upon request.

**Transferring Funds Out of the Reserve Account.**

## a. To Third Parties to Meet Legal Obligations

Funds in the Reserve Account may not be disbursed to Program Beneficiaries, Subrecipients, Contractors, or any other third parties, unless the funds are necessary for the Recipient to satisfy a legal obligation. The Recipient may only transfer award funds out of the Reserve Account to meet legal obligations to such parties if the recipient's chief executive officer (or equivalent), chief financial officer (or equivalent), chief reporting officer (or equivalent), or chief compliance officer (or equivalent) certify to the EPA Project Officer, with notice provided to the Financial Agent with the transfer request, that the amount of the expenditure is necessary to pay a third party pursuant to a financing agreement that has been reviewed by recipient's counsel for legal sufficiency. The certification notice must include the following language: "This certification is a material representation for the purposes of an EPA financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions." The Recipient must "flow-down" this requirement to Subrecipients, with each Subrecipient required to provide a substantively similar certification notice to Recipient when transferring subaward funds out of the Reserve Account to provide Financial Assistance to Qualified Projects, with notice provided to the Financial Agent with the transfer request. In accordance with 2 CFR 200.337, the Recipient must make those certifications available to the EPA, upon request.

While transfers out of the Reserve Account are not formally subject to any of the requirements established in either the EPA General Term and Condition on Automated Standard Application Payments (ASAP) and Proper Payment Draw Down or the Interim Drawdown Procedures Programmatic Term and

Condition, Recipient agrees to the following requirements:

a) When the need for a longer disbursement window is known in advance of the transfer, Recipient must notify the EPA Project Officer prior to executing the transfer and follow-up to inform the EPA Project Officer of the amount of the transfer that has been disbursed for an Allowable Activity in 5, 10, and 14 business days. Recipient must return any undisbursed amounts to the Deposit Account at the Financial Agent on the 15th business day, or

b) When the need for a longer disbursement window is not known in advance of the transfer, Recipient must notify the EPA Project Officer of the delay no later than 5 business days after the transfer and follow-up to inform the EPA Project Officer of the amount of the transfer that has been disbursed for an Allowable Activity in 10 and 14 business days. Recipient must return any undisbursed amounts to the Deposit Account at the Financial Agent on the 15th business day.

Recipients must obtain prior written approval from the EPA Project Officer (who will in turn notify the EPA Award Official) for any transfers that will not be disbursed for an Allowable Activity within 15 business days.

These requirements "flow down" to Subrecipients, who agree to provide the same notifications to and seek prior approval from Recipients where applicable.

## b. To Program Income from Operations Account

When funds in the Reserve Account are no longer necessary to meet prudent capital management practices consistent with the Recipient's overall risk portfolio and a potential legal obligation to a third party pursuant to a financing agreement, the Recipient may transfer such funds to the Program Income from Operations Account. Recipient need not submit a certification notice to effectuate such a transfer.

## 3. Program Income from Operations Account

This account within the Deposit Account will enable Program Income from Operations (as defined under the definition of Program Income) to be held, tracked, and segregated in accordance with the Accounting Principles Programmatic Term and Condition.

**Transferring Funds Into the Program Income from Operations Account.** When Recipient earns Program Income from Operations, it must deposit such funds into the Program Income from Operations Account. Recipient need not submit a certification notice to effectuate such a transfer. When Financial Agent generates interest income on behalf of Recipient by investing Recipient liquidity in accordance with the Cash Management Requirements under the Financial Risk Management Requirements Programmatic Term and Condition, it must deposit such income into the Program Income from Operations Account in accordance with the terms of the FAA. Such interest income is considered additional Program Income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9).

**Transferring Funds Out of the Program Income from Operations Account.** Funds in this account may be transferred to either the Budget Account or Reserve Account to be used for grant performance purposes in accordance with the Program Income Programmatic Term and Condition. Recipient need not submit a certification notice to effectuate such a transfer.

**Flow-Down Requirements of Deposit Account at Financial Agent**. EPA may elect to extend the requirements under this term and condition to any and all Subrecipients of the Recipient at EPA's sole discretion, including but not limited to establishing and maintaining a security interest on all award funds held by the Subrecipient at the Financial Agent.

5G - 84094001 - 1    Page 1

| | **U.S. ENVIRONMENTAL PROTECTION AGENCY**<br><br>**Assistance Amendment** | | **GRANT NUMBER (FAIN):** 84094001<br>**MODIFICATION NUMBER:** 1<br>**PROGRAM CODE:** 5G | **DATE OF AWARD**<br>12/20/2024 |
|---|---|---|---|---|
| | | | **TYPE OF ACTION**<br>No Cost Amendment | **MAILING DATE**<br>12/20/2024 |
| | | | **PAYMENT METHOD:**<br>ASAP | **ACH#** |

| **RECIPIENT TYPE:** | **Send Payment Request to:** |
|---|---|
| Not for Profit | Contact EPA RTPFC at: |
| **RECIPIENT:** | **PAYEE:** |
| Climate United Fund<br>7550 WISCONSIN AVE<br>FI 8<br>BETHESDA, MD 20814-3559<br>EIN: | Climate United Fund<br>7550 WISCONSIN AVE<br>FI 8<br>BETHESDA, MD 20814-3559 |

| **PROJECT MANAGER** | **EPA PROJECT OFFICER** | **EPA GRANT SPECIALIST** |
|---|---|---|
| Elizabeth Bafford<br>7550 Wisconsin Ave<br>FI 8<br>Bethesda, MD 20814<br>Email:<br>Phone: | Michelle Tucker<br>1200 Pennsylvania Ave, NW, 19-H16<br>Washington, DC 20460<br>Email:<br>Phone: | Walker Oneil<br>OGD- GMBOD, 3093R<br>1200 Pennsylvania Ave, NW<br>Washington, DC 20460-0001<br>Email:<br>Phone: |

**PROJECT TITLE AND EXPLANATION OF CHANGES**

GGRF NCIF: Climate United

This amendment updates all terms and conditions.

| **BUDGET PERIOD**<br>04/01/2024 - 06/30/2029 | **PROJECT PERIOD**<br>04/01/2024 - 06/30/2029 | **TOTAL BUDGET PERIOD COST**<br>$ 6,970,000,000.00 | **TOTAL PROJECT PERIOD COST**<br>$ 6,970,000,000.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 10/12/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 0.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 6,970,000,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| **ISSUING OFFICE (GRANTS MANAGEMENT OFFICE)** | **AWARD APPROVAL OFFICE** |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| Environmental Protection Agency, Grants Management & Business Operations Division<br>1200 Pennsylvania Ave, NW Mail code 3903R<br>Washington, DC 20460 | Environmental Protection Agency, OGGRF<br>OA - Office of the Administrator<br>1200 Pennsylvania Ave, NW<br>Washington, DC 20460 |

| THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY | |
|---|---|
| Digital signature applied by EPA Award Official Katherine Tsing-Choy - Associate Award Official | **DATE**<br>12/20/2024 |

5G - 84094001 - 1    Page 2

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 6,970,000,000 | $ 0 | $ 6,970,000,000 |
| EPA In-Kind Amount | $ 0 | $ 0 | $ 0 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 6,970,000,000 | $ 0 | $ 6,970,000,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.957 - Greenhouse Gas Reduction Fund: National Clean Investment Fund | Clean Air Act: Sec. 134(a)(2) and (3) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

5G - 84094001 - 1    Page 3

Budget Summary Page

| Table A - Object Class Category<br>(Non-Construction) | Total Approved Allowable<br>Budget Period Cost |
|---|---|
| 1. Personnel | $ 89,871,170 |
| 2. Fringe Benefits | $ 33,252,333 |
| 3. Travel | $ 4,697,854 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 1,080,080 |
| 6. Contractual | $ 861,952,518 |
| 7. Construction | $ 0 |
| 8. Other | $ 5,950,949,314 |
| 9. Total Direct Charges | $ 6,941,803,269 |
| 10. Indirect Costs: 10.00 % Base de minimis MTDC | $ 28,196,731 |
| 11. Total (Share: Recipient ___0.00 % Federal _100.00 %) | $ 6,970,000,000 |
| 12. Total Approved Assistance Amount | $ 6,970,000,000 |
| 13. Program Income | $ 315,000,000 |
| 14. Total EPA Amount Awarded This Action | $ 0 |
| 15. Total EPA Amount Awarded To Date | $ 6,970,000,000 |

5G - 84094001 - 1    Page 4

# Administrative Conditions

## A. General Terms and Conditions

The Recipient agrees to comply with the current EPA general terms and conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2024-or-later. These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award. The EPA repository for the general terms and conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

## B. Correspondence Condition

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA.  Unless otherwise noted, all such correspondence should be sent to the following email addresses:

- Federal Financial Reports (SF-425): ██████████████ and EPA Grants Specialist listed on the award
- MBE/WBE reports (EPA Form 5700-52A):  Debora Bradford ██████████████, ████████ ██████████████, and the EPA Grants Specialist listed on the award
- All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to Recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: EPA Grants Specialist listed on the award and EPA Project Officer listed on the award
- Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: EPA Project Officer listed on the award

## C. Intergovernmental Review Period

In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period when a Recipient or Subrecipient intends to provide Financial Assistance to Qualified Project(s) that involves construction or land use planning. With the exception of Qualified Project(s) that will be carried out in the State of California, the Recipient must ensure that directly affected State, areawide, regional, and local government entities have 60 calendar days to review the description of the Qualified Project(s) and provide comments to the EPA Project Officer. Qualified Project(s) that will be carried out in the State of California must be submitted to the California Single Point of Contact at https://cfda.opr.ca.gov for review as provided in California law.

EPA has allowed for an intergovernmental review comment period on behalf of the Recipient. This comment period closed on Tuesday October 22, 2024. The Recipient need not take any additional action with respect to intergovernmental review.

The Recipient agrees to comply with the provisions of 40 CFR Part 29, implementing the Demonstration Cities, Metropolitan Development Act, the Intergovernmental Cooperation Act, and Executive Order 12372 as amended in 1983, to ensure that projects funded under federal programs are consistent with local planning requirements.

## D. Pre-Award Costs

As provided in 2 CFR 200.458, Recipients are authorized to incur pre-award costs, which are costs that would have been allowable if incurred after the date of the Federal award. For competitive grants, EPA interprets the requirement in the regulation that pre-award costs be incurred "directly pursuant to the negotiation and in anticipation of the Federal award" to limit allowable pre-award costs to those a Recipient incurs after EPA has notified the Recipient that its application has been selected for award consideration. The pre-award costs must be included in the workplan and budget to be eligible. As provided in 2 CFR 1500.9, Recipients incur pre-award costs at their own risk. Please refer to *Section I.C: Pre-Award Costs* of the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance for additional information.

## E. New Recipient Training Requirement

The Recipient agrees to complete the EPA Grants Management Training for Applicants and Recipients and the How to Develop a Budget training within 90 calendar days of the date of award of this agreement. The Recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the Recipient should refer to RAIN-2024-G01.

# Programmatic Conditions

**National Clean Investment Fund (NCIF) Terms and Conditions (December 12, 2024)**

## I. DEFINITIONS

**Acquisition of Intangible Property:** 2 CFR 200.1 defines Intangible Property as "property having no physical existence, such as trademarks, copyrights, data (including data licenses), websites, IP licenses, trade secrets, patents, patent applications, and property such as loans, notes and other debt instruments, lease agreements, stocks and other instruments of property ownership of either tangible or intangible property, such as intellectual property, software, or software subscriptions or licenses." Acquisitions of Intangible Property involve the purchase of Intangible Property through procurement contracts.

**Air Pollutant:** Air Pollutant means any air pollutant that is listed pursuant to Section 108(a) of the Clean Air Act (or any precursor to such an air pollutant). This includes particulate matter, ozone, carbon monoxide, sulfur dioxide, nitrogen dioxide, and lead (see 40 CFR Part 50) and their precursors (e.g., volatile organic compounds).

**Award Agreement:** Award Agreement means the set of legally binding documents between EPA and the Recipient under the federal award. Award Agreement is used interchangeably with Assistance Agreement and Notice of Award.

**Apprentice:** Apprentice means an individual working on a project receiving Financial Assistance who is participating in a Registered Apprenticeship program under the National Apprenticeship Act that meets the requirements of 29 CFR Parts 29 and 30.

**Environmental Information:** Environmental Information is defined in EPA's Environmental Information Quality Policy. Environmental Information includes "data and information that describe environmental processes or conditions which support EPA's mission of protecting human health and the environment. Examples include but are not limited to: direct measurements of environmental parameters or processes; analytical testing results of environmental conditions (e.g., geophysical or hydrological conditions); information on physical parameters or processes collected using environmental technologies; calculations or analyses of environmental information; information provided by models; information compiled or obtained from databases, software applications, decision support tools, websites, existing literature, and other sources; development of environmental software, tools, models, methods and applications; and design, construction, and operation or application of environmental technology."

**Environmental Information Operations:** Environmental Information Operations is defined in EPA's Environmental Information Quality Policy. Environmental Information Operations means "[a] collective term for work performed to collect, produce, evaluate, or use environmental information and the design, construction, operation or application of environmental technology."

**EPA Award Official**: EPA Award Official means the award official from the Office of Grants and Debarment that is authorized to execute the Award Agreement, as well as any subsequent amendments to the Award Agreement, and to make any other final determinations required by law or regulation on behalf of the EPA.

**EPA Project Officer**: EPA Project Officer means the project officer from the Office of the Greenhouse

Gas Reduction Fund that is assigned, along with the EPA Grants Specialist, to monitor the Recipient on programmatic and technical aspects of the project and is typically authorized to make programmatic approvals on behalf of the EPA. Where required, the Recipient must notify or request approval from the EPA Project Officer through the EPA Project Officer's individual EPA email address as well as ████████████ such that the Office of the Greenhouse Gas Reduction Fund may delegate an alternative EPA Project Officer in the case of any absence.

**Financial Assistance:** Section 134(b)(1) of the Clean Air Act directs that the Recipient use funds for "Financial Assistance." Consistent with the definition of *Federal financial assistance* in 2 CFR 200.1, Financial Assistance means financial products, including debt (such as loans, partially forgivable loans, forgivable loans, zero-interest and below-market interest loans, loans paired with interest rate buydowns, secured and unsecured loans, lines of credit, subordinated debt, warehouse lending, loan purchasing programs, and other debt instruments), equity investments (such as equity project finance investments, private equity investments, and other equity instruments), hybrids (such as mezzanine debt, preferred equity, and other hybrid instruments), and credit enhancements (such as loan guarantees, loan guarantee funds (whether full or partial), loan loss reserves, and other credit enhancement instruments). Expenditures for Financial Assistance are in the form of Subawards (other than subgrants), Participant Support Costs, or Acquisitions of Intangible Property, as defined in this Award Agreement. Subgrants are not eligible as Financial Assistance. The characterization of a Financial Assistance transaction as a Subaward, Participant Support Cost, or Acquisition of Intangible Property is limited to the transaction. For example, the same entity may be a Subrecipient for one transaction and a Program Beneficiary or a Contractor for another transaction.

*Freely Associated States: Freely Associated States means the Republic of the Marshall Islands (the Marshalls), the Federated States of Micronesia (FSM), and the Republic of Palau (Palau).*

*Greenhouse Gas: Greenhouse Gas means carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons, and sulfur hexafluoride, as defined in Section 134(c)(2) of the Clean Air Act. Greenhouse Gas Emissions mean emissions of Greenhouse Gases.*

**Low-Income and Disadvantaged Communities**: Section 134(a)(3) of the Clean Air Act appropriates funds "for the purposes of providing financial assistance and technical assistance in low-income and disadvantaged communities." Low-Income and Disadvantaged Communities means CEJST-Identified Disadvantaged Communities, EJScreen-Identified Disadvantaged Communities, Geographically Dispersed Low-Income Households, Properties Providing Affordable Housing, and Federally Recognized Tribal Entities, as defined below.

- *CEJST-Identified Disadvantaged Communities:* All communities identified as disadvantaged through version 1.0 of the Climate and Economic Justice Screening Tool (CEJST), released on November 22, 2022, which includes census tracts that meet the thresholds for at least one of the tool's categories of burden and land within the boundaries of Federally Recognized Tribes.

- *EJScreen-Identified Disadvantaged Communities:* All communities within version 2.3 of EJScreen that fall within either (a) the limited supplemental set of census block groups that are at or above the 90th percentile for any of EJScreen's supplemental indexes when compared to the nation or state or (b) geographic areas within Tribal lands as included in EJScreen, which includes the following Tribal lands: Alaska Native Allotments, Alaska Native Villages, American Indian Reservations, American Indian Off-reservation Trust Lands, and Oklahoma Tribal Statistical Areas.

- *Geographically Dispersed Low-Income Households:* Low-income individuals and households

living in Metropolitan Areas with incomes not more than 80% AMI or 200% FPL (whichever is higher), and low-income individuals and households living in Non-Metropolitan Areas with incomes not more than 80% AMI, 200% FPL, or 80% Statewide Non-Metropolitan Area AMI (whichever is highest). Federal Poverty Level (FPL) is defined using the latest publicly available figures from the U.S. Department of Health and Human Services. Area Median Income (AMI) is defined using the latest publicly available figures from the U.S. Department of Housing and Urban Development (HUD). Metropolitan Area and Non-Metropolitan Area are defined using the latest publicly available figures for county-level designations from the Office of Management and Budget. Statewide Non-Metropolitan Area AMI is defined using the latest publicly available figures from the U.S. Department of the Treasury's CDFI Fund, with an adjustment for household size using HUD's Family Size Adjustment factor.

- *Properties Providing Affordable Housing:* Properties providing affordable housing that fall within either of the following two categories: (a) multifamily housing with rents not exceeding 30% of 80% AMI for at least half of residential units and with an active affordability covenant from one of the following housing assistance programs: (1) Low-Income Housing Tax Credit; (2) a housing assistance program administered by HUD, including Public Housing, Section 8 Project-Based Rental Assistance, Section 202 Housing for the Elderly, Section 811 Housing for Disabled, Housing Trust Fund, Home Investment Partnership Program Affordable Rental and Homeowner Units, Permanent Supportive Housing, and other programs focused on ending homelessness that are funded under HUD's Continuum of Care Program; (3) a housing assistance program administered by USDA under Title V of the Housing Act of 1949, including under Sections 514 and 515; (4) a housing assistance program administered by a tribally designated housing entity, as defined in Section 4(22) of the Native American Housing Assistance and Self-Determination Act of 1996 (25 USC § 4103(22)); or (5) a housing assistance program administered by the Department of Hawaiian Homelands as defined in Title VIII of the Native American Housing Assistance and Self-Determination Act of 1996 (24 CFR 1006.10) or (b) naturally-occurring (unsubsidized) affordable housing with rents not exceeding 30% of 80% AMI for at least half of residential units.

- *Federally Recognized Tribal Entities:* All Federally Recognized Tribal entities, which are considered disadvantaged regardless of whether a Federally Recognized Tribe has land, consistent with M-23-09 (memorandum dated as of January 27, 2023) and CEJST. A "Federally Recognized Tribal Entity" means (i) any individual member of a Federally Recognized Tribe; (ii) any for-profit business that has at least 51 percent of its equity ownership (or the equivalent in limited liability companies) by members of Federally Recognized Tribes; (iii) any non-profit entity with at least 51 percent of its Board of Directors (i.e., Governing Board) comprised of members of Federally Recognized Tribes; or (iv) any Federally Recognized Tribal government entity.  Under this definition, any Federally Recognized Tribal Entity is included within the definition of Low-Income and Disadvantaged Communities, regardless of where that entity is located (i.e., the entity may be located in areas outside of the CEJST land area dataset, including but not limited to tribal service areas or counties).

**Market-Building Activities:** Market-Building Activities means activities that meet all three of the following criteria: (1) build the market for financeable Qualified Projects, (2) are not tied directly to Qualified Projects the Recipient intends to finance, and (3) are necessary and reasonable for the deployment of Financial Assistance to Qualified Projects.

**Materially Impaired:** For the definition and application of these terms under this Assistance Agreement (e.g. the Clarifications to EPA General Terms and Conditions) and any associated legal documentation

related to the Assistance Agreement, note that EPA defines "Materially Impaired" in the context of effective performance of the Assistance Agreement as 1) the issuance of a written determination and finding from EPA that the Recipient has failed to achieve sufficient progress in accordance with the Sufficient Progress clause under the Clarifications to EPA General Terms and Conditions Programmatic Term and Condition and 2) if EPA in its sole discretion determines that a corrective action plan is an appropriate means of remedying the lack of sufficient progress, the subsequent issuance of a separate written determination and finding from EPA that the Recipient has not materially addressed its failure to achieve sufficient progress after implementing a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

**Named Subrecipient:** Named Subrecipient means an entity that is named on the workplan in effect under this Assistance Agreement to receive a Subaward in the form of a Subgrant from the Recipient in order to carry out part of the award.

**Participant Support Costs:** 2 CFR 200.1 defines Participant Support Costs as "direct costs that support participants (see definition for Participant in § 200.1) and their involvement in a Federal award, such as stipends, subsistence allowances, travel allowances, registration fees, temporary dependent care, and per diem paid directly to or on behalf of participants." EPA regulations at 2 CFR 1500.1(a)(1) expand the definition of Participant Support Costs to include "subsidies, rebates, and other payments to program beneficiaries to encourage participation in statutorily authorized environmental stewardship programs," which includes the Greenhouse Gas Reduction Fund. In this program, Participant Support Costs may include expenditures by the Recipient as Predevelopment Activities, Market-Building Activities, and Program Administration Activities (which may include subsidies, rebates, and other payments) as well as Financial Assistance to Qualified Projects.

**Period of Closeout:** Period of Closeout means the time interval between the beginning of the closeout period (the date that the award has been closed out, in accordance with 2 CFR 200.344) to the end of the closeout period (the date that the Closeout Agreement has been terminated). The Period of Closeout may also be referred to as the Closeout Period.

**Period of Performance:** 2 CFR 200.1 defines Period of Performance as "the total estimated time interval between the start of an initial Federal award and the planned end date, which may include one or more funded portions, or budget periods." For the purposes of this Award Agreement, the Period of Performance means the time interval between the start of the Federal award (either the first date that the Recipient has incurred allowable pre-award costs or the date on the Notice of Award, whichever is earlier) and the end of the Federal award (the date that the award has been closed out, in accordance with 2 CFR 200.344). The Period of Performance may also be referred to as the Performance Period.

**Post-Closeout Program Income:** Post-Closeout Program Income means Program Income retained at the end of the Period of Performance, which is subject to the terms and conditions of the Closeout Agreement, as well as Program Income earned by the Recipient during the Period of Closeout that is directly generated by a supported activity or earned as a result of the Federal award, which is also subject to the terms and conditions of the Closeout Agreement. Under the Closeout Agreement, the Recipient is authorized to deduct the cost of generating Post-Closeout Program Income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of Post-Closeout Program Income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Post Closeout Program Income. Costs of generating Post-Closeout Program Income can be incurred in advance of receiving the gross income,

with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the Post-Closeout Program Income, provided the Recipient can account for the actual costs incurred.

**Predevelopment Activities:** Predevelopment Activities means activities that meet all three of the following criteria: (1) improve the likelihood of the Recipient financing Qualified Projects, (2) are tied directly to Qualified Projects the Recipient intends to finance, and (3) are necessary and reasonable for the Recipient to deploy Financial Assistance to Qualified Projects.

**Priority Project Categories:** Priority Project Categories means Distributed Energy Generation and Storage, Net-Zero Emissions Buildings, and Zero-Emissions Transportation, as defined below.

- *Distributed Energy Generation and Storage:* Projects, activities, and technologies that deploy small-scale power generation and/or storage technologies (typically from 1 kW to 10,000 kW), plus enabling infrastructure necessary for deployment of such generation and/or storage technologies. Projects, activities, and technologies within this category must support *carbon pollution-free electricity,* which is electrical energy produced from resources that generate no carbon emissions, consistent with the definition specified in Executive Order 14057 (Catalyzing Clean Energy Industries and Jobs Through Federal Sustainability).

- *Net-Zero Emissions Buildings:* Projects, activities, and technologies that either (1) retrofit an existing building, making a substantial contribution to that building being a net-zero emissions building and as part of a plan for that building achieving net-zero emissions over time, or (2) construct a new net-zero emissions building in a Low-Income and Disadvantaged Community. A *net-zero emissions building* is a building that meets the requirements of Version 1 of the National Definition for a Zero Emissions Building (June 2024).

- *Zero-Emissions Transportation:* Projects, activities, and technologies that deploy zero-emissions transportation modes, plus enabling infrastructure necessary for zero-emissions transportation modes—especially in communities that are overburdened by existing diesel pollution, particulate matter concentration, and degraded air quality. Projects, activities, and technologies within this category must be consistent with the zero-emissions transportation decarbonization strategies in The U.S. National Blueprint for Transportation Decarbonization.

**Program Administration Activities:** Program Administration Activities means activities that support administration of the grant program, to the extent such activities meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. Program Administration Activities include but are not limited to establishing and convening advisory councils, as described in Item 2 of EPA's Guidance on Selected Items of Cost for Recipients, and fund raising, as described in Item 4 of EPA's Guidance on Selected Items of Cost for Recipients.

**Program Beneficiary:** Program Beneficiary means an entity (either an individual or an organization) that receives Financial Assistance or technical assistance as an end-user, except when such Financial Assistance is characterized as an Acquisition of Intangible Property (in which case the entity is a Contractor, as defined in 2 CFR 200.1). Expenditures to Program Beneficiaries are in the form of Participant Support Costs, as defined in 2 CFR 1500.1. A Program Beneficiary is distinct from a Subrecipient, as defined in 2 CFR 200.1.

**Program Income:** 2 CFR 200.1 defines Program Income as "gross income earned by the recipient or subrecipient that is directly generated by a supported activity or earned as a result of the Federal award during the period of performance except as provided in § 200.307(c)". 2 CFR 200.1 notes that Program Income "includes but is not limited to income from fees for services performed, the use or rental or real or personal property acquired under Federal awards, the sale of commodities or items fabricated under a Federal award, license fees and royalties on patents and copyrights, and principal and interest on loans made with Federal award funds." For this program, Program Income also includes but is not limited to income from origination fees, servicing fees, and asset management fees; dividends from equity investments; revenue from asset sales; release of grant funds previously used as Financial Assistance (such as through loan guarantees, loan loss reserves, or similar transactions); interest and other earnings on disbursements of grant funds that have not been transferred to third parties; and funds raised with costs charged against the grant award (such as private debt, philanthropic contributions, and other funds raised). Program Income must be treated in accordance with the Program Income Programmatic Term and Condition. EPA-specific rules on Program Income are provided at 2 CFR 1500.8, and rules on allowable fund raising costs are provided under 2 CFR 200.442 (with additional details in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients). Under this award agreement, the Recipient is authorized to deduct the cost of generating program income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of program income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Program Income. Costs of generating program income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the program income, provided the Recipient can account for the actual costs incurred. Program Income requirements flow down to Subrecipients but not to Contractors or Program Beneficiaries.

**Qualified Project:** Section 134(c)(3) of the Clean Air Act provides that a Qualified Project is any project, activity, or technology that (A) reduces or avoids greenhouse gas emissions and other forms of air pollution in partnership with, and by leveraging investment from, the private sector; or (B) assists communities in the efforts of those communities to reduce or avoid greenhouse gas emissions and other forms of air pollution. For this Assistance Agreement, Qualified Project means any project, activity or technology meeting all six requirements listed below at the time that Financial Assistance is provided to the project, activity, or technology:

- The project, activity, or technology would reduce or avoid Greenhouse Gas Emissions, consistent with the climate goals of the United States to reduce Greenhouse Gas Emissions 50-52 percent below 2005 levels in 2030, reach 50 percent zero-emission vehicles share of all new passenger cars and light trucks sold in 2030, achieve a carbon pollution-free electricity sector by 2035, and achieve net-zero emissions by no later than 2050. The project, activity, or technology may reduce or avoid such emissions through its own performance or through assisting communities in their efforts to deploy projects, activities, or technologies that reduce or avoid such emissions.

- The project, activity, or technology would reduce or avoid emissions of other Air Pollutants. The project, activity, or technology may reduce or avoid such emissions through its own performance or through assisting communities in their efforts to deploy projects, activities, or technologies that reduce or avoid such emissions.

- The project, activity, or technology would deliver additional benefits (i.e., in addition to primarily reducing or avoiding emissions of greenhouse gases and other Air Pollutants) to communities within one or more of the following seven categories: climate change; clean energy and energy efficiency; clean transportation; affordable and sustainable housing; training and workforce

development; remediation and reduction of legacy pollution; and development of critical clean water infrastructure.

- The project, activity, or technology may not have otherwise been financed.
- The project, activity, or technology would mobilize private capital.
- The project, activity, or technology would support only commercial technologies, defined as technologies that have been deployed for commercial purposes at least three times for a period of at least five years each in the United States for the same general purpose as the project, activity, or technology.

**Senior Management:** Senior Management means the chief executive officer, chief risk officer, general counsel, chief compliance officer, chief investment officer, chief reporting officer, and chief financial officer (or equivalent positions).

**Subaward:** 2 CFR 200.1 defines a Subaward as "an award provided by a pass-through entity to a subrecipient for the subrecipient to contribute to the goals and objectives of the project by carrying out part of a Federal award received by the pass-through entity. It does not include payments to a contractor, beneficiary, or participant". A Subgrant refers to a Subaward in the form of a grant.

**Subrecipient:** Consistent with 2 CFR 200.1, Subrecipient means an entity that receives a Subaward from a pass-through entity to carry out part of a Federal award but does not include an entity that is a Program Beneficiary of such an award. A Subrecipient is distinct from a Program Beneficiary, which is referenced in 2 CFR 1500.1. In this program, there are three main types of Subrecipients: (1) a Subrecipient that receives a Subgrant that will be used, either in whole or in part, to provide Financial Assistance to Qualified Projects, or a "Financial Assistance Subrecipient"; (2) a Subrecipient that receives a Subgrant that will be used exclusively for Predevelopment Activities, Market-Building Activities, and/or Program Administration Activities, or a "Technical Assistance Subrecipient"; and (3) a Subrecipient that receives Financial Assistance in the form of a Subaward, with the Subrecipient then using the Subaward to provide Financial Assistance to Qualified Projects, or a "Financial Intermediary Subrecipient". In accordance with 2 CFR 200.332, each Subrecipient is accountable to the Recipient for proper use of EPA funding. Note that a financial transaction is a Subaward to a Financial Intermediary Subrecipient if the following two characteristics are true: (i) the financial transaction provides an award by a pass-through entity to a Subrecipient through a form of *Federal financial assistance*, other than a grant, and (ii) the proceeds of the award are used directly as Financial Assistance to Qualified Projects, carrying out part of a Federal award received by the pass-through entity.

The EPA Subaward Policy applies to Subgrants made to Financial Assistance Subrecipients and Technical Assistance Subrecipients, including but not limited to Named Subrecipients. However, the EPA Subaward Policy does not apply to Subawards made to Financial Intermediary Subrecipients.

**Waste, Fraud, or Abuse:** For the definition and application of these terms under this Assistance Agreement (e.g. the Financial Risk Management Requirements, Clarifications to EPA General Terms and Conditions, and Financial Agent Terms and Conditions) and any associated legal documentation related to the Assistance Agreement, refer to their use in the *Reporting Waste, Fraud, and Abuse* clause in the EPA General Terms and Conditions effective October 1, 2024 and 2 CFR 200.113: "credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act 31 U.S.C. 3729-3733."

## II. NATIONAL PROGRAMMATIC TERMS AND CONDITIONS

### A. Performance Reporting

In accordance with 2 CFR 200.329 and 2 CFR 200.337, the Recipient agrees to the following four requirements of performance reporting: (1) progress reports, (2) transaction and-project level report , (3) organizational disclosures, and (4) ongoing disclosures. These performance reporting requirements "flow-down" as needed to enable the Recipient to comply with the requirements described in this term and condition. The Recipient must ensure that these reports cover its own grant-related activities, and where applicable to a certain performance report or element of a performance report, the grant-related activities of its Subrecipients, Contractors, and/or Program Beneficiaries. To comply with these performance reporting requirements, the Recipient agrees to use information collection instruments authorized by GGRF Accomplishment Reporting ████████████████████████ ██████████, once such instruments are authorized; to the extent that information is not available for transactions that were closed prior to authorization of these instruments, the Recipient will not be out of compliance with the performance reporting requirements.

The Recipient agrees to have its chief executive officer (or equivalent) and chief reporting officer (or equivalent) review, sign, and submit performance reporting electronically to the EPA Project Officer. To the extent it is known, or should have been known, by the chief executive officer (or equivalent) and chief reporting officer (or equivalent) that the reporting is not materially compliant with the terms and conditions, or demonstrates material noncompliance with the terms and conditions, the chief executive officer (or equivalent) and chief reporting officer (or equivalent) must note such noncompliance to the EPA Project Officer alongside the submission. Should the chief executive officer (or equivalent) and chief reporting officer (or equivalent) signing the submission knowingly and willfully make any material false statement, they may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

EPA intends to make performance reporting information available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the Recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) prior to submission to EPA. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the Recipient. Recipient agrees that submitted information that does not include PII or CBI may be shared for program evaluation purposes, including with third parties.

The EPA Project Officer may extend the due date for performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. On a case-by-case basis, the EPA Project Officer may waive or modify performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. Notwithstanding any other provision of this Assistance Agreement, if Recipient's inability to submit the required performance reporting is due to issues with EPA systems, the Recipient shall be granted a reasonable extension to submit the reports after the technical issue has been corrected.

Where applicable, the intervals for reporting are authorized by 2 CFR 200.329(c)(1), as more frequent reporting is necessary for the effective monitoring of the Federal award and could significantly affect

program outcomes.

## 1. Progress Reports

### *Semi-Annual Report*

The Recipient agrees to submit semi-annual reports covering six months of the calendar year in accordance with information collection instruments approved through GGRF Accomplishment Reporting ███████████████████████████████████████. A single semi-annual report must be submitted to cover grant-related activities of the Recipient and its Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the semi-annual report.

The Recipient agrees to submit semi-annual reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The first semi-annual reporting period ends on December 31 and covers all activities beginning on the first day of the Period of Performance.

### *Annual Report*

The Recipient agrees to submit annual reports that contain detailed narratives describing program performance over the Recipient's fiscal year, supported with qualitative discussions and quantitative metrics. A single annual report must be submitted to cover grant-related activities of the Recipient and its Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the annual report.

The Recipient must include the following broad, non-exhaustive elements in its annual reports:

- Progress towards objectives on key performance metrics over the reporting period,
- Summary of key activities completed in the reporting period, including case studies across different types of Financial Assistance to Qualified Projects,
- Geographic coverage of Financial Assistance to Qualified Projects made in the reporting period,
- Descriptions and examples of actions taken to meaningfully involve the communities the program serves in program design and operations,
- Case studies of different types of Market-Building and/or Predevelopment Activities, and
- Plans for key activities (including anonymized current transaction pipeline) to be completed as well as outputs and outcomes to be achieved in the next reporting period.

These reports must be submitted ready to be published on the EPA website for public consumption and must not include any material that the Recipient considers to be Confidential Business Information (CBI)

or Personal Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or claims of CBI. Should EPA identify PII or claims of CBI in reports, the EPA Project Officer will require that the Recipient re-submit the report without the PII or claims of CBI so that it can be published without redaction.

The Recipient agrees to submit **annual reports** electronically to the EPA Project Officer within 90 calendar days after the Recipient's fiscal year end date. The first annual report is due 90 calendar days after the Recipient's fiscal year that ends in 2025.

*Final Report*

The Recipient agrees to submit a final report containing two documents. First, the recipient must submit a report containing all of the elements described above for the annual report, covering the entire Period of Performance and overall assessment of its program performance and implementation of its workplan in effect under this Assistance Agreement. Second, the recipient must submit its investment strategy for the Closeout Period to detail its use of Post-Closeout Program Income over the Closeout Period. EPA intends to make the investment strategy, either in whole or in part, available to the public through disclosing copies of the investment strategy as submitted or using the content of the investment strategy. Pursuant to 2 CFR 200.338, the Recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the Recipient.

The two documents for the final report must be submitted to cover the grant-related activities of the Recipient and its Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the final report.

The Recipient agrees to submit the two documents for the final report electronically to the EPA Project Officer no later than 120 calendar days after the end date of the Period of Performance.

## 2. Transaction and Project-Level Report

The Recipient agrees to submit quarterly transaction and project-level reporting in accordance with information collection instruments approved through GGRF Accomplishment Reporting ████████ ████████████████████████████████████. The data submission must cover the grant-related activities of the Recipient and its Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the data submission.

The Recipient agrees to submit the transaction and project-level report electronically to the EPA Project Officer within 30 calendar days after the quarterly reporting period ends. The Recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the quarterly reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The four quarterly reporting periods for data submission are as follows: July 1 to September 30; October 1 to December 31; January 1 to March 31; and April 1 to June 30. The data submissions must cover

transactions originated in the preceding quarter. For the quarterly reporting period that ends September 30, the Recipient must provide information on transactions originated from April 1 to June 30 rather than from July 1 to September 30. For the quarterly reporting period that ends December 31, the Recipient must provide information on transactions originated from July 1 to September 30 rather than October 1 to December 31. For the quarterly reporting period that ends March 31, the Recipient must provide information on transactions originated from October 1 to December 31 rather than January 1 to March 31. For the quarterly reporting period that ends June 30, the Recipient must provide information on transactions originated from January 1 to March 31 rather than April 1 to June 30. The first transaction and project-level report is due 30 calendar days after December 31, 2024 and must cover all transactions originated from the beginning of the Performance Period through September 30, 2024.

## 3. Organizational Disclosures

The Recipient agrees to submit annual organizational disclosures electronically to the EPA Project Officer within 30 calendar days after submission of its Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. The organizational disclosures must cover the Recipient's fiscal year and be submitted in accordance with information collection instruments approved through GGRF Accomplishment Reporting ███████████████████. Additionally, the Recipient agrees to submit such organizational disclosures for each Financial Assistance Subrecipient that has received in excess of $10,000,000 in NCIF subgrants to provide Financial Assistance to Qualified Projects under the National Clean Investment Fund (to be delivered within 30 calendar days after submission of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System). The requirement for organizational disclosures is not applicable for any fiscal year in which the reporting entity did not meet the requirements of 2 CFR Subpart F—Audit Requirements. The first Organizational Disclosures are due in 2025.

## 4. Ongoing Disclosures

In addition to other ongoing disclosure obligations within the regulations and terms and conditions of this Award Agreement, the Recipient agrees to notify the EPA Project Officer of the following events in accordance with 2 CFR 200.329(e):

1. Changes to the Recipient's independent certified public accounting firm;

2. Non-reliance by the Recipient or its independent auditor on previously issued financial statements or a related audit report or completed interim audit review;

3. Changes in fiscal year end of the Recipient;

4. Material impairments to the Recipient's assets;

5. Intention to file bankruptcy petition or enter into receivership;

6. Submission of annual Form 990 to the IRS, with provision of copy to EPA Project Officer upon request (only if submission of the Form 990 is otherwise required).

Additionally, the Recipient agrees to submit such ongoing disclosures for each Financial Assistance Subrecipient that has received in excess of $10,000,000 to provide Financial Assistance to Qualified Projects under the National Clean Investment Fund. The Recipient agrees to submit ongoing disclosures

electronically to the EPA Project Officer within 15 calendar days of the event.

## B. Cybersecurity Condition

(a) The Recipient agrees that when collecting and managing environmental data under this Assistance Agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward Agreements and, during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

## C. Competency Policy

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the Recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the Recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The Recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process.  A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA Project Officer for this award.

## D. Public or Media Events

For public or media events that are planned more than 15 calendar days in advance, the Recipient agrees to notify the EPA Project Officer of public or media events it has organized publicizing the

accomplishment of significant activities related to execution of the workplan in effect under this Assistance Agreement and provide the opportunity for attendance and participation by federal representatives with at least 15 calendar days' notice.

## E. Geospatial Data Standards

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards.  Information on these standards may be found at https://www.fgdc.gov/.

## F. Leveraging and Fund Raising

### 1. Leveraging

The Recipient agrees to make commercially reasonable efforts to provide the proposed leveraged funding that is described in its workplan in effect under this Assistance Agreement. If the proposed leveraging does not substantially materialize during the Period of Performance, and the Recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future grant applications from the Recipient. In addition, if the proposed leveraging does not substantially materialize during the Period of Performance and the Recipient does not provide a satisfactory explanation, then EPA may reconsider the legitimacy of the award; if EPA determines that the Recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the workplan in effect under this Assistance Agreement, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

### 2. Fund Raising

2 CFR 200.442 provides coverage on allowable fund-raising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients. Fund raising costs are an allowable cost and may include costs that are reasonable and necessary for raising capital from private investors to provide Financial Assistance to Qualified Projects.

Allowable fund-raising costs must meet the following two criteria, in addition to meeting the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500: (1) must be in support of the Greenhouse Gas Reduction Fund's third program objective to mobilize financing and private capital and (2) must be reasonable and necessary to raise capital from private investors. Funds a Recipient raises for its own use with costs borne by an EPA Financial Assistance Agreement are considered Program Income, which must be treated in accordance with the Program Income Programmatic Term and Condition. When fund raising costs are paid for by both the award as well as other sources, a portion of the funds raised equal to the share of fund-raising costs charged to the award will be treated as Program Income.

## G. Quality Assurance

Authority: Quality Assurance applies to all assistance agreements involving Environmental Information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The recipient shall ensure that subawards involving Environmental Information issued under this agreement include appropriate quality requirements for the work. The recipient shall ensure sub-award recipients develop and implement Quality Assurance (QA) planning documents in accordance with this

term and condition; and/or ensure sub-award recipients implement all applicable approved QA planning documents. EPA will not approve any QA planning documents developed by a Subrecipient; the Recipient is responsible for reviewing and approving its Subrecipient QA planning document(s), if required based on the Subrecipient's Environmental Information Operations.

## 1. Quality Management Plan (QMP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the recipient must: (i) develop a QMP, (ii) prepare the QMP in accordance with the current version of EPA's Quality Management Plan (QMP) Standard and submit the document for EPA review, and (iii) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the Recipient may (i) submit a previously EPA-approved and current QMP and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the QMP is acceptable for this agreement.

The Recipient must submit the QMP within 90 calendar days after grant award, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must review their approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the Recipient shall revise its QMP to incorporate minor changes and notify the EPA PO and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA PO and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

## 2. Quality Assurance Project Plan (QAPP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QAPP, (ii) prepare the QAPP in accordance with the current version of EPA's Quality Assurance Project Plan (QAPP) Standard, (iii) submit the document for EPA review, and (iv) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the Recipient may (i) submit a previously EPA-approved QAPP proposed to ensure the collected, produced, evaluated, or used environmental information is of known and documented quality for the intended use(s) and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the recipient and EPA Project Officer (PO) in writing if the previously EPA-approved QAPP is acceptable for this agreement.

The Recipient must submit the QAPP within 90 calendar days after grant award, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must notify the PO and QAM when substantive changes are needed to the QAPP. EPA may require the QAPP be updated and re-submitted for approval.

The recipient must review their approved QAPP at least annually. The results of the QAPP review and any revisions must be submitted to the PO and the QAM at least annually and may also be submitted

when changes occur.

**For Reference:**

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• EPA's Quality Program website has a list of QA managers, and Non-EPA Organizations Quality Specifications.

## H. Real Property

In accordance with 2 CFR 200.311, title to Real Property acquired or improved under this agreement will vest upon acquisition by the Recipient, including but not limited to title to Real Property acquired through exercise of a remedy for default of a Financial Assistance arrangement. This Real Property must be used for the originally authorized purpose as long as needed for that purpose, during which time the Recipient must not dispose of or encumber its title or other interests. The Real Property Programmatic Term and Condition flows down to Subrecipients but not to Program Beneficiaries or Contractors that receive Financial Assistance to Qualified Projects, which may acquire title to Real Property after receiving Financial Assistance to Qualified Projects.

The Recipient must obtain prior approval from the EPA Award Official for the acquisition of Real Property. Note that the Recipient may meet this requirement by specifying the types of acquisitions of Real Property it plans to carry out (including in cases where the Recipient would acquire title to Real Property through exercise of a remedy for default) in its workplan in effect under this Assistance Agreement.

<u>Disposition</u>

If the Recipient disposes of the Real Property and uses the proceeds for the originally authorized purpose (i.e., under the terms and conditions of the Award Agreement), then the proceeds will be treated as Program Income and there are no further disposition requirements.

Otherwise, when Real Property is no longer needed for the originally authorized purpose, the Recipient must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

1. Retain title after compensating EPA. The amount paid to EPA will be computed by applying EPA's percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where Recipient is disposing of Real Property acquired or improved with a Federal award and acquiring replacement Real Property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

2. Sell the property and compensate EPA. The amount due to EPA will be calculated by applying EPA's percentage of participation in the cost of the original purchase (and cost of any

improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the Recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

3. Transfer title to EPA or to a third party designated/approved by EPA. The Recipient is entitled to be paid an amount calculated by applying the Recipient's percentage of participation in the purchase of the Real Property (and cost of any improvements) to the current fair market value of the property.

<u>Recordation</u>

As authorized by 2 CFR 200.316, EPA requires that Recipients who use EPA funding to purchase and improve Real Property through an EPA funded construction project record a lien or similar notice in the Real Property records for the jurisdiction in which the Real Property is located, which indicates that the Real Property has been acquired and improved with federal funding and that use and disposition conditions apply to the Real Property.

## I. Program Income

In accordance with Clean Air Act Section 134(b)(1)(C) as well as 2 CFR 200.307(c) and 2 CFR 1500.8 (b), the Recipient must retain Program Income earned during the Period of Performance. Program Income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the Assistance Agreement and beyond the Period of Performance based on a Closeout Agreement.

In any period of time before such a Closeout Agreement is effective but after the Recipient has fully used the award for allowable activities, the Recipient is authorized to use Program Income under the terms and conditions of the Assistance Agreement, as opposed to the terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition. The terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition will supplant the terms and conditions of the Assistance Agreement once the Closeout Agreement becomes effective.

In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, under ordinary circumstances, the Recipient may only use Program Income once the initial award funds are fully used for allowable activities or the Period of Performance ends for a different reason. However, Program Income may be used by the Recipient in advance of the initial award funds being fully used where reasonable and necessary to execute the activities in the workplan in effect under this Assistance Agreement.

## J. Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the Recipient or Subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the Recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.

## III. ADDITIONAL PROGRAMMATIC TERMS AND CONDITIONS

### A. Eligible Recipient

**The Recipient agrees to maintain its status as an Eligible Recipient, which includes:**

a. Meeting the definition of *Nonprofit organization* set forth in 2 CFR 200.1;

b. Having an organizational mission consistent with being "designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services;"

c. Not receiving any "deposit" (as defined in Section 3(I) of the Federal Deposit Insurance Act) or "member account" or "account" (as defined in Section 101 of the Federal Credit Union Act);

d. Being funded by public or charitable contributions; and

e. Having the legal authority to invest in or finance projects.

### B. Workplan and Budget

The Recipient agrees to execute the workplan in effect under this Assistance Agreement. This document, once approved by the EPA, will reflect an agreement between the Parties and will be incorporated into and be a part of the agreement between the Recipient and the EPA.

The Recipient agrees to conduct an annual review of the workplan in effect under this Assistance Agreement within 90 calendar days of June 30 of each calendar year. If material changes are made during the annual review or in between annual reviews, the Recipient agrees to submit the updated workplan to the EPA Project Officer.

The Recipient also agrees to conduct an annual review of the EPA-approved detailed budget table within 90 calendar days of June 30 of each calendar year. If material changes are made during the annual review or in between annual reviews, the Recipient agrees to submit the updated detailed budget table to the EPA Project Officer. Such submissions are not subject to prior approval unless otherwise required by the regulations or the terms and conditions of the Award Agreement.

### C. Recipient Organizational Plan

The Recipient agrees to execute the workplan in accordance with the documents listed below, as submitted to EPA through Grants.gov for EPA-R-HQ-NCIF-23 or provided to EPA after the application submission deadline.

1. Organizational Plan, pursuant to *Section IV.C: Content of Application Submission* of the Notice of Funding Opportunity;

2. Legal Entity Structure Diagram, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity; and

3. Organizational and Governing Documents, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity.

The Recipient agrees to maintain its incorporation in the United States, as reflected in the above documents.

The Recipient agrees to conduct an annual review of the documents within 90 calendar days of June 30 of each calendar year. If material changes are made during the annual review or in between annual reviews, the Recipient agrees to submit the updated documents to the EPA Project Officer. Such submissions are not subject to prior approval unless otherwise required by the regulations or the terms and conditions of the Award Agreement.

## D. Recipient Policies and Procedures

The Recipient agrees to execute the workplan in accordance with the documents listed below (or other documents submitted in lieu of the documents listed below), as submitted to EPA through Grants.gov for EPA-R-HQ-NCIF-23 or provided to EPA after the application submission deadline.

1. Legal and Compliance Risk Management Policies and Procedures, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity;

2. Financial Risk Management Policies and Procedures, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity;

3. Board Policies and Procedures, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity;

4. Management Policies and Procedures, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity;

5. Consumer Protection Policies and Procedures, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity;

6. Equity Policies and Practices, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity; and

7. Conflict of Interest Mitigation Plan, which include all documents submitted upon EPA's request regarding measures that will be taken to eliminate, neutralize, mitigate or otherwise resolve conflicts of interest.

8. Documentation of Personnel and Fringe Benefit Charges, which includes all documents submitted upon EPA's request to document how personnel and fringe benefits will be charged against the grant award in accordance with 2 CFR 200.430 *Compensation—personal services* and 2 CFR 200.431 *Compensation—fringe benefits*. Notwithstanding the content of the Recipient's EPA-approved budget, the Recipient is not authorized to charge the grant award for personnel and fringe benefits against employees without using the W-2 as the definitive definition of "employee" until the Documentation of Personnel and Fringe Benefit Charges has been reviewed and approved by the EPA, as communicated by the EPA Project Officer.

The Recipient agrees to conduct an annual review of the documents within 90 calendar days of June 30 of each calendar year. If material changes are made during the annual review or in between annual reviews, the Recipient agrees to submit the updated documents to the EPA Project Officer. With the exception of the Documentation of Personnel and Fringe Benefit Charges, where changes will be subject to prior approval, such submissions are not subject to prior approval unless otherwise required by the regulations or the terms and conditions of the Award Agreement.

## E. Allowable and Unallowable Activities

The Recipient agrees to only use the award to support the following allowable activities: Financial Assistance to Qualified Projects; Predevelopment Activities; Market-Building Activities; and Program Administration Activities. The Recipient must use awards funds exclusively for allowable activities within the ten EPA regions, with the exception of the Freely Associated States. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500.

The Recipient agrees to not use the award for the following unallowable activities: (a) Financial Assistance to Qualified Projects in the form of Subgrants; (b) Subgrants for the purposes of providing Financial Assistance to Qualified Projects (other than Subgrants from the Recipient to first-tier Subrecipients); and (c) activities that support deployment of projects that do not meet the definition of Qualified Projects. The allowability of legal costs incurred in connection with the award shall be governed by applicable provisions of 2 CFR Part 200, Subpart E, including but not limited to 2 CFR 200.403, 2 CFR 200.435, 2 CFR 200.441 and 2 CFR 200.459.

## F. Foreign Entity of Concern

As part of carrying out this award, the Recipient agrees to ensure that entities the Recipient contracts with, the Recipient makes Subawards to, or that receive funds as Program Beneficiaries at any tier of funding under this grant agreement are not—

> (A) an entity owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);

> (B) an entity headquartered in a covered nation under 10 U.S.C. 4872(d); or

> (C) a subsidiary of an entity described in (A) or (B).

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

## G. LIDAC Expenditure Requirement

The Recipient agrees to ensure that a minimum of 40% of the award is used for the purposes of providing Financial Assistance in Low-Income and Disadvantaged Communities, with compliance maintained over each annual reporting period (i.e., from July 1 to June 30). Funds used for the purposes of providing Financial Assistance may include Financial Assistance to Qualified Projects; Predevelopment Activities; Market-Building Activities; and Program Administration Activities. This requirement applies to the entire award provided to the Recipient but does not "flow down" to each

Subrecipient.

## H. Revolving Loan Fund Characterization

EPA considers the portion of the award used to provide Financial Assistance to Qualified Projects that may generate Program Income as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). Such Financial Assistance may include Subawards, Participant Support Costs, and/or Acquisitions of Intangible Property. In accordance with section 2.0 *Applicability and Effective Date* and the definition of *Subaward* in section 3.0 of the EPA Subaward Policy, the EPA Subaward Policy does not apply to the Recipient's Subawards from the capitalization of a revolving loan fund.

EPA does not consider the remaining portion of the award as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). As such, all Subgrants made by the Recipient are subject to the EPA Subaward Policy.

## I. Subawards

Subawards to Technical Assistance Subrecipients

The Establishing and Managing Subawards General Term and Conditions applies to Technical Assistance Subrecipients.

Subawards to Financial Intermediary Subrecipients

The following requirements apply when the Recipient provides a Subaward to a Financial Intermediary Subrecipient. These requirements apply to the Recipient and Subrecipient in lieu of those specified in the Establishing and Managing Subawards General Term and Condition, as the EPA Subaward Policy does not apply to Financial Intermediary Subrecipients.

    1. The Recipient must establish and follow a system that ensures all Subawards to Financial Intermediary Subrecipients are in writing and contain all of the elements required by 2 CFR 200.332(b), with the exception of the indirect cost provision of 2 CFR 200.332(b)(4) (which does not apply to loans). EPA has developed an optional template for Subaward Agreements available in Appendix D of the EPA Subaward Policy, which may also be used for such Subaward Agreements with Financial Intermediary Subrecipients.

    2. The Financial Intermediary Subrecipient must comply with the internal control requirements specified at 2 CFR 200.303 and is subject to the 2 CFR Part 200, Subpart F, *Audit Requirements*. The pass-through entity must include a condition in all Subawards that requires Financial Intermediary Subrecipients to comply with these requirements. No other provisions of the Uniform Grant Guidance, including the Procurement Standards, apply directly to the Subrecipient.

    3. Prior to making the Subaward, the Recipient must ensure that the Financial Intermediary Subrecipient has a "unique entity identifier." This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR 200.332(b)(1). The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining a UEI is available in the General Condition of the pass-through entity's agreement with EPA entitled *"System for Award Management and Universal Identifier Requirements."*

<u>Subawards to Financial Assistance Subrecipients</u>

The following requirements apply when the Recipient provides a Subaward to a Financial Assistance Subrecipient. These requirements apply to the Recipient and Subrecipient <u>in addition</u> to those specified in the Establishing and Managing Subawards General Term and Condition.

    1. The Recipient must obtain written approval from the EPA Award Official prior to providing a Subgrant to a Financial Assistance Subrecipient that would exceed $10,000,000 cumulatively in Financial Assistance Subawards under the National Clean Investment Fund and Capitalization Funding under the Clean Communities Investment Accelerator.

    2. Prior to providing a Subgrant not named on the application to a Financial Assistance Subrecipient, the Recipient must obtain disclosure from the potential Subgrantee regarding award funds that it has sought and/or received under the National Clean Investment and Clean Communities Investment Accelerator programs.

## J. Participant Support Costs

The Recipient may provide Financial Assistance to Qualified Projects in the form of Participant Support Costs. In addition, the Recipient may provide Participant Support Costs for other purposes, including Predevelopment Activities, Market-Building Activities, and Program Administration Activities, to the extent such purposes are authorized under the Award Agreement.

The Recipient agrees to the following eligibility, restrictions, timelines, and other programmatic requirements on Participant Support Costs, in addition to other requirements included in the terms and conditions of this Award Agreement:

    1. The Recipient and Program Beneficiaries are responsible for taxes, if any, on payments made to or on behalf of entities participating in this program that are allowable as Participant Support Costs under 2 CFR 200.1, 2 CFR 200.456, or 2 CFR 1500.1. EPA encourages the Recipient and Program Beneficiaries to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of subsidies, rebates, and other participant support cost payments. However, EPA does not provide advice on tax issues relating to these payments.

    2. Participant Support Cost payments are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and the Suspension and Debarment General Term and Condition. The Recipient, therefore, may not make Participant Support Cost payments to entities excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180 and must ensure that Subrecipients adhere to this requirement as well. The Recipient is responsible for checking that Program Beneficiaries (i.e., entities receiving Participant Support Costs) are not excluded from participation through either (1) checking the System for Award Management (SAM) or (2) obtaining eligibility certifications from the Program Beneficiaries.

The Recipient agrees to provide written guidelines for Participant Support Costs to the EPA Project Officer prior to making payments to Program Beneficiaries, unless already described in the Recipient's workplan in effect under this Assistance Agreement. These guidelines must: (a) describe the activities that will be supported by the Participant Support Costs; (b) specify the range of funding to be provided through the Participant Support Costs; (c) identify which types of entities will have title to equipment (if

any) purchased with the funds; (d) establish source documentation requirements (e.g., invoices) for accounting records; and (e) describe purchasing controls to ensure that the amount of the Participant Support Cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

## K. Acquisitions of Intangible Property

### 2 CFR 200 Procurement Standards

The Recipient may provide Financial Assistance to Qualified Projects in the form of Acquisitions of Intangible Property. The Recipient agrees to acquire Intangible Property in compliance with the conflict of interest and competition requirements described in the 2 CFR Part 200 Procurement Standards. This includes but is not limited to the requirements at 2 CFR 200.318 to:

- Have and use documented procurement procedures to govern acquisitions of Intangible Property;
- Maintain oversight to ensure that contractors perform in accordance with the terms, conditions, and specifications of their contracts;
- Maintain written standards of conduct covering conflicts of interest and governing the actions of employees engaged in the selection, award, and administration of contracts as well as maintain written standards of conduct covering organizational conflicts of interest;
- Prioritize entering into inter-entity agreements where appropriate for procurement or use of common or shared goods and services as the Recipient seeks to mobilize financing and private capital;
- Award contracts only to responsible contractors possessing the ability to perform successfully under the terms and conditions of the proposed procurement; and
- Maintain records sufficient to detail the history of procurement.

### Disposition

If the Recipient disposes of the Intangible Property and uses the proceeds for the originally authorized purpose (i.e., under the terms and conditions of the Award Agreement), then the proceeds will be treated as Program Income and there are no further disposition requirements.

### Recordation

The Recipient agrees to record liens or other appropriate notices of record to indicate that Intangible Property has been acquired with Federal funding and that use and disposition conditions apply to the Intangible Property, in cases where Financial Assistance to Qualified Projects is in the form of an Acquisition of Intangible Property. As provided in 2 CFR 200.1: "…loans, notes and other debt instruments, lease agreements, stock and other instruments of property ownership (whether the property is tangible or intangible)" are *Intangible Property* for the purposes of the restrictions described at 2 CFR 200.315(a). "Other appropriate notices of record" is not limited to filing Uniform Commercial Code instruments and may also include a notice of record in the legally-binding transaction documents.

Additional guidance is available at [Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance Agreements](#).

## L. Labor and Equitable Workforce Development Requirements

## 1. Davis-Bacon and Related Acts (DBRA)

### A. Program Applicability

As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to projects assisted by grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this Award Agreement shall be paid wages at rates not less than those prevailing for the same type of work on similar construction in the locality as determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Greenhouse Gas Reduction Fund, the relevant construction type and prevailing wage classifications would be "Building" and "Residential." The Secretary of Labor's wage determinations are available at https://sam.gov/content/wage-determinations.

Under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific construction projects that were not completed prior to the execution of the final binding documentation governing the use of the Financial Assistance. The Recipient must ensure that any construction work financed in whole or in part with such Financial Assistance, as defined in these Terms and Conditions, provided under this agreement complies with Davis-Bacon and Related Act requirements and the requirements of these Terms and Conditions.

Note, however, that under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements do not apply to any form of Financial Assistance which meets any of the following criteria:

- Financial Assistance which exclusively funds pre-construction (e.g. permitting or design work) or post-construction activities (e.g. Acquiring Intangible Property related to a previously completed construction project or re-financing activity related to a previously completed construction project).
- Financial Assistance which serves end-users who are individual homeowners or tenants of single-family homes or multifamily buildings when these individual end-users ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.
- Financial Assistance which serves end-users who meet the definition of Federally Recognized Tribal Entities, as defined under this Assistance Agreement, when these Federally Recognized Tribal Entities ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.
- Financial Assistance which serves any end-user when such Financial Assistance is less than $250,000 for a project and the end-user ultimately selects the contractor(s) and executes the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.

If the Recipient encounters a situation that presents uncertainties regarding DBRA applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with a Subrecipient, Program Beneficiary, contractor, or subcontractor determines any instances of non-compliance or

potential non-compliance with the requirements of this Term and Condition or the Davis-Bacon and Related Act, the Recipient agrees to promptly inform the EPA Project Officer for possible referral to the U.S. Department of Labor for guidance or enforcement action.

Note, the use of the term project in this term and condition is distinct from the use of the term project within the definition of Qualified Project under Clean Air Act Section 134(c)(3), which is broader and includes "any project, activity, or technology." Consistent with the definitions at 29 CFR § 5.2, the term "construction" refers to all types of work done on a particular building or work at the site of the work by laborers and mechanics employed by a contractor or subcontractor. Additional guidance is available in the definition of the term "building or work" in 29 CFR § 5.2.

## B. Davis-Bacon and Related Acts

Davis-Bacon and Related Acts (DBRA) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

- Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;
- Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and
- Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

## C. Recipient Responsibilities When Entering Into and Managing Contracts:

### a. Solicitation and Contract Requirements:

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** Recipients are responsible for complying with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

### b. After Award of Contract:

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

## D. Recipient Responsibilities When Establishing and Managing Additional Subawards:

### a. Include DBRA Requirements in All Subawards (including Loans): Include the following text on

all Subawards under this grant: "By accepting this award, the EPA Subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

**b. Provide Oversight to Ensure Compliance with DBRA Provisions:** Recipients are responsible for oversight of Subrecipients and must ensure Subrecipients comply with the requirements in 29 CFR 5.6.

**c. Provide Oversight to Ensure Compliance with Participant Support Cost Requirements:** Recipients are responsible for oversight of Subrecipients and must ensure that Subrecipients comply with the requirements in subsection E, below.

## E. Recipient/Subrecipient Responsibilities When Managing Participant Support Costs to Program Beneficiaries

When DBRA is applicable, Financial Assistance provided in the form of a participant support cost to a Program Beneficiary shall include the following text:

"[Name of Recipient/Subrecipient providing the Financial Assistance] retains the following responsibilities for all contracts and subcontracts assisted by this [form of Financial Assistance]:

**a. Solicitation and Contract Requirements:**

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** "[Name of Recipient/Subrecipient providing the Financial Assistance] is responsible for ensuring that any contracts or subcontracts made by Program Beneficiaries and/or assisted by Participant Support Costs comply with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include the following text "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

**b. After Award of Contract:**

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

The contract clauses set forth in this term and condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

## F. DBRA Compliance Monitoring Requirement

Reasonable and necessary costs for DBRA compliance are allowable and allocable grant costs. Such costs include, but are not limited to, the procurement of a payroll reporting and compliance management software product to meet the documentation and reporting requirements under 29 CFR 5.5(a)(3)(ii) for all construction projects assisted under this award.

## 2. Compliance with Federal Statutes and Regulations

The Recipient agrees to comply with other applicable federal statutes and regulations related to labor and equitable workforce development as well as to enforce compliance with Subrecipients, contractors, and other partners (e.g., by including such provisions in contractual agreements). This includes but is not limited to applicable health and safety regulations as administered by the Occupational Safety and Health Administration.

## 3. Free and Fair Choice to Join a Union

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), the Recipient agrees to design and implement a policy to increase high-quality job opportunities for American workers and improving equitable access to these jobs, including in traditional energy communities, through the timely implementation of requirements for prevailing wages and registered apprenticeships and by focusing on high labor standards and the free and fair chance to join a union.

In accordance with the EPA General Terms and Conditions, grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

## 4. Labor and Equitable Workforce Development Implementation Plan

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), by December 31, 2024, the Recipient must submit a Labor and Equitable Workforce Development Implementation Plan to the EPA Project Officer. The Implementation Plan should articulate policies, practices, and procedures adopted by the Recipient to maximize high-quality jobs and workforce development outcomes on projects assisted with the award. Examples of how this can be demonstrated include, but are not limited to:

- Mechanisms for promoting job quality and evaluating labor standards on projects being considered for and/or receiving Financial Assistance;
- Plans to support workforce development as part of Market-Building Activities;
- Current and planned partnerships with labor and workforce development organizations, including the purpose of those partnerships;
- Mechanisms for maximizing training and employment opportunities for participants in Registered Apprenticeship Programs on projects, including apprenticeship utilization targets, as applicable;
- Mechanisms for creating high-quality job training and employment opportunities available to residents of low-income and disadvantaged communities through projects and other program activities; and
- Processes for promoting Project Labor Agreements on construction projects above $25,000,000, as appropriate, in alignment with Executive Order 14063 (Use of Project Labor Agreements for

Federal Construction Projects) and Executive Order 13502 (Use of Project Labor Agreements for Federal Construction Projects), as well as other types of binding agreements that promote strong workforce outcomes, such as Community Workforce Agreements and Community Benefits Agreements.

The Recipient may use or reference materials already submitted to EPA as part of its submission of the Implementation Plan, where relevant.

Note that EPA may make the information from this plan available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the Recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the Recipient.

## M. Build America, Buy America Act

The Build America, Buy America Act – Public Law 117-58, requires the EPA to ensure that for any activity related to the construction, alteration, maintenance, or repair of infrastructure, "none of the funds made available for a Federal Financial Assistance program for infrastructure, including each deficient program, may be obligated for a project unless all of the iron, steel, manufactured products, and construction materials used in the project are produced in the United States." (P.L. 117-58, Secs 70911 – 70917).

The Recipient is bound to the EPA Build America, Buy America General Term and Condition, which outlines the Build America, Buy America (BABA) requirements that all Recipients of EPA Financial Assistance awards must comply with.

Under the Greenhouse Gas Reduction Fund, BABA requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific infrastructure projects that were not completed prior to the date the Recipient's award funds were obligated by the EPA.

EPA interprets the definition of infrastructure consistent with 2 CFR 184 and M-24-02 (memorandum dated as of October 23, 2023), including the "public function" test, when determining whether projects qualify as public infrastructure, based on the Civil Rights Act definition of public accommodation.

The following types of Greenhouse Gas Reduction Fund projects are deemed infrastructure for the purposes of BABA applicability:

1. The public infrastructure portion of any property (e.g., retail in a mixed-use multi-family property) where the principal purpose of the Financial Assistance is to directly benefit such portion of the property;

2. Privately-owned commercial buildings when they meet the "public function" test;

3. Residential-serving community solar projects, which EPA deems "structures, facilities, and equipment that generate, transport, and distribute energy" per 2 CFR 184.4(c);

4. Publicly accessible EV charging stations;

5. Publicly owned energy generation and/or storage transportation facilities;

6. Publicly owned transportation facilities (e.g., bus depot);

7. Privately-owned transportation facilities that serve a public function.

The following types of Greenhouse Gas Reduction Fund projects are not deemed infrastructure for the purposes of BABA applicability:

1. Privately-owned vehicles for private use;

2. Certain publicly-owned or operated vehicles that EPA has determined do not constitute infrastructure (e.g. school buses);

3. Privately-owned manufacturing or industrial facilities;

4. Privately-owned offices;

5. Single family homes;

6. Privately-owned, non-mixed-use, multi-family housing properties;

7. Privately-owned residential portions of mixed-use properties;

8. EV charging stations that are not publicly accessible;

9. Any privately-owned, behind-the-meter energy generation and storage project that does not otherwise meet the definition of infrastructure.

The inclusion of the following types of funding, support, guarantee, or sponsorship in the funding stack of any Greenhouse Gas Reduction Fund project does not trigger BABA, in and of itself or in combination:

1. Low-Income Housing Tax Credit (LIHTC);

2. Fannie Mae and Freddie Mac Backed Multifamily Mortgages;

3. Federal Housing Administration Insured Multifamily Mortgages;

4. HUD Section 8 Funding;

5. Other Federal, State, Tribal, or Local Housing Assistance Funding Sources: in general, subsidies issued by federal, state, tribal, or local housing assistance funding sources that do not confer equity or ownership stakes for the governmental funding source do not trigger BABA applicability.

BABA applicability is assessed at the time of provision of Financial Assistance based on the terms, limitations, and requirements of the Financial Assistance. Applicability does not change retroactively

based on a change of use (e.g., if a ground floor apartment is re-zoned for a restaurant). Recipients may not temporarily modify or mischaracterize usage to intentionally avoid BABA compliance.

If the Recipient encounters a situation that presents uncertainties regarding Build America, Buy America applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

## N. Governance Requirements

The Recipient agrees to comply with the following governance requirements starting December 31, 2024. The governance requirements "flow-down" to Financial Assistance Subrecipients that have received in excess of $10,000,000 in NCIF subgrants but not to other subrecipients. The governance requirements are waived for (i) any entity that has been determined by the U.S. Treasury's CDFI Fund to meet the CDFI certification requirements set forth in 12 CFR 1805.201 and (ii) any entity whose specific governance structure is set forth in State, Tribal, or local law.

The Recipient (or Subrecipient) may meet all or some of the governance requirements through the parent entity, provided the Recipient (or Subrecipient) is subject to the governance of the parent entity and the Recipient (or Subrecipient) is wholly-controlled by the parent entity. Similarly, the governance requirements may be waived for the Recipient (or Subrecipient) through the parent entity meeting the CDFI certification requirements set forth in 12 CFR 1805.201, provided the Recipient (or Subrecipient) is wholly-controlled by the parent entity.

### 1. Board Size and Composition

The Recipient agrees to ensure that its board size in terms of number of members (excluding advisory committees) is commensurate with the scope of oversight and monitoring activities as well as the scale, complexity, and risk profile of the Recipient's workplan in effect under this Assistance Agreement as well as other business activities. The board must have a sufficient number of members to adequately staff each of its
committees.
The Recipient agrees to ensure that its board consists of members that are qualified with relevant expertise, skills, and track record as well as representative members (including from Low-Income and Disadvantaged Communities).

### 2. Board Independence

The Recipient agrees to ensure that the majority of the board is independent, in accordance with the Internal Revenue Service's definition of "independent" for the purposes of Form 990 reporting.

### 3. Board Committees

The Recipient agrees to have the following board-level committees to oversee and monitor management, with each committee staffed by members qualified to execute the committee's objectives. While the Recipient need not adhere to the exact naming convention or structure in this term and condition, each of the responsibilities must be covered by board-level committees at all times during the Period of Performance; for the avoidance of doubt, one committee may perform the responsibilities of one or more of the committees specified below.

1. An investment or credit committee to oversee and approve investment or credit decisions;

2. A risk management committee to oversee the formulation and operationalization of the risk management framework;

3. An audit committee to oversee the integrity of reporting and internal controls and the performance of audit functions, with a majority independent members on such committee;

4. A nomination/governance committee to oversee nomination and succession of board and senior management, with a majority independent members on such committee; and

5. A compensation committee to oversee board as well as senior management and staff compensation, with a majority independent members on such committee.

Further, the Recipient agrees to act in good faith to ensure each committee obtains information from management, auditors, or other third-parties necessary to discharge their duties.

## 4. Board Policies and Procedures

The Recipient agrees to enforce board policies and procedures including, among others, those that ensure strong ethics and mitigate conflicts of interest; ensure appropriate board training to review and assess internal risk assessments for all of the organization's significant activities; and ensure regular board engagement, including frequency of meetings and attendance procedures.

The Recipient agrees to require recusals from any officers or members of the board of directors with a personal or organizational conflict of interest in the decision-making and management related to financial transactions under this award. Such recusals must include but not be limited to decision-making and management of Subawards, participant support cost payments, Acquisitions of Intangible Property to or from any organization in which an officer or member of the board of directors or their immediate family is directly employed by or has a consulting or other contractual relationship with, serves on the board, or is otherwise affiliated with the organization. The term "immediate family" has the same meaning as that term in the EPA's Final Financial Assistance Conflict of Interest Policy.

## O. Consumer Protection Requirements

The Recipient agrees to carry out the following consumer protection requirements to the extent that the Recipient directly interacts, transacts, or contracts with consumers in the provision of Financial Assistance to Qualified Projects:

1. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply;

2. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;

3. With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint

procedures for the consumer if they have a problem with the solar project or sales process;

4. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and

5. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.

The Recipient agrees to monitor and oversee Subrecipients and contractors with respect to these consumer financial protection requirements to the extent that they directly interact, transact, or contract with consumers, in accordance with 2 CFR 200.332(e) and 2 CFR 200.318.

## P. Financial Risk Management Requirements

### 1a. Cash Management Requirements: Advance Payments

The Recipient must deposit and maintain advance payments of Federal funds exclusively in insured accounts, in accordance with 2 CFR 200.305(b)(10). As provided in 2 CFR 200.1, an advance payment is "a payment that a Federal agency or pass-through entity makes by any appropriate payment mechanism and payment method before the recipient or subrecipient disburses the funds for program purposes." A Recipient drawing down funds from ASAP prior to disbursement for actual and allowable project costs constitutes an advance payment. Interest income earned on the advance payment from EPA to the Recipient prior to disbursement is subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12); consequently, such interest earned in excess of $500 must be remitted annually to the Department of Health and Human Services Payment Management System.

### 1b. Cash Management Requirements: Program Income

The Recipient is authorized to maintain Program Income in two types of accounts:

1. Insured accounts, including in amounts in excess of the federal insurance limit of $250,000.
2. Accounts where such income is used to purchase (i) U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days (if purchased directly) and that such instruments are held-to-maturity (if purchased directly), or (ii) short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions. Note, the underlying instruments included in a short-term money market fund consisting solely of U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities and offering daily investor redemptions need not be of a particular duration or held-to-maturity.

Interest income and other returns earned on funds that have already been disbursed is considered additional Program Income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12).

### 2. Financial Health Metrics

The Recipient agrees to report the following financial health metrics at the entity-level on an annual basis in accordance with its fiscal year as well as on behalf of each Financial Assistance Subrecipient that receives in excess of $10,000,000 in NCIF subgrants. The metrics are due to the EPA Project Officer within 30 calendar days after submission of the reporting entity's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System and may be submitted through the Organizational Disclosures form. The requirement for submission of financial health metrics is not applicable for any fiscal year in which the reporting entity did not meet the requirements of 2 CFR Subpart F—Audit Requirements. The first financial health metrics are due in 2025.

1. Net Asset Ratio: The net asset ratio is defined as net assets divided by total assets.
2. Current Ratio: **The current ratio is defined as current assets divided by current liabilities, where** current assets is equal to the value of all assets that are reasonably expected to be converted into cash within the coming 12-month period in the normal course of business and current liabilities is equal to the total value of all debts or obligations that must be paid in the coming 12-month period.

3. Delinquency Rate: The delinquency rate is defined as the value of loans outstanding that are 90+ calendar days delinquent divided by the value of loans outstanding, where loans 90+ calendar days delinquent includes those with outstanding balances 90+ calendar days overdue and still accruing interest as well as those in nonaccrual status.

4. Net Charge-Off Rate: The net charge-off rate is defined as the value of loans charged-off over the past fiscal year, minus the value of loan recoveries over the past fiscal year, divided by the value of loans outstanding.

5. Concentration: The concentration of the portfolio, as demonstrated by calculating and reporting on recipient-level exposure, defined as on-balance sheet exposures to a single consolidated entity over all on-balance sheet exposures, for top ten highest exposures.

Note, the Delinquency Rate and Net Charge-Off Rate may exclude the value of loans which include an element of forgiveness, if and only if such forgiveness was established in the terms governing the financial product at origination.

The EPA Project Officer will consider Recipient and, where applicable, Subrecipient performance against these financial health metrics only to the extent by which they Materially Impair the Recipient's ability to execute the workplan in effect under this Assistance Agreement when assessing whether the Recipient is making sufficient progress in implementing the workplan in effect under this Assistance Agreement, as specified in the Sufficient Progress clause under the Clarifications to EPA General Terms and Conditions Programmatic Term and Condition.

## 3. Climate-Related Financial Risks

The Recipient agrees to comply with Executive Order 11988 (Floodplain Management). This may include accounting for and evaluating practicable alternatives or other mitigation related to ameliorating flood risks and protecting flood plains as part of its financial risk management policies and procedures.

The Recipient agrees to comply with Executive Order 14030 (Climate-Related Financial Risk). This may include accounting for climate-related financial risks—including physical and transition risks—in its financial risk management policies and procedures.

## 4. Additional Requirements

The Recipient agrees to not subordinate EPA's interest in grant funds that have not yet been used for program purposes in a manner that waives EPA's claim for compensation under any applicable statutory claims, 2 CFR Part 200, or common law. Once a Recipient uses grant funds for program purposes and incurs a financial obligation, as defined under 2 CFR 200.1, EPA will only seek claims on those funds in the event that they were used for costs that do not comply with the terms and conditions of the Award Agreement or if there is adequate evidence of Waste, Fraud, or Abuse, prompting adverse action by EPA per 2 CFR 200.339. This does not prohibit the use of subordinated debt as a form of Financial Assistance.

The Recipient agrees to provide Financial Assistance Subrecipients with training and technical assistance on program-related matters, including on prudent financial risk management practices, in accordance with 2 CFR 200.332(f).

## Q. Historic Preservation

### National Historic Preservation Act (NHPA)

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The Recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties can include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (c) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The Recipient should work with their Project Officer to ensure that Subrecipients are available to work with EPA on any required consultation process with the State Historic Preservation Office (SHPO) or Tribal Historic Preservation Office (THPO) prior to commencing the project to ensure compliance with Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

### Archeological and Historic Preservation Act (AHPA)

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific, prehistorical, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The Recipient must ensure that Subrecipients performing construction projects are aware of this requirement, and the Recipient must notify EPA if the AHPA is triggered.

## R. Uniform Relocation Assistance and Real Property Acquisition Policies Act

The Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require the Recipient to follow certain procedures for acquiring property for purposes under the federal award, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing. The Recipient must comply with, and ensure Subrecipients comply with, the URA and 49 CFR Part 34 if an EPA-funded acquisition of property results in permanent displacement of individuals or businesses. Note that although the URA does not apply to temporary displacement of residents, the cost for temporary relocation of residents may be an allowable cost under the "necessary and reasonable for the performance of the Federal award" provision of 2 CFR 200.403(a). The Recipient must obtain prior approval of the EPA Project Officer and EPA Award Official for the allowability of costs for temporary relocation of residents.

## S. Remedies for Non-Compliance

The Recipient agrees to comply with the terms and conditions of the Award Agreement. Should the Recipient fail to adhere to the terms and conditions of the Award Agreement, the EPA may impose additional conditions as set forth in 2 CFR 200.208. If the EPA determines that noncompliance cannot be remedied by imposing additional conditions, the EPA may seek remedies under 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as provided in 2 CFR 200.343. As specified in 2 CFR 200.343, which will remain in effect throughout the term of this award, costs during suspension or after termination are allowable if (a) the costs result from financial obligations which were properly incurred by the non-Federal entity before the effective date of suspension or termination, are not in anticipation of it, and (b) the costs would be allowable if the Federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect.

The Recipient agrees to comply with the statutory requirements of Section 134 of the Clean Air Act. Should the Recipient violate the statutory requirements of Section 134 by failing to use grant funds in accordance with Section 134 or by failing to ensure that the activities of Subrecipients are in accordance with Section 134, EPA may seek remedies under Section 113, which may subject the Recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or criminal penalties through a DOJ criminal judicial enforcement action.

Notwithstanding any other provision of this Award Agreement, EPA will not determine that Recipient has failed to comply with the terms and conditions of the Award Agreement, without providing a reasonable opportunity to remedy under 2 CFR 200.208, for good faith efforts to comply with the Performance Reporting National Programmatic Term and Condition, Additional Programmatic Terms and Conditions regarding Build America, Buy America or Labor and Equitable Workforce Development Requirements, requirements for Subrecipient oversight, or to obligate or expend funds for allowable activities.

## T. Clarifications to EPA General Terms and Conditions

EPA agrees to make the following clarifications to the EPA General Terms and Conditions. These clarifications expand on, rather than replace or modify, the EPA General Terms and Conditions. The

Recipient agrees to comply with these clarifications.

## 1. Indirect Cost Rate

The Recipient must exclude costs for acquisitions of Intangible Property from any calculations of modified total direct costs (MTDC), as defined in 2 CFR 200.1. Intangible Property is not a "service" and therefore is not included in MTDC. The Recipient should note that Subrecipients that receive loans cannot charge an indirect cost rate against their loans and that entities that receive Participant Support Costs cannot charge an indirect cost rate against their participant support cost payments.

Modified total direct costs (MTDC), as defined in 2 CFR 200.1, means all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $50,000 of each Subaward (regardless of the period of performance of the Subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, Participant Support Costs and the portion of each Subaward in excess of $50,000.

In the event that the Recipient is compensating an affiliated entity for its direct and indirect costs related to use of employees, the Recipient must not charge its indirect cost rate against any of these costs.

Notwithstanding the General Term and Condition "Indirect Cost Rate Agreements," the Recipient may claim up to a 15% de minimis rate of modified total direct costs authorized by 2 CFR 200.414(f).

## 2. Sufficient Progress

The EPA Project Officer may assess whether the Recipient is making sufficient progress in implementing the workplan in effect under this Assistance Agreement under this Assistance Agreement within 90 calendar days of June 30, 2025 as well as within 90 calendar days of June 30 of each year thereafter during the Period of Performance. "Sufficient progress" shall be assessed based on a comparison of the Recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes. As noted under the Financial Risk Management Programmatic Term and Condition, the Recipient's financial health, as measured by the required Financial Health Metrics, are also an input in this process. This term and condition "flows down" to Subrecipients, with the Recipient required to assess whether each Subrecipient is making sufficient progress in implementing the workplan under its Subaward Agreement; the Recipient may increase the frequency and scope of the review of sufficient progress of Subrecipients, in accordance with 2 CFR 200.332 *Requirements for Pass-Through Entities.*

If the EPA Project Officer determines that the Recipient has not made sufficient progress in implementing its workplan in effect under this Assistance Agreement, the Recipient, if directed to do so, must implement a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

EPA will not find that the Recipient has failed to make sufficient progress in implementing its workplan in effect under this Assistance Agreement based on shifts between types of Financial Assistance and/or Qualified Projects over the Period of Performance (or other shifts in portfolio allocation, such as by region or market segment, over the Period of Performance). If EPA finds the Recipient has failed to achieve sufficient progress on deployment of Financial Assistance to Qualified Projects in general, or is achieving progress at a slower rate than projected under the workplan in effect under this Assistance Agreement, the Recipient will have an opportunity to implement a corrective action plan pursuant to 2 CFR 200.208.

## 4. Termination

EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 effective as of October 1, 2024, when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse or material misrepresentation of eligibility status, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the Assistance Agreement, EPA must (1) de-obligate uncommitted funds and re-obligate them to another Eligible Recipient selected under Funding Opportunity Number 66.957 (NCIF) to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 days of the de-obligation and (2) amend the Recipient's Assistance Agreement to reflect the reduced amount, based on the de-obligation. In accordance with 2 CFR 200.341, EPA will provide the Recipient notice of termination. If an Eligible Recipient has assumed a legal obligation properly incurred for an allowable activity entered into by a suspended or terminated Recipient, EPA will re-obligate funds to the Eligible Recipient to satisfy the legal obligation and accept an amended workplan and budget to that effect.

## U. Period of Performance

The Period of Performance under this Award Agreement will end on the date specified in the Notice of Award. However, the Period of Performance may end prior to the date specified in the Notice of Award if all required work of the Federal award has been completed, in accordance with 2 CFR 200.344. In accordance with 2 CFR 200.344(b), the Recipient agrees to liquidate all financial obligations incurred under the award no later than 120 calendar days after the end date of the Period of Performance. In this context, to "liquidate all financial obligations" means to pay outstanding bills, such as the payment of staff salaries accrued during the Period of Performance but for which the due date falls after the end date of the Period of Performance. To "liquidate all financial obligations" does not mean to liquidate, terminate, or accelerate outstanding obligations related to the provision of Financial Assistance to Qualified Projects at the end of the Period of Performance, which would continue to be subject to the Closeout Agreement.

The Recipient should note that the Recipient will not be considered to have met the requirements for closeout under its award under 2 CFR 200.344 so long as any Subrecipient has not met the requirements for closeout under its subaward under 2 CFR 200.344.

Notwithstanding the Extension of Project/Budget Period Expiration Date General Term and Condition, in accordance with 2 CFR 200.308(g)(2), the Recipient is authorized to initiate a one-time extension of the Period of Performance by up to 12 months without prior EPA approval, provided that the extension complies with the requirements 2 CFR 200.308(g)(2). In accordance with 2 CFR 200.308(g)(2), the Recipient must "notify the Federal agency in writing with the supporting justification and a revised period of performance at least 10 calendar days before the conclusion of the period of performance."

## V. Closeout Agreement

As provided at 2 CFR 200.307(c) and 2 CFR 1500.8(d), after the end of the Period of Performance of the Assistance Agreement, the Recipient may keep and use Program Income remaining at the end of the Assistance Agreement and use Post-Closeout Program Income in accordance with this term and condition. The Closeout Agreement goes into effect for this Assistance Agreement the earlier of 1) the day after the Assistance Agreement Period of Performance ends, 2) the first date when all required work of the Federal award has been completed in accordance with 2 CFR 200.344 and the Recipient has met

the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition) or 3) an alternative date that is mutually agreed by the Recipient and the EPA Grants Management Officer or Award Official.

In accordance with 2 CFR 200.344, EPA will proceed to closeout the Award Agreement and enter the Closeout Period even if the Recipient has not met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition). As provided in 2 CFR 200.344: "When the recipient or subrecipient fails to complete the necessary administrative actions or the required work for an award, the Federal agency or pass-through entity must proceed with closeout based on the information available." This Closeout Agreement is therefore self-executing.

This term and condition is the entire Closeout Agreement between the EPA and the Recipient. If any provisions of this Closeout Agreement are invalidated by a court of law, the parties shall remain bound to comply with the provisions of this Closeout Agreement that have not been invalidated. The Closeout Agreement will be interpreted and, if necessary, enforced under Federal law and regulations. The Recipient shall comply with the requirements specified below as part of the Closeout Agreement. Definitions within 2 CFR 200.1, including as supplemented through *I. Definitions* of this award agreement, apply identically to how they do under the Period of Performance, unless otherwise noted.

As specified in the Flow-Down Requirements Programmatic Term and Condition, the Closeout Agreement Programmatic Term and Condition flows down to Subrecipients such that the Recipient must enter into a corresponding Closeout Agreement with any Subrecipient that has Program Income or anticipates generating Post-Closeout Program Income at the end of the Subrecipient's Period of Performance.

## 1. Allowable Activities

The Recipient shall use Post-Closeout Program Income in accordance with the Allowable and Unallowable Activities Programmatic Term and Condition, as applicable.

## 2. Reporting Requirements

After the Closeout Agreement becomes effective, the Recipient shall disclose annual reports publicly, as described in the Performance Reporting Programmatic Term and Condition, rather than meeting the reporting requirements described in the Performance Reporting Programmatic Term and Condition.

## 3. LIDAC Expenditure Requirements

The Recipient shall expend 40% of Post-Closeout Program Income for the purposes of providing Financial Assistance in Low-Income and Disadvantaged Communities and comply with this requirement in accordance with the LIDAC Expenditure Requirement Programmatic Term and Condition, as applicable. Funds used for the purposes of providing Financial Assistance may include Financial Assistance to Qualified Projects; Predevelopment Activities; Market-Building Activities; and Program Administration Activities. This requirement applies to the entire award provided to the Recipient but does not "flow down" to each Subrecipient.

## 4. Cash Management Requirements

The Recipient must maintain Post-Closeout Program Income in accordance with the Cash Management Requirements in the Financial Risk Management Requirements Programmatic Term and Condition, as applicable. However, the Recipient may submit a Cash Management Policy for review and approval by the EPA Project Officer, which can authorize the Recipient to deviate from the aforementioned Cash Management Requirements.

### 5. Financial Health Metrics

After the Closeout Agreement becomes effective, the Recipient agrees to report financial health metrics in accordance with the Financial Health Metrics in the Financial Risk Management Requirements Programmatic Term and Condition (on behalf of the Recipient as well as any Financial Assistance Subrecipient that has received in excess of $10,000,000 in NCIF subgrants) publicly, rather than disclosing the metrics to EPA, as applicable. The requirement for submission of financial health metrics is not applicable for any fiscal year in which the reporting entity did not meet the requirements of 2 CFR Subpart F—Audit Requirements. The Recipient agrees to add the following two financial health metrics as part of the financial health metrics for the Closeout Period:

> 1. Self-Sufficiency Ratio: The self-sufficiency ratio is defined as earned revenue divided by operating expenses, where earned revenue is equal to the value of all income earned from normal business transactions and operating expenses is equal to the value of all expenses incurred as a part of normal business operations over the prior 12-month period, not including interest, financing, depreciation, amortization, and loan loss provision expense.

> 2. Operating Cash Ratio: The operating cash ratio is defined as cash and cash equivalents divided by operating expenses, where cash and cash equivalents is equal to the total value of all cash and cash equivalent items that can be converted into cash immediately and operating expenses is equal to the value of all expenses incurred as a part of normal business operations over the prior 12-month period, not including interest, financing, depreciation, amortization, and loan loss provision expense.

### 6. Conflicts of Interest

The Recipient agrees to comply with the conflict of interest requirements described in the Conflicts of Interest Programmatic Term and Condition through September 30, 2031.

### 7. Remedies for Non-Compliance

The Recipient agrees to identical remedies for non-compliance that are specified in the Remedies for Non-Compliance Programmatic Term and Condition, as applicable. During the Closeout Period, the workplan and budget submitted for the Period of Performance are no longer applicable.

### 8. Suspension and Debarment

The Recipient agrees to ensure that Post-Closeout Program Income is not transferred to entities that are currently suspended, debarred, or otherwise declared ineligible under 2 CFR Part 180. The Recipient can maintain compliance with this requirement through either (1) checking the System for Award Management (for Subrecipients, Contractors, or Program Beneficiaries) or (2) obtaining eligibility certifications from counterparties (for Program Beneficiaries). The Recipient may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM to determine whether an entity is

presently excluded or disqualified.

## 9. Non-Discrimination

The Recipient must use Post-Closeout Program Income in compliance with EPA regulations at 40 CFR Part 7 regarding non-discrimination in EPA-funded programs, as applicable.

**Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, The Age Discrimination Act of 1975.** The Recipient agrees to comply with these laws, prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency" in 40 CFR Part 5 and 40 CFR Part 7, the Recipient agrees, and will require all Subrecipients to agree, not to discriminate on the basis of race, color, national origin, sex, disability or age.

**Executive Order 11246 Part III of Executive Order No. 11246 (September 24, 1965) as amended prohibits discrimination in Federally assisted construction activities.** As provided in section 301 of the Executive Order, the Recipient will ensure that Subrecipients include the seven clauses specified in section 202 of the Order in all construction contracts. Section 302 defines "Construction contract" as "any contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to Real Property." Contracts less than $10,000 are exempt from the requirements of the Order.

## 10. Record-Keeping

In accordance with 2 CFR 200.334(e), the Recipient shall maintain appropriate records to document compliance with the requirements of the Closeout Agreement (i.e., records relating to the use of Post-Closeout Program Income) for a three-year period following the end of the Closeout Agreement, unless one of the conditions specified in the regulation applies. Note that this requirement applies if and when the Closeout Agreement is terminated, in accordance *with Item 14. Termination of the Closeout Agreement*. EPA may obtain access to these records to verify that Post-Closeout Program Income has been used in accordance with the terms and conditions of this Closeout Agreement. Records and documents relating solely to performing the grant agreement prior to closeout may be disposed of in accordance with 2 CFR 200.334.

Additionally, the Recipient must maintain adequate accounting records for how Post-Closeout Program Income is managed and spent as well as all other appropriate records and documents related to the activities conducted using Program Income.

The Recipient agrees to ensure that Subrecipients comply with Federal Funding Accountability and Transparency Act (FFATA) reporting requirements. The Recipient may use the terms of its Subaward Agreements or other effective means to meet its responsibilities.

## 11. Other Federal Requirements

The following other federal requirements apply to the use of Post-Closeout Program Income under the Closeout Period to the same extent they do under the terms of the Performance Period:

- Davis-Bacon and Related Acts, as specified in the Labor and Equitable Workforce Development Requirements Programmatic Term and Condition;
- Build America, Buy America Act, as specified in the Build America, Buy America Act Programmatic Term and Condition; and
- National Historic Preservation Act, as specified in the Historic Preservation Programmatic Term and Condition.

No other federal requirements apply to the use of Post-Closeout Program Income under the terms of this Closeout Agreement, other than those specified in this Closeout Agreement.

## 12. Audit Requirements

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Closeout Period, as activities related to the Federal award referenced in 2 CFR 200.502(a) include activities during the Closeout Period.

Through September 30, 2031, the Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## 13. Amendments to the Closeout Agreement

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Closeout Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

## 14. Termination of the Closeout Agreement

The Closeout Agreement terminates when either of the following situations occur: (1) the Recipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Recipient and the EPA Award Official or Grants Management Officer mutually agree to terminate the Closeout Agreement, with the Recipient remitting current and future Post-Closeout Program Income to the federal government.

The ability to terminate the Closeout Agreement flows down to Subrecipients, as a Closeout Agreement between the Recipient and Subrecipient terminates when either (1) the Subrecipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Subrecipient and the Recipient mutually agree to terminate the Closeout Agreement, with the Subrecipient remitting current and future Post-Closeout Program Income to the Recipient.

The de minimis amount must be agreed-upon in writing by the Recipient and the Director of the Office of the Greenhouse Gas Reduction Fund (or equivalent), prior to the Recipient using the "de minimis" criteria to terminate the Closeout Agreement.

## 15. Points of Contact

The points of contact for the Closeout Agreement are the EPA Project Officer (for the EPA) and the Authorized Representative on the EPA Key Contacts Form most recently submitted to the EPA Project Officer (for the Recipient). If changes are made to these points of contact, the respective party must notify the other within 30 calendar days of the planned change.

## W. Legal Counsel

The Recipient agrees to appoint appropriate legal counsel if counsel is not already available.

## X. Accounting Principles

The Recipient must account for all award funds in accordance with Generally Accepted Accounting Principles (GAAP) as in effect in the United States.

The Recipient must segregate and account for the award funds separately from all other program and business accounts. Additionally, the Recipient must segregate and account for Program Income separately from all other program and business accounts.

## Y. Internal Controls

The Recipient must comply with standards for internal controls described at 2 CFR 200.303. The "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States referenced in § 200.303 are available online at https://www.gao.gov/assets/gao-14-704g.pdf

## Z. Audits

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Period of Performance, as described in the Audit Requirements General Term and Condition. Additionally, in accordance with 2 CFR 200.332 and 2 CFR 200.501(i), the Recipient agrees to disclose directly to the EPA Project Officer audited financial statements from any for-profit Subrecipient that expends $1,000,000 or more of EPA funds from the Recipient's grant program in the Subrecipient's fiscal year. Any for-profit Subrecipient that must disclose such financial statements is required to select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.). The Subrecipient must submit the audit to the Recipient within 9 months of the end of the Recipient's fiscal year or 30 days after receiving the report from an independent auditor, whichever is earlier.

The Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## AA. EPA Project Officer Oversight and Monitoring

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that specific conditions are necessary to ensure that the National Clean Investment Fund program is effectively carried out by Eligible Recipients that have not previously managed grants with the

same scale and complexity of this agreement. These specific conditions will remain in effect throughout the Period of Performance unless the EPA Award Official determines, based on a request by the Recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer or Division Director of the National Clean Investment fund, will oversee and monitor the grant agreement through activities, if determined necessary, including:

1. Upon request, requiring the Recipient to participate in an annual workshop (i.e., one workshop per calendar year) with other Recipients under the National Clean Investment Fund and/or Clean Communities Investment Accelerator; the EPA Project Officer will contact the Recipient to finalize details for each annual workshop.

2. Participating in project activities, to the extent permissible under EPA policies, such as: consultation on effective methods of carrying out the workplan, provided the Recipient makes the final decision on how to perform authorized activities; coordination by EPA staff with other Recipients under the Greenhouse Gas Reduction Fund and with other EPA programs; and coordination by EPA staff with other federal programs to avoid duplication of effort;

3. Closely monitoring the Recipient's management and oversight of Subrecipients and procedures for ensuring that Program Beneficiaries adhere to program participation guidelines;

4. Closely monitoring the Recipient's performance to verify compliance with the workplan in effect under this Assistance Agreement and achievement of environmental results;

5. Participating in periodic telephone conference calls with Recipient personnel to discuss project successes and challenges as well as similar items impacting program performance;

6. Reviewing and commenting on performance reports prepared under the Award Agreement. Note that the final decision on the content of performance reports rests with the Recipient;

7. Verifying that the Recipient is expending the award on allowable activities, including but not limited to reviewing a sample of Financial Assistance transactions to verify compliance with regulatory requirements and the terms and conditions of the Award Agreement; and

8. Periodically reviewing costs incurred by the Recipient as well as its contractors and Subrecipients if needed to ensure appropriate expenditure of grant funds. Note that Recipients are not required to submit documentation of costs incurred before obtaining payments of grant funds.

Subject to approval by the EPA Award Official, the EPA Project Officer and the Recipient may mutually agree to additional areas of oversight and monitoring.

*Method for Reconsideration.* If the Recipient believes that one or more of these specific conditions are not warranted or requires modification, the Recipient must file a written objection naming the specific condition(s) within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The Recipient must submit the written objection via email to the Award Official, Grant Specialist, and Project Officer identified in the Notice of Award.

## AB. Compliant URL Links

The EPA may elect to develop informational materials to publicize the key characteristics of the Recipient's GGRF award. These materials may include links to Recipient and/or Subrecipients' websites. The Recipient agrees to work with the EPA Project Officer or another member of GGRF program staff to ensure any such links are compliant with pertinent EPA and government-wide standards.

## AC. Conflicts of Interest

The Recipient must comply with requirements on transfers of funds that create actual and potential conflicts of interest, as specified in this term and condition. Transfers of funds include Subawards, Contracts (including but not limited to Acquisitions of Intangible Property), and Participant Support Costs. The definitions in the EPA's Financial Assistance Conflict of Interest Policy (COI Policy) apply to this term and condition.

There are three categories of transfers of funds, with the requirements differing by each category (as specified in this term and condition):

**1. Transfers with Affiliated Entities:** Subawards, Contracts, and Participant Support Costs to Affiliated Entities or co-invested in projects with Affiliated Entities. An Affiliated Entity is any entity that is related to the Recipient in accordance with the indicia of control described in 2 CFR 180.905.

**2. Financial Assistance to Qualified Projects:** Subawards, Contracts (in the form of Acquisitions of Intangible Property), and Participant Support Costs as forms of Financial Assistance to Qualified Projects, unless such transfers are with Affiliated Entities. These transfers are not within the scope of the COI Policy, which states that "subawards in the form of loans, loan guarantees, interest subsidies and principal forgiveness, purchases of insurance or similar transactions entered into with borrowers by recipients of revolving loan fund capitalization grants or other EPA financial assistance agreements where Agency funds may be used for lending activities."

**3. Subgrants and Contracts:** Subgrants and Contracts (other than Acquisitions of Intangible Property), unless such transfers are with Affiliated Entities.

Note that all Contracts (including Acquisitions of Intangible Property) must also comply with the conflict of interest standards in 2 CFR 200.318(c).

## 1. Transfers with Affiliated Entities

### Prior Approval of COI Mitigation Plan

The Recipient must not transfer funds with Affiliated Entities unless those transfers have been included in an EPA-approved COI Mitigation Plan on Transfers of Funds with Affiliated Entities. The Recipient agrees to seek prior EPA approval for changes to the COI Mitigation Plan on Transfers of Funds with Affiliated Entities.

### Quarterly Disclosure Requirement

The Recipient agrees to disclose, on a quarterly basis, a list of newly originated transfers of funds with Affiliated Entities that are within the scope of its EPA-approved COI Mitigation Plan on Transfers of

Funds with Affiliated Entities. Each quarterly disclosure must include (1) a list of such transfers of funds made over the quarter and (2) steps taken to taken to eliminate, neutralize or mitigate any conflicts of interest, in accordance with the EPA-approved COI Mitigation Plan on Transfers of Funds with Affiliated Entities. The Recipient must disclose its own transfers as well as transfers made by Subrecipients.

The quarterly periods for such disclosures are defined as follows: April 1 to June 30; July 1 to September 30; October 1 to December 31; and January 1 to March 31. The Recipient must make the disclosures to the EPA Project Officer within 30 calendar days of the end of the quarterly period.

### Project Officer Review

In accordance with 2 CFR 200.337, the EPA Project Officer may access records relating to a subset of transactions disclosed to review for compliance with the Recipient's EPA-approved COI Mitigation Plan on Transfers of Funds with Affiliated Entities as well as this term and condition. The EPA Project Officer will not approve transfers of funds in advance but rather will review transfers of funds that have already occurred for compliance.

### Waivers and Modifications

EPA agrees that, for transfers of funds with Affiliated Entities, the requirements of this term and condition apply in lieu of the requirements of the Disclosing Conflict of Interest General Term and Condition.

On a case-by-cases basis, the EPA Project Officer may extend the due date for disclosures on transfers of funds with Affiliated Entities. On a case-by-case basis, the EPA Project Officer may waive or modify the disclosure requirements on transfers of funds with Affiliated Entities.

### 2. Financial Assistance to Qualified Projects

### Quarterly Disclosure Requirement

The Recipient agrees to disclose, on a quarterly basis, a list of transfers of funds as Financial Assistance to Qualified Projects with actual and potential conflicts of interest. Each quarterly disclosure must include (1) a list of such transfers of funds made over the quarter and (2) steps taken to taken to eliminate, neutralize or mitigate any conflicts of interest, in accordance with any EPA-approved documents related to eliminating, neutralizing, and mitigating conflicts of interest. The Recipient must disclose its own transfers as well as transfers made by Subrecipients.

The quarterly periods for such disclosures are defined as follows:  April 1 to June 30; July 1 to September 30; October 1 to December 31; and January 1 to March 31. The Recipient must make the disclosures to the EPA Project Officer within 30 calendar days of the end of the quarterly period.

### Project Officer Review

In accordance with 2 CFR 200.337, the EPA Project Officer may access records relating to a subset of transactions disclosed to review for compliance with the Recipient's EPA-approved documents related to eliminating, neutralizing, and mitigating conflicts of interest as well as this term and condition. The EPA Project Officer will not approve transfers of funds in advance but rather will review transfers of funds that have already occurred for compliance.

## Waivers and Modifications

On a case-by-cases basis, the EPA Project Officer may extend the due date for disclosures on transfers of funds as Financial Assistance to Qualified Projects. On a case-by-case basis, the EPA Project Officer may waive or modify the disclosure requirements on transfers of funds as Financial Assistance to Qualified Projects.

## 3. Subgrants and Contracts

The Recipient agrees to comply with the Disclosing Conflict of Interest General Term and Condition for Subgrants and Contracts (excluding Acquisitions of Intangible Property), unless such transfers are with Affiliated Entities. If such transfers are with Affiliated Entities, then the Recipient is required to include them in the process specified in *1. Transfers with Affiliated Entities*.

## AD. Prior Approvals

EPA will only have authority to review and approve revisions to the Recipient's workplan in effect under this Assistance Agreement, budget, and other documents if authorized by 2 CFR 200.308 or 2 CFR 200.208. The Recipient must contact the EPA Project Officer when the EPA has prior approval authority specified below. Approval will not be unreasonably withheld. Denial of a request for prior approval will be provided in writing, with an explanation of the rationale.

## Workplan

For the purposes of this Award Agreement, EPA interprets 2 CFR 200.308(c)(1) to enable the Recipient to revise the activities specified in its workplan in effect under this Assistance Agreement without prior EPA approval, provided the activities still comply with the terms and conditions of the Award Agreement. The allowable and allocable grant costs are narrowly defined, pursuant to the terms and conditions of the Award Agreement; in accordance with 2 CFR 200.308(c)(1), any changes to the workplan in effect under this Assistance Agreement that comply with the statute as well as the terms and conditions would not be a "change in the scope or objective of the project or program." Therefore, so long as the Recipient is updating its workplan in effect under this Assistance Agreement with the revised activities in accordance with the terms and conditions of the Award Agreement, EPA will not require prior approval.

## Budget

For the purposes of this Award Agreement, EPA implements 2 CFR 200.308(i)(2) in accordance with Item 1 of the Transfer of Funds General Term and Condition to enable the Recipient to revise the EPA-approved budget included in its Award Agreement without prior EPA approval, provided the cumulative funding transfers among Object Class Categories (Personnel, Fringe Benefits, Travel, Equipment, Supplies, Contractual, Construction, Other, Indirect) do not exceed 10% of the total budget approved at time of award. Therefore, so long as the Recipient is updating its EPA-approved budget by transferring funds by less than or equal to these amounts, EPA will not require prior approval.

However, notwithstanding the requirements of 2 CFR 200.308(i)(2), if the Recipient seeks to transfer any amount of funds budgeted for Participant Support Costs to other budget categories, then it must seek prior approval pursuant to 2 CFR 200.308(f)(5).

## Transfers of Funds

2 CFR 200.308(f)(6) requires the Recipient to obtain prior agency approval for "Subaward activities not proposed in the application and approved in the Federal award." If the types of activities are described in the workplan in effect under this Assistance Agreement (including types of transfers to be conducted through Subawards, Participant Support Costs, Acquisitions of Intangible Property, and other Contracts as defined in 2 CFR 200.1), then EPA has provided the necessary prior agency approval for the purposes of 2 CFR 200.308(f)(6). Approval for the purposes of this regulation does not mean that such transfers of funds are compliant with the statutes, regulations, and terms and conditions.

<u>Changes in Key Personnel</u>

2 CFR 200.308(f)(2) requires the Recipient to obtain prior agency approval for a "[c]hange in key personnel (including employees and contractors) that are identified by name or position in the Federal Award." If the Recipient is seeking to add or replace a "key person," as defined by members of the board of directors and Senior Management whose roles are specified in the most recently submitted Organizational Plan, then the Recipient must obtain prior EPA approval of the qualifications of the key person.

The Recipient must request prior agency approval for an addition or replacement of a "key person" via email through the EPA Project Officer, who will have 8 calendar days to communicate EPA's disapproval of their qualifications via email, along with an accompanying justification. If 8 calendar days have passed without notification of EPA disapproval of the key person's qualifications pursuant to 2 CFR 200.308(c)(2), the Recipient is authorized to change the "key person." Once the change is effective, the Recipient must submit an updated Organizational Plan to the EPA Project Officer.

## AE. Flow-Down Requirements

As described in 2 CFR 200.101(b)(1), the terms and conditions of Federal awards flow down to Subawards unless a particular section of 2 CFR 200.101 or the terms and conditions of the Federal award specifically indicate otherwise. As required by 2 CFR 200.332(b), the Recipient agrees to ensure that Subrecipients are aware of the requirements that apply to the Subrecipient.

For the purposes of this Award Agreement, all terms and conditions must flow down to Subawards to the extent they are applicable. The EPA Project Officer is authorized to waive the applicability of programmatic terms and conditions to Subawards, unless the term and condition implements statutory, regulatory, or executive order requirements.

## AF. Resolution of Disputes Termination Provision

The Recipient is precluded from drawing down more than 78.46% of the Total Approved Assistance Amount until this condition is removed, which will occur when: a) the EPA Award Official, at the direction of the Grants Competition Disputes Decision Official (GCDDO), provides written confirmation that all administrative disputes under the National Clean Investment Fund and the Clean Communities Investment Accelerator are resolved in accordance with the dispute resolution procedures in Appendix A of the EPA Order 5700: Policy for Competition of Assistance Agreements; or b) the administrative disputes are withdrawn, abandoned or dismissed; or c) December 31, 2024, whichever is sooner.

If EPA does need to alter the Selection Official's selection and partial funding decisions for this agreement based on a GCDDO determination the EPA Award Official will partially terminate this assistance agreement, de-obligate a portion of the funds that have been obligated and use the de-

obligated funds to satisfy the terms of a GCDDO remedy benefiting another entity. The Recipient will then provide an updated workplan and budget information, as needed, to amend the agreement.

For the purposes of this term and condition, EPA's partial termination may apply not just to obligated funds that have not been drawn down from ASAP but also to Program Income that has been generated and retained by the Recipient under 2 CFR 1500.8(d) and the Program Income Programmatic Term and Condition of this agreement. In accordance with 2 CFR 200.307(e)(1), EPA may require that the amount of funds committed by EPA to the Recipient be reduced by all or some of the Program Income that has been generated by the Recipient.

## AG. Deposit Account at Financial Agent

A depository institution has been designated as a financial agent of the United States (the Financial Agent) for the Greenhouse Gas Reduction Fund. The Recipient is required to set up and utilize an Account or Accounts at the Financial Agent in accordance with the Financial Agent Terms and Conditions (Section V) included in this Assistance Agreement.

## AH. Interim SF-425 Requirement

The Recipient must submit an SF-425 within 30 calendar days of receiving access to an Account or Accounts at the Financial Agent, with the SF-425 covering all activities supported by funds drawn from ASAP and disbursed for actual and allowable costs, other than funds disbursed into the Account or Accounts at the Financial Agent.

## AI. Amendments to Award Agreement

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Award Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

## AJ. Preservation of Guidance and Data

Any statutes, regulations, agency documents, policies, and guidance (including FAQs and EPA's Implementation Framework for the Greenhouse Gas Reduction Fund), or executive orders referenced herein are incorporated by reference into the Award Agreement as of the effective date of this amended Award Agreement. These incorporated documents will be controlling on Recipient and Subrecipients in the event such documents are deleted, repealed, rescinded, or replaced unless a statute provides otherwise. This includes, but is not limited to, the Uniform Administrative Requirements, Cost Principles and Audit Requirements for Federal Awards; Title 2 CFR Part 200 effective October 1, 2024, and the EPA General Terms and Conditions effective October 1, 2024.

This provision cannot be changed without the consent of the Recipient.

## IV. ADMINISTRATIVE TERMS AND CONDITIONS

Please refer to Page 4, "Administrative Conditions."

## V. FINANCIAL AGENT TERMS AND CONDITIONS

### A. Revisions to Award Agreement to Account for Financial Agent Arrangement

Because a depository institution has been designated as a financial agent of the United States (the Financial Agent) for the Greenhouse Gas Reduction Fund, the following revisions to the Award Agreement are effective without further action or notice required by the Recipient or EPA.

### 1. Revisions to Section I. Definitions

*The following new definition will be added to the Award Agreement:*

**Capitalization by Nonexchange Capital Contribution:** Capitalization by Nonexchange Capital Contribution means award funds that (1) the Recipient draws down from the Automated Standard Application Payments (ASAP) system and (2) disburses into the 'Budget Account' as defined under the Deposit Account at Financial Agent Programmatic Term and Condition to capitalize itself for subsequent use for any of the following Allowable Activities: Financial Assistance to Qualified Projects; Predevelopment Activities; Market-Building Activities; and Program Administration Activities.  Under this two-step transaction, which involves both a drawdown and disbursement, the Recipient's drawdown from ASAP is deemed (a) an advance payment of Federal funds in accordance with 2 CFR 200.305(b)(1); while the disbursement into the Deposit Account at Financial Agent is deemed (b) an allowable cost to be charged to the EPA award, and (c) a "nonexchange transaction", consistent with the definition of this term in the Statement of Federal Financial Accounting Standards No. 5. The full amount of the Capitalization by Nonexchange Capital Contribution must be recognized, reported, and accounted for as Program Income in accordance with the Program Income Programmatic Term and Condition once clauses (a) and (b) are fulfilled. Any Subrecipient with a Deposit Account at Financial Agent will be entitled to receive its payments from Recipient as a Capitalization by Nonexchange Capital Contribution.

*The definition of Program Income under the Award Agreement will be amended and replaced with:*

**Program Income:** 2 CFR 200.1 defines Program Income as "gross income earned by the non-Federal entity that is directly generated by a supported activity or earned as a result of the Federal award during the period of performance except as provided in § 200.307(f)." 2 CFR 200.1 notes that Program Income "includes but is not limited to income from fees for services performed, the use or rental or real or personal property acquired under Federal awards, the sale of commodities or items fabricated under a Federal award, license fees and royalties on patents and copyrights, and principal and interest on loans made with Federal award funds." For this program, there are two types of Program Income: (1) "Program Income from Operations" and (2) "Program Income from Capitalization by Nonexchange Capital Contribution".

Program Income from Operations includes but is not limited to income from origination fees, servicing fees, and asset management fees; dividends from equity investments; revenue from asset sales; release of grant funds previously used as Financial Assistance (such as through loan guarantees, loan loss reserves, or similar transactions); interest and other earnings on disbursements of grant funds that have not been transferred to third parties; and funds raised with costs charged against the grant award (such as private debt, philanthropic contributions, and other funds raised). Under this award agreement, the Recipient is authorized to deduct the cost of generating Program Income from Operations under 2 CFR

200.307(b) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of Program Income from Operations include origination, servicing, and management costs that are not charged as direct costs to the Federal award. Costs of generating Program Income from Operations can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the Program Income from Operations, provided the Recipient can account for the actual costs incurred. Program Income from Operations requirements flow down to Subrecipients but not to Contractors or Program Beneficiaries. Program Income from Operations can be earned prior to the availability of the 'Program Income from Operations' account as defined under the Deposit Account at Financial Agent Programmatic Term and Condition.

Program Income from Capitalization by Nonexchange Capital Contribution means award funds from the ASAP system that the Recipient draws down and immediately deposits into the 'Budget Account' at the Financial Agent in accordance with (a) the definition of Capitalization by Nonexchange Capital Contribution and (b) the Deposit Account at Financial Agent Programmatic Term and Condition. Program Income from Capitalization by Nonexchange Capital Contribution cannot be earned prior to the availability of the 'Budget Account' as defined under the Deposit Account at Financial Agent Programmatic Term and Condition.

Both forms of Program Income under this program must be treated in accordance with the Program Income Programmatic Term and Condition. EPA-specific rules on Program Income are provided at 2 CFR 1500.8, and rules on allowable fund raising costs are provided under 2 CFR 200.442 (with additional details in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients). Program Income requirements flow down to Subrecipients but not to Contractors or Program Beneficiaries.

## 2. Revisions to Section II. National Programmatic Terms and Conditions

*The **Program Income Programmatic Term and Condition** will be amended and replaced with:*

### Program Income

In accordance with Clean Air Act Section 134(b)(1)(C) as well as 2 CFR 200.307(e)(2) and 2 CFR 1500.8 (b), the Recipient must retain Program Income earned during the Period of Performance. Program Income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the Assistance Agreement and beyond the Period of Performance based on a Closeout Agreement.

In any period of time before such a Closeout Agreement is effective but after the Recipient has fully used the award for allowable activities, the Recipient is authorized to use Program Income under the terms and conditions of the Assistance Agreement, as opposed to the terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition. The terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition will supplant the terms and conditions of the Assistance Agreement once the Closeout Agreement becomes effective.

In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, under ordinary circumstances, the Recipient may only use Program Income from Operations once the initial award funds are fully used for allowable activities or the Period of Performance ends for a different reason. However, Program Income from Operations may be used by

the Recipient in advance of the initial award funds (i.e. Program Income from Capitalization by Nonexchange Capital Contribution) being fully used where reasonable and necessary to execute the activities in the workplan in effect under this Assistance Agreement.

## 3. Revisions to Section III. Additional Programmatic Terms and Conditions

*The Allowable and Unallowable Activities Programmatic Term and Condition will be amended and replaced with:*

## Allowable and Unallowable Activities

The Recipient agrees to only use the award to support the following allowable activities: Capitalization by Nonexchange Capital Contribution; Financial Assistance to Qualified Projects; Predevelopment Activities; Market-Building Activities; and Program Administration Activities. The Recipient must use awards funds exclusively for allowable activities within the ten EPA regions, with the exception of the Freely Associated States. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500.

Capitalization by Nonexchange Capital Contribution generates Program Income for the Recipient in an amount equal to the available EPA award balance drawn down from ASAP into the 'Budget Account' as defined under the Deposit Account at Financial Agent Programmatic Term and Condition. Program Income from Capitalization by Nonexchange Capital Contribution must be expended on Financial Assistance to Qualified Projects, Predevelopment Activities, Market-Building Activities, and Program Administration activities in accordance with the workplan in effect under this Assistance Agreement.

The Recipient agrees to not use the award for the following unallowable activities: (a) Financial Assistance to Qualified Projects in the form of Subgrants; (b) Subgrants for the purposes of providing Financial Assistance to Qualified Projects (other than Subgrants from the Recipient to first-tier Subrecipients); (c) activities that support deployment of projects that do not meet the definition of Qualified Projects; and (d) activities that support deployment of projects outside the boundaries of the ten EPA regions. The allowability of legal costs incurred in connection with the award shall be governed by applicable provisions of 2 CFR Part 200, Subpart E, including but not limited to 2 CFR 200.403, 2 CFR 200.435, 2 CFR 200.441 and 2 CFR 200.459.

*The Deposit Account at Financial Agent Programmatic Term and Condition will be amended and replaced with:*

## Deposit Account at Financial Agent

The Recipient will open a Deposit Account at a depository institution that has been designated as a financial agent of the United States (the Financial Agent). Such account will be used as Recipient's operating account for the award.  Upon establishment of the Deposit Account, the Recipient will drawdown the entire available EPA award balance from ASAP and disburse it into the Deposit Account, where it must be maintained until the Closeout Agreement goes into effect in accordance with the Closeout Agreement Programmatic Term and Condition. Note, this requirement applies to any and all drawdowns from ASAP by the Recipient while the Deposit Account is available and accessible. Once the Closeout Agreement goes into effect, the Recipient will be entitled to transfer any remaining funds in the Deposit Account to an account at a financial institution of its choosing, provided such account is insured in accordance with 2 CFR 200.305(b)(10)).

The Recipient will grant EPA a perfected security interest in all funds held in the Deposit Account. The Recipient will take all such actions, enter into all such agreements, and execute and deliver all such documentation as may be necessary and/or as directed by EPA from time to time to establish and maintain such security interest, including but not necessarily limited to entering into an account control agreement (ACA) with the Financial Agent and EPA.

Notwithstanding any other provision of this Assistance Agreement, EPA will only furnish the Financial Agent with a Notice of Exclusive Control under an ACA when EPA issues a written determination and finding that the Recipient has failed to comply with the terms and conditions of this Assistance Agreement, and that noncompliance is substantial such that effective performance of the Assistance Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse or material misrepresentation of eligibility status, and that EPA has initiated action under 2 CFR 200.339 to wholly or partly suspend or terminate the Federal award, as authorized in the terms of the Assistance Agreement. The written determination and finding and a copy of the Notice of Exclusive Control shall be sent to the Recipient when the Notice of Exclusive Control is furnished to the Financial Agent. EPA and Recipient have mutually agreed only to the specific process outlined in this term for furnishing a Notice of Exclusive Control instruction to the Financial Agent.

Note, funds in the Deposit Account that were legally obligated by the Recipient for financial obligations, as defined under 2 CFR 200.1, prior to the issuance of, but not in anticipation of, a Notice of Exclusive Control constitute "financial obligations which were properly incurred" by the Recipient in accordance with 2 CFR 200.343 and are to remain allowable costs during suspension or after termination of the Recipient's Assistance Agreement. Funds necessary to meet such financial obligations will be disbursed to Program Beneficiaries, Subrecipients, Contractors, or any other third parties which are due payment after a Notice of Exclusive Control is issued.

Note that a financial obligation to a third party for Financial Assistance is deemed "properly incurred" per 2 CFR 200.343 if it is a legally-binding, arms-length agreement where funds are transferred to the 'Reserve Account' in accordance with these terms and conditions. Any Notice of Exclusive Control shall not include any such funds. Funds necessary to meet such financial obligations for Financial Assistance will be disbursed to Program Beneficiaries, Subrecipients, Contractors, or any other third parties which are due payment after a Notice of Exclusive Control over other funds in the Deposit Account is issued.

Funds held in the Recipient's account at the Financial Agent may be invested in accordance with the Cash Management Requirements in the Financial Risk Management Programmatic Term and Condition. The Financial Agent will be compensated in accordance with the terms of a valid Financial Agency Agreement (FAA).

The Deposit Account will consist of three distinct account types ('Budget,' 'Reserve', and 'Program Income from Operations'), each of which serves a distinct purpose (while the exact naming convention and structure of these accounts may differ from the below, the accounts must perform a substantively similar function). The Recipient is required to utilize the accounts at the Financial Agent for their intended purpose during any period in which the accounts are available and accessible, with exceptions to this requirement permitted by the EPA Project Officer only on a case-by-case basis, to the extent such exceptions are necessary to execute against the workplan in effect under this Assistance Agreement.

## 1. Budget Account

This account within the Deposit Account will hold funds that have yet to be used for any of the following

allowable activities: Financial Assistance to Qualified Projects; Predevelopment Activities; Market-Building Activities; and Program Administration Activities. It will hold funds within a number of sub-accounts that correspond to more specific allowable expenditures under the particular type of award or subaward.

**Transferring Funds Into the Budget Account.** Upon establishment of the Deposit Account, the Recipient will drawdown the entire available EPA award balance from ASAP directly into the Budget Account. The Recipient will direct the Financial Agent to allocate funds across the various sub-accounts in the Budget Account in accordance with its workplan in effect under this Assistance Agreement. Recipient need not submit a certification notice to transfer funds within the Budget Account, but remains subject to the Transfer of Funds EPA General Term and Condition and any associated pre-approval or notification requirements therein.

**Transferring Funds Out of the Budget Account.** When transferring award funds out of the Budget Account to provide Financial Assistance to Qualified Projects, Recipient must provide the EPA Project Officer with a certification notice from the Recipient's chief executive officer (or equivalent), chief financial officer (or equivalent), chief reporting officer (or equivalent), or chief compliance officer (or equivalent) that the amount of the payment is necessary to execute against the workplan in effect under this Assistance Agreement and that financing agreements for identified Qualified Projects necessitating the payment have been reviewed by the Recipient's counsel for legal sufficiency, with notice provided to the Financial Agent with the transfer request. The certification notice must include the following language: "This certification is a material representation for the purposes of an EPA Financial Assistance Agreement, and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions." The Recipient must "flow-down" this requirement to Subrecipients, with each Subrecipient required to provide a substantively similar certification notice to Recipient when transferring subaward funds out of the Budget Account to provide Financial Assistance to Qualified Projects, with notice provided to the Financial Agent with the transfer request. In accordance with 2 CFR 200.337, the Recipient must make those certifications available to the EPA, upon request.

While transfers out of the Budget Account are not formally subject to any of the requirements established in either the EPA General Term and Condition on Automated Standard Application Payments (ASAP) and Proper Payment Draw Down or the Interim Drawdown Procedures Programmatic Term and Condition, Recipient agrees to the following requirements:

a) When the need for a longer disbursement window is known in advance of the transfer, Recipient must notify the EPA Project Officer prior to executing the transfer and follow-up to inform the EPA Project Officer of the amount of the transfer that has been disbursed for an Allowable Activity in 5, 10, and 14 business days. Recipient must return any undisbursed amounts to the Deposit Account at the Financial Agent on the 15th business day, or

b) When the need for a longer disbursement window is not known in advance of the transfer, Recipient must notify the EPA Project Officer of the delay no later than 5 business days after the transfer and follow-up to inform the EPA Project Officer of the amount of the transfer that has been disbursed for an Allowable Activity in 10 and 14 business days. Recipient must return any undisbursed amounts to the Deposit Account at the Financial Agent on the 15th business day.

Recipients must obtain prior written approval from the EPA Project Officer (who will in turn notify the EPA Award Official) for any transfers that will not be disbursed for an Allowable Activity within 15 business

days.

These requirements "flow down" to Subrecipients, who agree to provide the same notifications to and seek prior approval from Recipients where applicable.

## 2. Reserve Account

This account within the Deposit Account is intended to enable funds to be set-aside within the Financial Agent for use for any form of Financial Assistance that requires the Recipient to pledge or legally commit award funds for a future expenditure to a third party to meet a legal obligation.

**Transferring Funds Into the Reserve Account.** The Recipient may only transfer award funds into the Reserve Account for grant performance purposes if the Recipient's chief executive officer (or equivalent), chief financial officer (or equivalent), chief reporting officer (or equivalent), or chief compliance officer (or equivalent) certify to the EPA Project Officer, with notice provided to the Financial Agent with the transfer request, that the amount of the expenditure is necessary to execute against the workplan in effect under this Assistance Agreement, and that financing agreements for identified qualified projects necessitating the expenditure have been reviewed by Recipient's counsel for legal sufficiency. The certification notice must include the following language: "This certification is a material representation for the purposes of an EPA financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions." The Recipient must "flow-down" this requirement to Subrecipients, with each Subrecipient required to provide a substantively similar certification notice to Recipient when transferring subaward funds into the Reserve Account, with notice provided to the Financial Agent with the transfer request. In accordance with 2 CFR 200.337, the Recipient must make those certifications available to the EPA, upon request.

**Transferring Funds Out of the Reserve Account.**

## a. To Third Parties to Meet Legal Obligations

Funds in the Reserve Account may not be disbursed to Program Beneficiaries, Subrecipients, Contractors, or any other third parties, unless the funds are necessary for the Recipient to satisfy a legal obligation. The Recipient may only transfer award funds out of the Reserve Account to meet legal obligations to such parties if the recipient's chief executive officer (or equivalent), chief financial officer (or equivalent), chief reporting officer (or equivalent), or chief compliance officer (or equivalent) certify to the EPA Project Officer, with notice provided to the Financial Agent with the transfer request, that the amount of the expenditure is necessary to pay a third party pursuant to a financing agreement that has been reviewed by recipient's counsel for legal sufficiency. The certification notice must include the following language: "This certification is a material representation for the purposes of an EPA financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions." The Recipient must "flow-down" this requirement to Subrecipients, with each Subrecipient required to provide a substantively similar certification notice to Recipient when transferring subaward funds out of the Reserve Account to meet legal obligations to third parties, with notice provided to the Financial Agent with the transfer request. In accordance with 2 CFR 200.337, the Recipient must make those certifications available to the EPA, upon request.

While transfers out of the Reserve Account are not formally subject to any of the requirements established in either the EPA General Term and Condition on Automated Standard Application Payments

(ASAP) and Proper Payment Draw Down or the Interim Drawdown Procedures Programmatic Term and Condition, Recipient agrees to the following requirements:

> a) When the need for a longer disbursement window is known in advance of the transfer, Recipient must notify the EPA Project Officer prior to executing the transfer and follow-up to inform the EPA Project Officer of the amount of the transfer that has been disbursed for an Allowable Activity in 5, 10, and 14 business days. Recipient must return any undisbursed amounts to the Deposit Account at the Financial Agent on the 15th business day, or

> b) When the need for a longer disbursement window is not known in advance of the transfer, Recipient must notify the EPA Project Officer of the delay no later than 5 business days after the transfer and follow-up to inform the EPA Project Officer of the amount of the transfer that has been disbursed for an Allowable Activity in 10 and 14 business days. Recipient must return any undisbursed amounts to the Deposit Account at the Financial Agent on the 15th business day.

Recipients must obtain prior written approval from the EPA Project Officer (who will in turn notify the EPA Award Official) for any transfers that will not be disbursed for an Allowable Activity within 15 business days.

These requirements "flow down" to Subrecipients, who agree to provide the same notifications to and seek prior approval from Recipients where applicable.

## b. To Program Income from Operations Account

When funds in the Reserve Account are no longer necessary to meet prudent capital management practices consistent with the Recipient's overall risk portfolio and a potential legal obligation to a third party pursuant to a financing agreement, the Recipient may transfer such funds to the Program Income from Operations Account. Recipient need not submit a certification notice to effectuate such a transfer.

## 3. Program Income from Operations Account

This account within the Deposit Account will enable Program Income from Operations (as defined under the definition of Program Income) to be held, tracked, and segregated in accordance with the Accounting Principles Programmatic Term and Condition.

**Transferring Funds Into the Program Income from Operations Account.** When Recipient earns Program Income from Operations, it must deposit such funds into the Program Income from Operations Account. Recipient need not submit a certification notice to effectuate such a transfer. When Financial Agent generates interest income on behalf of Recipient by investing Recipient liquidity in accordance with the Cash Management Requirements under the Financial Risk Management Requirements Programmatic Term and Condition, it must deposit such income into the Program Income from Operations Account in accordance with the terms of the FAA. Such interest income is considered additional Program Income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12).

**Transferring Funds Out of the Program Income from Operations Account.** Funds in this account may be transferred to either the Budget Account or Reserve Account to be used for grant performance purposes in accordance with the Program Income Programmatic Term and Condition. Recipient need not submit a certification notice to effectuate such a transfer.

**Flow-Down Requirements of Deposit Account at Financial Agent**. EPA may elect to extend the requirements under this term and condition to any and all Financial Assistance Subrecipients of the Recipient at EPA's sole discretion, including but not limited to Recipient establishing and maintaining a security interest on all award funds held by its Financial Assistance Subrecipients at the Financial Agent.

5G - 84094001 - 2    Page 1

| **U.S. ENVIRONMENTAL PROTECTION AGENCY** **Assistance Amendment** | | **GRANT NUMBER (FAIN):** 84094001 **MODIFICATION NUMBER:** 2 **PROGRAM CODE:** 5G | **DATE OF AWARD** 01/16/2025 |
|---|---|---|---|
| | | **TYPE OF ACTION** No Cost Amendment | **MAILING DATE** 01/16/2025 |
| | | **PAYMENT METHOD:** ASAP | **ACH#** |

| **RECIPIENT TYPE:** Not for Profit | **Send Payment Request to:** Contact EPA RTPFC at: ▉ |
|---|---|
| **RECIPIENT:** | **PAYEE:** |
| Climate United Fund 7550 WISCONSIN AVE FI 8 BETHESDA, MD 20814-3559 EIN: ▉ | Stephanie Horner 7550 WISCONSIN AVE 3rd Floor BETHESDA, MD 20814-3559 |

| **PROJECT MANAGER** | **EPA PROJECT OFFICER** | **EPA GRANT SPECIALIST** |
|---|---|---|
| Elizabeth Bafford 7550 Wisconsin Ave 3rd Floor Bethesda, MD 20814 Email: ▉ Phone: ▉ | Michelle Tucker 1200 Pennsylvania Ave, NW, 19-H16 Washington, DC 20460 Email: ▉ Phone: ▉ | Walker Oneil OGD- GMBOD, 3093R 1200 Pennsylvania Ave, NW Washington, DC 20460-0001 Email: ▉ Phone: ▉ |

**PROJECT TITLE AND EXPLANATION OF CHANGES**

GGRF NCIF: Climate United

This agreement provides funding under the Inflation Reduction Act (IRA) to Climate United (CU). The recipient will utilize the funding to reduce emissions of greenhouse gases and other air pollutants; deliver benefits of greenhouse gas- and air pollution-reducing projects to American communities, particularly low-income and disadvantaged communities; and mobilize financing and private capital to stimulate additional deployment of greenhouse gas- and air pollution-reducing projects. Specifically, the recipient will endeavor to accomplish this by working with community groups, technical assistance providers, financial institutions, and workforce development entities to reduce the barriers and limit the inefficiencies that have prevented broad adoption and financing of clean technologies. To ensure clean energy acceleration and market transformation beyond the National Clean Investment Fund (NCIF), Climate United will integrate this capital resource into existing lending products and processes so that all lenders, (i.e., beyond just the community, green and nonprofit sectors) learn to address decarbonization in their routine lending practices. Greening existing lending with NCIF support will have the broadest transformative impact on the capital markets nationwide.

This amendment approves the sole-source procurement request, changes to the workplan and detailed budget, and updates to the key contacts.

| **BUDGET PERIOD** 04/01/2024 - 06/30/2029 | **PROJECT PERIOD** 04/01/2024 - 06/30/2029 | **TOTAL BUDGET PERIOD COST** $ 6,970,000,000.00 | **TOTAL PROJECT PERIOD COST** $ 6,970,000,000.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 10/12/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 0.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 6,970,000,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| **ISSUING OFFICE (GRANTS MANAGEMENT OFFICE)** | **AWARD APPROVAL OFFICE** |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| Environmental Protection Agency, Grants Management & Business Operations Division 1200 Pennsylvania Ave, NW Mail code 3903R Washington, DC 20460 | Environmental Protection Agency, OGGRF OA - Office of the Administrator 1200 Pennsylvania Ave, NW Washington, DC 20460 |

| **THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY** | |
|---|---|
| Digital signature applied by EPA Award Official Katherine Tsing-Choy - Associate Award Official | **DATE** 01/16/2025 |

5G - 84094001 - 2    Page 2

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 6,970,000,000 | $ 0 | $ 6,970,000,000 |
| EPA In-Kind Amount | $ 0 | $ 0 | $ 0 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 6,970,000,000 | $ 0 | $ 6,970,000,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.957 - Greenhouse Gas Reduction Fund: National Clean Investment Fund | Clean Air Act: Sec. 134(a)(2) and (3) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

5G - 84094001 - 2    Page 3

Budget Summary Page

| Table A - Object Class Category<br>(Non-Construction) | Total Approved Allowable<br>Budget Period Cost |
|---|---|
| 1. Personnel | $ 84,722,869 |
| 2. Fringe Benefits | $ 31,347,462 |
| 3. Travel | $ 7,181,082 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 1,471,330 |
| 6. Contractual | $ 768,783,830 |
| 7. Construction | $ 0 |
| 8. Other | $ 6,037,162,925 |
| 9. Total Direct Charges | $ 6,930,669,498 |
| 10. Indirect Costs: 15.00 % Base de minimis MTDC | $ 39,330,502 |
| 11. Total (Share: Recipient ___0.00 % Federal __100.00 %) | $ 6,970,000,000 |
| 12. Total Approved Assistance Amount | $ 6,970,000,000 |
| 13. Program Income | $ 315,000,000 |
| 14. Total EPA Amount Awarded This Action | $ 0 |
| 15. Total EPA Amount Awarded To Date | $ 6,970,000,000 |

# Administrative Conditions

All Administrative Conditions Remain the Same.

# Programmatic Conditions

All Programmatic Conditions Remain the Same.

# Exhibit B



**ACCOUNT CONTROL AGREEMENT**

**among**

Climate United Fund**, as PLEDGOR**

United States Environmental Protection Agency**, as SECURED PARTY**

**and**

**CITIBANK, N.A., as BANK**

**Dated as of November 1, 2024**

**THIS ACCOUNT CONTROL AGREEMENT** (this "**Agreement**"), dated as of November 1, 2024, by and among Climate United Fund, a Delaware 501(c)(3) nonstock corporation (the "**Pledgor**"), the United States Environmental Protection Agency, an agency of the United States Government (the "**Secured Party**") and Citibank, N.A., a national banking association organized and existing under the laws of the United States of America ("Citibank") and acting through its Agency & Trust business solely in its capacity as bank under this Agreement, and any successors appointed pursuant to the terms hereof (Citibank in such capacity, the "**Bank**").

**WHEREAS,** the Pledgor and the Secured Party have entered into that certain federal financial assistance agreement, as identified in Addendum 1, (the "**Grant Agreement**") pursuant to which the Pledgor has granted the Secured Party a security interest in the accounts as identified in Addendum 1 established and maintained by the Bank for the Pledgor (the "**Accounts**").

**WHEREAS,** the Bank has been designated and authorized to act as a financial agent of the United States pursuant to the authority of the U.S. Department of the Treasury under 12 U.S.C. §§ 90 and 265.

**WHEREAS,** the parties wish that the Bank enter into this Agreement in order to provide for the "control" (as defined in Section 9-104(a) of the Uniform Commercial Code in effect in the State of New York ("**UCC**"), in the case of a deposit account, or Section 8-106 of the UCC, in the case of a security account) of the accounts as a means to perfect the security interest of the Secured Party.

**WHEREAS,** the Pledgor and the Secured Party have agreed that the terms and conditions entitled "Deposit Account at Financial Agent" in the Grant Agreement indicate the conditions under which the Secured Party may exercise its right of control herein, and such conditions will be defined as "default" for the purposes of this Agreement.

**WHEREAS,** capitalized terms used herein without definition and that are defined in Article 8 or Article 9 of the UCC as adopted in the State of New York shall have the respective meanings set forth herein.

**NOW, THEREFORE,** for good and valuable consideration, the receipt and adequacy of which is hereby irrevocably acknowledged, the parties hereto agree as follows:

1.     **The Accounts.** The Pledgor and the Bank represent and warrant to, and agree with the Secured Party that:

(a)     The Bank maintains the Accounts for the Pledgor, and all property (including, without limitation, all funds and financial assets) held by the Bank for the accounts of the Pledgor are, and will continue to be, credited to the Accounts in accordance with instructions given by the Pledgor (unless otherwise provided herein).

(b)     To the extent that cash is credited to the Accounts, the Accounts are a deposit account; and to the extent that financial assets (other than cash) are credited to the Accounts, the Accounts are a securities account. The Bank is (i) the bank with which the Accounts are maintained and (ii) the securities intermediary with respect to financial assets held in the Accounts. The Pledgor is (A) the Bank's customer with respect to the Accounts and (B) the entitlement holder with respect to all financial assets credited from time to time to the Accounts.

(c)     Notwithstanding any other agreement to the contrary, the Bank's jurisdiction with

respect to the Accounts for purposes of the UCC is, and will continue to be for so long as the Secured Party's security interest shall be in effect, the State of New York.

(d)    The Pledgor and the Bank do not know of any claim to or interest in the Accounts or any property (including, without limitation, funds and financial assets) credited to the Accounts, except for claims and interests of the parties referred to in this Agreement.

**2.    Control over Accounts.**

The Bank shall comply with all instructions, notifications, and entitlement orders the Bank receives directing the disposition of funds and financial assets in the Accounts including, without limitation, directions to distribute proceeds of any such transfer or redemption of interest or dividends on financial assets in the Accounts, substantially in the form attached hereto as Exhibit B ("**Account Direction**"), originated by the Pledgor, until the time that that Bank receives a notice, substantially in the form attached hereto as Exhibit A (a "**Notice of Exclusive Control**") from the Secured Party that the Secured Party is exercising its right to exclusive control over an Account, and after such time that the Bank receives a Notice of Exclusive Control, the Secured Party for such Account, without further consent by the Pledgor.

**3.    Priority of Secured Party's Security Interest.**  The Bank subordinates in favor of the Secured Party any interest, lien or right of setoff it may have, now or in the future, against the Accounts or assets in the Accounts; *provided; however*, that, subject to the foregoing, the Bank may set off all amounts due to it in respect of its fees and expenses (including, without limitation, the payment of any legal fees or expenses) or any amounts payable pursuant to Section 4 hereof.

**4.    Investment of Funds.**

(a)    The Bank shall deposit the assets in non-interest bearing Accounts and invest the assets in the Accounts consistent with the instructions provided by the Pledgor, in Addendum 1. The Pledgor's instructions will be in accordance with the Grant Agreement, provided that the Bank is not responsible for verifying whether the Pledgor's instructions are in compliance with the Grant Agreement. The Bank shall invest such assets in the Accounts on the date of deposit provided that such assets are received on or before 11:00 a.m. New York City time.  Any assets received after 11:00 a.m. New York City time shall be treated as if received on the following Business Day. For purposes of this Agreement, "**Business Day**" shall mean any day that the Bank is open for business.

(b)    The Bank is hereby authorized and directed to sell or redeem any such investments as it deems necessary to make any payments or distributions required under this Agreement. The Bank shall have no responsibility or liability for any loss in the value of any investment made pursuant to this Agreement, or for any loss, cost or penalty resulting from any sale or liquidation of the assets in the Account.  The Bank is hereby authorized to execute purchases and sales of investments through the facilities of its own trading or capital markets operations or those of any affiliated entity.  The Bank does not have a duty nor will it undertake any duty to provide investment advice.

(c)    The Bank shall transfer any earnings or proceeds received on or distributions of earnings or proceeds from the assets in the Accounts to the Program Income from Operations Account on a monthly basis.

**5.    Tax Matters.**



(a)     The Pledgor and the Secured Party agree that, unless and until the Grant Agreement is terminated, any earnings or proceeds received on or distributions of earnings or proceeds from the assets in the Accounts shall be treated as the income of the Pledgor and shall be reported on an annual basis on United States Internal Revenue Service ("**IRS**") Form 1099-DIV, as required pursuant to the Internal Revenue Code of 1986, as amended (the "**Code**") and the regulations there under. Principal payments are not reportable to any payee hereunder.  No earnings or proceeds received on or distributions of earnings or proceeds from the assets in the Accounts, or principal payments from the Accounts, are reportable to the Secured Party. The Pledgor, the Secured Party and the Bank agree that the Bank will not be responsible for providing tax reporting and withholding for payments that are for compensation for services performed by an employee or independent contractor.

(b)     The Pledgor and the Secured Party shall upon the execution of this Agreement provide the Bank with a duly completed and properly executed IRS Form W-9 or applicable IRS Form W-8, in the case of a non-U.S. person, for each payee, together with any other documentation and information requested by the Bank in connection with the Bank's tax reporting obligations under the Code and the regulations thereunder.  With respect to the Bank's tax reporting obligations under the Code, the Foreign Account Tax Compliance Act and the Foreign Investment in Real Property Tax Act and any other applicable law or regulation, the Pledgor and the Secured Party understand that, in the event valid U.S. tax forms or other required supporting documentation are not provided to the Bank, the Bank may be required to withhold tax from the assets in the Accounts and report account information on any earnings, proceeds or distributions from the assets in the Accounts.

(c)     Should the Bank become liable for the payment of taxes, including withholding taxes relating to any funds, including interest and penalties thereon, held by it pursuant to this Agreement or any payment made hereunder, the Pledgor agrees to indemnify and hold the Bank harmless pursuant to Section 7(b) hereof from any liability or obligation on account of taxes, assessments, interest, penalties, expenses and other governmental charges that may be assessed or asserted against the Bank, provided that such liability shall not be satisfied by assets in the Accounts. If the Pledgor fails to indemnify the Bank for such taxes, the Bank will notify the Secured Party.

(d)     The Bank's rights under this Section 5 shall survive the termination of this Agreement or the resignation or removal of the Bank.

6.     <u>**Concerning the Bank.**</u>

(a)     <u>Bank Duties</u>.  Each of the Pledgor and the Secured Party acknowledges and agrees that (i) the duties, responsibilities and obligations of the Bank shall be limited to those expressly set forth in this Agreement, each of which is administrative or ministerial (and shall not be construed to be fiduciary in nature), and no duties, responsibilities or obligations shall be inferred or implied, (ii) the Bank shall not be responsible for any of the agreements referred to or described herein (including, without limitation, the Grant Agreement and any defined term therein not otherwise defined in this Agreement), or for determining or compelling compliance therewith, and shall not otherwise be bound thereby, and (iii) the Bank shall not be required to expend or risk any of its own funds to satisfy payments from the Accounts hereunder.

(b)     <u>Liability of Bank</u>.  The Bank shall not be liable for any damage, loss or injury



resulting from any action taken or omitted in the absence of gross negligence or willful misconduct (as finally adjudicated by a court of competent jurisdiction).   In no event shall the Bank be liable for indirect, incidental, consequential, punitive or special losses or damages (including but not limited to lost profits), regardless of the form of action and whether or not any such losses or damages were foreseeable or contemplated.  The Bank shall be entitled to rely upon any instruction, notice, request or other instrument delivered to it without being required to determine the authenticity or validity thereof, or the truth or accuracy of any information stated therein.  The Bank may act in reliance upon any signature believed by it to be genuine (including any signature affixed by DocuSign) and may assume that any person purporting to make any statement, execute any document, or send any instruction in connection with the provisions hereof has been duly authorized to do so.  The Bank may consult with counsel satisfactory to it, and the opinion or advice of such counsel shall be full and complete authorization and protection in respect of any action taken, suffered or omitted by it in good faith and in accordance with the opinion and advice of such counsel.  The Bank may perform any and all of its duties through its agents, representatives, attorneys, custodians and/or nominees.  The Bank shall not incur any liability for not performing any act or fulfilling any obligation hereunder by reason of any occurrence beyond its control (including, without limitation, any provision of any present or future law or regulation or any act of any governmental authority, any act of God or war or terrorism, or the unavailability of the Federal Reserve Bank wire services or any electronic communication facility).

(c)  <u>Reliance on Orders</u>.  The Bank is authorized to comply with final orders issued or process entered by any court with respect to the assets in the Accounts, without determination by the Bank of such court's jurisdiction in the matter.  If any portion of the assets in the Accounts are at any time attached, garnished or levied upon under any court order, or in case the payment, assignment, transfer, conveyance or delivery of any such property shall be stayed or enjoined by any court order, or in case any order, judgment or decree shall be made or entered by any court affecting such property or any part thereof, then and in any such event, the Bank is authorized to rely upon and comply with any such order, writ, judgment or decree which it is advised is binding upon it without the need for appeal or other action; and if the Bank complies with any such order, writ, judgment or decree, it shall not be liable to the Pledgor or the Secured Party or to any other person or entity by reason of such compliance even though such order, writ, judgment or decree may be subsequently reversed, modified, annulled, set aside or vacated.

(d)  <u>Erroneous Payments</u>.  If the Bank releases any funds (including but not limited to the assets in the Accounts or any portion of it) to the Pledgor or the Secured Party and subsequently determines (in its absolute discretion) that the payment (or any portion of it) was made in error, the Pledgor or the Secured Party, as applicable, shall upon notice promptly refund the erroneous payment, and none of the obligations of the Pledgor or the Secured Party, as applicable, or the remedies of the Bank will be affected by any act, omission, matter or thing (including, without limitation, any obligation pursuant to which an erroneous payment is made) which, but for this provision, would reduce, release, preclude or prejudice any such obligation or remedy (whether or not known by the Bank, the Pledgor or the Secured Party). Each of the Pledgor and the Secured Party agrees not to assert discharge for value, bona fide payee, or any similar doctrine as a defense to recovery of any erroneous payment by the Bank.

**7.   <u>Compensation, Expense Reimbursement and Indemnification</u>.**

(a)  <u>Compensation</u>. The Bank's compensation shall be as specified in <u>Schedule A</u>.



(b)    Indemnification. The Pledgor covenants and agrees to indemnify the Bank and its employees, officers, directors, affiliates, and agents (each, an "**Indemnified Party**") for, hold each Indemnified Party harmless from, and defend each Indemnified Party against, any and all claims, losses, actions, liabilities, costs, damages and expenses of any nature incurred by any Indemnified Party, arising out of or in connection with this Agreement or with the administration of its duties hereunder, including, but not limited to, attorney's fees, costs and expenses, except to the extent such loss, liability, damage, cost or expense shall have been finally adjudicated by a court of competent jurisdiction to have resulted solely from the Indemnified Party's own gross negligence or willful misconduct, provided that such liability shall not be satisfied by assets in the Accounts. The foregoing indemnification and agreement to hold harmless shall survive the termination of this Agreement and the resignation or removal of the Bank. If the Pledgor fails to indemnify the Bank pursuant to this Section 7(b), the Bank shall notify the Secured Party.

**8.**    **Statements, Confirmations and Notices of Adverse Claims.**  The Bank will send copies of all statements and confirmations for the Accounts simultaneously to the Pledgor and the Secured Party.  The Bank shall be deemed to have delivered statements and confirmations if such statements and confirmations are available on one or more of the Bank systems to deliver electronic media.  The Bank will use reasonable efforts promptly to notify the Secured Party and the Pledgor if any other person claims that it has a property interest in the Accounts or any financial asset in the Accounts.

**9.**    **Entire Agreement; Exclusive Benefit.**  This Agreement constitutes the entire agreement between the parties and sets forth in its entirety the obligations and duties of the Bank with respect to the assets in the Accounts.  This Agreement is for the exclusive benefit of the parties to this Agreement and their respective permitted successors, and shall not be deemed to give, either expressly or implicitly, any legal or equitable right, remedy, or claim to any other entity or person whatsoever.  No party may assign any of its rights or obligations under this Agreement without the prior written consent of the other parties.

**10.**    **Resignation and Removal.** The Bank may be removed only by the U.S. Department of the Treasury.

**11.**    **Governing Law.** This Agreement is governed by and shall be construed and interpreted in accordance with federal law of the United States, except where there is no applicable federal law, in accordance with the laws of the State of New York, without giving effect to the conflict of laws principles thereof.

**12.**    **Representations and Warranties.**

(a)    Each of the Pledgor and the Secured Party represents and warrants that it has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder; and this Agreement has been duly approved by all necessary action and constitutes its valid and binding agreement enforceable in accordance with its terms, except as may be limited by applicable bankruptcy, insolvency, moratorium, reorganization or other similar laws affecting the enforcement of creditors' rights and subject to general equity principles.

(b)    Each of the Pledgor and the Secured Party represents that neither it nor any of its parents or subsidiaries, or any of their respective directors, officers, or employees, or to the knowledge of the Pledgor and the Secured Party, the affiliates of the Pledgor, the Secured Party or any of its subsidiaries, will, directly or indirectly, use any part of any proceeds or lend, contribute,



or otherwise make available such assets in the Accounts in any manner that would result in a violation by any person of economic, trade, or financial sanctions, requirements, or embargoes imposed, administered, or enforced from time to time by the United States (including, without limitation, the Office of Foreign Assets Control of the U.S. Department of the Treasury and the U.S. Department of State), the United Kingdom (including, without limitation, His Majesty's Treasury), the European Union and any EU member state, the United Nations Security Council, and any other relevant sanctions authority.

**13.    Notices; Instructions.**

(a)    Any notice or instruction hereunder shall be in writing in English, and may be sent by (i) secure file transfer or (ii) electronic mail with a scanned attachment thereto of an executed notice or instruction, and shall be effective upon actual receipt by the Bank in accordance with the terms hereof.  Any notice or instruction must be executed (which execution may be manual or affixed by DocuSign) by an authorized person of the Pledgor or the Secured Party, as applicable (the person(s) so designated from time to time, the "**Authorized Persons**").  Each of the applicable persons designated on Schedule B and Schedule C attached hereto have been duly appointed to act as Authorized Persons hereunder and individually have full power and authority to execute any notices or instructions, to amend, modify or waive any provisions of this Agreement, and to take any and all other actions permitted under this Agreement, all without further consent or direction from, or notice to, it or any other party.  Any notice or instruction must be originated from a corporate or government domain.  Any change in designation of Authorized Persons shall be provided by written notice, signed by an Authorized Person, and actually received and acknowledged by the Bank.  Any communication from the Bank that the Bank deems to contain confidential, proprietary, and/or sensitive information shall be encrypted in accordance with the Bank's internal procedures.

(b)    Each of the Pledgor and the Secured Party understands and agrees that the Bank cannot determine the identity of the actual sender of any notice or instruction and that the Bank shall be entitled to conclusively presume that notices or instructions that purport to have been sent by an Authorized Person have been sent by such Authorized Person.  Each of the Pledgor and the Secured Party agrees: (i) to assume all risks arising out of the use of electronic means (including electronic mail, secure file transfer or such other method or system specified by the Bank as available for use in connection with its services hereunder) to submit instructions to the Bank, including, without limitation, the risk of the Bank acting on unauthorized instructions, and the risk of interception or misuse by third parties; (ii) that it is fully informed of the protections and risks associated with the various methods of transmitting instructions to the Bank and that there may be more secure methods of transmitting instructions than the method(s) selected by the Pledgor and the Secured Party, as applicable; (iii) that the security procedures (if any) to be followed in connection with its transmission of instructions provide to it a commercially reasonable degree of protection in light of its particular needs and circumstances; and (iv) to notify the Bank immediately upon learning of any compromise or unauthorized use of the security procedures.  The Pledgor and the Secured Party agree that the security procedures set forth in Section 13(a) and this Section 13(b) are commercially reasonable.

If to the Pledgor:
As provided in Addendum 1

If to the Secured Party:
The Office of the Greenhouse Gas Reduction Fund,



United States Environmental Protection Agency
Attention: David Widawsky
Telephone: ███████████
E-mail: ████████████████████████

If to the Bank:
Citibank, N.A.
Agency & Trust
388 Greenwich Street
New York, NY  10013
Attn.: Nerlie Delly
Telephone: █████████████
E-mail: █████████████████████

**14.**    **Amendment; Waiver.**   Any amendment of this Agreement shall be binding only if evidenced by a writing signed by each of the parties to this Agreement.  No waiver of any provision hereof shall be effective unless expressed in writing and signed by the party to be charged.

**15.**    **Severability.**   The invalidity, illegality or unenforceability of any provision of this Agreement shall in no way affect the validity, legality or enforceability of any other provision. If any provision of this Agreement is held to be unenforceable as a matter of law, the other provisions shall not be affected thereby and shall remain in full force and effect.

**16.**    **Mergers and Conversions.**   Any corporation or entity into which the Bank may be merged or converted or with which it may be consolidated, or any corporation or entity resulting from any merger, conversion or consolidation to which the Bank will be a party, or any corporation or entity succeeding to the business of the Bank will be the successor of the Bank hereunder without the execution or filing of any paper with any party hereto or any further act on the part of any of the parties hereto except where an instrument of transfer or assignment is required by law to effect such succession, anything herein to the contrary notwithstanding.

**17.**    **Termination.**   This Agreement shall terminate upon receipt by the Bank of notice from the Secured Party that its security interest in such Accounts and all assets therein have terminated.  Upon receipt of such notice, the Secured Party shall have no further right to originate instructions with respect to the assets in the Accounts.  The Bank shall, upon payment of all outstanding fees and expenses hereunder, promptly forward any amounts held by the Bank in the Accounts to the Pledgor, and the Bank shall be relieved and discharged of any further responsibilities with respect to its duties hereunder.

**18.**    **Counterparts.**   This Agreement may be executed simultaneously in two or more counterparts, any one of which need not contain the signatures of more than one party, but all such counterparts taken together shall constitute one and the same agreement. Signatures on counterparts of this Agreement executed and delivered in electronic format (i.e. "pdf") or by other electronic means (including DocuSign) shall be deemed original signatures with all rights accruing thereto except in respect to any non-US entity, whereby originals may be required.

**[Remainder of Page Left Intentionally Blank]**



**IN WITNESS WHEREOF**, each of the parties has caused this Agreement to be executed by a duly authorized representative as of the day and year first written above.

**CITIBANK, N.A.,**
as Bank

By: _Nerlie Delly_
    8BE0246B7B634D0...
    Name: Nerlie Delly
    Title: Senior Trust Officer

**Climate United Fund,**
as Pledgor

By: _Elizabeth Bafford_
    C11FE0C468DE48F...
    Name: Elizabeth Bafford
    Title: President & CEO

**United States Environmental Protection Agency**

By: _Phillip K Schindel_
    8474CD72C10743B...
    Name: Philip Schindel
    Title: EPA Award Official

# EXHIBIT A

## FORM OF NOTICE OF EXCLUSIVE CONTROL

VIA EMAIL: ███████████████████████████

Nerlie Delly
Vice President
Citibank, N.A.
Agency & Trust
388 Greenwich Street
New York, New York 10013

Pursuant to the Account Control Agreement dated November 1, 2024, among Climate United Fund (the "**Pledgor**"), United States Environmental Protection Agency (the "**Secured Party**"), and Citibank, N.A. (the "**Bank**"), we hereby instruct you of the following:

The Pledgor and the Secured Party have agreed that the terms and conditions entitled "Deposit Account at Financial Agent" in the Grant Agreement indicate the conditions under which the Secured Party may exercise its right of control herein, and such conditions will be defined as "default" for the purposes of the Account Control Agreement.

As required by the Grant Agreement, the Secured Party has issued a written determination and finding that Pledgor has failed to comply with the terms and conditions of the Grant Agreement, and that noncompliance is substantial such that effective performance of the Grant Agreement is materially impaired or there is adequate evidence of waste, fraud, material misrepresentation of eligibility status, or abuse, and that the Secured Party has initiated action under 2 CFR 200.339 to wholly or partly suspend or terminate the Grant Agreement, as authorized in the terms of the Grant Agreement.

Therefore, the Secured Party hereby notifies you that (i) a default has occurred and is continuing under the Grant Agreement and (ii) from and after the receipt of this notice until you receive further instruction from Secured Party, you are hereby directed to retain and hold all funds in the Account and not to [invest or] disburse the same to any party whatsoever, other than as instructed by the Secured Party.

**United States Environmental Protection Agency**

as Secured Party

By: _____
    Name:
    Title:
    Date:

Exhibit A

**EXHIBIT B**

**FORM OF ACCOUNT DIRECTION (NCIF)**
**Pledgor's UEI Number:** ████████████

[Date]

Citibank, N.A.
Agency & Trust
388 Greenwich Street
New York, NY 10013
Attn: Nerlie Delly
E-mail: ████████████████████████████

VIA: CitiSFT

RE: Account Control Agreement dated November 1, 2024, among Climate United Fund (the "**Pledgor**"), United States Environmental Protection Agency (the "**Secured Party**"), and Citibank, N.A. (the "**Bank**")

Pursuant to Section 2 of the above referenced Account Control Agreement, the Pledgor hereby instructs the Bank to disburse a total amount of $[●] funds as per below and as per the attached upload file named xxx:

**Check applicable boxes:**

( ) **Internal Transfer within the Bank (intra-entity).**

( ) **Internal Transfer within the Bank (inter-entity).**

( ) **External Transfer outside the Bank (for Predevelopment Activities, Market-Building Activities, and/or Program Administration Activities).**

( ) **External Transfer outside the Bank (for Financial Assistance Activities).**

**If an Internal Transfer within the Bank (intra-entity), check the following applicable boxes:**

( ) **Transfer of $[●] across Pledgor's 'Budget' sub-accounts, as defined in the Grant Agreement.**

( ) **Transfer of $[●] from Pledgor's 'Program Income from Operations' account to Pledgor's 'Budget' sub-account(s), as defined in the Grant Agreement.**

( ) **Transfer of $[●] from Pledgor's 'Reserve' account to Pledgor's 'Program Income from Operations' account, as defined in the Grant Agreement.**

( ) **Transfer of $[●] from Pledgor's 'Budget' sub-account(s) or 'Program Income from Operations' account to 'Reserve' account, as defined in the Grant Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this expenditure is necessary to execute against the EPA-approved workplan. Financing agreements for identified Qualified Projects necessitating the transfer have been reviewed by Recipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

**If an Internal Transfer within the Bank (inter-entity), check the following applicable boxes:**

**( ) Transfer of \$[●] from Pledgor's 'Budget' sub-account(s) to 'Financial Assistance Subrecipient' as defined in the Grant Agreement.**

**If an External Transfer outside the Bank (for Predevelopment Activities, Market-Building Activities, and/or Program Administration Activities), check one of the following boxes:**

**( ) Disbursement of \$[●] for Predevelopment Activities as defined in the Grant Agreement.**

**( ) Disbursement of \$[●] for Market-Building Activities as defined in the Grant Agreement.**

**( ) Disbursement of \$[●] for Program Administration Activities as defined in the Grant Agreement.**

**If an External Transfer outside the Bank (for Financial Assistance Activities), check the following applicable boxes:**

**( ) Disbursement of \$[●] from Pledgor's 'Budget' sub-account to provide Financial Assistance to Qualified Projects as defined in the Grant Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this expenditure is necessary to execute against the EPA-approved workplan. Financing agreements for identified Qualified Projects necessitating the transfer have been reviewed by Recipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

**( ) Disbursement of \$[●] from Pledgor's 'Reserve' account to satisfy a legal obligation to a third party as defined in the Grant Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this transfer is necessary to execute against the EPA-approved workplan and pay a third party pursuant to a financing agreement that has been reviewed by Recipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

Capitalized terms in this instruction letter not otherwise defined shall have the same meaning given to them in the Account Control Agreement.

Exhibit B

Signature on this Account Direction executed and delivered in electronic format (i.e. "pdf") or by other electronic means (including DocuSign) shall be deemed original signatures with all rights accruing thereto.

IN WITNESS WHEREOF, the Pledgor has caused this Account Direction to be duly executed and delivered as of the date first written above.

Pledgor:


_____

Authorized Person

**ADDENDUM 1**
**Account Control Agreement**

| | |
|---|---|
| **Date of Account Control Agreement** | November 1, 2024 |
| **Grant Agreement** | Agreement Title: GGRF NCIF: Climate United (5G — 84094001)<br>Agreement Date: 8/8/2024 |
| **Pledgor Notice Details** | Attn: Beth Bafford<br>Address: 7550 Wisconsin Ave, 3rd Floor, Bethesda, MD 20814<br>Email: ███████████████ |
| **UEI Number** | ████████████ |
| **Tax Identification Number** | ████████ |
| **Citi Deposit Instructions** | Bank: CITIBANK, N.A.<br>ABA: ████████<br>Account Name:<br>Account Number:<br>Ref: |

**Money Market Fund Investment Selection**

| Fund Name | Fund Number | CUSIP |
|---|---|---|
| Blackrock Treasury Trust Fund (10) Institutional Shares | TTTXX | ████████ |

**Accounts to Be Established**

| Account Number | Account Name | Initial Deposit Amount |
|---|---|---|
| ████████ | CUF Financial Assistance | $1,521,223,698.62 |
| ████████ | CUF Predevelopment | $23,618,778.17 |
| ████████ | CUF Market-Building | $68,560,774.30 |
| ████████ | CUF Program Administration | $171,303,020.35 |
| ████████ | CUF Other Pass-Through Funding | $3,668,418,776.25 |
| ████████ | CUF Reserves | $0.00 |
| ████████ | CUF Program Income from Operations | $0.00 |

**CitiVelocity Reporting Entitlements Request**:

The Pledgor hereby requests that the Bank entitle the following individuals to view-only access to the Bank's client reporting system for all accounts opened under this Account Control Agreement.

Pledgor Client Profile Name: Climate United Fund

| Name | Phone Number | | Email | |
|---|---|---|---|---|
| Beth Bafford | ███████ | | █████████████ | |
| Stephanie Seiberg | ███████ | | █████████████ | |
| Ann Dobbyn | ███████ | | █████████████ | |
| Emmeline Liu | ███████ | | ██████████ | |
| Comfort Siodlarz | ███████ | | ████████████ | |

The Pledgor hereby acknowledges that all accounts opened under this Account Control Agreement will be entitled to the Bank's client reporting system and made available for view-only access to the following Client Profiles and their associated users:

| Entity | Client Profile Name |
|---|---|
| Secured Party | U.S. Environmental Protection Agency |

**CitiSFT Entitlements Request:**

Citi makes available the Secure File Transfer (CitiSFT) platform for clients to securely upload Account Directions. The Pledgor hereby requests that the Bank entitle the below individuals with upload only access to CitiSFT:

| Name | Phone Number | | Email | | Maker, Checker, Maker and Checker |
|---|---|---|---|---|---|
| Beth Bafford | ██████ | | ████████████ | | Checker |
| Stephanie Seiberg | ██████ | | ████████████ | | Checker |
| Ann Dobbyn | 3█████ | | ████████████ | | Checker |
| Comfort Siodlarz | ████████ | | ████████████ | | Maker |
| Weijie Ma | ██████ | | ████████████ | | Maker |
| Emmeline Liu | ██████ | | ███████████ | | Maker |

*Elizabeth Bafford*
Signed by:
C11FE0C458DE46F...

Authorized Signature

Elizabeth Bafford

EAB

Addendum 1

## SCHEDULE A

### BANK COMPENSATION

**General compensation**

For the services described in the Account Control Agreement, the Bank shall charge each Pledgor as follows:

| Agency & Trust Services | Fees |
| --- | --- |
| **Acceptance Fee**<br>This one-time fee covers the acceptance of the appointment, the review of the related Transaction documents submitted in connection with the execution and delivery thereof, setting up of internal controls, and communication with other members of the working group, as necessary. | Waived |
| **Annual Administration Fee**<br>To cover the administrative functions of Citi under the Agreement, including the establishment and maintenance of the account(s), safekeeping of assets, maintenance of the records, execution and administration of the Agreement provisions, and other duties required under the terms of the Agreement. | Waived |
| **Wire Fees** | Waived |
| **Legal Fees**<br>To cover the review of legal documents by Citibank Agency & Trust's outside counsel. | Waived |

The Transaction documents will be governed in accordance with federal law of the United States, except where there is no applicable federal law, in accordance with the laws of the State of New York, without giving effect to the conflict of laws principles thereof, as established in the Agreement and subject to internal approval and satisfactory review of all documentation. All outgoing payments processed by Citi will be made via wire. Account balances invested in an Institutional Money Market Fund will be chosen by the client from a list of providers that Citi will supply. If invested in a Money Market Fund, fund distributors may provide Citi with Shareholder Servicing fees. These fees are discussed in the fund's prospectus, which will be delivered to the client prior to investment. All of Citi's responsibilities will be non-discretionary and Citi will not be required to make any advances of its own funds. Therefore, all services provided by Citi must strictly follow the terms stated in the Agreements or in the written instructions of the authorized parties or third parties authorized to send instructions to Citi.

In accordance with US regulations regarding anti-money laundering and terrorist financing, Federal law requires Citi to obtain, verify and record information that identifies each business or entity that opens an account or establishes a relationship with Citi. What this means for our clients: when a client opens an account or establishes a relationship, we will ask for the client's business name, a street address and a tax identification number that Federal law requires us to obtain. In accordance with the Unlawful Internet Gambling Act (the "Act"), Citibank, N.A. accounts or other Citibank, N.A. facilities in the United States may not be used to process "restricted transactions" as such term is defined in U.S. 31 CFR Section 132.2(y).

**SCHEDULE B**

**PLEDGOR AUTHORIZED LIST OF SIGNERS**
**(to be provided separately)**

Each of the following person(s) is authorized to execute documents and to direct the Bank as to all matters on the Pledgor's behalf.  The Bank may confirm the instructions received by return call to any one of the telephone numbers listed below.

**PLEDGOR**

|  | Specimen Signature | DocuSign Specimen Signature |
|---|---|---|
| Name:<br>Title:<br>Phone:<br>Email: | | |

|  | Specimen Signature | DocuSign Specimen Signature |
|---|---|---|
| Name:<br>Title:<br>Phone:<br>Email: | | |

|  | Specimen Signature | DocuSign Specimen Signature |
|---|---|---|
| Name:<br>Title:<br>Phone:<br>Email: | | |

## SCHEDULE C

### SECURED PARTY AUTHORIZED LIST OF SIGNERS
### (to be provided separately)

Each of the following person(s) is authorized to execute documents and to direct the Bank as to all matters on the Secured Party's behalf.  The Bank may confirm the instructions received by return call to any one of the telephone numbers listed below.

### SECURED PARTY

| | Specimen Signature | DocuSign Specimen Signature |
|---|---|---|
| Name:<br>Title:<br>Phone:<br>Email: | | |

| | Specimen Signature | DocuSign Specimen Signature |
|---|---|---|
| Name:<br>Title:<br>Phone:<br>Email: | | |

| | Specimen Signature | DocuSign Specimen Signature |
|---|---|---|
| Name:<br>Title:<br>Phone:<br>Email: | | |

## AMENDMENT TO ACCOUNT CONTROL AGREEMENT

This Amendment to the Account Control Agreement (this "**Amendment**"), is entered into as of January 13, 2025 by and among CITIBANK, N.A. (in such capacity, the "**Bank**"), UNITED STATES ENVIRONMENTAL PROTECTION AGENCY (the "**Secured Party**"), and CLIMATE UNITED FUND (the "**Pledgor**" and together with Bank and Secured Party, collectively, the "**Parties**").

### R E C I T A L S :

A.    Reference is made to that certain Account Control Agreement, dated as of November 1, 2024 (as amended from time to time, the "**ACA**") by and among the Bank, the Secured Party and the Pledgor.  Capitalized terms used herein and not otherwise defined herein shall have the meaning given to such terms in the ACA.

B.    The Parties desire to amend the ACA as set forth herein.

NOW, THEREFORE, in consideration of the premises, the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1) Amendments to ACA.  The ACA is hereby amended as follows:

   a) Section 2 is amended by adding the following proviso to the end of such section:

      "; provided that notwithstanding the foregoing, after the delivery of a Notice of Exclusive Control, Bank shall continue to disburse funds and financial assets associated with financial obligations "properly incurred" by the Pledgor prior to the issuance of, but not in anticipation of, a delivery of a Notice of Exclusive Control, in Pledgor's "Reserve" Account pursuant to Account Directions originated by Pledgor except for any specific funds or financial assets, identified by Secured Party in the applicable Notice of Exclusive Control as not being "properly incurred" by the Pledgor in accordance with 2 CFR 200.343."

   b) Exhibit A (Notice of Exclusive Control) of the ACA is hereby amended and restated in the form attached to this Amendment as Exhibit A.

   c) Exhibit B (Form of Account Direction (NCIF) of the ACA is hereby amended and restated in the form attached to this Amendment as Exhibit B.

2) Counterparts.  This Amendment may be executed in several counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same document. Signatures transmitted by facsimile or e-mail shall be sufficient to bind the Parties to this Amendment.

3) Ratification.  The Parties acknowledge that in all other respects, the provisions of the ACA are hereby reaffirmed and ratified, and shall remain in full force and effect.

4) <u>Conflict</u>.  The Parties agree that in the event of a conflict between the terms and conditions of this Amendment and the ACA (as may have been amended by any prior amendment), the terms and conditions of this Amendment shall govern.

[Remainder of Page Intentionally Blank; Signature Pages to Follow]

IN WITNESS WHEREOF, the Parties hereto have executed this Amendment in their respective signatures, intending that this Amendment shall become effective as of the date first above written.

**CLIMATE UNITED FUND**

By: *Elizabeth Bafford*

Name: Elizabeth Bafford

Title: CEO

[*Signature Page to Amendment to Account Control Agreement*]

**CITIBANK, N.A.**

By: _Nerlie Delly_ _____

Name: Nerlie Delly

Title: Senior Trust Officer

*[Signature Page to Amendment to Account Control Agreement]*

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**

By: _Signed by:_ _[signature]_

Name: Phillip K Schindel

Title: Acting Dir, Grants Mgmt & Business Ops Division

*[Signature Page to Amendment to Account Control Agreement]*

EXHIBIT A

**FORM OF NOTICE OF EXCLUSIVE CONTROL**

VIA EMAIL: █████████████████████████

Nerlie Delly
Vice President
Citibank, N.A.
Agency & Trust
388 Greenwich Street
New York, New York 10013
[Re. Account # [●]]

Pursuant to the Account Control Agreement dated November 1, 2024, among Climate United Fund (the "**Pledgor**"), United States Environmental Protection Agency (the "**Secured Party**"), and Citibank, N.A. (the "**Bank**"), we hereby instruct you of the following:

The Pledgor and the Secured Party have agreed that the terms and conditions entitled "Deposit Account at Financial Agent" in the Grant Agreement indicate the conditions under which the Secured Party may exercise its right of control herein, and such conditions will be defined as "default" for the purposes of the Account Control Agreement.

As required by the Grant Agreement, the Secured Party has issued a written determination and finding that Pledgor has failed to comply with the terms and conditions of the Grant Agreement, and that noncompliance is substantial such that effective performance of the Grant Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse (as defined in the Grant Agreement) or material misrepresentation of eligibility status, and that the Secured Party has initiated action under 2 CFR 200.339 to wholly or partly suspend or terminate the Grant Agreement, as authorized in the terms of the Grant Agreement.

Therefore, the Secured Party hereby notifies you that (i) a default has occurred and is continuing under the Grant Agreement and (ii) from and after the receipt of this notice until you receive further instruction from Secured Party, you are hereby directed to retain and hold all funds in the Account or Accounts named in this Notice and not to [invest or] disburse the same to any party whatsoever, other than as instructed by the Secured Party. Notwithstanding the foregoing, Bank shall continue to disburse funds in Pledgor's "Reserve" Account pursuant to Account Directions originated by Pledgor [except for $[   ] in Account No. [      ], identified by Secured Party in the written determination and finding, that Secured Party has determined was not "properly incurred" by the Pledgor in accordance with 2 CFR 200.343].

**United States Environmental Protection Agency**

Exhibit A

as Secured Party

By: _____
    Name:
    Title:
    Date:

Exhibit A

EXHIBIT B

FORM OF ACCOUNT DIRECTION (NCIF)

**Pledgor's UEI Number:** ███████████

[Date]

Citibank, N.A.
Agency & Trust
388 Greenwich Street
New York, NY 10013
Attn.:Nerlie Delly
E-mail: ████████████████████████████

VIA: CitiSFT

RE: Account Control Agreement dated November 1, 2024, among Climate United Fund (the "**Pledgor**"), United States Environmental Protection Agency (the "**Secured Party**"), and Citibank, N.A. (the "**Bank**")

Pursuant to Section 2 of the above referenced Account Control Agreement, the Pledgor hereby instructs the Bank to disburse a total amount of $[●] funds as per below and as per the attached upload file named xxx:

**Check applicable boxes:**

( ) **Internal Transfer within the Bank (intra-entity).**

( ) **Internal Transfer within the Bank (inter-entity).**

( ) **External Transfer outside the Bank (for Predevelopment Activities, Market-Building Activities, and/or Program Administration Activities).**

( ) **External Transfer outside the Bank (for Financial Assistance Activities).**

**If an Internal Transfer within the Bank (intra-entity), check the following applicable boxes:**

( ) **Transfer of $[●] across Pledgor's 'Budget' sub-accounts, as defined in the Grant Agreement**.

( ) **Transfer of $[●] from Pledgor's 'Program Income from Operations' account to Pledgor's 'Budget' sub-account(s), as defined in the Grant Agreement**.

( ) **Transfer of $[●] from Pledgor's 'Reserve' account to Pledgor's 'Program Income from Operations' account, as defined in the Grant Agreement.**

( ) **Transfer of $[●] from Pledgor's 'Budget' sub-account(s) or 'Program Income from Operations' account to 'Reserve' account, as defined in the Grant Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this expenditure is necessary to execute against the workplan in effect under the Grant Agreement. Financing agreements for identified Qualified Projects necessitating the transfer have been reviewed by Recipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

**If an Internal Transfer within the Bank (inter-entity), check the following applicable boxes:**

( ) **Transfer of $[●] from Pledgor's 'Budget' sub-account(s) to 'Financial Assistance Subrecipient' as defined in the Grant Agreement.**

**If an External Transfer outside the Bank (for Predevelopment Activities, Market-Building Activities, and/or Program Administration Activities), check one of the following boxes:**

( ) **Disbursement of $[●] for Predevelopment Activities as defined in the Grant Agreement.**

( ) **Disbursement of $[●] for Market-Building Activities as defined in the Grant Agreement.**

( ) **Disbursement of $[●] for Program Administration Activities as defined in the Grant Agreement.**

**If an External Transfer outside the Bank (for Financial Assistance Activities), check the following applicable boxes:**

( ) **Disbursement of $[●] from Pledgor's 'Budget' sub-account to provide Financial Assistance to Qualified Projects as defined in the Grant Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this expenditure is necessary to execute against the workplan in effect under the Grant Agreement. Financing agreements for identified Qualified Projects necessitating the transfer have been reviewed by Recipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

( ) **Disbursement of $[●] from Pledgor's 'Reserve' account to satisfy a legal obligation to a third party as defined in the Grant Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this transfer is necessary to execute against the workplan in effect under the Grant Agreement and pay a third party pursuant to a financing agreement that has been reviewed by Recipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

Capitalized terms in this instruction letter not otherwise defined shall have the same meaning given to them in the Account Control Agreement.

Signature on this Account Direction executed and delivered in electronic format (i.e. "pdf") or by other electronic means (including DocuSign) shall be deemed original signatures with all rights accruing thereto.

IN WITNESS WHEREOF, the Pledgor has caused this Account Direction to be duly executed and delivered as of the date first written above.

Pledgor:

_____

Authorized Person

Exhibit C



**THE ADMINISTRATOR**

WASHINGTON, D.C. 20460

Acting Deputy Administrator W.C. McIntosh
U.S. Environmental Protection Agency
1200 Pennsylvania Ave, NW
Washington, DC 20460

March 2, 2025

Office of Inspector General
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

Dear Acting Inspector General Murley:

I am formally referring to your office urgent and deeply concerning matters of financial mismanagement, conflicts of interest, and oversight failures within the Greenhouse Gas Reduction Fund (GGRF).

To restore integrity and public trust, the Environmental Protection Agency (EPA) has launched certain oversight and accountability measures that still exist despite the GGRF being designed to limit oversight. We have placed staff on administrative leave, begun a full assessment of internal controls, and are cooperating with the Department of Justice (DOJ) and Federal Bureau of Investigation (FBI) in their ongoing investigation.

Given the severity of the alleged misconduct, waste, conflicts of interest, and potential fraud within the GGRF program, the Administrator is conducting a comprehensive review. Concurrent investigations by the Department of Justice (DOJ) and Federal Bureau of Investigation (FBI) are underway. In response to these developments, the financial institution has voluntarily paused further disbursements, aligning with the ongoing investigation by DOJ and FBI's publicly reported recommendation to freeze the funds. These decisive actions aim to safeguard federal funds and ensure adherence to congressional intent.

**Systemic Failures in Oversight of GGRF and Disturbing Public Information**

Recent findings reveal a pattern of reckless financial management, blatant conflicts of interest, astonishing sums of tax dollars awarded to unqualified recipients, and severe deficiencies in regulatory oversight under the prior administration. The EPA Office of Inspector General (OIG) plays a critical role in eliminating waste and abuse, and we stand with your office in our shared mission to restore accountability and prevent further misuse of taxpayer dollars.

One of the most disturbing initial indicators of financial misconduct is a publicly circulated video of a former Biden Administration EPA political appointee boasting that officials were "tossing gold bars off the Titanic" — rushing to distribute billions in taxpayer dollars before the incoming administration could review or halt improper disbursements.[1] Even more troubling, the official implied that political favoritism influenced funding decisions, with expectations of securing employment at grant-recipient organizations.

**Documented Evidence of Potential Financial Misconduct**

These are not hypothetical concerns; they are supported by troubling evidence that continues to emerge of improper conduct, including:

1. Lack of EPA Oversight in GGRF Distribution

- A large private-sector financial institution was used as an external financial agent, holding $20 billion in taxpayer dollars — an unprecedented arrangement for EPA.
- Only eight prime recipients controlled all $20 billion, acting as pass-through entities to subrecipients — many of which were also structured as pass-throughs, raising serious concerns about transparency and accountability.
- The design of this scheme removed $20 billion from governmental oversight in the days, weeks, and months before a new administration took office.
- The unusual and apparently improper structure of the agreements governing the administration of the GGRF altogether excluded EPA from being a party to Account Control Agreements (ACAs) with subrecipients.

2. Conflicts of Interest and Political Favoritism

- Jahi Wise, the former director of the GGRF, personally oversaw a $5 billion grant to his previous employer, the Coalition for Green Capital — without recusing himself.2

---

[1] https://www.youtube.com/watch?v=CblV6EwzKxg

- A $2 billion grant was awarded to Power Forward Communities, a new nonprofit with ties to Stacey Abrams, despite reporting only $100 in total revenue in 2023.[2]
- Young, Gifted & Green was awarded $20 million, even though its CEO applied for funding while serving on the White House Environmental Justice Advisory Council.[3]

3. Prime Recipients' Lack of Financial Competency

- Recipients were required to begin drawing down funds within 21 days even though EPA, apparently recognizing the lack of qualifications, deemed it necessary that the recipients complete training on "How to Develop a Budget" within 90 days.[4]
- The EPA itself determined that recipients lacked basic financial competency — yet allowed them to manage and distribute billions of taxpayer dollars.
- If an entity requires 90 days to learn how to create a budget, it cannot be trusted to start responsible distribution of taxpayer funds within 21 days.

These examples are the tip of the iceberg and suggest a deeply entrenched pattern of political favoritism, lack of qualifications, and other possibly unlawful allocation of taxpayer funds. Disturbingly, these cases likely represent only a fraction of broader issues.

**Failure of Internal Controls & Structural Weaknesses in GGRF Management**

Your predecessor testified before Congress last September, describing the GGRF's financial structure as "fantastically complex."[5]  What we have uncovered since then raises even greater concerns:

- Financial Agent Agreements, Account Control Agreements (ACAs), and Amended Account Control Agreements, signed in the final months (and in some cases just days) of the Biden Administration, *reduced* rather than enhanced EPA oversight.

---

[2] Thomas Catenacci, "DOGE Finds $2 Billion in Taxpayer Funds Earmarked for Stacey Abrams-Linked Group," *Washington Free Beacon*, last modified February 19, 2025, https://freebeacon.com/trump-administration/billions-doge-found-parked-at-bank-earmarked-for-stacey-abrams-backed-green-group/.

[3] Thomas Catenacci, "Biden Environmental Justice Adviser Received Millions in Taxpayer Funds After Personally Applying For EPA Grant," *Washington Free Beacon*, last modified February 24, 2025, https://freebeacon.com/energy/biden-environmental-justice-adviser-received-millions-after-personally-applying-for-epa-grant/.

[4] U.S. Environmental Protection Agency, "RAIN-2024-G01," *EPA Grants*, last modified March 4, 2024, https://www.epa.gov/grants/rain-2024-g01.

[5] U.S. House Committee on Energy and Commerce "Holding the Biden-Harris EPA Accountable for the Radical Rush-to-Green Spending," https://www.youtube.com/watch?v=dkgMglo8g9g (34 minute mark), 19 September 2024.

- ACAs governing the GGRF appear to have been hastily amended, at the behest of GGRF recipients and without consideration, in the days leading up to Inauguration Day.
- EPA was not a party to the Account Control Agreements with subrecipients, allowing taxpayer dollars to be further distributed without proper agency oversight.
- The ironically named "Notice of Exclusive Control," the ostensible purpose of which is to allow EPA to take control of accounts at the financial agent, grants prime recipients and subrecipients the ability to transfer funds to private financial institutions of their choosing outside the scope of the financial agent agreement. It would have been more appropriately called a Notice of Less Control given the manner in which it granted recipients more power over the disposition of the money and the status of their accounts prior to the amendment.
- Contract provisions appear to have been intentionally structured to weaken EPA oversight.

**Immediate Action & Request for OIG Assistance**

Given the magnitude and significant risks to taxpayer funds, I am formally requesting your assistance with a comprehensive review of this arrangement and the issues involved. I value your recommendations.

If your office requires additional resources to conduct a full investigation, please let us know immediately. The EPA is committed to providing any necessary support to ensure a thorough and independent review of the program.

While these issues can be fully investigated, we will continue to aggressively pursue enhanced oversight, answers, and accountability. We stand firmly alongside the Office of the Inspector General in our shared mission to eliminate waste, fraud, and abuse with the EPA. I look forward to your recommendations.

Sincerely,

W.C. McIntosh
Acting Deputy Administrator
U.S. Environmental Protection Agency

cc:
       Lee Zeldin, Administrator, U.S. EPA
       James Payne, Acting General Counsel, U.S. EPA
       Eric Amidon, Chief of Staff, U.S. EPA

# Exhibit D



Acting Deputy Administrator W.C. McIntosh
U.S. Environmental Protection Agency
1200 Pennsylvania Ave, N.W.
Washington, DC 20460

March 4, 2025

Elizabeth Bafford
CEO
Climate United Fund
7550 Wisconsin Ave, 3rd floor
Bethesda, MD 20814

RE: Compliance and Oversight Review of EPA Greenhouse Gas Reduction Fund

Dear Elizabeth Bafford,

Your organization was awarded funding under the Environmental Protection Agency's
(EPA) Greenhouse Gas Reduction Fund (GGRF). This funding—which was appropriated to
EPA under Section 134 of the Clean Air Act—was referenced by a Biden EPA political
appointee, in a widely circulated video, as "gold bars" that were "tossed off the Titanic".
Shockingly, their plan involved parking $20 billion at an outside financial institution to be
distributed to just 8 pass-through organizations, including your entity. This arrangement
was the first of its kind in EPA history and was purposely designed to obligate all the money
in a rush job with less, not more, oversight by the federal government.

This video is one of many recent developments that have raised questions and concerns
regarding the award process, potential self-dealing and conflicts of interest, qualifications
of recipients, the effectiveness and efficiency of the program, and the appropriate
management and oversight of these funds. As a result, a referral has been made to EPA
Office of Inspector General. The program is also subject to an ongoing investigation by
other federal agencies.

As part of EPA's oversight responsibilities within the Grant Agreement and Administrator Zeldin's pledge to Congress and the American public to be accountable for every penny EPA spends, please submit the requested responses and documents via email or secure file transfer to GGRFoversight@epa.gov **no later than 12:00 PM ET on March 28, 2025.** Responses, other than required forms, should be in Word format. Failure to fully respond to this request on time will be considered a violation of the Grant Agreement and may result in further compliance actions, which may include withholding payments, suspension of funding, or other enforcement measures. Your urgent cooperation in this timely matter is required pursuant to the terms of your Grant Agreement and federal regulations, including 2 CFR 200.337. Additionally, as part of EPA's due diligence process, the agency will work with the U.S. Department of the Treasury (Treasury) and the Financial Agent (FA) to establish and implement additional account controls consistent with prudent operational standards pursuant to the Financial Agency Agreement (FAA).

1. Provide a list of your current board of directors, including their roles, affiliations, and any financial compensation or stipends received from this grant.
2. Provide copies of your organization's most recent IRS Form 990 filings and any required financial disclosures under federal grant regulations.
3. Provide all written communications (hard copy, electronic, or otherwise), notices, or formal discussions your organization had with EPA officials regarding eligibility and program design prior to the grant award.
4. Provide a list of all EPA-sponsored training sessions, workshops, or technical assistance events attended by your organization related to this grant, including names of attendees and completion dates.
5. Submit proof of completion of EPA's "How to Develop a Budget" training, including date of completion and the names and roles of those who received it.
6. Provide copies of all EPA performance metrics and guidance documents you (or your representative) have in your possession defining program success and include an explanation of your understanding of how success was defined for these programs.
7. Provide an itemized breakdown of funds spent to date, including personnel, contractual, subawards, and program-related expenses.
8. What percentage of grant funds have been allocated to administrative costs versus direct financial assistance to subrecipients? Describe how your organization determines allowable administrative costs under this grant, including a justification for the percentages allocated to administrative expenses versus direct program funding. Provide supporting documentation.
9. Provide the total annual budget for your organization for fiscal years 2022, 2023, 2024, and 2025, including a breakdown of revenue sources prior to and after receiving this grant.
10. List all subrecipients of this grant, the funding amounts allocated to each, and the criteria used to determine eligibility. Include award dates and the purposes of each award. Provide a copy of your organization's subrecipient selection criteria and process, including due diligence measures and compliance verification.

11. Submit copies of all subaward agreements issued under this grant, including any contractual terms regarding fund disbursement and compliance monitoring and any required Account Control Agreements, in accordance with EPA reporting requirements.

12. What specific internal controls does your organization have in place to prevent, detect, and address fraud, waste, or abuse of funds? Provide any related policies or procedures, including any mechanisms for detecting improper payments, conflicts of interest, or misuse of funds. Please note which, if any, of these are part of your organization's formal financial policies.

13. Provide a list of all EPA and federal agency officials with whom your organization has had official grant-related communications since the award date.

14. What formal guidance, directives, or technical assistance has your organization received from EPA regarding how these grant funds should be used? Provide copies of any written guidance or relevant communications. Did your organization receive any guidance from EPA or other government entities on how the funds should be used? If so, specify.

15. Has your organization received any formal or informal direction from federal officials regarding how to allocate or distribute funds? If so, provide documentation or meeting records that detail this guidance.

16. List all projects funded to date, including project descriptions, status and locations, amounts awarded, success rate, and anticipated environmental impact.

17. For each funded project, submit documentation on how each project is measuring greenhouse gas reductions, specific emissions reduction targets, metrics used to measure progress, and specific methodologies and verification processes.

18. Has your organization been subject to any compliance reviews, audits, or corrective action plans related to this grant? If so, provide the results and any corrective measures taken. Provide copies of any independent audits, compliance reviews, or risk assessments conducted on your organization's use of EPA funds.

19. Submit an updated annual budget report showing what percentage of your organization's total revenue is now derived from this grant.

20. Has your organization used any grant funds for lobbying, political activity, or policy advocacy – directly or indirectly? If so, please provide details and justification for compliance with federal restrictions.

21. Provide a list of all current employees or contractors who previously worked at EPA or other federal agencies in the last three years. Include job descriptions and compensation details, if applicable.

22. Provide documentation demonstrating how this program has successfully mobilized private capital, including details on secured investments, investor agreements, leveraged investments or co-financing agreements.

23. Provide documentation of all external capital raised using grant funds, including private sector investments, loan guarantees, or matching funds secured.

24. What fundraising costs, if any, have been allocated to this grant? Provide a breakdown by category.

25. Provide details on any profits, interest earnings, or other income generated as a result of this grant, and how those funds are being reinvested.
26. Submit a list of all third-party vendors, consultants, funds, or contractors paid using grant funds, including compensation details and selection process documentation.
27. Provide records of any disclosed or potential conflicts of interest.
28. Provide a list of any state or local government entities receiving funds through your organization under this grant.
29. Provide a list of all quarterly transaction-level data submissions required under the grant's reporting conditions.
30. Have there been any discrepancies, delays, or issues in required reporting to EPA? If so, provide an explanation and corrective actions taken.
31. Provide documentation of all cybersecurity measures taken to safeguard sensitive data related to this grant.
32. Submit documentation on timekeeping and payroll allocation methods used to ensure that personnel costs charged to this grant are in compliance.
33. Provide documentation on how your organization ensures that all EPA-funded activities comply with Title IV of the Civil Rights Act, including nondiscrimination policies, public engagement efforts, and accessibility measures.
34. Provide documentation on how your organization ensures public access to information regarding funded programs, expenditures, and project outcomes as required under the grant agreement.
35. Submit documentation on the data collection methodologies used to evaluate program effectiveness, including any tracking systems, performance indicators, or external evaluations conducted.

Administrator Zeldin has made it clear that one of his top priorities at EPA is to be an excellent steward of the American public's hard-earned tax dollars. There will be zero tolerance of any waste, fraud, or abuse. Your cooperation and timely response to these inquiries will assist in ensuring transparency and accountability in the administration of these funds. I hope you share in EPA's concerns and have some of the same questions yourself.

Thank you for your prompt attention to this matter.

Sincerely,

W.C. McIntosh
Acting Deputy Administrator
U.S. Environmental Protection Agency

Cc: Citibank, N.A.

# Exhibit E

# KIRKLAND & ELLIS LLP

1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
United States

Reg Brown, P.C.
To Call Writer Directly:

██████████████████

Facsimile:

██████████████

www.kirkland.com

March 6, 2025

**By E-mail**                                                                    **CONFIDENTIAL**

Lee Zeldin
Administrator
Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

Re:     Account Control Agreements under Greenhouse Gas Reduction Fund

Dear Administrator Zeldin:

On March 4, 2025, Citibank, N.A. (the "Bank") received a directive from the U.S. Department of the Treasury pursuant to the Financial Agency Agreement (FAA), instructing the Bank "to work directly with the EPA to establish and implement reasonable account controls to serve the purposes and interests of the United States." Treasury also instructed the Bank "not to disburse funds from any of the GGRF accounts prior to the end of the day Sunday, March 9, 2025," in order "to provide the EPA with the necessary time to develop reasonable account controls." In addition to this communication from Treasury, the Bank is in receipt of your March 4 letters to the eight prime recipients, seeking responses to various requests in furtherance of the EPA's oversight of the program. As those letters note, "as part of EPA's due diligence process, the agency will work with the U.S. Department of the Treasury (Treasury) and the Financial Agent (FA) to establish and implement additional account controls consistent with prudent operational standards pursuant to the Financial Agency Agreement (FAA)."

Currently, the Bank has approximately $450 million in pending transfer instructions from the prime recipients and subrecipients. We have also received additional demands from prime recipients and subrecipients seeking disbursement of funds or an explanation. *See* Exhibit A (email from NY Green Bank (February 28); letter from Foley Hoag on behalf of Power Forward Communities (March 1); letter from Holwell Shuster & Goldberg on behalf of Coalition for Green Capital (March 6)). Pursuant to Treasury's instruction, the Bank awaits further guidance from the EPA on the additional account controls and direction on the pending requests. To aid in the EPA's due diligence process, the Bank is sharing as Exhibit B information regarding the pending transfer instructions.

## KIRKLAND & ELLIS LLP

Administrator Lee Zeldin
March 6, 2025
Page 2

The Bank awaits the EPA's and Treasury's additional direction.  We also ask that EPA establish a direct line of communication with the recipients and subrecipients regarding its future decisions.

Sincerely,

Reg Brown, P.C.
Jeremy Dresner, P.C.

cc:    U.S. Department of the Treasury
        U.S. Department of Justice

# EXHIBIT A

**From:** Rubin, Jesse [SVCS] ███████████████
**Sent:** Friday, February 28, 2025 9:29 AM
**To:** [greenbank.ny.gov] Grenier, Ben (GREENBANK)
**Subject:** RE: NYGB | Transfer Instructions

Hi Ben,

We will forward your correspondence to the EPA and other federal officials for an appropriate response.

Thanks,
Jesse

---

**From:** ███████████ Grenier, Ben (GREENBANK)
**Sent:** Friday, February 28, 2025 9:21 AM
**To:** Rubin, Jesse [SVCS]
**Subject:** RE: NYGB | Transfer Instructions

Jesse – just so I get it. If we make a draw request it won't be honored at this time ?

---

**From:** Rubin, Jesse ██████████████
**Sent:** Friday, February 28, 2025 9:18 AM
**To:** Grenier, Ben (GREENBANK)██████████████; O'Connor, Marion ██████████████ *CITI
US A&T GGRF Financial Agent██████████████ Delly, Nerlie ██████████████
**Cc:** Suich, Joseph S (GREENBANK)██████████████ Reiter, Will D (GREENBANK)
███████████████
**Subject:** RE: NYGB | Transfer Instructions

> ATTENTION: This email came from an external source. Do not open attachments or click on links from unknown senders or
> unexpected emails.

Hi Ben,

We do not have an updated status at this time and continue to monitor the situation with EPA for status updates once
they become available for the program. We will advise once we have new information to share regarding transfer
instructions.

Best Regards,
Jesse

---

**From:** ███████████ Grenier, Ben (GREENBANK)
**Sent:** Friday, February 28, 2025 9:04 AM
**To:** O'Connor, Marion [SVCS]; *CITI US A&T GGRF Financial Agent; Delly, Nerlie [SVCS]
**Cc:** Suich, Joseph S (GREENBANK); Reiter, Will D (GREENBANK)
**Subject:** NYGB | Transfer Instructions

Hi Marion,

Are you presently processing transfer instructions for our NCIF subaward?

If not, will you advise us when and / or share the process by which we can begin to transfer funds?

Best regards,
Ben


**Ben Grenier**
Director

**NY Green Bank**
**A Division of NYSERDA**
1333 Broadway, 3rd Floor | New York, NY 10018-9998
O: ▮▮▮▮▮▮▮▮ | F: ▮▮▮▮▮▮▮▮ | E ▮▮▮▮▮▮▮▮▮▮▮▮▮

www.greenbank.ny.gov

This email and any files transmitted with it may contain confidential and/or privileged material and are intended solely for the person or entity to whom they are addressed. Any review, retransmission, dissemination, or taking of any action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you are not the intended recipient and have received this communication in error, please contact the sender and delete the material from any computer and/or device.



1301 Avenue of the Americas
New York, NY 10019

▮▮▮▮▮ main
fax

Noah C. Shaw
▮▮▮▮▮▮ direct

March 1, 2025

**Via E-Mail & Overnight Mail**

Mr. Brent McIntosh
Chief Legal Officer
Citibank, N.A.
388 Greenwich Street
New York, NY 10013
▮▮▮▮▮▮

      Re:   <u>National Clean Investment Fund Accounts</u>

Dear Mr. McIntosh,

We represent Power Forward Communities, Inc. ("PFC" or "Pledgor"), which has beneficial ownership of Citibank accounts that collectively hold approximately $2 billion in funds awarded under the Environmental Protection Agency's National Clean Investment Fund ("NCIF"). PFC is a coalition led by some of the country's most trusted housing, climate, and community investment groups, which came together to transform the housing sector, save homeowners and renters money, invest in stronger communities, and help meet national climate goals. Led by Enterprise Community Partners, Rewiring America, Habitat for Humanity International, Local Initiatives Support Corporation (LISC), and United Way Worldwide, PFC aims to expand and preserve affordable housing, improve air quality, and create well-paying jobs by ramping up simple energy efficiency and other improvements in single-family and multifamily homes nationwide.

We write to request that Citibank comply with PFC's transfer instructions with respect to its accounts, as described herein, so that PFC can continue with its important mission. In addition, we request a meeting as soon as possible to discuss these urgent matters.

Since February 14, 2025, PFC and certain subgrantees have submitted multiple requests to Citibank to disburse funds in accordance with PFC's NCIF grant agreement and Account Control Agreement ("ACA"). Citibank has not fulfilled those requests. Nor has Citibank offered any reason for its failure to do so, despite PFC's February 19, 2025 request for such reason. Because of Citibank's failure to adhere to its obligations under the ACA, PFC and its subgrantees face financial shortfalls that imperil their ability to retain employees,

Mr. Brent McIntosh
Page 2

deliver the projects for which the funds are allocated and which they are legally obligated to perform, and meet their other legal obligations.

Pursuant to the ACA among Citibank, PFC, and EPA, Citibank "maintains the Accounts for [PFC (the Pledgor)], and all property (including, without limitation, all funds and financial assets) held by the Bank for the accounts of the Pledgor are, and will continue to be, credited to the Accounts in accordance with instructions given by the Pledgor." ACA § 1(a). The ACA contemplates only one scenario under which Citibank may be authorized to deviate from those obligations: when it receives a "Notice of Exclusive Control" from EPA. ACA § 2.

To PFC's knowledge, EPA has not issued such a notice. Nor could EPA do so, as that Notice can only be issued following (1) a "written determination and finding that Pledgor has failed to comply with the terms and conditions of the Grant Agreement, and that noncompliance is substantial such that effective performance of the Grant Agreement is materially impaired or there is adequate evidence of waste, fraud, material misrepresentation of eligibility status, or abuse," and (2) EPA "has initiated action under 2 CFR 200.339 to wholly or partly suspend or terminate the Grant Agreement, as authorized in the terms of the Grant Agreement." To PFC's knowledge, EPA has made no such determination or even allegation, nor has it taken any action to terminate the Grant Agreement.

<u>PFC Was Awarded Funds Pursuant To A Congressionally Approved And Transparent Funding And Contracting Process</u>

Congress enacted the Inflation Reduction Act of 2022 ("IRA") in August 2022. Among other components, the IRA amended the Clean Air Act to authorize EPA to make competitive grants under the NCIF. *See* 42 U.S.C. § 7434. Specifically, Congress funded NCIF with a total of approximately $14 billion—$11,970,000,000.00 under 42 U.S.C. § 7434(a)(2) and another $2,000,000,000.00 under 42 U.S.C. § 7434(a)(3)—and instructed that the funds remain available to be awarded until September 30, 2024.

Pursuant to that legislative mandate, on July 14, 2023, EPA released Notice of Funding Opportunity ("NOFO") No. EPA-R-HQ-NCIF-23, which it further updated on August 11, 2023. The purpose of this NOFO was to solicit applications for grants intended to "deploy clean energy and combat the climate crisis but also improve health outcomes, lower energy costs, and create high-quality jobs for Americans—all while strengthening our country's economic competitiveness and ensuring energy security." Relevant here, the NOFO included "a $14 billion NCIF competition to finance clean technology deployment nationally." The application requirements for this competition were complex, covering, as the EPA described on its website, "a diverse set of topics and include[ing] not just a detailed project narrative but also a robust set of application requirements."

PFC submitted its application in response to the NOFO in October 2023. So too did other applicants. From there, EPA engaged in a six-month review process to evaluate the applications and determine the winners.

Mr. Brent McIntosh
Page 3

To call this multi-staged review and scoring process "thorough" would be an understatement. Nearly fifty federal employees participated in the process, with roles including:

- Serving on one of the review panels created by EPA to review and score the applications on issues relating to (1) consumer protection, (2) equity and environmental justice, (3) financial risk management, (4) financial transactions, (5) financial statement analysis, (6) governance, (7) labor and equitable workforce, and (8) legal and compliance risk management. The federal employees who served on these panels hailed from all corners of the federal government, including in EPA, the U.S. Department of the Treasury, the U.S. Department of Energy, and other federal agencies;

- Interviewing and scoring the top-ranked applicants to ensure that those applicants and the leaders thereof were fully capable of executing the proposed program; and

- Serving on the Senior Review team that, following weeks of meetings, made unanimous recommendations to the Selection Officials as to which applicants should be awarded. As with the review panels, the Senior Review team members consisted of employees from across multiple federal government agencies.

On April 4, 2024, the EPA publicly announced the winning applicants. EPA awarded NCIF funds of $6.97 billion to Climate United Fund, $5 billion to Coalition for Green Capital, and $2 billion to PFC.

On August 8, 2024, the NCIF awards to each of the awardees were memorialized in grant agreements that are materially identical in their terms and conditions. Of particular importance, the August 8, 2024 grant agreements expressly contemplate that the awards be administered by a "Financial Agent," defined to mean a "depository institution designated as a financial agent of the United States." The awardees were required to "set up and utilize an Account or Accounts at the Financial Agent."

This Financial Agent, of course, is Citibank. PFC understands that Citibank was not formally designated by the United States as the Financial Agent until December 20, 2024. However, on November 1, 2024, the awardees, EPA, and Citibank entered into Account Control Agreements that provide the terms and conditions by which Citibank must manage the accounts and disburse payments therefrom.

<u>The Federal Government Seeks To Freeze PFC's Funds</u>

Despite this well-documented and public record, the current Administration has asserted allegations of wrongdoing with respect to the NCIF awards. The Administration initially attempted to implement an across-the-board suspension of obligated but undisbursed funds appropriated through the IRA and the bipartisan Infrastructure Investment and Jobs Act (IIJA). Those suspension efforts are currently on-hold following the issuance of a Temporary Restraining Order and a subsequent Order enforcing that TRO by a federal court. *See* Temporary Restraining Order, *New York v. Trump*, Case No. 1:25-cv-00039-JJM-PAS

Mr. Brent McIntosh
Page 4

(D.R.I. Jan. 31, 2025), ECF No. 50; Order Enforcing Temporary Restraining Order, *id.* at ECF No. 96 (Feb. 10, 2025).

Thereafter, the Administration apparently shifted its focus to funds like PFC's that had been obligated and disbursed to third party fiscal agents. In early February, EPA issued an internal memorandum identifying programs that were to be "temporarily paused for new obligations or disbursements … pending a review for compliance with applicable administrative rules and policies." Included among such programs are those funded under the IRA and IIJA. Then, on February 12, 2025, new EPA Administrator Lee Zeldin posted a video on X.com in which he referenced the NCIF funds held by PFC's Citibank accounts, pledged to claw them back, and stated that EPA would work with the Department of Justice ("DOJ"). Mr. Zeldin repeated those pledges on February 20, 2025, during a media appearance on *Fox News*.

News reports have suggested that Citibank voluntarily froze PFC's accounts based on a request from DOJ officials. Of particular concern is a recent report dated February 27, 2025, in the *Washington Post*, which suggests that Citibank continues to disregard PFC's transfer requests without any legal basis for doing so. We presume you are aware of these reports. Yet, as of the writing of this letter, PFC's accounts at Citibank remain frozen.

\*    \*    \*

As noted, Citibank continues to fail – without explanation – to comply with PFC's transfer instructions in violation of the ACA. At the same time, publicly reported information indicates more and more strongly that any standing request to Citibank by the federal government that Citibank not honor PFC's requests is inadequate and without legal basis.

We therefore request that Citibank immediately comply with PFC's transfer instructions so it can meet its contractual obligations and deliver the important benefits of the NCIF program to homeowners and residents throughout the country.

We further request a meeting as soon as possible to discuss these urgent matters. PFC reserves all rights.

Sincerely,

Noah C. Shaw
Beth Neitzel
James M. Gross

FOLEY HOAG LLP

*Counsel for Power Forward Communities, Inc.*

# HOLWELL SHUSTER & GOLDBERG LLP

*425 Lexington Avenue*
*New York, New York 10017*
*Tel:* █████
*Fax:* █████
*www.hsgllp.com*

*Vincent Levy*
*(646) 837-5120*
████████

March 6, 2025

BY EMAIL

Brent McIntosh
Chief Legal Officer and Corporate Secretary
Citibank, N.A.
████████████

Re:    Coalition for Green Capital

Dear Mr. McIntosh:

My firm represents the Coalition for Green Capital ("CGC"). CGC has an account at Citi holding grant moneys awarded by the EPA (the "Account"). Since at least February 18, our client's Account has been frozen by Citi without any explanation from Citi.

Citi must promptly provide CGC with unrestricted access to its funds. The Account Control Agreement ("ACA") governing CGC's account (enclosed) gives CGC exclusive control over the account. Pursuant to the ACA, Citi is obligated to "comply with all instructions, notifications, and entitlement orders" issued by CGC. See Section 2. The only exception to this obligation is if the EPA has issued a Notice of Exclusive Control.

No such notice has been issued.

We add that CGC's 19 sub-recipients have accounts at Citi subject to the same control provisions, and that they also have been unable to access their funds.

**We request by 5pm Eastern, tomorrow, March 7**:

(i)     confirmation that Citi shall comply with Section 2 of the ACA, including that Citi "shall comply with all instructions, notifications, and entitlement orders" that Citi receives from CGC "directing the disposition of funds and financial assets" in the Account unless and until Citi receives a Notice of Control from EPA (in the form attached as Exhibit A to the ACA) that EPA is exercising its right to exclusive control over an Account,

(ii)    confirmation that Citi shall comply with the control provisions in the ACAs governing the accounts CGC's 19 sub-recipients, and

1

(iii)   an explanation as to why -- if Citi has not received a Notice of Exclusive Control from EPA -- Citi has failed to comply with all instructions, notifications, and entitlement orders provided by CGC (and sub-recipients) directing the disposition of funds and financial assets in the Account.

Absent confirmation that Citi shall comply with Section 2 of the ACA, our client may be compelled to seek appropriate legal and equitable relief. In connection with this matter, our client reserves all rights.

We look forward to your prompt response in this serious matter, as time is of the essence.

Sincerely yours,

Vincent Levy

Cc:   Nerlie Delly
      Jesse Rubin

**Exhibit B**
**Pending Instructions**

| Pledgor (Instructing Party) | Date of transaction | Debit Account Name | Amount | Credit Account Name |
|---|---|---|---|---|
| CPC Climate Capital | 2/12/2025 | CPC Climate Program Admin | $301,400.00 | CPC Climate Capital LLC |
| CPC Climate Capital | 2/12/2025 | CPC Climate Program Admin | $243,532.85 | CPC Climate Capital LLC |
| CPC Climate Capital | 2/12/2025 | CPC Climate Program Admin | $703,680.84 | CPC Climate Capital LLC |
| CPC Climate Capital | 2/12/2025 | CPC Climate Reserves | $1,505,000.00 | The Community Preservation Corporation-Climate Capital Financial Assistance Disb. Acct |
| Self-Help Climate Capital LLC | 2/18/2025 | SHCC Climate Program Admin | $419,231.92 | Self-Help Climate Capital |
| Illinois Finance Authority | 2/14/2025 | ILLINOISFIN | $104,733,000.00 | IFA DEPOSITORY/MASTER FUNDING |
| Illinois Finance Authority | 2/13/2025 | ILLINOISFIN | $25,996.25 | IFA DEPOSITORY/MASTER FUNDING |
| Illinois Finance Authority | 2/18/2025 | ILLINOISFIN | $314,347.42 | IFA DEPOSITORY/MASTER FUNDING |
| California Infrastructure & Economic Development Bank | 2/13/2025 | FinAsst | $415,314.46 | State of CA GO-Biz IBank Fund 9334 |
| ICLEI Local Governments for Sustainability USA Inc. | 2/19/2025 | ICLEILocalGov Program Admin | $501,068.13 | ICLEI - LOCAL GOVERNMENTS FOR SUSTAINABILITY |
| Power Forward Communities, Inc. | 2/14/2024 | PFC Program Administration | $1,085,683.50 | Enterprise Community Partners, Inc. |
| Rewiring America Community Investment Fund | 2/14/2025 | Rewiring Prog Admin | $61,482.93 | Rewiring Community Investment Fund |
| Solar and Energy Loan Fund | 2/13/2025 | Program Administration | $173,571.00 | Solar Energy Lending Fund |
| Solar and Energy Loan Fund | 2/13/2025 | Market-building Activities | $18,159.00 | Solar Energy Lending Fund |
| Solar and Energy Loan Fund | 2/13/2025 | Financial Assistance | $2,553,518.00 | Program Administration |
| Solar and Energy Loan Fund | 2/13/2025 | Financial Assistance | $600,000.00 | Predevelopment |
| Solar and Energy Loan Fund | 2/13/2025 | Financial Assistance | $806,482.00 | Market Building Activities |
| Mountain BizCapital | 2/26/2025 | MTNBTASubAward | $500,000.00 | GBRATASu |

| Pledgor (Instructing Party) | Date of transaction | Debit Account Name | Amount | Credit Account Name |
|---|---|---|---|---|
| Climate United Fund | 2/12/2025 | CUF Financial Assistance | $250,000,000.00 | CUF Reserves |
| Climate United Fund | 2/18/2025 | CUF Program Administration | $898,342.31 | Climate United Fund |
| Climate United Fund | 2/21/2025 | CUF Program Administration | $711,525.13 | Climate United Fund |
| Climate United Fund | 3/5/2025 | CUF Financial Assistance | $42,250,000.00 | CUF Reserves |
| Coalition for Green Capital | 2/18/2025 | CGC Program Administration | 3,558,704.44 | Coalition for Green Capital |
| Coalition for Green Capital | 2/27/2025 | CGC RESERVES - USD | 10,000,000.00 | CGC PROGRAM INCOME FROM OPERATIONS - USD |
| United Way Worldwide | 2/14/2025 | United Way Reserves | $13,557,402.97 | United Way Market Bld |
| United Way Worldwide | 2/14/2025 | United Way Reserves | $2,551,379.23 | United Way Prog Admin |
| LISC Green LLC | 2/14/2025 | LISC Program Admin | $173,073.77 | LISC Green LLC |
| LISC Green LLC | 2/7/2025 | LISC Program Admin | $14,518.86 | LISC Green LLC |
| Inclusiv | 2/20/2025 | INC PROGRAM ADMINISTRATION - USD | $271,397.54 | Inclusiv Inc |
| Inclusiv | 3/3/2025 | INC PROGRAM ADMINISTRATION - USD | $296,177.44 | Inclusiv Inc |
| Efficiency Maine Trust | 2/20/2025 | EffMaineTst Financial Assistance | $225,000.00 | Efficiency Maine Trust |
| Efficiency Maine Trust | 2/21/2025 | EffMaineTst Financial Assistance | $17,807.83 | AmeriNat |
| Efficiency Maine Trust | 2/20/2025 | EffMaineTst Financial Assistance | $10,000,000.00 | Efficiency Maine Trust |
| Montgomery County Green Bank Corporation | 2/19/2025 | MontGreen Other Pass Through | $1,839,749.97 | MontGreen Predevelopment |
| Montgomery County Green Bank Corporation | 2/19/2025 | MontGreen Other Pass Through | $503,607.42 | MontGreen Market Building |
| Montgomery County Green Bank Corporation | 2/19/2025 | MontGreen Market Building | $229,686.25 | Montgomery County Green Bank Corporation |
| Montgomery County Green Bank Corporation | 2/19/2025 | MontGreen Program Admin | $10,250.46 | Montgomery County Green Bank Corp |

| Pledgor (Instructing Party) | Date of transaction | Debit Account Name | Amount | Credit Account Name |
|---|---|---|---|---|
| Justice Climate Fund | 2/25/2025 | JCF Program Administration | $28,750.00 | Justice Climate Fund, Inc |
| Opportunity Finance Network | 02/26/25 | OFN Technical Assistance Services | $94,651.75 | OFN Program Administration |
| Opportunity Finance Network | 03/3/25 | OFN Program Administration | $588,226.28 | OFN Operating Account |
| Opportunity Finance Network | 03/3/25 | OFN Technical Assistance Services | $144,530.00 | OFN Operating Account |
| Connecticut Green Bank | 3/4/2025 | CTGreenBank Financial Assistance | $45,308.06 | CTGreenBank Program Admin |
| Connecticut Green Bank | 3/4/2025 | CTGreenBank Program Admin | $45,308.06 | Connecticut Green Bank |
| Connecticut Green Bank | 2/14/2025 | CTGreenBank Financial Assistance | $70,724.25 | CTGreenBank Program Admin |
| Connecticut Green Bank | 2/14/2025 | CTGreenBank Program Admin | $70,724.25 | Connecticut Green Bank |

# Exhibit F



U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

March 8, 2025

By E-mail – CONFIDENTIAL

Reg Brown, P.C.
Kirkland & Ellis LLP
1301 Pennsylvania Avenue, N.W.
Washington, DC 20004

Re: Account Controls under Greenhouse Gas Reduction Fund

Dear Mr. Brown,

We acknowledge receipt of your March 6, 2025 letter and appreciate Citibank's (the "Bank")
engagement as we work to establish the necessary oversight and compliance guardrails on the
Greenhouse Gas Reduction Fund (GGRF).

As the Bank is aware, the U.S. Department of the Treasury (Treasury) has directed them to work with
EPA to establish new account controls to ensure that federal funds are disbursed in full compliance with
applicable laws, regulations, and agreements. However, under the current structure, EPA does not have
the necessary amount of account controls or level of oversight, which presents challenges and risks in
ensuring appropriate financial management. These concerns are further compounded by the
amendments made to the Account Control Agreements on January 13, 2025—just one week before
Inauguration Day—which further limited the government's ability to provide oversight and ensure
accountability over the funds.

The Bank, in its letter, also acknowledged EPA's communication to the eight prime recipients on March
4, 2025, which shared our concerns directly with them and initiated a compliance review of their
organization, activities, and funds. The purpose of the compliance review is to inform EPA of any further
oversight issues or noncompliance as well as alert us to potential patterns of fraud, waste or abuse.
Responses are due at noon ET on March 28, 2025, and those will guide EPA as we develop and
implement new account controls with the Bank. We anticipate the need to work through this process
with the Bank on a case-by-case basis, both for the prime and subrecipients and the individual accounts
themselves.

On March 2, 2025, EPA sent the attached letter to EPA's Office of Inspector General detailing numerous concerns that EPA has at this time regarding self-dealing, conflicts of interest, recipient qualifications, and actions taken to deliberately undermine federal government oversight that is required to ensure compliance with the law.

Given these structural challenges, the current lack of critical information, ongoing investigations by the U.S. Department of Justice and Federal Bureau of Investigation, and ongoing reviews by other federal oversight entities, it is time-critical and essential that we work together to develop and implement necessary safeguards. As Treasury said in its March 4th instruction to the Bank, this process to establish and implement account controls, and the Bank's direct coordination with EPA during this process, serve the purposes and interests of the United States of America.

If the Bank has proposals for how to accomplish the goals described above and in other correspondence, we welcome that information at this time.

One important question we have for the Bank at this time is whether they interpret the "Notice of Exclusive Control" as actually providing EPA with exclusive control over *all* the funds, or if EPA's issuance of a "Notice of Exclusive Control" could result in recipients successfully instructing the Bank to make an external transfer of funds to a third party. If the latter, the "Notice of Exclusive Control" has clearly been misnamed and should have more appropriately been called a "Notice of *Less* Control."

We appreciate the Bank's cooperation and look forward to working together to ensure responsible financial management and accountability of these funds.

Sincerely,

W.C. McIntosh

W.C. McIntosh
Acting Deputy Administrator
U.S. Environmental Protection Agency

cc:
- Citibank, N.A.
- Chris Pilkerton, Acting General Counsel, U.S. Department of the Treasury
- Eric Froman, Assistant General Counsel (Banking & Finance), U.S. Department of the Treasury
- U.S. Department of Justice
- Jim Payne, Acting General Counsel, U.S. Environmental Protection Agency

Exhibit G



**From:** Froman, Eric
**To:**
**Cc:**
**Subject:** GGRF
**Date:** Monday, March 10, 2025 1:13:13 AM

The U.S. Environmental Protection Agency (EPA) has informed the U.S. Department of the Treasury (Treasury) that they are instructing Citibank to impose certain account controls on accounts at Citibank related to the Greenhouse Gas Reduction Fund (GGRF), pursuant to Section I.B of Exhibit A to the Financial Agency Agreement (FAA), dated September 19, 2024, between Treasury and Citibank. In accordance with Treasury's authorities under the FAA, Treasury is instructing Citibank, in its capacity as fiduciary, to comply with EPA's instructions to Citibank pursuant to the FAA.

Thank you.

Eric Froman
Office of the General Counsel
U.S. Department of the Treasury

# Exhibit H



**From:**
**To:**
**Subject:**      GGRF accounts

The U.S. Environmental Protection Agency (EPA) has informed the U.S. Department of the Treasury (Treasury) of their concerns regarding potential fraud and/or conflicts of interest related to the Greenhouse Gas Reduction Fund (GGRF). Treasury understands that the EPA anticipates developing additional account controls, including issuing a series of oversight questions to recipients, consistent with prudent operational standards and EPA's authority under grant agreement documents and Section I.B of Exhibit A to the Financial Agency Agreement (FAA), dated September 19, 2024, between Treasury and Citibank. Consequently, Treasury is instructing Citibank, in its capacity as fiduciary, to work directly with the EPA to establish and implement reasonable account controls to serve the purposes and interests of the United States, in accordance with Section 5 of the FAA. Further, in order to provide the EPA with the necessary time to develop reasonable account controls, we are further instructing Citibank not to disburse funds from any of the GGRF accounts prior to the end of the day Sunday, March 9, 2025.

Thank you.

Eric Froman
Office of the General Counsel
U.S. Department of the Treasury

# Exhibit I



U.S. Environmental Protection Agency
1200 Pennsylvania Ave, N.W.
Washington, DC 20460

March 11, 2025

By Email

Elizabeth Bafford
CEO
Climate United Fund
7550 Wisconsin Ave, 3rd floor
Bethesda, MD 20814

Re: Notice of Termination

Dear Elizabeth Bafford,

Pursuant to the U.S. Environmental Protection Agency's ("EPA" or "the Agency") authority under 2 C.F.R. §§ 200.339-40, the General Terms and Conditions of EPA assistance award agreements, the terms and conditions of the Grant Agreement, and the Agency's inherent authority to reconsider prior determinations in light of new information, the Agency is terminating Grant Agreement No. 84094001, awarded to Climate United Fund under the Greenhouse Gas Reduction Fund ("GGRF"), effective immediately. This termination is based on substantial concerns regarding program integrity, the award process, programmatic fraud, waste, and abuse, and misalignment with the Agency's priorities, which collectively undermine the fundamental goals and statutory objectives of the award.

Following a comprehensive review and consistent with multiple ongoing independent federal investigations into programmatic fraud, waste, abuse and conflicts of interest, EPA has identified material deficiencies, including, but not limited to: 1) the absence of adequate oversight and account controls to prevent financial mismanagement; 2) the improper or speculative allocation of funds inconsistent with EPA's oversight and fiscal responsibilities; and 3) the circumvention and defeat of key oversight mechanisms in the disbursement of federal funds. EPA has determined that these deficiencies pose an unacceptable risk to the efficient and lawful execution of this grant that cannot be remedied by imposing specific conditions, necessitating immediate termination to safeguard taxpayer funds and ensure compliance with federal financial assistance regulations.

Additionally, the Agency has considered concerns raised by EPA Administrator Lee Zeldin regarding the need for rigorous oversight and accountability in the administration of public funds. The Administrator has emphasized the importance of eliminating fraud, waste, and abuse within EPA, particularly in high-

value awards such as those under GGRF. The structural and operational weaknesses identified in the execution of this grant are inconsistent with these priorities and materially impair the EPA's ability to ensure compliance with statutory and regulatory mandates governing the lawful expenditure of public money.

The Agency has also determined that its existing process for awarding and overseeing execution of the Grant Agreement lacks sufficient protections to guard against potential violations of the Constitution, particularly the Appointments Clause and private nondelegation doctrine. U.S. Const. art. II, § 2, cl. 2; *e.g.*, *Alpine Sec. Corp. v. FINRA*, 121 F.4th 1314, 1341 (D.C. Cir. 2024). Consistent with its independent duty to avoid exceeding constitutional constraints, EPA has reconsidered the prior administration's conclusion that the oversight mechanisms for the Grant Agreement are sufficient to ensure that the Recipient will not exercise significant authority independently of EPA's oversight and ultimate approval.

This termination is executed in accordance with Sections III.S and III.T.4 of the Grant Agreement and with EPA's General Terms and Conditions as incorporated in, and applicable in addition to, the terms of the Grant Agreement, and is consistent with EPA's obligations to safeguard public funds and inherent authority to reconsider prior decisions. This letter constitutes the notice of termination required by 2 C.F.R. § 200.341. Consistent with 2 C.F.R. §§ 200.344-45 and the Closeout Agreement, the recipient is required to cease all further program expenditures immediately, provide a comprehensive final financial and programmatic report, and comply with all applicable closeout procedures.

EPA is committed to ensuring that federal funding is administered in a manner that upholds transparency, accountability, and the highest standards of fiscal responsibility. This termination reflects the Agency's duty to protect public funds and maintain the integrity of its grant programs. In the coming months, EPA will work to re-obligate lawfully appropriated funds within the GGRF program with enhanced controls to ensure adequate governance, transparency, and accountability, consistent with applicable regulatory and statutory requirements.

Sincerely,

W.C. McIntosh
Acting Deputy Administrator
U.S. Environmental Protection Agency

cc:
- U.S. EPA, Office of the Greenhouse Gas Reduction Fund (OGGRF)
- U.S. EPA, Office of Mission Support (OMS)
- U.S. EPA, Office of General Counsel (OGC)
- U.S. Department of Justice
- U.S. Department of the Treasury
- U.S. House of Representatives
- U.S. Senate
- Citibank, N.A.