**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CLIMATE UNITED FUND,<br><br>              Plaintiff,<br><br>    v.<br><br>CITIBANK, N.A., *et al.*,<br><br>              Defendants. | Case No. 1:25-cv-00698 (TSC) |
| COALITION FOR GREEN CAPITAL,<br><br>              Plaintiff,<br><br>    v.<br><br>CITIBANK, N.A., *et al.*,<br><br>              Defendants. | Case No. 1:25-cv-00735 (TSC) |
| POWER FORWARD COMMUNITIES, INC.,<br><br>              Plaintiff,<br><br>    v.<br><br>CITIBANK, N.A., *et al.*,<br><br>              Defendants. | Case No. 1:25-cv-00762 (TSC) |

**<u>DECLARATION OF ERIC AMIDON</u>**

I, Eric Amidon, hereby declare as follows:

    1.    I am the Chief of Staff of the Environmental Protection Agency (EPA).

I have held this position since January 21, 2025. In this position, I am responsible for

overseeing EPA initiatives, managing EPA operations, and coordinating activities across EPA's various mission offices.

2.  This declaration incorporates information known to me and collected through reasonable diligence from those involved in the decision to reconsider the EPA's approach to administering the Greenhouse Gas Reduction Fund ("GGRF") National Climate Investment Accelerator (NCIF) program and to terminate the NCIF grant awards to Climate United Fund (CUF), Coalition for Green Capital (CGC), and Power Forward Communities, Inc. (PFC) on March 11, 2025.

## I.   EPA's Determination That The Grants Lacked Adequate Oversight

3.  On January 20, 2025, President Trump was inaugurated as the 47th President of United States. Administrator Lee Zeldin was nominated to lead the EPA and confirmed by the Senate on January 29, 2025. Incoming EPA officials became seriously concerned about potential waste, fraud, abuse, and conflicts of interest in the GGRF program based on public reporting, communications from Congress, and the initial results of investigations into the Biden EPA's contractual scheme for administering $13.97 billion in NCIF grants and processes for grantee selection and oversight.

### A.   Public Reporting, Ethics, and Competency Concerns

4.  Incoming EPA officials were alarmed by statements made by Brent Efron, a Biden Administration official tasked with implementing the GGRF at the EPA, in a publicly reported December 2024 video. Mr. Efron stated that he worked "with Biden appointees" on GGRF "implementation" and expressed interest in "go[ing] [to] work for one of those places." Mr. Efron stated that the EPA had sought "until recently" to ensure "processes are in place to … prevent fraud and prevent abuse," but had changed course

after the 2024 presidential election to "get the money out as fast as possible before they come in" to the tune of "billions" of dollars, "with a B." Mr. Efron predicted that "Congress will say, we're stopping this entirely [and] pass a law that says all this money doesn't exist anymore" and explained that the EPA "gave [grantees] the money" as "an insurance policy against Trump winning" because it would be harder to pull back the funding. According to Mr. Efron, "it truly feels we're on the Titanic and we're throwing gold bars off the edge."[1]

5.  In February 2025, a news article revealed serious potential conflicts of interest on the part of Jahi Wise, former Senior Advisor to the Administrator and inaugural Director of the GGRF program at the EPA. The article noted that Mr. Wise had worked for CGC until joining the Biden White House Climate Policy Office in January 2021 and then joining the EPA in December 2022. Under Mr. Wise's leadership, the Biden EPA's GGRF program awarded CGC billions of dollars in GGRF grant funding. According to the article, Mr. Wise left the EPA in September 2024—after the EPA's GGRF program awarded CGC $5 billion in grant funding—to join the Open Society Institute, a nonprofit funded by George Soros. A true and correct copy of the news article is attached as **Exhibit A**.

6.  Mr. Wise only recused himself from agency matters involving CGC until January 21, 2023, which was the expiration of the two-year period following employment covered by the prior administration's ethics bar. The recusal period ended before the EPA

---

[1] 'Gold Bars': EPA Advisor Admits 'Insurance Policy' Against Trump Funnels Billions to Climate Groups, Youtube (Dec. 3, 2024), https://youtu.be/CblV6EwzKxg.

issued a Notice of Funding Opportunity (NOFO) in July 2023, before the EPA selected CGC in early 2024, and before the EPA issued a $5 billion grant award to CGC in August 2024.

7. In March 2024, a news article identified additional potential conflicts of interests involving Obama Administration and Biden Administration officials who held or currently hold leadership roles at the NCIF grantees. A true and correct copy of the news article is attached as **Exhibit B**.

8. Among other things, the article noted that:

    a. Beth Bafford, CUF's CEO, served as a special assistant in the Obama Administration Office of Management and Budget;

    b. Phil Aroneanu, CUF's Chief Strategy Officer, served as a strategic advisor to the Biden Administration Department of Energy for the last two years of the prior administration;

    c. Richard Kauffman, CFC's CEO, served as a senior advisor to the Obama Administration Department of Energy and as New York Governor Andrew Cuomo's "energy czar";

    d. Tim Mayopoulos, PFC's CEO, served as CEO of Fannie Mae during the Obama Administration;

    e. and major subgrantees selected by the NFIC grantees had similar entanglements with the Obama and/or Biden Administrations.

9. The article also noted that CUF, CFC, and PFC lacked a demonstrated history of successfully managing billions of dollars. CUF is a coalition of three nonprofits that joined together in June 2023 for the purpose of applying for GGRF funds; CFC

expended only $2.42 million in 2023 before receiving a $5 billion award; and PFC became a registered nonprofit only in late 2023.

10. More recently, a February 2025 article confirmed that PFC had received only $100 in 2023 and had not secured tax-exempt status from the Internal Revenue Service until 2024. The article further confirmed that Democratic politician Stacey Abrams has held senior advisory, consultant, and counsel roles at Rewiring America, one of PFC's main coalition partners. A true and correct copy of the news article is attached as **Exhibit C**.

11. Incoming EPA officials also received an ethics complaint from a watchdog organization regarding conflicts of interest that was originally filed on June 27, 2024, and resubmitted on March 7, 2025, to Administrator Zeldin, the White House, and EPA's Office of Inspector General (OIG). The complaint revealed that Mr. Hayes had served on CGC's Board of Directors before joining the Biden Administration in January 2021 as Special Assistant to the President for Climate Policy. Mr. Hayes subsequently returned to CGC's Board of Directors before CGC formally submitted its application for billions of dollars in GGRF funding from EPA (which it ultimately received). A true and correct copy of the refiled ethics complaint is attached as **Exhibit D**.

12. Incoming EPA officials were further concerned by the Biden EPA's decision to require the NCIF grantees to complete basic budget trainings, which suggested an acknowledgement that the grantees lacked the necessary competency and established track record to manage billions of dollars in taxpayer funds. The Grant Agreements required each NCIF grantee to complete a "How to Develop a Budget" training within 90 days. The EPA does not generally require this training for applications received prior to

March 4, 2024, including CUF's, CGC's, and PFC's applications, but may determine that the training should be required on a case-by-case basis.

### B. Congressional Oversight

13. Members of Congress and Committees with oversight responsibility over the EPA expressed significant concern regarding the Biden EPA's contractual scheme, award decisions, and selection process.

14. The House Committee on Energy and Commerce's Subcommittee on Oversight and Investigations conducted a hearing on January 31, 2024, regarding potential waste, fraud, and abuse in the GGRF program as it was being formulated by EPA. Representative Cathy McMorris Rodgers, Chair of the House Committee on Energy and Commerce, noted that PFC was a newly formed coalition that included Rewiring America, an organization that counted Stacy Abrams and several other former Democratic appointees and political action committee members among its leadership. Representative McMorris Rodgers and other participating Representatives expressed urgent concerns with EPA's implementation of the GGRF grant program.[2]

15. Former EPA Inspector General Sean O'Donnell testified to the House Energy and Commerce Subcommittee on Environment, Manufacturing, and Critical Materials on September 19, 2024, that the EPA's "pace of spending" GGRF funds "escalates not only the risk for fraud but also the urgency for oversight." Mr. O'Donnell

---

[2] Hearing: Fighting the Misuse of Biden's Green Bank Giveaway, House Comm. On Energy and Commerce Subcomm. on Oversight and Investigations (Jan. 30, 2024), https://energycommerce.house.gov/events/oversight-and-investigations-subcommittee-hearing-fighting-the-misuse-of-biden-s-green-bank-giveaway-1.

further testified that EPA's OIG "would need to hire oversight professional[s] with specialized expertise" to conduct sufficient oversight regarding the NCIF grants in particular, not only to "preven[t] waste, fraud, and abuse, but also [to] ensur[e] that IRA funds deliver the real environmental and human health benefits that the public is paying for." Because EPA's OIG had not been allocated funds for this purpose, EPA OIG's "ability to expand" such oversight "is severely limited."[3]

16.   At Administrator Zeldin's confirmation hearing on January 16, 2025, Senator Pete Ricketts questioned the Administrator on EPA's expenditure of grant funding. Senator Ricketts noted that the Senate Committee on Environment and Public Works had serious concerns about "how some of these dollars were being distributed" and that he and Senator Shelley Moore Capito, the Committee's chair, had recently held a press conference to address the subject. Senator Ricketts sought, and obtained, a commitment from the Administrator to "look into this to make sure those dollars were spent appropriately" and to "claw back those taxpayer dollars" that had not already been distributed.[4]

17.   EPA's Acting Inspector General Nicole Murley testified to the House Energy and Commerce Subcommittee on Oversight and Investigations on February 26, 2025, that EPA was "particularly concerned about" the GGRF program, including because

---

[3] Statement of Inspector General Sean O'Donnell, Hearing before the H. Comm. on Energy and Commerce Subcomm. on Environment, Manufacturing, and Critical Materials (Sept. 19, 2024), https://energycommerce.house.gov/events/subcommittee-on-environment-manufacturing-and-critical-materials-hearing-holding-the-biden-harris-epa-accountable-for-radical-rush-to-green-spending.

[4] Hearing on the Nomination of Lee Zeldin to be Administrator of the Environmental Protection Agency, S. Comm. on Environment and Public Works (Jan. 16, 2025), https://www.epw.senate.gov/public/index.cfm/2025/1/hearing-on-the-nomination-of-the-honorable-lee-m-zeldin-to-be-administrator-of-the-environmental-protection-agency.

the grant "structure makes providing effective oversight challenging," and that EPA is "concerned that there will be critical gaps in monitoring, accountability, and compliance in the GGRF."[5]

### C. Last Minute Amendments to the Grant Agreements

18. Incoming EPA officials initiated a review of the NCIF grants, including the December 20, 2024 and January 13, 2025 amendments to key provisions in the Grant Agreements and Account Control Agreements (ACAs), to assess the adequacy of the remaining oversight mechanisms for ensuring the $6.97 billion in public funds included within the award are spent effectively and lawfully to accomplish the objectives of CAA section 143.

19. EPA determined that the Biden Administration's contractual scheme for administering the NCIF grants did not provide sufficient oversight and transparency to accomplish these stewardship obligations and objectives. The EPA cannot, for example, assert control over grant funds in subgrantee accounts short of outright termination and does not have a contractual relationship with subgrantees. The EPA also lacks sufficient visibility, oversight, and control into subgrantee activities, as the Biden EPA's contractual scheme significantly shifted oversight responsibility to the NCIF grantees. As described below, the Biden EPA's last-minute amendments to the Grant Agreements and Account Control Agreements further deprived the EPA of contractual rights to insist on the NCIF

---

[5] Statement of Acting Inspector General Nicole N. Murley, Hearing before the H. Comm. on Energy and Commerce Subcomm. on Oversight and Investigations (Feb. 26, 2025), https://www.epaoig.gov/congressional-testimony/congressional-testimony-hearing-subcommittee-oversight-and-investigations-0.

grantees' adherence to these responsibilities by imposing inexplicable, unexplained, and unprecedented barriers to EPA's ability to find noncompliance and reduce the awards short of outright termination.

20. On August 8, 2024, EPA issued Grant Agreements to CUF, CGC, and PFC that included virtually identical terms and conditions.

21. Section III.S, titled "Remedies for Noncompliance," provided that EPA may impose remedies for noncompliance, including termination, with a limited set of circumstances where grantees would receive notice and opportunity to cure:

> The Recipient agrees to comply with the terms and conditions of the Award Agreement. Should the Recipient fail to adhere to the terms and conditions of the Award Agreement, the EPA may impose additional conditions as set forth in 2 CFR 200.208. If the EPA determines that noncompliance cannot be remedied by imposing additional conditions, the EPA may seek remedies under 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as provided in 2 CFR 200.343. ...Notwithstanding any other provision of this Award Agreement, EPA will not determine that Recipient has failed to comply with the terms and conditions of the Award Agreement, without providing an opportunity to remedy under 2 CFR 200.208, for good faith efforts to comply with the Additional Programmatic Terms and Conditions regarding Build America, Buy America or Labor and Equitable Workforce Development Requirements.

22. Section III.T.4, titled "Termination," purported to modify EPA's General Terms and Conditions and applicable regulations:

> Notwithstanding the General Term and Condition "Termination," EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 applicable to EPA grants as of July 1, 2024, pursuant to 89 FR 55262 (July 3, 2024), when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is materially impaired or there is adequate evidence of waste, fraud, material misrepresentation of eligibility status, or abuse, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the Assistance Agreement, EPA must (1) de-obligate uncommitted funds and re-obligate them to another Eligible Recipient to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 days of the de-obligation and (2) amend the Recipient's Assistance Agreement to reflect

the reduced amount, based on the de-obligation. In accordance with 2 CFR 200.341, EPA will provide the Recipient notice of termination.

23. The Grant Agreements issued on August 8, 2024, did not define the terms "Materially Impaired" or "Waste, Fraud, and Abuse," and used the terms in a manner that left EPA with significant discretion to administer the agreement.

24. On November 5, 2024, then former President Donald Trump defeated then Vice President Kamala Harris in the presidential election. State electors formally cast their votes in the Electoral College on December 17, 2024.

25. On December 20, 2024, EPA issued amended Grant Agreements that revised the compliance and termination provisions and specifically defined the terms "Materially Impaired" and "Waste, Fraud, and Abuse." The amendments did not define any other additional terms or materially alter the existing terms of other provisions of the Grant Agreements as relevant here.

26. As amended, Section III.S, titled "Remedies for Noncompliance," added several critical oversight provisions to the list of conditions for which the grantees would receive notice and opportunity to cure before EPA could assert contractual authority to find noncompliance (changes bolded):

> The Recipient agrees to comply with the terms and conditions of the Award Agreement. Should the Recipient fail to adhere to the terms and conditions of the Award Agreement, the EPA may impose additional conditions as set forth in 2 CFR 200.208. If the EPA determines that noncompliance cannot be remedied by imposing additional conditions, the EPA may seek remedies under 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as provided in 2 CFR 200.343. ...Notwithstanding any other provision of this Award Agreement, EPA will not determine that Recipient has failed to comply with the terms and conditions of the Award Agreement, without providing a reasonable opportunity to remedy under 2 CFR 200.208, for good faith efforts to comply with the **Performance Reporting National Programmatic Term and Condition**,

> Additional Programmatic Terms and Conditions regarding Build America, Buy America or Labor and Equitable Workforce Development Requirements, **requirements for Subrecipient oversight, or to obligate or expend funds for allowable activities**.

By adding these terms to the list of conditions, EPA removed its contractual authority to find the grantees in immediate noncompliance for failing to report the expenditure of grant funds, audit results, and project status (Performance Reporting), to oversee subrecipient compliance with statutory, regulatory, and contractual requirements (Subrecipient oversight), and to spend grant funds only on activities allowed by CAA section 134 (allowable activities).

27.   As amended, Section III.T.4, titled "Termination," incorporated new defined terms for "Materially Impaired" and "Waste, Fraud, or Abuse" (changes bolded):

> EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 **effective as of October 1, 2024**, when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is **Materially Impaired** or there is adequate evidence of **Waste, Fraud, or Abuse** or material misrepresentation of eligibility status, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the Assistance Agreement, EPA must (1) de-obligate uncommitted funds and re-obligate them to another Eligible Recipient **selected under Funding Opportunity Number 66.957 (NCIF)** to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 days of the de-obligation and (2) amend the Recipient's Assistance Agreement to reflect the reduced amount, based on the de-obligation. In accordance with 2 CFR 200.341, EPA will provide the Recipient notice of termination. **If an Eligible Recipient has assumed a legal obligation properly incurred for an allowable activity entered into by a suspended or terminated Recipient, EPA will re-obligate funds to the Eligible Recipient to satisfy the legal obligation and accept an amended workplan and budget to that effect.**

As explained further below, this revision purported to restrict EPA's contractual authority to terminate absent evidence of severe criminal or civil violations.

28. The new definition of "Materially Impaired" in the amended Grant Agreements specified that:

> EPA defines 'Materially Impaired' in the context of effective performance of the Assistance Agreement as 1) the issuance of a written determination and finding from EPA that the Recipient has failed to achieve sufficient progress in accordance with the Sufficient Progress clause under the Clarifications to EPA General Terms and Conditions Programmatic Term and Condition and 2) if EPA in its sole discretion determines that a corrective action plan is an appropriate means of remedying the lack of sufficient progress, the subsequent issuance of a separate written determination and finding from EPA that the Recipient has not materially addressed its failure to achieve sufficient progress after implementing a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

Read together with the amended termination provision, this language purported to revise EPA's contractual right to terminate for noncompliance absent written determinations and opportunities to cure for elements that were not required under the terms of the original agreement of August 8, 2024.

29. The new definition of "Waste, Fraud, and Abuse" in the amended Grant Agreements specified that:

> For the definition and application of these terms under this Assistance Agreement … and any associated legal documentation related to the Assistance Agreement, refer to their use in the Reporting Waste, Fraud, and Abuse clause in the EPA General Terms and Conditions effective October 1, 2024 and 2 CFR 200.113: "credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act 31 U.S.C. 3729-3733.

Read together with the amended termination provision, this language purported to revise EPA's contractual right to terminate for misconduct to "credible evidence" that the grantees committed one or more serious federal crimes or actionable civil violations under the False Claims Act. That heightened determination was not required under the terms of the original agreements of August 8, 2024, to which the definition now applied.

30. Incoming EPA officials determined that these amendments had no plausible purpose other than restricting EPA's ability to exercise oversight and control over the billions of taxpayer dollars held at Citibank for the grantees' purposes.

### D. Last Minute Amendments to the Account Control Agreements

31. On September 19, 2024, the U.S. Department of the Treasury (Treasury) concluded a Financial Agency Agreement (FAA) with Citibank, NA that selected Citibank to serve as financial agency for the funds awarded to the NCIF and CCIA grantees. EPA was not a party to the FAA but retained certain rights to issue account controls in addition to the rights retained by Treasury to issue instructions to the financial agent.

32. On November 1, 2024, EPA, Citibank, and each NCIF grantee entered into an Account Control Agreement (ACA) governing the grant funds held at Citibank as the financial agent. The ACAs provided that Citibank would process grantee payment instructions and transactions without prior approval from EPA, which held an interest in the funds as a secured party, provided that the grantees certified the amount of payment was necessary to execute against the workplan and copied EPA on the transaction notice. Related provisions in the Grant Agreements authorized the NCIF grantees to withdraw funds without prior EPA approval so long as the withdrawal "d[id] not exceed 10% of the total budget approved at time of award" for a given category.

33. The ACAs further provided that EPA could exercise its right as a secured party to take control over grant funds held at Citibank by filing a "Notice of Exclusive Control." As originally worded, Section 2 of the ACAs stated that:

> The Bank shall comply with all instructions, notifications, and entitlement orders the Bank receives directing the disposition of funds and financial assets in the Accounts including, without limitation, directions to distribute proceeds of any

such transfer or redemption of interest or dividends on financial assets in the Accounts, substantially in the form attached hereto as Exhibit B Account Direction the Pledgor, until the time that that Bank receives a notice, substantially in the form attached hereto as Exhibit A Notice of Exclusive Control from the Secured Party that the Secured Party is exercising its right to exclusive control over an Account, and after such time that the Bank receives a Notice of Exclusive Control, the Secured Party for such Account, without further consent by the Pledgor.

34. On January 13, 2025, EPA, Citibank, and each NCIF grantee signed an amendment to the ACAs that revised Section 2 with respect to the effect of EPA's filing of a Notice of Exclusive Control. New language at the end of Section 2 stated that:

> ; provided that notwithstanding the foregoing, after the delivery of a Notice of Exclusive Control, Bank shall continue to disburse funds and financial assets associated with financial obligations "properly incurred" by the Pledgor prior to the issuance of, but not in anticipation of, delivery of a Notice of Exclusive Control, in Pledgor's "Reserve" Account pursuant to Account Directions originated by Pledgor except for an specific funds or financial assets, identified by Secured Party in the applicable Notice of Exclusive Control as not being "properly incurred" by the Pledgor in accordance with 2 CFR 200.343.

Because of this amendment, EPA's filing of a Notice of Exclusive Control would no longer result in the grantees needing to obtain EPA's consent before instructing Citibank to disburse funds for expenses the grantees considered "properly incurred."

35. Incoming EPA officials determined that these amendments had no plausible purpose other than restricting EPA's ability to reassert control over the grant funds held at Citibank through anything short of outright termination.

### III. EPA's Further Determinations and Ongoing Investigations

36. Under Administrator Zeldin's leadership, EPA has reassessed and adopted agency policies and priorities that materially differ from the prior administration. For example, on March 3, 2025, the Administrator issued a public statement emphasizing that the "American people deserve accountability and responsible stewardship of their tax

dollars" and that "[i]t is my pledge to be accountable for every penny EPA spends." The Administrator noted that this policy "marks a stark turn from the waste and self-dealing of the Biden-Harris Administration intentionally tossing 'gold bars off the Titanic.'" EPA has also initiated a review of prior actions for consistency with the Constitution and the best reading of applicable statutes. *See* Exec. Order 14222, 90 Fed. Reg. 11,095 (Mar. 3, 2025).

37.   With respect to the NCIF grants, EPA determined that the Grant Agreements and related contracts raise serious constitutional concerns under the Appointments Clause and private nondelegation doctrine. Specifically, EPA determined that the financial structure of the grant effectively delegates EPA's authority to distribute grant funds under CAA section 134 to a private entity that is not properly appointed as an officer of the United States and over which EPA lacks sufficient oversight and control to retain ultimate authority over fund expenditure. Moreover, EPA determined that the amendments of December 20, 2024 and January 13, 2025—which limited EPA's contractual rights to terminate for misconduct short of a federal crime and limited EPA's contractual rights to assert exclusive control over funds in the Citibank accounts—left EPA with insufficient authority to retain control of funds short of outright termination.

38.   On March 2, 2025, EPA referred its findings on financial mismanagement, conflicts of interest, and oversight failures within the GGRF program to EPA's OIG for further investigation. The referral letter explained that:

> a.   The prior administration's unprecedented choice to use a financial agent for EPA grants deprives the Government of immediate control over money held in grantee accounts at Citibank, particularly under Section 2 of the ACAs as amended on January 13, 2025;

    b. EPA lacks sufficient oversight and transparency into the use of grant funding because grantees act as a pass-through for subrecipients, many of which are themselves pass-throughs, and EPA is not a party to agreements between the grantees and the subrecipients;

    c. Conflicts of interest involving high-level EPA GGRF officials raise questions about EPA's selection processes;

    d. Grants were awarded to entities that apparently failed to meet statutory and regulatory requirements for eligibility, including because they had insufficient experience managing substantial funding and may not have been operative prior to 2023; and

    e. Last-minute modifications to the Grant Agreements and ACAs appeared intentionally designed to reduce EPA's oversight and control over grant funding.

39. The Department of Justice and Federal Bureau of Investigation have initiated a criminal investigation into the GGRF program, including potential fraud, waste, abuse, and impermissible conflicts of interest in connection with NCIF and CCIA grants. EPA is cooperating fully in that investigation, which remains ongoing, and is not at liberty to disclose additional facts uncovered as part of the investigation.

40. EPA OIG has initiated an investigation into the GGRF program, including based on the March 2, 2025 referral letter. EPA is cooperating fully in that investigation, which remains ongoing, and is not at liberty to disclose additional facts uncovered as part of the investigation.

**IV.     EPA's Termination Decisions**

41.    On March 11, 2025, EPA terminated the Grant Agreements with CUF, CGC, and PFC by sending Notices of Termination to the Agency's contact of record for each grant. EPA specified that the termination was effective immediately, included the entirety of the grant, and was executed in accordance with Sections III.S and III.T.4 of each Grant Agreement, EPA's General Terms and Conditions, and EPA's inherent authority to reconsider prior decisions.

42.    EPA noted that the terminations were based on substantial concerns regarding program integrity, the award process, and programmatic fraud, waste, and abuse. EPA also noted that the grants no longer aligned with the Agency's priorities or effectuated the fundamental goals of the underlying statute.

43.    EPA explained that the grants lacked "adequate oversight and account controls to prevent financial mismanagement," were deficient with respect to "the improper or speculative allocation of funds inconsistent with EPA's oversight and fiscal responsibilities," and involved "the circumvention and defeat of key oversight mechanisms in the disbursement of federal funds."

44.    EPA further explained its determinations that the grants lacked sufficient protections to guard against violations of the Appointments Clause and private nondelegation doctrine. Specifically, EPA reconsidered the previous administration's apparent position that the Grant Agreements contained sufficient controls to ensure that EPA retailed ultimate oversight and approval over use of the grant funds.

45.    Finally, EPA confirmed that the Agency and NCIF grantees would proceed to the closeout process as provided by 2 C.F.R. §§ 200.344-45 and the Closeout Agreement.

EPA further stated that consistent with CAA Section 134 and language in each Grant Agreement, the EPA would proceed in the coming months to reobligate the NCIF funding in a manner that ensures adequate oversight, accountability, and effective and efficient use of taxpayer dollars.

      I HEREBY DECLARE TO THE BEST OF MY KNOWLEDGE AND BELIEF, UNDER PENALTY OF PERJURY under the laws of the United States of America, that the foregoing is true and correct.

EXECUTED this 26th day of March, 2025 at Washington, DC.

_____
Eric Amidon