# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CLIMATE UNITED FUND** | |
| Plaintiff, | |
| v. | Civil Action No. 25-cv-698-TSC |
| **CITIBANK, N.A.**, *et al.* | |
| Defendants. | |
| **COALITION FOR GREEN CAPITAL** | |
| Plaintiff, | |
| v. | Civil Action No. 25-cv-735-TSC |
| **CITIBANK, N.A.**, *et al.* | |
| Defendants. | |
| **POWER FORWARD COMMUNITIES, INC.** | |
| Plaintiff, | |
| v. | Civil Action No. 25-cv-762-TSC |
| **CITIBANK, N.A.**, *et al.* | |
| Defendants. | |

## REPLY IN SUPPORT OF PLAINTIFFS' CONSOLIDATED MOTION FOR PRELIMINARY INJUNCTION

Vincent Levy (NY 0487)
Kevin D. Benish (NY 0495)
Patrick J. Woods*
Daniel Fahrenthold (NY0603)
HOLWELL SHUSTER & GOLDBERG LLP
425 Lexington Avenue, 14th Floor
New York, NY 10017
Tel.: (646) 837-5151
vlevy@hsgllp.com
*Application for admission pending.

*Attorneys for Plaintiff Coalition for Green Capital*

Beth C. Neitzel (103611)
Jack C. Smith (1725229)
Kevin Y. Chen (admitted *pro hac vice*)
FOLEY HOAG LLP
155 Seaport Boulevard, Suite 1600
Boston, MA 02210
Tel. (617) 832-1000
bneitzel@foleyhoag.com
jcsmith@foleyhoag.com
kchen@foleyhoag.com

Noah C. Shaw (*pro hac vice* motion pending)
James M. Gross (admitted *pro hac vice*)
FOLEY HOAG LLP
1301 Ave. of the Americas, 25th Floor
New York, NY 10019
Tel.: (212) 812-0400
ncshaw@foleyhoag.com
jgross@foleyhoag.com

*Attorneys for Plaintiff Power Forward Communities*

Adam G. Unikowsky (989053)
Kathryn L. Wynbrandt* (1602446)
David B. Robbins (493976)
Tanner J. Lockhead* (90011928)
JENNER & BLOCK LLP
1099 New York Avenue, Suite 900
Washington, D.C. 20001
Tel.: (202) 639-6000
Fax: (202) 639-6066
aunikowsky@jenner.com
*Application for admission pending.

Gabriel K. Gillett (admitted *pro hac vice*)
Simon A. de Carvalho (*pro hac vice* forthcoming)
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
Tel.: (312) 222-9350
ggillett@jenner.com
sdecarvalho@jenner.com

Allison N. Douglis (admitted *pro hac vice*)
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036
Tel.: (212) 891-1600
Fax: (212) 891-1699
adouglis@jenner.com

*Attorneys for Plaintiff Climate United Fund*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................... iii

GLOSSARY OF TERMS .................................................................................... vii

INTRODUCTION .................................................................................................1

ARGUMENT ........................................................................................................3

I.     This Court Has Jurisdiction Over All Claims Against EPA. ...............................3

       A.     The Tucker Act Does Not Impliedly Preempt Plaintiffs' APA Claims. .................3

              1.     Plaintiffs' Rights Arise From Regulations, Statutes, and the
                     Constitution. ...............................................................................4

              2.     Plaintiffs Do Not Seek Damages or "Specific Performance." .....................7

              3.     Plaintiffs Do Not Challenge Unreviewable Funding Decisions. ................9

       B.     Plaintiffs May Alternatively Invoke this Court's Equitable Jurisdiction ..............10

II.    The Court Should Issue a Preliminary Injunction Barring EPA From
       Terminating Plaintiffs' Grants or Impeding Citibank From Disbursing Grant
       Funds. ........................................................................................................11

       A.     Plaintiffs Are Likely to Succeed on Their Claims for Violations of
              Federal Law. ..........................................................................................11

              1.     EPA Violated the Prohibition on Arbitrary and Capricious
                     Action. .....................................................................................11

              2.     EPA's Notices of Termination Violate Federal Regulations. ....................15

              3.     EPA's Notices of Termination Violate the Inflation Reduction
                     Act. ..........................................................................................16

              4.     EPA's Suspension of the Grants Violates the APA. ................................17

       B.     Plaintiffs Are Likely to Succeed on Their Appropriations Clause
              Claims. ..................................................................................................18

       C.     Plaintiffs Are Likely to Succeed on Their Due Process Claims. ..........................20

       D.     Plaintiffs Will Suffer Irreparable Harm Absent Injunctive Relief Against
              EPA. ......................................................................................................22

E.      The Balance of Equities and Public Interest Favor Plaintiffs Over EPA. .............25

F.      The Court Should Reject EPA's Request for a Bond. ............................................25

III.    The Court Should Issue a Preliminary Injunction Barring Citibank From Failing
        to Disburse Plaintiffs' Grant Funds Pursuant to the ACAs. ..............................................27

A.      Plaintiffs Are Likely to Succeed on Their Claims Against Citibank.....................27

B.      The Other Preliminary Injunction Factors Favor Plaintiffs. ..................................30

C.      Citibank's Request for a Stay or Dismissal Is Improper, and the
        Principles of Derivative Sovereign Immunity It Invokes Are Inapposite.............30

CONCLUSION...................................................................................................................................30

# TABLE OF AUTHORITIES[*]

**CASES**

*AIDS Vaccine Advocacy Coalition v. United States Department of State*, 2025 WL 752378 (D.D.C. Mar. 10, 2025)..................................................................6, 20

*In re Aiken County*, 725 F.3d 255 (D.C. Cir. 2013)..............................................17, 19

*Alexander v. Sandoval*, 532 U.S. 275 (2001)...............................................................10

*American First Legal Foundation v. Becerra*, 2024 WL 3741402 (D.D.C. Aug. 9, 2024) ..........................................................................................................................26

*America's Community Bankers v. FDIC*, 200 F.3d 822 (D.C. Cir. 2000)....................8

*American Ass'n of Colleges for Teacher Education v. McMahon*, 2025 WL 863319 (D. Md. Mar. 19, 2025) ...........................................................................................6

*Amerijet International, Inc. v. Pistole*, 753 F.3d 1343 (D.C. Cir. 2014) ....................11

*Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320 (2015).............................10

*Bailey v. Federal Bureau of Prisons*, 2024 WL 3219207 (D.D.C. June 28, 2024) ......26

*Benderson Development Co. v. United States Postal Service*, 998 F.2d 959 (Fed. Cir. 1993) .............................................................................................................7

*Boaz Housing Authority v. United States*, 994 F.3d 1359 (Fed. Cir. 2021)...................7

*Bowen v. Massachusetts*, 487 U.S. 879 (1988)..........................................................8, 9

*Campbell-Ewald Co. v. Gomez*, 577 U.S. 153 (2016) .................................................30

*Carroll v. Safford*, 44 U.S. (3 How.) 441 (1845)........................................................11

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971), *abrogated by Califano v. Sanders*, 430 U.S. 99 (1977) ................................................................9

*City of New Haven v. United States*, 809 F.2d 900 (D.C. Cir. 1987) ..........................19

*Crowley Government Services, Inc. v. General Services Administration*, 38 F.4th 1099 (D.C. Cir. 2022) ...........................................................................................4, 6

*Dart v. United States*, 848 F.2d 217 (D.C. Cir. 1988) .................................................11

---

[*] Authorities upon which we chiefly rely are marked with an asterisk.

iii

*Department of Commerce v. New York*, 588 U.S. 752 (2019)................................................14, 15

*Destiny USA Holdings, LLC v. Citigroup Global Markets Realty Corp.*, 69 A.D.3d 212 (N.Y. App. Div., 4th Dep't 2009) ..............................................................................................30

*District of Columbia v. Department of Agriculture*, 444 F. Supp. 3d 1 (D.D.C. 2020) ...............26

*Does 1-26 v. Musk*, 2025 WL 840574 (D. Md. Mar. 18, 2025)....................................................26

*DSE, Inc. v. United States*, 169 F.3d 21 (D.C. Cir. 1999) ............................................................25

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009)...........................................................13

*Guerrero-Lasprilla v. Barr*, 589 U.S. 221 (2020) ..........................................................................7

*Hein v. Freedom from Religion Foundation, Inc.*, 551 U.S. 587 (2007).......................................19

*Horwitz-Matthews, Inc. v. City of Chicago*, 78 F.3d 1248 (7th Cir. 1996) ....................................7

*Hughes Communications Galaxy, Inc. v. United States*, 271 F.3d 1060 (Fed. Cir. 2001) .................................................................................................................................................21

*Ingersoll-Rand Co. v. United States*, 780 F.2d 74 (D.C. Cir. 1985)..............................................5

*Ipsen Biopharmaceuticals, Inc. v. Azar*, 943 F.3d 953 (D.C. Cir. 2019)......................................18

*In re Joliet-Will County Community Action Agency*, 847 F.2d 430 (7th Cir. 1988)......................22

*Kelso Enterprises Ltd. v. A.P. Moller-Maersk*, 375 F. App'x 48 (2d Cir. 2010)...........................29

*Lincoln v. Vigil*, 508 U.S. 182 (1993) ..........................................................................................10

*Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) ...............................................1, 3, 11

*Maryland v. Department of Agriculture*, 2025 WL 800216 (D. Md. Mar. 13, 2025) ...................26

*Maryland Department of Human Resources v. Department of Health & Human Services*, 763 F.2d 1441 (D.C. Cir. 1985)...........................................................................................8, 9

*Massachusetts Law Reform Institute v. Legal Servs. Corp.*, 581 F. Supp. 1179 (D.D.C.), *aff'd*, 737 F.2d 1206 (D.C. Cir. 1984) ......................................................................................23

*Massachusetts v. National Institutes of Health*, 2025 WL 702163 (D. Mass. Mar. 5, 2025) ..........................................................................................................................................6

*Matek Inc. v. IBM Corp.*, 2024 WL 663340 (D.D.C. Feb. 16, 2024) ......................................28, 29

*McQuiggin v. Perkins*, 569 U.S. 383 (2013).................................................................................11

*Mead Johnson & Co. v. Abbott Laboratories*, 201 F.3d 883 (7th Cir. 2000), *amended on denial of reh'g*, 209 F.3d 1032 (7th Cir. 2000) ................................................................26

\**Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982) ........................................4, 6

\**Motor Vehicles Manufacturers Ass'n of United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983) ........................................................12

*Nalco Co. v. United States EPA*, 786 F. Supp. 2d 177 (D.D.C. 2011) .........................23

*National Council of Nonprofits v. OMB*, 2025 WL 368852 (D.D.C. Feb. 3, 2025) .......... 17-18

*National Council of Nonprofits v. OMB*, 2025 WL 597959 (D.D.C. Feb. 25, 2025) ..........23, 26

*NB ex rel. Peacock v. District of Columbia*, 794 F.3d 31 (D.C. Cir. 2015) ................22

*Nomura Home Equity Loan, Inc. v. Nomura Credit & Capital, Inc.*, 30 N.Y.3d 572 (2017) .........................................................................................29

*Olympic Federal Savings & Loan Ass'n v. Director, Office of Thrift Supervision*, 1990 WL 134841 (D.D.C. Sept. 6, 1990) .................................................................21

*In re OPM Data Security Breach Litigation*, 928 F.3d 42 (D.C. Cir. 2019) ................30

*OPM v. Richmond*, 496 U.S. 414 (1990) .......................................................19

*Osborn v. Bank of United States*, 22 U.S. (9 Wheat.) 738 (1824) .............................11

*Pacito v. Trump*, 2025 WL 655075 (W.D. Wash. Feb. 28, 2025) ................................6

*P.J.E.S. ex rel. Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492 (D.D.C. 2020) ..........25

*Physicians for Social Responsibility v. Wheeler*, 956 F.3d 634 (D.C. Cir. 2020) ..........9-10

*Sierra Club v. Salazar*, 177 F. Supp. 3d 512 (D.D.C. 2016) ..................................12

*Spectrum Leasing Corp. v. United States*, 764 F.2d 891 (D.C. Cir. 1985) ..................5, 6

*Texas Children's Hospital v. Burwell*, 76 F. Supp. 3d 224 (D.D.C. 2014) ..................23

*Train v. City of New York*, 420 U.S. 35 (1975) ..............................................19, 20

*United States Conference of Catholic Bishops v. Department of State*, 2025 WL 763738 (D.D.C. Mar. 11, 2025) .............................................................................6

*United States v. Winstar Corp.*, 518 U.S. 839 (1996) ........................................7

*Vinyl Inst., Inc. v. EPA*, 106 F.4th 1118 (D.C. Cir. 2024) .................................13

*W.W.W. Associates, Inc. v. Giancontieri*, 77 N.Y.2d 157 (1990)....................................28

*XP Vehicles, Inc. v. Department of Energy*, 118 F. Supp. 3d 38 (D.D.C. 2015)..........................18

STATUTES

5 U.S.C. § 701(a)(2).................................................................................9

42 U.S.C. § 7434(a)(1)-(3)..........................................................................20

42 U.S.C. § 7434(c)(1)..............................................................................17

OTHER AUTHORITIES

2 C.F.R. § 200.340..............................................................................4, 13

2 C.F.R. § 200.340(a)(4).......................................................................15, 16

2 C.F.R. § 200.341(a)..............................................................................15

2 C.F.R. § 200.342.................................................................................15

Applicability Date for the Office of Management and Budget's Regulatory Revisions,
89 Fed. Reg. 55,262 (July 3, 2024)...........................................................2, 14, 16

Guidance for Federal Financial Assistance, 89 Fed. Reg. 30,046 (Apr. 22, 2024) ...........13, 14, 16

Press Release, EPA, <u>Administrator Zeldin Announces that Billions of Dollars Worth of
"Gold Bars" Have Been Located at Outside Financial Institution</u> (Feb. 13, 2025)................18

## GLOSSARY OF TERMS

| Term or Abbreviation | Definition | Citation(s) |
|---|---|---|
| ACA | Account Control Agreement with Citibank, related to Plaintiffs' grants. | CU Ex. 8 CGC Ex. A PFC Ex. D |
| Amidon Decl. | Declaration of Eric Amidon (EPA) | |
| Bafford Decl. | Declaration of Elizabeth Bafford (CU) | |
| Brown Decl. | Declaration of Stephen Brown (CGC) | |
| Buendia Decl. | Declaration of Jessica Buendia (CGC) | |
| CGC | Coalition for Green Capital | |
| CGC Ex. | Exhibits to the Declaration of Vincent Levy | CGC Exs. A-J |
| CU | Climate United Fund | |
| CU Ex. | Exhibits to the Declaration of Elizabeth Bafford | CU Exs. 1-11 |
| Dkt. | Docket entry in *Climate United Fund v. Citibank, N.A., et al.*, 25-cv-698 | Dkt. |
| Donovan Decl. | Declaration of Shaun Donovan (PFC) | |
| FAA | Financial Agency Agreement between Citibank and U.S. Department of the Treasury | Dkt. 14-1 |
| GGRF | Greenhouse Gas Reduction Fund | |
| GSA | U.S. General Services Administration | |
| Hopson Decl. | Declaration of Eli Hopson (CGC) | |
| Kauffman Decl. | Declaration of Richard Kauffman (CGC) | |
| Matusiak Decl. | Declaration of Ari Matusiak (PFC) | |
| Mayopoulos Decl. | Declaration of Timothy J. Mayopoulos (PFC) | |
| Moon Decl. | Declaration of John Moon (PFC) | |
| NOA | Notice of Award | |
| NOFO | Notice of Funding Opportunity | |
| Notice | Notice of Termination of grant issued by EPA to each Plaintiff, dated March 11, 2025 | CU Ex. 11 CGC Ex. I PFC Ex. J |
| ODAG | Office of the Deputy Attorney General | |
| PFC | Power Forward Communities, Inc. | |
| PFC Ex. | Exhibits to the Complaint in *Power Forward Communities, Inc. v. Citibank, N.A., et al.*, 25-cv-762. | PFC Exs. A-J |
| USAO-DC | Office of the U.S. Attorney for the District of Columbia | |
| VA | U.S. Department of Veterans Affairs | |

## INTRODUCTION

EPA's response to Plaintiffs' lawsuit rests on a remarkable view of Executive power. According to EPA, it has the unfettered and unreviewable right to cancel grants and claw back funds that were already distributed to recipients if it believes the distribution "no longer advance[s] the interests of the United States." Dkt. 49 at 2. Regulations, statutes, and even the Constitution are no obstacle, EPA contends, because there are contracts between EPA and Plaintiffs, so any dispute between them must be heard in the Court of Federal Claims.

That is wrong. "Unlike normal contractual undertakings, federal grant programs originate in and remain governed by statutory provisions expressing the judgment of Congress concerning desirable public policy." Dkt. 28 at 11 (quoting *Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 669 (1985)). Thus, federal courts must "fulfill their obligations under the APA to independently identify and respect [any] delegations of authority, police the outer statutory boundaries of those delegations, and ensure that agencies exercise their discretion consistent with the APA." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 403-04 (2024).[1]

EPA fares no better on the merits. Tellingly, after a blitz of statements in the press and on social media, and after issuing official documents with accusations of fraud and waste causing great injury to Plaintiffs, EPA now says that "EPA did not terminate for Plaintiffs' noncompliance." Dkt. 49 at 25. This remarkable concession means that the grounds for termination set forth in the Notices were not only disparaging, but known by EPA to be false.

Now, EPA hangs its hat on the claim that "applicable regulations *allow* an agency to terminate for consideration of its priorities." *Id.* at 2. But they do not. OMB amended the applicable regulations in April 2024, effective October 2024, to eliminate the ability to terminate federal

---

[1] Case citations and quotations are "cleaned up" unless otherwise specified.

grants due to changed agency priorities *except* when expressly permitted in the grant award. OMB suggested that federal agencies may wish to implement that change before October 2024. And that is what EPA did here—it determined in July 2024, months before the last election, that it would apply the new OMB directive to all new grants, including Plaintiffs' NCIF grants. That history, apparently forgotten by EPA, also disproves EPA's repeated claim that "Plaintiffs' agreements originally" permitted termination due to changes in agency priorities, "but subsequent post-election and post-award amendments stripped away the agency's right." Dkt. 49 at 2, 4-5, 12-13, 14, 23, 26. Plaintiffs' original awards in August 2024 expressly cited EPA's July 2024 determination to apply OMB's new regulations immediately. Applicability Date for the Office of Management and Budget's Regulatory Revisions, 89 Fed. Reg. 55,262, 55,263 (July 3, 2024).

Beyond that, EPA violated federal law multiple times over. It violated its obligation to provide a reasoned explanation for its decision. It violated its regulations governing when and how a grant may be terminated. It violated federal statutes by trying to eviscerate a program approved by Congress and seeking, without authority, to claw back already-disbursed funds. And it violated the Constitution, including the Appropriations Clause, the separation of powers, and due process.

For its part, Citibank makes no effort to justify its conduct under the agreements it signed with Plaintiffs and their subgrantees, the Account Control Agreements (or ACAs). Instead, Citibank claims it was directed to act as it did by its principal, the U.S. Department of the Treasury. That is no excuse. Citibank does not dispute that settled New York law (which governs the ACAs, CU Ex. 8 at 5) instructs that a person who signs a contract is subject to liability for breaching it even if that person acts at the direction of a principal. And Citibank's assertions that the ACAs must be read in harmony with the Financial Agency Agreement (FAA) that it signed with Treasury (not Plaintiffs) do not move the needle: Plaintiffs are not parties to the FAA and so cannot be

bound by it, and in any event the ACAs are clear on their face that Citibank's obligations with regard to the funds are exclusively set forth in the ACAs.

The Court should enter a preliminary injunction. Plaintiffs have demonstrated several forms of irreparable harm, including potentially fatal disruption to Plaintiffs' operations; irreplaceable loss of clients, partnerships, and opportunities; devastating reputational injury; interference with Plaintiffs' missions; and an immediate risk of insolvency for some of the Plaintiffs and their subgrantees. Many of these injuries have already materialized and will worsen if Plaintiffs continue to be deprived of access to *their* funds. Compounding these injuries are reputational harms from EPA's accusations against Plaintiffs and from the legal and financial uncertainties created by EPA and Citibank. On the other side of the ledger, Plaintiffs ask only that Defendants be compelled to act in accordance with the law, a request that is in the public interest.

## **ARGUMENT**

### I.    **This Court Has Jurisdiction Over All Claims Against EPA.**

#### A.    **The Tucker Act Does Not Impliedly Preempt Plaintiffs' APA Claims.**

Although this Court has already held that it has jurisdiction to consider Plaintiffs' claims for violations of the APA, regulations, statutes, and the Constitution, EPA continues to insist otherwise. EPA leads by sponsoring the breathtaking theory that, so long as a plaintiff has a contractual relationship with the government, it may violate its own regulations, federal statutes, and the Constitution—and may act entirely arbitrarily—because the plaintiff might have a contract claim in the Court of Federal Claims. *See* Dkt. 49 at 10-12. This proposition, if accepted, would unsettle the bedrock principle that courts must "set aside any [agency] action inconsistent with the law as they interpret it." *Loper Bright*, 603 U.S. at 391-92.

The D.C. Circuit has rejected a far narrower proposition than what EPA asserts, "explicitly reject[ing]" what it called "the 'broad' notion 'that any case requiring some reference to or

incorporation of a contract is necessarily on the contract and therefore directly within the Tucker Act' because to do so would 'deny a court jurisdiction to consider a claim that is validly based on grounds other than a contractual relationship with the government.'" *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1107 (D.C. Cir. 2022). Instead, Circuit law calls for consideration of "both … the source of the rights upon which the plaintiff bases its claims, and … the type of relief sought (or appropriate)." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982). Under these factors, the Court should reaffirm its jurisdictional ruling that Plaintiffs may press their claims here.

### 1. Plaintiffs' Rights Arise From Regulations, Statutes, and the Constitution.

To begin, the complaints and preliminary-injunction motion made clear that the source of rights for Plaintiffs' claims comes from regulations, statutes, and the Constitution. Despite that, EPA still contends that "[t]here is no source for Plaintiffs' asserted rights other than their claim of the contractual right to perform under the grants they were awarded." Dkt. 49 at 11.

But that is not so. EPA points out that *one* of Plaintiffs' claims concerns a federal regulation, 2 C.F.R. § 200.340, that in turn refers to the terms and conditions of federal grants. Dkt. 49 at 9-13. But although the determination of whether EPA violated Section 200.340 requires looking at the terms and conditions—because, as further explained below, the regulation permits EPA to terminate grants only on grounds outlined in the terms and conditions—this does not turn the claim into a contract claim. *See Crowley*, 38 F.4th at 1107. And Plaintiffs' many other claims alleging violations of federal law leave no doubt as to Plaintiffs' claimed source of rights. Plaintiffs claim a right to be free from arbitrary government action under the APA (a statute), a right to be treated consistent with regulations, a right to have their grants respected in accordance with

4

Congress's mandate, and a right to receive notice and to be heard under the Due Process Clause. None of that comes from the terms and conditions of any contract.

Driving home that this is not a garden-variety breach-of-contract case, EPA is not even relying on the terms of the grants to justify termination. CU Ex. 11 at 1; EPA Br. 12-13. Rather, its asserted programmatic considerations led EPA to issue an across-the-board termination of all NCIF grants using essentially identical Notices of Termination. That decision violates EPA's own regulations, federal statutes, and the U.S. Constitution; the claim thus belongs in this Court.

None of EPA's cases are to the contrary. EPA cites *Ingersoll-Rand Co. v. United States*, 780 F.2d 74 (D.C. Cir. 1985), for the proposition that a plaintiff may not "recharacterize breach of contract claims as APA claims," Dkt. 49 at 10, but the case is inapposite. There, the government cancelled a contract for air compressors. That injury canonically should be remedied by contract damages, and the D.C. Circuit rejected Ingersoll's attempt to avoid that conclusion by framing its case as requesting equitable relief rescinding the termination. But here it is not possible, as it was in *Ingersoll-Rand*, to "conceive of this dispute as entirely contained within the terms of the contract," 780 F.2d at 78, because the government has already *performed* its end of the bargain by obligating and disbursing the funds to Plaintiffs. Accordingly, Plaintiffs' claims are not that EPA has breached the Grant Agreements, but rather that EPA has acted contrary to law in attempting to claw back those already-disbursed funds. The right upon which Plaintiffs base their claims is the right to be free of unlawful agency action, and the "source[s] of th[at] right" are the APA, a federal statute, the Constitution, and EPA's own regulations. *See* Dkt. 33-1 at 22-23; Dkt. 28 at 12.

*Spectrum Leasing Corp. v. United States*, 764 F.2d 891 (D.C. Cir. 1985), also cited by EPA, is similarly inapt. There, the plaintiff-contractor failed to perform on a contract awarded by GSA to develop a data communications network to be used by the VA, and GSA withheld payment

by invoking the liquidated damages provision in the contract, returning the contractor's unpaid invoices. *See id.* at 892. The contractor sought "an injunction compelling the GSA to cease withholding" the $1.8 million it had invoiced. *Id.* at 892 & n.1. The D.C. Circuit understandably concluded that a request for an injunction compelling GSA to pay invoices was simply a disguised claim for money damages. *See id.* at 894-95.

There is nothing like that here. EPA has already disbursed all the funds to Plaintiffs. The question is whether EPA may claw these funds back consistent with federal regulations, statutes, and the Constitution. As the D.C. Circuit has explained, district courts have jurisdiction in "property disputes arising from contractual relationships" to adjudicate claims that government actors "acted beyond the scope of their statutory authority." *Megapulse*, 672 F.2d at 969. And district courts have jurisdiction to consider claims "in the nature of tort" even when the "claim presuppose[d] the existence of a contract." *Crowley*, 38 F.4th at 1108, 1110.

EPA also relies on *U.S. Conference of Catholic Bishops v. Dep't of State*, 2025 WL 763738, at *5 (D.D.C. Mar. 11, 2025). *See* Dkt. 49 at 15. That case remains inapposite for the reasons Plaintiffs already explained, including because Plaintiffs here are not asking the government to pay money "past due" (rather, all parties agree that the money is already disbursed). *See* Dkt. 33-1 at 24-25. EPA has nothing to say beyond the observation that the plaintiffs in *Catholic Bishops* cited one of the regulations Plaintiffs invoke here, but, as explained *supra* at 4 and *infra* at 13-16, that regulation does not make this a contract case.[2]

---

[2] *Catholic Bishops* is an outlier among recent district-court decisions. *Compare* 2025 WL 763738, at *5-7, *with, e.g., Am. Ass'n of Colls. for Teacher Educ. v. McMahon*, 2025 WL 863319, at *2-5 (D. Md. Mar. 19, 2025); *AIDS Vaccine Advocacy Coal. v. Dep't of State*, 2025 WL 752378, at *8 (D.D.C. Mar. 10, 2025); *Mass. v. Nat'l Insts. of Health*, 2025 WL 702163, at *7-8 (D. Mass. Mar. 5, 2025); *Pacito v. Trump*, 2025 WL 655075, at *5-6, *16-17 (W.D. Wash. Feb. 28, 2025).

Finally, the D.C. Circuit's instructions in *Megapulse* (and since) sink EPA's extreme view that there can be no judicial review here because the government supposedly has an "inherent contractual right to breach" like any other private party. Dkt. 49 at 13. EPA is not just a contracting counterparty here, but also a regulator, and the Executive, unlike private parties, has regulatory, statutory, and constitutional obligations that constrain its range of action vis-à-vis private parties. As this Court recognized, "[u]nlike normal contractual undertakings, federal grant programs originate in and remain governed by statutory provisions expressing the judgment of Congress concerning desirable public policy." Dkt. 28 at 11 (quoting *Bennett*, 470 U.S. at 669). Thus, EPA's assertion that there is a contractual relationship between the parties does not come close to overcoming the "well-settled" and "strong presumption" favoring "judicial review of administrative action." *Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 229 (2020).[3]

### 2.    Plaintiffs Do Not Seek Damages or "Specific Performance."

Turning to the second *Megapulse* factor, Plaintiffs are not seeking damages or specific performance of a contract. They are seeking injunctive relief mandating compliance with regulations, statutes, and the Constitution, and enjoining EPA from interfering with Plaintiffs' property and grants in violation of federal law. As this Court recognized, "any monetary benefit that might flow to Plaintiffs 'would not come from this court's exercise of jurisdiction, but from

---

[3] EPA's remaining authority is farther afield. Justice Scalia's concurrence in *United States v. Winstar Corp.*, 518 U.S. 839, 919-20 (1996), does not stand for the proposition, Dkt. 49 at 15-16, that the Executive has an inviolable right to breach contracts. *Boaz Housing Authority v. United States* did not hold that where "the government has implemented its grant programs by 'employ[ing] contracts' … the proper recourse for any asserted violation of those grant terms is 'a suit in the Claims Court for damages,'" Dkt. 49 at 16, but rather that "depending upon the terms of the contract and the circumstances of non-payment, the government may find itself subject to suit in the Claims Court for damages[.]" 994 F.3d 1359, 1368 (Fed. Cir. 2021). *Horwitz-Matthews, Inc. v. City of Chicago*, 78 F.3d 1248, 1250-51 (7th Cir. 1996), addressed the Contracts Clause. And *Benderson Dev. Co. v. U.S. Postal Serv.*, 998 F.2d 959, 962 (Fed. Cir. 1993), is irrelevant because, as stated therein, "the Postal Service, in contradistinction to other federal entities, may sue and be sued on contract claims in courts other than the Court of Federal Claims."

the structure of statutory and regulatory requirements governing compensation' in this action." Dkt. 28 at 12 (quoting *Tootle v. Sec'y of Navy*, 446 F.3d 167, 174 (D.C. Cir. 2006)).

The distinction between money *damages* and specific *remedies*, even monetary relief, is settled. Dkt. 28 at 12. "Damages" provide "compensatory relief" to "*substitute* for a suffered loss," as opposed to "specific remedies," which "are not substitute remedies at all, but attempt to give the plaintiff the very thing to which he was entitled." *Bowen v. Massachusetts*, 487 U.S. 879, 895 (1988) (quoting *Md. Dep't of Human Res. v. Dep't of Health & Human Servs.*, 763 F.2d 1441, 1446 (D.C. Cir. 1985)).

Plaintiffs are not seeking damages. EPA disbursed the funds to Plaintiffs, and the funds belong to Plaintiffs and their subgrantees, and may be used by them in accordance with the awards. EPA does not own the funds anymore, although it retained a security interest as a secured party. CU Ex. 8 at 1. Plaintiffs wish to enjoin EPA's effort to interfere and to claw back these funds. In no sense are Plaintiffs seeking "a substitute for that which has been lost" (*i.e.*, damages); they are seeking an order "restor[ing] to the plaintiff[s] that to which [they] w[ere] entitled from the beginning," before EPA began to act unlawfully. *Am.'s Cmty. Bankers v. FDIC*, 200 F.3d 822, 829 (D.C. Cir. 2000).

EPA claims *Bowen* is inapposite because, "[h]ere, the monetary relief is not merely some downstream consequence of vacating agency action like a regulation or order—the action that Plaintiffs directly challenge is itself *contractual* in nature (the termination of the grants)." Dkt. 49 at 14. Those are just words without substance. There is no meaningful distinction between *Bowen* and this case. There, the Secretary of HHS "disallowed" Medicaid reimbursement payments to the state of Massachusetts in a specific amount based on an interpretation of the Medicaid Act and applicable regulations. *See* 487 U.S. at 885-87. When Massachusetts sued in district court, the

district court did what district courts do every day—interpret federal law—and reversed the disallowance. *See id.* at 888. Thus, the entitlement to monetary relief in *Bowen* was not just some incidental "downstream consequence of vacating agency action"; it was the sole purpose of the lawsuit, and followed directly from a vacatur of the agency's action.

Similarly, EPA's repeated assertion that Plaintiffs seek "the classic contractual remedy of specific performance," *see* Dkt. 49 at 2, 3, 9, 11, 12, 13, 14, does not make it so. Again, Plaintiffs seek an injunction restoring the *status quo* before EPA's campaign of illegal actions beginning with the freeze of Plaintiffs' funds and culminating in the purported terminations. Plaintiffs do not seek "a remedy that would deny EPA any right to end the parties' agreements[.]" Dkt. 49 at 12. They seek to halt an illegal effort to claw back funds that belong to them, a declaration that EPA's actions exceeded its regulatory, statutory, and constitutional authority, and an order nullifying those actions to that extent. *See Bowen*, 487 U.S. at 893-94. That Plaintiffs would be permitted to draw down funds as a result of the vacatur of unlawful agency action does not take the case out of this Court's jurisdiction. *Maryland*, 763 F.2d at 1446-48.

### 3. Plaintiffs Do Not Challenge Unreviewable Funding Decisions.

EPA separately argues that judicial review is foreclosed by 5 U.S.C. § 701(a)(2) because Plaintiffs are really challenging funding decisions committed to agency discretion by law. Dkt. 49 at 16-17. This argument ignores settled precedent and mischaracterizes Plaintiffs' claims.

First, APA review is unavailable only "in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971) (citation omitted), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). But "judicial review is available where there are 'meaningful standards to cabin the agency's otherwise plenary discretion,'" *Physicians for Soc. Resp. v.*

*Wheeler*, 956 F.3d 634, 643 (D.C. Cir. 2020), and it is settled that "judicially manageable standards may be found in formal and informal policy statements and regulations as well as in statutes," *id.*

Second, Plaintiffs are not challenging EPA's funding decision or its design of a competitive grant program. The program competition, mandated by Congress, occurred back in 2024, and the funds were all obligated by Congress's deadline (September 2024), and then disbursed. Plaintiffs are challenging EPA's subsequent freezing of Plaintiffs' funds, the purported termination of *all* NCIF awards, and EPA's effort to claw back the funds. There is law to apply to those claims—the APA, federal regulations, federal statutes, and the Constitution.

*Lincoln v. Vigil*, 508 U.S. 182 (1993), EPA's principal authority, is inapt. It concerned a challenge to "[t]he allocation of funds from a lump-sum appropriation" that carried with it "a congressional recognition that [the] agency must be allowed flexibility to shift funds within a particular appropriation account so that the agency can make necessary adjustments for unforeseen developments and changing requirements." *Id.* at 192-93. Here, the disbursement occurred and is not being challenged. Plaintiffs challenge EPA's effort to unwind it and to claw back funds.

### B.    Plaintiffs May Alternatively Invoke This Court's Equitable Jurisdiction.

In the alternative, as Plaintiffs explained, the Court may also enjoin federal officials from acting contrary to federal law under its equitable jurisdiction. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015); *see* Dkt. 33-1 at 25-26 (collecting cases). EPA has virtually no response to this established precedent. *See* Dkt. 49 at 21 n.10.

EPA appears to believe that the enactment of the APA and of the Tucker Act implicitly stripped federal courts of this longstanding jurisdictional authority. EPA cites *Alexander v. Sandoval*, 532 U.S. 275 (2001), apparently for the proposition that the Court should not imply a right of action. But the ability to seek an injunction against unlawful government action has been recognized by the Supreme Court and "trac[es] back to England." *Armstrong*, 575 U.S. at 327; *see,*

*e.g.*, *Osborn v. Bank of United States*, 22 U.S. (9 Wheat.) 738 (1824); *Carroll v. Safford*, 44 U.S. (3 How.) 441 (1845). Such an established basis of jurisdiction will not be displaced "absent the clearest command." *McQuiggin v. Perkins*, 569 U.S. 383, 397 (2013) (citation omitted). Neither the APA nor the Tucker Act contain that requisite clear statement. Instead, the D.C. Circuit has instructed, "[n]othing in the subsequent enactment of the APA altered" courts' ability to restrain federal officials under this line of authority. *Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988) (citation omitted).

**II.    The Court Should Issue a Preliminary Injunction Barring EPA From Terminating Plaintiffs' Grants or Impeding Citibank From Disbursing Grant Funds.**

**A.    Plaintiffs Are Likely to Succeed on Their Claims for Violations of Federal Law.**

**1.    EPA Violated the Prohibition on Arbitrary and Capricious Action.**

"Congress in 1946 enacted the APA 'as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices.'" *Loper Bright*, 603 U.S. at 391 (citation omitted). As Plaintiffs explained, EPA's termination was arbitrary and capricious because it: (i) contained only a formulaic explanation without factual support; (ii) relied on authority that did not apply, and (iii) invoked unsubstantiated rationales, including a supposed need to improve oversight, that do not provide legal authority for termination. Dkt. 33-1 at 27-31.

In response, EPA abandons much of the rationale it gave in the Notices of Termination, and does not dispute many of the points stated in Plaintiffs' brief. At the outset, EPA does not dispute that it is insufficient to "merely parrot[] the language of" regulations, as EPA did here, because it "explains nothing about *why* the agency" acted as it did. *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014); Dkt. 33-1 at 27.

11

EPA also does not dispute that, although the Notices referred to 2 C.F.R. §§ 200.339 and 340, and vaguely cited concerns of "waste, fraud, and abuse," it provided no substantiation to satisfy the APA's reasoned-explanation requirement. This Court already recognized that these "vague[] reference[s]" to "programmatic waste, fraud, and abuse and conflicts of interest" were "insufficient." Dkt. 28 at 16. It is perhaps for this reason—EPA's lack of any evidence to support these accusations—that EPA no longer presses these claims. Indeed, EPA's new admission that it "did *not* terminate for Plaintiffs' noncompliance," Dkt. 49 at 25 (emphasis added), confirms that EPA's invocation of "waste, fraud, and abuse" was arbitrary and pretextual.

And so, unable to defend its reasoning in the Notices of Termination, EPA says only that the terminations were lawful because "[u]nder the new administration, new EPA officials prudently reviewed EPA's spending" and "determined that the level of oversight provided in Plaintiffs' Grant Agreements was exceedingly insufficient." Dkt. 49 at 22-23. This is inadequate.

To begin, this is not a permissible ground for termination under the regulations invoked by EPA in the Notices of Termination. *See* Dkt 33-1 at 32-33; *infra* at 15-16. Moreover, EPA also failed "to supply a reasoned analysis for the change" in position. *Sierra Club v. Salazar*, 177 F. Supp. 3d 512, 532-33 (D.D.C. 2016); Dkt. 33-1 at 30-31. As EPA's own cases establish, a change in priorities does not negate the APA. A new administration may "reapprais[e] [] the costs and benefits of its programs and regulations," but it "*may not* choose not to enforce laws of which it does not approve, or to ignore statutory standards in carrying out its regulatory functions." *Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 59 & n.* (1983) (emphasis added) (Rehnquist, J., concurring in part, dissenting in part) (cited at Dkt. 49 at 22).

Likewise, it is not enough that EPA "display awareness that it *is* changing position"; an agency "*must*" provide "a more detailed justification than what would suffice for a new policy

12

created on a blank slate" when, as here, "its new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009) (some emphasis added) (cited at Dkt. 49 at 24); *see also* Dkt. 33-1 at 30-31 (explaining reliance interests). EPA's position that it could terminate any grant program *in its entirety* simply because of the "agency's priorities," Dkt. 49 at 2, would arrogate extraordinary power to the Executive and abrogate decades of jurisprudence.

Of course, the Notices provide no reasoned explanation for the about-face, although in briefing EPA claims that running the program out of EPA directly, rather than through Citibank, would improve oversight and efficiency. Dkt. 49 at 23. This is an improper post-hoc justification. *Vinyl Inst., Inc. v. EPA*, 106 F.4th 1118, 1126 (D.C. Cir. 2024) (quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943)). Agencies do not get "the benefit of additional time" to "provide[] a second, supplemental" rationale for their decisions. Dkt. 49 at 7 n.6 (describing second Amidon declaration as exactly that). Regardless, the explanation is inadequate. The ASAP system does not allow EPA to review or approve draws, and the arrangement with Citibank offers EPA enhanced oversight—providing EPA with real-time insight into all funds of prime and subgrantees and program income (neither of which is available under ASAP). Bafford Decl. ¶¶ 31-33.

Finally, EPA gets nowhere by citing December 2024 amendments to the grant awards related to 2 C.F.R. § 200.340, *see* Dkt. 49 at 23—amendments the agency blatantly mischaracterizes as eleventh-hour changes designed to impede the new administration's policy agenda. In *April 2024*, OMB amended the sole regulation cited by EPA here, 2 C.F.R. § 200.340, to permit termination of federal grants when inconsistent with agency priorities *only* when that basis is stated in the grant's terms and conditions, 89 Fed. Reg. 30,046, 30,089 (Apr. 22, 2024).

The new regulation was made effective in October 2024, but OMB stated that "Federal agencies may also elect to apply the final guidance to their Federal awards issued prior to October 1, 2024." *Id.* at 30,049. Consistent with OMB's changes, *in July 2024*, EPA announced that "EPA ha[d] decided to apply the revised version of 2 CFR 200.340 to EPA financial assistance agreements awarded or amended to add funds on or after July 1, 2024." *See* 89 Fed. Reg. at 55,263. And EPA did so in the case of Plaintiffs' NCIF grants. *See* CU Ex. 3 at 41 ("EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR 200.339 and the version of 2 CFR 200.340" applicable to EPA grants as of July 1, 2024, pursuant to 89 FR 55,262).

This was months before the election. And the December 2024 amendment did not change that aspect of the termination provision; it merely reflected a technical change to refer to the new regulations (2 C.F.R. § 200.340 effective as of October 1, 2024) in lieu of EPA's determination to apply the new regulation effective in July 2024 (89 Fed. Reg. 55,262):

> ~~4.~~ **4. Termination**
>
> ~~Notwithstanding the General Term and Condition "Termination,"~~ EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 ~~applicable to EPA grants~~effective as of ~~July~~October 1, 2024, ~~pursuant to 89 FR 55262 (July 3, 2024),~~ when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is ~~materially impaired~~Materially Impaired or there is adequate evidence of ~~waste, fraud,~~Waste, Fraud, or Abuse or material misrepresentation of eligibility status~~, or abuse~~, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the Assistance Agreement, EPA must (1) ~~de- obligate~~de-obligate uncommitted funds and re-obligate them to another Eligible Recipient selected under Funding Opportunity Number 66.957 (NCIF) to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 days of the de-obligation and (2) amend the Recipient's Assistance Agreement to reflect the reduced amount, based on the de-obligation. In accordance with 2 CFR 200.341, EPA will provide the Recipient notice of termination. If an Eligible Recipient has assumed a legal obligation properly incurred for an allowable activity entered into by a suspended or terminated Recipient, EPA will re-obligate funds to the Eligible Recipient to satisfy the legal obligation and accept an amended workplan and budget to that effect.

In sum, EPA has repeatedly failed to provide an explanation for terminating Plaintiffs' grants beyond the most basic claim that EPA, under a new administration, considers its supervision over the program to be "insufficient." Dkt. 49 at 23. There is a "significant mismatch between the

decision [EPA] made and the rationale [it] provided." *Dep't of Com. v. New York*, 588 U.S. 752, 783 (2019). And although EPA continues to insist that it "has not abandoned the GGRF program," Dkt. 49 at 23 n.11, Administrator Zeldin's public comments make clear that EPA plans otherwise, Dkt. 33-1 at 29-30. Plainly, EPA "had made up [its] mind" to cancel the GGRF grants already, "and did so for reasons … unrelated to" its stated rationales, in violation of the APA. *Dep't of Com.*, 588 U.S. at 783.

### 2.    EPA's Notices of Termination Violate Federal Regulations.

As Plaintiffs explained, EPA's purported terminations did not comply with applicable federal regulations. Dkt. 33-1 at 32-34. Specifically, Plaintiffs showed that the Notices of Termination failed to comply with the prerequisites for termination under 2 C.F.R. §§ 200.339 and 400, were devoid of the "reasons for termination" required by 2 C.F.R. § 200.341(a), and deprived Plaintiffs of the "opportunity to object" mandated by 2 C.F.R. § 200.342.

EPA's answer is most notable for what it does *not* say—*i.e.*, it does not assert that it complied with 2 C.F.R. §§ 200.341(a) or 342, or that the agency's purported termination is permissible under 2 C.F.R. § 200.339. Section 200.339 permits an agency to terminate a federal grant where the recipient "fail[ed] to comply with the U.S. Constitution, Federal statutes, regulations, or terms and conditions of the Federal award," and such "noncompliance cannot be remedied by imposing specific conditions." Yet, although EPA expressly relied on this provision in the Notices of Termination, Section 200.339 now appears nowhere in the agency's justification. Why not? Because, as EPA concedes for the first time in its opposition when forced to defend its conclusory termination, "EPA did not terminate for Plaintiffs' noncompliance." Dkt. 49 at 25.

Regardless, the Notices of Termination also violate the sole regulatory provision EPA now cites: 2 C.F.R. § 200.340(a)(4). Per EPA, this regulation "does not … limit an agency's ability to terminate a grant to those bases agreed to in a grant agreement." Dkt. 49 at 25. But as stated above,

EPA is dead wrong; that is *exactly* what Section 200.340(a)(4) does. It provides that an "award may be terminated … [b]y the Federal agency … *pursuant to the terms and conditions of the Federal award*, *including*, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." *Id.* (emphasis added). The text is unambiguous: EPA can terminate on the grounds that the program "no longer effectuates the program goals or agency priorities" only if that basis is stated in the grant agreement. *See* 89 Fed. Reg. at 30089 ("*Provided that the language is included in the terms and condition of the award*, the revised termination provision at section 200.340 continues to allow Federal agencies … to terminate an award [based on the award no longer effectuating program goals or agency priorities]." (emphasis added)). The award here does not include this basis.

Perhaps recognizing this problem, EPA tries a different tack, claiming that its *original* agreement with Plaintiffs included a different set of terms of conditions which, in EPA's telling, would have allowed the agency to terminate the awards on policy grounds. That argument is both beside the point (that prior version does not apply here) and misleading. True, EPA's prior General Terms and Conditions contained the language EPA wishes were applicable here. But as explained, *supra* at 13-14, when EPA executed the award agreements in August 2024, it had already announced that it would "apply the revised version of 2 CFR § 200.340 to EPA financial assistance agreements awarded or amended to add funds on or after July 1, 2024." 89 Fed. Reg. at 55,263. Thus, far from being a "change[] to th[e] terms made in the twilight of the prior administration," Dkt. 49 at 26, EPA contemplated from the outset that Plaintiffs' awards would be governed by the current version of 2 CFR § 200.340(a)(4)—a regulatory requirement EPA violated here.

### 3.    EPA's Notices of Termination Violate the Inflation Reduction Act.

There is no dispute that EPA, in administering the NCIF competitive process and obligating Plaintiffs' awards before September 30, 2024, adhered to the IRA's statutory mandate. *See* Dkt. 49

at 19 ("EPA satisfied the requirements of the statute" by "timely" obligating Plaintiffs' funds). Yet, EPA contends, its decision to cancel that program and claw back Plaintiffs' grant funds is somehow also consistent with the statute and simply "part of [EPA's] GGRF program operation." *Id.* That is wrong—and perplexing. EPA's decision to terminate all NCIF grants "'based on reasons of policy," *id.* at 29, and program "structure," *id.* at 17, plainly violates the IRA's directive that EPA obligate grant funds to "nonprofit organizations," no later than September 30, 2024, "for the rapid deployment of low- and zero-emission products, technologies, and services." 42 U.S.C. § 7434(c)(1); *see In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013) ("[T]he President may not decline to follow a statutory mandate … simply because of policy objections.").

To be sure, in the limited circumstances where EPA may unilaterally terminate Plaintiffs' Grant Agreements (none of which applies here), the Grant Agreements recognize that EPA may de-obligate "uncommitted funds and re-obligate them." CU Ex. 3 at 41. But consistent with the IRA's statutory requirements, the agency "must … re-obligate [those funds] to another Eligible Recipient *selected under Funding Opportunity Number 66.957 (NCIF)* to effectuate the objectives of Section 134 of the Clean Air Act." *Id.* (emphasis added); *accord id.* at 51-52. Here, however, EPA has purported to terminate the awards of *all* Eligible Recipients selected under the NCIF NOFO, effectively cancelling the program. It has no statutory authority to do so—nor to create an entirely new grant program after the IRA's September 30, 2024 deadline.

### 4.    EPA's Suspension of the Grants Violates the APA.

EPA's suspension of Plaintiffs' awards before terminating them independently violated regulations and the Constitution in multiple ways. Dkt. 33-1 at 35-36. EPA's only answer is that the suspension was merely a "precautionary," "temporary hold" that did not constitute final agency action reviewable under the APA. Dkt. 49 at 26. But as courts have recognized, even temporary suspensions of grants "produce legal consequences." *E.g.*, *Nat'l Council of Nonprofits v. OMB*,

2025 WL 368852, at *10-11 (D.D.C. Feb. 3, 2025) (OMB Memorandum instructing agencies to "temporarily pause all activities related to the obligation or disbursement of all Federal financial assistance … led to legal consequences and constituted final agency action." (emphasis omitted)); *Ipsen Biopharm., Inc. v. Azar*, 943 F.3d 953, 959 (D.C. Cir. 2019). That is the definition of "final agency action" under the APA, as EPA's own cited cases confirm. *See* Dkt. 49 at 26.

And EPA's suspension of the awards represented a "culmination" of the agency's decisionmaking; EPA's decision was plainly made already by February 14, as it relied on the same baseless claims of insufficient oversight, waste, and abuse in the February 13, 2025 press release[4] as it did in the Notices of Termination, *see* Dkt. 13-1. *See XP Vehicles, Inc. v. Dep't of Energy*, 118 F. Supp. 3d 38, 61 (D.D.C. 2015) (informal agency action final when it "provide[d] no indication" that the agency's decision was "at all tentative or open to any further reconsideration").

EPA also suggests that its termination notice has "mooted" Plaintiffs' suspension-related arguments. Dkt. 49 at 26. Yet in the same breath, EPA continues to defend the suspension's propriety, arguing that it "was reasonable for many of the same reasons that termination was reasonable." *Id.* Accordingly, to prevent EPA from relying on its illegal suspension even if the illegal termination is enjoined, the Court should enjoin both. *See* Dkt. 33-1 at 35.

### B.    Plaintiffs Are Likely to Succeed on Their Appropriations Clause Claims.

EPA has no good answer to Plaintiffs' Appropriation Clause claims.

To begin, EPA's standing argument is meritless. The Supreme Court's decision in *Hein v. Freedom from Religion Foundation*, which reaffirms that taxpayers generally have no right to challenge the constitutionality of government expenditures, is irrelevant here. Plaintiffs are recipients of federal grants who challenge EPA's purported termination of those grants (and

---

[4] Press Release, EPA, <u>Administrator Zeldin Announces that Billions of Dollars Worth of "Gold Bars" Have Been Located at Outside Financial Institution</u> (Feb. 13, 2025).

effective cancellation of the grant program) on the ground that EPA's conduct violates Congress's directive about how to spend money. *See* Dkt. 33-1 at 40. Such a suit hardly suggests that "every federal taxpayer could sue to challenge any Government expenditure." *Hein v. Freedom from Religion Found., Inc.*, 551 U.S. 587, 593 (2007).

Nor is EPA correct that only actions "to *halt* the Executive from disbursing funding" are cognizable under the Appropriations Clause. *See* Dkt. 49 at 18-19. As the Supreme Court has long recognized, "the [Appropriations] Clause has a more fundamental and comprehensive purpose"— namely, to "assure that public funds *will be spent according to the letter of the difficult judgments reached by Congress* as to the common good, and not according to the individual favor of Government agents." *OPM v. Richmond*, 496 U.S. 414, 427-28 (1990) (emphasis added).

In other words, the Appropriations Clause and separation-of-powers principles forbid the Executive from unilaterally *declining to expend* funds Congress appropriated. *Id.*; *see In re Aiken Cnty.*, 725 F.3d at 261 n.1 ("With respect to the suggestion that the President has a constitutional power to decline to spend appropriated funds, we must conclude that existence of such a broad power is supported by neither reason nor precedent." (citation omitted)). EPA's decision to terminate a federal grant program it concedes was established in accordance with Congress's directives, Dkt. 49 at 18, 19, is hardly the stuff of "'normal and orderly operation of the government," *id.* at 19 (quoting *City of New Haven v. United States*, 809 F.2d 900, 907 (D.C. Cir. 1987)). EPA's own authority recognizes as much. *See City of New Haven*, 809 F.2d at 908 (impoundments "designed to negate congressional budgetary policies" are precisely those which *do not* reflect the "normal and orderly operation of government").

*Aiken* and *Train v. City of New York*, 420 U.S. 35 (1975), are thus right on point. For one thing, like this case, "[t]hose cases concerned policy disagreements with Congress," Dkt. 49 at 18.

*See id.* at 29; *infra* (outlining evidence of the current Administration's policy disagreement with the IRA's GGRF). For another, *Aiken* and *Train* recognize that the Executive may not refuse to disburse funds that were appropriated but not yet obligated or disbursed. That prohibition applies *a fortiori* here, where the Executive seeks to claw back funds that were *obligated and disbursed*.

EPA's pledge in the Notices to "work to re-obligate lawfully appropriated funds" does not change matters. For starters, and for the many reasons Plaintiffs outlined, Dkt. 33-1 at 35, there is ample reason to doubt that EPA will re-obligate NCIF funds as Congress directed. (And it *cannot* do so under the Grant Agreements, having assertedly terminated *all* NCIF awards. *Supra* at 17.) From President Trump's Executive Order issued his first day in office directing all federal agencies to "immediately" suspend IRA funds, *see* PFC Compl. ¶ 6, to the OMB memoranda repeating President Trump's order to terminate the so-called "Green New Deal," *id.*, to Administrator Zeldin's many public statements disparaging the GGRF and NCIF programs, Dkt. 33-1 at 35, "the record here shows that Defendants are acting to rescind or defer the funds Congress has appropriated and have no intent to spend them." *AIDS Vaccine*, 2025 WL 752378, at *15.

In any event, any effort to re-obligate the billions of dollars Congress appropriated for the GGRF based on EPA's new policy priorities would amount to the agency effecting a new grant program after the September 30, 2024 deadline. *See* 42 U.S.C. § 7434(a)(1)-(3). Such action would directly contravene the intent of Congress and thereby violate the Appropriations Clause.

### C.    Plaintiffs Are Likely to Succeed on Their Due Process Claims.

EPA does not dispute that Plaintiffs were provided no process *whatsoever* before the agency froze, and then sought to terminate, their NCIF awards. Nor does EPA dispute Plaintiffs' description, *see* Dkt. 33-1 at 43, of the extraordinary sequence of events preceding the purported termination. Instead, EPA contends that despite that disturbing lack of process, Plaintiffs' due process claims fail as they "are nothing more than another set of contract claims." Dkt. 49 at 21.

EPA is wrong. Again, this is not a contract dispute governed by the Tucker Act. *See supra* at 3-11. EPA's own cases, *see* Dkt. 49 at 21, acknowledge "that a district court has jurisdiction to hear a due process claim" when "an underlying set of circumstances gives rise to both a contract claim and an independent Constitutional claim." *Olympic Fed. Sav. & Loan Ass'n v. Dir., Off. of Thrift Supervision*, 1990 WL 134841, at *9 (D.D.C. Sept. 6, 1990).

EPA cites *Hughes Communications Galaxy, Inc. v. United States*, 271 F.3d 1060 (Fed. Cir. 2001), for the proposition that a "party whose rights derive from a federal contract cannot maintain a separate claim based upon a property interest." Dkt. 49 at 20. But Plaintiffs' rights do not derive only from a federal contract, *see supra* at 4-7, and *Hughes*'s facts are inapposite. *Hughes* involved a party that sought to assert a takings claim in addition to a breach of contract claim, but its takings claim was ultimately addressed only to a demand for prejudgment interest *on its contract damages*, a theory of "property" that rose and fell with the contract dispute. *See* 271 F.3d at 1070. Here, Plaintiffs assert procedural due process and APA claims against EPA, not takings or contract claims. And unlike in *Hughes*, the agreements expressly vest Plaintiffs with property interests. *See* Dkt. 33-1 at 41-42 (citing, e.g., CU Ex. 8 ¶ 1(c) (describing grantees as "entitlement holder[s] with respect to all financial assets") and CU Ex. 3 at 56 (authorizing grantees to "legally obligate[]" grant funds "for financial obligations" to third parties)).

EPA ignores these provisions, relying instead on the Grant Agreements' list of approved uses of grant funds and grant closeout procedures. Dkt. 49 at 20. But the fact that Plaintiffs are "required to spend the funds on allowed uses under the grants," *id.*, and not at their fancy, does not mean Plaintiffs have no protected interest in those funds. They do—and they seek to maintain them precisely for the purpose of supporting the many "allowable activities" that coincide with Plaintiffs' public-interest missions, *see* Dkt. 33-1 at 13-15. EPA's "perfected security interest" in

the funds held in Plaintiffs' accounts, Dkt. 49 at 20, is not to the contrary. That interest is "grant[ed] [to] EPA" by the Plaintiffs, CU Ex. 3 at 56, in accordance with New York's UCC, CU Ex. 8, at 1, making clear that EPA is a secured party, and not the owner of the funds.[5]

In any event, the D.C. Circuit has held that even for funds not yet obligated, "[i]f [a] statute or implementing regulations place substantive limitations on official discretion to withhold award [of the eligibility criteria], there is a legitimate claim of entitlement, as to which the Due Process Clause affords protection." *NB ex rel. Peacock v. District of Columbia*, 794 F.3d 31, 41-42 (D.C. Cir. 2015). Plaintiffs' interest here is greater: the funds were awarded, obligated, and disbursed, and nothing in the IRA or implementing regulations authorizes EPA to freeze or take back those funds. Plaintiffs plainly have a property interest that may not be taken away without due process.

### D.    Plaintiffs Will Suffer Irreparable Harm Absent Injunctive Relief Against EPA.

EPA's actions have caused and will continue to cause Plaintiffs irreparable harm warranting injunctive relief.

EPA claims that the "only harm to Plaintiffs' mission here is not getting paid under the terms of the agreements," which is "insufficient for injunctive relief." Dkt. 49 at 27. But as the Court's TRO decision explains, the D.C. Circuit has held precisely to the contrary: financial harm can "constitute irreparable harm … where the loss threatens the very existence of the movant's business." Dkt. 28 at 19 (quoting *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). Applying that standard, the Court recognized that "Plaintiffs will be unable to finance programs

---

[5] EPA cites *In re Joliet-Will County Community Action Agency*, 847 F.2d 430, 432 (7th Cir. 1988) for the proposition that federal grant funds do not become an awardee's property until they incur a program cost. That is incorrect. *Joliet*'s essential holding is that federal grant funds do not become part of a bankrupt grantee's estate because the government's interest is superior to that of any unsecured creditor, *id.* at 433—a proposition not in dispute here. And, unlike here, nothing in *Joliet* suggests that (1) the debtor had a property interest under the award or (2) the funds had been disbursed.

they have launched, and they will have to cease operations." *Id.* The Court cited detailed declarations from Climate United and PFC, *id.* at 19-21, and on this motion, Climate United and PFC's declarations further substantiate the existential risks. Dkt. 33-1 at 44-47, 51-54. EPA ignores this evidence. And it does not attempt to distinguish *National Council of Nonprofits v. OMB*, which granted a preliminary injunction where "continued funding [was needed] to keep the[] doors open." 2025 WL 597959, at *18 (D.D.C. Feb. 25, 2025).

Of course, far less is required for a preliminary injunction. Plaintiffs cited law establishing that the sorts of injury to all three Plaintiffs' reputation, goodwill, and ability to operate as intended count as irreparable. *See e.g.*, *Tex. Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 242-44 & n.7 (D.D.C. 2014); *Nalco Co. v. EPA*, 786 F. Supp. 2d 177, 188 (D.D.C. 2011); *Mass. Law Reform Inst. v. Legal Servs. Corp.*, 581 F. Supp. 1179, 1187-88 (D.D.C. 1984), *aff'd*, 737 F.2d 1206 (D.C. Cir. 1984). EPA ignores that law too and claims, without offering any example, that "Plaintiffs' brief and declarations are full of speculative language[.]" Dkt. 49 at 27. EPA also insists Plaintiffs' harm is insufficiently "immediate." *Id*. at 28. But EPA fails to grapple with declarations from all three plaintiffs offering detailed and specific descriptions of harms that are both certain and imminent—and irreparable under established law, including the inability to provide continued financing under existing programs, *see* Dkt. 33-1 at 45, 48-49, 53; the inability to compensate employees, pay rent, or pay necessary contractors, *id.* at 45, 52; the inability to vet project applications or engage in technical assistance or knowledge-sharing activities, *id.* at 49; pauses in hiring, rescission of job offers, and deferral of compensation, *id.* at 45, 52-53; and decisions by partners to cease engagement with Plaintiffs while the status of their funding is uncertain, *id.* at 47, 48-49, 51. In many cases, Plaintiffs have *already suffered* the injuries EPA claims are "speculative." Dkt. 49 at 27-29; *see, e.g.*, Dkt. 33-1 at 47-48, 51 (all three Plaintiffs have already

experienced a "chilling effect" in their business relationships and harm to partnerships).

EPA's vague assertion that the impact of terminating Plaintiffs' work "may be exaggerated," Dkt. 49 at 28, ignores the specific and concrete details in the declarations about the work Plaintiffs and their subgrantees have done so far and the impact of its cancellation. This includes Climate United's pre-construction financing project for a major solar power project in Arkansas, a project to purchase and lease battery electric heavy-duty trucks in California, and recently launched awards as part of the Climate United NEXT program. *See* Dkt. 33-1 at 45; Bafford Decl. ¶¶ 38-41. It includes CGC's Network Loan Program to partner with green banks across the country, its Municipal Investment Fund to provide market-building and predevelopment grants and technical assistance for communities across the country, and its programs to provide direct funding to investment projects. *See* Dkt. 33-1 at 48-49; Brown Decl. ¶¶ 6-11; Buendia Decl. ¶¶ 5-14; Kauffman Decl. ¶¶ 8-13. And it includes PFC's and its subgrantees' programs to provide financing for affordable housing construction and rehabilitation projects, like the affordable housing projects in Iowa, Michigan, and Virginia that face imminent funding deadlines. *See* Dkt. 33-1 at 53; Donovan Decl. ¶¶ 18-22; Moon Decl. ¶¶ 16-23; Matusiak Decl. ¶¶ 19-20. EPA does not acknowledge or address the *current* impact on these programs, let alone the potential breach of agreements Plaintiffs already executed. *See, e.g.*, Bafford Decl. ¶ 70; Brown Decl. ¶¶ 7-8.

Plaintiffs will also suffer irreparable reputational harm. EPA incants that "the showing of reputational harm must be concrete and corroborated, not merely speculative." Dkt. 49 at 29. True enough—but all three plaintiffs submitted declarations with concrete and corroborated explanations of their current and anticipated reputational harm, all of which EPA ignores. *See* Dkt. 33-1 at 46-47, 49-52; Bafford Decl. ¶¶ 72-75; Brown Decl. ¶¶ 11-13; Buendia Decl. ¶¶ 15-18; Kauffman Decl. ¶¶ 18-24; Mayopoulos Decl. ¶¶ 20, 26-27; Matusiak Decl. ¶ 20; Moon Decl. ¶ 30.

E.      **The Balance of Equities and Public Interest Favor Plaintiffs Over EPA.**

EPA does not respond to Plaintiffs' submission that the balance of equities favors Plaintiffs. Dkt. 33-1 at 54-55. As for the public interest, EPA asserts a generalized interest in protecting the "public fisc." Dkt. 49 at 29. But EPA has not shown why the existing safeguards to prevent fraud, waste, or abuse under the terms of Plaintiffs' grants are insufficient, especially where EPA has *conceded* that it did not terminate Plaintiffs' grants for noncompliance. *See* Dkt. 33-1 at 55; Dkt. 49 at 23, 25, 29. As this Court properly recognized, "vague and unsubstantiated assertions of fraud are insufficient." Dkt. 28 at 22. EPA is also wrong to assert that "Plaintiffs' theory would bind the Executive to perform contracts, even if the agreements no longer serve any public purpose, or instead run counter to the public interest." Dkt. 49 at 30. Plaintiffs' arguments are tied to the facts of this case: they have substantiated how the grants *do* serve a public purpose (the very one Congress directed) and that EPA acted unlawfully in terminating them. *See* Dkt. 33-1 at 13-15, 27-35, 55-56.

F.      **The Court Should Reject EPA's Request for a Bond.**

District Courts have "broad discretion … to determine the appropriate amount of an injunction bond" under Federal Rule of Civil Procedure 65(c), *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999), "including the discretion to require no bond at all," *P.J.E.S. ex rel. Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 520 (D.D.C. 2020) (quoting *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 107 (D.D.C. 2012)). In this case, EPA fails to suggest an amount for bond, instead recommending that the court should "err on the high side." *Id*.

Courts have uniformly exercised their discretion to require no bond or only a nominal bond, explaining that "where the government is alleged to have unlawfully withheld [b]illions of dollars of previously committed funds … it would defy logic … to hold Plaintiffs hostage for the resulting harm. That is especially so when Defendants … will personally face no monetary injury from the

injunction." *Nat'l Council of Nonprofits v. OMB*, 2025 WL 597959, at *19; *see Am. First Legal Found. v. Becerra*, 2024 WL 3741402, at *16 n.11 (D.D.C. Aug. 9, 2024) (no bond); *Bailey v. Fed. Bureau of Prisons*, 2024 WL 3219207, at *13 n.5 (D.D.C. June 28, 2024) (same); *Maryland v. Dep't of Agric.*, 2025 WL 800216, at *26 (D. Md. Mar. 13, 2025) (requiring nominal $100 bond); *Does 1-26 v. Musk*, 2025 WL 840574, at *32 (D. Md. Mar. 18, 2025) (same). The Court should similarly require either a nominal bond or no bond.[6]

### G.    The Injunction Should Permit Plaintiffs and Subgrantees to Access Funds.

EPA contends that the "scope of any relief granted here should not extend beyond the Court's Temporary Restraining Order." Dkt. 49 at 30. But that relief—which would merely keep the funds frozen and still prevent Plaintiffs from getting funds—would not address Plaintiffs' irreparable harm and, for Climate United and PFC, would drive them to financial ruin. The TRO was a temporary freeze to preserve the status quo and prevent imminent harm that could not be addressed in a matter of weeks. But now that the issues have been thoroughly aired, the Court should enter an injunction that prevents Plaintiffs from experiencing irreparable harm that cannot be remedied pending the much longer period required to dispose of the merits.

EPA suggests, without argument, that any injunction should be "limited to the Plaintiffs[ ] alone who have shown imminent and irreparable harm." Dkt. 49 at 30-31. But extending the injunction to the accounts of Plaintiffs' subgrantees is necessary to provide "complete relief." *District of Columbia v. Dep't of Agric.*, 444 F. Supp. 3d 1, 49 (D.D.C. 2020) (collecting cases). The NCIF program expressly contemplates that recipients may administer "subawards (in the form

---

[6] Indeed, in this case, EPA's argument for a bond is particularly weak because the funds are in Plaintiffs' name in a Citibank account, so a preliminary injunction would not require EPA to expend any funds that have not already been disbursed. And EPA's sole authority that the Court "should err on the high side" in setting a bond, *Mead Johnson & Co. v. Abbott Labs.*, 201 F.3d 883, 888 (7th Cir. 2000), dealt with a commercial dispute between two competing manufacturers of infant formula. That fact pattern could not be further from the instant dispute.

of subgrants) to carry out a portion of the grant's activities," while Plaintiffs remain "accountable to EPA for effectively carrying out the full scope of the work and the proper financial management of the grant (including subawards to non-lead coalition members)." CU Ex. 1 at 6-7. And Plaintiffs have put forward evidence that their subgrantees' inability to access funds affects Plaintiffs' operations and ability to carry out their mission. *See, e.g.*, Moon Decl. ¶¶ 16-23; Donovan Decl. ¶ 24; Matusiak Decl. ¶ 20. If EPA may circumvent an injunction by simply freezing the funds held by subrecipients—where Citibank has no legal basis to deny subgrantees access to their accounts and EPA has no legal right of control—Plaintiffs will not have received complete relief.

### III. The Court Should Issue a Preliminary Injunction Barring Citibank From Failing to Disburse Plaintiffs' Grant Funds Pursuant to the ACAs.

#### A. Plaintiffs Are Likely to Succeed on Their Claims Against Citibank.

Citibank does not seriously dispute that it breached its obligations in the ACAs. The ACAs specify that Citibank "*shall* comply with *all* instructions, notifications, and entitlement orders the Bank receives directing the disposition of funds and financial assets in the Accounts." CU Ex. 8 at 2 (emphases added). And they explain that Citibank's duties are exclusively "administrative or ministerial," and that Citibank "shall not be responsible" for determining whether requests for grant funds comply with any contracts or laws. *Id.* at 3. Citibank breached the ACAs by failing to comply with instructions by Plaintiffs and their subgrantees to disburse funds. Dkt. 33-1 at 56-57.

Citibank claims that it was required *under the FAA* to carry out the FBI's and Treasury's purportedly lawful orders. Dkt. 48 at 12-17. As Plaintiffs have already explained, however, if the Court grants Plaintiffs' preliminary injunction with respect to EPA, this defense would disappear: Citibank cannot claim it is obeying lawful government orders when a court finds those orders unlawful. Dkt. 33-1 at 57. Importantly, Citibank has not disputed this basic premise.

But the Court should hold that Citibank breached the ACAs regardless, because the FAA

offers no defense. Citibank does not dispute the settled law that agents are liable for breaching agreements they sign in their own name (as here), even if they were directed to breach by a principal. Citibank asserts only that the FAA and the ACAs are "'interrelated agreements' that must be 'read together ... 'in harmony,'" and that the FAA authorizes Citibank to refuse to perform its obligations under the ACAs. Dkt. 48 at 13, 17-18 (citation omitted). That argument fails.

First, Plaintiffs never signed the FAA and are not bound by it. The merger clauses in the ACAs confirm as much, making clear that the ACAs—which do not even reference the FAA, let alone incorporate it—"constitute[] the entire agreement between" each Plaintiff, Citibank, and EPA. CU Ex. 8 at 5. Citibank points to the ACAs' general reference to Citibank's role "as a financial agent of the United States," Dkt. 48 at 5 (quoting Dkt. 14-4 at 1). But that vague reference cannot displace the parties' clear agreement in the integration clause. Meanwhile, "when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms," and parties cannot rely on "[e]vidence outside the four corners of the document as to what was really intended but unstated or misstated." *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (N.Y. 1990).

Citibank cites cases stating that "interrelated agreements" should be interpreted "in harmony," Dkt. 48 at 13-14. But those cases hold that when *the same parties* enter into multiple writings regarding a transaction, courts read the separate writings together to discern the true nature of their "[a]greement." *Matek Inc. v. IBM*, 2024 WL 663340, at *2-3 n.3 (D.D.C. Feb. 16, 2024). In *Matek*, for example, IBM hired Matek to perform services for Howard, a transaction memorialized in two agreements that explicitly incorporated one another: one between IBM and Matek, and one between IBM, Matek, and Howard, *see id.* at *1, *3 n.2. When IBM cancelled both contracts and Matek sued, the court sensibly looked to both contracts—including the one

involving Howard—to discern the scope of the agreement *between IBM and Matek. See id.* at *2-3. *Matek* does not hold that a party's rights under a contract can be limited for "harmony" with a contract to which it is a non-party. Nor do any of Citibank's other cases.

Regardless, the FAA does not permit Citibank's actions either. The FAA instructs Citibank to "comply with all lawful instructions or directions received from Treasury." Dkt. 14-1 § 5.B.iv. As Citibank acknowledges, *before* March 4, when Treasury directly ordered Citibank to cease disbursing Plaintiffs' funds, Citibank froze Plaintiffs' funds based solely on FBI's "'recommendation'" that it do so. Dkt. 48 at 7 (quoting Dkt. 14-5 at 1). That "recommendation" was not an "instruction[] or direction[]," and it was not "from Treasury." Dkt. 14-1 § 5.B.iv. And *after* March 4, the "instructions" Citibank received from Treasury were not "lawful," as the FAA unambiguously permitted Citibank to freeze accounts only "in accordance with the [ACAs]," Dkt. 14-1 § 1.B.4. And here, of course, the freezes did not comply with the ACAs. To the extent Citibank argues that this latter instruction is inconsistent with its own obligations as a fiduciary of the United States, Citibank's own cases recognize that the "specific language" of the ACAs must "prevail over [their] more general language" referencing Citibank's fiduciary duty. *Kelso Enterprises Ltd. v. A.P. Moller-Maersk*, 375 F. App'x 48, 49 (2d Cir. 2010).

Finally, Citibank cannot rely on the exculpatory clause's reference to "any act of any governmental authority." Dkt. 14-1 § 6(b); Dkt. 48 at 16-17. That clause cannot be read to allow Citibank to reject Plaintiffs' control over their funds at the mere suggestion of EPA; to do so would render meaningless the ACA's careful provisions regarding the import, form and content of a Notice of Exclusive Control. *Id.* § 2, Ex. A; *Nomura Home Equity Loan, Inc. v. Nomura Credit & Cap., Inc.*, 30 N.Y.3d 572, 581 (2017) (when interpreting exculpation clause, reiterating rule that "a contract must be construed in a manner which gives effect to each and every part").

**B.    The Other Preliminary Injunction Factors Favor Plaintiffs.**

Citibank nowhere disputes that the remaining preliminary injunction factors favor Plaintiffs. Nor could it. Plaintiffs will undoubtedly suffer irreparable harm if Citibank is not enjoined from continuing to refuse to disburse Plaintiffs' funds to them. *See supra* at 22-24. Indeed, it is settled that where "the subject of the action involves a specific fund," an inability to access those funds is irreparable. *See Destiny USA Holdings, LLC v. Citigroup Glob. Mkts. Realty Corp.*, 69 A.D.3d 212, 217 (N.Y. App. Div., 4th Dep't 2009); Dkt. 33-1 at 46.

**C.    Citibank's Request for a Stay or Dismissal Is Improper, and the Principles of Derivative Sovereign Immunity It Invokes Are Inapposite.**

Finally, Citibank argues that, if the Court were to hold "that it lacks jurisdiction over plaintiffs' claims," then Citibank would "be entitled to derivative sovereign immunity." Dkt. 48 at 17-18. In that hypothetical, Citibank says the Court should either "stay litigation against Citibank" or "dismiss" the action against Citibank entirely. Dkt. 48 at 17-19.

"Derivative sovereign immunity" does not apply here because Citibank has "exceeded its authority." *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 167 (2016). Further, the doctrine is "*less* embracive than the immunity a sovereign enjoys." *In re OPM Data Sec. Breach Litig.*, 928 F.3d 42, 68-69 (D.C. Cir. 2019) (emphasis added). Citibank claims an immunity that is far *broader* than EPA's immunity. EPA does not claim it is immune from suit in all forums, only that Plaintiffs' claims must be heard in the Court of Federal Claims. But as Citibank points out, it cannot be sued in that court. Dkt. 48 at 18-19. Thus, under Citibank's theory, it cannot be sued *anywhere*. The Court should not confer on Citibank an immunity drastically *broader* than EPA's.

## CONCLUSION

Plaintiffs' motion for preliminary injunction should be granted.

Dated: March 28, 2025

Respectfully submitted:

/s/ *Vincent Levy*
  Vincent Levy (NY 0487)
  Kevin D. Benish (NY0495)
  Patrick J. Woods*
  Daniel Fahrenthold (NY0603)
  HOLWELL SHUSTER & GOLDBERG
  LLP
  425 Lexington Avenue, 14th Floor
  New York, NY 10017
  Tel.: (646) 837-5151
  vlevy@hsgllp.com
  *Application for admission pending.

*Attorneys for Plaintiff Coalition for Green Capital*

/s/ *Beth C. Neitzel*
  Beth C. Neitzel (103611)
  Jack C. Smith (1725229)
  Kevin Y. Chen (admitted *pro hac vice*)
  FOLEY HOAG LLP
  155 Seaport Boulevard, Suite 1600
  Boston, MA 02210
  Tel. (617) 832-1000
  bneitzel@foleyhoag.com
  jcsmith@foleyhoag.com
  kchen@foleyhoag.com

Noah C. Shaw (*pro hac vice* motion pending)
James M. Gross (admitted *pro hac vice*)
FOLEY HOAG LLP
1301 Ave. of the Americas, 25th Floor
New York, NY 10019
Tel.: (212) 812-0400
ncshaw@foleyhoag.com
jgross@foleyhoag.com

*Attorneys for Plaintiff Power Forward Communities*

 /s/ *Adam G. Unikowsky*
  Adam G. Unikowsky (989053)
  Kathryn L. Wynbrandt* (1602446)
  David B. Robbins (493976)
  Tanner J. Lockhead* (90011928)
  JENNER & BLOCK LLP
  1099 New York Avenue, Suite 900
  Washington, D.C. 20001
  Tel.: (202) 639-6000
  Fax: (202) 639-6066
  aunikowsky@jenner.com
  *Application for admission pending.

Gabriel K. Gillett (admitted *pro hac vice*)
Simon A. de Carvalho (*pro hac vice* forthcoming)
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
Tel.: (312) 222-9350
ggillett@jenner.com
sdecarvalho@jenner.com

Allison N. Douglis (admitted *pro hac vice*)
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036
Tel.: (212) 891-1600
Fax: (212) 891-1699
adouglis@jenner.com

*Attorneys for Plaintiff Climate United Fund*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 28, 2025, I filed the foregoing document with the Clerk of Court for the United States District Court for the District of Columbia using the court's CM/ECF filing system.

/s/  Adam G. Unikowsky
Adam G. Unikowsky
JENNER & BLOCK LLP
1099 New York Avenue
Washington, D.C. 20001
Tel.: (202) 639-6000
Fax: (202) 639-6066
aunikowsky@jenner.com