**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **CLIMATE UNITED FUND,** <br><br> Plaintiff, <br> v. <br><br> **CITIBANK, N.A.,** *et al.* <br><br> Defendants. | Case No. 1:25-cv-00698 (TSC) |
| **COALITION FOR GREEN CAPITAL,** <br><br> Plaintiff, <br> v. <br><br> **CITIBANK, N.A.,** *et al.* <br><br> Defendants. | Case No. 1:25-cv-00735 (TSC) |
| **POWER FORWARD COMMUNITIES, INC.,** <br><br> Plaintiff, <br> v. <br><br> **CITIBANK, N.A.,** *et al.* <br><br> Defendants. | Case No. 1:25-cv-00762 (TSC) |
| **CALIFORNIA INFRASTRUCTURE AND ECONOMIC DEVELOPMENT BANK,** *et al.* <br><br> Plaintiffs, <br> v. <br><br> **CITIBANK, N.A.,** *et al.* <br><br> Defendants. | Case No. 1:25-cv-00820 (TSC) |

**FEDERAL DEFENDANTS' OPPOSITION TO SUBGRANTEE PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................... 2

PROCEDURAL HISTORY ............................................................................................... 5

LEGAL STANDARD ....................................................................................................... 5

ARGUMENT .................................................................................................................... 5

   I.    This Court Lacks Jurisdiction to Hear Subgrantees' Claims. ............................... 5

       A.    Subgrantees Lack Standing to Bring Their Claims. ......................................... 6

       B.    Sovereign Immunity Bars this Court from Adjudicating Subgrantees' Claims. ............. 8

       C.    Subgrantees, Like Grantees, Cannot Challenge Funding Decisions Committed to Agency Discretion. ........................................................................................... 12

   II.    Subgrantees are Unlikely to Succeed on the Merits of their APA Claims. ...................... 13

   III.    Subgrantees' Alleged Economic Harms Are Neither Imminent Nor Irreparable. ......... 15

       A.    Subgrantees' Alleged Imminent Loss is Financial and Uncertain. ................................ 15

       B.    Subgrantees' Alleged Reputational Harms Are Financial, Uncertain, and Would Not be Remedied by an Injunction. ...................................................................................... 18

   IV.    An Injunction Would be Contrary to the Public Interest. ............................................. 21

   V.    Any Injunction Should be Narrowly Tailored. ............................................................. 21

   VI.    Bond is Required if the Court Issues a Preliminary Injunction. .................................... 22

CONCLUSION ................................................................................................................ 23

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Aetna Life Ins. Co. of Hartford, Conn., v. Haworth*,
  300 U.S. 227 (1937) ........................................................................................ 6

*Ahuruonye v. U.S. Dep't of Interior*,
  312 F.Supp.3d 1 (D.D.C. 2018) .................................................................. 19, 20

*Am. Tel. and Tel. Co. v. United States*,
  124 F.3d 1471 (Fed. Cir. 1997) ...................................................................... 13

*Anderson v. United States*,
  344 F.3d 1343 (Fed. Cir. 2003) ....................................................................... 8

*Brendsel v. Off. of Fed. Hous. Enter. Oversight*,
  339 F. Supp. 2d 52 (D.D.C. 2004) ................................................................... 13

*C.G.B. v. Wolf*,
  464 F. Supp. 3d 174 (D.D.C. 2020) ................................................................... 5

*Caribbean Marine Servs. Co. v. Baldrige*,
  844 F.2d 668 (9th Cir. 1988) .......................................................................... 18

*Chaplaincy of Full Gospel Churches v. England*,
  454 F.3d 290 (D.C. Cir. 2006) ........................................................................ 15

*Church v. Biden*,
  573 F. Supp. 3d 118 (D.D.C. 2021) .............................................................. 17, 18

*City of Houston v. Dep't of Hous. & Urb. Dev.*,
  24 F.3d 1421 (D.C. Cir. 1994) ........................................................................ 18

*Climate United Fund v. Citibank, N.A.*,
  No. 25-CV-698, 2025 WL 842360 (D.D.C. Mar. 18, 2025) ................................. 18

*Crowley Gov't Servs., Inc. v. GSA*,
  38 F.4th 1099 (D.C. Cir. 2022) ......................................................................... 8

*Davis v. Pension Benefit Guar. Corp.*,
  571 F.3d 1288 (D.C. Cir. 2009) ...................................................................... 16

*Dennis Melancon, Inc. v. City of New Orleans*,
  703 F.3d 262 (5th Cir. 2012) .......................................................................... 16

*Dep't of Army v. Blue Fox, Inc.*,
525 U.S. 255 (1999) ................................................................................................ 9

*DSE, Inc. v. United States*,
169 F.3d 21 (D.C. Cir. 1999) ............................................................................... 22

*Erickson Air Crane Co. of Wash. v. United States*,
731 F.2d 810 (Fed.Cir.1984) .............................................................................. 8, 9

*Faculty Senate of Fla. Int'l Univ. v. Winn*,
477 F. Supp. 2d 1198 (S.D. Fla. 2007) ................................................................ 16

*G4S Tech. LLC v. United States*,
114 Fed. Cl. 662 (2014) ....................................................................................... 10

*Guttenberg v. Emery*,
26 F. Supp. 3d 88 (D.D.C. 2014) ......................................................................... 19

*Heckler v. Chaney*,
470 U.S. 821 (1985) ............................................................................................. 12

*Heckler v. Turner*,
468 U.S. 1305 (1984) ........................................................................................... 21

*In re Griffith*,
206 F.3d 1389 (11th Cir. 2000) ........................................................................... 14

*Int'l Ass'n of Machinists and Aerospace Workers v. Nat'l Mediation Bd.*,
374 F. Supp. 2d 135 (D.D.C. 2005) ..................................................................... 19

*John Doe Co. v. Consumer Fin. Prot. Bureau*,
849 F.3d 1129 (D.C. Cir. 2017) ........................................................................... 19

*Lincoln v. Vigil*,
508 U.S. 182 (1993) ............................................................................................. 12

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ............................................................................................... 6

*Madsen v. Women's Health Ctr., Inc.*,
512 U.S. 753 (1994) ............................................................................................. 21

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
567 U.S. 209 (2012) ............................................................................................... 8

*Mathews v. Eldridge*,
    424 U.S. 319 (1976) ............................................................................... 21

*Mead Johnson & Co. v. Abbott Labs.*,
    201 F.3d 883 (7th Cir. 2000) ................................................................. 22

*Mexichem Spec. Resins, Inc. v. E.P.A.*,
    787 F.3d 544 (D.C. Cir. 2015) ................................................. 15, 16, 17

*Miles v. Apex Marine Corp.*,
    498 U.S. 19 (1990) ................................................................................. 14

*Mobil Oil Expl. and Producing Se. v. United States*,
    530 U.S. 604 (2000) ............................................................................... 14

*Nat'l Ass'n of Chain Drug Stores v. U.S. Dep't of Health & Hum. Servs.*,
    631 F. Supp. 2d 17 (D.D.C. 2009) ........................................................ 22

*Neb. Dep't of Health & Hum. Servs. v. U.S. Dep't of Health & Hum. Servs.*,
    435 F.3d 326 (D.C. Cir. 2006) .............................................................. 21

*Patriot, Inc. v. U.S. Dep't of Hous. & Urban Dev.*,
    963 F. Supp. 1 (D.D.C. 1997) ............................................................... 20

*Planned Parenthood Ass'n of Utah v. Schweiker*,
    700 F.2d 710 (D.C. Cir. 1983) .............................................................. 19

*Sampson v. Murray*,
    415 U.S. 61 (1974) ................................................................................. 16

*Santini v. Farris*,
    No. 2:21-cv-13045, 2022 WL 831420 (E.D. Mich. Feb. 15, 2022) ........................................... 20

*Sardarian v. Fed. Emergency Mgmt. Agency*,
    No. 3:19-CV-00910 (OAW), 2022 WL 4080325 (D. Conn. Apr. 1, 2022) ........................... 7, 11

*Save Jobs USA v. U.S. Dep't of Homeland Sec.*,
    105 F. Supp. 3d 108 (D.D.C. 2015) ...................................................... 17

*Sharp v. Weinberger*,
    798 F.2d 1521 (D.C. Cir. 1986) ............................................................ 10

*Sullivan v. United States*,
    625 F.3d 1378 (Fed. Cir. 2010) .............................................................. 8

*TransUnion LLC v. Ramirez*,
 594 U.S. 413 (2021) ............................................................................................. 7

*Trudeau v. Fed. Trade Com'n*,
 384 F.Supp.2d 281 (D.D.C. 2005)................................................................ 19, 20

*U.S. Conference of Catholic Bishops v. U.S Dep't of State*,
 No. 25-cv-465, 2025 WL 763738 (D.D.C. Mar. 11, 2025) ...................................11

*United States v. Johnson Controls, Inc.*,
 713 F.2d 1541 (Fed. Cir. 1983) ......................................................................... 10

*United States v. Michigan*,
 230 F.R.D. 492 (E.D. Mich. 2005) ................................................................ 16, 17

*Warth v. Seldin*,
 422 U.S. 490 (1975) ............................................................................................. 8

*Winter v. Nat. Res. Def. Council, Inc.*,
 555 U.S. 7 (2008) .............................................................................................. 20

*Wisc. Gas Co. v. FERC*,
 758 F.2d 669 (D.C. Cir. 1985)............................................................................ 15

*Wise v. United States*,
 128 F. Supp. 3d 311 (D.D.C. 2015)..................................................................... 18

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
 576 U.S. 1 (2015) .............................................................................................. 13

**Statutes**

5 U.S.C. § 701(a)(2) ...............................................................................................11

5 U.S.C. § 702 ................................................................................................... 6, 9

28 U.S.C. § 1331 ................................................................................................... 9

28 U.S.C. § 1491(a) ............................................................................................... 6

42 U.S.C. § 7434(c)(1)(C) ............................................................................... 2, 15

42 U.S.C. § 7434(a) ............................................................................. 11, 12, 13, 14

**Rules**

Fed. R. Civ P. 65(c) ................................................................................................ 22

**Regulations**

2 C.F.R. § 200.1 ..................................................................................................... 7

2 C.F.R. § 200.101 ................................................................................................. 3

2 C.F.R. § 200.331 ............................................................................................ 1, 3, 7

2 C.F.R. § 200.339 ............................................................................................... 2, 3

2 C.F.R. § 200.340 .............................................................................................. 2, 14

2 C.F.R. § 200.341 ................................................................................................. 2

| Term or Abbreviation | Definition | Citation(s) |
|---|---|---|
| ACA | Account Control Agreement with Citibank, related to subawards. | *CIEDB* ECF Nos. 17-1, Ex. A; 17-2, Ex. A; 17-4, Ex. A, and 17-5, Ex. A |
| APA | Administrative Procedure Act | |
| CGC | Coalition for Green Capital | *CIEDB*, ECF No. 17-3, Ex. A |
| CGC grant agreement | Notice of Award (including grant terms and conditions) for CGC | |
| CIEDB | California Infrastructure and Economic Development Bank | |
| *CIEDB,* ECF No. | Docket entry in *CIEDB, et al. v. Citibank, et al.*, 25-cv-820 | |
| Climate United | Climate United Fund | |
| *Climate United Fund,* ECF No. | Docket entry in *Climate United Fund v. Citibank, N.A., et al.*, 25-cv-698 | *Climate United Fund*, ECF No. 14, Ex. 1 |
| Efficiency Maine | Efficiency Maine Trust | |
| EPA | U.S. Environmental Protection Agency | |
| EPA Subaward Policy | EPA Amended Grants Policy Issuance (GPI) 16-01 EPA Subaward Policy, October 1, 2024 | |
| FAA | Financial Agency Agreement between Citibank and U.S. Department of the Treasury | |
| GGRF | Greenhouse Gas Reduction Fund | |
| Grantee Plaintiffs | NCIF primary grant recipient and plaintiffs in *Climate United Fund v. Citibank, N.A., et al.*, 25-cv-698 | |
| Grantee Plaintiffs' PI Motion | Grantee Plaintiffs' Consolidated Motion for Preliminary Injunction in *Climate United v. Citibank, N.A., et al.*, 25-cv-698 | *Climate United Fund*, ECF No. 33 |
| IFA | Illinois Finance Authority | |
| MnCIFA | Minnesota Climate Innovation Finance Authority | |
| NCIF | National Clean Investment Fund | |
| Subaward Agreements | Subgrantees' agreements with CGC | |
| Subgrantees | CGC grant subrecipients/ subgrantee plaintiffs in *CIEDB, et al. v. Citibank, et al.*, 25-cv-820 | |
| Subgrantee's PI Motion | Subgrantees' Motion for Preliminary Injunction in *CIEDB, et al. v. Citibank, et al.*, 25-cv-820 | *Climate United Fund*, ECF No. 33 |
| Termination Letter | Notice of Termination of grant issued by EPA to each Plaintiff, dated March 11, 2025 | *Climate United Fund*, ECF No. 49-2, Exhibit I |
| Treasury | U.S. Department of Treasury | |

## INTRODUCTION

The subgrantee plaintiffs' (Subgrantees) motion for preliminary injunction seeks to litigate a grant agreement to which they are not a party and under which they have no legal right or interest. Like the grant recipients (Grantees),[1] Subgrantees attempt to shoehorn contract claims into the Administrative Procedure Act (APA). But Subgrantees have an even worse case for jurisdiction given that Congress has never waived sovereign immunity for contract claims by subgrantees lacking any legal relationship with the government. Subgrantees' motion should therefore be denied.

Although Subgrantees seek to rely upon the APA as a source for this Court's jurisdiction, they lack standing to sue under that statute. In fact, the regulations they seek to rely upon expressly provide that subrecipients have no legal relationship with the Environmental Protection Agency (EPA). 2 C.F.R. § 200.331; EPA Amended Grants Policy Issuance (GPI) 16-01 EPA Subaward Policy, October 1, 2024, (EPA Subaward Policy) at § 5.0(a).[2]

Moreover, sovereign immunity precludes this Court's jurisdiction over Subgrantees' claims. Subgrantees' only source of rights are the rights in their agreements with their prime grantee, Coalition for Green Capital (CGC). Neither the APA nor the Tucker Act waive sovereign immunity for claims brought by subrecipients to enforce government awards to which they are not a party. This Court thus lacks jurisdiction to grant preliminary relief with respect to Subgrantees' claims.

---

[1] Grantees are Coalition for Green Capital, Power Forward Communities, Inc., and Climate United Fund. They each filed separate lawsuits, which the Court consolidated with the instant suit.

[2] https://www.epa.gov/sites/default/files/2020-11/documents/gpi-16-01-subaward-policy_attachments.pdf.

Distinct from the jurisdictional flaws, Subgrantees also cannot show that they are likely to succeed on the merits of their claims. EPA's termination of the CGC grant agreement did not violate the Inflation Reduction Act or the Constitution, nor did that termination violate any federal grant regulation. Subgrantees also cannot demonstrate that the EPA acted arbitrarily or capriciously in terminating CGC's grant agreement.

Finally, the Subgrantees' alleged harm is neither imminent nor irreparable. Their alleged losses are all speculative, economic, or both. And any access to funding—which only became available to them two months ago—depends on the actions of CGC, which, by statute, must have other sources of funds that it may use to pay subgrantees. *See* 42 U.S.C. § 7434(c)(1)(C). Even if CGC halts funding, the grant funding can be restored if CGC or Subgrantees ultimately prevail on the merits of their claims. The public interest will not be served by forcing EPA to continue performance under agreements that EPA has determined are not in the best of EPA's implementation of and oversight over the Greenhouse Gas Reduction Fund, and do not advance agency policies and priorities.

## BACKGROUND

EPA incorporates the background of the Greenhouse Gas Reduction Fund (GGRF) program described in detail in its opposition to the Grantee's motion, *Climate United Fund*, ECF No. 49, USA Opp.,[3] and adds the following:

In August 2024, EPA awarded a $5 billion National Clean Investment Fund (NCIF) grant to Coalition for Green Capital (CGC grant agreement). The CGC grant agreement included specific terms and conditions, incorporated various provisions of the Uniform Grant Guidance, 2

---

[3] References to documents filed under the lead case will refer to *Climate United Fund* followed by their ECF numbers; references to documents filed under the Subgrantees' case will refer to *CIEDB* followed by their ECF numbers.

C.F.R. §§ 200.339, 340 and 341, and was subject to EPA's General Terms and Conditions.  *See CIEDB*, ECF No. 17-3, CGC grant agreement, Ex. A.

The CGC grant agreement allowed CGC, as the "Recipient" of the $5 billion award, to make subawards to state and local banks, among other organizations.  *See generally id.*  The "terms and conditions of Federal awards flow[ed] down to Subawards unless a particular section of 2 CFR § 200.101 or the terms and conditions of the Federal award specifically indicate[d] otherwise."  *Id.* at 50.  As provided in the CGC grant agreement, "Subrecipients" were "distinct" from "Program Beneficiar[ies]" and "accountable to the Recipient for proper use of EPA funding."  *Id.* at 11, 13.  The EPA's Subaward Policy, referenced in the CGC grant agreement, made clear that "EPA does not have a direct legal relationship with subrecipients."[4]

The CGC grant agreement authorized the employment of a designated financial agent to hold the entire $5 billion award and to administer program distributions.  *See CIEDB*, ECF No. 17-3, Ex. A, CGC grant agreement, at 50-51.  In September 2024, defendant Citibank was selected to that role under a Financial Agent Agreement with the U.S. Treasury.  *See Climate United Fund*, ECF No. 14, Ex. 1 (filed under seal) (FAA).  Although EPA was not a party to the FAA, the agency had authority to issue account controls with respect to the prime grantees in addition to the rights retained by Treasury to issue instructions to Citibank.  *Climate United Fund*, ECF No. 25-1, Declaration of Eric Amidon, ¶ 23.  The FAA was binding only on "the parties to th[e] FAA," and "[n]o other person or entity [had] any right or obligation hereunder,

---

[4] EPA Subaward Policy at § 5.0(a), *see supra* note 2.  This language mirrors the regulation specific to subrecipient awards in the Uniform Guidance.  *See* 2 C.F.R. § 200.331 (effective Oct. 1, 2025).

except for successor financial agents accepted by Treasury." *Climate United Fund*, ECF No. 14, FAA, at 15 (§ 30.E).

Subgrantees are four subrecipients selected by CGC under the terms of the CGC grant agreement. *See CIEDB,* ECF No. 1 (Complaint), ¶ 4. They do not have agreements with EPA. *See CIEDB*, ECF No. 17, PI Mot. at 17 ("Indeed, Plaintiffs as subgrantees are not even party to any contract to which EPA is also a party."). Rather, they have Subaward Agreements with prime grant recipient CGC, *see id.* ¶ 4, and Account Control Agreements with defendant Citibank (ACAs), *see id.* ¶ 33. All Subgrantee ACAs were executed on or after January 20, 2025. *See CIEDB* ECF Nos. 17-1, Ex. A (Illinois Finance Authority ACA), 17-2, Ex. A (Efficiency Maine Trust ACA), 17-4, Ex. A (Minnesota Climate Innovation Finance Authority ACA), and 17-5, Ex. 1 (California Infrastructure and Economic Development Bank ACA).

Subgrantees allege that, following EPA's termination of the CGC grant agreement, they could no longer access NCIF funding in their accounts. *See CIEDB*, ECF 1, Compl. ¶¶ 43-46 (alleging that IBank's request for $415,314 in NCIF funding was not fulfilled); *id.* ¶¶ 50-51 (alleging that Efficiency Maine's requests for a transfer of $10 million and a transfer of $17,807 were not fulfilled, and that it "continues to be unable to access the more than $25 million in funds held in its Citibank account"); *see CIEDB*, ECF No. 17, PI Mot. at 24 (describing "the delay" on MnCIFA's "ability to draw on the NCIF funds"); *id.*, ECF No. 17-1, ¶ 13 (describing IFA's inability to draw down on the $108 million subaward from CGC). To remedy these alleged harms, Subgrantees seek to compel EPA's performance under the CGC grant agreement and its adherence to the FAA. *See CIEDB*, ECF No. 1, Compl. at 53-54.

## PROCEDURAL HISTORY

Subgrantees filed suit on March 19, 2025.  *See Cal. Infra. and Econ. Devel. Bank, et al. vs. Citibank, N.A.*, *et al.*, Case. No. 25-cv-820 (D.D.C.), ECF No. 1.  The Court consolidated the suit with those of the Grantees and set the deadlines for briefing on the Subgrantees' motion for preliminary injunction, with argument scheduled for April 2, 2025.  The Court further instructed the parties to file all papers in the lead case, *Climate United Fund*, Case No. 1:25-cv-698.  Subgrantees filed their motion for a preliminary injunction on March 24, 2024.  *See CIEDB*, PI Mot., ECF No. 17.

## LEGAL STANDARD

"The standard for issuance of the 'extraordinary and drastic remedy' of a temporary restraining order or a preliminary injunction is very high, and by now very well established."  *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 197 (D.D.C. 2020).  A movant seeking such an extraordinary remedy "bears the burden of making a clear showing" that it is "entitled to such relief."  *Id.*  To make such a showing, Subgrantees bear the burden of establishing (1) they are likely to "succeed on the merits," (2) they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of the equities tips in [their] favor," and (4) "an injunction is in the public interest."  *Id.*

## ARGUMENT[5]

### I.    This Court Lacks Jurisdiction to Hear Subgrantees' Claims.

Subgrantees lack standing to challenge the termination of a government agreement to which they are not parties.  Their motion for preliminary relief should be denied, and their

---

[5] As set out in the parties' Joint Status Report, *CIEDB*, ECF No. 10, and approved by the Court's March 25, 2025 Minute Order, Subgrantees agreed in their motion for a preliminary injunction to "make best efforts to avoid briefing issues that are duplicative of the [Grantee] Plaintiffs'

complaint against EPA should be dismissed, on that ground alone.  Moreover, this Court lacks

jurisdiction to adjudicate Subgrantees' claims under the APA because the APA's waiver of

sovereign immunity does not allow suits for "monetary damages" or for relief expressly or

impliedly forbidden by another statute.  5 U.S.C. § 702.  And the Tucker Act, 28 U.S.C. §

1491(a), forbids subrecipients from suing the United States for specific performance of prime

grants.

    **A.**    **Subgrantees Lack Standing to Bring Their Claims.**

 The subgrantees lack standing because they have no legally protected right to grant

funding that can be enforced against EPA.  "The Constitution limits the exercise of judicial

power to 'cases' and 'controversies.'"  *Aetna Life Ins. Co. of Hartford, Conn., v. Haworth*, 300

U.S. 227, 239 (1937) (citing U.S. Const. art. III, § 2).  For a "case or controversy" to exist, a

litigant must have standing to bring the claim.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560

(1992).  To prevail on the threshold issue of standing, the plaintiff must show (1) an injury-in-

fact, (2) traceability, and (3) a likelihood that the injury is redressable by the court.  *Id.* at 560-

561. "The party invoking federal jurisdiction bears the burden of establishing these elements."

*Id.* at 561.

    Subgrantees cannot meet this burden.  To satisfy the first element of Article III standing,

Subgrantees must show an invasion of a legally protected interest.  *Lujan*, 504 U.S at 560

(internal quotations and citations removed).  And Subgrantees, as *sub*recipients of a Federal

---

submissions of March 21, 2025" and the government agreed that its "response will be limited to
the arguments raised in the [Subgrantees'] submissions, and [the government] will not use this
opposition to the [Subgrantees'] motion to respond to or otherwise sur-reply to arguments made
in the [Grantee] Plaintiffs' reply."  Therefore, this opposition incorporates all relevant portions of
the government's opposition to the Grantees' motion, *Climate United*, ECF No. 49.

award, cannot demonstrate "a legally protected interest." *Sardarian v. Fed. Emergency Mgmt. Agency*, No. 3:19-CV-00910 (OAW), 2022 WL 4080325, at \*1–2 (D. Conn. Apr. 1, 2022).

In *Sardarian*, the plaintiff filed suit against FEMA and local and state agencies, alleging that "*his* grant" under FEMA's Hazard Mitigation Program "was unjustifiably terminated," and FEMA "misled him about *his* grant award limit," and his home "[was] under threat of constant flooding." *Id.* at \*2 (emphasis in original). The court dismissed the suit for lack of standing, holding that the plaintiff did not have a "legally protected interest" under *Lujan,* because FEMA awarded "the grant in question" to the State of Connecticut and to the Town of Westport, and plaintiff was not the recipient of the Federal grant "for purposes of establishing jurisdiction." *Id.*

Here, Subgrantees are not parties to the grant that was terminated. Rather, they are "subrecipients," who "receive[d] a subaward from a pass-through entity, to carry out part of a Federal award." 2 C.F.R. § 200.1. Subgrantees' status is undisputed. Compl. ¶ 33; *see* PI Mot. at 9 ("Plaintiffs are subrecipients under CGC's NCIF grant."). EPA's Subaward Policy and the revised Uniform Guidance, effective October 1, 2024, clarified that Federal awarding agencies "do[] not have a direct legal relationship with subrecipients or contractors of any tier." *See* 2 C.F.R. § 200.331. Because Subgrantees cannot show that they were "recipient[s] of a [Federal] award," *see Sardarian*, 2022 WL 4080325, at \*1, and do not have any direct legal relationship with the EPA, they do not have a "legally protected interest." *Id.* Rather than recognize the limitations inherent in their status, Subgrantees brazenly attempt to couch their lack of rights as some separate positive source of rights. *CIEDB*, ECF No. 17, PI Mot. at 17. ("Indeed, Plaintiffs as subgrantees are not even party to any contract to which EPA is also a party."). That contention subverts the limitations Congress defined when it enacted the APA, and it is a clear attempt to circumvent Article III's standing requirements. *See TransUnion LLC v. Ramirez*, 594 U.S. 413,

424-30 (2021) (recognizing that an alleged statutory violation does not automatically confer Article III standing).

The Subgrantees also lack prudential standing as subrecipients to Federal agreements because any rights against the government belong to the grantees. *Warth v. Seldin*, 422 U.S. 490, 499–500 (1975) ("[E]ven when the plaintiff has alleged injury sufficient to meet the 'case or controversy' requirement, . . . the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.") (citing cases). The lack of prudential standing here is consistent with the Tucker Act's denial of standing to a subrecipient, or any other party not in privity with the government. "A plaintiff must be in privity with the United States to have standing to sue the sovereign on a contract claim." *Sullivan v. United States*, 625 F.3d 1378, 1379–80 (Fed. Cir. 2010) (citing *Anderson v. United States*, 344 F.3d 1343, 1351 (Fed.Cir.2003)). "Not only is privity a fundamental requirement of contract law, but it is particularly important in cases involving government contracts because the 'government consents to be sued only by those with whom it has privity of contract.'" *Id.* (quoting *Erickson Air Crane Co. of Wash. v. United States*, 731 F.2d 810, 813 (Fed.Cir.1984)).

**B.     Sovereign Immunity Bars this Court from Adjudicating Subgrantees' Claims.**

The federal government is generally "immune from suit in federal court absent a clear and unequivocal waiver of sovereign immunity." *Crowley Gov't Servs., Inc. v. GSA*, 38 F.4th 1099, 1105 (D.C. Cir. 2022). And although the APA provides "a limited waiver of sovereign immunity for claims against the United States" seeking non-monetary relief, *id.*, that waiver does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought," *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012).

Here, neither the APA nor the Tucker Act waive the federal government's sovereign immunity with respect to the Subgrantees' claims. With respect to the APA, a claimant must seek "relief other than money damages." 5 U.S.C. § 702. The Supreme Court long ago recognized that subcontractors cannot turn to the APA for jurisdiction in an effort to recover funds owed under a prime agreement. *Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 263 (1999). In *Blue Fox*, a prime contractor failed to pay a subcontractor (Blue Fox) for a construction project completed for the Department of the Army. *Id.* at 256-57. Predicating jurisdiction on 28 U.S.C. § 1331 and the APA—as Subgrantees do here—Blue Fox sought an "equitable lien" on any Army funds not yet paid under the prime contract, or any funds available or appropriated for completion of the construction project, and an order directing the Army to pay those funds. *Id.* at 258. The Supreme Court rejected Blue Fox's arguments for APA jurisdiction, reasoning:

> [T]he sort of equitable lien sought by respondent here constitutes a claim for "money damages"; its goal is to seize or attach money in the hands of the Government as compensation for the loss resulting from the default of the prime contractor. As a form of substitute and not specific relief, respondent's action to enforce an equitable lien falls outside of § 702's waiver of sovereign immunity.

*Id.* at 263. The Supreme Court emphasized that "unless waived by Congress, sovereign immunity bars subcontractors and other creditors from enforcing liens on Government property or funds to recoup their losses." *Id.* at 265. *Blue Fox* thus demonstrates that subrecipients, like Subgrantees, are bound by the limitations that the Tucker Act imposes upon the APA's waiver of sovereign immunity. Like Blue Fox, Subgrantees have no privity with EPA, as they themselves acknowledge. And Subgrantees seek to retain funds from a terminated grant—opportunistic labels aside, that is a demand for money damages. The relief Subgrantees demand thus "falls outside of § 702's waiver of sovereign immunity." *Blue Fox,* 525 U.S. at 263. And Subgrantees have no right to enforce CGC's contract against the United States. *See Erickson Air Crane*, 731

F.2d at 813 ("The government consents to be sued only by those with whom it has privity of

contract, which it does not have with subcontractors.").

Additionally, Subgrantees seek relief that both the APA and Tucker Act forbid. The APA

provides, again, that "[n]othing herein . . . confers authority to grant relief if any other statute that

grants consent to suit expressly or impliedly forbids the relief which is sought." *Id*. The Tucker

Act "forbids the relief" that Subgrantees seek, that is, specific performance of the CGC grant

agreement and continued access to the funding the prime agreement provides. *See Sharp v.

Weinberger*, 798 F.2d 1521, 1523-24 (D.C. Cir. 1986) ("The waiver of sovereign immunity in the

[APA] does not run to actions seeking . . . specific performance in contract cases, because . . . the

Tucker Act and Little Tucker Act impliedly forbid such relief.") (citations omitted). The Tucker

Act also forbids the court "to hear a claim brought directly against the federal government by a

subcontractor." *G4S Tech. LLC v. United States*, 114 Fed. Cl. 662, 669 (2014), *aff'd*, 779 F.3d

1337 (Fed. Cir. 2015) (citing *United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1550 (Fed.

Cir. 1983)).

Even if this Court were to find that Subgrantees have a legal right to enforce CGC's

contract, it would still lack jurisdiction to grant Subgrantees relief. Like the Grantees' claims,

Subgrantees' claims are founded upon a contract, as they seek to undo termination of the CGC

prime agreement, alleging EPA's termination was improper. *See, e.g.*, *CIEDB*, ECF No. 1,

Compl. ¶¶ 95, 105 (alleging, in support of Counts 1 and 2, "[d]efendants have taken official

action purporting *to terminate the [GGRF] grants to the prime recipients*, which were intended

to implement the NCIF"); *CIEDB*, ECF No. 17, PI Motion at 21 ("The *terms and conditions for

the NCIF award to CGC* (the award for which [Subgrantees] are subawardees) *contain no

provision for termination* based on agency priorities . . . .) (emphasis added); *id.* at 53-54

(seeking to "vacate the purported termination" of the CGC grant agreement and to require EPA's adherence to "the terms of the Financial Agency Agreement"). Under the Tucker Act, only the Court of Federal Claims has jurisdiction "to render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States . . . ." Thus, any legal right Subgrantees may have with respect to their contract claims must be litigated in the Court of Federal Claims.

The D.C. Circuit just denied injunctive relief pending appeal on nearly identical facts in *United States Conference of Catholic Bishops v. U.S. Department of State*, App. No. 25-5066 (D.C. Cir. Mar. 28, 2025). Like this case, the plaintiff in *Catholic Bishops* initially sought an injunction in district court to prevent the United States Department of State from "pausing or canceling contracts." *Catholic Bishops*, No. 25-cv-465, 2025 WL 763738, at *1 (D.D.C. Mar. 11, 2025). Also like this case, the grant funding at issue was terminated before the preliminary injunction hearing. *Id.* at *2. The government argued that the district court lacked jurisdiction under the APA—just as EPA argues here. And crucially, the plaintiff in *Catholic Bishops* argued that the government violated the very same termination regulation that this lawsuit is built on, 2 C.F.R. § 200.340. *Id.* at *3; *see also* Appellee's Mot. for Injunction at pp. 23, App. No. 25-5066 (Mar 14, 2025) (Doc. No. 2105901). Despite this termination regulation, the district court refused to consider the merits of termination. *Id.* at *7, 8. As the district court explained, "the agency action that [plaintiff] ask[ed] the Court to reverse [wa]s the Government's decision to cease a financial relationship with the [plaintiff]." *Id.* at *7. Despite plaintiff's "creative drafting," the district court concluded that relief must be pursued under the Tucker Act, not the APA. *Id.* The plaintiff then moved the D.C. Circuit for an injunction pending appeal, raising the same arguments Grantees and Subgrantees advance here. In a per curium order, the D.C. Circuit

denied relief.  *See Catholic Bishops*, App. No. 25-5066 (D.C. Cir.  Mar. 28, 2025).  The same

result should apply here, on nearly identical facts.

> **C.    Subgrantees, Like Grantees, Cannot Challenge Funding Decisions Committed to Agency Discretion.**

Subgrantees also improperly challenge funding decisions that are committed to agency

discretion by law.  5 U.S.C. § 701(a)(2).  When "a statute is drawn so that a court would have no

meaningful standard against which to judge the agency's exercise of discretion," *Heckler v.*

*Chaney*, 470 U.S. 821, 830 (1985), review under the APA is unavailable because there is no

waiver of sovereign immunity where agency action requires "complicated balancing of a number

of factors which are peculiarly within [agency's] expertise."  *Lincoln v. Vigil*, 508 U.S. 182, 193

(1993) (quoting *Heckler*, 470 U.S. at 831-32); *see also Climate United Fund*, ECF No. 49, USA

Opp. at 16-17.

Here, Congress entrusted EPA "to make grants, on a competitive basis" for distinct

purposes, 42 U.S.C. § 7434(a), and left it to EPA to design its programs, provide appropriate

oversight and control, and "carry out other greenhouse gas emission reduction activities, *as*

*determined appropriate by the Administrator*."  *See id*. § 7434(a)(1) (emphasis added).  EPA's

determination that the current structure of Grantees' agreements does not afford the agency

necessary oversight and account controls is a matter uniquely within EPA's expertise and a

matter committed to its discretion.  *See Lincoln*, 508 U.S. at 192.  Because Congress gave EPA

"the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it

sees as the most effective or desirable way," *id*. at 192, Subgrantees are unlikely to succeed on

their effort to intrude upon the agency's exercise of discretion.

II.    **Subgrantees are Unlikely to Succeed on the Merits of their APA Claims.**

As explained, Subgrantees' claims are nearly identical to those of Grantees.  *Compare CIDEB*, ECF No. 17, at 18-21 (Subgrantees' PI Motion) *with Climate United Fund*, ECF No. 33-1, at 27-41 (Grantees' PI Motion).  In accord with the parties' representations to the Court that they would minimize duplicative briefing, EPA incorporates the arguments in its opposition to Grantees' motion, *see Climate United Fund*, ECF No. 49, USA Opp. at 21-26, and further emphasizes the following:

**1.**    The Court should reject Subgrantees' broad arguments invoking "separation of powers," which are unmoored to any right of action.  First, the Subgrantees have no standing and identify no waiver of sovereign immunity that would allow them to assert any stand-alone separation of powers claim.  And EPA's termination of the CGC grant agreement did not violate any provision of the Inflation Reduction Act, nor did it usurp Congress's "power of the purse" or "violate the separation of powers."  *CIEDB*, ECF No. 17, PI Mot. at 18-19.

As relevant here, "when the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate."  *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 10 (2015).  In the instant case, Congress authorized EPA to make grant awards and left the design, implementation, and administration of those grants to EPA's discretion, *see* 42 U.S.C. § 7434(a)(1)-(2).

Plainly, Congress knows how to write laws that constrain Executive Branch discretion, and it did not do so here.  "Congress knows how to impose mandatory provisions in contracts." *Am. Tel. and Tel. Co. v. United States*, 124 F.3d 1471, 1478 (Fed. Cir. 1997), *aff'd*, 307 F.3d 1374 (Fed. Cir. 2002).  And"[w]here Congress knows how to say something but chooses not to, its silence is controlling."  *Brendsel v. Off. of Fed. Hous. Enter. Oversight*, 339 F. Supp. 2d 52, 65

(D.D.C. 2004) (quoting *In re Griffith*, 206 F.3d 1389, 1394 (11th Cir. 2000)).  Moreover, the judiciary will "assume that Congress is aware of existing law when it passes legislation." *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990).  Congress passed, and the President signed, the Inflation Reduction Act on August 16, 2022.  In doing so, it directed EPA to make use of GGRF's funding by using the contractual vehicle of a grant process.  That congressional direction has consequences for the parties that Subgrantees simply wish to ignore.

The Executive Branch, just like any other party to a contract, maintains an unqualified right to breach that contract for any reason.  *See Climate United Fund*, ECF No. 49, USA Opp. at 13-14.  Congress is charged to know this law.  *Miles*, 498 U.S. at 32; *Mobil Oil Expl. and Producing Se. v. United States*, 530 U.S. 604, 607 (2000).  Here, Congress empowered EPA with the discretion to manage the grant program, defining only the amount of money appropriated, a deadline for award of the appropriation, and broad policy objectives.  42 U.S.C. § 7434(a)(1)-(2).  Nothing in the statute suggests that Congress denied EPA the standard contract right to cease performing an initially awarded agreement and potentially face contract remedies if a counterparty can demonstrate EPA's administration of the program breached the grant agreements.  There is simply no cogent separation of powers argument in Subgrantees' favor.  Indeed, the opposite is true—by asking this Court to hold the EPA to specific performance, the Subgrantees invite intrusion into the constitutional discretion vested in the Executive Branch and the power of the purse vested in the House of Representatives by the Appropriations Clause.

**2.**  EPA's termination was also not contrary to the Uniform Grant Guidance in 2 C.F.R. Part 200.  Although § 200.340 provides bases for termination and obligates an agency to include those bases in grant agreements, the regulation does not mandate what grant termination

provisions must or must not say, or limit an agency's ability to terminate a grant to those bases listed in the grant agreement. *See Climate United Fund,* ECF No. 49, USA Opp. at 25-26.

## III.   Subgrantees' Alleged Economic Harms Are Neither Imminent Nor Irreparable.

Subgrantees alleged two categories of harm—lost business and reputational harm—and both fail to support the extraordinary relief of a preliminary injunction in this case. The first category, "imminent loss of business," fails because the alleged harm is financial, not irreparable, and because the alleged potential loss of qualified projects is not certain. Subgrantees recognize that they will continue to operate while they await a ruling on the merits, and that both they and CGC have access to other sources of funding, as required for each "eligible recipient" for an award. *See* 42 U.S.C. § 7434(c)(1)(C). At any rate, any "loss" of potentially qualified projects is purely speculative because Subgrantees admit that they have not yet vetted identified projects. Similarly, the alleged risk that EPA will "claw back" Subgrantees' subaward funds is equally speculative.

The second category, reputational harms, fails because the alleged harms are financial, are not certain, and would not be remedied by an injunction. Subgrantees acknowledge that EPA's termination letter did not mention any wrongdoing by subgrantees. And even if Subgrantees could demonstrate some reputational harm, they offer no reason that a preliminary injunction would remedy it.

### A.   Subgrantees' Alleged Imminent Loss is Financial and Uncertain.

The D.C. Circuit "has set a high standard for irreparable injury." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). "Where the injuries alleged are purely financial or economic, the barrier to proving irreparable injury is higher still, for it is 'well settled that economic loss does not, in and of itself, constitute irreparable harm.'" *Mexichem Spec. Resins, Inc. v. E.P.A.*, 787 F.3d 544, 555 (D.C. Cir. 2015) (quoting *Wisc. Gas*

*Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). "The Supreme Court has echoed this message, finding that 'the temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury.'" *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1295 (D.C. Cir. 2009) (citing *Sampson v. Murray*, 415 U.S. 61, 90 (1974)).

Subgrantees may continue to operate during the pendency of this lawsuit. In terminating CGC's grants, EPA has not prohibited or made it unlawful for Subgrantees to carry out their work. Nor has any other government action. The government is not preventing Subgrantees from providing services; EPA has just terminated the grant agreements under which the government would provide reimbursement for services to prime grantee CGC, which, in turn, will make its own decision about whether and how to reimburse Subgrantees. *See, e.g.*, *Faculty Senate of Fla. Int'l Univ. v. Winn*, 477 F. Supp. 2d 1198, 1208 (S.D. Fla. 2007) ("There is no irreparable harm here because the plaintiffs can fund the desired travel themselves and then, if they prevail in this suit, obtain reimbursement. In other words, the harm is financial."). The only harm to Subgrantees is financial, based on a lack of funding for CGC as the prime grantee, which is insufficient for injunctive relief.

Subgrantees' alleged harm—delayed disbursement of funds—would be remedied at the conclusion of a lawsuit, if their claims are meritorious. And the inability to collect money unless and until a plaintiff prevails on the merits is a standard part of litigation that does not justify a preliminary injunction. "The rule that equitable remedies cannot issue when the damages are monetary in nature has been ingrained in law for 'half a millennium or so,' and no judge within the English common law tradition has the luxury of ignoring it." *United States v. Michigan*, 230 F.R.D. 492, 495 n.1 (E.D. Mich. 2005); *see also Dennis Melancon, Inc.* v. *City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (the "possibility that adequate compensatory or other

corrective relief will be available at a later date, in the ordinary course of litigation, [weighs] heavily against a claim of irreparable harm") (citation omitted).

Although harms from waiting for money are insufficient to justify a preliminary injunction, Subgrantees cannot even claim those insufficient harms. *See Michigan*, 230 F.R.D. at 495 (movant failed to show irreparable harm beyond monetary damages even though "[movant] argue[d] that its ratepayers are low-income and do not have the luxury of saying, 'It's only money.'"). Efficiency Maine Trust recognizes that it has significant other capital available even aside from that available through CGC, claiming only that capital available for revolving loan funds would be exhausted in the next *12 months*. *CIEDB*, ECF No. 17, PI Mot. at 25. MnCIFA recognizes that its operating expenses are covered by State grants and that its lending will continue, albeit at a "slow[er]" pace. *Id.*

And Subgrantees' alleged "risks" of losing business from qualified projects fail to justify a preliminary injunction because they are not "certain." An irreparable harm "must be 'both certain and great, actual and not theoretical.'" *Church v. Biden*, 573 F. Supp. 3d 118, 138 (D.D.C. 2021) (quoting *Mexichem*, 787 F.3d at 555). Subgrantees' brief and declarations are full of speculative language, pointing the Court to harms that "may"—but have not and might not— occur. Subgrantees admit that they have not committed to fund the identified projects and have not even completed any due diligence or obtained credit approvals. *CIEDB*, ECF No. 17, PI Mot at 23. The potential loss of a potential opportunity is insufficient. *See Save Jobs USA v. U.S. Dep't of Homeland Sec.*, 105 F. Supp. 3d 108, 113 (D.D.C. 2015) (denying preliminary injunction of rule that would allow H-4 visa holders to apply for jobs because plaintiff did not provide evidence the visa holders would compete with plaintiff's members). Subgrantees have not provided evidence that they would have extended loans to identified potential recipients.

Nor have they demonstrated that they cannot secure similar business opportunities after a ruling on the merits.

And the risk that EPA might "claw back" and re-obligate funds, thus making them unavailable to the current grantees is also not imminent harm. *See CIEDB*, ECF No. 17, PI Mot. at 28. In issuing a TRO in favor of Grantees, this Court stated that funds transferred out of Citibank would not be recoverable because "[i]n cases involving government expenditures, 'once the relevant funds have been obligated, a court cannot reach them in order to award relief.'" *Climate United Fund v. Citibank, N.A.*, No. 25-CV-698, 2025 WL 842360, at *9 (D.D.C. Mar. 18, 2025) (quoting *City of Houston v. Dep't of Hous. & Urb. Dev.*, 24 F.3d 1421, 1426–27 (D.C. Cir. 1994)). But an irreparable harm must be "'of such imminence that there is a clear and present need for equitable relief.'" *Church*, 573 F. Supp. 3d at 138 (quoting *Mexichem*, 787 F.3d at 555). "Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction. A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) (citations omitted). Subgrantees cannot meet this standard because any assertions about the alleged imminence of EPA's alleged claw back and re-obligation are purely speculative. *Cf. Wise v. United States*, 128 F. Supp. 3d 311, 320 (D.D.C. 2015) (denying preliminary injunction against foreclosure sale because plaintiffs did not face "immediate" sale of their property where foreclosure process was ongoing).

### B. Subgrantees' Alleged Reputational Harms Are Financial, Uncertain, and Would Not be Remedied by an Injunction.

Faced with the reality that their tenuous claims of economic harm cannot justify the extraordinary remedy of preliminary injunction, Subgrantees turn to manufacturing reputational

harms, which "can be used to establish irreparable harm in certain circumstances." *Trudeau v. Fed. Trade Com'n*, 384 F. Supp. 2d 281, 297 (D.D.C. 2005) (citation omitted). Those circumstances are not present here. Indeed, harms that "can be redressed through monetary compensation" are "by definition not irreparable." *Guttenberg v. Emery*, 26 F. Supp. 3d 88, 103 (D.D.C. 2014). Subgrantees point to the following as "just a few examples of the specific reputational harms" they will "suffer": limitation on their ability to apply or receive federal or state grant funds, decrease in the amount of bonds they can issue, or increase on their borrowers' interest rates. *CIEDB*, ECF No. 17, PI Mot. 27-28. These harms are "'strictly economic' and therefore not irreparable . . . [and] the discontinuance of funds did not injure [Plaintiffs'] reputation because it reflected no more than a decision based on reasons of policy." *Planned Parenthood Ass'n of Utah v. Schweiker*, 700 F.2d 710, 718 n.16 (D.C. Cir. 1983) (noting the discontinuance of title X funding was not sufficient to justify preliminary injunction). Loss of grant funding or increased interest rates, if any, resulting from changed circumstances, are all economic losses and do not constitute irreparable harm that would warrant preliminary injunction. *Ahuruonye v. U.S. Dep't of Interior*, 312 F. Supp. 3d 1, 24 (D.D.C. 2018), *see also Int'l Ass'n of Machinists and Aerospace Workers v. Nat'l Mediation Bd.*, 374 F. Supp. 2d 135, 142 (D.D.C. 2005) (holding that "financial loss can be remedied with money damages" and does not constitute irreparable injury). Subgrantees also fail to show that an increase in their interest rate is "certain."

Subgrantees' alleged reputation harms also fail because they are speculative. The D.C. Circuit rejected entry of a preliminary injunction "when [the alleged injuries are] nothing more than speculation about how third parties might respond" to an agency's statements and actions. *John Doe Co. v. Consumer Fin. Prot. Bureau*, 849 F.3d 1129, 1134 (D.C. Cir. 2017). "As with

all other forms of irreparable harm, the showing of reputational harm must be concrete and corroborated, not merely speculative." *Trudeau*, 384 F. Supp. 2d at 297; *see also Ahuruonye*, 312 F. Supp. 3d at 24 (quoting *Trudeau*). On the one hand, Subgrantees argue that the Termination Letter "threatens additional severe reputational harms to [them] if given effect" because EPA "insinuated without outright stating in its letter that CGC—and by extension . . . subawardees—have committed fraud, waste, and abuse and otherwise acted in a deficient manner." *Id.* at 26-27. But, on the other hand, Subgrantees acknowledge that EPA's termination is fundamentally concerned with EPA's ability to exercise oversight and control. *See CIEDB*, ECF No. 17, PI Mot. at 14-15. Subgrantees do not explain how statements about "EPA's past conduct, not CGC's or its subgrantees' actions" (*see id.* at 15) implicate the Subgrantees' reputations, because they do not.

Subgrantees' citation to *Patriot, Inc. v. U.S. Dep't of Hous. & Urban Dev.*, 963 F. Supp. 1, 5 (D.D.C. 1997) only undermines their argument. In *Patriot*, the court found reputational harm because HUD promulgated a letter specifically addressing the plaintiff's business practices. *Id.* The Termination Letter [and other statements by EPA] did not address the Subgrantees, and focused instead on "EPA's past conduct." *CIEDB*, ECF No. 17, PI Mot. at 15. Any effect on the Subgrantees' reputation is speculative at best.

Finally, Subgrantees cannot explain how a preliminary injunction would remedy the "cloud of uncertainty" surrounding future funding of the program. *CIEDB*, ECF No. 17, PI Mot. at 23. A plaintiff must prove "not just that [it] faces an irreparable harm, but that the injunction would clearly avoid this injury." *Santini v. Farris*, No. 2:21-cv-13045, 2022 WL 831420, at *3 (E.D. Mich. Feb. 15, 2022), *report and recommendation adopted*, No. 21-13045, 2022 WL 831224 (E.D. Mich. Mar. 18, 2022) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20

(2008)).  Even if the Court enters preliminary relief, that preliminary relief does not guarantee

final relief, nor could it curtail EPA's clearly stated intent to cancel these grant agreements.  Any

entity that considers seeking NCIF funds from Subgrantees will know that that Subgrantees'

access to grant funds is not guaranteed.  Because a preliminary injunction cannot remedy

Subgrantees' claimed harms, a preliminary injunction should not issue.

## IV.    An Injunction Would be Contrary to the Public Interest.

The balance of equities and public interest weigh against granting Subgrantees'

preliminary injunction.  *See Climate United Fund*, ECF No. 49, USA Opp. at 29-30.  The

government has a strong interest in safeguarding the public fisc.  *See Mathews v. Eldridge*, 424

U.S. 319, 348 (1976).  And the government is unlikely to recover funds after Subgrantees spend

them.  The loss of likely unrecoverable funds is a classic injury to the government that should

preclude preliminary relief. *See Heckler v. Turner*, 468 U.S. 1305, 1307-1308 (1984) (Rehnquist,

J., in chambers) (prospect of the government being forced to make $1.3 million in improper

payments per month supported a stay of injunction).  For this reason, a preliminary injunction

should be denied.

## V.    Any Injunction Should be Narrowly Tailored

For the reasons explained above, Subgrantees are not entitled to any preliminary injunctive

relief.  But in the event the Court concludes otherwise, injunctive relief "must be narrowly

tailored to remedy the specific harm shown," *Neb. Dep't of Health & Hum. Servs. v. U.S. Dep't of

Health & Hum. Servs.*, 435 F.3d 326, 330 (D.C. Cir. 2006) (citation omitted), and "should be no

more burdensome to the defendant than necessary to provide complete relief to the plaintiffs,"

*Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted).  The scope of

any relief granted here should not extend beyond the Court's TRO, *see Climate United Fund*,

ECF No. 28, which essentially "freezes" NCIF grant funds at Citibank, preventing EPA from

asking Citibank to return the money to the government and preventing the three NCIF grantees

from obtaining disbursement.  *See Climate United Fund*, ECF No. 31 at 2 ("In complying with

the Court's directives that it 'preserve the status quo,' . . . Citibank will—absent further order

from the Court—not give effect to EPA's Termination Letter but will continue to comply with

EPA's and Treasury's directives from March 10, 2025, that it 'pause the processing of payment

instructions for the GGRF accounts until further notice.'").

That the Court should limit any relief to continuing that freeze is especially warranted

considering the significant risk that any monies disbursed to Subgrantees may not be

recoverable.  Any granted relief should also be (1) limited to the specific agency action

Subgrantees' challenge—the Termination Letter—not any other conduct whose lawfulness is not

before this Court, *see Nat'l Ass'n of Chain Drug Stores v. U.S. Dep't of Health & Hum. Servs.*,

631 F. Supp. 2d 17, 21 (D.D.C. 2009); and (2) limited to the specific Subgrantees who have

shown imminent and irreparable harm, and to the specific extent of the demonstrated harm.

## VI.    Bond is Required if the Court Issues a Preliminary Injunction.

If the Court decides to grant any preliminary injunctive relief, the Court should order

security with any preliminary injunction.  Under Federal Rule of Civil Procedure 65(c), the Court

may issue a preliminary injunction "only if the movant gives security" for "costs and damages

sustained" by defendants if they are later found to "have been wrongfully enjoined."  Fed. R.

Civ. P. 65(c).  Although this Rule provides "broad discretion in the district court to determine the

appropriate amount of an injunction bond," *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir.

1999), when setting security, courts "should err on the high side" because setting a bond amount

too low might produce injury since "the damages for an erroneous preliminary injunction cannot

exceed the amount of the bond."  *Mead Johnson & Co. v. Abbott Labs.,* 201 F.3d 883, 888 (7th

Cir. 2000).  Should the Court issue an injunction at this preliminary stage that exceeds the scope

of the temporary restraining order and allows Subgrantees to draw down on the Citibank accounts, the Court must require Subgrantees to post a bond.

## CONCLUSION

EPA respectfully requests that the Court deny Subgrantees' motion for a preliminary injunction.

Dated: March 31, 2025                    Respectfully Submitted,

                                         YAAKOV ROTH
                                         Acting Assistant Attorney General

                                         KIRK T. MANHARDT
                                         Director

                                         */s/ Kevin P. VanLandingham*
                                         MARC S. SACKS (Ga. Bar No. 621931)
                                         *Deputy Director*
                                         KEVIN P. VANLANDINGHAM (NY Reg No. 4741799)
                                         *Assistant Director*
                                         U.S. Department of Justice
                                         Civil Division
                                         Corporate/Financial Section
                                         P.O. Box 875
                                         Ben Franklin Stations
                                         Washington D.C. 20044-0875
                                          Tel: (202) 307-1134
                                         Email: kevin.p.vanlandingham@usdoj.gov

                                         *Attorneys for the United States*
                                         *Environmental Protection Agency*