```
                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA


 CLIMATE UNITED FUND, et al.,     .  No. 25-cv-0698 (TSC)
                                  .  No. 25-cv-0735 (TSC)
          Plaintiffs,             .  No. 25-cv-0762 (TSC)
                                  .  No. 25-cv-0820 (TSC)
     v.                           .
                                  .
 CITIBANK, N.A., et al.,          .  Washington, D.C.
                                  .  Wednesday, April 2, 2025
          Defendants.             .  12:08 p.m.
 . . . . . . . . . . . . . . . . . .
```

PRELIMINARY INJUNCTION HEARING
BEFORE THE HONORABLE TANYA S. CHUTKAN
UNITED STATES DISTRICT JUDGE


<u>APPEARANCES</u>:

```
For Plaintiff               ADAM G. UNIKOWSKY, ESQ.
Climate United Fund:        Jenner & Block LLC
                            1099 New York Avenue, NW
                            Suite 900
                            Washington, DC 20001


For Plaintiff Coalition     VINCENT LEVY, ESQ.
for Green Capital:          Holwell Shuster & Goldberg LLP
                            425 Lexington Avenue
                            14th Floor
                            New York, NY 10017


For Plaintiff Power         BETH C. NEITZEL, ESQ.
Forward Communities:        Foley Hoag LLP
                            155 Seaport Boulevard
                            Suite 1600
                            Boston, MA 02210


For Plaintiff               MEGHAN STRONG, ESQ.
California Infrastructure   California Department of Justice
and Economic Bank:          455 Golden Gate Avenue
                            Suite 1100
                            San Francisco, CA 94102
```

For Defendant Citibank:          KENNETH WINN ALLEN, ESQ.
                                 Kirkland & Ellis LLP
                                 1301 Pennsylvania Avenue NW
                                 Washington, DC 20004

For Defendant EPA:               MARCUS S. SACKS, ESQ.
                                 U.S. Department of Justice
                                 P.O. Box 875
                                 Ben Franklin Station
                                 Washington, DC 20044

Court Reporter:                  BRYAN A. WAYNE, RPR, CRR
                                 U.S. Courthouse, Room 4704-A
                                 333 Constitution Avenue NW
                                 Washington, DC 20001

Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription.

P R O C E E D I N G S

THE DEPUTY CLERK:  Good afternoon, Your Honor.  We're on record in civil case 25-698, Climate United Fund versus Citibank, N.A., et al.  Starting with plaintiffs' counsel, please approach the podium and state your appearance for the record.

MR. UNIKOWSKY:  My name is Adam Unikowsky, and I represent plaintiff Climate United.

THE COURT:  Good afternoon.

MR. LEVY:  Good afternoon, Your Honor.  Vincent Levy on behalf of Coalition for Green Capital.

THE COURT:  All right.  Good afternoon.

MS. NEITZEL:  Good afternoon.  Beth Neitzel for Power Forward Communities.

THE COURT:  Okay.

MS. STRONG:  Good afternoon, Your Honor.  Meghan Strong on behalf of the California Infrastructure and Economic Development Bank.  I'm also here on behalf of the other state green bank plaintiffs in the 820 matter.

THE COURT:  All right.  Good afternoon.  Mr. Sacks.

MR. SACKS:  Good afternoon, Your Honor.  Mark Sacks, Department of Justice on behalf of the federal defendants. My colleague Kevin VanLandingham is here with me as well.

THE COURT:  Good afternoon.

MR. ALLEN:  Good afternoon, Your Honor.  Kenneth Winn

Allen on behalf of Citibank.

THE COURT:  Good afternoon.  It's Winn Allen.  Okay. Mr. Sacks, I'm not seeing your name on here.  All right. I know who you are.

Okay.  Just give me one minute, please.

Before we get started, my understanding is that the plaintiffs in 25-CV-93, withdrew their motion for temporary restraining order this morning.  So did you all get that filing?  Okay.  I'm just letting you know.

All right.  So we're on the record here for a hearing on a motion for preliminary injunction in the consolidated case 25-CV-698.  The parties in Climate United Fund versus Citibank, Coalition For Green Capital versus Citibank, and Power Forward Communities versus Citibank consented to consolidation at the TRO hearing on March 17.

We'll also hear arguments from the parties in California Infrastructure and Economic Development Bank versus Citibank, who's also consolidated after the parties agreed or at least did not object to consolidation on March 25.

I won't repeat the extensive background in this case. As we all know by now, these cases involve the EPA's grant funding for certain clean energy projects that were awarded to plaintiffs and subgrantees in April 2024 under the National Clean Investment Fund, NCIF, program.  Since mid-February of this year plaintiffs have been unable to draw on their grant

award accounts which are held in Citibank accounts.

On March 11, a day before I held the first hearing in the TRO in this matter, EPA sent a letter of termination to all plaintiffs indicating that EPA was terminating their grants.

On March 12 and March 15, I held hearings on the motion for TROs, and on March 18 I granted plaintiffs' request and entered a TRO, though narrower than plaintiffs had requested, simply to preserve the status quo ante by ordering that Citibank leave the funds in the account and not transfer them to the Treasury or anyplace else.

Now, as to plaintiffs' motion for preliminary injunction, plaintiffs ask that I first enjoin EPA Administrator Lee Zeldin and Deputy Administrator McIntosh and others from (1) effectuating EPA's notice of termination as to each plaintiff; (2) from unlawfully suspending, terminating or limiting access to plaintiffs' grant awards, except as permitted in accordance with the applicable Account Control Agreement -- that's the ACA -- with Citibank, the grant awards, and applicable law; and 3, from directly or indirectly impeding Citibank from disbursing the funds or causing Citibank to deny, obstruct, delay or otherwise limit access to the funds in accounts established in connection with plaintiffs' grants, including funds and accounts established by plaintiffs, except as permitted under the terms of the applicable ACA and applicable law.

Plaintiffs also ask the court to enjoin Citibank from (1)

violating its obligations under each plaintiff's ACA, including by failing to process, disburse and release funds in accounts established in connection with each plaintiff's grant, including funds in accounts established by plaintiffs' subgrantees in accordance with the applicable ACA, both with respect to requests already submitted and future requests; and (2) from transferring or otherwise moving funds out of accounts established in connection with plaintiffs' grants, including funds and accounts established by plaintiffs' subgrantees except at the direction of plaintiffs or plaintiffs' subgrantees as permitted in the applicable ACA.

They also ask that the preliminary injunction expressly cover plaintiffs' subgrants.

EPA defendants argue that relief must be narrowly tailored and the scope of relief should not extend beyond the Court's TRO.  Specifically, any relief should be limited to the plaintiffs who have shown imminent and irreparable harm based on the termination letter, not any other conduct, and if a preliminary injunction is issued that allows plaintiffs to draw down on their accounts, EPA asks that the Court require plaintiffs to post a bond.

As to the case originally filed as 25-CV-820, plaintiffs in those cases -- in that case are state green banks, that is public or quasi public entities that provide crucial financial services to pollution-reducing projects in their states.  These

subgrantee plaintiffs, as I will refer to them, sued the same defendants and have moved for the same preliminary injunction based on the same events.  And these subgrantee plaintiffs ask that I convert the relief extended in the TRO in CV-698 to a preliminary injunction that lasts the duration of this action; that I further enjoin Citibank from violating its obligations to disburse funds in response to valid, ordinary course disbursement instructions from plaintiffs; and 3, that I order defendants to file a status report within 24 hours of the issuance of any preliminary injunction confirming their compliance with the order.

So I've read the briefing.  What I really wanted to do today is sort of take each topic in turn, jurisdiction, irreparable harm, likelihood of success, etc., because I do have some specific questions as to each category.  Then we'll move on to the subgrantee plaintiffs and hear from defendants.

Let me ask you before I begin, Mr. Sacks, I had some questions for you regarding the letter of termination, and I asked you at the last two hearings we had whether the government had further information to proffer regarding the reasons for termination.  Do you have any information to supplement the record at this point?

MR. SACKS:  We do not, Your Honor.

THE COURT:  All right.  So we're still moving -- where we are today is the record of -- reasons for termination that

we had at the previous two prior hearings.  Is that correct? There's been no -- has there been an investigation opened? Has there been a grand jury empaneled, anything like that?

MR. SACKS:  I'm not aware of any further information on that subject.  We did file a second declaration of Mr. Amidon with our opposition to the PI here.  That's subsequent to the arguments we've had previously.  But that doesn't provide new justifications --

THE COURT:  No, it doesn't.

MR. SACKS:  -- for the termination; it simply expands upon I believe what the bases were.

THE COURT:  Okay.

All right.  We all know the standard for a preliminary injunction.  There has to be a likelihood of success on the merits, there has to be irreparable harm, the balance of equities have to tip in favor of the movant, and the injunction has to be in the public interest.

So let me start with jurisdiction because the government's position is and has been that this case is a breach of contract case and under the Tucker Act this court has no jurisdiction to hear this case; it should be brought before the Court of Federal Claims.

Under the Tucker Act, the Court of Federal Claims has exclusive jurisdiction over certain monetary claims against the government.  A court must decide if the action is at its

essence a contract claim, and whether that is the case depends both on the source of the rights upon which the plaintiff bases its claims, and on the type of relief sought. These are known as the Megapulse factors from *Megapulse v. Lewis*, 672 F.2d 959, a D.C. Circuit case.

So the plaintiffs have argued that their claims are not in essence breach of contract claims. The source of rights argument is that plaintiffs' claims are based in the Constitution, federal statutes and federal regulations, not contract terms, and they do not seek money judgment or specific performance of a contract. They seek to hold unlawful and set aside agency action from which vacatur is the normal remedy.

The defendants argue that plaintiffs are improperly challenging funding decisions committed to agency discretion and that plaintiffs seek to deny EPA's inherent contractual rights to breach, like any contracting party.

And plaintiffs' own arguments demonstrate that their source of rights stem from their agreements, that the Constitution affords no right to receive or perform a grant, and absent agreements plaintiffs would have no right to claim NCIF funds. Their source of rights lies in the fact that they're grant recipients and therefore contracting parties.

Defendants also argue that the regulations that they cite do not afford plaintiffs individual rights that would exist

independent of their contractual rights or separate them from their status as parties to the grant agreements.

They also argue that the type of relief sought also indicates that the court has no jurisdiction and that the parties have disagreement over whether as a matter of contract law, the terminations comported with the terms of the agreement.

So at the outset, it's clear that there are agreements and a contract involved.  I think we can all agree that just because a contract is involved doesn't mean that these are contractual claims that will automatically strip this court of jurisdiction.

As the parties have identified, whether this is a true contract claim that belongs in the Court of Federal Claims hinges on the Megapulse factors, so I'm going to ask plaintiffs and the EPA defendants to speak briefly on that.

So what does the Court need to look to when evaluating your claims?  Do I need to look at the contract, to the grant agreements, the notice of awards, the statutes, the regulations, what?

MR. LEVY:  For that Megapulse factor, the primary source of rights to which the Court must look are the regulations that we cite, statutes that we cite in our brief, including the APA and the IRA, and the Constitution of the United States.  Those are the sources of our rights.  The D.C.

Circuit has made very clear that the fact that a court may have reference to a contract as part of that adjudication -- I apologize. The fact that a court may have to refer to a contract does not turn the claim into --

THE COURT: You're referring to *Crowley*.

MR. LEVY: Correct, Your Honor. And only one of our arguments relies in any respect on the contract, and that's one of the regs that we cite, which states that EPA may cancel a grant for policy changes only if that is in the terms and conditions of the contract. That's the only claim that in any way refers to a contract.

And then there's the second aspect of the test, of course, which is the type of relief sought. We are not seeking the sort of relief that is in any way an order of money damages --

THE COURT: Well, that's one of my questions. Why is this not an ask for money damages or specific performance from a contract?

MR. LEVY: The fact that money may become available as a feature or as a function --

THE COURT: It's all about the money. I mean, this case is all about the fact that Citibank has money that you believe is due to you under a contract, and they're not giving you the money. And what you're asking me to do is order Citibank to give you the money. At its most basic terms.

MR. LEVY: So we have a contract against Citi under the

ACA.  That is not subject to jurisdiction or the Tucker Act. Citi is a private party.

THE COURT:  Right.  But Citi's position is we're not doing anything until the government tells us it's okay, or a court tells us it's okay.

MR. LEVY:  Right.  And my colleague will address the Citi arguments more directly, but there is a private contract between two private parties, Citi and the plaintiffs, and it has a merger clause, integration clause that says all the obligations are there.  It's a mine-run commercial contract. There's no argument that the Tucker Act preempts that claim.

So I think the government's argument is that because the court may have to refer to the terms and conditions of the grant awards, that turns the claims into a contract claim.  It does not.

And in terms of the relief being sought, I think the direction of the D.C. Circuit and the Supreme Court, including in *Bowen*, make very clear that an award of specific relief is not a money damages award even if the effect of that is to have money sent.  And that's not what's happening here because the money is already in our accounts at Citi.  And that is in fact a key distinguishing factor between our case and the *Catholic Bishops* case, which is the principal authority that my friends rely upon.

The court there said that the dispositive factor was the

second *Megapulse* criterion because the plaintiffs were seeking an order requiring payment. And that's not what's happening here, because the money is in our accounts already, and the relief we are seeking is an order preliminarily invalidating the termination of this grant program and enjoining the impairment with a private contract with Citi. It's nothing to do with -- it's not a contract claim that challenges government contracts or requires the government to turn money over to us. The money was disbursed, it belongs to us.

There was another key distinguishing factor between our case and *Catholic Bishops,* which is in *Catholic Bishops* and in *Ingersoll-Rand* there were termination for convenience clauses in the contract, and the circuit in *Ingersoll-Rand* said that was a key issue because it was possible to conceive of the entire case as a contract dispute. That is not the case here.

And in fact, the government does not at all rely on the terms of the contract to justify termination. Although initially in the notice of termination it relied upon waste, fraud, abuse, very generically, in the PI opposition brief it has said very clearly that it does not allege a violation by the plaintiffs of terms and conditions, but that instead it is relying on the right to change its mind as a matter of policy.

THE COURT: Well, can EPA terminate the awards if they no longer effectuate agency priorities? That's a popular phrase these days.

MR. LEVY:  Our awards cannot be terminated on that ground under the applicable regulations because -- and my friend Ms. Neitzel will address that more clearly.  But there was a regulation that said very clearly that that sort of termination can occur only if it's in the terms and condition, and that's as a feature of regulatory law which was in place at the time these grants were awarded.

And so we don't agree that that's a possibility in these grants.  That is in fact the distinguishing factor with *Catholic Bishops*.  We think given their heavy reliance on that case and the fact that there is an order on that issue on appeal, that it would be helpful to the parties and the circuit for the Court to expressly distinguish that case.

THE COURT:  All right.  Mr. Sacks, do you want to -- did I let you finish, Mr. Levy?

MR. LEVY:  I'm --

THE COURT:  I'll let you respond to him, yes.

Mr. Sacks, let me just ask you as a matter of procedure, we were originally scheduled to have this first TRO hearing on March 11.  Government asked for another day.  Plaintiffs agreed.  I agreed.  And in that day, that 24 hours, EPA terminated the contracts.  If we had had the hearing on March 11, before the termination letter, would I have jurisdiction over these claims?

MR. SACKS:  No, Your Honor, you would not.

THE COURT:  Why?

MR. SACKS:  For the same reasons that we've been discussing already.

THE COURT:  So what legal effect does the termination letter have?

MR. SACKS:  The legal effect of the termination letter is --

THE COURT:  As far as this case is concerned.

MR. SACKS:  Well, as far as jurisdiction, it has no effect on this court's jurisdiction.

THE COURT:  Okay.

MR. SACKS:  So I want to start if I could with the statement my friend finished with, I believe, which is essentially a statement that EPA could not terminate these awards if they didn't comply with the terms and conditions within the contract.  They would be forever bound to continue performing the contract unless they can meet those specific terms within the contract.

THE COURT:  I mean, I think that agencies terminate contracts all the time, but I think what the plaintiffs are arguing is when they do that, they have to comply with the rules for termination, and that EPA hasn't done that in this case.  What you're saying is the termination doesn't make a difference in my jurisdiction.

MR. SACKS:  It doesn't, Your Honor.  The difference

is whether that termination complied with the contract, which gave EPA the right to do certain things, or it didn't, and arguably becomes a breach of contract.

THE COURT:  So let's pretend for a moment that it's March 11, not the 12th.  You haven't issued your letter of termination.  Why don't I have jurisdiction?

MR. SACKS:  You don't have jurisdiction because the claims brought by the plaintiffs at that point, which I believe was that the alleged freeze of the money was violating the terms and conditions of the contract or violating regulations or violating the Constitution, all of those things were sourced -- the source of the right was their -- the contract and their desire to have access to funds under the contract.

THE COURT:  Plaintiffs bring APA claims arguing that, in part, there's a -- they're entitled to certain funds under grants and agreements they've entered into with EPA, and EPA can't unilaterally tell Citibank not to turn over the funds in those entities' accounts just because they don't like the program anymore.

And so it's not a contractual dispute, plaintiffs argue; it's arbitrary and capricious and contrary to law dispute. And that would be the case whether, as you say, if you're saying that the existence of the termination letter doesn't really affect my jurisdiction, why wouldn't that be an

argument that takes it out from under the Tucker Act?

MR. SACKS:  Because we still come back to the *Crowley* and *Megapulse* tests, and we have to look at the source of the right and the remedy sought.  And the source of the right, I certainly understand they believe the APA and the regulations that govern how EPA operates the grants are a separate source of right, apart from contract, that gives them the right to pursue an APA claim in this court and gives this court jurisdiction over that --

THE COURT:  So you're saying on March 11 it was a contract dispute.  March 12 it was a contract dispute.  The existence of the termination letter doesn't alter that.

MR. SACKS:  100 percent, Your Honor.

THE COURT:  Okay.  So plaintiffs filed suit and asked for TRO because the government's withholding grant money.  You've already answered my question with regard to whether the letter strips the court of its jurisdiction.  But does the termination letter cabin my review under the APA?

MR. SACKS:  Well, again, Your Honor, I think there is no APA review permitted here because of the source of the right and the remedy sought.

THE COURT:  When is an action by the government over grant awards reviewable by this court?  Does this court ever have jurisdiction over the termination of -- over grant awards?

MR. SACKS:  It again would depend on the source of the right and the remedy sought.  When you look at *Crowley* and *Megapulse* and you analyze the facts of those cases, those have very different sources of rights from the contracts at issue. When you look at this case, the legal principles of those cases apply here a hundred percent.

THE COURT:  How do you respond to Mr. Levy's argument with regard to the nature of the contract at issue in *Catholic Bishops*?

MR. SACKS:  Sure.  So Mr. Levy brought up two distinctions he believed make this case different from *Catholic Bishops*.  So if I could address each of those in turn --

THE COURT:  Yes.

MR. SACKS:  -- I would appreciate the opportunity to do so.  The first I believe he said was that the difference here is that the money is at Citibank in the accounts of the plaintiffs and the money is not in the federal treasury, and that's a difference.

I would argue that's a distinction without a difference. The fact that the money is in Citibank as a financial agent does not mean the plaintiffs own this money in a way that other grantees who have to get reimbursed out of the federal treasury don't own the money.

THE COURT:  And what authority did EPA have to instruct

Citibank not to release the funds?

MR. SACKS:  Their authority under the financial agent agreements.  But again, the question that's important here I think from the plaintiffs' perspective is whether the fact of the money is with Citibank gives them more rights than another grantee, the grantees in the *Catholic Bishops* case.  And it does not.  That money is still government federal funds until plaintiffs perform under the contract, under the grant, and have the right to utilize that money.  With the grant terminated, they don't have those rights anymore.

The contracts themselves say if the contract is terminated, any remaining money will be deobligated from the plaintiff, from the grantee, and reobligated again by the agency.  That's an express understanding in the contract; this money can be taken away at any point at which EPA terminates.

So the money --

THE COURT:  So if the government awards a grant and enters into a contract with a party but midway through decides to rescind the grant, do I have jurisdiction under the APA?

MR. SACKS:  No, Your Honor, you do not.

THE COURT:  And if the government awards a grant but does not enter into a contract with a party and later decides to rescind the grant, is that reviewable by this court?

MR. SACKS:  That's a question I'd want to consider further, Your Honor.  If there's no existing contract there,

then the source of right analysis may be different.  I don't know the answer to that.

THE COURT:  Thank you.  Continue.

MR. SACKS:  The second distinction that my friend raised, I believe, is that in the Catholic Bishops contracts, termination for convenience or for agency priorities is specifically included in the grant documents, whereas here of course it is not.  Again, that is a distinction without a difference, because the question still is -- I mean, both grants have a termination clause.  And both times the government terminated the grants.

The question at issue is are those terminations consistent with what the contract gave the parties rights to or inconsistent, making it breach?  Whether in one case it's a lawful termination under the contract, and in another, perhaps here, it may not be -- again, we're not conceding that, but let's say for a second that it's not -- that doesn't change the source of the right.  The right is the grant agreements; the termination clause is within those agreements.

And both of those agreements, as you know, incorporate the regulation that I believe the plaintiffs place most of their weight on, 200.340, as constraining the EPA's rights to terminate here.

THE COURT:  But plaintiffs cite not just to the contract -- in fact, the contract is the least of it.  They

cite to various regulations that they contend were violated, including the Constitution.  Do these regulations -- I mean, the Constitution always applies obviously, but do the regulations apply to this dispute?

MR. SACKS:  The regulations apply to the dispute in the sense that they're incorporated into the contract and potentially give the plaintiffs contractual rights.

THE COURT:  So are you saying that the contract can supersede the authority of, for example, the APA?  That the APA doesn't apply if the contract sort of talks about rights to terminate?

MR. SACKS:  Well, the APA doesn't apply if the relief that the plaintiffs seek is impliedly forbidden by another statutory provision, right?  And that's what the Tucker Act does here.

So if -- again, we are not here today to say that all cases involving grants or contracts can only go to the Court of Federal Claims.  We're here today to talk about these specific documents before us and the source of rights in this case. And I understand the arguments about the appropriations clause, I understand the arguments about due process.  I understand the arguments about the Inflation Reduction Act and 7434, but there are no rights within the Constitution or the Inflation Reduction Act that give these plaintiffs rights.

What gives them rights is they signed a grant agreement

with the United States that incorporated various regulations and set the terms of the agreement between the parties.

THE COURT:  But doesn't the agency's decision, not just in termination but in ordering -- because this claim was brought before the agency terminated -- in ordering Citibank not to release the plaintiffs' funds from their accounts, is that decision not subject to APA review under arbitrary and capricious or contrary to law?  It's all contractual?

MR. SACKS:  Again, because the source of their right, their desire to have those funds and not have them stayed or not have them terminated, their source of right for that is their contractual agreement with the government to run their program.

THE COURT:  Is there a difference here between money damages and the relief that plaintiffs are seeking?

MR. SACKS:  I don't think the Court has to answer that question because what the plaintiffs are asking for is --

THE COURT:  I'm actually asking you to answer that question.

MR. SACKS:  Well, I don't think we need to go as far as saying -- let's put it this way:  Yes, they're seeking money, certainly.  Whether you classify that as monetary damages or not is a separate question.  What they are seeking is specific performance.  And with all due respect, I understand but they are dressing up their claims for compliance with regulations,

compliance with the statute.  They want one thing here: they want to perform their contracts and get the money they were promised to do so.  That's clearly what they want.  That is specific performance.

Even taking the regulation at issue, 200.340, what they say I believe is that that regulation says -- the regulation begins by saying there's various bases on which the government may terminate agreements, one of them being agency priorities. But then it says that the government needs to make sure that it puts in a grant agreement the bases it's going to rely upon for termination, right?  And that provision was part of the initial contract and the amended contract here, right?  We're not saying that it isn't.  We know that.

And so the question then becomes, if that's a regulatory violation, our failure to do that, what does this court do to correct that, right?  It's not going to issue a monetary award because it can't.  What's it going to do to correct that? It's going to go tell the agency, okay, under 340, go back now and correct that.  If you want to terminate for that basis, put it into the grant agreement.  But we can't do that because it's a bilateral contract and we can't -- sorry.

So how is the court going to correct that error?  They're going to ask us to, under 340, go back and include those grounds for termination into an amended version of the agreement that the plaintiffs will not agree to?  I use that

as an example to show why there is no real APA relief to offer here. The only relief this court can offer is to tell the government you cannot terminate and you must perform the contract. And unfortunately, that's not relief this court has the authority or jurisdiction to provide.

THE COURT: According to EPA's acting CFO Gregg Treml, who provided a declaration in this case, he said EPA had never used a financial agent in connection with a grant program prior to 2024, and EPA's use of a financial agent in connection with the GGRF program was the first use of a financial agent for a non-exchange grant program administered by the federal government. That's in his declaration which is ECF 49-5.

Has the government or other agencies, if you know, used a financial agent in connection with a grant program before?

MR. SACKS: From conversations I've had with Treasury, I think the answer to that is yes, we've used financial agents before. I don't believe in this exact context, but I can't give the Court any more information than that.

THE COURT: What mechanism, if not a contract, did EPA previously use in awarding grants?

MR. SACKS: I don't believe EPA has arguably made a large number of grants. I'm just not sure about that, Your Honor. But I would assume what they did -- I think the more traditional means of grant-making is that the money remains in

the Treasury and then grantees submit requests for reimbursement to obtain the funds that they've utilized.

THE COURT:  Last year in *Loper Bright Enterprises* the Supreme Court held that federal courts must fulfill their obligations under the APA to independently identify and respect delegations of authority, police the outer statutory boundaries of those delegations, and ensure that agencies exercise their discretion consistent with the APA.

So how does *Loper Bright* affect your jurisdictional argument?

MR. SACKS:  It doesn't, Your Honor.  To the best of my knowledge, *Loper Bright* would apply here if this court considered this to be an APA case and the question was about whether the EPA interpreted and complied with 7434, the Greenhouse Gas Reduction Fund statute.  *Loper Bright* what I believe does is says that the agency no longer is permitted to have deference given to it in its interpretation of the statute; that a court makes its own independent determination.

But there is no issue before the court here about whether EPA correctly interpreted and fulfilled the obligations of 7434.  It's a command to give grants, it gives discretion to the administrator, and to do it by a certain date.  Those are the only commands from Congress within that statute.  I don't think there's any dispute EPA has done that.

There's a dispute now about what happens if the money is

deobligated, but that's not addressed by the statute.  EPA complied with the statute, there's no issue with that.

I don't think *Loper Bright* applies or changes the analysis under what we call -- what used to be the step two of *Chevron*, I think, which is the arbitrary and capricious analysis.  I don't believe it changes this court's legal analysis of those claims in this case.  But again, we don't think the Court should be conducting that analysis.

THE COURT:  All right.  I'll let you finish and then I'll have Mr. Levy respond.

MR. SACKS:  We certainly understand the plaintiffs' desire for relief, and we understand the Court's desire to potentially provide them some relief, but the only way the Court can do that is if it applies the tests from *Crowley* and *Megapulse* and finds the source of right is something other than --

THE COURT:  I don't have any desire to give anybody any relief.  My desire is to make sure that the law is complied with, and obviously to assure myself of my own jurisdiction to do so.

MR. SACKS:  I'm sorry.  I just meant the desire to hear the plaintiffs and if they're entitled to help --

THE COURT:  I'm here every day.  That's what I do.

MR. SACKS:  But what we must do and what the Court has done is look at the tests from *Megapulse* and apply those

firmly to the facts before it.  And again, I think if you read those cases and the facts of those cases and see how the court applied the tests there and read the other cases we've cited in our briefs like *Ingersoll-Rand*, for example, you'll see very quickly that there's kind of a line of what is a contract case and what is not, and we would submit that this case, these facts, these documents, fall well on the side of the contract line.  Thank you.

THE COURT:  Thank you, Mr. Sacks.

Mr. Levy.

MR. LEVY:  So I guess I'll begin by just remarking upon the concession -- or the contention that the termination letters --

THE COURT:  Doesn't change anything.

MR. LEVY:  That's pretty remarkable in terms of both factors in the analysis.  And that is another distinguishing factor, frankly, with *Catholic Bishops* case that is pretty key.

You know, my friend declined to say whether -- he said it didn't matter whether the award being sought is effectively a money damages award.  That is in fact the key question in the second factor and it is critical here.  It was in fact critical in *Megapulse*.  And the circuit and the Supreme Court have made clear that the fact that an order enjoining government action may result in money becoming available as a

function of their regulatory or statutory scheme does not turn the order into a prohibited order for damages.

So here, of course, the money is in our account, it belongs to the plaintiffs, and it is program income.  So we just don't agree --

THE COURT:  How do you respond to Mr. Sacks's argument that the relief you're asking for means that EPA would be forever bound in a contract like this?

MR. LEVY:  Well, there are terms and conditions in the contract, so we're not saying that.  What we're saying is that based on the record before the court for the APA claim, that the agency has acted arbitrarily and capriciously and violated its regulations.  We're saying that the process that EPA and the government undertook here violated the Due Process Clause.  We're saying it violated the Appropriations Clause.  We're not saying never in a million years could these contracts be terminated.

THE COURT:  What about his argument that without this contract you wouldn't have any claims at all?

MR. LEVY:  Well, I think that proves too much because it -- there's several cases including by this circuit and the Supreme Court that concerned grants, grant awards, and the court made clear those could be considered, including in *Bowen*.  There were grants there.  Clearly if the grants weren't there, there wouldn't be a dispute.  The fact that

there are grants isn't the question.  The question is what rights are being invoked, and the rights that are being invoked here are again in statutes, regulations and the Constitution.  And the remedy that's being sought is not effectively a damages award.  Those are the questions.

THE COURT:  All right.  Thank you.

MR. LEVY:  Thank you, Your Honor.

THE COURT:  All right.  With regard to likelihood of success, under the APA a court will set aside an agency decision if it is arbitrary, capricious, an abuse of discretion otherwise not in accordance with the law, contrary to statute or unsupported by substantial evidence.

So I have a few questions here about the terminations to help me evaluate the parties' arguments on the likelihood of success.  And let me be clear, this is not about what I think about the legality or validity of the terminations.

Ms. Neitzel, what is the agency action you're attempting to set aside here?

MS. NEITZEL:  We are challenging both the unlawful suspension of the accounts -- in other words, Citibank's refusal to comply with our disbursement instructions at EPA's urging.  And of course we are also seeking an order preliminarily enjoining the agency from proceeding with the notices of termination.

THE COURT:  Doesn't EPA have the right to manage its

own grants and programs?  I mean, why doesn't this include terminating or freezing funds?

MS. NEITZEL:  It has a right to manage its own grant programs, of course.  But they must do so within the metes and bounds of the law.  And in this case and in any other case governing a government grant, that involves the applicable regulations, it involves any relevant statutes, and of course the Constitution.

And so here our argument is, and the source of our rights are, those authorities.  In other words, there are multiple statutory provisions that are violated, meaning the APA and the IRA, there are multiple governing regulations that were violated by APA -- EPA's actions.

THE COURT:  But those violations all stem from the existence of the contract, don't they?

MS. NEITZEL:  Well, not exactly.  They relate to the existence of the contract unquestionably, but, for example, we've talked a lot about a key regulation that is the central termination provision in the federal government's uniform grant guidance.  That's 2 CFR § 200.340.  That is the source of one of our arguments, to be sure.  We have an argument that is -- and it's clearly the case that in this case the government violated that provision.

That is the only claim we have that requires that the court also look specifically to the terms and conditions of the

grant.  And the reason for that is because, as we've talked about already some this morning, and as you heard Mr. Sacks discuss as well, that the revised version of that provision says that the government may terminate a grant simply on the basis of changed priorities or program goals, but it can do so only if that basis is included in the terms and conditions of the award.

So in evaluating the application of that particular regulation, yes, the court must look to the regulation -- or excuse me, the terms and conditions of the contract.  But that does not mean that it is a contractual claim.  Nor of course are any of our other claims here based in the contract.

THE COURT:  So are the terminations unreviewable because they're committed to agency discretion by law?  It does seem that funding decisions are traditionally regarded as committed to agency discretion.

MS. NEITZEL:  The funding decision here, Your Honor, has already been made.  Again, these awards were announced in April of 2024, the awards were executed in August of 2024, the funds were disbursed into our accounts, and we are not challenging any of that, obviously.  What we are challenging is the government's unlawful conduct that I described at the outset here, in other words, the freezing of the funds and then the unlawful terminations.

THE COURT:  So your argument is that *Lincoln v. Vigil*

doesn't apply because this is not -- because the disbursements already occurred and the EPA isn't trying to claw them back as it was in that case.

MS. NEITZEL:  I know one of my colleagues will discuss this in greater detail.  In fact, Mr. Levy will when he returns.

But, yes, we discussed *Lincoln* -- this is on page 10 of our reply brief, where we talk about why *Lincoln v. Vigil* doesn't apply here.  And it's specifically because it, as we explained, concerned a challenge to the allocation of funds from a lump sum appropriation that carried with it a congressional recognition that the agency must be allowed flexibility to shift funds within a particular appropriation account so that the agency can make necessary adjustments for unforeseen developments and changing requirements.  Obviously, the circumstances here are different as we've set forth in our papers.

Here the disbursement occurred and is not being challenged. Plaintiffs' challenge, of course, as we've explained, is to EPA's attempt to unwind the program and claw back those funds. And I do want to talk a little bit more, Your Honor, about, although --

THE COURT:  Go ahead.  I don't have any more questions at this point.

MS. NEITZEL:  I do want to talk a little bit more about

the rationales that were the basis here for EPA's purported terminations.

THE COURT: I mean, does it matter? Does motive matter here? Does it matter if this is a pretext? There's a new administration, they get to change their priorities, they get to change their goals. That's what they get to do. Does it matter if this is a pretext? Does it matter what the motive is here?

MS. NEITZEL: I'm not sure that the motive matters, Your Honor, but pretext absolutely does matter. That is quintessentially arbitrary and capricious behavior. So what we look to and what any court looks to under the APA when assessing the lawfulness of an agency's action is its contemporaneous explanation.

So let's talk a little about that, because as the Court will recall, EPA stated in the notices that it was terminating the awards based on, quote, substantial concerns regarding program integrity and programmatic fraud, waste and abuse. And the notices reiterate that point, saying they are consistent with investigations based on fraud, waste, abuse and conflicts of interest.

And at the first TRO hearing in this case Mr. Sacks, when pressed by this court, reaffirmed that the awards were terminated for the reasons stated in the notices of termination. To say nothing about the agency's many public

statements accusing our clients of waste, fraud, abuse and conflicts of interest.

But that's not what the government says now. In the government's opposition it says, on page 25 of its brief, that EPA did not terminate for plaintiffs' noncompliance. On page 26 the government states it did not terminate the awards for any, quote, conduct of plaintiffs --

THE COURT: I noticed that.

MS. NEITZEL: -- for which they could use the opportunity to object or explain.

And then on page 29 of their brief, in arguing that the freezing of plaintiffs' funds and the purported terminations could not have hurt plaintiffs' reputations, they argue that that is so because the actions here -- in other words, the terminations and the discontinuance of the funds, was based merely on, quote, reasons of policy.

Now, of course, EPA's new arguments, as well as Mr. Amidon's multiple post hoc declarations, are just that, they're post hoc rationales that cannot now be used to justify the agency's actions. But they do confirm -- and this is where we began, Your Honor -- that the justification that was provided in the notices of termination were pretextual.

But it is *Warth* pointing out that even if the Court could consider the new justifications, they're inadequate. EPA's argument now appears to be they terminated the grants because

they lacked adequate oversight mechanisms.  But for one thing, as we've said, that is not a lawful basis of termination here. But number two, EPA has never even attempted to explain it.

EPA's only basis for that appears to be Treasury's use of a financial agent, Citi, in this grant program.  But plaintiffs have explained time and again that Citibank's role in this arrangement in fact provides significantly increased oversight and transparency by affording the agency complete, realtime view access into every account at issue.  In other words, both the prime grantee accounts and the subgrantee accounts.

Treasury's ASAP system can't do that.  And EPA has never even sought to explain how having the funds at Treasury would otherwise provide increased oversight and transparency.

And I'd like to turn as well briefly -- we've already discussed this a little bit, but I'd like to talk a little bit more about EPA's stated legal authorities for the termination, because in addition to the agency's about-face on the rationales, it has also changed its tune on the authorities it says authorize the termination here.

In the notices, the Court will recall, EPA listed five authorities that it said supported the notices of termination. There were two regulations.  Those were 2 CFR § 200.339, and the one we've talked about a lot today, § 200.340.  The third basis was EPA's general terms and conditions.  Then the terms and conditions of plaintiffs' grant agreements.  And lastly,

the agency's inherent authority.

Now, for the reasons we've explained in our papers, those authorities do not support the terminations here.

But what we think is most striking here is that EPA now seems to agree that those do not support the termination.  In other words, with one exception, the agency appears to have seemingly abandoned these authorities.

So according to EPA, the notices complied with and are justified under one regulation -- this is what they said in their opposition at least, which sounds somewhat different from what Mr. Sacks said today.  And that regulation is the one we've been discussing throughout this afternoon, 2 CFR 200.340.  EPA said in its opposition that it reads that regulation to allow it to terminate a grant whenever an award "no longer effectuates the program goals or agency priorities."

But as we've covered somewhat today, and I think as Mr. Sacks has now conceded, that is only half right.  Because as we've explained in our briefs, the current iteration of § 200.340 and the iteration that governs these awards, permits an agency to terminate on that basis only if it is stated in the award itself.  As the Court knows, that is not stated here.

And although what Mr. Sacks said here today, if I'm understanding correctly, seems to be somewhat at odds with

what the government wrote in its opposition, in the opposition EPA contended that the original agreements with plaintiffs included different terms that would have permitted termination on the basis of changed priorities, had it not been for 11th hour, in other words, December 2024 amendments to the terms and conditions of the awards that were aimed at thwarting the agenda of the incoming administration.

But that too is wrong, right? Because this change to this regulation was first announced in April of 2024, and then in July of 2024 EPA announced that it would apply that regulation consistent with OMB guidance to all awards going forward. In other words, to any awards made after July 1, 2024. That is exactly what happened here.

So this regulation does not support EPA's legal case or its public narrative, and for the reasons we've explained in our paper, none of the other authorities that EPA cited contemporaneously support the terminations. Thank you.

THE COURT: Thank you. Mr. Sacks?

MR. SACKS: Your Honor, could I begin by making one factual clarification I think is important, which I think the parties don't quite get yet. In the August 2024 original grant agreement, at the beginning of that grant agreement, on page 5, it says the recipient agrees to comply with the current EPA general terms and conditions, and it gives a website link to EPA's website where it lists those terms and

conditions in place as of 2023 to 2024.

Those EPA terms and conditions clearly state in a termination provision that EPA may terminate for agency priorities. Those terms and conditions were incorporated into the original grant agreement.

Now, the termination provision in the grant agreement potentially is at odds with that right because it seems to cabin EPA's termination rights under 200.340.

THE COURT: Yes.

MR. SACKS: But the grant agreement also, at page 18, says that the clarifications in the termination provision expand on rather than replace or modify the EPA general terms and conditions. So there is at least a dispute about whether in that original grant agreement EPA's general terms and conditions, incorporated into the agreement, gave EPA the right at that point in time to terminate for agency priorities.

THE COURT: But you're saying now that that's not why EPA terminated.

MR. SACKS: I believe that is why --

THE COURT: Right. But before, in your termination letter, that's not what you said.

MR. SACKS: That is certainly something that we said in our termination letter.

THE COURT: You said there was waste, fraud, abuse, and

you were launching investigations and, you know, there was malfeasance, right? You seem to be abandoning that position now.

MR. SACKS: I don't believe that's correct, Your Honor. I think that the termination letter -- and we can all read it and see what it says, but it addresses in a number of ways the idea of lack of account controls, a need for better regulation and control over the money at issue here, and agency priorities. All of that is a part of the basis for termination that's included within the citation in the termination letter to 200.340.

And again, I don't believe the termination letter accuses the plaintiffs of waste, fraud and abuse. It uses that term. I don't think it's a statement that the grant is being terminated because they have committed waste, fraud.

THE COURT: That's certainly been the statement of EPA officials all over the public sphere.

MR. SACKS: I understand that there's been a lot of attention to what the EPA has said.

THE COURT: Well, the administrator of the EPA speaks for the agency.

MR. SACKS: I certainly understand that, Your Honor. At the same time, I think EPA tried to lay out in the termination letter and in Mr. Amidon's declarations the bases for termination.

But to go back to the issue of making sure we understand the record here.  So again, in that original grant agreement, those terms and conditions from EPA allow termination for agency priorities.

THE COURT:  Okay.  Agency priority is in the notice, but there were several other reasons given as well.  You'll agree with me on that?

MR. SACKS:  I will, yes, but if I could just finish this point, Your Honor, I want to be clear about this.  When the grant was amended in December, EPA's terms and conditions had changed at that point.  So when that grant agreement incorporated the then-existing EPA terms and conditions, those were different; they no longer allowed EPA to terminate for agency priorities.

So there was indeed a change between the original grant agreement in August and the December grant agreement.  In fact, there were multiple changes that restricted or limited EPA's ability to terminate the grant agreement.  That was done of course after the election.

When the new administration came in, they looked at the changes that had been made and the limitations on EPA's right to terminate the grant agreement, and there was concern about what that meant for EPA's oversight of the grant agreements and the program.

So I think what the plaintiffs want you to -- I think what

the plaintiffs believe, and have submitted, is that there was no difference between the original grant agreement and the amendment in terms of EPA's rights, so there was no actual change.  But the facts don't bear that out.  And a close review of the two grant agreements show that there were significant changes to EPA's rights and their ability to terminate in that amendment, done after the election.  And that was part of the bases on which EPA, when it evaluated this program and these grant agreements, had concerns about their oversight abilities, which led to the termination.

You also asked counsel -- kind of stepping aside for a different issue -- about whether the funds here are committed to agency discretion by law.  And you cited *Lincoln v. Vigil*, which of course the government relies upon in our briefing.  And I do think that case applies here.  I believe there was a program that was run and the agency decided to stop running it and use the money a different way.  And that's essentially what we have here.

THE COURT:  Well, not quite.  That's again, as Ms. Neitzel pointed out, the agency deciding to use money for another purpose.  That's not what -- this is money that was granted to the plaintiffs and their subgrantees and was simply to be disbursed to them through their Citibank accounts.  That's not the same factually as that case.

And let me ask you, are 2 CFR §§ 200.340 and 200.341

relevant to the grant agreements in the contracts here?

MR. SACKS:  They are absolutely relevant because they're incorporated into the contract.

THE COURT:  And did EPA follow those regulations when they terminated the grants?

MR. SACKS:  Well, no regulation says EPA can't terminate a grant.

THE COURT:  I know.  But did they follow the regulations when they terminated the grants?

MR. SACKS:  That's a complicated question, because again, 340 says that one potential basis for termination is agency priorities.  It goes on to say that if you want to utilize that or any other basis, you have to put it in the grant agreement.  So 340 directs you to the grant agreement itself to determine whether or not EPA has met the terms of the grant agreement in terminating the agreement and whether or not that may or may not be a breach.

So 341, the notice provision, I think in the plaintiffs' reply they agree that EPA complied with that notice provision. I could be wrong about that, but I think when I read that this morning, they essentially have abandoned arguing that we didn't comply with 341.  They argued we didn't comply with 342, I believe, but 341, the notice provision, I think that requires the agency to tell them we're terminating and give them a basis for it.  They may disagree with that basis or

think that it's pretextual, but I think EPA did comply with that regulation.

THE COURT:  They didn't do that before they ordered Citibank to freeze the funds.  They terminated on the eve of the TRO hearing.  You all terminated, I should say.

MR. SACKS:  I believe 341 is simply about giving notice of termination, and I think the letter --

THE COURT:  But the letter was issued after EPA told Citibank not to disburse the funds.  So sort of a post hoc thing.  It didn't terminate and then tell Citibank we're terminating so don't disburse the funds.  It said don't disburse the funds, and when the plaintiffs filed the TRO, the termination letter was apparently very hastily provided.

MR. SACKS:  Respectfully, Your Honor, I don't think the freeze that was in place has anything to do with whether or not EPA complied with 200.341.  That's a termination provision, and if they provided the proper notice required by the regulation, again, that would be something that they did.

THE COURT:  But I don't think plaintiffs concede that. They didn't.  The record indicates that -- well, at least according to plaintiffs, they inquired with Citibank over and over, and with EPA, about why they weren't getting the funds disbursed, and received no answer, no response, no kind of notice, and then on the eve of the TRO hearing, get a termination letter.  So I don't think the plaintiffs -- I

mean, they can stand up and speak for themselves, but that appears to be one of the problems here.

MR. SACKS:  Well, if there is a concern about whether or not EPA had the right to request Citibank to freeze the money leading up to termination, that's a separate legal issue.

THE COURT:  That's not what I was asking.  We were talking about notice.  It doesn't appear that the parties -- that plaintiffs had any notice, that their only notice came when they were told by Citibank we've been ordered not to disburse the funds, and then they get a termination letter.  Isn't that the sequence of events here?

MR. SACKS:  I think that's right, but 341(a) says the federal agency must provide written notice of termination to the recipient.  The written notice should include the reasons for termination, the effective date, and the portion of the federal award to be terminated.

THE COURT:  Right.  And you did that on the 11th.

MR. SACKS:  Correct.

THE COURT:  Right.  But before you did that, you instructed Citibank not to disburse the funds.  Right?

MR. SACKS:  But that's not a termination, Your Honor.

THE COURT:  I'm just asking, is that what you did? That's the sequence of events.

MR. SACKS:  Yes.

THE COURT: Okay. And in fact, just to make this clear and it's not just plaintiffs' allegations here, is it correct that plaintiffs inquired with EPA about why they weren't -- the funds weren't being disbursed, and EPA didn't respond until they filed a termination letter? Is that correct?

MR. SACKS: I believe there's record evidence that at least one of the plaintiffs reached out to EPA and perhaps there was not a meeting scheduled prior to termination.

THE COURT: I think there was a -- plaintiffs allege that there was a meeting scheduled and the meeting was canceled.

MR. SACKS: A meeting not held, I'm sorry, Your Honor. I believe the record demonstrates that.

And finally, I'll just go back to the point Your Honor began with in talking to my friend, which was does EPA have the right to run its own programs and decide as a steward of federal funds how best to utilize that money. And I think we cite the authorities for that in our brief, and I think that's an important overarching principle of law --

THE COURT: Of course, Mr. Sacks. Of course. Administrations change, they come with different priorities and focuses, agency focuses and priorities change. Absolutely. I don't think anybody is disputing that.

I think what plaintiffs have challenged is the manner in which -- not just the termination happened because the manner

in which EPA just instructed its financial agent not to release the funds, without any notice, without any compliance with federal law, not just contract principles, with federal law and with due process.  And I think that's -- they can tell me if I'm wrong, but I think that's the summit of their argument.  Not that EPA can't change priorities.  I certainly wouldn't agree with that.

MR. SACKS:  Sure.  So two responses to that, Your Honor, and then I'll sit down.  The first is that again, those complaints coming from the plaintiffs, which I understand, are sourced out of their rights in the grant agreement and aren't properly before this court.

And then finally, what we're kind of talking about in this segment of the argument really comes down to the arbitrary and capricious standard under the APA and whether the termination meets that standard, if that's indeed where this Court is going to go, I think the Court --

THE COURT:  I don't know where I'm going to go yet.

MR. SACKS:  If the Court may go there, I just want to close by saying, obviously, we all know what that standard is and the amount of kind of deference it gives an agency and the need to present merely a rational basis of a termination.  I would submit that, despite all of the reasons that plaintiffs look at and the court has looked at as maybe don't feel are as supported in the record, there are supported bases in the

letter, and in the declaration which was contemporaneous with the letter, gives this contemporaneous basis for the termination, that show a rational basis here regarding oversight of the funds, the changes to the grant agreements that restricted EPA's rights under those agreements, that provide a rational basis for the termination --

THE COURT:  That's a bit of a shifting target, Mr. Sacks, as I've asked you repeatedly, and you've been very candid with me, in saying that you don't know what the evidence is of waste, fraud and abuse and violation of the law and corruption and all of that.  And I still don't.  I mean, here we are weeks in, and as far as I -- you're still unable to proffer me any information with regard to any kind of investigation, malfeasance.

So it's -- you know, but then you're like, well, we don't have to do that because it's terminated for this other reason, no longer effectuating agency priorities.  So you've sort of taken different positions here, and I'm trying to sort of pin you down.

MR. SACKS:  Sure.  I think the position we're taking is the one that's set forth in the --

THE COURT:  Termination letter.

MR. SACKS:  -- termination letter, and I think there's a question of whether, if indeed that is a final agency action this court can review, the question is whether that is

rationally based on the record at the time of the termination.

And again, putting aside the issues, the potential allegations of waste, fraud and abuse, which may be aired at a later date, the issues in the letter regarding EPA's oversight, the changes to the grant agreements, there is enough of a record that provides a clear rational basis for the agency's decision to terminate.  And that's all the Court needs, we would submit, if it goes down the APA route, to find the termination did not violate the APA.

Thank you, Your Honor.

THE COURT:  All right.  Thank you.

MS. NEITZEL:  Your Honor, I'm going to start where Mr. Sacks just left off and then I'll touch on a few other points.  Mr. Sacks just said there's enough information in the notices of termination issued on March 11 to be able to follow the agency's basis for termination.

Even if there were multiple rationales that the agency has since abandoned, even if it has changed course with respect to a number of them, there was an indication in there that the court can discern that the awards were being terminated for a change in priorities and the concern about a lack of sufficient oversight.

But as I said previously, and as the government still hasn't responded to, the government has never, despite I don't know how many opportunities at this point, explained why

having the money at Treasury would provide increased oversight and satisfy the concerns that it has ostensibly articulated. So we still don't have a basis for that, especially when, as plaintiffs have articulated, the arrangement with Citibank would appear to afford the agency increased transparency.

THE COURT: Well, based on the public statements of the EPA administrator that there were concerns with how these contracts were arrived at and other theories of improper activity. So I mean, I'm not sure that simply being able to keep an eye on the money is what the EPA has been stating is the reason for not wanting these contracts to continue.

MS. NEITZEL: Well, that is what EPA -- I will find the page, Your Honor, but now in its argument, that was essentially the only thing that the agency articulated in its opposition. This is on page -- this is on page 23 in particular of their opposition, where they state three times that the termination letter explains and was based on the grant agreements' "lack of adequate oversight and account controls."

However, even if it is the case, Your Honor, that they also articulated concerns about the manner in which these awards were issued, there has been no explanation for that. And again, plaintiffs have explained, in their complaints, in their TRO submissions, and in their PI filings, the significant care and rigor with which these awards were -- in

which -- excuse me -- under which plaintiffs were selected and the awards were executed. And the ongoing substantial oversight mechanisms in place, not just because of the manner in which the arrangement with Citibank affords complete real-time view into all the accounts, but all of the third-party audits, all of EPA's oversight mechanisms that are indeed in place. Again, we have repeatedly said, why are those not sufficient. And there has never been an answer.

Now, I want to go back to section 200.340. And I apologize, we're going down a bit of a rabbit hole with that regulation today. But when Mr. Sacks stood up he said no, no, what she just said is inaccurate. That in the original contracts there was a provision that permitted the government to terminate based on changed priorities because that was still -- because the prior iteration of that regulation was the one that was still in place in EPA's general terms and conditions for awards.

But if you look at our reply brief, Your Honor, this is on page 14, we provided a redline showing the changes to the termination provision in the award agreement. In other words, the changes from the manner that that termination agreement appeared in August when the awards were originally executed, and how it was updated in December. And as you'll see with the first -- very first clause said, in August, notwithstanding the general term and condition termination,

EPA maintains the right to terminate, etc.

In other words, EPA stated in August, despite what our general terms and conditions say, we now maintain the right to terminate the assistance agreement only as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 applicable to EPA grants as of July 1, 2024, after the agency announced, consistent with OMB guidance, that it would be applying the new version of the regulation early.

But I also want to take a step back. Again, we've gone down this rabbit hole, but all of this is more or less irrelevant. The government has never asserted, because it cannot, that EPA's update to this regulation was improper, that OMB's update to the regulation, that EPA's announcement that it would be applying that updated regulation was improper, or the amendment to this agreement was somehow unlawful or improper.

So we know, there's no dispute at this point about which version of § 200.340 is in effect now and governs these grants. That is what matters. But I do think it is important for the public narrative, given what they have tried to do with that public narrative, to understand that this was in effect from the get-go.

Just very quickly, Your Honor, there were allusions to two other regulations, §200.341 and 342. We do maintain that those were -- excuse me, on 341, which is the regulation

providing notice and the requirement that the reasons for the termination be clearly articulated in that notice, we do continue to maintain, as we stated in our briefs, that that has been violated. We did not raise it in our reply brief again because there was nothing about it in the opposition suggesting that they didn't violate it.

And we maintain that that was violated here for two reasons. The first, Your Honor, are the reasons that you articulated. In other words, even prior to the issuance of the official notices of termination, there was a suspension of the awards unquestionably. There was arguably, as Climate United initially articulated it, arguably a constructive termination of these awards, and that was without any process whatsoever, as we elucidate in our due process argument.

But the second reason is because, as we've said, this regulation, Section 341, requires not only notice, which arguably was provided by the termination notice, although it was effective immediately -- but it also requires that the agency state the reasons for the termination. And EPA did not do so, for all the reasons we've said. In fact, they've since confirmed that much of what was in there was pretextual, and they no longer seek to defend it. The little that they do seek to defend, again, has not been explained.

THE COURT: Well, they state the reasons -- when I asked for -- you know, for the information to support the

reasons, in other words, where is the investigation, where is the evidence of fraud, waste and abuse and so on, what I get is our reasons are in the letter.  So it's a very circular response.

MS. NEITZEL:  That's right, Your Honor.  There were no specific facts articulated whatsoever to substantiate any of the allegations in the letter.  There were no allegations or facts identified with respect to any particular grantee at all.  So in that respect, EPA violated Section 341 as well.

Now, with respect to Section 342, that is the provision that permits a party to object or have an opportunity to dispute the imposition of specific remedies when there is an allegation of noncompliance.  In light of the government's new concession that they did not terminate for noncompliance, and that they did not terminate based on any of our conduct, that would appear to be inapplicable.

THE COURT:  Since I have you up here, I'm going to get to my last set -- I've sort of lumped in the due process and appropriations clause, IRA claims -- what's your reading of section 7434?  Is this for --

MS. NEITZEL:  I'm going to let Mr. Levy talk about that.

THE COURT:  Okay.  And I'll have the same question for you, Mr. Sacks, about 7434.  So you can start thinking about that.

MS. NEITZEL:  Thank you.

THE COURT:  Thank you, Ms. Neitzel.

How do you read 7434?  Does it reflect that it was Congress's intention to spend a certain amount of money by a certain date, that is, September 30, 2024?

MR. LEVY:  Right.  So the statute says that $27 billion was appropriated for certain purposes, that the funds had to be obligated by September of 2024.  And in fact EPA abided by the statute.  Back in the day, it ran a competitive process, it awarded the funds to recipients that were eligible under the statute, the sorts of not-for-profits identified by Congress.  It made the selection in August of 2024.  It obligated the funds in September of 2024.  And so that's what the statute requires, that's what it says.

And the Supreme Court and the D.C. Circuit have made clear that appropriation statutes of that nature are mandatory and don't allow for discretion.  So the *Train* case by the Supreme Court and *Aiken County* case have made clear that when there is a statutory directive including an appropriation, that the Executive Branch may not decline to abide by those requirements for policy reasons.

And in *Train*, for example, there was the assertion that prior to the obligation the Supreme Court should read in an exercise of discretion by the executive, and the court said no, the only place that one might imply discretion is at the

obligation phase.  That's at page 48 of the opinion.

And here what's remarkable is that EPA is saying the funds have been obligated, they've been disbursed, they would have been mandatory, but we can come back because we don't like the policy that was effectuated during the obligation phase --

THE COURT:  Well, defendants argue that Congress didn't appropriate the funds in favor of any specific recipient, and that you all don't have a statutory right to this money.  Is that correct?

MR. LEVY:  Well, I think what Congress established, there was obviously discretion by EPA, and it was subject to the exercise of abiding by the bounds of the statute to run a competitive process, which EPA did, and then we, our clients were awarded grants as a result of that.

But what -- so -- what EPA is now trying to do is to dismantle the entire program.  It's not clear whether it wishes to keep the money, which is what has been said in public statements, or --

THE COURT:  Well, it says it wants to re-obligate and reallocate the funds under GORF.  Does that affect your appropriations clause claim?

MR. LEVY:  Well, I don't think it does in the sense that there's no statutory authority to redo the program.  The program was -- the funds had to be obligated by September 2024.  There's no statute saying that the EPA can claw it

back.  And if, as in *Train*, the court won't read an implied authority to exercise discretion before obligation, then surely Congress ought to have spoken directly to the question if there were to be authority to claw it back.

And in fact, when Congress did enact the Impoundment Act, the governing circumstances were the president can impound funds, and the combination of these statutes collectively make very clear that there is no statutory authority to dismantle this program for policy reasons and either redo a program or allocate the funds for other purposes or take the money back to the Treasury.  That's not what Congress allowed.

And for those reasons, we think EPA violated the IRA, the statute, violated the separation of powers, violated the appropriations clause.  I note the EPA says the plaintiffs lack standing --

THE COURT:  I was just going to get to that.  So go ahead.

MR. LEVY:  So I think the only case they cite speaks to taxpayer standing.  We are not taxpayers.  We have clearly a vested interest here in the grants.  In fact, we allege a vested property interest that triggers the Due Process Clause as well.

THE COURT:  Well, that's an interesting point, because I'm having a little trouble with the argument that the funds are plaintiffs' property when there are legitimate ways for

EPA to halt the grants.  I mean, there are ways for them to do it.  What you're saying is they haven't done it the right way.

MR. LEVY:  Well, there are terms and conditions to the grants, but that doesn't mean that the plaintiffs don't have a vested property interest that is protected by the Constitution for purposes of due process.  It also -- and it also doesn't mean we don't have standing to challenge action that is contrary to the separation of powers.

THE COURT:  All right.  I'm going to let Mr. Sacks respond, and then my only questions after that go to the irreparable harm issue.

MR. LEVY:  On due process briefly --

THE COURT:  Yes.

MR. LEVY:  I think our arguments as to the substance of the process do have some overlap with the notice arguments in connection with the APA.  I don't want to repeat those arguments, but we do have independent constitutional arguments for violation of the due process.  There was zero pre-deprivation notice or an opportunity to be heard, and so it's a classic violation of the Due Process Clause.

THE COURT:  All right.

MR. LEVY:  Thank you.

THE COURT:  Mr. Sacks.  Let me start with section 7434.

MR. SACKS:  Thank you, Your Honor.  I think reading the statute tells us that Congress commanded EPA to do some

things.  It commanded them to make grants on a competitive basis.  It gave -- it said as determined appropriate by the administrator in accordance with the section, set out the appropriated funds, set out who were eligible recipients, and then gave a deadline to appropriate the funds.

EPA complied with the statute; I don't think there's any question about that.  There's nothing within the statute that gives a grantee or an eligible recipient the basis to sue the government for non- -- alleged noncompliance with the statute.

And again, let's remember what the record shows at this point in time.  It was a grant agreement that was done pursuant to statute.  Terminations of those grants for a basis set forth by the agency pursuant to the grant agreements, and a statement by the agency that they intend to re-obligate the funds consistent with the statute.  That's the only record before the court at this point in time.  There is no basis for the plaintiffs or anyone else to argue any violation with 7434.

And my friend said that there was no statutory authority, I think he said, no statutory authority for EPA to take back the money and re-obligate it.  But I think an argument might be different if one of the grantees went out of business and couldn't utilize the grant funds and that was returned to the agency.

Does that mean that the agency couldn't find a new grantee

to award the funds?  I don't think that would be the case.  I think they had the authority, unless Congress prevented them from doing so, of re-obligating that money.

THE COURT:  Well, your termination letter states that EPA is going to re-obligate and reallocate the funds under the GGRF.  Not "GORF," sorry, I said that before.

Can you point me to anything in the record that supports this, that EPA is going to do this, other than them saying that in the termination letter?

MR. SACKS:  No, Your Honor.  I think Mr. Amidon may say the same thing in his declaration, but I think the agency has been clear in that letter what they intend to do with the money once it's returned to the United States.

THE COURT:  And was the decision to suspend the funding, the disbursement of the funds, consistent with Congress's intent under the IRA?

MR. SACKS:  It's certainly not inconsistent with its intent.  I would say it's absolutely consistent in that it asks EPA to administer and run the program.  So certainly if EPA believes there are concerns about the administration of the grants, it seems more than reasonable to pause money going out the door while they assess whether indeed those concerns are valid and merit termination or not.  So certainly nothing would be inconsistent with --

THE COURT:  So you argue in part that EPA terminated

its grants as part of its administration of the programs that Congress authorized it to administer, and that the Executive Branch remains free to change positions upon administration. So the grants were canceled, terminated because of a change of policy and because the EPA wants to manage the grants?  Is that true?

MR. SACKS:  No, Your Honor.  That's not true.  Nothing that the agency has said -- my friend on the other side suggests that it's the fact that the money is at Citibank is the sole source of EPA's concerns about grant administration --

THE COURT:  I don't think that's it.  I mean, I think that EPA has made some statements about use of a financial agent, but I don't think that's a sole -- that's not what I hear the plaintiffs arguing, that that's EPA's sole focus.

MR. SACKS:  Well, their focus is oversight, their focus is account controls, and their focus are the decrease in EPA's rights that were a result of the amendment to the grant in December.  Those are part of the driving factors that led EPA to, when they reassessed the program, make a determination that termination was the appropriate way to facilitate their responsibilities as steward of the federal money and administrator of the program.

THE COURT:  Plaintiffs contend that EPA ordered Citibank to freeze the funds without first obtaining a court

order based on probable cause and supported by a sworn affidavit.  There obviously are reports that EPA tried to get those things unsuccessfully.  But isn't that a necessary step before freezing the funds?

MR. SACKS:  I don't believe so, Your Honor.  Under the account control agreement I believe that the -- under the financial agent agreement EPA has the authority to request that freeze as it believes is appropriate.  It did not do a notice of account control, which is a different standard under their agreements.  That's not what EPA did.

THE COURT:  All right.  Do you want to respond to any of the other arguments that Ms. Neitzel made?

MR. SACKS:  I'll just note again that when it comes to due process, there really is no separate process rights here outside of the grant agreement.  You've heard us say that before, but it's because it's true.  That's the basis of the process that the plaintiffs are entitled to, because that's what Congress said when it ordered EPA to run this program through grant agreements.  Those grant agreements set out the process.

And I'll note again that I understand why there are allegations that EPA is dismantling a program.  We've heard that over and over again, but I'd ask the Court to look at the record.  There's no evidence in the record to support that. The record shows termination of grant agreements --

THE COURT:  Isn't that the dismantling?  They're terminating all the agreements with the plaintiffs here, who are the grantees.  Doesn't that dismantle the program?  Reallocating the funds?

MR. SACKS:  Not at all, Your Honor.  It terminates these grant agreements but has no impact on the program and how EPA wants to run it.  It doesn't mean they'll run it better or worse, but they have the right to run it the way they want to run it after termination.

THE COURT:  What about your presentation of a change in agency priorities?  Doesn't that indicate that EPA -- and I'm not saying that's an illegitimate position to take, but isn't that indicating that EPA wants to dismantle this program?

MR. SACKS:  No, Your Honor.  The change in agency priorities here is within the constraints that Congress set forth in 7434.  Now, if indeed it turns out the change in agency priorities is outside the scope of this statute, then there may be plaintiffs out there with a basis for claims against EPA on that basis.  But we are nowhere near that and that would be assuming things that are simply not in the record.

Thank you, Your Honor.

THE COURT:  Thank you.  Did you want to respond, Mr. Levy?

MR. LEVY:  Very briefly.  I heard my friend say that

there was authority under the IRA to administer the grants. I don't see that anywhere in the statute. Section A speaks of appropriations, and there's a deadline, there are requirements to have a competitive process by September 30, 2024. Then there's a section governing the use of funds by eligible recipients. That's 7434(b), which speaks to what eligible recipients chosen by that competitive process by September can and should do.

And there's -- nowhere in this act is there any implied or certainly no express term allowing the sort of revocation that is being contemplated here. I would also -- I know we cited the AIDS vaccine case in our papers and I think it's very relevant to it, to the situation.

THE COURT: I have a couple of questions on irreparable harm.

MR. UNIKOWSKY: Thank you, Your Honor. I'll speak about irreparable harm, balance of equities, public interest, and also address the issues against Citibank.

THE COURT: So you're going to be up here for a little bit. You're rested.

MR. UNIKOWSKY: I've been very patient, Your Honor.

THE COURT: Unlike my court reporter. But he's hanging in there.

Are you able to obtain alternative sources of funding to offset the loss of funds from the grant award?

MR. UNIKOWSKY:  So I'll speak for my client, Climate United.  If the Court has specific questions for the other grantees, they're probably in a better position to answer those.

So Climate United has obtained very temporary stopgap funding that's basically allowed us to keep the lights on between the times of the TRO order and right now.  When I say the lights are on, they're sort of dimmed in some sense because we've had to defer compensation of our current employees, we've had to terminate lots of contracts, we've had to instruct lawyers other than me to stop work.  And so we've had to significantly scale down our operations.

The answer is no.  So we've had this very temporary stopgap funding, but that's not going to take us until a final judgment.  So we cannot continue.

THE COURT:  All right.  And I'll allow each -- if each Plaintiff wants to make the record on that issue, I'll let you do that now.  You can actually just pull the microphone to you without having to come up if you want.

MR. LEVY:  Thank you, Your Honor.  For Coalition for Green Capital, there is record evidence that some of our subgrantees are in the same position as Climate United.  But CGC itself is not.  As to the broader question about whether CGC could have access to the money without a remedy here, I think the answer is no, not the same funds, not to that scope.

There's also evidence in the record from our clients that termination itself would be disruptive to the ability to obtain sources of private and public funding because of the termination. And this of course speaks nothing to reputational harm, loss of goodwill and so on that is separate and apart.

THE COURT: All right.

MS. NEITZEL: And for Power Forward Communities, Your Honor, we have not yet been able to secure funding to keep the lights on. Now, the organization is in talks in hopes of securing the sort of stopgap funding that CU has acquired, and in hopes of being able to do the same. But that has not happened yet. And the last time we were here we spoke about some of the effects of that, including on our principal contractor, who does all of our back-shop compliance, financial management, etc. The fact that they had gone pencils down.

In our updated filings, in Mr. -- in our opposition brief in the updated declarations we explained that we have secured uncompensated a small amount of continuing services, in particular to respond to EPA's questionnaire that was due on the 28th, and some other minor services for subgrantees. But we have not been able to pay them yet, and that could stop at any moment.

THE COURT: All right. Did you have any other points

you wanted to make on the irreparable harm?

MR. UNIKOWSKY:  Can I just make a very short record.

THE COURT:  Yes.

MR. UNIKOWSKY:  Just one or two other things.  So the fact that we're going to go out of business is a pretty big irreparable harm from our perspective.  There's a few others I just wanted to raise to the Court's attention.  One is that we view our inability to fund the projects that we'd like to fund also as irreparable harm.  We already have a substantial amount of committed funds.  Several projects are already underway.  Those projects are consistent with Congress's intent when it enacted the Inflation Reduction Act.  They're not going to happen if this program is shut down, and we view that harm as irreparable.  Those projects will go away; they'll never come back.

There's also harms to our reputations.  Even from a short delay, from here until final judgment, even if we could keep the light on, which we can't, we depend on our reputation.  We are a financial institution.  We need to be a reliable lender. If we don't have funds, that is very damaging to our reputation.

And finally, there's case law from the circuit court that says that harms to an organization's institutional mission can be considered irreparable.  And that's the case here.  Again, we exist in order to be a financial institution, to finance

clean energy projects.  If we don't get those funds, our purpose --

THE COURT:  Well, if EPA at some point, or if I find that, but if EPA does have the option to terminate the contracts, the agreements, if EPA lawfully terminates the agreements, that's going to happen anyway.  Right?

MR. UNIKOWSKY:  Well, I mean, if it lawfully acted, that would still cause us irreparable harm, it would just be I guess lawful irreparable harm.

THE COURT:  Right.  And I don't mean to be flip.  But that's what happens when an agency, there's an election, there's a new administration, the agency has different priorities, and as long as they comply with the law in terminating the agreements, that happens.

MR. UNIKOWSKY:  That's right.  If an agency acts within the law, it can inflict irreparable harm, but here we have to show likelihood of success on the merits and irreparable harm. And assuming we're correct that this action is unlawful, we do have an independent obligation to show irreparable harm.  I think we've shown that.

THE COURT:  With regard to the public interest, I mean, are you asking to force the EPA into a contract or into continuing to be bound by a contract it does not believe serves the public interest?

MR. UNIKOWSKY:  I don't think so.  All we're asking EPA

to do is just follow the law with respect to these particular terminations. There's quite a bit of case law that says there's no public interest in an agency not following the law. In this case the Court posed the question to counsel, did you abide by the regulations, and counsel said it was complicated.

We actually think it's not complicated; the regulations were not complied with. And so the Court doesn't need to make broad statements about the public interest of the particular work we're doing. I think the Court can just say that the public interest supports following a statute and the regulations governing an agency.

THE COURT: All right.

MR. UNIKOWSKY: So I'll yield and then I'll discuss Citibank afterwards.

THE COURT: All right. Thank you.

MR. SACKS: Thank you, Your Honor. When it comes to harm, we'll stick with what we put in our briefing, which is that the harm is not irreparable here, it's financial. The harm is also not immediate.

THE COURT: What about reputational harm?

MR. SACKS: Reputational harm also I think can be viewed here as financial. And even if it can't, then it's not an immediate harm that is likely to be suffered by the plaintiffs based on the declarations evidence in the record to date.

And I do think the public interest weighs heavily here, Your Honor.  As we noted in our briefing, that *Mathews v. Eldridge* from the Supreme Court tells us that the United States has an interest in safeguarding the public fisc.  If this court were to allow the plaintiffs to access grant money on a grant that EPA has terminated, then that money may not be recovered.

THE COURT:  But Mr. Unikowsky pointed out that it's black letter law that there's no public interest in having -- in allowing an agency to act unlawfully.  And so if I determine that the agency acted unlawfully, there's a public interest in making sure that stops.

The termination issue is -- yeah, sure, I mean, if there's malfeasance going on, obviously the agency has an obligation to ensure that that's not happening.  But what plaintiffs are saying is that the agency has acted unlawfully in what it says is addressing malfeasance, although I don't have any evidence of that in the record.  But in terminating the contract.

MR. SACKS:  And again, I think we've made our position on that clear, but if the Court goes in that direction, then I think the question becomes what is the appropriate remedy for that.  And it's a remedy to make the EPA comply with the law perhaps, but it's not necessarily a financial remedy that would allow the plaintiffs to access money that the government may never recover.

THE COURT:  Well, I think what they're asking for is for them to -- for the funds that are legally due to them to be disbursed until such time as EPA complies with the law in terminating the agreements, if that's what EPA seeks to do.

And I don't think plaintiffs are saying you can never terminate.  What they're saying is you have to follow the law in doing so, and until you do so, they're entitled to disbursement of the funds that they were awarded under the grants.

MR. SACKS:  That's asking EPA to specifically perform a contract --

THE COURT:  It's actually asking Citibank to release the funds as they're obligated to do.  Isn't that what they're asking to do?

MR. SACKS:  That money is government funds on a grant that the EPA has terminated.

THE COURT:  Again, you're putting the cart before the horse.  The plaintiffs say you haven't terminated it, and they filed this complaint before you even filed the letter of termination.  They're saying it hasn't been terminated, that EPA unlawfully directed Citibank to not disburse funds to which they were legally owed, that they were awarded as grantees.

If EPA has concerns about oversight and the funding of these organizations, the way to do it is to either get a court

order, which you didn't do, or go through the procedures for termination and follow the APA in terminating the contract. And you haven't done that. You certainly did that -- you issued a termination letter, which is very thin on reasons, the night before this hearing. But you haven't done it.

I don't think anybody's going to argue -- I certainly wouldn't find that EPA can't change direction and decide that a particular program no longer suited the agency's goals. But you gotta comply with the law when you do that, and that's the crux of the issue here.

MR. SACKS: So if we go back into a pre termination world, then EPA has asked Citibank to freeze the money and not disburse it to the plaintiffs --

THE COURT: Where's the notice? Did you give plaintiffs any notice?

MR. SACKS: I don't believe there's any contractual requirement or regulatory requirement for notice in that circumstance.

THE COURT: Due process? Oh, but this is -- but your position is there's no due process because it's a contractual claim?

MR. SACKS: Certainly, Your Honor. There's no property right here that would entitle the plaintiffs to notice on that issue.

THE COURT: But the plaintiffs have been awarded the

funds.  It's not like they're asking to be awarded funds and somehow claiming that they have a property right in that. They were awarded funds.  The funds had been disbursed regularly, and EPA acts unilaterally in ordering Citibank not to disburse any further funds without even letting plaintiffs know, and not responding to their inquiries.  Is that lawful?

MR. SACKS:  It's certainly lawful, Your Honor.  I don't know if it's the best course of action and one that in retrospect we would all wish the agency had followed, but I don't believe it was unlawful or violative of the Constitution, statutes, regulations, or the contract in this case.

And so if we go back into a pre termination world -- I don't think we should but if we do go back into that world, then maintaining the stay on the funds in the account would be the most appropriate course of action here.  And if you want EPA to remedy what the court determined to be violations of regulation, then a freeze should remain in place and the agency should have the opportunity if they can to remedy those --

THE COURT:  But in the meantime there's -- plaintiffs claim they are suffering irreparable harm by not receiving the funds that they are legally -- they were legally and are legally entitled to until such time as EPA lawfully terminates the contracts.  And that would actually be the status quo.

The status quo is that plaintiffs were receiving their funds at specific periods pursuant to the agreement it had with Citibank.  And Citibank was doing that until EPA told them to stop.  And then issued a termination letter.

And all plaintiffs I think are asking is that EPA follow the law.  If it wants to get out of this contract, get out of the agreement, follow the law in doing that.  And until it does, plaintiffs should be entitled to access the funds.  I believe that's what they're saying.

MR. SACKS:  Sure.  And so to have a right to do that, obviously they have to demonstrate the irreparable harm necessary --

THE COURT:  And if they have -- in other words, if my freeze continues, if I continue this freeze until I reach a resolution or rule on the merits, it'll be too late for them. That's what they're saying.  It will be too late, they will no longer be able to operate.

MR. SACKS:  So eventually, at least under the grant agreements, if we all agree EPA can terminate them -- and if they haven't done that lawfully yet, can do so lawfully -- then the plaintiffs are going to cease to operate anyway perhaps, and they will have a potential claim for the monetary loss they've incurred through the Court of Federal Claims --

THE COURT:  But if I allow you to do it unlawfully, I'm allowing -- I mean, you can't be arguing that the end

justifies the means here.  I mean, what you're saying is well, you know, if we have to do it lawfully, they're not going to get the money anyways, so they might as well go out of business now because they're going to go out of business later.  That seems to be what you're saying.

MR. SACKS:  I'm not arguing that, Your Honor.  What I'm arguing is, looking at the irreparable harm that they've put forward and analyzing that based on the legal standards, then considering the public interest and the fact that if money goes out from these grant agreements through a court order, that money may not be recovered by the United States should the United States ultimately prevail in this case.

THE COURT:  But you could have prevented that by following -- by what plaintiffs are saying, if you wanted to stop that money from going out, you should have gone through the procedures under the APA for terminating the contract.  And what you did was you just -- instead of doing that, you just said don't give them the money anymore and then worked your way back.

MR. SACKS:  I don't think that's the proper characterization, Your Honor, but I understand that's the Court's --

THE COURT:  Well, I mean, I think that's maybe what -- plaintiffs probably put it way more precisely and elegantly than that.  But that's the argument, which is you want to get

out of this agreement, you want to get out of these contracts, you gotta follow the law in doing that.  You can't just tell the bank one day, stop giving them the money, and then go through the procedures.

And again, since the time plaintiffs have filed this TRO, there's been no development in the record with regard to grounds for termination.  Nothing else has happened.  No court order has been -- EPA could have gotten a court order.  They haven't done that.

MR. SACKS:  Sure, and I'll close just by going back to the Supreme Court precedent we've cited in our briefs, from *Mobil Oil* and from *Winstar*, that talk about the government as a contracting party and its right to terminate contracts, or indeed a right to breach a contract.  The question then becomes what are the rights of the counterparty after that. And that really is the situation that we're in here.

Thank you very much, Your Honor.

THE COURT:  All right.

Citibank.  You've been waiting all this time, haven't you? Well, let -- you're the plaintiff, so let me hear from you first.

MR. UNIKOWSKY:  Thank you, Your Honor.  So we ask the court to separately enter an injunction against Citibank, directing Citibank to comply with the contract with all of the Plaintiffs' disbursement requests.

THE COURT:  So I know that you are not parties to the FAA, but why shouldn't I read both the ACA and the FAA in harmony?  And doesn't the FAA specifically say that Citibank is to comply with all directions received from Treasury?

MR. UNIKOWSKY:  So I think the simplest answer to that question is that -- the sole argument Citibank has made, based on the FAA, is that it was following lawful orders by the government.  But we are here today to argue to the Court that the government's actions are not lawful.

So if the Court were to agree with us and conclude that the government's actions are not lawful, then there would be no basis at all for Citibank to deny our requests.  And so there would be no obstacle to the Court entering an injunction telling Citibank to comply with the contract.

If I could just say one thing about that.  I don't think Citibank will -- maybe that's a question for Citibank.  I think it's going to take an injunction against Citibank specifically for it to send us our funds.  So if the Court doesn't specifically enter such relief, we'll probable be back in court a few days later.  So we would ask the Court to enter that relief.  And I think that's the most straightforward and simplest way of resolving the dispute with Citibank.

But I want to answer Your Honor's questions head-on about the FAA, because of course, as the Court knows, Plaintiffs' position is, regardless of whether the Court finds that EPA

acted unlawfully, Citibank is still in breach of the contract. I do understand that Citibank is in a tough spot, letters coming from the FBI.  We're not impugning the motives of Citibank at all, but we don't think they complied with the plain text of this contract.

So first of all, our position is that the ACAs are not limited by the FAA for the simple reason that plaintiffs never signed the FAA.  So it's not part of the meeting of the minds between plaintiffs and Citibank.

There are a number of cases that are cited by Citibank in which courts consider multiple writings together and harmonize them all.  But as far as I can tell -- and I've looked at all of those cases -- every single one of them involved multiple writings between the parties that are in front of the court.

So what the court said, look, to determine what the actual meeting of the minds between the parties are, I have to look at all of the writings together, and I can kind of synthesize them and harmonize them to figure out exactly what the meeting of the minds was.

But that's not the case here.  The plaintiffs signed the ACAs, we did not sign the FAA, and so that is not pertinent to the meeting of the minds between plaintiffs and Citibank.

But just one other thing, Your Honor.  Even if the Court disagrees with that and incorporates the FAA into the ACAs, I actually do think that even under the FAA, the actions of

Citibank weren't lawful because there's extremely specific language in the FAA addressing when Citibank can freeze the funds, and it specifically says it can only do that in accordance with the account control agreements.

So that's in -- it's a sealed exhibit, but the relevant language I think is quoted in the parties' briefs, so I'm gonna just, you know, tell the Court, it's page A(4), and the pertinent provision says the financial agent -- that's Citibank -- shall freeze accounts and transfer funds in frozen accounts at the direction of the relevant secured party in accordance with the account control agreements.

So as we see it, there is harmony.  If the conditions for a freeze under the ACAs are not satisfied, then the FAA does not authorize Citibank to execute the freeze either.

And just one other thing, I mean, EPA has taken the position that our claim against EPA has to go to the Court of Federal Claims.  Of course we've disagreed with that.  But even if that's correct, we can't sue Citibank in the Court of Federal Claims.  This is the only court in which we're able to seek relief.  There's a contract between the parties.  So we'd urge the court to resolve those issues and enter an injunction specifically against Citibank, directing it to comply with its contractual obligations.

THE COURT:  All right.

So let me ask you, can the EPA monitor these accounts?

MR. ALLEN:  EPA can monitor these accounts, Your Honor.

THE COURT:  Okay.  And EPA contends that it terminated these grants in part because of the lack of government oversight, which is why I asked that question.  And what is usually required for a secured party to exercise its right of control?  There's a form attached to the amended January ACA as Exhibit A.  Did EPA ever issue a form of notice of exclusive control?

MR. ALLEN:  No, Your Honor, EPA has not issued a notice of exclusive control.

THE COURT:  Section 4 of FAA governs compensation, says Citibank shall be compensated for its services.  Are there any incentives to Citibank in the various agreements providing for compensation other than what it says here?

MR. ALLEN:  There is a provision of the FAA that details how Citibank is compensated.  It's Exhibit B.

THE COURT:  And is Citibank still receiving payment for its services?

MR. ALLEN:  It is.

THE COURT:  If I find that EPA acted unlawfully in suspending and terminating the grant awards, does that allow for Citibank to disburse the funds?

MR. ALLEN:  If the Court were to find that the termination was unlawful and the directives to Citibank to pause the processing of payment instructions was unlawful,

then at that point Citibank would be faced with disbursement requests from the plaintiffs, it would have no lawful instruction from its principal telling it to do -- to not comply.  And so at that point Citibank would comply with the requests it received from the plaintiffs, Your Honor.

THE COURT:  And that is regardless of whether I issued an injunction against Citibank?  You would probably prefer one.

MR. ALLEN:  I guess what I would say, Your Honor, is it might make things more simple --

THE COURT:  I'm sure.

MR. ALLEN:  -- if we were included in the Court's relief.  But certainly what I can say is we want to follow the Court's orders, and we also want to, to the extent we can, follow the directives from our principal, and we certainly would follow the Court's instructions however they're encapsulated in an order.

THE COURT:  All right.

MR. ALLEN:  Just to address briefly, Your Honor, there are some arguments in the briefs that Citibank has breached its contracts by not continuing to honor disbursement requests over directives from the government that it not do so.  And we just don't think that's correct.  Citibank has fully complied with its contractual obligations.

As the Court knows, those are contained in two contracts,

the FAA and the ACAs, and those interrelated contracts must be read together and in harmony.  Both contracts were signed within weeks of each other, they are clearly interrelated and they form part of the same general transaction, which is setting up Citibank's role as a financial agent for the United States government.

THE COURT:  But Mr. Unikowsky says that even if I read them in harmony, you're still obligated to disburse the funds.

MR. ALLEN:  Well, Your Honor, for two reasons, at least under the current record, we can't disburse the funds.

THE COURT:  I'm sorry, did you say you cannot?

MR. ALLEN:  Cannot on the current record.

THE COURT:  Why?

MR. ALLEN:  For two reasons.  First of all, on March 10 we received an instruction from the EPA to pause the processing and payment instructions for the GGRF accounts.  Under Exhibit A, Section 1(b) of the FAA, EPA has the authority to impose account controls that Citibank must implement.  And EPA told us that one of the interim account controls it was putting in place was a freeze on these accounts.

THE COURT:  Did EPA give a time limit?

MR. ALLEN:  EPA did not give a time limit, Your Honor.

THE COURT:  So that's not a control, that's a halting.

MR. ALLEN:  All they told us at the time, Your Honor,

was that it was an interim, and they said this interim account control will be rescinded as soon as reasonably practical once EPA completes its review and implements additional account controls.  That's what was told to us on March 10.

On March 11, Your Honor, the second reason we can't at least on the current record release the funds, is on March 11 EPA terminated the grants, and under the FAA -- and again, this is in Exhibit A -- Citibank must take direction from EPA in the event of a termination in accordance with the account control agreements.

So at least under the current directions that we're receiving from EPA and from Treasury, Citibank can't comply with the instructions it's receiving from plaintiffs.  And as I also mentioned, or we note in our papers, Your Honor, Citibank is required to comply with all lawful instructions or directions received from Treasury and owes a fiduciary duty of loyalty and fair dealing to the United States.

So because these contracts have to be construed in harmony and together, and because under New York law, interrelated agreements of this nature must be read together, Citibank currently finds itself under instructions from its principal not to release funds.  And therefore, when it did not honor disbursement requests, it didn't breach the contract; it was complying with both the FAA and the ACAs.

In addition, Your Honor, I would note that under section

6.B of the account control agreement -- and this is at ECF 33-10 at 4, it says Citibank cannot be held liable for failing to -- for not performing any act or fulfilling any obligation hereunder by reason of any occurrence beyond its control including without limitation... any act of governmental authority.

THE COURT:  I don't think plaintiffs are asking you to be found liable.  I think they're asking for you to be ordered to disburse the funds.

MR. ALLEN:  I understand, Your Honor.  I just wanted to note that, and of course Citibank will comply with any order that the Court might issue.  But I just wanted to briefly respond to the suggestion from plaintiffs that Citibank should have continued to honor these despite explicit directives from its principal that it not do so.

THE COURT:  Think you chose rock over hard place?

(Laughter.)

MR. ALLEN:  Unless the Court has any other questions.

THE COURT:  To be fair to the parties, to be allowed to make their arguments and to be fair to my court reporter, we're going to take a short break.  Obviously, going longer than I thought.  But these are tricky issues.  10 minutes. And I realize everybody is very hungry, myself included.

(Recess from 2:05 p.m. to 2:27 p.m.)

THE COURT:  You were finished, right?

MR. ALLEN:  Yes, Your Honor.

THE COURT:  Okay.  Mr. Unikowsky?

MR. UNIKOWSKY:  I promise I'll be quick, Your Honor. First of all, I think it's pretty clear from the remarks of my colleague that Citibank probably will not disburse funds without an order.  Just to raise one point to the Court's attention:  Even after the Court entered a TRO and found a likelihood of success on the merits, Citibank still didn't disburse our funds.  The court order the Court entered did not bar Citibank from doing so.  They explicitly said that defendant Citibank is enjoined from moving or transferring plaintiffs' grant funds to any party other than the account holders.

THE COURT:  I think Citibank sort of made clear at the hearing on the TRO that they weren't going to move any money anywhere absent a court order.  Am I characterizing your position correctly?

MR. ALLEN:  For the plaintiffs here, Your Honor, I think you're characterizing things correctly, and also we certainly understood the court's TRO order to prevent us from transferring plaintiffs' funds either to plaintiffs or to the government.

THE COURT:  Well, my order didn't say that, but I have to tell you, Mr. Unikowsky, I pretty much assumed they wouldn't, because --

MR. UNIKOWSKY:  I'm not blaming -- certainly the order didn't order them to do that.

THE COURT:  And my TRO did not find that EPA's actions were unlawful.

MR. UNIKOWSKY:  Right.

THE COURT:  That would go to your argument that if they are unlawful then Citibank has no reason to not disburse the funds.

MR. UNIKOWSKY:  I'm not suggesting Citibank did anything wrong at all, after the TRO.  All I'm saying is that I think clear language in the court order is needed.  We proposed some language in our proposed order.  And I think it would also be helpful for all parties if the court clarified sort of what the ACA means in this situation, or else there will be additional disputes with Citibank.

We've offered our interpretation of how the ACA and the FAA fit together, so I think it would be helpful in terms of future disputes for the Court resolve the parties' disputes over the interpretation of the contracts.

THE COURT:  "Future disputes."  That really strikes terror in my heart.

MR. UNIKOWSKY:  I hope there are none.

THE COURT:  All right.  Okay.  Subgrantees.  I want to hear from you.  I want to hear from you.  Obviously, I don't think we need to rehash everything we've discussed.  And I've

read the briefing.  But I think there's an argument with regard to standing.  Did you want to address why you have standing in this case?

MS. STRONG:  Yes, Your Honor.  I'd first just like to say that I think everything my friends for the other plaintiffs have already said applies equally to subgrantees, which is why I think standing is the main issue that I need to address for the subgrantees.

THE COURT:  I'm going to caution you to slow down.

MS. STRONG:  Yes, Your Honor.

THE COURT:  Thank you.

MS. STRONG:  So as to the standing argument, I think that subgrantees' standing is in fact straightforward. Subgrantees have accounts -- excuse me -- funds that are theirs that are held in accounts for them at Citibank.

THE COURT:  But those are plaintiffs' accounts.

MS. STRONG:  So as to the subgrantees, Your Honor, the subgrantees have their own separate accounts.  So there's -- for example, as to iBank, there's a designated account at Citibank for iBank, with iBank's own funds, and there's a separate ACA that covers those accounts.  The parties to that ACA are iBank, Citibank, and CGC, who is our primary grantee. EPA is not a party to that ACA.  So our standing runs from the injury that we have suffered by the denial of our access to our funds in our Citibank accounts.

And so the same jurisdictional and other arguments that Mr. Levy brought up apply to us with equal force, and simply put, the source of our rights here is the regulations, statutes and constitutional provisions cited in our complaints, and we are seeking to enjoin EPA from continuing to interfere with and deny our access to our funds.

THE COURT:  But you all aren't parties to the agreement, are you?

MS. STRONG:  So we're parties to our ACA, which entitles us to have our funds disbursed to us consistent with the ACA by Citibank.  EPA directed Citibank to freeze our funds with we allege no lawful basis, and I want to respond specifically to something I heard my friend for the EPA say earlier, which was that the FAAs and the ACAs provided the basis for EPA to freeze these funds.  But the FAA is not something that iBank or any other state green bank has signed. We're not party to that agreement.  And EPA isn't party to our ACA.  So I don't see any basis that EPA would have to freeze our accounts.  And I don't think EPA has provided one.

So our standing is, as I said, straightforward.  It's we have these funds, we are entitled to these funds, we're entitled to access them, and EPA has taken action to prevent us from accessing those funds, first via its action directive to Citibank to freeze those funds, and then by purporting to terminate the grant and say that it was going to claw back and

then re-obligate all of the funds under the NCIF grant.

THE COURT:  If I grant a preliminary injunction for the prime recipient plaintiffs, does that extend to the subgrantees?

MS. STRONG:  I think, Your Honor, to be safe, your order should make clear that it does --

THE COURT:  Oh, I'm sure you'd prefer that.

MS. STRONG:  I think the issue here is that because there are separate accounts, because iBank and the other state green banks' accounts are held in their own Citibank accounts, the order should extend explicitly to those accounts that are held for the subgrantees.

THE COURT:  What's your irreparable harm?

MS. STRONG:  So our irreparable harms are similar to the primary grantee plaintiffs.  I think they're most closely similar to CGC's harms, although these state green banks have other sources and types of funding that extend to different programs, and so the green banks themselves aren't at risk of ceasing to exist.  They are unable to administer the programs that -- and projects that they have set up specific for --

THE COURT:  But that's delay.  I mean, irreparable harm is, you know, something's going to happen that we can't undo. We're going to cease to exist, we can't pay our rent, we're going to be evicted, something of that sort, or reputational harm.  So I don't think yours is the same.

MS. STRONG:  Well, so that's what I want to get to, Your Honor.  I think there are two points of irreparable harm here that I think I have heard other plaintiffs mention, but also, whether or not they have, are irreparable harms that we suffer.  The first is, as Your Honor mentioned, reputational harms.

The state green banks, as green banks, their reputation and their ability to follow through on their financing commitments is of the utmost importance.  And the inability to do so due to their inaccess to their funds causes them reputational harm.

Relatedly, they suffer reputational harm based on the allegations that EPA has made both in public statements and also in the termination letter.

THE COURT:  But that's going to happen regardless.  In other words, EPA through its administrator has made no secret of the fact that they don't support these agreements, that they want to reallocate the funds, that they have opinions about how these agreements were entered into and so on.

So I can't order them not to have opinions.  I can't order them not to make statements.  He's doing that in his position as an administrator.  So the reputational harm is going to happen regardless, right?  I mean, even if the funding is restored until such time as EPA terminates the contracts, the reputational harm that has been caused by EPA's statements

about these programs is going to continue.  I can't stop that.

MS. STRONG:  Well, so, Your Honor, I think the specific reputational harm that has been suffered here that is irreparable and can be addressed by Your Honor issuing injunctive relief is specific to the reputational harm that state green banks have suffered as a result of the statements in the termination letter.

So the termination letter evokes waste, fraud, and abuse and substantial concerns about program integrity.  And I understand EPA to now be focused on a change in agency priorities.  So we've seen no basis or support for those other statements --

THE COURT:  How can my injunction -- I mean, that's PR.  And I don't mean to be flip.  But my granting injunctive relief and ordering Citibank to disburse the funds until such time as, you know, EPA terminates these contracts is not going to undo what's been said or what was stated in the letter.

MS. STRONG:  So I'd respond to that on two points, Your Honor.  First, I think that continuing the relief Your Honor issued in the TRO to preliminary injunctive relief, enjoining EPA from effectuating its termination letter does begin to address those harms.

But in addition, separate from the reputational harms, there are specific harms that run to the state green banks that would be remedied by the disbursement of funds due to

their inability to continue their due diligence in standing up these projects that have applied to them and being able to have these projects ready to fund if and when they do ultimately prevail on the merits.

Absent disbursing funds now, projects that are currently in the pipeline to be funded will not be funded. We won't be able to get those projects back. And so that's the irreparable harm that would be addressed by the interim relief we're seeking here.

So, Your Honor, I just want to briefly address too the primary relief we seek here, separate and apart from the disbursements, is the need to convert the TRO to -- the TRO relief to preliminary injunctive relief, and make sure that at a minimum these funds don't leave Citibank and return to the federal government. And that's why -- going back to the question that Your Honor asked earlier, that's why it's so important that the subgrantees be specifically identified here because their accounts are in a different place.

And I understand EPA to even be arguing that subgrantees who aren't separately represented here should not be covered by any injunctive relief. And that's why it's so very important and why indeed subgrantees, the subgrantees I'm here on behalf of, filed their own complaint to protect those interests and not have the subgrantee interests get lost amid the plaintiffs' interests.

There's significant funds at stake that are separately held in those separate subgrantee accounts, and it's important that those not return to the federal government and that these funds be -- the status quo be preserved as to the subgrantees as well.

THE COURT:  All right.  Mr. Sacks, do the subgrantees' grants fall under section 7434(a)(1)?  I didn't even let you come up here first.  Sorry.

MS. STRONG:  Is that a question for me, Your Honor?

THE COURT:  No, it was a question for Mr. Sacks, but I didn't even let him get a chance to get up here.  Sorry.  I wanted you to have the statute with you when you came up.

MR. SACKS:  I'm sorry, Your Honor.  Your question was whether the subgrants fall under 7434(a)(1)?

THE COURT:  Yes.

MR. SACKS:  I don't believe so, Your Honor, because the statute sets out the basis to give grants, which is what the agency has done here.  But I'd have to read a little bit closer to --

THE COURT:  Well, did the EPA's order to Citibank to freeze disbursement of the funds cover the subgrantee bank accounts?

MR. SACKS:  I believe it covered all accounts under the GGRF program, yes.  Or at least under the NCIF.

THE COURT:  So if I find the plaintiffs here have

standing, wouldn't the subgrantees also have standing?

MR. SACKS:  No, Your Honor, they would not.

THE COURT:  Why not?

MR. SACKS:  It's a completely different inquiry, Your Honor.  And we set this out in our brief.  I think there's three bases on which the Court can find that the subgrantee plaintiffs do not lack standing.

THE COURT:  Do not have standing.  Not "do not lack."

MR. SACKS:  Sorry.  I misspoke.  I'm tired.  Do not have standing.  The first is Article III constitutional basis for standing, and we cite a case from District of Connecticut a few years back that talks about whether or not a subgrantee has a legally protected interest against the government in this case --

THE COURT:  Normally -- I know that case.  Normally, I would agree with that except, as counsel just points out, they have bank accounts that have been frozen.  So they have a legal -- I mean, they have skin in the game.  They're not just saying we're due funds from the plaintiffs.  So yes, I think that would be a much weaker argument.  But they actually have accounts that have been frozen by order of the EPA.

MR. SACKS:  Well, they have skin in the game because of their contractual relationship with the grantees.

THE COURT:  And also -- yes, and they're due funds directly into their accounts.

MR. SACKS:  Based on their relationship with the grantee and through their own contract.  And that contract has not even been attached, I believe, to the complaint that they've filed here.  We haven't looked at those contracts to understand what the terms are and what their legal rights are vis-à-vis the grantee.  They don't have legal rights --

THE COURT:  So EPA ordered that their accounts -- that disbursement of the funds be frozen without even looking at their contracts?  On what authority did you order that disbursement of funds be frozen, if you don't even know what the relationship they have with the plaintiffs are?

MR. SACKS:  Well, the freezing of the funds was based on the financial agent agreement and EPA's rights under that agreement, and concerns about the program as we've discussed.

THE COURT:  So do they have standing under that?

MR. SACKS:  They do not, Your Honor.

THE COURT:  So you can order that their funds not be disbursed but they don't have standing to challenge you on that.  Is that what you're saying?

MR. SACKS:  They have rights through their grantee based on their contract with the grantee.  We're certainly not contesting the grantee's rights for standing here.

THE COURT:  So then I guess I'm wondering under what -- you're claiming your authority to freeze the funds that are in their accounts are under the ACA or the FAA.

MR. SACKS:  FAA.

THE COURT:  But they don't have any standing under those similar agreements to challenge your freezing.  That seems odd.

MR. SACKS:  We're not saying they don't have any potential injury, Your Honor, but that's a separate question from whether they meet all the elements of Article III standing.  And I don't believe they have a legally protected interest on which they can proceed here.

THE COURT:  The money in the accounts isn't a legally protected interest?

MR. SACKS:  I don't believe it is, Your Honor.  It's federal funds, again, as we've discussed.  And then there's also prudential standing based on the *Warth* case --

THE COURT:  I hate to keep going back to this.  But I asked you if subgrantees' standing rises or falls with the plaintiffs, and you said no.  But it seems your argument undercuts that.  Because you're saying their right to the funds is by virtue of them being a subgrantee.  I said, well, they have their own accounts.  So you're saying they may have a claim but not standing?  It seems as if you want to have it both ways.

MR. SACKS:  I don't think we do, Your Honor.  I think what their rights are are set forth in their contractual agreement with their grantee, which we haven't seen here,

again.

THE COURT:  So then EPA could have said, you know, Citibank, freeze the grantees' money, and then the grantee can work out the subgrantees' funds between themselves since we don't know what their contracts are.  But you didn't do that.  You said freeze the grantees' money and freeze the subgrantees' money as well, even though you don't know what the contracts say.

MR. SACKS:  Well, EPA's concerns are with the program integrity as a whole, and so the decision was made to temporarily freeze all program accounts.

THE COURT:  Let me ask you about this "temporarily" thing.  What's the end date here?  If I don't intervene, what's the end date for the freezing of the funds that is provided for?  You heard Mr. Unikowsky talk about temporary.  And you just mentioned it as well.  So when's the end date?

MR. SACKS:  Well, the "temporary" language came from the 310 direction to Citibank, and then of course the next day there was the termination.

THE COURT:  That's right.  I'm sorry.  Not Mr. Unikowsky, it was counsel for Citibank, that it was temporary.  When is the contemplated end?

MR. SACKS:  I don't believe there was a contemplated end at that point in time.  It was a temporary freeze to allow the agency to determine whether or not their concerns about

the grants justified termination or whether they should end the freeze because their concerns had been alleviated.

THE COURT:  Okay.  Standing here now, can you tell the court when you anticipate this temporary freeze will end?

MR. SACKS:  So you're asking if the termination was vacated by the court but the freeze was left in place, when would EPA take action --

THE COURT:  Oh, I see.  So your position is that the instruction to Citibank to freeze the accounts was temporary but then your termination letter made that permanent.  Is that right?

MR. SACKS:  No, Your Honor, it's completely --

THE COURT:  I'm trying to get at, if the freeze is -- is it still temporary?

MR. SACKS:  Well, I think at this point, the grants have been terminated.  So the money would go back to EPA but for the court's TRO.  So there's no freeze from EPA in place at this time.  There's a freeze from the court.

THE COURT:  So what you were telling Citibank was don't disburse the money for now until when?

MR. SACKS:  Until EPA had made a determination, again, whether or not they wanted to continue to operate the grants or they had determined they wanted to terminate them.

THE COURT:  I see.  Okay.

MR. SACKS:  So going back to the standing issue again,

the Supreme Court case from *Warth* talks about the standing of a party to litigate a third party's rights here.  And again, the rights vis-à-vis the government belong to the grantees through the grant agreements, not the subgrantees.

And then finally, privity of contract, which comes from the Court of Federal Claims of course, you can't come to the Court of Federal Claims without privity, and I think that's analogous to a standing argument that this court should adopt if it's going to keep the case.  There is no privity of contract here.  I mean, the subgrantees don't contest that there is.  There isn't.  So again, to the extent they have rights, they're in their documents.

I'll turn to harm if I could briefly, Your Honor.  So for the subgrantees, I don't believe there's been a showing of imminent harm that merits the release of funds to them if the Court intends to go that route.  My friend just said things they need to do are to continue their due diligence and be ready to fund projects.  Those do not satisfy the definition I think under any view of the case law of imminent irreparable harm that this court can satisfy through a preliminary injunction.

THE COURT:  But if I don't cover the funds in their specific accounts, that money will be no longer accessible regardless of what the ultimate outcome is in this case because it will be returned to Treasury, won't it?  If I don't

order Citibank to disburse those funds or maintain those funds, the funds are going to go back to the Treasury and the subgrantees won't have any access to them regardless of what I rule as to what plaintiffs' rights are.  Correct?

MR. SACKS:  No, I don't think so, Your Honor.  I think we're talking about two kinds of relief here.  One is a continuation of what the TRO -- or at least one interpretation of what the TRO does.

THE COURT:  I see.

MR. SACKS:  Right?  And that is to keep the money frozen where it is until we get a final judgment in this case that resolves who has the right to that money.

THE COURT:  So what you're saying is even if I -- hypothetically -- ordered Citibank to disburse the funds to plaintiffs, I could still find that subgrantees haven't shown irreparable harm, requiring them to get their money and order their funds continue to be frozen until I reach the merits. Is that right?

MR. SACKS:  I think that's correct, Your Honor.  And I think that same relief would also need to apply to CGC, because I don't think that grantee plaintiff has demonstrated the irreparable harm necessary to order funds disbursed out of their account.  It may be a different story with the other two grantee plaintiffs.

But one thing I think is important to think about if the

Court is going into what the scope of relief may be here, is that the purpose of a preliminary injunction is not to put the parties in what the Court believes is the status quo, right? And so let's assume that status quo is no termination, no freeze on the accounts --

THE COURT:  But it can be sometimes to maintain the status quo because of a danger of irreparable harm until such time as the court can rule on merits.

MR. SACKS:  Absolutely, Your Honor.  And I think the scope of relief if the court went in that direction would be to not go back to a status quo where all grantee and subgrantees have the right to access as much of the funds as they want --

THE COURT:  Well, no.  That's not even what they're asking.  They're asking to access the funds that they are entitled to under the terms of the agreement, not go on a, you know, spending spree.  Right?

MR. SACKS:  Well, under the terms of the agreement, the only restrictions on their ability to go on a spending spree would be their certification requirement under the account control agreement, I believe.  So I think if the Court is going to order relief here on a preliminary injunction, that it should do so narrowly tailored in terms of the disbursements that any grantee or subgrantee needs to continue operations until we've reached a final judgment in this case.

And I think particularly in light of what the D.C. Circuit did in the *Catholic Bishops* case in denying the request for an injunction pending appeal, I think we have some indication here of the potential likelihood of success on the merits of these plaintiffs.

And so considering that, I think it's important to recognize that because money that goes out the door may not be recovered by the EPA, that if the Court goes so far as to say, yes, we're going to freeze the money, we're going to reverse the termination, we're going to reverse the freeze, and we're going to allow access to the money, that access should be narrowly tailored to each individual plaintiff based on the demonstrated need, truly need for money based on irreparable harm and accompanied by a bond under Rule 65(c) for whatever amounts of money those plaintiffs would be allowed to access.

THE COURT:  Based on the filings I've seen, am I correct that all of the NCIF and CCIA funds were canceled, or frozen, or suspended?

MR. SACKS:  I believe that's correct, Your Honor.

THE COURT:  And did all the grantees and subgrantees receive the notice of termination on March 11, or just the plaintiffs, just the grantees?

MR. SACKS:  All NCIF and CCIA grantees received the notice.  There would be no basis for the United States to have a right to terminate subgrantee agreements.  The terms for

that are set forth in the grant agreement.

THE COURT:  All right.  Did you want to respond?

Before you sit down, Mr. Sacks, did you want an opportunity to respond to the TRO in 25-CV-948, that was filed on the more recent one?  Or did they withdraw that?

MR. SACKS:  That's withdrawn.

THE COURT:  That's withdrawn, okay.

MR. SACKS:  And I'll just, for the Court's information, we're talking to both of those CCIA grantee plaintiffs about whether there's a way that essentially we can deem our previous oppositions to the PI as applying to theirs or go argument and potentially have the court --

THE COURT:  I would appreciate that.

MR. SACKS:  We're working on a way to resolve that, Your Honor.

THE COURT:  All right.

MS. STRONG:  Just very briefly, Your Honor, if I can respond.

THE COURT:  Yes.

MS. STRONG:  So my friend cited I think three separate bases on which he thinks subgrantees lack standing.  I'll go in reverse order because I think the third is the easiest to dispense with here.

My friend said that the subgrantees don't have privy of contract.  And we don't dispute that we are not party to any

contract with the EPA.  We don't need privity of contract here because we're not bringing a contract claim.

As to the Article III standing, in the District of Connecticut case, the basis for that decision was that the individual, the pro se plaintiff who was seeking FEMA funds in that action, didn't have a legally protected interest in the funds, and the key difference here is that we have a legally protected interest in the funds.  In fact, the funds have already been disbursed to us, and so we are merely seeking to regain access to the funds that are already ours.

And then finally, as to prudential standing, I think similarly the *Warth* case and the statements that my friend just made run to this idea that we can't pursue third-party rights or third-party interests.  And again, that's not what we're doing here; we're seeking to protect our own rights and regain access to our own funds.

I want to also briefly address this question of making differing disbursements to different plaintiffs.  And I don't want to speak for the harm or the disbursements that should be made to the primary grantee plaintiffs; I just want to emphasize again that (1) I think it's important that the subgrantees' funds at a minimum stay at Citi and not return to federal government, and that the Court's order should explicitly extend relief to the subgrantees because their accounts are separate; but (2) I want to just reiterate that

there are projects that the state green banks had been working on standing up and funding that will -- the time to fund those will pass if they are not able to resume their activities and gain access to at least some of these funds during the pendency of this action.  So that's really the irreparable harm here.

THE COURT:  All right.  Counsel for Citibank, can you answer for me whether -- are the funds in the accounts?

MR. ALLEN:  The funds for the NCIF primary and subrecipients are in their accounts at Citibank.

THE COURT:  All right.  Thank you.

Okay.  Thank you, everyone.  Oh, Mr. Unikowsky.

MR. UNIKOWSKY:  If I could say --

THE COURT:  Yes, you can.

MR. UNIKOWSKY:  I truly don't mean to prolong this, Your Honor, but I haven't said anything about the subgrantee issue, so just one thing.

THE COURT:  Sure.

MR. UNIKOWSKY:  So plaintiffs have asked for an injunction to cover not only grantees themselves but also the subgrantees.  Not all the subgrantees have filed lawsuits. There are other ones that haven't, and we'd prefer that not all the subgrantees came to court.  I think it actually makes sense --

THE COURT:  I would too.

MR. UNIKOWSKY: I think it makes sense --

THE COURT: Just because I don't think we have room in here.

MR. UNIKOWSKY: Right. There's already a lot of plaintiffs here. I think it would make sense for an injunction in favor of the plaintiffs to also cover the subgrantees. We're not actually asserting injury to someone else; we're asserting an injury to us.

THE COURT: The issue is -- remember, this case comes in as a lawsuit against Citibank as well as the EPA, and do all these subgrantees have their own individual accounts with Citibank?

MR. UNIKOWSKY: They do. We've also sued EPA and then the termination covers the money in the subgrantees' accounts because it's still our grant program. We still are responsible for ensuring that the actions of the subgrantee ultimately comply with the terms and conditions of the primary grant. So if the EPA's termination decision is overturned, then not only should we but also our subgrantee be able to continue carrying out our activities.

So we view an injunction that would apply to the subgrantees as remedying harm to us, not just the subgrantee.

THE COURT: All right. Mr. Sacks, I have one last question for you. Has EPA taken any steps to obtain a court order freezing the funds?

MR. SACKS:  Not that I'm aware of, Your Honor.

THE COURT:  Okay.  And why is that?  If you know.

MR. SACKS:  I don't have an answer to that, Your Honor. I'm sorry.

THE COURT:  Hold on one second.

Okay.  Thank you.  Did you want to come up?

MR. LEVY:  May I just say one thing?

THE COURT:  So Mr. Sacks asked narrowly -- if I was going to issue a PI, to narrowly tailor it for what they need to continue operations.  I don't have that sort of information in front of me, Mr. Unikowsky.  I'll still let you speak, Mr. Levy.  And that I assume would be very different for each plaintiff and subgrantee.

MR. UNIKOWSKY:  So we'd urge the court to have the injunction just put us to the status quo ante where we were on February 16th before what we view as an unlawful freeze began. Because I think we still have irreparable harm even if the lights are on if we can't do anything.  We're a financial institution, we give loans, we monitor loans, we invest in projects.  And if we're not doing that and we're just sitting in our office, we're still being harmed, we can't carry out our mission.  We can't do what we're supposed to be doing.

And the reputational harms also continue.  The whole reputational harm that we're asserting is that we can't be trusted to dole out money.  That'll still happen if we're in

our office and the light is on but we can't dole out money.

So we'd urge the Court to simply grant an injunction that restores the parties to the state of the world on February the 16th.

THE COURT:  All right.  Mr. Levy?

MR. LEVY:  I think I was going to say much of what Mr. Unikowsky said and just to -- I understand Mr. Sacks -- our client is in a different position than the other grantees, but we do have irreparable harm and I would just refer to the briefs and the declaration.

THE COURT:  Thank you all.  Appreciate all the preparation that's gone into this.  I will -- do we need a briefing schedule?

(Court conferring.)

Okay.  Good.  I have quite enough.  All right.  Yes.

MR. ALLEN:  One ministerial issue.  Citibank's Rule 12 answer deadline is coming up on Friday for one of the cases. We filed an unopposed motion, that everybody I think has consented to, to put that deadline well off into the future and to coincide with the government's.  So that's what we intend to do unless the Court has a different preference.

THE COURT:  That's fine.  I'll take a look at that.

All right.  I will try and rule expeditiously.  Thank you.

(Proceedings adjourned at 3:00 p.m.)

\*   \*   \*   \*   \*   \*

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ Bryan A. Wayne*
Bryan A. Wayne