UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **JUSTICE CLIMATE FUND,**<br><br>      Plaintiff,<br><br>  v.<br><br>**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,** *et al.*<br><br>      Defendants. | Civil Action No. 1:25-cv-698 |

## JUSTICE CLIMATE FUND'S OPPOSITION TO EPA DEFENDANTS' CONTINGENT EMERGENCY MOTION FOR STAY PENDING APPEAL

Eric F. Citron (D.D.C. Bar ID 1001069)
Kathleen Foley (pro hac vice)
Zimmer, Citron & Clarke LLP
1629 K Street NW
Suite 300
Washington, DC 20006
Tel.: (202) 796-4540
ecitron@zimmercitronclarke.com
kfoley@zimmercitronclarke.com

David J. Zimmer (pro hac vice)
Zimmer, Citron & Clarke LLP
130 Bishop Allen Drive
Cambridge, MA 02139
Tel.: (617) 676-9421
dzimmer@zimmercitronclarke.com

*Attorneys for Plaintiff Justice Climate Fund*

**INTRODUCTION**

Earlier today, this Court consolidated Justice Climate Fund's (JCF) suit (No. 25-cv-938) with the cases involving the National Clean Investment Fund (NCIF) grantees consolidated at 25-cv-698. In the consolidated NCIF cases, the EPA Defendants (but not Citibank) have now moved to stay any preliminary injunction this Court issues in favor of the NCIF grantees. The EPA Defendants do not mention JCF in their stay motion. But, to the extent the EPA Defendants intend that any preliminary relief favoring JCF also be stayed, the Court should deny that motion. The EPA Defendants misstate the harm to EPA. They drastically understate the damage to JCF and its subgrantees from a stay of any preliminary relief, as is starkly illustrated by the attached declaration of Dr. Reginald Parker. And they err in analogizing this case to the Supreme Court's recent decision in *U.S. Department of Education v. California*, S. Ct. No. 24A910 (April 4, 2025). Even if this Court were to issue a stay, it (1) should not apply to Citibank, which has not moved for a stay; (2) should not apply to any order enjoining EPA Defendants or Citibank from seeking to move money from JCF's Citibank account; and (3) should not apply to any order enjoining EPA Defendants or Citibank from denying JCF access to its Citibank account for purposes of paying its operational expenses.[1]

**ARGUMENT**

**I.     EPA Defendants Overstate The Government's Harm.**

Contrary to their motion, EPA Defendants are not seeking to avoid disbursing government funds; they are seeking to improperly claw back money that the government already awarded *and distributed* to JCF. The government completely ignores this critical difference.

---

[1] For purposes of the merits, JCF rests on the arguments in the preliminary injunction papers.

1

The funds at issue were appropriated by Congress through the Inflation Reduction Act. 42 U.S.C. § 7434. They were then awarded to JCF through an extremely competitive and transparent process. And once EPA selected JCF as an awardee, EPA transferred the funds *to JCF*, where they were placed in a Citibank account *in JCF's name* and with JCF as the Pledgor. As detailed in JCF's memorandum in support of its preliminary injunction motion, that account is governed by an Account Control Agreement (ACA) between EPA, JCF, and Citibank that gives JCF control over the funds in the account. The ACA gives EPA a security interest in the funds, but gives EPA no other rights in the absence of a Notice of Exclusive Control, which EPA has not issued (and lacks the basis to issue with respect to JCF). Until EPA takes those steps, the funds must be distributed in accordance with any JCF directions that comply with the law and the governing contracts. Accordingly, the status quo is that JCF has access to those funds, and it is EPA who is trying to seize JCF's money, not the other way around.

EPA Defendants also dramatically overstate the extent to which this case is about "safeguarding the public fisc." Motion at 10. For one thing, applicable federal regulations require that Citibank pledge collateral security for the ACA funds; this collateralization gives the U.S. government what the Treasury already has determined by regulation is adequate protection in case the money were to be misused. *See* 31 C.F.R. § 202.6.

Making matters worse for EPA Defendants, they have effectively abandoned any pretense that their attempt to terminate JCF's grant is based on any kind of misfeasance on JCF's part. Instead, at the preliminary injunction hearing, EPA Defendants justified their attempt to seize JCF's money as being based entirely on a change in priorities from the prior Presidential Administration. Putting aside that such a change in priorities is not a valid basis for terminating JCF's grant award, it also does not suggest any threat to "the public fisc."

To be sure, EPA's change in priorities purports to focus, in part, on the relevant "level of oversight and control" that EPA Defendants would like to have. Motion at 10. But EPA has identified *no* evidence—none—that JCF has misused its funds in any way or that the current level of oversight and control creates any meaningful risk that JCF will misuse its funds in any way. The only risk to the government is thus that some fraction of JCF's funds might actually be used in the manner intended *by EPA itself* when EPA awarded JCF its grant after an extensive and transparent application process. That is hardly the type of irreparable harm that justifies any delay in enjoining EPA's blatantly unlawful attempt to terminate JCF's grant award and deprive JCF of its ability to access its funds and carry out its mission.

Relatedly, the EPA made clear at the hearing that what it thinks it will lose if this Court grants preliminary relief is its "right" to "breach" the contract governing JCF's account. But that is wrong: What the EPA is ultimately trying to do here is control not its own behavior, but the behavior of two other, private parties (JCF and Citibank), without seeking a court order of its own—or exercising any other lawful authority to which it can point. Accordingly, the relief JCF requests here amounts to nothing more than a confirmation of the status quo, and a direction to Citibank to discharge its preexisting contractual duties (which Citibank has not sought to stay). Had the government done what this Court suggested at the hearing and sought its own court order directing the freezing or return of the funds, it could perhaps seek an injunction pending appeal upon failing to receive the intervention it wanted. But it cannot claim irreparable harm from the fact that it could lose immediate access to money *already* held by another for the benefit of another without identifying any legal basis whatsoever on which it should be returned or JCF's access to it should be curtailed.

**II.    Staying JCF's Ability To Carry Out Its Program Would Cause Irreparable Harm To JCF And Its Subgrantees.**

EPA Defendants argue that plaintiffs will not be harmed "for one simple reason: This case is about money." Motion at 10.  But at least JCF's case is *not* actually about money.  JCF is a nonprofit that stands to make no money at all.  JCF was formed in 2023, after the passage of the IRA, by a coalition of organizations with extensive experience advancing community-development finance for unbanked American families, businesses, and communities. JCF's founding organizations sought to utilize CCIA funding to fill a critical gap for community lenders: Many community lenders were underrepresented in affordable clean energy and housing finance that advances community health, security and prosperity. By forming JCF, coalition members aimed to centralize support and technical assistance, ensure that resources would flow to community lenders not served, and help lenders build capacity through experience with JCF's small-scale funding.

This case is about whether JCF can carry out that mission.  And if JCF does not regain access to its awarded funds in the very near future—both for operational and programmatic costs—it will almost certainly fail.  That will lead to irreparable harm twice over.  First, JCF will be forced to simply close, terminating its employees and abandoning all of its subgrantees.  EPA Defendants completely ignore this in their purported equitable balancing.

Second, in closing, JCF will lose the ability to carry out its mission, consistent with congressional intent, to disburse obligated funds to community lenders pursuant to its closely vetted workplan.  JCF's inability to carry out its mission would also irreparably harm its subgrantee community lenders and, by extension, members of communities that would be served by projects those community lenders would finance.

JCF relies on its awarded funds—held in Citibank accounts in JCF's own name—for its operating expenses. *See* Declaration of Amir Kirkwood ("Kirkwood Decl.") ¶ 30, *Justice Climate Fund v. EPA*, No. 25-cv-938 (D.D.C. Apr. 2, 2025), ECF No. 7-2. Without access to those funds, JCF will run out of money to fund its operations in roughly 33 days. *Id.* ¶¶ 30, 34. The financial harm that would result from a stay "threatens the very existence of [JCF's] business" and is irreparable. *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).

Just as importantly, if JCF does not soon regain the ability to disburse obligated funds to its subgrantees, JCF's ability to fulfill its mission will be harmed beyond repair. Consistent with the design of the CCIA program and the meticulous workplan on which EPA has signed off, JCF has selected 35 community lenders to receive CCIA funds to support numerous projects. Kirkwood Decl. ¶¶ 8, 17. The disbursement of funds to community lenders, who then finance green projects in low-income and disadvantaged communities, is the work EPA awarded JCF congressionally appropriated funds to do, pursuant to a congressional mandate. If JCF continues to be unable to disburse the funds it has obligated, it necessarily cannot do that work. Moreover, even if funding were to be restored in the future, the reputational harms to JCF that are now resulting will soon become insurmountable. Many community lenders were already hesitant to participate in the GGRF program due to fears of being targeted, but JCF built trust-based relationships with community-lending partners, and together with them, created project pipelines. *See* Kirkwood Decl. ¶¶ 41-42. The reputational damage of breaking that trust—as by not disbursing obligated funds on promised timelines—will be exceedingly difficult to repair. *Id.* ¶ 42. If the funds are not accessible soon, the damage will be irreparable. *Id.*

If funding is not restored soon, the harm to JCF's subgrantees will be similarly irreparable. JCF's network of community lenders have acted in reliance on JCF's ability to

disburse the promised funds, including by approving applications for low-cost financing of projects that would result in monetary savings, energy independence, and job creation in low-income communities. *See* Kirkwood Decl. ¶ 37; Declaration of Dr. Reginald Parker ("Parker Decl.") ¶¶ 11-16, 19-20, 23 (submitted herewith as Exhibit A). For example, Freedmen Green Bank & Trust ("Freedmen"), which serves communities in Georgia, Mississippi, and Alabama, Parker Decl. ¶ 2, provides "affordable financing of residential, small-business, and community projects, including weatherization, building-upgrade, and clean-energy projects," *id.* ¶ 11. Freedmen "approved the applications of numerous project sponsors for low-cost financing for their qualified projects," *id.* ¶ 23, but has not received funds JCF obligated to it for technical assistance—essentially, operating capital. *Id.* ¶ 17-18. "Unless those funds are restored soon, Freedmen will be unable to continue in operation." *Id.* ¶ 18.

Members of the communities that would be served by community lenders like Freedmen will be seriously and irreparably harmed if JCF's access to its funding is not restored soon. JCF's network of community lenders finance projects that would reduce low-income families' energy expenditures and provide energy independence, ensuring that lights, heat, and air conditioning stay on during blackouts. Parker Decl. ¶¶ 13-14, 35-37. But funding delays, like those that have resulted from the freezing of JCF's funds, carry follow-on effects that make projects substantially more difficult or even impossible to complete, even when funding is restored. *See id.* ¶¶ 29-33. Unless JCF regains access to its awarded funds soon, projects that would provide significant benefits to the communities who most need them will never be completed.

## III. The Supreme Court's Order in *DOE v. California* Is Not Analogous.

The Supreme Court's recent order in *Department of Education v. California* is not analogous here for at least two reasons. First, any injunction that gives JCF access to its

6

Citibank funds would not be an order to "pay out past-due grant obligations and to continue paying obligations as they accrue." 24A910 at 1. Instead, any such injunction would simply give JCF access to the funds that are *already in its own bank account* because EPA has not taken the contractually required steps to exercise exclusive control over those funds, has not sought a court order freezing those funds in place, and has not identified any possible legal authority for seizing or freezing those funds. Second, EPA Defendants have not "compellingly argue[d] that respondents would not suffer irreparable harm while the TRO is stayed." 24A910 at 2. In *DOE v. California*, the state plaintiffs "represented in this litigation that they have the financial wherewithal to keep their programs running." *Id.* That was a crucial reason why the Supreme Court concluded that an injunction was unnecessary while the case proceeded. Here, by contrast, JCF (and the other plaintiffs) have submitted compelling evidence that they would have to close their doors absent an injunction and would not be able to litigate the case to completion. And that is in addition to the significant reputational and other harm they would suffer. In that way, too, this case is fundamentally different than *DOE v. California*.

## IV. Any Stay Should Be Limited In Three Key Ways.

To the extent this Court issues a stay, it should be limited in three key ways.

First, it should not apply to Citibank, which has not sought a stay of any injunction. If Citibank moves to stay any preliminary injunction this Court issues, this Court can address that motion when it is filed. Notably, however, the government has identified no likelihood of success apart from a jurisdictional argument that does not apply to Citibank. So even assuming that Citibank did seek a stay, it would almost certainly be impossible for it to establish a likelihood of success.

Second, it should not apply to any order enjoining EPA Defendants or Citibank from seeking to move money from JCF's Citibank account. EPA Defendants identify no basis for

7

allowing them to take money out of JCF's account while this litigation is pending and no possible irreparable harm that might accrue to the government from leaving those funds where they have been for many months.

Third, it should not apply to any order enjoining EPA Defendants or Citibank from denying JCF access to its Citibank account for purposes of paying its operational expenses. EPA Defendants' motion is based effectively entirely on the need to avoid the withdrawals it identifies, which relate to program distributions not operational expenses.

## CONCLUSION

For these reasons, the Court should deny the Federal Defendants' Contingent Emergency Motion for Stay Pending Appeal.

Dated: April 15, 2025          Respectfully submitted,

/s/ Eric F. Citron

Eric F. Citron (D.D.C. Bar ID 1001069)
Kathleen Foley (pro hac vice)
Zimmer, Citron & Clarke LLP
1629 K Street NW
Suite 300
Washington, DC 20006
Tel.: (202) 796-4540
ecitron@zimmercitronclarke.com
kfoley@zimmercitronclarke.com

David J. Zimmer (pro hac vice)
Zimmer, Citron & Clarke LLP
130 Bishop Allen Drive
Cambridge, MA 02139
Tel.: (617) 676-9421
dzimmer@zimmercitronclarke.com

*Attorneys for Plaintiff Justice Climate Fund*