**EXHIBIT A**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JUSTICE CLIMATE FUND<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.*<br><br>Defendants. | Civil Action No. 1:25-cv-938 |

**DECLARATION OF REGINALD PARKER IN SUPPORT OF JUSTICE CLIMATE FUND'S MOTION FOR PRELIMINARY INJUNCTION**

I, Reginald Parker, declare as follows:

1. I am a trustee and chairman of the Board of Directors of Freedmen Green Bank & Trust ("Freedmen"). I have served in that role since January 2023. I have a B.S. in engineering from MIT, a Ph.D. in engineering from Georgia Tech, and a finance M.B.A. from Florida State University. At Freedmen, I am responsible for developing the transactional structure for the bank's community investments.

2. Freedmen is a nonprofit and charitable trust headquartered in Atlanta, Georgia; it was founded in January 2023, partially in response to the passage of the Inflation Reduction Act. Freedmen is a community lender that relies on Greenhouse Gas Reduction Fund ("GGRF") funds both to fund qualified projects and to support its operations. Freedmen serves communities in Georgia, Mississippi, and Alabama, and receives no funds from the Georgia, Mississippi, or Alabama governments.

3. The irreparable harm to Freedmen and the communities it serves that will result from the continued unavailability of GGRF funds is significant and actual, not theoretical. EPA's and Citibank's actions have already had irreversible, severe, and adverse effects on

1

Freedmen and its communities, both directly and distributionally. Unless the Justice Climate Fund ("JCF") is permitted to access its GGRF award and disburse committed funds to Freedmen, those effects will continue and worsen.

4. It is important to underscore that Freedmen is not impacted in isolation. Freedmen is part of the JCF network of roughly 270 community lenders operating throughout underserved (i.e., unbanked or underbanked) areas across the United States. JCF's community lenders rely on JCF and on each other to develop lending strategies and achieve economies of scale in providing our services, and we support each other in performing our services. For these reasons, while Freedmen is standing up for itself by providing this declaration, it is also necessarily standing up for our network of peer community lenders, many of which have communicated the fear of being targeted for standing up for their own missions and communities. We at Freedmen are also afraid, but we know that we must nevertheless speak up and speak out. I therefore provide this declaration to communicate the types of irreparable harm that we have suffered as a result of the EPA's efforts to defund and undermine JCF, Freedmen, our peer network, and our communities, and how that damage will only continue and be exacerbated unless a preliminary injunction issues.

### The Need for Community Lenders Like Freedmen

5. There is no serious question that banking underpins U.S. household stability, security, and prosperity. The FDIC, the federal agency that both insures American depositors and supervises financial institutions, is clear on these benefits: "Gaining access to credit and

establishing a credit history allow households to smooth consumption, build wealth, and weather financial shocks."[1]

6. The concentration of banking driven by consolidation and the digitization of finance has impaired the historical relationship between banks and their communities. FDIC data show that in 1994, the year the Community Development Financial Institutions Fund was created under the Riegle Act, there were 10,453 commercial banks spread across our country.[2] In 2024, that number fell to 3,928.[3] Bank closures tend to disproportionately affect rural areas that are less well-off economically, where residents are less educated and more likely to belong to racial and ethnic minorities.[4] And lower-income, disabled, and of-color Americans are more likely to be unbanked.[5]

7. Underserved people lack the safety net that banking affords and, because they are unbanked, are less likely to be able to weather customary financial shocks, particularly in a volatile economy where the costs of goods and services are in flux or rising. The unbanked often do have incomes, but still struggle to afford expenses that ordinarily require credit (like buying a reliable car to get to work or school), and are forced to make tough choices that have long-term consequences for their families.

---

[1] Federal Deposit Insurance Corporation, *2023 FDIC National Survey of Unbanked and Underbanked Households: Executive Summary* 17 (Nov. 2024), https://www.fdic.gov/household-survey/2023-fdic-national-survey-unbanked-and-underbanked-households-executive-summary.

[2] Federal Deposit Insurance Corporation, BankFind Suite: Annual Historical Bank Data, https://banks.data.fdic.gov/explore/historical?displayFields=STNAME%2CBANKS%2CASSET%2CDEP%2CEQNM%2CNETINC&selectedEndDate=2024&selectedReport=CBF&selectedStartDate=1994&selectedStates=0&sortField=YEAR&sortOrder=desc (last visited Apr. 14, 2025).

[3] *Id.*

[4] *See, e.g.*, Press Release, Bd. of Governors of the Fed. Rsrv. Sys., Federal Reserve Board Publishes Report on Bank Branch Access in Rural Communities (Nov. 25, 2019), https://www.federalreserve.gov/newsevents/pressreleases/other20191125a.htm.

[5] *2023 FDIC National Survey of Unbanked and Underbanked Households: Executive Summary*, *supra* note 1, at 2.

8. Community lenders like Freedmen are considered "the backbone of financial stewardship in underserved communities."[6] The reason that we are considered the "backbone" of underserved communities is that Freedmen, like its peer community lenders, has taken the time to understand our communities, build relationships, provide financial-literacy education, and develop products that respond to the needs of underserved communities. We work to solve real problems facing real people for whom our services are a lifeline.

9. Community lenders are thus faced with the task of figuring out how to surmount the barriers that face underserved communities—barriers that can persist even when traditional banks exist or arrive in the community.

10. Those barriers are both known and, we believe, surmountable. In a survey administered biennially to approximately 30,000 U.S. families, the FDIC seeks to identify the reasons for respondents' unbanked status.[7] The top two reasons given in 2023 by those in underserved communities are that they cannot afford the minimum account requirements (including to avoid fees that erode account values), and that they do not trust banks.[8] A significant proportion of the unbanked persons surveyed also noted that they are not able to access the services they need, even where banks are available to them.[9] These reasons resonate with Freedmen's own experiences and findings.

---

[6] Asia Salazar, Nicholas Bobst & Sabina Flandrick, *Four Things Community Lenders Realized about the Clean Energy Transition*, RMI (May 30, 2024), https://rmi.org/four-things-community-lenders-realized-about-the-clean-energy-transition/.
[7] *See generally supra* note 1.
[8] *Id.* at 3.
[9] *Id.*

**How GGRF Funding Helps Freedmen Serve the Unbanked and Underserved**

11. Freedmen was created to provide affordable capital access and technical assistance to low- and moderate-income communities in Georgia, Mississippi, and Alabama, with the mission to advance those communities' health, security, and prosperity. Freedmen does that by providing affordable financing of residential, small-business, and community projects, including weatherization, building-upgrade, and clean-energy projects. Freedmen focuses in particular on projects that underpin community resilience—for example, creating secure microgrids at churches that are havens for community members in regions facing extreme weather risks. By doing this, we create a pathway for communities to advance local jobs and community economic viability.

12. As a community lender, Freedmen operates as a direct lender to projects, using funds from public and private partners to provide lower-cost capital to finance qualified projects that, but for Freedmen, would not otherwise be able to obtain financing.

13. GGRF funding focused on clean-energy systems and housing upgrades allows Freedmen to address the barriers to banking in effective ways that would not exist without GGRF funding or its focus on energy burdens. The term "energy burden" refers to the percentage of a household's income spent on energy costs (electricity, heating and transportation fuel). An energy-burdened household pays at least 6% of its income on energy costs, twice the proportion of family income that an average American spends.

14. With GGRF funding, our affordable financing of clean energy technologies, such as solar on roofs and heat pumps that offset boilers and replace air conditioning, reduces that disproportionate burden, bringing savings to families' pockets—often, for the first time. These savings become the safety net underserved families need and, like all safety nets, can transform

lives and livelihoods by allowing low-income families to weather financial events that would otherwise be destabilizing.

15. Our financing of clean energy systems also reduces the adverse health effects of, for instance, older boilers ubiquitous in low-income communities, improving family health and reducing health care costs.

16. At Freedman, we are able to use GGRF funds to: (1) lower the cost of entry to banking, eliminating minimums and needless fees and returning a higher interest rate on accounts than traditional banks; (2) take the time and effort to be an aligned partner, building trust via extensive community outreach, in which we communicate shared respect and the benefits of our reasonable underwriting of clean energy systems (with our outreach and staffing paid for, in large part, by GGRF technical assistance funds); (3) using technical assistance funds, provide financial literacy education to communities and to the contractors who serve them through our Freedom Academy; and (4) focus on streamlined, affordable, clean-energy loans that are structured to reduce monthly costs, creating savings that enable once energy-burdened families, businesses, and communities to thrive.

## Freedmen Will Be Irreparably Harmed If JCF Does Not Soon Regain The Ability To Disburse Its GGRF Funds

17. Freedmen is part of a consortium application that has been selected to receive grants from several primary recipients of GGRF awards, including JCF. Freedmen was selected to receive capitalization funding (financial assistance) of approximately $9.9 million in concessionary loans from a GGRF recipient that is focused on advancing green banks, and was also selected—but has not yet entered into contracts— to receive technical-assistance funding of approximately $450,000 from JCF and other GGRF awardees. The capitalization funding is to be

disbursed to finance qualified projects, and the technical-assistance funds are essentially working capital, critical to Freedmen's ability to function.

18. Technical-assistance funds are startup capital essential to funding Freedmen's operations. And because the technical-assistance funds JCF has obligated to Freedmen are in the form of a grant (rather than a loan), those funds will enable Freedmen to make its financing more affordable. The technical-assistance funds JCF has committed to Freedmen grants are thus critical to Freedmen, which is unfunded by the states in which it is located. Unless those funds are restored soon, Freedmen will be unable to continue in operation.

19. In preparation for receiving and deploying the awarded funds, Freedmen developed an extensive qualified-project pipeline of energy-saving upgrades to, and clean-energy microgrids at, churches, community centers, and nursing homes. These projects enable the facilities to save money on utilities and to be secure in the face of outages—for example, from major storm events common in these states. Demand for these projects exceeds available funds, and every dollar of funding matters to Freedmen and its communities.

20. In reliance on the promised receipt of funds from JCF that would sustain Freedmen's operations, Freedmen has taken numerous and substantial steps to engage with Freedmen's communities in Georgia, Mississippi, and Alabama to effectively advance projects, to stand up the institution to successfully underwrite affordable community loans, to obtain appropriate permitting, and to develop a high-quality, high-impact pipeline of qualified projects that meet the GGRF requirements. For example, Freedmen designed its assessment, underwriting, and financing systems (including all policies and protocols), developed its ability to mobilize private capital (through hundreds of meetings with capital providers), and designed the models

under which Freedmen has solicited and analyzed applications for low-cost financing. These efforts represent tens of thousands of hours of work by Freedmen staff.

21. EPA's and Citibank's actions in failing to disburse GGRF funds on the recipients' instructions have erected formidable barriers to Freedmen's success as a going concern. Those barriers are both operational and reputational, and unless the funding is restored soon, the damage will be irreparable.

22. Operationally, the freeze of GGRF funds, and of JCF's funds in particular, has meant that Freedmen has not received its awarded technical-assistance funds to support its daily operations. As a new enterprise focused on community development, Freedmen has few alternative sources of traditional funding. Freedmen's GGRF awards represented a transformative infusion of capital that was and is essential to Freedmen's future—its reputation, its growth as a business, and its enduring legacy. Unless the JCF funds are restored and disbursed soon, Freedmen will have to drastically scale back its business model and may well have to close its doors.

23. Prior to the freezing of JCF's funds, Freedmen approved the applications of numerous project sponsors for low-cost financing for their qualified projects. In so doing, Freedmen committed to the successful applicants that the financing for which they had been approved would in fact be provided. In order to make good on that promise, Freedmen must be able to continue in operation—something it cannot do without the committed technical-assistance funding from JCF.

24. The reputational harm done to Freedmen by the funding freeze presents an independent existential threat. While Freedmen currently has sufficient funds to begin financing some approved projects, a key factor in the success of Freedmen's projects—and thus its own success—is the mobilization of private capital. As a result of the funding freeze, private investors

have expressed significant reservations about involvement in Freedmen's work, and that involvement has slowed. This chilling of private-capital investment compromises Freedmen's ability to make good on its commitments to project sponsors.

25. Freedmen's inability to provide all the financing it promised to project sponsors is already doing significant harm to its reputation, and that harm will be magnified the longer it persists. As a green bank in a red state, Freedmen already faces skepticism. We have had to work hard to build relationships and to earn a reputation as a trustworthy, reliable lending institution. The funding freeze is damaging Freedmen's hard-won reputation for trustworthiness and reliability—qualities that all consumers consider essential in their lenders.

26. Freedmen's reputation is even more important to its success than that of a mine-run lender. Every day that we are delayed in deploying GGRF funding adds to the weight of the objective setbacks we face within our communities as a result of the funding freeze. The community trust we have worked so hard to build—trust in our ability to deliver affordable financing—is damaged, in ways that feed directly into these communities' preexisting perceptions about banks. That dynamic makes our work much harder. And we are set back in our efforts to reduce costs and increase our capacity by featuring our successes—community members sharing with others their experiences with Freedmen and with the clean-energy installations Freedmen would finance. The loss of these symbols of success means that Freedmen appears less effective than we could be had EPA not undertaken to defund and delay our work. That reputational effect is direct, but its knock-on effects to communities will delay adoption and therefore achievement of GGRF's mission of making low-income communities more secure, healthier, and better able to gain access to the middle class.

27. If Freedmen is unable to regain access to its technical-assistance award soon, it will likely fail—and its failure would, in turn, have reputational impacts across this community-lending sector. Failures of institutions like Freedmen have an outsized effect: Consistent with congressional intent, first movers like Freedmen are attempting to prove the feasibility of providing low-cost funding for energy- and cost-saving projects that benefit low- and moderate-income communities. Undermining Freedmen casts a long shadow on community lending.

28. Further, EPA's and Citibank's public positions have created uncertainty and fear among community lenders and project sponsors that they will be threatened with costly litigation in connection with their participation in the process. The chilling effect of EPA's and Citibank's actions independently impede Freedmen's ability to fulfill its and Congress's joint mission.

29. Even more important to Freedmen than its own irreparable harm is the profoundly adverse impact to its qualified project sponsors and communities of this funding freeze.

30. The small businesses and community organizations whose projects Freedmen's capital would finance have, like Freedmen, acted in reliance on receipt of the funds, and those projects cannot survive long without them.

31. It is the customary practice of the small-scale installation and construction businesses that support community solar to purchase materials, like solar panels, in tranched payments. Some of our project sponsors have already purchased one or more tranches of materials, and have made commitments to purchase more, in reliance on their receipt of committed financing from Freedmen to make further payments. Without access to their promised financing, these customers are currently either unable to make good on their own commitments to purchase further tranches or, where they can afford to continue making payments, are scrambling to find places to store the materials they have purchased but cannot afford to use. If their inability to access

Freedmen's financing continues for too long, the relationships our customers have built with their suppliers and contractors will sour along with those we have built with our customers.

32. The length of the delay is a critical consideration, because protracted delays have multiple spillover effects.

   a. Restarting the projects will become difficult or impossible even if alternative sources of funding later materialize, because the trust in the project's momentum and therefore viability will have been squandered.

   b. If delays are protracted, underwriting will need to re-occur, both for prudential investment reasons and because projects costs would be expected to change, which can be costly and compound the attrition burden that small projects face.

   c. Equipment may need to be resold to reduce immediate burdens and losses, with the result that projects are essentially pushed back to an early stage of development and with additional imbedded debt. These funds are funds our customers cannot afford to lose. They certainly cannot afford to pay for any part of a project twice—once through a lost deposit, and again if and when financing becomes available many months down the road.

33. In sum, because EPA and Citibank have frozen the promised funds and have yet to release them, our customers' projects are at risk of never being completed.

34. The communities these projects were intended to benefit are also at risk of irreparable harm unless EPA and Citibank release GGRF funds, thus permitting primary GGRF recipients like JCF to enable Freedmen to spend its obligated funds.

35. The cost to our communities is dangerously high. In much of the underserved Deep South—where Freedmen operates—air conditioning is a luxury, utility outages are

common, and extreme weather events can leave communities without electricity for days and sometimes weeks. For example, according to the National Oceanic and Atmospheric Administration, the annual average number of disasters in Georgia with losses exceeding $1 billion was 9.8 events between 2020 and 2024, making such events effectively routine.[10] The frequency and magnitude of these events has increased in recent years.[11] But with our financing of clean-energy systems—which create micro-grids that allow community churches and schools to keep the lights, heat, and air conditioning on—these outages and interruptions have a lower impact on our communities, causing less economic turmoil and heartache.

36. Our financing focuses on community energy security, including the installation of solar panels on churches and nursing homes, which would permit those places to be energy-independent safe havens for residents and community members in the aftermath of a storm. Unless our funding is restored soon, those projects cannot be completed in time for this year's storm season.

37. The risks to communities outlined above are, ultimately, risks to individuals. Without the immediate restoration of JCF's funding support, projects that would improve, sustain, and save life cannot proceed as scheduled. Oxygen machines that would be powered by solar panels during a blackout will turn off. Essential medications that require refrigeration will warm and spoil. The jobs that would be created in low-income communities will not materialize, and low-income families' energy spending will remain disproportionately high. Further delay will irreparably harm the health and wellbeing of the most vulnerable individuals in our society.

---

[10] Billion-Dollar Weather and Climate Disasters: Georgia, National Oceanic and Atmospheric Administration, https://www.ncei.noaa.gov/access/billions/state-summary/GA (last visited April 10, 2025).
[11] *See id.*

\*\*\*

I declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Executed this 15th day of April, 2025, in Atlanta, Georgia.

_____
Dr. Reginald Parker