UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CLIMATE UNITED FUND**<br>7550 Wisconsin Avenue 8th Floor<br>Bethesda, Maryland 20814<br><br>                          Plaintiff,<br><br>    v.<br><br>**CITIBANK, N.A.,**<br>5800 South Corporate Place<br>Sioux Falls, South Dakota 57108,<br><br>    and<br><br>**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**<br>1200 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20460,<br><br>    and<br><br>**LEE ZELDIN, in his official capacity as ADMINISTRATOR, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**<br>1200 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20460<br><br>                          Defendants. | ECF CASE<br><br>No. 1:25-cv-00698 |

**DECLARATION OF ELIZABETH BAFFORD IN SUPPORT OF
CLIMATE UNITED FUND'S OPPOSITION TO STAY MOTION**

I, Elizabeth Bafford, declare as follows:

    1.    I am the Chief Executive Officer of Climate United Fund ("Climate United"). I have managed Climate United since its inception in October 2022 and have worked at Climate United's parent entity since January 2014. In my current role, I am responsible for managing all

1

Climate United operations, including staffing and administration, coordination with third-party vendors, and administering financing programs operated by Climate United. I am also responsible for overseeing the management and allocation of funds awarded by the Environmental Protection Agency ("EPA") through its National Clean Investment Fund ("NCIF") in accordance with our EPA-approved workplan.

2. For these reasons, I have personal knowledge of the facts and information in this declaration.

3. I respectfully provide this declaration to detail the ways in which Climate United's reputation, mission and programs will continue to be imminently and irreparably harmed if the Court stays its order deciding Plaintiffs' motion for preliminary injunction. In addition, this declaration describes how Climate United will suffer particularly acute irreparable harm if this Court stays distribution of funds necessary to allow Climate United to continue to operate while this case proceeds, and stays distribution of funds related to requests made *prior to* EPA's purported termination on March 11, 2025—funds which I understand Climate United is entitled to receive regardless of the outcome of the merits of this case. These pre-March 11 requests as well as post-March 11 requests, and the details of these requests are detailed in Exhibit A attached to this declaration.

4. This declaration supplements my March 21, 2025 declaration submitted in support of Climate United's motion for a preliminary injunction, and is intended to provide detail on additional developments postdating that declaration.

**Continued Irreparable Impact on Climate United's Operations**

5. My March 21 declaration detailed the impact on Climate United's operations if Climate United does not promptly regain access to the funding provided by the NCIF Award. Those harms will continue to persist if the Court stays any preliminary injunction.

6. Climate United relies on the NCIF Award to pay payroll, health, vision, and dental benefits, life insurance, and short- and long-term disability insurance for its employees. As I explained in support of the motion for preliminary injunction, to preserve its available cash, since March 1, 2025, Climate United has already deferred 40% of compensation for senior staff because the temporary stopgap funding Climate United received was not enough to cover its operations. This significantly harms Climate United's ability to retain employees, as reflected in my March 21 Declaration.

7. Since March 21, one employee has left Climate United and others have notified Climate United that they are currently looking for other employment given the reduction in pay and uncertainty raised by our inability to access funds. A stay of any preliminary injunction with the potential for additional weeks or months without funding injects a consequential level of additional uncertainty which we anticipate will significantly accelerate staff departures. These are talented individuals with personal relationships with portfolio partners and specialized skillsets that took many months to identify and onboard. They cannot be replaced easily, if at all. If they leave Climate United, I believe that they will not return and that any others who might potentially serve as replacements will not be willing to consider joining Climate United.

8. Climate United relies on the NCIF Award to pay rent for its offices, including monthly rent payments. It also relies on the award to pay insurance. Notably, Climate United has received an invoice for its annual Directors and Officers and Errors and Omissions liability

insurance renewal which is due on May 31, 2025. This insurance protects Climate United's directors and officers from legal defense costs and personal financial losses if they are sued for alleged wrongful acts or omissions in their official capacity, even if those allegations have no merit. If Climate United is not able to fund that insurance payment, I believe it creates a serious risk that Climate United's officers and board members – who are uncompensated volunteers – will resign because they will not be willing to continue to serve as officers and directors if it could open them up to potential legal defense costs and personal liability. This risk is heightened by the fact that litigation is ongoing and that EPA has made multiple baseless and unfounded allegations about Climate United engaging in purported waste, fraud, and abuse related to its NCIF grant funds.

9. Climate United relies on the NCIF Award to pay third-party contractors who perform necessary services. As I explained in support of the motion for preliminary injunction, Climate United has already been required to terminate multiple vendors, cancel travel, and instruct non-essential contractors to cease work. The stopgap funding Climate United received was not enough to cover these expenses. This is causing significant disruption in our ability to carry out our responsibilities under the grant, including our compliance and community outreach work, and harming our partners who have done significant uncompensated work to prepare for implementation of this program.

**Continued Irreparable Impact on Climate United Subgrantees**

10. In addition, Climate United's subgrantees are facing similar pressures, which will impair their future ability to partner with Climate United on its projects. For example, one of Climate United's subgrantees recently executed a reduction in force on April 10, 2025 impacting a majority of its staff, due to budget constraints caused by no longer having access to the funds it was relying on from Climate United's subgrant. This reduction involved laying off 8 people and

reallocating 5 people to other business units that are not involved in implementing Climate United projects. Even if Climate United ultimately obtains access to its NCIF funds, it will therefore have to invest additional resources to rehire, onboard, and train employees to carry out its original workplan, causing delays in implementation for the overall program.

**Continued Irreparable Impact on Climate United's Programs and Mission**

11. My March 21 declaration detailed the impact on Climate United's existing programs if Climate United does not promptly regain access to the funding provided by the NCIF Award. Those harms will also continue to persist if the Court stays any preliminary injunction.

12. Climate United relies on the NCIF Award to be able to meet its commitments under subawards that it has already approved, as well as existing lending programs. Because it has not been able to access its NCIF funds, Climate United has been required to spend significant time identifying alternative capital sources for partners in its immediate pipeline and anticipates needing to do that going forward if the Court stays a preliminary injunction. If Climate United is unable to identify additional sources to bridge its funds, those projects could unwind altogether, and some may never be reassembled. This includes financing for solar projects that, if not completed in the near term, could lose their ability to operate because of changes in state regulation that have since made solar development economically infeasible. These already committed projects are projected to save significant energy costs for public schools, small businesses, and rural municipalities, create local jobs, and collectively drive over $100 million in local economic activity.

13. Climate United will be unable to finance programs it has already launched, including all of the projects and programs mentioned in my previous declarations. We will be in default of our loan agreements with multiple borrowers with unfunded balances and we will not

be able to make commitments to partners and borrowers who have spent weeks of uncompensated time responding to open and competitive requests.

### **Continued Irreparable Impact on Climate United's Reputation**

14. Finally, my March 21 declaration detailed the impact on Climate United's reputation caused by Climate United not having ready access to its NCIF funds. Climate United's ability to enter into lending and financing agreements, and to attract co-investment for those projects, relies on Climate United's reputation as a steady business partner. These harms, too, will persist if the Court stays a preliminary injunction.

15. As I explained in my March 21 Declaration, Climate United had already begun receiving input from current and prospective partners indicating that they were no longer going to engage with Climate United while the status of its funding was uncertain. Since March 21, Climate United has heard from additional current and prospective partners about similar concerns. Numerous partners have gone pencils-down on dealing with Climate United, impairing our ability to build trust in the market and execute on impactful projects and programs, particularly in communities that have often been left behind by traditional financial institutions.

16. In my March 21 Declaration, I stated that Climate United would receive increasingly unfavorable terms from vendors and prospective portfolio partners if access to NCIF funding was not restored. With our funding frozen for two months, we have experienced the harm I feared. As Climate United has informed EPA, almost all professional services vendors including its accountants and all legal counsel have required that Climate United either fund retainers or fixed fee arrangements at the onset of an engagement. Climate United also has outstanding and overdue invoices owing to vendors and such vendors have ceased work pending payment of those outstanding amounts. Climate United's portfolio partners have required upfront funding of all

commitment amounts into partner-owned accounts to ensure that funding will be available for the entirety of the project. No one wants a half-built project.

**Impact of Alternatives to Full Access to Funds**

17. I understand that in deciding the motion for preliminary injunction, this Court may consider modifying or limiting the scope of the Temporary Restraining Order it previously issued. Only full funding will be sufficient to address all of the harms identified above. However, at the very minimum, Climate United could likely survive the duration of this litigation if the Court restores Climate United's access to funding for its operations and does not correspondingly stay that order. And regardless, this Court should require disbursement of funds for expenses Climate United validly incurred prior to EPA's purported termination on March 11, 2025, because Climate United is entitled to those expenses even if EPA's termination is ultimately found to be valid.

18. In the preliminary injunction hearing, the Court asked how much funding would be required to allow Climate United to solely "continue operations," but not necessarily to finance projects. To fully cover operational expenses for the next six months—including payroll for employees, rent, insurance, payments to essential contractors, and other necessary expenses—Climate United would need access to at least $25 million in funding for itself and its coalition partner subgrantees. This would save Climate United and its partners from being forced to wind down operations before this case can be litigated to final judgment. Although this amount would not permit Climate United to continue any of its active projects and advance its mission—the very reason for Climate United's existence and for the NCIF funding—and thus would still force Climate United to suffer irreparable harm, it would at least allow Climate United to survive.

19. In addition, the irreparable harm Climate United and its partners are suffering could be mitigated at least somewhat if the Court were to order processing of $6,347,303.87 in draw

7

requests and disbursements related to Climate United's grant funds that included expenses incurred as of March 11, 2025. *See* Exhibit A. Although that amount would not be sufficient to cover operating expenses for the duration of this litigation, it would at least allow Climate United and its partners to keep the lights on for approximately 2 months.

20. As of March 11, 2025, there were an additional $292,250,000.00 in draw requests pending to finance legally committed projects. *See* Exhibit A. Because these requests were made before EPA purported to terminate Climate United's grant on March 11, 2025, my understanding is that Climate United is entitled to these funds regardless of whether the termination is considered effective. In other words, my understanding is that even if this Court lacks jurisdiction over Climate United's claims, and even if the Court of Federal Claims were to find EPA's termination is valid, and even if EPA were able to complete the closeout process, Climate United would *still* be entitled to this funding.

21. Finally, I note that the Court initially granted a temporary restraining order that did not allow Climate United or any of the other plaintiffs immediate access to the funds in their Citibank accounts, but enjoined Defendants from moving those funds away from those accounts. Under no circumstances should these funds be permitted to go back to Treasury while this litigation is pending. That would allow Climate United to have immediate access to those funds upon a final resolution of this litigation in its favor. It would also prevent Defendants from transferring those funds to other potential recipients. EPA has already stated its intent to re-obligate grant funds to other recipients. Preventing transfer of the funds from Climate United's accounts would also protect Climate United from being unable to recover the funds if they were transferred to another government entity, such as the Department of the Treasury.

**Status of Stopgap Charitable Grants**

22. As previously stated, funds available to cover operations from the NCIF grant were exhausted within 14 business days of the freeze given the structure of our Terms and Conditions. Since then, Climate United Fund has been operating on limited cash reserves and stopgap charitable grants and loans to cover costs. As outlined above, Climate United Fund has cut its monthly costs to only costs essential to maintaining its existence – primarily salaries, limited legal expenses, rent and essential IT costs. Even with these drastic reductions, the stopgap grants received will only allow us to maintain our existing staff for approximately an additional one to two weeks. Failure to be able to access funds would force us to furlough or terminate employees, terminate our rent agreements, and terminate other remaining monthly expenses like IT contracts.

* * *

I declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Executed this 15th day of April, 2025, in Bethesda, Maryland.

*/s/ Elizabeth Bafford*
ELIZABETH BAFFORD, CEO
Climate United Fund