UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CLIMATE UNITED FUND**<br><br>                    Plaintiff,<br><br>     v.<br><br>**CITIBANK, N.A.**, *et al.*<br><br>                    Defendants. | Civil Action No. 25-cv-698-TSC<br>Civil Action No. 25-cv-735-TSC<br>Civil Action No. 25-cv-762-TSC<br>Civil Action No. 25-cv-820-TSC<br>Civil Action No. 25-cv-938-TSC<br>Civil Action No. 25-cv-948-TSC<br>(Consolidated Cases) |

## DECLARATION OF TIMOTHY J. MAYOPOULOS

I, Timothy J. Mayopoulos, declare as follows:

1. I am the President and Chief Executive Officer of Power Forward Communities, Inc. ("PFC"). The statements made in this declaration are based on my personal knowledge, materials I have reviewed, and information made available to me pursuant to my duties at PFC.

2. This declaration supplements my March 21, 2025 declaration submitted in support of Plaintiffs' motion for a preliminary injunction and provides detail on additional developments postdating that declaration concerning the ways in which PFC will continue to be imminently and irreparably harmed if the Court's preliminary injunction order is stayed. In addition, this declaration provides detail regarding amounts needed for PFC to keep its doors open and to continue to operate while this case proceeds, including the total amount of expenses that PFC and its subrecipients Enterprise Green Accelerator, Inc., LISC Green LLC, and Rewiring Community Investment Fund, Inc. (collectively, the "subrecipients") incurred prior to receiving EPA's Notice of Termination on March 11, 2025. The disbursement instructions outlining expenses incurred by PFC and its subrecipients on or before March 11, 2025 are listed in Exhibit A attached to this declaration.

1

**Continued Irreparable Impact on PFC's Operations**

3. Since Defendants suspended PFC's accounts in mid-February 2025 and purportedly terminated PFC's award on March 11, 2025, PFC has searched for a source of funding to replace the NCIF award. That search has not yet been successful, and PFC remains without a committed source of alternative funding.

4. My March 21 declaration detailed the likely consequences for PFC's operations if PFC did not promptly regain access to its funds. PFC continues to suffer the harms identified in my prior declaration, including but not limited to: the reputational harm from the purported termination of the NCIF grant and uncertainty regarding PFC's ability to satisfy current and future financial obligations; the inability to pay contractors essential to PFC's operations; the pause in hiring necessary staff; the threat that PFC will be unable to pay its staff; and PFC's inability to fulfill its obligations under the NCIF program.

5. Moreover, without access to its NCIF funding, PFC remains unable to carry out its mission, including the important projects PFC has committed to deliver to the American public. Those projects are now in jeopardy because PFC cannot meet its commitments. *See, e.g.*, R. French & J. Hinkley, *Michigan drug recovery, worker housing in limbo after Trump funding freeze* (Apr. 3, 2025), available at https://www.bridgemi.com/michigan-health-watch/michigan-drug-recovery-worker-housing-limbo-after-trump-funding-freeze.

6. PFC is at imminent risk of having to lay off its staff and close its doors for good.

**Impact of Access to Operational Expenses**

7. A return to the status quo ante, i.e., normal access to PFC's funds, is necessary to address the harms identified above and in my March 21 declaration. However, PFC could likely at least keep its doors open during this litigation if (a) Citibank honored PFC's and its subrecipients' disbursement instructions for expenses incurred prior to the purported termination

2

on March 11, 2025 and (b) PFC were permitted to access the funds necessary to maintain operations for the next six months.

8. With respect to expenses incurred by PFC and its subrecipients before March 11, 2025, I understand that PFC and its subgrantees are entitled to reimbursement of allowable costs they incurred before EPA sent the Notices of Termination. Under the Grant Agreement, Plaintiffs may spend and draw funds for allowable costs to support activities contemplated by their awards. *See* Grant Agreement § V.A.3 (providing that Recipient may "use the award to support [certain] allowable activities" and authorizing Recipient to transfer funds out of Deposit Account for those purposes). Moreover, the applicable federal regulations and Grant Agreements entitle Plaintiffs to certain funds even *after* termination. Although costs incurred post-termination are generally "not allowable," such post-termination costs "*are* allowable if: (a) [t]he costs result from financial obligations which were properly incurred . . . before the effective date of . . . termination, and not in anticipation of it; and (b) [t]he costs would be allowable if the Federal award . . . expired normally at the end of the period of performance in which the termination takes effect." 2 CFR 200.343 (emphasis added), *accord* Grant Agreement § III.S. The effective date of termination for these purposes is March 11, 2025, the date of the Notices of Termination, which purported to terminate each Plaintiff's NCIF award "effective immediately." Accordingly, even if EPA were to prevail in this action, I understand that PFC would nevertheless be entitled to funds to cover all allowable costs incurred *pre*-termination, as well as to funds corresponding to certain *post*-termination costs.

9. PFC and its subrecipients incurred $4,598,722.89 in expenses prior to EPA's purported termination of the NCIF program on March 11, 2025, for which it has not been

reimbursed.  *See* Exhibit A.  PFC and its subrecipients have submitted disbursement instructions for all these expenses.  To date, Citibank has not fulfilled those disbursement requests.

10. Of the $4,598,722.89 in expenses incurred before March 11, 2025, only $771,294.53 are expenses that PFC and its subrecipients can readily determine were wholly incurred before February 13, 2025, the date that Citibank first froze the accounts.  *See id*.

11. Consistent with their ordinary practice, PFC and its subgrantees frequently submitted disbursement instructions for total expenses incurred during a period of one month or two months.  Some of these periods began before February 13, 2025 and ended after that date. *See id*.  For instance, on April 8, 2025, PFC submitted a disbursement instruction for expenses incurred between December 1, 2024 and February 28, 2025.  Thus, the vast majority of this request encompasses expenses incurred before Citibank implemented a freeze on PFC's funds on February 13—and *all* of this request corresponds to expenses incurred before the purported termination.  Of the $4,598,722.89 in expenses incurred by PFC and its subrecipients before March 11, 2025, $3,847,137.44 are expenses that were incurred at least in part before Citibank froze the accounts of PFC and its subrecipients on February 13, 2025.  *See* Exhibit A.

12. Since March 11, 2025, PFC has incurred approximately $500,000 in additional operating expenses.  PFC has not yet submitted disbursement instructions to Citibank for these expenses but intends to do so in accordance with its ordinary practice.

13. In the preliminary injunction hearing, the Court asked how much funding would be required to allow Plaintiffs simply to "continue operations," even if they could not finance projects.  To fully cover operational expenses for the next six months—including paying for outstanding expenses and for payroll for employees, insurance, payments to essential contractors, and other necessary expenses moving forward—PFC would need access to at least

4

$8,548,722.89 in funding for itself and its coalition partner subgrantees. That amount represents a miniscule fraction of PFC's grant award, totaling only 0.4% of the full $2 billion award, and only 8.1% of the EPA-approved budget of $105 million for PFC program oversight and administration. Receipt of this amount would save PFC and its partners from being forced to wind down operations before this case can be litigated to final judgment. Although this amount would not permit PFC to continue its active projects or advance its mission, and thus would still cause PFC irreparable harm, it would at least allow PFC to survive.

I declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge. Executed this 17th day of April, 2025.

_____
Timothy J. Mayopoulos